**FILED**

APR 1 0 2007

NANCY MAYER WHITTINGTON, **CLERK**
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Case: 1:07-cv-00654
Assigned To : Lamberth, Royce C.
Assign. Date : 4/10/2007
Description: ELEMARY v. HOLZMANN

DR. HODA ELEMARY,
*21 Leconte, Laguna Niguel, CA 92677*
*(949) 7152022* Plaintiff,

vs.

PHILIPP HOLZMANN A.G., a German *41 HESS STRASSE, Frankfurt, Germany*
corporation; WACHOVIA BANK, N.A., a *301 South Call Street, 8th Fl.*
national banking association; B.L. HARBERT *one Wachovia center charlotte N.C.*
INTERNATIONAL, LLC, a Delaware *820 Shade creek parkway Bir.hAm AL 35209*
limited liability company; SABBIA *Handelman 2820*
AKTIENGESELLSCHAFT, a Liechtenstein *Trisen, Liechtenstein* -9485
corporation; HARBERT INTERNATIONAL *375 Mohin*
ESTABLISHMENT, INC., a Liechtenstein *Trisen, Liechtenstein*
corporation; BILL L. HARBERT, SR.; and
BILLY HARBERT, JR.,
*820 Shade creek parkway, Birmingham, AL 35209*

Defendants.

1. **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
2. **BREACH OF CONTRACT**
3. **QUANTUM MERUIT**
4. **TERMINATION IN VIOLATION OF PUBLIC POLICY**
5. **SUPPRESSION OF FACTS (FRAUD)**
6. **VIOLATION OF 18 U.S.C. §1964 (CIVIL RICO)**
7. **VIOLATION OF 18 U.S.C. §1964 (CIVIL RICO)**

**DEMAND FOR JURY TRIAL**

## JURISDICTION AND VENUE

1.    This Court has original jurisdiction under 28 U.S.C. §1332, in that

Plaintiff DR. HODA ELEMARY ("Plaintiff") is a citizen of the State of California,

while defendant PHILIPP HOLZMANN A.G. is a German corporation having its

principal place of business in the Republic of Germany; defendant WACHOVIA

BANK, N.A. is a national banking association having its designated main office in the

State of North Carolina; defendant B.L. HARBERT INTERNATIONAL, LLC is a

Delaware limited liability company having its principal place of business in the State

1

of Alabama; defendant SABBIA AKTIENGESELLSCHAFT is a Liechtenstein corporation having its principal place of business in the Duchy of Liechtenstein; defendant HARBERT INTERNATIONAL ESTABLISHMENT, INC. is a Liechtenstein corporation having its principal place of business in the Swiss Confederation; and defendants BILL L. HARBERT, SR. and BILLY HARBERT, JR. are citizens of the State of Alabama (collectively hereinafter, "Defendants"). The matter in controversy exceeds, exclusive of interest and costs, the sum of Seventy-Five Thousand Dollars.

2.      Venue is proper in this district because the overwhelming majority of witnesses and events or omissions giving rise to the claim occurred in this district. Plaintiff was the exclusive manager of two actions brought in this District. All of the meetings, settlement conferences at the District Court, in which Plaintiff led a cadre of attorneys to present the Harbert case, and related negotiations took place in this District. Moreover, witnesses of thirty meetings that took place in this District, including officials of the Department of Justice (Carolyn G. Mark and Keith Morgan), can conveniently testify in this District but may be unable to testify in another District.

3.      The Court's determination on jurisdiction and venue is paramount to an equitable resolution of the instant case, as expounded hereinbelow under the heading "Forum Determination." Accordingly, the particular security concerns applicable to this action are stated by United States Senators and inherent in Defendants' physical threats.

2

4.    Jurisdiction and venue are proper in this District because Plaintiff and primary Defendant Bill L. Harbert, Sr. ("Mr. Harbert Sr.") were counseled in this District to have an agreement (the "November 3 Trust") upon which this Complaint is based, that expressly conveyed their will for jurisdiction and venue.  A true and correct copy of this document (the "November 3 Trust") is attached hereto as Exhibit "A" and incorporated herein by this reference.  Mr. Harbert was eager to first choose the Western Division of the Central District of California with respect to personal jurisdiction and venue and to establish a $3 million penalty to discourage any challenge of his choice in this matter.  However, in a separate letter which the parties executed on January 7, 2004, the parties agreed that the proper and second choice for venue is the United States District Court for the District of Columbia.  Mr. Harbert Sr. wished to shield Plaintiff from his son, Billy Harbert, Jr.'s pattern of placing his adversaries in the cross-fire of his physical abuse and renowned verbal battles with his father over the finances of their construction business.  On this basis, Mr. Harbert Sr. wished to settle the question of jurisdiction and venue to curb his son's flaring temper from causing damage to Plaintiff primarily in Birmingham, Alabama, where his son lives, establishing contacts with mercenaries and thugs.  The United States has exerted a great deal of effort to protect Plaintiff, who, according to documents from the White House and the National Security Council has enhanced U.S. national security by making " . . . her unique contributions to the formulation of the United States government's policies in the Middle East . . . and the education of the American

3

public about Middle East issues." Senator Dianne Feinstein also stated, "It is based

on the vital services Ms. Elemary provides Congress, which have been determined to

serve U.S. national interests. A majority of the United States Senators have

overwhelmingly endorsed Ms. Elemary's work and have credited her with playing a

pivotal role in lobbying the Congress to support Operation Desert Storm, as it did on

January 12, 1991 . . . ." This letter is displayed in Exhibit "E."

## FORUM DETERMINATION

5.    On July 28, 2006, Plaintiff filed in the Central District of California a

related case no. CV06-4723 RGK (PJWx) to the instant case with a substantially

different makeup of the causes of action and list of Defendants. On February 23,

2007, the Honorable R. Gary Klausner transferred venue to the Northern District of

Alabama. On March 22, 2007, in Birmingham, Alabama, the Honorable William M.

Acker, Jr. closed the case following Plaintiff's voluntary dismissal of her above-

referenced case. The law provides that a case dismissed without prejudice may be re-

filed in another District. Plaintiff filed this related but different case in this District.

However Defendants may argue the similarity of the cases, the law does not prohibit

Plaintiff from re-filing even the same case.

6.    An overwhelming majority of the witnesses and events in the instant case

occurred in the District Columbia and Los Angeles, California. There is only one

Defendant from the State of Alabama, whose health allows him to undergo discovery

and trial in this matter in accordance with the District Court's ruling in a recent case

on the health conditions of the other Defendants. Request for Judicial Notice has therefore been filed concerning the lack of reasons to transfer this case to the Northern District of Alabama. More importantly, from a legal point of view, determining venue and jurisdiction to be proper in the Northern District of Alabama would constitute denial of justice by subjecting Plaintiff and counsel to litigate their case while being placed under intolerable life-threatening conditions that will obviate Plaintiff's ability to continue to freely pursue or receive a resolution through the judicial system. Thus, in such a case Plaintiff would have been deprived of the "equal protection" of the laws under the United States Constitution by being compelled by a judicial body to chose between life or justice. It is evident that the choice between life or justice was not the intent of the architects of the Constitution.

7.      This Court has not yet ruled on two counts of violation of 18 U.S.C. §1964 (civil RICO). The law provides for judicial bodies to err on the side of safety. Until the Court adjudicates Plaintiff's two counts of Civil Rico against Defendants to determine the validity or lack thereof of Plaintiff's claim, the Court is obligated under the Constitution to provide security for the aggrieved citizenry, who seek to be made whole. The Court would have to overlook fundamental principles of justice to place the lives of Plaintiff and her counsel in harm's way by transferring venue to the Northern District of Alabama, where the Court has been notified that Plaintiff's earlier counsel's life was targeted by Defendants and Plaintiff was violently assaulted shortly after her counsel survived, but was left disabled. Neither Plaintiff nor her attorneys

5

are willing to risk their lives becoming scapegoats for another round of violence by Defendants. Plaintiff and her counsel will not go to the Northern District of Alabama to become a statistic. With a single Alabama Defendant, there is no reason to transfer venue to the northern District of Alabama.

## FACTS COMMON TO ALL CAUSES OF ACTION

8.      Plaintiff's action is in support of and arises in part out of the transactions stated in the United States' false claims case, Civil Action No. 95-1231 (RCL/JMF) currently in trial in the United States District Court for the District of Columbia (the "False Claims Case"), which cites the primary defendants named in this action for bid-rigging government contracts.

9.      Mr. Harbert Sr.'s payment of $54 million to satisfy a criminal fine imposed by the United States in the plea agreement in an anti-trust case (half of which came from his personal account) for bid-rigging government contracts was paid in installments beginning on February 4, 2002. The United States consequently began prosecuting the False Claims Case on the same subject matter. Plaintiff was then contracted by Defendants to delay the prosecution of the False Claims Case for a period of approximately four years on terms stipulated in the November 3 Trust, which Plaintiff did. Plaintiff was also contracted to negotiate a settlement, which Plaintiff also did.

10.     In a written document, Mr. Harbert Sr. approved the payment of a $15 million settlement to the United States negotiated on March 15, 2005. However, his

son Billy Harbert, Jr. declined to obey his father's wishes and refused to make the

payment to the United States to avoid paying Plaintiff her substantial success fee to

which she was entitled under the September 21 Agreement (hereinafter defined).  Billy

Harbert, Jr. insisted that he could do a better job than Plaintiff in negotiating a lower

figure than $15 million, and thereupon negotiated through counsel for several months

to no avail with the Department of Justice, which repeatedly told his counsel, Bryan

B. Lavine, Esq. of Troutman Sanders LLP, the lowest figure the United States would

accept was the $15 million negotiated with (Plaintiff) Dr. Hoda Elemary.

11.    Non-party William M. Sharp, Sr., Esq. ("Sharp") was brought in to the

Harbert group as personal counsel for Billy Harbert, Jr., and later was advisor to Mr.

Harbert Sr. as well.  However, Mr. Harbert Sr. later dismissed Sharp for siding with

Billy Harbert, Jr. at a substantial financial loss to Mr. Harbert Sr.  However, prior to

that incident, Mr. Harbert Sr. had fired Sharp for conspiring with other Defendants to

take over Plaintiff's position.

12.    At Billy Harbert, Jr.'s demand, Sharp issued several forged letters in the

form of <u>amending the September 21 Agreement</u>, dated (September 27,) October 5,

October 21, and November 11, 2004.  These letters were provided to him personally

by Billy Harbert, Jr., which Evangeline H. Hoover, executive assistant to both Mr.

Harbert Sr. and Billy Harbert, Jr. ("Hoover"), signed on behalf of Mr. Harbert Sr.

without his knowledge. These letters were intended to summarily dismiss Plaintiff

from her job. <u>When Plaintiff called the amendments to the September 21 Agreement</u>

stated in the last three letters to Mr. Harbert Sr.'s attention, Mr. Harbert Sr. wrote on these letters, "FORGERY", and stated in separate correspondence as well as in a paragraph written on each of the three letters that he never signed his name to these letters. True and correct copies of these letters are attached collectively hereto as Exhibit "B" and incorporated herein by this reference. As if this were not sufficient prima facie evidence of Defendants' concerted actions against Plaintiff, in an email Sharp gleefully boasted to all the conspirators employed by Billy Harbert, Jr., as well as to Plaintiff's counsel, that Hoover was going to hand over an attached letter to Plaintiff when she walked in for her bi-weekly briefing of Mr. Harbert Sr. of the developments in the False Claims Case.

13.    Moreover, Mr. Harbert Sr. complained verbally and in writing to Plaintiff of his son's abuse of an elderly person as a result of Billy Harbert, Jr.'s blackmailing his father. Mr. Harbert Sr. instructed Plaintiff on a daily basis, either in person or by telephone, to not involve Billy Harbert, Jr. in their affairs. Billy Harbert, Jr.'s persistent interference damaged Plaintiff and is noticeable even in forcing counsel to mislead the court in another case. These misrepresentations provide proof of Defendants' untrustworthiness together with evidence herein.

14.    Plaintiff witnessed unusual and abusive verbal exchanges between father and son in which Billy Harbert, Jr. exhibited his fundamental fears that his father would write him off as an heir and instead give Plaintiff his share of the inheritance. Billy Harbert, Jr. therefore developed an obsession seeking to destroy Plaintiff

8

financially and physically and to deprive her of her peace of mind and her right to pursue her career or any form of employment or happiness, and attempted to destroy the reputations of Plaintiff and Plaintiff's partner, Senator Bob Dole, at every opportunity, going so far as to exhibit streaks of madness as confirmed by his father in writing.

15.    The Camp David Accords, on which Plaintiff worked as advisor to President Anwar Sadat, provided funding for construction projects, including a waste water treatment project in Cairo, Egypt (the "Subject Project").  The Egyptian government awarded the contracts to U.S. companies that had been pre-qualified to bid.  The United States Agency for International Development ("USAID") paid the winning bidders on each contract.  As a direct and proximate result of Plaintiff's personal contacts among Middle East heads of state, the joint venture of which the Harbert Contractors (hereinafter defined) owned 60% was initially awarded approximately $115 million worth of contracts (the "Subject Contracts") from the Subject Project, which included pump stations, pipelines, and waste water treatment facilities.  Plaintiff was in a unique position (as former special advisor to President Anwar Sadat during the Camp David negotiations) to provide tangible results to the Harbert Contractors.

16.    In particular, non-party John M. Harbert and his brother, Mr. Harbert Sr., intentionally sought Plaintiff's assistance and intervention to secure contracts from the Subject Project for four reasons detailed in paragraph I of the Schedule attached

9

hereto (the "Incorporated Schedule").  Chief among these reasons, John and Bill Harbert wished to secure political cover by using Plaintiff's contacts with former Presidents Ford, Carter and Reagan, Dr. Kissinger and Messrs. Kaiser and Rockefeller as a necessary protection for their conspiracy to bid-rig the USAID contracts.  In addition, Plaintiff convinced the Egyptian Prime Minister, her uncle, Dr. Atef Sedky, to remove the Harbert Contractors' names from a catalogue of black-listed corporations (for a $79 million earlier action brought by the Egyptian government against Defendants, which Plaintiff had resolved in favor of the Harbert Contractors at the International Court in Paris, France) so they could do business in Egypt on the Subject Project.

17.   The United States later filed two separate actions against and suspended both Harbert Defendants and their corporate entities from future bidding on government contracts.

18.   Between April 2001 through April 2005, Defendants sought Plaintiff's intervention once again, primarily in the False Claims Case and later in the declaratory relief case, in which latter the Harbert Contractors sought to reduce the $54 million criminal fine imposed on them by the antitrust case.  <u>Plaintiff became the sole spokesperson and exclusive case manager for Mr. Harbert Sr. for four years.  Plaintiff worked in conjunction with former U.S. Senate Majority Leader, SENATOR BOB DOLE</u>, whom she retained in 2002 through 2005 to assist her in negotiating a settlement and a three-year extension of time with senior officials from the Department

of Justice (the "DOJ") concerning the prosecution of the Harbert Contractors on the False Claims Case.

19.    The two main defendants in this action are Billy Harbert, Jr. ("Billy Harbert Jr."), acting in his personal capacity as well as on behalf of Defendant B.L. Harbert International, LLC, and his father Mr. Harbert Sr., acting in his personal capacity and on behalf of Defendant Harbert International Establishment, Inc. Non-party Mr. Roy Anderson ("Anderson") -- a resident of the State of New Jersey -- executed a substantial part of the bid-rigging scheme at the instructions of both Harbert Defendants, for which wrongdoing he was sentenced by a jury to prison as well as asked to pay a fine.  (The suspension of both Harbert Defendants and their entities was lifted as a result of their payment of $54,000,000, to which they agreed in lieu of going to prison.  However, Anderson did not have such means and therefore was sentenced to prison, for which he was instead placed under house arrest due to his declining health.)  Mr. Harbert Sr. and Billy Harbert Jr. of Birmingham, Alabama and their corporate entities are hereinafter referenced together as the "Harbert Contractors".  The remaining Defendants are listed on pages 1 and 2 and in detail in paragraph V of the Incorporated Schedule.

20.    At the risk of Plaintiff's life, this action entails a rare and daring view from inside of the Harbert corporate structure of their criminal activities, including masterminding bid-rigging, the receipt of large sums of unreported income in specific Swiss bank accounts -- the proceeds of bid-rigging, unjust enrichment and the use of a

11

rogue Federal Bureau of Investigation agent to threaten violent acts against Plaintiff, including offers by the aforesaid FBI agent to "terminate" for a lofty price Plaintiff and other Harbert Contractors' perceived adversaries. The Harbert Contractors and non-party Bryan B. Lavine ("Lavine") threatened Plaintiff's life if Plaintiff divulged to the United States the Harbert Contractors' banking documents sent to Plaintiff by Ferrier Lullin & Cie SA, a Swiss bank headquartered in Geneva, Switzerland which was later acquired by Bank Julius Baer in Zurich in 2005, relating to the activities of the Harbert Contractors in the False Claims Case (the "Swiss Bank Records").

21.     Defendants in particular defrauded the United States and Plaintiff through unjust enrichment and unlawful pocketing of $40 million beyond the profit stipulated in the contracts between Defendants and the United States. The Harbert Contractors' margin of profit on the Subject Contracts was 65%, rather than the negotiated 15%. Moreover, the Harbert Contractors encouraged foreign corporations to join them in defrauding the American taxpayer and the recipient Middle East governments with the effect of severely undermining Plaintiff's credibility with Middle East heads of states with whom Plaintiff had enjoyed a very lucrative business relationship.

22.     Plaintiff sustained substantial losses in her theaters of operation, including, but not limited to, permanent damages as the direct and proximate result of the fraud and concealment by Defendants of the facts of the bid-rigging scheme. In particular, Defendants' damages inflicted on Plaintiff arose through four categories of unlawful actions:

12

a.    demanding that Plaintiff either break the law by altering evidence detrimental to the Harbert Contractors that was required to be surrendered to the United States, or have her employment terminated.  This evidence included, but was not limited to, the Harbert Contractors' balance sheets, unlawfully transferring funds into limited liability companies and tax evasion -- large sums of unreported income in numbered Swiss bank accounts;

b.    completely and intentionally discrediting Plaintiff in the presence of many United States Senators, the White House and DOJ officials who had earlier supported Plaintiff's activities in writing and who would have continued to benefit her career economically;

c.    coercing by the Harbert Contractors and Lavine of Plaintiff to dramatically reduce her income and expenses and lose her position as exclusive case manager, or agree to cover up crucial evidence concerning Defendants' Swiss Bank Records in connection with the then forthcoming trial of the False Claims Case, consequently threatening Plaintiff with physical harm if she did not relinquish her position by April 4, 2005 after Defendant Billy Harbert Jr. harassed Plaintiff's counsel, former Congressman Earl Hilliard's family and office staff in March, 2005, demanding that former Congressman Earl Hilliard withdraw his representation while he was in a coma; and

d.    physically assaulting and pushing Plaintiff down the stairs by a hired Myrmidon of the Harbert Contractors on April 14, 2005, causing Plaintiff to

13

break her shoulder and suffer incapacitation and intolerable physical pain for over seven months following the assault. Defendants sought to instill terror and fear to prevent Plaintiff from filing this action or revealing any information that would be detrimental to their claim of innocence in the False Claims Case. Plaintiff suffered severe mental anguish and emotional distress in addition to physical incapacitation as a direct and proximate result of Defendants' face-to-face and telephonic threats on her life, accompanied by warning to do her bodily injury and then making good on that warning.

23.    During and after the bid-rigging, Mr. Harbert Sr. and Billy Harbert Jr. insisted on maintaining a facade of lack of knowledge of the crimes that they were committing or requesting their subordinates to commit on their behalf. However, the evidence coupled with Plaintiff's legal recordings of Mr. Harbert Sr. shows deep involvement in such conspiracy, as current counsel representing the defendants in the False Claims Case (non-parties Lavine and June Ann Sauntry ("Sauntry")) have also admitted in evidence. In particular, in a specific conversation that was legally recorded by Plaintiff, concerning hush money that the Harbert Contractors paid to a government minister in the Middle East, Mr. Harbert Sr. notified Plaintiff of his need to keep his distance from the payment to that minister, who was aware of the Harbert contractors' bid-rigging of the Subject Project in Egypt. On the recorded tape, Mr. Harbert Sr. is heard stating to Plaintiff, "I would go to jail if anyone finds out that I knew, I cannot know about this". Mr. Harbert Sr. then states to Plaintiff, "You

handle it". Unmistakably, Mr. Harbert Sr. understood the nature of the crime he was demanding Plaintiff to execute on his behalf. Moreover, Mr. Harbert Sr. convicted himself in his own voice, "I would go to jail", which confirms his knowledge of the illegality of the acts in which he was personally involved, and that he wished to distance himself from them by demanding that Plaintiff assume the risks of committing a crime by saying, "You take care of it".

24. Defendants' willful and malicious disregard for conforming with various written guarantees, commitments and promises previously provided to Plaintiff was intended to punish Plaintiff for refusing to go along with Defendants' cover up of their original crime of bid-rigging the United States taxpayer in the amount of $40 million. The impact of Defendants' punishment was as follows: a) Plaintiff was deprived of continued employment despite the fact that Defendants issued written documents confirming their full satisfaction with Plaintiff's job performance, only one week before Plaintiff refused to implement Defendants' illegal cover-up plan. Defendants were also satisfied with Plaintiff's dealings with the DOJ as stated in writing by Mr. Harbert Sr.; b) Plaintiff and her associates were terrorized from publicly exposing the Harbert Contractors' bid-rigging until Plaintiff elected to take the risk of filing an action in the Central District of California on July 28, 2006; and c) Plaintiff was prevented from publicly demanding that Defendants cease and desist from carrying on their self-serving conspiracy as well as making threats to any employee that would discuss the Harbert Contractors' modus operandi for bid-rigging and consequent

15

cover-up conspiracy, as well as terrorizing employees that learned of the Harbert
Contractors' crimes.

25.    Plaintiff and Senator Dole were successful in a) securing a low
settlement figure through their negotiations with the most senior U.S. government
officials. The Harbert Contractors rejected three settlement offers negotiated among
Plaintiff, Senator Dole and the United States, including a $15 million offer. The
United States initially demanded $56 million in a settlement conference, stating that its
proven $25 million in damages would be trebled at the trial of the False Claims Case
to $75 million, now in progress. That $56 million was comprised of $22 million from
nonparty Harbert Corporation, for which Mr. Harbert Sr. is responsible to pay under
an agreement with Harbert Corporation in which he assumed liability for the bid-
rigging, and $34 million from Mr. Harbert Sr. personally, as demanded during the
settlement conference in court by Carolyn G. Mark, Senior Trial Counsel,
Commercial Litigation Branch, Civil Division, and b) extending by three years the
DOJ's prosecution of the False Claims Case, thereby enabling Mr. Harbert Sr. to
retain in his South Trust Bank stock portfolio $56 million (the lesser amount requested
by the government) in South Trust Bank shares, which more than doubled in value
immediately after Wachovia Bank, N.A. acquired South Trust Bank.

26.    Defendant Billy Harbert Jr. engaged in three sets of unlawful acts,
including, but not limited to, abuse of an elderly person, blackmail and
misrepresentration:

16

(a)    Defendant Billy Harbert Jr. deemed it necessary for the financial survival of his corporate entity, HILLC, to continue to collect multi-million dollar loans on an annual basis from Mr. Harbert Sr., which greatly distressed him. Mr. Harbert Sr. therefore sought Plaintiff's assistance in 2003 to protect him from what he described as "being blackmailed and coerced by Billy [Harbert Jr.] . . . ." Mr. Harbert Sr. instructed Plaintiff not to forward documents relating to the purchase of a property in Laguna Niguel, California for Plaintiff and issued letters with Plaintiff intended to disguise the purpose of such real estate and other transactions because he feared that Billy Harbert Jr. would use such transactions to demand additional financing for his company. Ultimately, however, Billy Harbert Jr. learned of the Laguna Niguel transaction from Sharp and used this information to secure substantial funding from Mr. Harbert Sr. and demanded that Mr. Harbert Sr. breach his agreement with Plaintiff. However, the primary Defendant, Mr. Harbert Sr., had already confirmed his position in writing to the effect that no triable issue of fact existed as to Mr. Harbert Sr.'s liability to Plaintiff with respect to breach of contract and unlawful termination. In particular, Mr. Harbert Sr. affirmed the September 21 Agreement in a November 11, 2004 letter to Sharp, "I am writing to bring to your attention to [sic] the fact that when I accepted your help to manage the qui tam and declaratory relief cases I had forgotten that I had a confirmed agreement with Dr. Elemary under liability to me to manage these cases to their conclusions. . . . [H]er position as exclusive case manager was guaranteed by me. I therefore have no choice

17

but to honor my agreements with Dr. Elemary . . . to limit my liability . . . ." A true and correct copy of Mr. Harbert Sr.'s reaffirmation of the September 21 Agreement is attached hereto as Exhibit "C" and incorporated herein by this reference.

(b)    In 2005, Defendants' determined obsession to obtain the Swiss Bank Records from Plaintiff was and remains today the cause of threats, blackmail, and physical violence, resulting in serious bodily injuries, perpetrated by Defendants on Plaintiff, including Plaintiff's broken shoulder on April 14, 2005, and the attempt on Plaintiff's counsel, former Congressman Earl Hilliard's life on March 2, 2005, who was retained by Plaintiff, which left the Congressman incapacitated with fractures and broken bones throughout his body for over two years.

(c)    Misrepresentation, physical threats, exiling Plaintiff to Saudi Arabia to conceal from her the Harbert Contractors' bid-rigging until they collected on the benefits thereof and additional damages from Defendants' violations beyond these stated herein are cited in paragraph VI of the Incorporated Schedule.

## ADDITIONAL FACTS ON JURISDICTION AND VENUE

[27.    Non-party Mr. Thomas R. Kitchens, who sought to avoid the threats and physical attacks by Defendant Billy Harbert Jr. when Mr. Kitchens agreed to testify in support of the United States anti-trust case against Defendants, for which the Harbert Contractors eventually paid a $54 million criminal fine for bid-rigging government contracts as referenced hereinabove.  Mr. Kitchens, who oversaw the operations of the

18

Harbert Contractors' conglomerate for 30 years, secretly requested and received participation in the Government Protection Program.

28.    The United States Congress intervened to expedite the receipt of Plaintiff's U.S. citizenship in 2001 due to Plaintiff's unique contacts with Middle East heads of state, which contacts Plaintiff used to help Defendants secure contracts in the transactions detailed below.  The United States' commitment to protect Plaintiff for her crucial assistance in the war on terrorism comprises, among other things, the whereabouts of Plaintiff, which is affected by the venue of the instant case.  The parties' (master and personal) agreements specified jurisdiction and venue as an important consideration of their agreement, without which said agreement would not have been acceptable nor executed by either party.  Accordingly, sacrifices made by Plaintiff in compliance with the terms of the jurisdiction and venue agreement would not have been made if Plaintiff was not guaranteed her personal security.  To this end, any changes in the jurisdiction and venue agreement between the parties would jeopardize Plaintiff's security and would be tantamount to altering key terms of the agreement after the fact -- namely, after Plaintiff had fulfilled her part of the bargain.

29.    Jurisdiction and venue are proper in this District because Plaintiff for the past thirty years was employed in this District and lived for half of the year at a special suite in the Williard Hotel conducting her business in dealing with the White House, employed by the Reagan administration, the U.S. Congress and hosting receptions at the U.S. Senate for world leaders, Supreme Court Justices and President

19

Bill Clinton. The primary Defendant, Mr. Harbert Sr., and Plaintiff had an

agreement within the November 3 Trust that specifically provided for the jurisdiction

and venue applicable to potential future litigation. On November 4, 2003, Mr.

Harbert Sr. executed a letter to Plaintiff reconfirming the $3 million penalty payment

to Plaintiff in the event he violates the jurisdiction and venue agreement stipulated in

the November 3 Trust. In particular, Mr. Harbert Sr. stated that "[i]n the event any

of my heirs would challenge this trust or should I be placed in a position to revoke or

modify [the November 3 Trust] . . . either I or my estate will be irrevocably and

unconditionally obligated to pay you the sum of three million dollars. This agreement

to pay said amount is in consideration of your assistance on my behalf over the past

few years in dealing with the DOJ in connection with the U.S. v. Bilhar, et al. case,

which involves both criminal fine of fifty-four million dollars and civil fine of thirty

million dollars. [¶] You have taken great risks in dealing with the DOJ and therefore

earned the sum of money referenced above only in the event that I or any of my heirs,

should challenge, revoke or modify the [November 3 Trust]." The confirmation of

the November 3 Trust was acknowledged on November 4, 2003 by Guillaume

Tourniaire, a Notary Public. A true and correct copy of this document (the

November 4, 2003 letter) is attached hereto as Exhibit "D" and incorporated herein by

this reference.

   30.    Jurisdiction and venue are proper in this District because the two key

agreements which are the subject of this action, hereinafter defined as the November 3

20

Trust and the September 21 Agreement, were negotiated into their final forms and executed in Washington, D.C.

31.    Mr. Kitchens, after 30 years of working on a day-to-day basis with the Harbert Contractors, knew enough about them to seek government protection.  Venue therefore is proper in this District because in Birmingham, Alabama, the Harbert Defendants have a corrupt influence on the local law enforcement community rendering Alabama an unsafe place for Plaintiff, her witnesses and attorneys.  On behalf of the Harbert Contractors, Mr. Kitchens had earlier threatened Plaintiff that "men in white sheets will finish you up" and subsequently apologized to Plaintiff on record for such threat.  Plaintiff's security has been and remains a primary concern of the United States.  A commitment was made to Plaintiff as expressed by United States Senate leaders, including, but not limited to, the former Chairman of the Judiciary Committee, Orrin G. Hatch, the ranking member of the Armed Services Committee, Carl Levin, and minority leader Harry Reid, as well as three California Senators, Dianne Feinstein, Barbara Boxer and the late Alan Cranston.  A true and correct copy of the United States Congress' commitment to Plaintiff as stated in several letters is collectively attached hereto as Exhibit "E" and incorporated herein by this reference.

32.    Plaintiff and Defendant Mr. Harbert Sr. designated a forum in the Central District of California in the November 3 Trust.  However, the parties were separately advised by their respective counsel that the court may elect to disregard their choice for venue and jurisdiction and for legal considerations regarding

convenience for the majority of the witnesses and Defendants, the District of Columbia would be the proper venue for this action.  In fairness, it is incumbent upon Plaintiff to inform the Court that in a similar previous case that was dismissed without prejudice (with nearly quadruple the number of Alabama defendants than exist in this action), the  District Judge in California stated in a minute order, dated February 23, 2007, "Thus, the Court agrees with Plaintiff venue is proper in this district." Accordingly, the parties issued a letter on January 7, 2004, confirming their second designated choice for venue and jurisdiction is the District of Columbia.]

## PARTIES

33.    The parties hereto are listed in paragraph 1 hereof.  In addition, a more detailed description is set forth in paragraph V of the Incorporated Schedule.

### FIRST CAUSE OF ACTION
### INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against HILLC and Billy Harbert Jr.)

34.    Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-33 hereof, inclusive, as if alleged herein in full.

35.    The September 21 Agreement provided, _inter alia_, that Plaintiff would receive a five percent (5%) success fee, in addition to her monthly compensation, on any savings negotiated from Mr. Harbert Sr.'s $34,000,000 and $22,000,000 (on behalf of Harbert Corporation) obligations under the False Claims Case (paragraph 16).

36.    On March 18, 2005, Carolyn G. Mark of the DOJ submitted a confirmation of a proposed settlement agreement, in writing, to Plaintiff, under which Mr. Harbert Sr. could settle the False Claims Case for $15,000,000. A true and correct copy of this proposed settlement agreement is attached hereto as Exhibit "F" and incorporated herein by this reference. Based on Mr. Harbert Sr.'s original liability of $56,000,000, such offer represented a savings of $41,000,000, on which Plaintiff's aforesaid success fee would have been five percent (5%) of such amount, or $2,050,000.

37.    This settlement offer was acceptable to Mr. Harbert Sr., but Billy Harbert Jr., acting in his personal capacity and on behalf of HILLC, caused it to be rejected, and thereby prevented the DOJ and the Harbert Contractors from entering into a settlement agreement based on such offer out of sheer malice towards Plaintiff.

38.    The provisions of the September 21 Agreement were known to Defendants because Plaintiff had been working with John Harbert since 1979 and had been acting as exclusive case manager on the False Claims Case since April, 2001.

39.    Defendant Billy Harbert Jr.'s disruption of the settlement negotiations between DOJ and Plaintiff constituted intentional interference with the terms of the September 21 Agreement and was therefore wrongful for reasons other than the mere fact of such disruption.

40.    As a direct and proximate result of Defendants' interference with the settlement negotiations between the DOJ and Plaintiff, Plaintiff was damaged in an

23

amount to be proven at trial, but no less than $2,050,000.

41.     The aforementioned acts and omissions of Defendants were willful, wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the intention on the part of Defendants to deprive Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages in an amount according to proof.

### SECOND CAUSE OF ACTION
### BREACH OF CONTRACT
### (Against Mr. Harbert Sr.)

42.     Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-33, hereof, inclusive, as if alleged herein in full.

43.     The November 3 Trust provided, *inter alia*, that Plaintiff, in carrying out her duties as the exclusive case manager for the False Claims Case, was not to be interfered with by Billy Harbert Jr.  The September 21 Agreement provided, *inter alia*, that Plaintiff was the exclusive case manager for the False Claims Case and the declaratory relief action, reporting to Mr. Harbert Sr. personally (paragraph 1); that Mr. Harbert Sr.'s then currently outstanding obligations with respect to his cases were $22,000,000 and $34,000,000 (paragraph 3); that Sharp (Billy Harbert Jr.'s personal counsel), at Mr. Harbert Sr.'s request, had been asked to evaluate Plaintiff's performance to date as case manager at the insistence of Billy Harbert Jr., describing

24

it as "extremely satisfactory and promising" (paragraph 4); that if the cases were not resolved, Sharp would be asked to review Plaintiff's progress one year from the date of the agreement, i.e., September 21, 2005 (paragraph 5); that until the cases were resolved, Plaintiff was to continue to be paid Thirty Thousand Dollars ($30,000) per month (paragraph 6); that subject to conferring with Plaintiff, Sharp was given sole authority to communicate with Moulton and Cornay and Defendant Billy Harbert Jr. and non-party Hall concerning the cases (paragraph 10); that Moulton, Cornay, Defendant Billy Harbert Jr. and non-party Hall would communicate concerning the cases solely with Sharp (paragraph 11); that communications regarding the cases would be made to Mr. Harbert Sr. solely by Plaintiff and Sharp (paragraph 12); and that Plaintiff would receive a five percent (5%) success fee, in addition to her monthly compensation, on any savings negotiated from Mr. Harbert Sr.'s $34,000,000 and $22,000,000 (on behalf of Harbert Corporation) obligations under the False Claims Case (paragraph 16).  A true and correct copy of the September 21 Agreement is attached hereto as Exhibit "G" and incorporated herein by this reference.

44.    Plaintiff has performed all conditions, covenants and promises required of her to be performed in accordance with the terms and conditions of the November 3 Trust and the September 21 Agreement, or has been excused from doing so by Defendant's breach.

45.    During the period commencing February 14, 2005 to the present, Mr. Harbert Sr. breached the November 3 Trust and the September 21 Agreement by

permitting Billy Harbert Jr. to interfere with Plaintiff's performance of her duties under, and thereby resulting in the termination of, the September 21 Agreement without cause and prior to the resolution of the False Claims Case; by refusing to accept, in bad faith, advantageous settlement terms obtained on Mr. Harbert Sr.'s behalf by Plaintiff and Senator Dole; and by failing to pay both the monthly stipend and the success fee earned by Plaintiff pursuant to the terms and conditions of the September 21 Agreement.

46.     As a result of Mr. Harbert Sr.'s breach of contract, Plaintiff has suffered actual damages, in an amount to be ascertained, but not less than Seven Hundred Eighty Thousand Dollars ($780,000), representing Plaintiff's monthly stipend from February, 2005 through April, 2007 (the filing date of this action), plus Two Million Fifty Thousand Dollars ($2,050,000), representing Plaintiff's success fee computed on her obtaining of a settlement offer of $15,000,000 from the DOJ on Mr. Harbert Sr.'s original liability of $56,000,000, or Two Million Eight Hundred Thirty Thousand Dollars ($2,830,000), and Thirty Thousand Dollars ($30,000) per month thereafter while the False Claims Case is pending.

47.     As a result of Mr. Harbert Sr.'s breach of contract, Plaintiff is further entitled to liquidated damages in the amount of One Million Dollars ($1,000,000), as provided in the Guarantee.

## THIRD CAUSE OF ACTION
### QUANTUM MERUIT
### (Against Mr. Harbert Sr.)

48.    Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-33, hereof, inclusive, as if alleged herein in full.

49.    On March 18, 2005, Defendant Mr. Harbert Sr. became indebted to Plaintiff in the amount of Two Million Fifty Thousand Dollars ($2,050,000) for the reasonable value of services rendered by Plaintiff at the special instance and request of said Defendant.

50.    Neither the whole nor any part of this sum has been paid although demand therefor has been made, and there is now due, owing and unpaid the sum of $2,050,000, with interest thereon at the legal rate from March 18, 2005.

## FOURTH CAUSE OF ACTION
### TERMINATION IN VIOLATION OF PUBLIC POLICY
### (Against Mr. Harbert Sr.)

51.    Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-33, hereof, inclusive, as if alleged herein in full.

52.    Plaintiff was employed by Mr. Harbert Sr. as exclusive case manager for the False Claims Case and the declaratory relief action from April, 2002 to April, 2005, having primary responsibility and authority concerning the retention, oversight, management and compensation of the thirteen lawyers engaged by the Harbert Contractors on these cases.

27

53.    The Harbert Contractors and Lavine attempted to coerce Plaintiff in or around November, 2004, either to resign her position as exclusive case manager, or agree to cover up crucial evidence urgently requested by the DOJ from the Harbert Contractors in connection with the False Claims Case, including, but not limited to, withholding from the United States Plaintiff's copies of the Swiss Bank Records. At that time and at all subsequent times, Plaintiff refused to conceal evidence from the United States as requested by Defendants. In 2005, Defendants' determined obsession to obtain original Swiss Bank Records of their corporate banking from Plaintiff, and later to retrieve recordings of statements made by Defendants, and other evidence in Plaintiff's possession, was and remains today the cause of threats, blackmail, and physical violence, resulting in serious bodily injuries, although Defendants were informed that several copies were placed in trust at various other locations, perpetrated by Defendants on Plaintiff and certain members of Congress, including, but not limited to, Plaintiff's broken shoulder on April 14, 2005, and an attempt on Congressman Earl Hilliard's life on March 2, 2005, which left the Congressman incapacitated with fractures and broken bones throughout his body for over two years.

54.    As a proximate result of Defendants' conduct as described in paragraph 53, above, and in violation of public policy as set forth in paragraph 55, below, Mr. Harbert Sr. terminated Plaintiff's employment effective April 5, 2005.

55.    Plaintiff was protected from termination pursuant to the provisions of 31 U.S.C. §3730(h).

56.   As a result of Defendants' conduct, Plaintiff has suffered actual damages, in an amount to be ascertained, but not less than Seven Hundred Eighty Thousand Dollars ($780,000), representing Plaintiff's monthly stipend from February, 2005 through April, 2007 (the filing date of this action), plus Two Million Fifty Thousand Dollars ($2,050,000), representing Plaintiff's success fee computed on her obtaining of a settlement offer of $15,000,000 from the DOJ on Mr. Harbert Sr.'s original liability of $56,000,000, or Two Million Eight Hundred Thirty Thousand Dollars ($2,830,000), and Thirty Thousand Dollars ($30,000) per month thereafter while the False Claims Case is pending.

57.   In doing the acts set forth above, Defendant knew that the conduct they would have required of Plaintiff was unlawful, and required Plaintiff to choose between violating the law and losing her employment.  Notwithstanding this knowledge, Defendant despicably subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights by insisting that Plaintiff violate the law, and terminating Plaintiff's employment when Plaintiff refused to do so.

**FIFTH CAUSE OF ACTION**
**SUPPRESSION OF FACTS (FRAUD)**
**(Against Holzmann, HILLC, Sabbia, Bilhar,**
**Mr. Harbert Sr. and Billy Harbert Jr.)**

58.   Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-33, hereof, inclusive, as if alleged herein in full.

29

59.    At the time Plaintiff acted on the Harbert Defendants' behalf to enable them to bid on the Subject Project in Egypt, each of Mr. Harbert Sr., Bilhar, non-party Harbert Corporation, Billy Harbert Jr., HILLC, Anderson, non-party Harbert U.K. Services, Ltd. ("Harbert U.K."), Holzmann, Sabbia, Hoover and non-parties Peter Schmidt, Harbert Jones Joint Venture ("Harbert Jones") and ABB intended to engage in illegal bid-rigging or were aware of such intentions.

60.    The USAID administrator confirmed that the awarding of the major contracts in the Subject Project was based on two factors.  It is public knowledge in Egypt that Plaintiff and her uncle, the Egyptian Prime Minister Atef Sedky, played a major role in the awarding of the Subject Project to the Harbert Contractors by notifying USAID that Harbert Jones, the joint venture set up by the Harbert Contractors to bid on various contracts, was acceptable to the government of Egypt for contracts 27 and 33, as well as the three contracts 20A, 07 and 29, which were the subject of indictments brought by the United States.  USAID approved the Harbert Contractors' bid on account of its being the lowest bid and the Egyptian Government's approval of the Harbert Contractors' participation in the Subject Project after their names were removed by Plaintiff's efforts from the itemized blacklisted corporations that would have prevented them from doing business in Egypt.

61.    Defendants' bid-rigging included obtaining a collusive, artificially inflated, and noncompetitive price for the Subject Project and an illegal and inflated profit thereon.  As a result of the bid-rigging conspiracy, Defendants submitted and

30

caused to be submitted false and inflated claims for payment to the USAID for work done on the Subject Project. Defendants' conspiracy conflicted with U.S. foreign policy by perverting the noble purpose of the Accords, which sought to bring peace to the troubled Middle East. Defendants acted without regard to the impact of their actions on their association with Plaintiff who, as referenced above, helped clear the way for securing the major contracts of the Subject Project for the Harbert Contractors.

62.     At the time Plaintiff sought approvals for the Harbert Contractors to work on the Subject Project, Defendants did not disclose to her their intentions to engage in bid-rigging and disgrace Plaintiff by violating United States law and the spirit of the Accords. Later, when Plaintiff agreed to become the exclusive case manager for the False Claims Case, Defendants concealed from Plaintiff the extent of their culpability in the bid-rigging scheme. Defendants knew of such intentions and culpability and, at the time Plaintiff performed such services, Plaintiff was ignorant of Defendants' intentions to engage in, and subsequent participation in, bid-rigging. Plaintiff could not, in the exercise of reasonable diligence, have discovered Defendants' actual intentions and subsequent culpability, which Defendants ensured was a well-kept secret.

63.     Defendants' suppression from Plaintiff of their intentions to engage in, and subsequent participation in, bid-rigging was intended to induce Plaintiff to use her high-level political connections and influence to cause the Harbert Contractors to be

31

eligible to bid for and be awarded contracts 20A, 07 and 29, and, later, to assist Defendants to delay prosecution of the False Claims Case. If Plaintiff had been aware of Defendants' actual intentions and culpability, Plaintiff would not, as she did, have vouched for Defendants' integrity to secure such approvals and participated in such defense.

64.    As a proximate result of the revelation of the fraud practiced upon Plaintiff by Defendants as hereinabove set forth, Plaintiff's lucrative relationship with the Egyptian government, USAID, U.S. corporations and some members of the Congress was destroyed. Plaintiff had earned her living (according to a letter from U.S. Senator Dianne Feinstein)" . . . based on the vital services Ms. Elemary provides Congress, which have been determined to serve U.S. national interests. A majority of the United States Senators have overwhelmingly endorsed Ms. Elemary's work [in writing] . . . ." This letter is attached hereto as Exhibit "E." Plaintiff has also promoted the passage of multi-billion dollar legislation and assisted U.S. corporations to secure lucrative contracts in the Middle East. When Defendants concealed from Plaintiff their intentions to rig the bids and isolated her by dispatching her to Saudi Arabia during the execution of their conspiracy, Defendants knowingly interfered with Plaintiff's special contacts and violated the trust vested by U.S. government officials and Senate leaders and the most senior Egyptian government officials in Plaintiff as their own private inspector on the ground. To this end, the bid-rigging conspiracy severely tarnished the status of Plaintiff's reputation as an

32

honest broker between the United States business community and the Middle East as well as within the U.S. Senate. Defendants effectively, and knowingly, destroyed Plaintiff's source of income for life in an amount to be ascertained, but Plaintiff is informed and believes, and thereon alleges, that such damages exceed Three Million Dollars ($3,000,000).

65.    The aforementioned acts and omissions of Defendants were willful, wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the intention on the part of Defendants to deprive Plaintiff of property, legal rights and otherwise cause injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages in an amount according to proof.

### SIXTH CAUSE OF ACTION
### VIOLATION OF 18 U.S.C. §1964 (CIVIL RICO)
#### (Against Billy Harbert Jr.)

66.    Plaintiff refers to and incorporates by this reference each allegation set forth at paragraphs 1-33, hereof, inclusive, as if alleged herein in full.

67.    Defendant Billy Harbert Jr. is a "person" within the meaning of 18 U.S.C. §1961(3).

68.    HILLC is an "enterprise" within the meaning of 18 U.S.C. §1961(4).

69.    Defendant Billy Harbert Jr. was "associated with" the aforesaid enterprise in that such Defendant either actively took part in the scheme to extort

Plaintiff as herein alleged, furthered such scheme by cooperation or request, lent aid or encouragement to the wrongdoers or ratified and adopted acts committed by other Defendants for such Defendant's benefit.

70.    During the relevant times, the activities of the enterprise alleged herein have affected interstate commerce in that HILLC is located in Delaware and Alabama and Plaintiff is located in California.

71.    As set forth hereinbelow, Defendant Billy Harbert Jr. and non-party Lavine initially engaged in repeated one-on-one and conference telephone calls with Plaintiff in an effort to effectuate the premature termination of the September 21 Agreement, following which they turned to more extreme measures. Defendant and the foregoing non-parties displayed the same modus operandi as did Defendants in the aforementioned conspiracy cause of action herein, in that they begin with tortious acts as described in paragraph 72-75, below, and, when such unethical activity did not achieve the desired result, Defendants resorted to criminal activity as described in paragraphs 76-78, below, including physical threats and violence, as did Defendants in the conspiracy when they resorted to forgery. Defendant Billy Harbert Jr. was intimidated by the success of Senator Bob Dole and Plaintiff in assisting his father, Defendant Mr. Harbert Sr., in the False Claims Case. Billy Harbert Jr. was cautioned to take immediate action to bring the involvement of plaintiff and Senator Dole to an end before Mr. Harbert Sr. excluded Billy Harbert Jr. from his will or ceased to finance or guarantee financing for HILLC's construction projects.

34

72.     Defendant Billy Harbert Jr. first interfered with several settlement attempts by Senator Dole and Plaintiff, including, but not limited to, with the Honorable Alberto Gonzales, at the time counsel to the President, and with William D. Dillon, the prosecutor of the antitrust case. On or about April, 2002, Billy Harbert Jr. and his counsel, Lavine of Troutman Sanders, interfered with and stymied Plaintiff's successful earlier negotiations with the United States prosecutor in the antitrust case, Mr. Dillon, who had agreed with Plaintiff to work out more lenient terms on behalf of the United States. Mr. Dillon requested Plaintiff to have her counsel Charles F. Rule of Fried, Frank, Jacobson & Shriver contact him at once to work out the details of the understanding he on behalf of the United States had reached with Plaintiff, who was acting on behalf of Mr. Harbert Sr. Ironically, on that same day, Lavine, at the request of Billy Harbert Jr., contacted Mr. Dillon to misinform him that Mr. Harbert Sr. had agreed to withdraw the appeal and discharge Mr. Rule. However, upon learning of Lavine's conversation with Mr. Dillon, Mr. Harbert Sr. directed a letter to Mr. Rule urging him to continue to prosecute the appeal.

73.     On account of the continued involvement and achievements of Senator Dole and Plaintiff despite Billy Harbert Jr.'s attempts to thwart their way, the Billy Harbert Jr. group of Defendants conspired amongst themselves to use more aggressive tactics to force Plaintiff and her associates to end their involvement with the False Claims Case.

35

74.    Unwarranted and severe criticism of Senator Dole and Plaintiff were thereupon initiated by Defendant Billy Harbert Jr. and his counsel, Lavine and non-party Mr. Henry F. Frohsin (these attorneys were paid by Mr. Harbert Sr. but considered Billy Harbert Jr. to be their client, and not Defendant Mr. Harbert Sr., and have referred to Billy Harbert Jr. as the "client" in writing), who had been retained by Mr. Harbert Sr. for his own cases, causing Mr. Harbert Sr. to correct Mr. Frohsin in a letter on this intentional confusion -- an example of Defendants' abuse of an elderly person.

75.    Billy Harbert Jr., in consultation with his counsel Lavine, elected to frighten Plaintiff to deprive her of the benefit of her good work as acknowledged by Mr. Harbert Sr. and Sharp in writing on September 1, 2004, after using her and her contacts to delay the execution of justice in the False Claims Case.

76.    Defendant Billy Harbert Jr. engaged in repeated career and life threats against Plaintiff and her contacts between 1997 and 2006. Billy Harbert Jr. strongly objected to the involvement of Senator Bob Dole. From 2003 until April 2005, Billy Harbert Jr.'s threats became increasingly more alarming as he sought to substantially damage Plaintiff and her associates. On or about March 1, 2005, Plaintiff received a call advising her that Robert Southby of Dothan, Alabama was associated with Billy Harbert Jr. through his brother-in-law, Rusty Moulton, who was in the scrap metal business as was Robert Southby. Two days later, Plaintiff learned of a preplanned car accident of Plaintiff's lawyer in Alabama, former United States Congressman Earl

36

Hilliard. Mr. Robert Southby was the driver of the tractor that hit Congressman Hilliard.

77.    On March 2, 2005, Robert A. Southby of Dothan, Alabama was apparently waiting for Plaintiff's counsel, Earl Hilliard, in a construction tractor, which he parked across a darkened, narrow highway, at approximately 1:00 a.m., two minutes before Congressman Hilliard was driving his car back to his home. The accident was intended to be fatal, were it not for Congressman Hilliard's veering his steering wheel at the last instant to the right away from Mr. Southby's tractor wheel, and resulted in compound injuries with shattered broken bones throughout his body. A police report of the accident was dismissed by the Birmingham police, who failed to conduct the investigation required by law, and the police thenceforth refused to cooperate on this matter with the public. Congressman Hilliard was unable to walk for two years after his accident. Following the accident, while Congressman Hilliard was in a coma, Billy Harbert Jr. harassed his family and daughter-in-law with demands that the Congressman withdraw his legal representation.

78.    In particular, on April 14, 2005, Billy Harbert Jr. dispatched a hitman to Plaintiff's home in California, who then awaited Plaintiff in her front courtyard while she drove her car into the garage. He approached Plaintiff stating, "I am here to pick up the Harbert Swiss bank account records". Plaintiff notified the Harbert hitman that she was not in possession of them at her home, at which time he indicated that he would "come into the house . . . to search for them". Plaintiff firmly stated that she

37

would call 911 if he came into the house and asked the Harbert hitman to leave her property immediately while proceeding to climb two steps from the garage into the house. Plaintiff was thereupon pushed down from the back, falling on the steps and fractured her scapula (right shoulder) which was displaced, requiring seven months of intensive physical therapy to heal sufficiently so Plaintiff could function again. To this date, according to Dr. Alexander H. Tischler of the Newport Orthopedic Institute, Plaintiff's internal rotation is not yet 100 degrees.

79.    During the relevant times, the attempts by Billy Harbert Jr. to obtain the Swiss Bank Records and to induce Plaintiff to relinquish her claims presented herein by threatening Plaintiff with physical harm or death constituted an attempt to obtain property from Plaintiff, with Plaintiff's consent, induced by fear, therefore constituting in each such case an attempt at "extortion" within the meaning of 18 U.S.C. §1951(b)(2).

80.    During the relevant times, the preplanned car accident with Congressman Hilliard on March 2, 2005, as stated herein in paragraphs 76-77, and the physical attack on Plaintiff on April 14, 2005, as stated herein in paragraph 78, therefore constituted in each case an attempt to affect commerce by extortion, as proscribed and prohibited by the Hobbs Act, 18 U.S.C. §1951(a).

81.    Each of the aforesaid violations by Billy Harbert Jr. of the extortion statute as hereinabove alleged constitutes an instance of "racketeering activity" within the meaning of 18 U.S.C. §1961(1).

82.    The multiple acts of racketeering activity by Billy Harbert Jr. were interrelated, part of a common and continuous pattern of fraudulent schemes, and perpetuated for the same or similar purposes, thus constituting a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).

83.    In engaging in the above said actions, Billy Harbert Jr. has become associated with and has conducted or participated in the conduct of the affairs of said enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(a), to wit, multiple instances of attempted extortion in violation of 18 U.S.C. §1951(a), as more particularly set forth in paragraph 80 of this Complaint.

84.    In engaging in the aforesaid actions, Billy Harbert Jr. has violated the provisions of 18 U.S.C. §1962(c).

85.    By reason of the violation of 18 U.S.C. §1962(c) committed by Billy Harbert Jr., Plaintiff was injured in her business and property in a sum at present unknown, but in excess of Two Hundred Ten Thousand Dollars ($210,000), including, but not limited to, by payment of attorney's fees.  Plaintiff will amend this Complaint to set forth said damages at such time as they have been ascertained.

### SEVENTH CAUSE OF ACTION
### VIOLATION OF 18 U.S.C. §1964 (CIVIL RICO)
### (Against Mr. Harbert Sr.)

86.    Plaintiff refers to and incorporates by this reference each allegation set forth at paragraphs 1-33, hereof, inclusive, as if alleged herein in full.

39

87.    Defendant Mr. Harbert Sr. is a "person" within the meaning of 18 U.S.C. §1961(3).

88.    Sabbia is an "enterprise" within the meaning of 18 U.S.C. §1961(4).

89.    Defendant Mr. Harbert Sr. was "associated with" the aforesaid enterprise in that such Defendant either actively took part in the phantom equipment-leasing scheme as herein alleged, furthered such scheme by cooperation or request, lent aid or encouragement to the wrongdoers or ratified and adopted acts committed by other Defendants for such Defendant's benefit.

90.    During the relevant times, the activities of the enterprise alleged herein have affected interstate commerce in that Sabbia is located in Liechtenstein and Plaintiff is located in California.

91.    In order to conceal the excessive amount of the profits being generated by the bid-rigging scheme, which amounted to 65% of the Subject Contracts as opposed to the negotiated 15% rate, Mr. Harbert Sr. organized a phantom equipment-leading transaction in which Sabbia would purport to make lease payments to South Trust Bank in Birmingham, Alabama in respect of equipment which was never, in fact, purchased.  The transaction had the effect of simultaneously reducing the apparent profitability of the Subject Contracts to the Harbert Contractors while providing a fund -- the purchase price for the equipment allegedly being leased -- which was in fact paid to participants in the bid-rigging scheme.

92.    During the period September, 1989 to December, 1992, payments aggregating in excess of $4,000,000 were wired by Sabbia from Contrade Ormond, Burrus Banque Privee SA Geneve in Geneva, Switzerland (the "Originating Bank") to South Trust Bank in Birmingham, Alabama (the "Receiving Bank").

93.    The Originating Bank had no knowledge or notice of the fraudulent character of the transaction in which Sabbia was engaged.

94.    The foregoing phantom equipment leasing scheme, insofar as it caused the Originating Bank to become an unwitting participant in the bid-rigging scheme, constituted a "scheme or attempt to defraud, by or against a foreign bank" within the meaning of 18 U.S.C. §1956(c)(7)(B)(iii).

95.    Each of the amounts transferred in the aforesaid wire transfers from the Originating Bank to the Receiving Bank therefore constituted "the proceeds of specified unlawful activity" within the meaning of 18 U.S.C. §1956(a)(1).

96.    Defendant was aware that the amounts being transferred from the Originating Bank to the Receiving Bank represented "the proceeds of some form of unlawful activity," to wit, the phantom equipment-leasing scheme, within the meaning of 18 U.S.C. §1956(a)(1).

97.    The receipt by the Receiving Bank of each of the amounts being transferred from the Originating Bank constituted a "financial transaction" within the meaning of 18 U.S.C. §1956(c)(4)(A)(i).

98.    Defendant conducted the aforesaid financial transactions with the intent to promote the carrying on of the phantom equipment-leasing scheme.

99.    During the relevant times, the conducting by Defendant of the wire transfers from the Originating Bank to the Receiving Bank, as stated herein in paragraphs 91-93, therefore constituted in each case the laundering of monetary instruments, as proscribed and prohibited by 18 U.S.C. §1956(a)(1)(A).

100.    Each of the aforesaid violations by Defendant Mr. Harbert Sr. of the statute prohibiting laundering of monetary instruments as hereinabove alleged constituted an instance of "racketeering activity" within the meaning of 18 U.S.C. §1961(1).

101.    The multiple acts of racketeering activity by Mr. Harbert Sr. were interrelated, put of a common and continuous pattern of fraudulent schemes, and perpetrated for the same or similar purposes, thus constituting a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).

102.    In engaging in the above said actions, Mr. Harbert Sr. has become associated with and has conducted or participated in the conduct of the affairs of said enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(a), to wit, multiple instances of laundering of monetary instruments in violation of 18 U.S.C. §1956(a)(1)(A), as more particularly set forth in paragraph 99 of this Complaint.

103.    In engaging in the aforesaid actions, Mr. Harbert Sr. has violated the provisions of 18 U.S.C. §1962(c).

104.    By reason of the violation of 18 U.S.C. §1962(c) committed by Mr. Harbert Sr., Plaintiff was injured in her business and property in a sum at present unknown, but in excess of $3,000,000, including, but not limited to, by payment of attorney's fees.  Plaintiff will amend this Complaint to set forth said damages at such time as they have been ascertained.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

### FOR THE FIRST CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial, but in excess of $2,050,000, plus interest thereon.

2.    For an award of punitive and exemplary damages in a sum to be later determined.

### FOR THE SECOND CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial, but in excess of $3,830,000, plus interest thereon.

### FOR THE THIRD CAUSE OF ACTION

1.    For the sum of $2,050,000, plus interest thereon.

### FOR THE FOURTH CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial, but in excess of $2,830,000.

2.    For an award of punitive and exemplary damages in a sum to be later determined.

## FOR THE FIFTH CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial, but in excess of $3,000,000.

2.    For an award of punitive and exemplary damages in a sum to be later determined.

## FOR THE SIXTH CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial, but in excess of $210,000, such sum to be duly trebled in accordance with 18 U.S.C. §1964(c).

2.    For equitable and injunctive relief as might be appropriate in accordance with 18 U.S.C. §1964(c), including:

        a.    reasonable restrictions on the future activities of Defendants;

        b.    an equitable accounting of all benefits, consideration and profits received directly or indirectly or underlying, including, but not limited to, the imposition of a constructive trust with tracing; and

        c.    the imposition and execution of equitable liens.

## FOR THE SEVENTH CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial, but in excess of $3,000,000, such sum to be duly trebled in accordance with 18 U.S.C.

§1964(c).

2.     For equitable and injunctive relief as might be appropriate in accordance with 18 U.S.C. §1964(c), including:

a.     reasonable restrictions on the future activities of Defendants;

b.     an equitable accounting of all benefits, consideration and profits received directly or indirectly or underlying, including, but not limited to, the imposition of a constructive trust with tracing; and

c.     the imposition and execution of equitable liens.

## FOR ALL CAUSES

1.     For costs of suit herein incurred.

2.     For such other and further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:   April 8, 2007

Dr. Hoda Elemary
21 Le Conte
Laguna Niguel, California 92677
(949) 715-2022 (telephone)
(949) 715-2060 (fax)

Plaintiff
In Propria Persona

45

## INCORPORATED SCHEDULE

I.    a) Plaintiff removed the Harbert Contractors' name from a list of corporations blacklisted by Egypt (for an earlier $79 million dispute between Defendants and the Egyptian government, which Plaintiff had amicably resolved at the international court in Paris at no monetary fine to the Harbert Contractors), so that Defendants could be eligible to do business in Egypt and bid on the Subject Project; b) Plaintiff assisted in drafting parts of the Accords concerning the funding of such projects as the Subject Project; c) Plaintiff was able to enlist the support and backing of the Egyptian Prime Minister, Dr. Atef Sedki, Plaintiff's uncle; and d) Defendants wished to discourage investigation of the Harbert Contractors' activities by securing themselves with a watertight coverup for their secret bid-rigging operation by benefiting from the political protection of Plaintiff's association with Presidents Gerald Ford, Jimmy Carter and later, Ronald Reagan, as well as Dr. Henry Kissinger and Messrs. Rockefeller and Kaiser, who sat on the Board of Directors with Plaintiff on a New York-based organization founded by Plaintiff -- The Sadat Peace Foundation, Inc.  Each of these four reasons severely damaged Plaintiff during Defendants' execution of the bid-rigging plan and, afterwards, when the bid-rigging became public knowledge.  To this end, the Harbert Contractors' bid-rigging directly impacted and severely damaged Plaintiff, who had used her credibility internationally when she vouched for the Harbert Contractors' character and integrity to secure the awarding of the subject five contracts to Defendants.

i

II.    Defendants elected to bid rig approximately $40 million in illegal profits, destroying Plaintiff's lucrative relations with Egyptian leaders and swiftly moving to implement their Machiavellian master plan that deliberately banished and quarantined Plaintiff from learning of their bid-rigging schemes to which Defendants correctly anticipated Plaintiff would object. Accordingly, the Harbert Contractors willfully exiled Plaintiff to their claim in Saudi Arabia before the Saudi Royal Board of Grievances between 1990 and 1997 to ensure that Plaintiff had no knowledge of Defendants' conspiracy to obtain a collusive, artificially inflated, and non-competitive price for the Subject Contracts the Harbert Contractors had obtained by using Plaintiff's contacts and illegal and inflated profit thereon. As a result of this conspiracy, Defendants submitted and caused to be submitted false and inflated claims for payment to the United States, including the operation of Defendant Sabbia -- Defendant Mr. Harbert Sr.'s brainchild. Such operations were extracted from a Swiss banker's memorandum of meetings with Mr. Harbert Sr., who described in great detail the operation of masterminding the bid-rigging. During the course of Plaintiff's pursuit of payment of the Saudi Claim in Saudi Arabia, Plaintiff had no knowledge of Defendants' deep involvement and culpability in masterminding the bid-rigging conspiracy in which the Harbert Contractors were engaged during that time.

III.    The monetary loss to the United States and Plaintiff as a direct result of Defendants' fraudulent activities pales in comparison to the political hemorrhage that the Harbert Contractors have caused through their betrayal of the United States.

Defendants' remorseless pursuit of enriching themselves, notwithstanding the interests of Plaintiff or the United States in the world's most troubled region -- the Middle East, have negated the purpose for which the United States Congress has authorized substantial funding to combat the Islamic fundamentalists' campaign to damage the United States' image.  Instead, the Harbert Contractors have aided and abetted Islamic terrorists' false statements against the United States, and confirmed Osama bin Laden's misguided propaganda that Americans are untrustworthy.

Plaintiff's political contacts in the Middle East were deliberately and willfully damaged by the Harbert Contractors.  In the Subject Project, Plaintiff played the major role in securing the bids in the late 1980's and delaying the False Claims Case for three years between 2002 and 2005 and negotiated with Senator Dole a low settlement that the Department of Justice is no longer prepared to entertain.  The United States will accept today either a $56 million settlement or a $75 million judgment if the False Claims Case is tried to a verdict.

The Harbert Contractors intentionally concealed from Plaintiff the facts of Defendants' activities.  Defendants knowingly interfered with Plaintiff's special contacts and violated the trust vested by the most senior Egyptian and Arab government officials in Plaintiff as their own private inspector on the ground while the Harbert Contractors unjustly enriched themselves by stealing funds intended for Egypt's development.  To this end, the bid-rigging conspiracy severely tarnished the status of Plaintiff's reputation as an honest broker between the United States business

iii

community and the Middle East. As a result of the actions of Billy Harbert Jr. and his cabal, however, the arrangement contemplated by the September 21 Agreement fell promptly into disarray, Sharp sending a letter to Plaintiff on September 27, 2004 (the "September 27 Letter") announcing that Sharp was now the case manager and that Plaintiff's monthly compensation would only be guaranteed through the end of 2004. On October 5, 2004, a letter was purportedly sent by Mr. Harbert Sr. to Plaintiff demoting Plaintiff to "case resolution manager" and requiring all of Plaintiff's actions to be approved by Sharp (the "October 5 Letter"). These sentiments were reiterated in a subsequent letter, dated October 21, 2004, purportedly sent by Mr. Harbert Sr. to Plaintiff (the "October 21 Letter").

Thereafter, on November 11, 2004, another letter (the "November 11 Letter") purportedly signed by Mr. Harbert Sr., addressed to seven of Mr. Harbert Sr.'s lawyers and acknowledged by Hoover on that date, reiterated the statements made in the October 21 Letter and concluded, "Again, pure and simple, Bill Sharp is the case manager."

That same day, however, Mr. Harbert Sr. repudiated the October 5 Letter, the October 21 Letter, and the November 11 Letter. In statements notarized by Carla D. Faile, a notary public in Jefferson County, Alabama, Mr. Harbert Sr. wrote on the October 5 Letter "I DID <u>NOT</u> WRITE THIS LETTER OR AUTHORIZE ANYONE TO SIGN IT", and on the October 21 letter, on the first page, "I DID NOT WRITE THIS LETTER NOT [SIC] AUTHORIZE ANYONE TO

iv

SIGN IT ON MY BEHAVE [SIC]" and, on the second page, "I DID NOT WRITE THIS LETTER NOR AUTHORIZE ANYONE TO SIGN IT ON MY BEHALF -- FORGERY." Finally, on the first page of the November 11 Letter, Mr. Harbert Sr. wrote, "TO THE LEGAL TEAM [:] KINDLY DISREGARD THIS LETTER. I HAVE NO INTENTION OF TERMINATING HODA ELEMARY OR ANY MEMBER OF THE LEGAL TEAM," which writing was acknowledged on November 13, 2004 by Marsha H. Fifer, a notary public.

Moreover, also on November 11, 2004, Mr. Harbert Sr. sent Plaintiff a letter specifically disavowing Sharp's statements concerning Plaintiff's contractual arrangements in the September 27 Letter and reconfirming the September 21 Agreement; sent separate letters to each of Keith Morgan, William D. Dillon and Carolyn G. Mark at the DOJ, confirming Plaintiff's status as "exclusive case manager"; on each of the four pages of the September 21 Agreement, wrote "Confirmed on 11/11/04 Bill Harbert," which signature was acknowledged on each page by Ms. Faile; and sent a letter addressed to Plaintiff and four other parties referencing the "recent confusion and uncertainty regarding the management and direction of my legal team" and stating that if he "remove[s]" Plaintiff, he will be liable in damages to the amount of one million dollars ($1,000,000) (the "Guarantee").

On February 14, 2005, Mr. Harbert Sr., acting under pressure by Billy Harbert Jr., wrote to Plaintiff stating that he was terminating the September 21 Agreement effective April 5, 2005.

v

On March 18, 2005, Ms. Mark submitted an offer, in writing, to Plaintiff, by which Mr. Harbert Sr. could settle the False Claims Case for $15,000,000. This offer was accepted by Mr. Harbert Sr. but rejected by Billy Harbert Jr.

IV.    During a heated argument between Mr. Harbert Sr. and Billy Harbert Jr., Plaintiff became compromised, both morally and physically, when she was a firsthand witness to an exchange of accusations between Mr. Harbert Sr. and Billy Harbert Jr., who admitted during the argument their personal involvement in defrauding the United States of $40 million, the accrued benefits of their bid-rigging. Billy Harbert Jr. then accused his father of stealing $7 million from his uncle, the late John Harbert, demanding immediate repayment from his father to his late uncle's estate.

Between 1991 and 1998, during the course of her pursuit of payment of the Harbert claim in Saudi Arabia, Plaintiff had no knowledge of Defendants' deep involvement in and culpability with respect to the bid-rigging conspiracy in which the Harbert Contractors were engaged during that time. It was not until 2004 and 2005 that Plaintiff became aware of the extent of Defendants' culpability.

V.    Plaintiff, Dr. Hoda Elemary, is a citizen of the State of California.

Defendant Philipp Holzmann A.G. ("Holzmann") is a corporation organized and existing under the laws of the Republic of Germany, with its principal place of business in the City of Frankfurt in the Republic of Germany.

Defendant Wachovia Bank, N.A. ("Wachovia") is a national banking association having its designated main office in the State of North Carolina.

Defendant B.L. Harbert International, LLC ("HILLC") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Alabama.

Defendant Sabbia Aktiengesellschaft is a corporation organized and existing under the laws of the Duchy of Liechtenstein, with its principal place of business in the Duchy of Liechtenstein.

Defendant Harbert International Establishment, Inc. ("Bilhar") is a corporation organized and existing under the laws of the Duchy of Liechtenstein, with its principal place of business in the Swiss Confederation.

Defendant Bill L. Harbert, Sr. is a citizen of the State of Alabama.

Defendant Billy Harbert, Jr. is a citizen of the State of Alabama.

VI.    Plaintiff's career was destroyed as a consequence of her vouching for the Harbert Contractors to enable them to participate in the Subject Project, as a result of which Plaintiff lost credibility both with the United States government and Middle East officials.  In addition, (a) Billy Harbert Jr. derailed Plaintiff's imminent arrival at a mutually satisfactory settlement to renegotiate the terms of the $54 million plea bargain with Assistant United States Attorney William Dillon when such Defendant conspired to misrepresent facts to him during a telephone call with Mr. Dillion to thwart Plaintiff's efforts; (b) Sabbia was created at Mr. Harbert Sr.'s inspiration to

vii

engage in a bogus sale-leaseback transaction in order to reduce the apparent profitability of the Subject Project as well as provide a slush fund for the other participants in the bid-rigging scheme; (c) Billy Harbert Jr. falsely claimed on HILLC's website that his company HILLC (rather than Mr. Harbert Sr.'s corporate entity Bilhar) was responsible for upgrading the sewer system in Cairo, Egypt, so that Plaintiff's existing clients, including, but not limited to, Bechtel, suspected Plaintiff of embellishing her credentials when she stated that she assisted Mr. Harbert Sr. to secure the contracts in developing the Subject Project; and (d) the Harbert Contractors' counsel, Sharp, admitted in a memorandum that pre-settlement indictments for bid-rigging, tax fraud, money laundering, violation of the Racketeer Influenced and Corrupt Organizations Act, wire fraud and related crimes would likely be pursued by the DOJ against Mr. Harbert Sr. and other individuals and entities if the False Claims Case went to trial.

# LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST

## ARTICLE ONE

Bill L. Harbert, called The Settlor and Trustee, declares that he has set aside the property described in Schedule A, attached to this instrument. All property and Securities subject to this instrument from time to time are respectively referenced as the "Property Estate" and "Stock Estate". THE TRUST ESTATE is inclusive of the property and stocks held together in the trust created in this instrument and shall be managed and distributed according to the terms of the Personal Arrangement Contract "Personal Arrangement".

## ARTICLE TWO

This instrument (in addition to creating a trust) sets the contract's terms and documents a five year old Secret agreement of a personal financial arrangement made by and between Bill L. Harbert (Harbert) and Dr. Hoda Elemary (Elemary) on November 3, 2003.

## ARTICLE THREE
## RECITALS

The parties' mutual benefits for conveying properties and stocks are:

I. On or about November 1998, the parties entered into a secret personal agreement that was further defined in 2002, whereby at Harbert's request, Elemary committed to Harbert to assist him with his personal affairs including his litigation troubles and to provide him-on a more permanent basis-with companionship, love, friendship and comfort as she had from time to time since 1991. Accordingly, Harbert's reasons for purchasing Elemary a house in Laguna Niguel, CA are: a).The personal aspect of their relationship b).An approximately $50 million Harbert earned in profit from Elemary's contacts with international senior Governments officials-who awarded Harbert lucrative oil pipelines and Mega Mid-East development contracts and  c). "The great career risks" Elemary had assumed by enlisting her friends in Washington to shield Harbert from prosecution by the Department of Justice (DOJ) for 3 years.

II. On February 4, 2002 Harbert pled guilty on behalf of his corporation's, Bilhar, violation of one count of the Sherman Antitrust Act for bid rigging. Harbert paid the United States a $54 million fine. Harbert therefore eagerly sought Elemary's intervention on his behalf. Elemary was advised By Senator Orrin Hatch that "representing anyone associated with bid rigging to the DOJ, White House or Congress is tantamount to taking great career risks".  Elemary cautiously agreed to Harbert's request on strict conditions. Harbert officially named Elemary as exclusive case manager to benefit from her high powered political contacts, which included personally advising five Consecutive U.S. Presidents on Mid-East terrorism. In July 2002 Elemary retained her personal friend, former Senate Majority Leader, BOB DOLE, to assist her in dealing with the DOJ.

III. With the exception of Elemary's deposit into escrow, the parties initiated discussions on August 16-18, and agreed on October 22, 2003 that the Laguna Niguel beach house would be paid in full by Harbert including real estate taxes at purchase time.

## ARTICLE FOUR
### (Personal Arrangement)

NOW, THEREFORE, in consideration of this personal arrangement as well as the business agreements and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties covenant and agree as follows:

1- Any potential lawsuit arising out of this Personal Arrangement Contract or business guarantees and agreements, as well as potential counter claims shall be governed and construed according to the laws of the state of California. Any lawsuit to enforce the terms of this Personal Arrangement and business agreements shall be commenced, and litigated (for personal disputes) in the Family Court – Superior Court in Los Angeles, California, and (for business disputes) in U.S. District Court, Central Division in Los Angeles, CA, in the County of Los Angeles. Any and all potential lawsuits, as well as compulsory counter claims will be <u>without exception</u>, litigated in California as though all the parties and witnesses to such lawsuits were California citizens and that the subject matter of the dispute upon which these lawsuits are based occurred in their entirety in the State of California, County of Los Angeles. In the event that either party to this contract-or their co-defendants or co-plaintiffs-file a motion to change this understanding on venue and jurisdiction (for any potential lawsuit) the violating party will unconditionally and unequivocally assume liability to pay the other party liquidated damages of three million dollars. Cleary, it is difficult to asses such damages. Nevertheless the parties have determined that the liquidated damages are at least $3 millon. The parties confirm their agreement herein that the violating party will pay $3 million to the other party. In the event that Harbert breaches any of the Business Agreements or Personal contract, Elemary will exclusively decide whether to pursue an expedited trial schedule, which include binding arbitration by a retired judge and/or a twenty five weeks expedited trial, whose cost will be born equally by Harbert and Elemary. Harbert's breach of this agreement for an expedited trial schedule will result in a one week demand for payment of $3 million. Otherwise, Harbert agrees to Elemary to demand double that amount from his LLC or bank accounts in Alabama and Switzerland.

2- Harbert unequivocally and unconditionally guarantees Elemary to overcome his current problems with cash flow that resulted in Harbert taking out a mortgage on the subject property. As a direct and proximate result of the drastic impact on Elemary on account of Harbert's cash flow problems, Harbert committed himself to the following:
A. To provide Elemary with a monthly payment to cover the mortgage payment and real estate taxes.
B. To divide in equal parts of fifty percent (50%) each with Elemary any and all profits arising out of his securities and stocks holdings beyond and above, i- accrued interest, ii- a seven percent (7%) annual increase of stock holdings for a two year period between the date of the execution of this document and Nov. 3rd 2005.

3- Harbert is hereby committed to compensate Elemary for his delay in paying fully for the beach house and agrees that at the earliest possible date, but no later than March 31st, 2005, Harbert will pay back the mortgage in full on the Beach House in compliance with his unwavering guarantee to fully pay for the beach house to satisfy his

2

part of the bargain in exchange for his acknowledgement of the receipt of 12 years of companionship and personal services and 25 years of business service.

4. Harbert confirms his unconditional commitment to fulfill written guarantees stipulated herein to provide the promised minimum security for Elemary irrespective of any third party interference (including by son Billy Harbert) or change of circumstances.

## ARTICLE FIVE

In the event the parties, convey the subject property through their own names, such transactions shall be legally titled as referenced below in article nine. The use of this legal title is necessary to insure this Personal Arrangement or (TRUST ESTATE) is consistent with other guarantees and agreements executed by the parties that refer to THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST as the instrument for transmuting real estate property. However, this Personal Arrangement Contract is legally not revocable despite the word revocable in the title. Each party hereby represents, warrants, and agrees to the other as follows:

A. Each party has received independent legal advice from his or her attorney with respect to the advisability of entering into this Personal Arrangement Contract and TRUST ESTATE.

B. Each party carefully read this Personal Arrangement Contract/ Trust created by this instrument and understands contents and legal effects of each provision hereof.

## ARTICLE SIX

Harbert is referenced in this document as the current Settlor and Trustee, Harbert will resign on November 3, 2003. Elemary will become the Settlor and Trustee two weeks after Harbert's execution of this document.

## ARTICLE SEVEN

The Settlor may not revoke the Personal Arrangement (Contract). However, Schedule B, attached, describes the necessary measures to be implemented when the parties elect to utilize the trust created in this instrument, to convey property & stocks.

## ARTICLE EIGHT

The Settlor appoints for life in the office of Settlor & Trustee, the person listed herein who shall effective the date of execution of this document, serve as the Settlor/Trustee first: Dr. Hoda Elemary. Elemary shall have power to designate one or more individuals or corporate fiduciaries to serve concurrently or serially to succeed the trustee in the event of her inability or unwillingness to act. The Trustee may revoke this instrument in whole or in part at any time. The Trustee may at any time amend any terms of this trust. Upon the trustee's death, the entire undistributed principal and income of the trust estate shall go to Elemary's designee. The Trustee shall have the full power to sell, encumber, convey, exchange, invest, reinvest, partition, divide, improve, sever and repair the property or stocks constituting the Trust Estate from time to time. The Settlor/Trustee shall have all powers conferred on the Settlor &Trustee by law and all powers contained in California Probate Code sections 16200-16249. If any provision of this instrument is unenforceable, the remaining provisions shall remain in full effect.

## ARTICLE NINE

The trust created in this instrument may be referred to as THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST.

Executed on November _3_ , 2003.

_Bill L. Harbert_
_____
BILL L. HARBERT, Trustee

I certify that I have read the foregoing declaration of trust and that it correctly states the terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustee. I approve the declaration of trust in all particulars and request that the trustee execute it.

Date: November _3_ , 2003     _Bill L. Harbert_
_____
BILL L. HARBERT, Settlor

City of Washington
DISTRICT OF COLUMBIA          }
                             }
UNITED STATES OF AMERICA     }

On November **3rd**, 2003, before me, GUILLAUME TOURNIAIRE G.C.T. ~~Greg L. Harbert~~, personally appeared BILL L. HARBERT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity on behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.          SEAL

[Signature]

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

4

# SCHEDULE A

Fifty-percent (50%) undivided interest in single family residence located at 21 LE
CONTE, LAGUNA NIGUEL, CALIFORNIA 92677, and more particularly
described as follows:

LOT 16 OF TRACT NO. 8551, IN THE CITY OF LAGUNA NIGUEL, COUNTY
OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A SUBDIVISION
MAP, RECORDED FEBRUARY 29, 1984, IN BOOK 522, PAGES 1 TO 17,
INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY.

APN: 658-251-07

# SCHEDULE B

1.  In order to add property to this Trust, the Parties shall sign a separate document, other than this Trust, confirming the description of those properties and/or stocks to be added to this Trust, in addition to the Property described in Schedule A, attached hereto.

2.  Each of the Parties hereto agrees to execute such other and further documents as are necessary and appropriate to accomplish the transfer of said additional properties and/or stocks into this Trust, i.e., assignments, deeds, etc.

Executed on November 3 , 2003.

_____
DR. HODA ELEMARY, Successor Trustee

    I certify that I have read the foregoing declaration of trust and that it correctly states the terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustee. I approve the declaration of trust in all particulars and request that the trustee execute it.

Date:  November 3 , 2003

_____
DR. HODA ELEMARY, Successor Settlor

**BILL HARBERT**

November 10, 2004

Dr. Hoda Elemary
21 LeConte
Laguna Niguel, CA 92677

Dear Hoda:

I am writing to reaffirm my guarantee of several agreements between us that were detailed in the notarized confirmation document "Master Agreement" dated September 21, 2004. You may disregard William Sharp's correspondence including his September 27, 2004 letter to you that attempted to void said confirmation.

I would like you to know that I did not sign nor authorize that my name be signed on my behalf the October 5 and October 21, 2004 letters sent to you by Mr. Sharp under the pretense that I signed and authorized these letters be sent to you.

With Kind Regards

Sincerely,

*Bill L. Harbert*

Bill L. Harbert

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D. Fa...* **FILED**
*November 11, 2004*
APR 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Bill L. Harbert
P.O. Box 531390
Birmingham, AL 35253
205-802-2810
Fax: 205-802-2815

October 21, 2004

Confidential

Via Hand Delivery

Dr. Hoda Elemary
World Peace Today, Inc.
2252 South Caliente Road
Palm Springs, CA 92264

*I did not write this letter not authorize anyone to sign it on my behalf.*

*Bill Harbert*

Dear Hoda:

This letter updates and supersedes my October 5, 2004 letter to you. As you know, at the end of September I made the decision to move the case manager job for the qui tam and declaratory judgment matters over to Bill Sharp. Therefore, Bill has management authority over the qui tam and declaratory judgment matters.

In order for Bill to do his job, you are not to take any action without first clearing it with him. Furthermore, all communications to me, Van Hoover or other members of my business team or family shall be through Bill Sharp.

Once again I have directed Bill Sharp to make clear to the legal team that he is serving as case manager. I also have directed Bill to make clear to the legal team that there should be no further contact regarding the declaratory judgment proceeding with the Department of Justice, any judicial authorities or their clerks, or any other parties outside the legal team by you or anyone else without Bill's prior review and authorization. I have also asked Bill to review and authorize all legal and consulting fees. I will not be responsible for fees and costs unless Bill reviews these in advance of the services being rendered for them.

I have asked Bill Sharp to make it clear to the Department of Justice attorneys and others involved in this case that Bill has the sole authority to make settlement offers or other commitments (whether as to substantive matters, procedural matters or otherwise). I have already asked Bill to appoint and oversee my local counsel in Birmingham as well as to determine when and who shall be involved in various upcoming conference

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

Dr. Hoda Elemary
October 21, 2004
Page 2 _____ Confidential

calls, hearings and meetings regarding the declaratory judgment
proceeding.

     I would still ask that you or your counsel discuss your
continuing role  in the qui tam matter with Bill Sharp.  Again,
you are not to take any action without first clearing it with
Bill.  Thank you for your continued cooperation.

                         Yours very truly,

                         *Bill Harbert*

                         Bill L. Harbert

cc:  Legal Team

BLH:vh

*I did not write this letter
nor authorize anyone to sign
on my behalf - Forgery*

                         *Bill Harbert*

                         CARLA D. FAILE
                    Notary Public, Jefferson County, Alabama
                    My Commission Expires March 21, 2007

                         *Carla D Faile*
                         *November 11, 2004*

NOV 12 '04 09:35AM    RBERT INTL CONS 205 802 2815                                              P.2

*To the Legal Team*

*Kindly disregard ~~designed~~ disregard*
*this letter. I have no*
*intention of*
*terminating Hoda*
*Elemary or any member*
*of the Legal Team.*

*Bill L Harbert*

**Bill L. Harbert**
**P.O. Box 531390**
**Birmingham, AL  35253**
**205-802-2810**
**Fax:  205-802-2815**

November 11, 2004

*State of Alabama*
*County of Jefferson*
*Sworn and subscribed before me*
*Marsha H. Fifee, Notary Public*
*on this 13th day of Nov. 200?*
*Personally appeared Bill Har*
*who is known to me to be the sam*
*Marsha H. Fifee*

**Privileged &**
**Confidential**

**<u>VIA FACSIMILE</u>**

*My Commission Expires*
*September 19, 2006*

**Barry Coburn, Esq. - 202-628-4177**
**Marshall Harris, Esq. - 202-756-3333**
**Bryan B. Lavine, Esq. - 404-962-6613**
**Sam C. Pointer, Jr., Esq. - 205-581-0799**
**June Ann Sauntry, Esq. - 404-962-6613**
**David Schertler, Esq. - 202-628-4177**
**Jerry L. Steering, Esq. - 949-474-1883**

**Ladies and Gentlemen:**

I am attaching a copy of my October 21, 2004 letter to Dr. Hoda Elemary that was previously sent to you.  I know that there has been some friction regarding the management of the qui tam action and the declaratory judgment action.  I know that the friction has worsened since I appointed Bill Sharp as case manager on October 21, 2004.

I am writing this letter to you in order to reconfirm and more clearly define my directives as described in my October 21, 2004 letter because of some events that have occurred during the past couple of days.

I met with Jerry Steering and Dr. Hoda Elemary yesterday evening and this morning in Birmingham.  Dr. Elemary claimed that she is still in charge as case manager, that Bill Sharp is not in charge, and that none of you are cooperating with Bill and all of you are still working with Hoda.

I wanted to let all of you know that I am reconfirming the mandate set forth in my October 21, 2004 letter.  Pure and simple, Bill Sharp is in charge of the management of the qui tam action and the declaratory judgment cases.  He is the case manager and Dr. Hoda Elemary is not the case manager.  I told this today to Dr. Elemary and Mr. Steering and I told Dr. Hoda Elemary that she must report to Bill Sharp and to no one else.  She must clear any action with Bill Sharp before taking any action.  She has no authority to discuss my matters with you, to attend or schedule meetings, to talk to any third party about the cases, or to take any other action until Bill Sharp approves any matter in advance.  I also told Dr. Elemary to follow the above mandate in my October 21, 2004 letter.  Again, pure and simple, Bill Sharp is the case manager.

In particular, no one is to take any calls, directives, or other instructions from Dr. Hoda Elemary unless Bill Sharp first says that it is

Bill L. Harbert
P.O. Box 531390
Birmingham, AL 35253
205-802-2810
Fax: 205-802-2815

October 5, 2004

**Confidential**

Dr. Hoda Elemary
World Peace Today, Inc.
2252 South Caliente Road
Palm Springs, CA 92264

Dear Hoda:

As you know, at the end of September I made the decision to move the case manager job for the qui tam and declaratory judgment matters over to Bill Sharp.

Bill explained to me that based on the discussion the two of you had that Bill is now serving executive case manager and that you are serving as case resolution manager. I am okay with these titles so long as Bill has management authority over the qui tam and declaratory judgment matters.

Because the declaratory judgment litigation is now headed to Birmingham, I have directed Bill to make clear to the legal team that he is serving as executive case manager. I also have directed Bill to make clear to the legal team that there should be no further contact regarding the declaratory judgment proceeding with the Department of Justice, any judicial authorities or their clerks, or any other parties outside the legal team by you or anyone else without Bill's prior authorization. In addition, and in order to avoid any confusion, I am asking Bill to appoint and oversee my local counsel in Birmingham as well as to determine when and who shall be involved in various upcoming conference calls, hearings and meetings regarding the declaratory judgment proceeding.

I would still ask that you continue your role as case resolution manager for the qui tam proceeding though anything you want to do should be reviewed first with Bill. On the declaratory judgment proceeding I would like you to take no action unless Bill asks for your involvement.

Yours very truly,

*Bill Harbert*

Bill L. Harbert

BLH:vh

*I did not write this letter we authorize any one to sign it.*   *Bill L Harbert*

CARLA L. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D Faile*
*November 11, 2004*

# BILL HARBERT

William M. Sharp, Esq.                                    November 11, 2004
SHARP AND HARRISON, P.A.
Two Urban Centre, Suite 900
4890 West Kennedy Boulevard
Tampa, Florida 33609-1850

Re: *Qui Tam and Declaratory Relief Actions*

Dear Bill:

I appreciate all of your fine work in assisting my family and me, and look forward to continuing to work with you on these personal issues.

I am writing to bring to your attention to the fact that when I accepted your help to manage the qui tam and declaratory relief cases I had forgotten that I had a confirmed agreement with Dr. Elemary under liability to me to manage these cases to their conclusions. Although I have only agreed to make payments to her for a limited period of time, her position as exclusive case manager was guaranteed by me. I therefore have no choice but to honor my agreements with Dr. Elemary (which preceded any understanding between us concerning these two matter) to limit my liability.

Although I have appreciated your work in the above matters, I simply cannot continue with the recent confusion and disruption that has arisen between you and several key members of my legal team, namely, Jerry Steering, Barry Coburn and David Schertler, as well as the confusion over the responsibilities of you and Dr. Hoda Elemary in my qui tam and declaratory judgment matters. I have therefore made the decision that Dr. Elemary is to be the sole case manager/resolutions for these matters, as stated by you in your letter of September 27, 2004.

I know you can appreciate that all decisions concerning the qui tam and declaratory judgment proceedings are mine and mine alone to make, and that the final decision as to who will be my case manager is mine and mine alone.

*[signature]*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*[signature]* Carla D Faile
November 11,

**FILED**
APR 1 0 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

820 SHADES CREEK PARKWAY, 35209     POST OFFICE BOX 531390     BIRMINGHAM, ALABAMA 35253
TELEPHONE (205) 802-2800

William M. Sharp, Esq.
SHARP AND HARRISON, P.A.
November 11, 2004
Page Two

I believe that the current arrangement will not serve my interests for the reasons stated above. We need to work together and stop all the distractions, which is why I have decided to unify the existing legal team under Dr. Elemary's leadership. You and I will continue to work together on various aspects of this case. Based on my long relationship with her and her effective work on my behalf in the past, I am comfortable with Dr. Elemary as the sole case manager.

I have asked Dr. Elemary to be available in three months so we can sit together and review the progress made to date and together with you make necessary decisions if changes are called for. It is imperative that we allow time to heal the rifts that currently exist. You must appreciate that there has been too much <u>non-productive, costly and disruptive</u> activity surrounding my legal team and their efforts. This must stop. I need unification, not division, if we are to prevail against the government. An effective team cannot be pulled from both ends or have conflicting leadership.

That said, I know we can rise above this difficult and awkward moment, and can continue working together on other matters.

Very truly yours,

Bill L. Harbert

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

November 11, 2004

# Bill L. Harbert

November 4, 2003

Ms. Hoda Elemary
2252 Caliente Road
Palm Springs, California 92264

      Re:    *21 Le Conte, Laguna Niguel, California 92677*
             *APN 658-251-07*

Dear Hoda:

The purpose of this letter is to confirm the fact that I have no intention whatsoever to revoke now or in the future The Laguna Niguel Beach House 2003 Revocable Trust. However, if any of my heirs challenge this trust or should I be placed in a position to revoke or modify The Laguna Niguel Beach House 2003 revocable trust concerning the above-referenced property, either I or my estate will be irrevocably and unconditionally obligated to pay you the sum of three million dollars  This agreement to pay said amount is in consideration of your assistance on my behalf over the past few years in dealing with the DOJ in connection with the U.S. v. Bilhar, et al. case, which involves both criminal fine of fifty-four million dollars and civil fine of thirty million dollars.

You have Taken great risks in dealing with the DOJ and therefore earned the sum of money referenced above only in the event that I or any of my heirs, should challenge, revoke or modify the Laguna Niguel Beach House 2003 revocable trust.

With kind regards

Sincerely,

*[signature]*

Bill L. Harbert

City of Washington
District of Columbia

Bill L. Harbert appeared personally before me, presenting an Alabama drivers license as identification

**FILED**

APR 1 0 2007

Guillaume Tourniai
Notary Public, District of Columbia
My Commission Expires 01-01-2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

DIANNE FEINSTEIN
CALIFORNIA

COMMITTEE ON APPROPRIATIONS
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND ADMINISTRATION

# United States Senate

WASHINGTON, DC 20510-0504

(202) 224-3841

May 27, 1999

The Honorable Amr Moussa
Minister of Foreign Affairs
Ministry of Foreign Affairs
Arab Republic of Egypt,

Dear Mr. Moussa:

I am writing to ask you to provide me with a response concerning the Egyptian Government's position in ensuring that Ms. Hoda Elemary can travel safely in and out of Egypt at this time.

The purpose of this request is not to question Egypt's sovereign privileges over Ms. Elemary. It is based on the vital services Ms. Elemary provides Congress, which have been determined to serve U.S. national interests. A majority of the United States Senators have overwhelmingly endorsed Ms. Elemary's work and have credited her with playing a pivotal role in lobbying the Congress to support Operation Desert Storm, as it did on January 12, 1991; forgive Egypt's $7 billion debt, as it did on October 19, 1990; and, undertake many supportive initiatives in favor of advancing the peace process and enhancing close relations between the United States and Egypt.

I understand that she is the target of threats from political groups that oppose Egypt's cooperation with the U.S. and Israel. Because of her involvement in the Middle East peace process, I am requesting any information you may have concerning any political reasons that may prevent Ms. Elemary's safe return to the United States. I understand she will be traveling to Egypt in early June, 1999.

I look forward to Your Excellency's response regarding Ms. Elemary's secured return to the United States from Egypt.

With warmest personal regards.

Sincerely yours,

Dianne Feinstein
United States Senator

DF:rwh

FILED

APR 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# United States Senate

WASHINGTON, DC 20510-2803

July 21, 2000

Dona Coultice
Director, California Service Center
Immigration and Naturalization Service
Post Office Box 30014
Laguna Niguel, CA 92607

Dear Director Coultice:

I write today to request the expedition of Ms. Hoda Elemary's application for naturalization. Ms. Elemary (A# 72917452) is the founder of the Sadat Peace Foundation to Egypt, which advances the dialogue and cooperation between the United States and the people of the Middle East. She and the Foundation provide vital services of national interest to Congress, and I hope that you will give this request for expedition every serious consideration.

Ms. Elemary travels to Egypt and other countries in the Middle East on a variety of peace missions. Previous trips have required the assistance of the State Department and Members of Congress to ensure her safety and security. Expediting her naturalization application will provide her with the automatic protection of our embassies and consulates overseas, thereby promoting her peace missions and negating the need for additional assistance by the State Department and the Congress. An expedited review of her application takes on additional significance in light of the fact that Ms. Elemary is expected to travel to the Middle East again this fall.

On a more personal note, I understand that Hoda will be choosing my home State of Nevada as the first place that she will call home as an American citizen. I am proud that she has made this decision, and I look forward to calling her a fellow Nevadan in the very near future.

Should you have any questions or require additional information, please do not hesitate to call Eddie Ayoob of my staff at (202) 224-3542. Thank you for your assistance in this matter.

With all best wishes,

Sincerely,

HARRY REID
United States Senator

E-Mail: senator_reid@reid.senate.gov
Web: http://reid.senate.gov

PRINTED ON RECYCLED PAPER

ORRIN G. HATCH
UTAH

WENDY J. HIGGINBOTHAM
ADMINISTRATIVE ASSISTANT

135 RUSSELL SENATE OFFICE BUILDING
TELEPHONE (202) 224-5251
TDD (202) 224-2849

# United States Senate
WASHINGTON, DC 20510-4402

January 25, 1995

Mr. Joseph L. Thomas
Immigration and Naturalization Service
Western Service Center
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677-8111

Dear Mr. Thomas:

I am writing on behalf of Mrs. Hoda Elemary, who I understand has
filed a National Interest Petition with the INS.

Mrs. Elemary is the founder and executive director of the Sadat
Peace Foundation, named for the late Egyptian President Anwar
Sadat, whose historic contributions to Middle East peace and
stability the Foundation is committed to advancing.  I first met
Mrs. Elemary in 1988 and I have been a supporter of the
Foundation and its efforts to promote dialogue and cooperation
between the U.S. and the states of the Middle East.

Mrs. Elemary has worked with members of both parties to support
bipartisan goals of strong U.S. diplomatic and economic relations
with Israel and the moderate Arab nations of the Middle East.
Through the Foundation, she has convened conferences in
Washington as well as helped to organize a congressional
delegation visit to the Middle East in 1990.  Unfortunately, I am
told that, because of her support for U.S. relations with the
governments in the Middle East, she now has reason to fear
fundamentalist forces who have demonstrated their ability to
destroy those dedicated to open and moderate approaches to the
Middle East's problems.

By dedicating herself to furthering Anwar Sadat's aims of a
peaceful and stable Middle East, Mrs. Elemary has also served
U.S. interests.  For this reason, I believe her petition should
be awarded favorable consideration.

Sincerely,

Orrin G. Hatch
United States Senator

OGH:pmm

BARBARA BOXER
CALIFORNIA

COMMITTEES:
BUDGET
ENVIRONMENT
AND PUBLIC WORKS
FOREIGN RELATIONS

# United States Senate

HART SENATE OFFICE BUILDING
SUITE 112
WASHINGTON, DC 20510-0505
(202) 224-3553
senator@boxer.senate.gov
http://boxer.senate.gov #

June 3, 1999

His Excellency Amr Moussa
Minister of Foreign Affairs
Cairo, Arab Republic of Egypt

Dear Mr. Minister:

I write regarding one of my constituents, Ms. Hoda Elemary. I respectfully request that you direct the appropriate agencies to ensure her safety and security when she travels to Egypt this month.

As you may know, Ms. Elemary is the founder of the Sadat Peace Foundation, an internationally recognized organization that has works for peace in the Middle East. Ms. Elemary also worked to convince the Congress to support Operation Desert Storm and forgive Egypt's $7 billion debt.

Ms. Elemary now permanently resides in my state of California. However, I understand that she continues to be a target of threats from political groups opposed to Egypt's cooperation with the United States and Israel.

I respectfully request that you take all necessary steps to ensure Ms. Elemary's safety and security when she travels to and from Egypt this month. If there is any reason that you believe she may not be able to travel safely to Egypt and promptly return to the United States, I ask that you notify me as soon as possible.

Sincerely,

Barbara Boxer
United States Senator

1700 MONTGOMERY STREET
SUITE 240
SAN FRANCISCO, CA 94111
(415) 403-0100

312 N. SPRING STREET
SUITE 1748
LOS ANGELES, CA 90012
(213) 894-5000

650 CAPITOL MALL
SUITE 6544
SACRAMENTO, CA 95814
(916) 440-2787

2300 TULARE STREET
SUITE 130
FRESNO, CA 93721
(209) 497-5109

600 B STREET
SUITE 2240
SAN DIEGO, CA 92101
(619) 239-3884

210 NORTH E STREET
SUITE 210
SAN BERNARDINO, CA 92401
(909) 888-8525

PRINTED ON RECYCLED PAPER

. TIM JOHNSON
SOUTH CAROLINA

COMMITTEES:
AGRICULTURE, NUTRITION
AND FORESTRY
BANKING, HOUSING AND
URBAN AFFAIRS
BUDGET
ENERGY AND NATURAL
RESOURCES

WASHINGTON OFFICE:
WASHINGTON, DC 20510-4104
202-224-5842
TDD: 202-224-6279

RAPID CITY OFFICE:
PO BOX 1698
RAPID CITY, SD 57709
(605) 341-3990

ABERDEEN OFFICE:
PO BOX 1954
ABERDEEN, SD 57402
(605) 226-3440

SIOUX FALLS OFFICE:
PO BOX 1424
SIOUX FALLS, SD 57101
(605) 332-8896

TOLL FREE
1-800-537-0025

## United States Senate

WASHINGTON, DC 20510-4104

June 6, 2000

The Honorable Doris Meissner
Immigration and Naturalization Service
425 I Street NW
Washington, D.C. 20536

Dear Commissioner Meissner:

I am writing on behalf of Hoda Elemary, Executive Director of the Sadat Peace Foundation, regarding the expeditious determination of her application for naturalization.

The Sadat Peace Foundation is an internationally recognized organization that has worked toward a complete peace in the Middle East. Since 1995, several Members of Congress have contacted your office in support of Ms. Elemary's request for naturalization. I am enclosing copies of some of these letters, marked Exhibit "A", to illustrate the level of support for Ms. Elemary's work on behalf of peace in the Middle East. I am also enclosing copies of correspondence between Senators Feinstein and Boxer and the State Department and Egypt regarding Ms. Elemary's concern for safety while traveling on peace missions to Egypt. These letters are marked Exhibit "B".

Thank you for your immediate consideration of this request, and please do not hesitate to contact me or Ian Marquardt in my Washington, D.C. office if I can be of further assistance.

Sincerely,

Tim Johnson
United States Senate

# United States Senate

**WASHINGTON, DC 20510**

November 9, 2001

The Honorable Tom Ridge
Director of Homeland Security
The White House
Washington, DC 20500

Dear Governor Ridge:

We are writing on behalf of Hoda Elemary, the President of the Sadat Peace Foundation, to urge you or your staff to meet with Ms. Elemary to discuss the current situation in the Middle East, and a possible diplomatic and educational initiative to reach out, engage, and neutralize Muslim fundamentalists who support terrorism.

We have known Ms. Elemary for many years, during which time she has offered important services to the U.S. Congress, including building support in the Arab world for Operation Desert Storm and in bettering U.S.-Egyptian relations. The Sadat Peace Foundation seeks to build on the legacy of President Sadat's work and is dedicated to peace in the Middle East.

Given the current crisis facing the world community in combating terrorism, Ms. Elemary has asked us to intercede on her behalf and facilitate a meeting with your office to discuss these matters.

Our thanks for your consideration. Please know that you have our support in your efforts to protect U.S. national security and the lives and safety of American citizens.

Sincerely,

Dianne Feinstein

Carl Levin

SENATOR ALAN CRANSTON
27080 Fremont
Los Altos Hills, CA 94022
Tel: 650-948-6556
FAX: 650-948-6516

July 31, 2000

Mr. Thomas J. Schlitgen
District Director
U. S. Dept. Of Justice - INS
300 N. Los Angeles St.
Los Angeles, CA 90012

Re: Justification for Expediting Hoda Elemary's
    N-400 Application for Citizenship

Dear Mr. Schlitgen:

I am writing to request the expedition of Ms. Hoda Elemary's (A72917452) application for naturalization. Ms. Elemary is scheduled to travel to the Middle East in the Fall of 2000. The expedition of her naturalization will negate the need for additional assistance by the State Department and U. S. Senators by providing for automatic protection by the Embassy.

Ms. Elemary is the Foundress and President of the Sadat Peace Foundation, an organization that has played an invaluable role in the Middle East peace process. As a former United States Senator, I have known Ms. Elemary and her work for over fourteen years.

As you know, no region in the world has been such a potential flash point for conflict as the Middle East. Since its founding in 1984, the Sadat Peace Foundation has dedicated itself to promote peace in that troubled region and to secure U. S. interests in a peaceful Middle East. The Sadat Peace Foundation has accomplished much to foster peace, from publishing treatises espousing the benefits of resolution, to hosting conferences to increase mutual awareness of the different sides of the conflict, to encouraging behind-the-scenes meetings of top political leaders. Without the work of the Sadat Peace Foundation, the political breakthroughs of the past ten years simply may not have been possible.

The invaluable work of the Sadat Peace Foundation would itself not have been possible without the tireless dedication of the woman who founded it. The Sadat Peace Foundation was in large part borne of Ms. Elemary's vision to continue the work of that world leader, and she made the Foundation a reality in 1984 by enlisting the support and endorsement of the most prominent figures in Washington, including Presidents Jimmy Carter and Ronald Reagan. Over the past decade she has developed the Foundation into an internationally recognized and respected institution and made it an important player in the ongoing peace process. Through her professionalism and personal conviction, and her patience and perseverance, she personally is bringing

Mr. Thomas J. Schliigen
July 31, 2000
Page 2

Anwar Sadat's hopes for a lasting peace into being.

I was contacted frequently by Ms. Elemary during my tenure in the United States Senate and can provide the INS with an eye witness perspective of Ms. Elemary's specific role in impacting the Middle East peace process.

Mrs. Elemary met with me personally and with many other Senators in the Fall of 1990. Through her professionalism and personal conviction she helped convince some undecided Senators to support the United States' forgiveness of Egypt's $7 billion debt. Mr. Elemary was present on October 19, 1990 and witnessed the close vote on the Senate floor in favor of the position she espoused. Consequently, several Senators acknowledged Ms. Elemary's role in helping to secure enough votes towards the forgiveness of Egypt's debt in 1990. In January 1991, the *Washington Post* published the enclosed article in which the Sadat Peace Foundation encouraged members of Congress to vote in favor of Operation Desert Storm. This article accurately provided members of Congress a visionary perspective that the Middle East peace process would be greatly enhanced following Operation Desert Storm provided Congress approved it. Clearly, Ms. Elemary's vital efforts encouraged the United States government to play a pivotal role in the Middle East peace process over the past few years.

I have first hand knowledge that Ms. Elemary worked closely with senior U. S. Senators and administration officials as well as with Middle East heads of state in advancing the peace process. During my tenure in the United States Senate, the chairmen of the Foreign Relations and Armed Services Committees, respectively Claiborne Pell and Sam Nunn, issued the enclosed letters to Ms. Hoda Elemary in praise of her efforts to ........................................... find letters to Ms. Elemary and the Sadat Peace Foundation from former President Ronald Reagan, a senior aide at the National Security Council, former Israeli Prime Minister Yitzhak Rabin and former Minister Shimon Peres, Bush administration officials, Colin Powell and Frank Carlucci, Jon Glassman, the House of Representatives Chairman of the Committee on Foreign Affairs, Lee Hamilton, as well as my former colleague, Sen. Paul Simon.

Our country needs people of the caliber and dedication of Ms. Elemary. She is contributing to our nation's understanding and influence in the troubled Middle East region. It is most certainly in our national interest for her to have the protection of being a U. S. citizen during her September mission to the Middle East. For these reasons, I urge you to expedite Ms. Elemary's application.

With kind regards,

Alan Cranston

Enclosures



**U.S. Department of Justice**

*Civil Division*
*Commercial Litigation Branch*

CGMark
46-16-2472

Tel. (202) 307-0256

601 D Street, NW, Room 9930
Washington, D.C. 20004

March 18, 2005

<u>BY FAX – (949) 715-2060</u>

Dr. Hoda Elemary
P.O. Box 7952
Beverly Hills, CA 90212

   Re:  U.S. ex rel. Miller v. Holzmann A.G., et al.
      <u>1:95CV01231 (D.C.D.C., filed Jun 30, 1995)</u>

Dear Dr. Elemary:

   I am writing in response to your letter of today concerning the telephone conversation on March 17th among you, Howard Teicher, AUSA Keith Morgan, and myself concerning settlement of the above-referenced matter with Bill L. Harbert Sr. Based upon our various discussions and Mr. Harbert's letter of November 11, 2004, we understand that you represent Mr. Harbert in connection with the settlement of this matter.

   AUSA Morgan and I agreed to recommend a settlement whereby Mr. Harbert pays Fifteen Million ($15,000,000.00) within 10 days of the execution of a settlement agreement. The United States would thereupon release its claims against Mr. Harbert. As we discussed, any agreement would have to be authorized and approved by officials of the Department of Justice.

   As we advised you, as a matter of policy, this office does not ever agree to any language that pertains to the tax treatment of a payment to be made by a defendant in a settlement. All our settlements are tax neutral -- neither side characterizes the payment.

   The United States takes no position with regard to how Mr. Harbert liquidates his assets to pay the settlement amount. Our discussion of possible sources whereby Mr. Harbert could make the settlement payment was not intended to be all inclusive but merely to illustrate that Mr. Harbert is able to make the payment at the time of settlement and that payment over time is not necessary. We note that there is almost $2 million of Group 2 Wachovia shares described in Table F of the documents previously provided by Bill Sharp, Esq. which would be available

FILED
APR 10 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

- 2 -

for the settlement, over and above the $20.7 million discussed during our telephone conversation.

We look forward to hearing from you.

Sincerely,

CAROLYN G. MARK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division

cc:    AUSA Keith Morgan

## AGREEMENT

This agreement is made on September 21, 2004 by and between Bill L. Harbert and Dr. Hoda Elemary. The purpose of this agreement is to confirm the parties' relevant prior agreements on key issues and to establish a forum to transact their business and communicate more efficiently and thus be able to spend more time on resolving Mr. Bill L. Harbert's complex legal matters . The parties agree as follows:

1. Dr. Elemary had been acknowledged as the case manager and has primary responsibility over retention, oversight and management of the legal team (the "Legal Team") as well as arranging for meetings, conference calls and inviting the appropriate members of the Legal Team, the Harbert staff and U.S. Government officials that is necessary to provide the optimum results in these meetings. Dr. Elemary is also responsible for working with, influencing and negotiating a settlement with the U.S. Government on the behalf of Bill L. Harbert and to report from time to time to Bill Harbert, with respect to the current civil proceedings between Bill L. Harbert and the U.S. Government (the "Qui Tam Matter") as well as the status of the criminal fine as such Dr. Elemary retained the services of Senator Bob Dole and the leading anti-trust and qui tam lawyers in the United States to assist Mr. Harbert.

2. With respect to the criminal fine, Dr. Elemary is currently working with Mr. Harbert on the unpaid balance of said fine in the sum of approximately $22 million on the basis of "The Declaration of Bill L. Harbert Regarding Plea Agreement" dated July 17, 2003, a copy of which is attached hereto as exhibit "A" and made a part hereof (the "Declaration"). (In the Declaration, Bill L. Harbert acknowledges that he was coerced into signing a guarantee to pay any unpaid portion of the Criminal Fine due by defendant Bilhar).

3. Previous agreements executed by the parties detail that Mr. Harbert fully understood based on earlier financial concessions and payments that he made to Dr. Elemary, the Herculean task that would be required of Dr. Elemary to influence the U.S. Government to amend it's prior agreement and accept the circumstances that compelled Mr. Harbert to sign said personal guarantee, which due to Bilhar's lack of funds at this time, would require Mr. Harbert to personally pay an amount equivalent to $22 million on the Criminal Fine, in addition to the government's requested minimum amount for a settlement of $34 million in the Qui Tam Matter, for a grand total payment to the government of $56 million.

4. Mr. Harbert fully understands that if he elects to proceed to trial on the Qui Tam Matter, he could be compelled to pay over $100 million should treble damages be assessed. Mr. Harbert further acknowledges that he was not made aware when he signed the personal guarantee of the future impact of the Qui Tam Matter on his personal estate. After employing Dr. Elemary

*9/21/04*

CARLA D. FAILE *Bill L. Harbert*
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007    *9/21/04*

City of Washington
District of Columbia

*Carla D Faile*
*November 11, 2004*

On this 21st day of September, 2004
BILL L. HARBERT personally appeared before me
and acknowledged that he executed the foregoing document

*Confirmed on 11/11/04*
*Bill Harbert*

**FILED**

APR 1 0 2007

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

for two years, Mr. Bill L. Harbert engaged attorney Mr. William Sharp to evaluate the work in progress achieved by Dr. Elemary to date. Mr. Sharp traveled to California to conduct this assessment, and together with Mr. Harbert, concluded that Dr. Elemary's work and case management skills were and are extremely satisfactory and promising. Mr. Harbert, in consultation with Mr. Sharp, has agreed to reconfirm Mr. Harbert's original agreement with Dr. Elemary to allow her to bring the Qui Tam Matter and Criminal Fine matter to a satisfactory conclusion.

5. Mr. Harbert understands that it may take several months or longer to reach a satisfactory settlement with the U.S. Government. Previous agreements between Mr. Harbert and Dr. Elemary do not provide for a termination date since the parties had agreed that any such termination date would occur only upon obtaining a satisfactory resolution of the above referenced two matters. It is evident that based on earlier agreements signed by Mr. Bill L. Harbert that Dr. Elemary had every reason to depend on Mr. Harbert's written guarantee and has involved her high level government contacts to achieve satisfactory progress to date. In addition, Dr. Elemary has now consented to be directed by Mr. Harbert. Only in the event that the two above referenced matters are not resolved within the next few months, Mr. Harbert will ask Mr. Sharp to review Dr. Elemary's progress one year from the date of this agreement.

6. With respect to the termination date of this agreement, Mr. Harbert will determine the termination date of this Agreement only by entering into a settlement with the U.S. Government with respect to the above-referenced two matters based on his consent to pay the Government an amount, if any, with which he is comfortable. Until such termination of this Agreement, Mr. Harbert unconditionally and unequivocally hereby agrees and commits to pay Dr. Hoda Elemary the sum of Thirty Thousand Dollars ($30,000.00) per month, commencing either on October 1, 2004 or a mutually agreed upon date in October 2004 and continuing each month thereafter until such a time as Mr. Harbert settles the above two referenced matters with the Government.

7. Due to the fact that Dr. Elemary is often called upon to undertake a project or to travel internationally within a 24 hour notice as a result of the involvement of Senator Bob Dole and other dignitaries who assist Dr. Elemary in seeking a settlement of the two above referenced matters, Mr. Harbert personally guarantees Dr. Elemary that said monthly payments will be paid within 24 hours following presentations of a monthly invoice by Dr. Elemary to Mr. Harbert.

8. Mr. Sharp has concluded, and Bill L. Harbert agrees, that Bill L. Harbert's quitclaim deed of Mr. Harbert's interest in the single family residence located at 21 Le Conte, Laguna Niguel, California to Dr. Elemary was valid, legal and proper, and without undue influence or

*[handwritten]* X Ele
9/21/04

*[handwritten]* Confirmed
on 11/11/04
Rich Harbert

2of 4

*[handwritten]* Rich Harbert
9/21/04

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007
*[handwritten signature]* Carla D Faile
November 11, 2004

*[handwritten]* City of Washington
District of Columbia

*[handwritten]* On this 21st day of September, 2004
BILL L. HARBERT personally appeared before me
and acknowledged that he executed the foregoing document



Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2009

coercion, and was Mr. Harbert's intention. Mr. Harbert therefore understands that he cannot convey his interest in said property to any other person or entity, including Mr. Harbert's son, Billy Harbert. William Sharp has reviewed the arrangement between Mr. Harbert and Dr. Elemary regarding said Le Conte property, and finds that arrangement in order.

9. Effective September 1, 2004, William Sharp is a member of the Legal Team, with responsibilities of working with Dr. Elemary to achieve the goals of Bill L. Harbert with respect to the above-referenced cases.

10. Subject to conferring with Dr. Elemary, William Sharp has the sole authority to communicate with Anne Maltin, Elizabeth Cornay, Billy Harbert, as well as Alan Hall and Jim Rein, regarding the above-referenced cases.

*ANNE MOULTON* →

11. Based on discussions among the parties, Anne Maltin, Elizabeth Cornay, Bill Harbert, Alan Hall and Jim Rein will communicate exclusively with William Sharp regarding the above-referenced cases.

12. For the sake of Bill L. Harbert's peace of mind, no communications regarding the above-referenced cases will be made to Bill L. Harbert, except through either William Sharp or Dr. Elemary.

13. While considerable progress has been made to date in connection to the above-referenced cases, substantial government resistance is anticipated and/or setbacks may arise. Dr. Elemary, Mr. Sharp and the legal team will use their best efforts to overcome such resistance and/or setbacks and achieve the best possible results.

14. It is understood that every effort will be made by Dr. Elemary to continue to keep the legal fees of the legal team as they are at present.

15. Payments to Dr. Hoda Elemary stipulated herein, are based on the assumption that Bill L. Harbert will take his time before he settles these cases, consistent with his concept of fairness. However, the government may very well wish, in short order, to re-negotiate the terms of it's earlier plea agreement with Mr. Harbert on the basis that Bilhar has not made the September 1, 2004 payment. Indeed, the government may consider entering into a different agreement that will not require Mr. Harbert to put out large sums of money (to settle the above referenced two matters) but rather the government may seek the assistance of the Harbert Group. In such a case, a different financial arrangement mutually acceptable by both parties to this agreement may be necessary to negotiate in the future

*HE Ee Confirmed
9/21/04    on 11/11/04
Bill L Harbert    3of 4*

*Bill Harbert
9/21/04*

*City of Washington
District of Columbia

On this 21st day of September, 2004
BILL E. HARBERT personally appeared before me
and acknowledged that he executed the foregoing document.*

**Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008**

**CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007**

*Carla D Faile
November 11, 2004*

16. It is hereby acknowledged that the sacrifices made by Dr. Elemary and Mr. Harbert to overturn the government's current official demand of $56 million are substantial and immensely impactful on the lives of the parties. It is evident that the progress being achieved by Dr. Elemary today will not only effect Bill L. Harbert but his entire estate. To this end, Dr. Elemary is therefore unconditionally guaranteed to receive five percent (5%) - in addition to her monthly fee - of any funds she saves Mr. Harbert from ultimately paying the government in a settlement. In other words, in the event Dr. Elemary reduces Mr. Harbert's current payment plan of $22 million on the criminal fine and $34 million of the requested minimum settlement amount by the DOJ on the qui tam case, Mr. Harbert will pay Dr. Elemary five percent of any amount of reduction from either the $22 million or the $34 million amounts. If Dr. Elemary does not save Mr. Harbert any funds, Mr. Harbert is not obligated to pay Dr. Elemary the five percent.

17. William Sharp has reviewed the August 27, 2004 letter from Bill L. Harbert to Dr. Elemary, and has reported to Mr. Harbert his conclusion that he is satisfied with the progress in the above-referenced cases achieved by Dr. Elemary and the Legal Team, and has addressed Bill L. Harbert's estate and succession plans as set forth in that letter.

Dated: September 21, 2004

_Bill L. Harbert_
Bill L. Harbert

Dated: September 21, 2004

_Dr. Hoda Elemary_
Dr. Hoda Elemary

*I confirmed this master contract agreement on 11/11/04*

*Bill Harbert*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D. Faile*
*November 11, 2004*

4 of 4

City of Washington
District of Columbia

On this 21st day of September, 2004

BILL L. HARBERT personally appeared before me and acknowledged that he executed the foregoing document.

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2...

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

## I (a) PLAINTIFFS

Dr. Hoda Elemary

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Orange (CA)
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Dr. Hoda Elemary
21 Le Conte
Laguna Niguel, California  92677
(949) 715-2022

## DEFENDANTS

Philipp Holzmann A.G.; Wachovia Bank, N.A.; B. L.
Harbert International, LLC; Sabbia Aktiengesellschaft; Harbert
International Establishment, Inc.; Bill L. Harbert, Sr.; Billy Harbert, Jr.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Germany
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF

Case: 1:07-cv-00654
Assigned To : Lamberth, Royce C.
Assign. Date : 4/10/2007
Description: ELEMARY v. HOLZMANN

Suite 1000
Washington, D.C.  20004

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ⊗ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ⊙ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ⊙ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

- ○ **A.** *Antitrust*
  - ☐ 410 Antitrust

- ○ **B.** *Personal Injury/ Malpractice*
  - ☐ 310 Airplane
  - ☐ 315 Airplane Product Liability
  - ☐ 320 Assault, Libel & Slander
  - ☐ 330 Federal Employers Liability
  - ☐ 340 Marine
  - ☐ 345 Marine Product Liability
  - ☐ 350 Motor Vehicle
  - ☐ 355 Motor Vehicle Product Liability
  - ☐ 360 Other Personal Injury
  - ☐ 362 Medical Malpractice
  - ☐ 365 Product Liability
  - ☐ 368 Asbestos Product Liability

- ○ **C.** *Administrative Agency Review*
  - ☐ 151 Medicare Act

  **Social Security:**
  - ☐ 861 HIA ((1395ff)
  - ☐ 862 Black Lung (923)
  - ☐ 863 DIWC/DIWW (405(g)
  - ☐ 864 SSID Title XVI
  - ☐ 865 RSI (405(g)

  **Other Statutes**
  - ☐ 891 Agricultural Acts
  - ☐ 892 Economic Stabilization Act
  - ☐ 893 Environmental Matters
  - ☐ 894 Energy Allocation Act
  - ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

- ○ **D.** *Temporary Restraining Order/Preliminary Injunction*

  Any nature of suit from any category may be selected for this category of case assignment.

  *(If Antitrust, then A governs)*

- ○ **E.** *General Civil (Other)*   **OR**   ⊗ **F.** *Pro Se General Civil*

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOLA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ⊙ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
28 U.S.C. sec. 1332. Plaintiff's employment contract was wrongfully terminated after she was fraudulently induced to enter into it.

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ 16,460,000 Check YES only if demanded in complaint
JURY DEMAND: YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☒ NO ☐ If yes, please complete related case form.

DATE  April 6, 2007 ✓  SIGNATURE OF ATTORNEY OF RECORD _____

4/10/07                                                                 JTC

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.