## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DR. HODA ELEMARY,<br><br>        Plaintiff,<br><br>        v.<br><br>PHILIPP HOLZMANN A.G.; WACHOVIA BANK, N.A.; B.L. HARBERT INTERNATIONAL, LLC; SABBIA AKTIENGESELLSCHAFT; HARBERT INTERNATIONAL ESTABLISHMENT, INC.; BILL L. HARBERT, SR.; AND BILLY HARBERT, JR.,<br><br>        Defendants. | NO: 1:07-cv-00654-RCL<br><br>Hon. Royce C. Lamberth<br><br>Oral Argument Requested |

## CERTAIN DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rule of Evidence 201, Defendants Bill L. Harbert, Sr., Billy Harbert, Jr., B.L. Harbert International, LLC and Harbert International Establishment, Inc. (collectively, "Moving Defendants") hereby request that this Court take judicial notice of the materials attached to the Declaration of Roger Goldman as Exhibits 1 through 12. These materials are submitted in support of (a) the Motion of Defendants Billy Harbert, Jr. and B.L. Harbert International, LLC to Dismiss; (b) the Motion of Defendants Bill L. Harbert, Sr. and Harbert International Establishment, Inc. to Dismiss; and (c) the Motion of Certain Defendants to Transfer Venue, filed concurrently herewith. In support of this Motion, Moving Defendants submit the accompanying Memorandum of Law.

Dated: June 27, 2007

Respectfully submitted,

_/s/ Roger S. Goldman_____
Roger S. Goldman
(D.C. Bar No. 333294)
LATHAM & WATKINS LLP
555 11th Street, N.W.
Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: roger.goldman@lw.com

Of Counsel:
Matthew H. Lembke
　　(*pro hac vice* pending)
BRADLEY ARANT ROSE & WHITE LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Tel: (205) 521-8000
Fax: (205) 521-8800
Email: mlembke@bradleyarant.com

Attorneys for Defendants B.L. Harbert
International, LLC, Harbert International
Establishment, Inc., Bill L. Harbert, Sr., and
Billy Harbert, Jr.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DR. HODA ELEMARY,<br><br>        Plaintiff,<br><br>       v.<br><br>PHILIPP HOLZMANN A.G.; WACHOVIA BANK, N.A.; B.L. HARBERT INTERNATIONAL, LLC; SABBIA AKTIENGESELLSCHAFT; HARBERT INTERNATIONAL ESTABLISHMENT, INC.; BILL L. HARBERT, SR.; AND BILLY HARBERT, JR.,<br><br>        Defendants. | NO: 1:07-cv-00654-RCL<br><br>Hon. Royce C. Lamberth<br><br>Oral Argument Requested |

**MEMORANDUM OF LAW IN SUPPORT OF CERTAIN DEFENDANTS'
REQUEST FOR JUDICIAL NOTICE**

## I.    LEGAL STANDARD

Rule 201(b) of the Federal Rules of Evidence permits a court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 16 (D.D.C. 2001). Under Rule 201(d), a district court shall take judicial notice "if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d).

## II.    DESCRIPTION OF DOCUMENTS SUBJECT TO JUDICIAL NOTICE

Defendants Bill L. Harbert, Sr., Billy Harbert, Jr., B.L. Harbert International, LLC and Harbert International Establishment, Inc. ("Moving Defendants") respectfully request that the Court take judicial notice of the following documents, which are attached as Exhibits 1 through 12: court records in matters related to the instant suit and a letter from Plaintiff's attorney to Defendants' attorneys. Judicial notice is appropriate because these documents cannot reasonably

be disputed, and these documents are not being submitted to determine the truth or falsity of the allegations they contain.[1] All of the attached documents are "capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned." F.R.E. 201(b). *See Sibley v. Breyer*, 456 F. Supp. 2d 43, 45 (D.D.C. 2006) (stating that the court may take judicial notice of public records from other proceedings); *Weil v. Markowitz*, 829 F.2d 166, 173 n. 15 (D.C. Cir. 1987) (taking judicial notice of a related proceeding in another court); *Kruvant v. District of Columbia*, No. 03-1402 JDB, 2005 WL 3276300, at *10 (D.D.C. Aug. 10, 2005) (noting that the administrative hearing officer took judicial notice of a letter from the defendant to the plaintiff); *LeBoeuf, Lamb, Greene, & MacRae, L.L.P. v. Abraham*, 347 F.3d 315, 325 (D.C. Cir. 2003) (taking judicial notice of a letter sent by defendant to a third party). Therefore, Defendants hereby respectfully request that the Court take judicial notice of the following documents:

- Letter from Brian J. Jacobs to Yasmin N. Best *et al.*, dated June 14, 2007, attached as Exhibit 1;
- Civil Minutes granting Defendants' Motion to Transfer Venue, *Elemary v. Harbert*, No. CV06-4723 RGK (PJWx) (C.D. Cal. filed Feb. 28, 2007), attached as Exhibit 2;
- Complaint in *Elemary v. Harbert*, CV07-0217 RGK (PJWx) (C.D. Cal. filed Feb. 20, 2007), attached as Exhibit 3;
- First Amended Complaint in *Elemary v. Harbert*, CV06-4723 RGK (PJWx) (C.D. Cal. filed Oct. 30, 2006), attached as Exhibit 4;
- Complaint in *Elemary v. Steering*, No. BC370218 (L.A. Super. Ct. filed Apr. 27, 2007), attached as Exhibit 5;
- Memorandum of Points and Authorities in Opposition to Motion of Defendant Billy

---

[1] Judicial notice of the court records merely establishes the existence of the litigation and that the allegations and statements contained in the respective filings were made in the litigation. *See, e.g.*, *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829-30 (5th Cir. 1998). Similarly, judicial notice of Mr. Jacobs's letter merely establishes the writing of the letter and the statements contained therein.

Harbert, Jr. to Dismiss, in *Elemary v. Harbert*, CV06-4723 RGK (PJWx) (C.D. Cal. filed Jan. 22, 2007), attached as Exhibit 6;

- Second Amended Complaint For False Claims Act Violations And Demand For Jury Trial in *U.S. ex rel. Miller v. Philipp Holzmann A.G., et al.*, No. 95-1231 WBB (D.D.C. filed Jan. 16, 2001), attached as Exhibit 7;

- United States' First Amended Complaint, *U.S. ex rel. Miller v. Philipp Holzmann A.G., et al.*, No. 95-1231 WBB (D.D.C. filed Dec. 10, 2002), attached as Exhibit 8;

- Indictment in *U.S. v. Bill Harbert International Construction, Inc., et al.*, No. CR-01-PT-0302-S (N.D. Ala. filed July 25, 2001), attached as Exhibit 9;

- Plea Agreement in *U.S. v. Bill Harbert International Construction, Inc., et al.*, No. CR-01-PT-0302-S (N.D. Ala. filed Feb. 4, 2002), attached as Exhibit 10; and

- Notice of Voluntary Dismissal in *Elemary v. Harbert*, CV06-4723 RGK (PJWx) (N.D. Ala. filed March 20, 2007), attached as Exhibit 11.

- Complaint in *Elemary v. Harbert*, No. SC094189 (L.A. Super. Ct. filed June 8, 2007), attached as Exhibit 12.

Dated:  June 27, 2007                          Respectfully submitted,

_/s/ Roger S. Goldman_____
Roger S. Goldman
(D.C. Bar No. 333294)
LATHAM & WATKINS LLP
555 11th Street, N.W.
Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: roger.goldman@lw.com

Of Counsel:
Matthew H. Lembke
    (*pro hac vice* pending)
BRADLEY ARANT ROSE & WHITE LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Tel: (205) 521-8000

Fax: (205) 521-8800
Email: mlembke@bradleyarant.com

Attorneys for Defendants B.L. Harbert
International, LLC, Harbert International
Establishment, Inc., Bill L. Harbert, Sr., and
Billy Harbert, Jr.

## DECLARATION OF ROGER S. GOLDMAN

1.      I am an attorney licensed to practice law in the District of Columbia and the United States District Court for the District of Columbia.  I am also a partner with Latham & Watkins LLP, and counsel for Defendants Bill L. Harbert, Sr., Billy Harbert, Jr., B.L. Harbert International, LLC and Harbert International Establishment, Inc.  I have personal knowledge of all the facts alleged herein, and would competently testify thereto in a court of law.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a letter from Brian J. Jacobs to Yasmin N. Best *et al.*, dated June 14, 2007.

3.      Attached hereto as Exhibit 2 is a true and correct copy of Civil Minutes granting Defendants' Motion to Transfer Venue, *Elemary v. Harbert*, No. CV06-4723 RGK (PJWx) (C.D. Cal. filed Feb. 28, 2007).

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Complaint in *Elemary v. Harbert*, CV07-0217 RGK (PJWx) (C.D. Cal. filed Feb. 20, 2007).

5.      Attached hereto as Exhibit 4 is a true and correct copy of the First Amended Complaint in *Elemary v. Harbert*, CV06-4723 RGK (PJWx) (C.D. Cal. filed Oct. 30, 2006).

6.      Attached hereto as Exhibit 5 is a true and correct copy of the Complaint in *Elemary v. Steering*, No. BC370218 (L.A. Super. Ct. filed Apr. 27, 2007).

7.      Attached hereto as Exhibit 6 is a true and correct copy of  Plaintiff's Memorandum of Points and Authorities in Opposition to Motion of Defendant Billy Harbert, Jr. to Dismiss, in *Elemary v. Harbert*, CV06-4723 RGK (PJWx) (C.D. Cal. filed Jan. 22, 2007).

8.      Attached hereto as Exhibit 7 is a true and correct copy of Second Amended Complaint For False Claims Act Violations And Demand For Jury Trial in *U.S. ex rel. Miller v. Philipp Holzmann A.G., et al.*, No. 95-1231 WBB (D. D.C. filed Jan. 16, 2001).

9.      Attached hereto as Exhibit 8 is a true and correct copy of United States' First Amended Complaint, *U.S. ex rel. Miller v. Philipp Holzmann A.G., et al.*, No. 95-1231 WBB (D.D.C. filed Dec. 10, 2002).

10.     Attached hereto as Exhibit 9 is a true and correct copy of the Indictment in *U.S. v.*

*Bill Harbert International Construction, Inc., et al.*, No. CR-01-PT-0302-S (N.D. Ala. filed July 25, 2001).

     11.     Attached hereto as Exhibit 10 is a true and correct copy of the Plea Agreement in *U.S. v. Bill Harbert International Construction, Inc., et al.*, No. CR-01-PT-0302-S (N.D. Ala. filed Feb. 4, 2002).

     12.     Attached hereto as Exhibit 11 is a true and correct copy of Plaintiff's Notice of Voluntary Dismissal in *Elemary v. Harbert*, CV06-4723 RGK (PJWx) (N.D. Ala. filed March 20, 2007).

     13.     Attached hereto as Exhibit 12 is a true and correct copy of Complaint in *Elemary v. Harbert*, No. SC094189 (L.A. Super. Ct. filed June 8, 2007).

     I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge, and that this declaration was executed on June 27, 2007, in Washington, D.C.

Roger S. Goldman

## CERTIFICATE OF SERVICE

I, Roger Goldman, hereby certify on this 27th day of June 2007, that I filed the foregoing {Request for Judicial Notice, Memorandum of Law and Proposed Order} via the Court's CM/ECF system, which will send a notice of electronic filing to the following CM/ECF users:

**Mark Butler Bierbower**
mbierbower@hunton.com

I further certify that the foregoing documents were sent via first class mail, postage pre-paid to the following non CM/ECF user:

**HODA ELEMARY**
21 Le Conte
Laguna Niguel, CA 92677

/s/ Roger Goldman
Roger Goldman

EXHIBIT 1

# BRIAN J. JACOBS

LAW OFFICES OF BRIAN J. JACOBS
9107 WILSHIRE BOULEVARD, FIFTH FLOOR
BEVERLY HILLS, CA 90210

ADMITTED IN
CALIFORNIA AND NEW YORK

TELEPHONE (310) 770-6874
FACSIMILE (310) 858-6489

June 14, 2007

*Via Facsimile*

*Privileged &
Confidential*

Ms. Yasmin N. Best
Mr. Roger S. Goldman
Mr. David J. Schindler
Latham & Watkins LLP
555 11th street
Suite 1100
Washington, D.C. 20004

### Re:    *In re Marriage of: Elemary and Harbert*
### L.A.S.C., Cases No.: 094189 & SD025099

Dear Ms. Best and Messrs. Goldman and Schindler:

I have carefully reviewed Dr. Hoda Elemary's May 22, 2007 letter to the managing partners of your firm, which I thought unjustly demanded that you restrict yourselves to the facts when, in fact, you may not know all the relevant facts in this matter. I admit I have a slight edge over you, as I have known Dr. Elemary since Beverly Hills High School.

Based on a sense of obligation to deal with other counsel fairly, I concluded during my repose that it is my duty to inform you of specific basic facts that you may need in your response to the complaint and in drafting motions and preparing any arguments you make so that you no longer have to encounter the Ottoman Empire-like slaughterhouse impact of my client's wrath. These facts concern evidence in reply to the contents of Messrs. Goldman's and Lembke's letters, the impact of the secret marriage of Mr. Bill L. Harbert ("Mr. Harbert") and Dr. Elemary   (collectively, "the Parties") and any future motion to transfer venue to the Northern District of Alabama.

A legally certified transcription of an audiocassette tape and the tape itself will be delivered to you on or before June 20, 2007, to clarify once and for all the facts of the Parties' relationship and Mr. Harbert's recorded position on several crucial issues germane to the issues raised in the above-referenced letters, as well as the

Counsel of Latham & Watkins
June 14, 2007
Page Two

letter Mr. Harbert received from Richard E. Masson of Dehnadi & Masson LLP.

The principal goal of this correspondence is to place the facts in perspective and prevent future misunderstandings, confusion and waste of your time as you ponder over Dr. Elemary's purpose in filing a battery of lawsuits and the complex connection between civil and family law in this litigation – customarily, a majority of civil cases of related subject matter are automatically transferred to the Family Law courtroom for adjudication. Accordingly, we are prepared to sign another stipulation with you to save you the unnecessary expense of preparing a defense for our four complaints if in fact the majority of our cases will be transferred to the Family Law courtroom.

A further goal of this correspondence is to address the ramification of Mr. Harbert's marriage to Dr. Elemary. When there is a contentious litigation, there is often a strained relationship between counsel. However, in the instant case, there need be no contentious litigation, since the Parties maintain a close relationship and obviously continue to communicate frequently, despite the fact that, as the evidence indicates, Mr. Harbert was forced to abandon his own principles against his will and sided with Billy Harbert, Jr. against Dr. Elemary to appease Billy's violent temper and deep-seated fear and concern over Dr. Elemary's perceived threat to his inheritance.

There may be animosity between Billy and Dr. Elemary, but I am advised that there has never been an unkind word exchanged between Mr.Harbert and Dr. Elemary for 27 years. There would be no litigation if Mr. Harbert had not sided with Billy, who interfered by force (in the Parties' relationship) against both of their wills and caused their breakup for his own financial benefit, despite a large number of statements notarized or containing Mr. Harbert's thumb imprint, which unconditionally guaranteed Dr. Elemary that he would ensure that Billy would not interfere.

Consequently, acting on behalf of Billy, his earlier counsel continued to abuse Dr. Elemary's reputation, which further aggravated her and necessitated – for legal reasons – adding additional lawsuits to the array of our litigation. .

Concurrently with the filing of a petition (L.A.S.C. SD 025099) for legal separation, the enclosed complaint for (personal) damages in the amount of $63,000,000 (Case No. 09414890) was filed last week in the Superior Court of the State of California, Central District, Western Division in the City of Santa Monica, and was assigned to the Family Law courtroom of the Honorable David J. Cowan. At Dr. Elemary's suggestion, out of courtesy to Mr. Harbert, if you wish to accept service of these documents on his behalf, please let us know so

☒003/006

Counsel of Latham & Watkins
June 14, 2007
Page Three

that we may deliver them to you and avoid disturbing Mr. Harbert with service.

There is overwhelming evidence of Mr. Harbert's marriage to Dr. Elemary, including, but not limited to, his own statements during numerous legally recorded telephone conversations with Dr. Elemary. The above-referenced tape contains one such legally-recorded telephone conversation.

In these conversations, Mr. Harbert discussed relevant subjects, including certain aspects of Mr. Harbert's marriage, which subsumed responding to Dr. Elemary's questions concerning the status of his nuptial future. In particular, in light of the letters Dr. Elemary had received from Messrs Goldman and Lembke, Dr. Elemary asked Mr. Harbert if he wanted her to divorce him, to which he responded, "No". In the conversation he also affirmed the fond memories he has of the early days in his marriage. Our evidence is not limited to electronically obtained evidence but is also circumstantial, as, for example, when Dr. Elemary was in Birmingham, and Mr. Harbert and Dr. Elemary excused themselves from a group of friends (which included, at that time, Matthew Lembke), and sat alone at the opposite side of the Copper Grill.

I would be remiss if I did not remind you of the **$ 51,300,000 in profits** Mr. Harbert obtained through the influence of his wife's father, the former Prime Minister of Egypt, and the protection accorded him by her uncle, also a former Egyptian Prime Minister in 1992, from Egypt's accounting official inspectors during Mr. Harbert's preoccupation with the subject project of the recently concluded False Claims Case -- the Waste Water Project which was under construction in Cairo, Egypt, in 1992, and a majority of his other projects when he elected to marry Dr. Elemary. It is evident that Mr. Harbert made huge profits as a direct result of his marriage to Dr. Elemary. In return, he made generous promises to her and to her family, which <u>he has not recently kept</u>.

<u>On August 25, 2004, Mr. Harbert personally confirmed profiting in the above-stated amount in writing in the presence of a notary public. If that is not enough prima facie evidence, he also placed his thumb print on this legal declaration (attached), confirming the profits he made. Accordingly, based on documentary evidence provided mostly by Mr. Harbert during a 15-year period, the Parties will not disagree that huge amounts in profits were obtained by Mr. Harbert.</u>

This was the fringe benefit of Mr. Harbert's employment of and marriage to Dr. Elemary in Egypt. In addition, Mr. Harbert was awarded oil lines contracts in the United Arab Emirates from her family contacts. Another example included $13,000,000 by which Mr. Harbert profited under a reversal of judgment in his favor by order of King Fahd of Saudi Arabia. Mr. Harbert again gave Dr. Elemary

Counsel of Latham & Watkins
June 14, 2007
Page Four

the credit in writing for King Fahd's intervention on his behalf. At the same time,
he continues to refuse to take care of her financial needs as he agreed so to do
in his November 3, 2003 and September 21, 2004 binding and confirmed
agreements.

There are several acknowledged legal documents which specifically reference
Mr. Harbert's pledge to Dr. Elemary, not to mention his continued physical,
emotional and financial support of our client over the past fifteen (15) years. As
such, his marriage to Dr. Elemary is valid and binding, despite Mr. Harbert's
insistence that the marriage remain a secret for 15 years, a condition with which
Dr. Elemary complied even though she did not understand why until she learned
two years after marrying Mr. Harbert that he had failed to tell her of his first wife
and that he was already married when he married her.

Most recently, Mr. Harbert has witnessed Dr. Elemary, after delaying the
prosecution of the False Claims Case for four years with the help of Senator
Dole, using her influence and contacts to secure a ruling from the District Court
that dismissed Mr. Harbert as a defendant from the False Claims Case, thus
saving him $88 million or a part thereof.

Despite these achievements, Mr. Harbert has not to date offered to resume
fulfilling his obligations towards Dr. Elemary either under the marriage or the
Parties' business agreements. You can appreciate that such matrimonial
deception for the purpose of obtaining profits in Egypt will not be favorably
viewed by the court, nor will the fact that Mr. Harbert has breached his written
personal promises and business guarantees. Mr. Harbert's son Billy boasts that
Dr. Elemary received only Three Million Dollars over 27 years of employment and
marriage. That is approximately 5% that Dr. Elemary received out of the
**$51,300,000 in profits Mr. Harbert obtained as a direct and proximate result
of Dr. Elemary's contacts and skill** (not to mention his dismissal as a
defendant in the False Claims case). The lack of justice in Mr. Harbert's
maltreatment of Dr. Elemary may well shock the conscience of the court so as to
grant Dr. Elemary the full amount due her under the law.

As you are aware, Dr. Elemary's matrimonial and business cases are not based
on the standard "he said, she said" verbal agreements.  I have seldom seen as
voluminous and carefully compiled evidence as Dr. Elemary will be able to
provide to the court, which includes a). thick files of Mr. Harbert's signed and
acknowledged commitments to our client, ranging in time from 1992 through
2005; b). a library of audio cassettes confirming Mr. Harbert's written
agreements; and c). [for anyone that may still have doubts as to the reasons,
validity and state of mind which applied when Mr. Harbert signed the nuptial and

@005/006

Counsel of Latham & Watkins
June 14, 2007
Page Five

business agreement[s] video cassettes that show Mr. Harbert, on camera,
answering his earlier lawyers' questions concerning his intentions and, inter alia,
whether he was under undue influence when he signed said agreements.

Although Dr. Elemary does not wish to dissolve her marriage at this time, she
does, however, feel that she must insure and enforce her legal rights as Mr.
Harbert's spouse. Mr. Harbert's walking away from his commitments to our
client is neither moral nor lawful. As such, and in light of her deteriorating
financial situation, Dr. Elemary as his wife has no other option but to seek judicial
intervention to insure and enforce her rights as his spouse.

In fairness to Mr. Harbert, he could not resist turning his back on profits of
$51,300,000, which is far more than most royal dowries. Therefore, he married
Dr. Elemary and signed promises and guarantees hoping there would be no
consequences for breaching his written commitments.

By the same token, the court will deduce that had Dr. Elemary not been
associated with Mr. Harbert, Dr. Elemary did and would have maintained the
same standard of living. This standard of living requires Mr. Harbert's keeping
his financial commitments to Dr. Elemary. His breach has lowered her standard
of living.

Further, Dr. Elemary requests that Mr. Harbert **comply with the terms and
conditions stipulated in the November 3, 2003 Laguna Niguel Trust, and the
September 21, 2004 agreement. However, Dr.Elemary will consider** a
settlement offer presented to her, taking into account the assets and interests
acquired by the community since 1992. Indeed, it is not Dr. Elemary's intent to
engage in a public divorce battle, but, rather, to first attempt reasonably and
amicably to resolve these issues.

Please be informed that should Mr. Harbert elect to reject the settlement offer as
his son refused to accept Dr. Elemary's negotiated $15 million settlement on the
False Claims Case and instead received an $ 88 million verdict, Mr. Harbert will
in this case, as well, subject himself and his heirs to a liability of 50% of his entire
estate, including any funds he had transferred, which will also be subject to the
50% liability.

Moreover, family law automatically grants a plaintiff the right to demand a full
accounting of the spouse, Mr. Harbert's community property, income, profits and
securities appreciation (in Dr. Elemary's case, since 1992), irrespective of
whether his assets are in country or outside the United States. This will also be a
public accounting and will unfortunately allow the United States, in pursuit of its

Counsel of Latham & Watkins
June 14, 2007
Page Six

obligation to collect on the False Claims Case judgment, to levy on Mr. Harbert's
holdings and impose additional fines and taxes on any unreported income or file
an injunction to prevent him from transferring or using his funds and assets if he
elects not to file an appeal. The price of a bond on an $88 million judgment will,
of course, be ridiculously steep.   He therefore may not wish to expose his assets
at this time since he is still faces liability under the False Claims Case judgment,
according to the Government's penetration of corporate veils and other legal
judgment collection methods

Sincerely yours,

Brian J. Jacobs

# EXHIBIT 2

SEND, ENTER, JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 06-4723-RGK (PJWx) | Date | February 23, 2007 |
| Title | *DR. HODA ELEMARY v. BILLY HARBERT, JR., et al.* | | |

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

ENTERED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

FEB 2 8 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

Present: The Honorable   R. GARY KLAUSNER, U.S. DISTRICT JUDGE

| Sharon L. Williams | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:      Attorneys Present for Defendants:

Not Present                           Not Present

**Proceedings:**      **(IN CHAMBERS)  Certain Defendants' Motion to Transfer Venue (DE 32); Motion of Defendants Billy Harbert, Jr. and Bill Harbert, Sr. For Severance (DE 34);  Defendant James Rein's Motion to Dismiss(DE 36); Defendant Bill Harbert, Sr.'s Motion to Dismiss (DE 30); Defendants William Sharp, Sr. and Sharp & Associates's Motion to Dismiss (DE 33); Defendants BHIC, HIE, and HILLC Motion to Dismiss (DE 35); Defendant Alan Hall's Motion to Dismiss (DE 31); Defendant Evangeline Hoover's Motion to Dismiss (DE 37); and Defendant Billy Harbert, Jr's Motion to Dismiss (DE 38)**

## I.    INTRODUCTION

Plaintiff Dr. Hoda Elemary ("Plaintiff"), a citizen of California, brought suit against Defendants Bill L. Harbert, Sr. ("Harbert Sr."), Billy Harbert, Jr., Matthew H. Lembke, Ken Polk, Evangeline H. Hoover, Sam Pointer, and Alan Hall, citizens of Alabama; Defendants B.L. Harbert International, LLC ("HILLC"), Bill Harbert International Construction, Inc. ("BHIC") and Harbert International, Inc. ("HII"), Delaware companies with their principal places of business in Alabama; Defendant Roy Anderson, a citizen of New Jersey; Defendant Harbert U.K. Services, Ltd. ("HUKS"), an English company with its principal place of business in the United Kingdom; Defendant Harbert International Establishment, Inc. ("HIE"), a Liechtenstein corporation with its principal place of business in the Swiss Confederation; Defendant Troutman Sanders LLP, a Georgia limited liability partnership with its principal place of business in Georgia; Defendants Bryan B. Lavine and June Ann Sauntry, citizens of Georgia; Defendant Sharp and Harrison, P.A., a Florida professional association with its principal place of business in Florida; Defendant William M. Sharp, Sr., a citizen of Florida; Defendant, Barry Coburn, a citizen of the District of Columbia; Defendant, James Rein, a citizen of the Republic of South Africa; Defendant Sabbia Aktiengesellschaft, a Liechtenstein corporation having its principal place of business in the Duchy of Liechtenstein; and Defendant Wachovia Bank, N.A., a national banking association with its main office in North Carolina (collectively, "Defendants").

Plaintiff alleges (1) suppression of facts (fraud), (2) conspiracy (wrongful termination), (3) violation of 18 U.S.C. § 1964, (4) intentional interference with contract, (5) breach of contract, (6) quantum meruit, (7) termination in violation of public policy, (8) breach of implied contract of continued employment, (9) intentional infliction of emotional distress, (10) slander, and (11) libel.

Presently before the Court is Defendants' Motion to Transfer Venue under 28 U.S.C. § 1404(a). For the following reasons, the Court grants Defendants' Motion.

## II.    FACTUAL BACKGROUND

The facts are alleged as follows:

Plaintiff is a citizen of California and a former employee of Billy Harbert, Jr., acting in his personal capacity as well as on behalf of HILLC, and his father Harbert Sr., acting in his personal capacity and on behalf of BHIC, HIE, and HII. Because of Plaintiff's personal contacts among the Middle East heads of state, Plaintiff was retained to help secure construction project contracts in Egypt for Defendants. Plaintiff convinced the Egyptian Prime Minister, her uncle, to remove Defendants' names from a catalogue of black-listed corporations so they could do business in Egypt on the contracts.

Plaintiff alleges that Defendants also used her United States contacts to secure political cover as a necessary protection for their conspiracy to defraud the United States and Plaintiff by bid-rigging the contracts. The fraud led to unjust enrichment and unlawful pocketing of $40 million beyond the profit stipulated in the contracts between Defendants and the United States. As a result, a False Claims Case was instituted against Defendants. Plaintiff claims that Defendants' unlawful conduct tarnished her reputation as an honest broker between the United States business community and the Middle East.

Between April 2001 and April 2005, Defendants sought Plaintiff's intervention to manage their False Claims Case and later in a declaratory relief case. Plaintiff was able to negotiate a settlement and a three-year extension of time with senior officials from the Department of Justice ("DOJ") in the False Claims Case.

On November 3, 2003, Harbert Sr. and Plaintiff entered into the Laguna Niguel Beach House 2003 Revocable Trust ("November 3 Trust"), in consideration for Plaintiff's past assistance and companionship. On September 21, 2004, Plaintiff and Harbert Sr. elected to document some of their shorter agreements and entered into another agreement ("September 21 Agreement"), in which Harbert Sr. agreed to pay Plaintiff a success fee of 5% of the amount of any savings negotiated from his $56,000,000 liability in the False Claims Case. Plaintiff alleges that Defendants thereafter, through fraud and undue influence, deprived Plaintiff of her stipend and employment under the September 21 Agreement, while she resided in California.

## III.    JUDICIAL STANDARD

Pursuant to the federal statute governing transfer of venue, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought." 28 U.S.C. § 1404(a). To support a motion for transfer the moving party must show: (1) that venue is proper in the transferor district; (2) that the transferee district is one where the action might have been brought; and (3) that the transfer will serve the convenience of the parties and witnesses and will promote the interest of justice. *Goodyear Tire & Rubber Co. v. McDonnell Douglas Corp.*, 820 F. Supp. 503, 506 (C.D. Cal. 1992) (referring to *Mercury Serv., Inc. v. Allied Bank of Texas*, 117 F.R.D. 147, 154-55 (C.D. Cal. 1987), *aff'd without opinion*, 907 F.2d 154 (9th Cir. 1990)).

## IV.  DISCUSSION

Presently before the Court is Defendants' motion to transfer venue under 28 U.S.C. § 1404(a). Upon consideration of the moving and opposing papers, and for the reasons set forth below, the Court rules as follows.

### A.  Venue Is Proper in the Central District of California

As stated above, to support their Motion to Transfer, Defendants must initially show that venue is proper in the current district. Venue is proper in a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(a)(2). In this regard, the statute does not require that a majority of the events or omissions occur in the district for which venue is claimed, or even that those events of omissions predominate; it is sufficient if a "substantial part" occurs there. *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005); *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). In tort actions, the district in which the injuries were suffered and, in contract actions, the district where the performance was due are properly deemed to be the districts in which a "substantial part" of the events or omissions occurred. *Id.* at 1371; *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1076 (9th Cir. 2001); *Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 867 (2d Cir. 1992).

Here, Plaintiff contends that venue is proper in the Central District of California because a substantial part of the events or omissions giving rise to the claims occurred in this district.[1] In particular, Plaintiff claims that her loss of income, arising from both the damages to her standing within the political community and her wrongful termination, took place in this district. Moreover, Plaintiff resided in this district at the time of the negotiations for the September 21 Agreement. *See, e.g., Moor v. AT&T Latin America Corp.*, 177 F. Supp. 2d 785, 789 (N.D. Ill. 2001) (where plaintiff sent and received communications as part of the parties' negotiations and numerous communications were directed at the plaintiff in the forum, a "substantial part" of the subject events is deemed to have taken place there). Thus, the Court agrees with Plaintiff that venue is proper in this district.

### B.  This Case Could Have Been Brought to the Northern District of Alabama

To support a motion for transfer under § 1404(a), the moving party must also show that the proposed transferee court is one in which the action could have been commenced originally, meaning: (1) it would have had subject matter jurisdiction; (2) defendants would have been subject to personal jurisdiction; and (3) venue would have been proper. *See Hoffman v. Blaski*, 363 U.S. 335, 343-344 (1960).

#### 1.  *There Is Federal Subject Matter Jurisdiction*

The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states. 28 U.S.C. § 1332(a)(1). Here, the matter in controversy exceeds the sum or value of $75,000, and the Plaintiff is a

---

[1] Plaintiff also argues that venue is proper in this district because of the forum-selection clause in the November 3 Trust that designates the Central District of California as the exclusive forum for "any lawsuit to enforce the terms of this Personal Arrangement and business arrangements." However, as is later discussed, Plaintiff's contract claims are based on the terms of the later-executed September 21 Agreement. Therefore, as the Court explains, the forum-selection clause of the November 3 Trust does not govern the claims in this case.

resident of California while Defendants are residents of Alabama and other states. Thus, the Northern District of Alabama would have had subject matter jurisdiction over this action.

### 2.  *Defendants Would Have Been Subject to Personal Jurisdiction*

In *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), the Supreme Court held that a court may exercise personal jurisdiction over a defendant consistent with due process only if he or she has "certain minimum contacts" with the relevant forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Here, the Northern District of Alabama has personal jurisdiction over Defendants who reside in that district. Moreover, the defendants who are not Alabama residents have significant contacts with Alabama. Those contacts are related to Plaintiff's claims in this action. Therefore, personal jurisdiction over all of the Defendant's would exist in the Northern District of Alabama.

### 3.  *Venue Would Have Been Proper*

Venue is proper in a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(a)(2). Defendants argue, and the Court agrees, that a substantial portion of Plaintiff's allegations concern activities that purportedly occurred in the Northern District of Alabama. In particular, Plaintiff alleges, among other things, that the Alabama Defendants, while in Alabama, knowingly and willingly conspired and agreed among themselves to terminate Plaintiff's employment through forgery and undue influence of Harbert Sr., while Plaintiff was in California. In furtherance of this conspiracy, Plaintiff alleges that the Alabama Defendants also formed the Dispute Resolution Committee, engaged her in threatening conference calls, and prepared and transmitted forged letters to her. Therefore, the Northern District of Alabama is a proper venue for this action and is one in which this action might have been brought. Thus, the resolution of this motion turns on whether transfer to the Northern District of Alabama will serve the convenience of witnesses and parties and be in the interests of justice.

### C.  **Convenience and Justice Warrant Transfer**

Section 1404(a) is intended to place discretion in the Court to adjudicate motions for transfer according to an "'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). The moving party has the burden of showing that the action should be transferred on those grounds. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979). A motion to transfer venue under § 1404(a) thus requires the Court to weigh a number of case-specific factors in its determination of whether transfer is appropriate in a particular case. *Id.*

### 1.  *Plaintiff's Choice of Forum Weighs Against Transfer*

Unless the balance of factors is *strongly* in favor of Defendants, Plaintiff's choice of forum is given significant weight and should rarely be disturbed. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (emphasis added). However, "where the forum lacks any significant contact with the activities alleged in the complaint, plaintiff's choice of forum is given considerably less weight, even if the plaintiff is a resident of the forum." *IBM Credit Corp. v. Definitive Computer Servs., Inc.*, 1996 WL 101172, at *2 (N.D. Cal. Feb. 28, 1996); *accord MTS Sys. Corp. v. Hysitron, Inc.*, 2006 WL 2547698, at *3 (N.D. Cal. Sept. 1, 2006).

In the instant case, Defendant contends that California lacks significant contact with the activities alleged, and therefore, Plaintiff's choice of forum should be given minimal consideration. However, Defendants have failed to make such a showing.[2] More specifically, many of the activities alleged, although occurring in Alabama, were directed at Plaintiff in California. In other words, California was the recipient locale of Defendants' threatening phone calls, forged letters, and all other alleged conspiratorial acts directed at Plaintiff. These acts form the basis for Plaintiff's causes in action. Therefore, the Court finds that Plaintiff's choice of forum weighs against transfer.

### 2.    _Forum-Selection Clause Does Not Apply Here_

Plaintiff contends that the motion to transfer venue should be denied because the forum-selection clause of the November 3 Trust governs this action. In _Stewart Org., Inc. v. Ricoh Corp._, 487 U.S. 22 (1988), however, the Supreme Court held that a forum-selection clause, which represents the parties' agreement as to the most proper forum, should receive neither dispositive consideration nor no consideration but rather the consideration for which Congress provided in § 1404(a). _Id._ at 31; _see, e.g._, _Heller Fin'l, Inc. v. Midwhey Powder Co._, 883 F.2d 1286, 1293 (7th Cir. 1989) ("Despite the existence of a valid forum-selection clause, courts may still transfer a case under § 1404(a)."). Thus, a forum-selection clause is simply another factor.

However, in the instant case, the Court need not even consider this factor. More specifically, Plaintiff's breach of contract claims are based on the later-executed September 21 Agreement. Plaintiff does not allege that there is a similar forum-selection clause in the September 21 Agreement, nor does Plaintiff explain why this contract clause would extend to the tort claims asserted against Harbert Sr. Moreover, the Court does not find that the language of the forum-selection clause in the November 3 Trust, either explicitly or implicitly, governs subsequent business agreements between Plaintiff and Defendants. By its terms, the forum-selection clause of the November 3 Trust selects this district only for litigation "to enforce the terms of this Personal Arrangement and business agreements." Nor can the Court determine that such was the intent of the parties to the November 3 Trust, especially where both the November 3 Trust and the September 21 Agreement appear to memorialize previous, not forthcoming, arrangements between Plaintiff and Harbert Sr. Therefore, the Court finds that the forum-selection clause does not apply here.

### 3.    _Convenience of the Parties Favors Transfer_

The venue transfer provisions of § 1404(a) are not meant to merely shift the inconvenience to Plaintiff. _Reed Elsevier, Inc. v. Rice Innovator Corp._, 105 F. Supp. 2d 816, 821 (S.D. Ohio 2000) (internal citation omitted). On balance, the Court finds that transferring the case to the Northern District of Alabama will not merely shift the inconvenience to Plaintiff.

---

[2]Defendants argue that the only event that Plaintiff asserts took place in California is an alleged assault of Plaintiff. In essence, Defendants have interpreted "significant contact with the activities alleged" to mean "the location in which the events giving rise to the claim took place." This, however, is not a proper reading of the rule. As applied above, the standard does not require that California be the location of the events that gave rise to the claims. Rather, the standard requires only that California be significantly connected with the activities alleged.

In the instant case, Plaintiff is a resident of California while Defendants are dispersed in several states (including Alabama, District of Columbia, Georgia, New Jersey, North Carolina, and Florida) and in foreign countries (including Republic of South Africa, United Kingdom, Liechtenstein, and the Swiss Confederation). Ten of the twenty-two Defendants either reside in or have their principal place of business in Alabama. Moreover, most of the Defendants have no contacts with the Central District of California. Plaintiff, on the other hand, has traveled extensively and has been to Alabama on numerous occasions to meet with Harbert Sr. Therefore, the Court finds that this factor weighs in favor of transfer.

#### 4.    _Convenience of the Witnesses Favors Transfer_

The chosen venue's convenience for the witnesses "is the most important factor in determining whether to transfer because of the inconvenience of the forum." _Hope v. Otis Elevator Co._, 389 F. Supp. 2d 1235, 1243 (E.D. Cal. 2005); _Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League_, 89 F.R.D. 497, 501 (C.D. Cal. 1981). More specifically, "it is the convenience of non-party witnesses, rather than that of party witnesses, that is accorded greater weight in a transfer of venue analysis." _State St. Capital Corp. v. Dente_, 855 F. Supp. 192, 198 (S.D. Tex. 1994).

##### a.    _Non-party witnesses_

When a party seeks the transfer on account of the convenience of witnesses under § 1404(a), the moving party must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover. _Heller_, 883 F.2d at 1293. The Court will consider, not only the number of witnesses located in the respective districts, but also the nature and quality of their testimony in relation to the issues in the case. _Brandon Apparel Group, Inc. v. Quitman Mfg. Co. Inc._, 42 F. Supp. 2d 821, 834 (N.D. Ill. 1999).

In the instant case, Plaintiff contends that Defendants merely list the non-parties referred to in the Complaint, in lieu of specifying key witnesses and presenting a generalized statement of what their testimony would cover. Defendants, on the other hand, assert that the development of any definite plan for which witnesses will be called in this action would be premature. Nevertheless, Defendants name the identity of nine potential non-party witnesses who reside in the Northern District of Alabama and several others who reside in districts much closer to that district than the Central District of California. Although Defendants fail to make any direct statements of what their testimony will cover, the Court can infer their general areas of testimony from the context in which their names are mentioned in the Complaint. Accordingly, the Court·finds that the convenience of non-party witnesses favors transfer.

##### b.    _Party witnesses_

Here, Plaintiff is the only party witness who is a California resident, while Defendants are either Alabama residents or residents of states and countries that are significantly closer to Alabama than California. Defendants assert, and Plaintiff does not dispute, that Plaintiff is in a much better position to bear the burden of travel given her traveling experience, while two of the Defendants who reside in the Northern District of Alabama are elderly with health problems and now rarely, if ever, travel. _See, e.g._, _Zeta-Jones v. Spice House_, 372 F. Supp. 2d 568, 576 (C.D. Cal. 2005) (granting motion to transfer venue, in part, because "traveling to California [from Nevada] may pose a greater inconvenience to [the president of a corporate defendant] because of his medical condition").

Plaintiff argues that Defendants were aware that only four Defendants might be subpoenaed to travel to California and that the remaining eighteen Defendants would be deposed in their home towns. The Court, however, finds this argument to be irrelevant. The Court must assume that the Defendants are willing to appear and testify on their own behalf. Therefore, the Court finds that the convenience of party witnesses favors transfer as well.

5. _The Interests of Justice Favors Transfer_[3]

        a. _Ease of Access to Evidence_

Because many of the alleged activities took place in Alabama, Plaintiff's discovery efforts in this matter would not be focused on California but rather on obtaining information and documents from Defendants, nearly half of whom are Alabama residents. Thus, a substantially larger percentage of the evidence relative to this action is found in the Northern District of Alabama. Although this factor is relatively less important than some of the other factors, given "the comparatively low cost of transporting documents," _Pennwalt Corp. v. Purex Indus., Inc.,_ 659 F. Supp. 287, 290 (D. Del. 1986), the Court finds that it favors transfer.

        b. _Differences in the Cost of Litigation in the Two Forums_

Absent transfer, most witnesses will not be subject to this Court's subpoena power. _See_ Fed. R. Civ. P. 45(b)(2). Even if witnesses were willing to testify, the long-distance travel required of all Defendants could impede trial in this district and would impose substantial expense on witnesses or the parties calling them. _See, e.g., In re East. Dist. Repetitive Stress Litig.,_ 850 F. Supp. 188, 194 (E.D.N.Y. 1994) (granting motion to transfer venue, but in part, because transfer would obviate the need for such travel and the attendant expense on the witnesses and the parties calling them). On the other hand, transfer will allow live trials at lesser expense, an important factor in determining whether to transfer a case. Therefore, the Court finds that this factor favors transfer to the Northern District of Alabama.

Therefore, the balance strongly outweighs the Plaintiff's choice of forum in favor of transferring this case to the Northern District of Alabama.

## V.  **CONCLUSION**

In light of the foregoing, Defendants' Motion to Transfer Venue is **GRANTED**. Based on this ruling the following motions are **denied as moot**:

    (1) Defendants Billy Harbert, Jr. and Bill Harbert, Sr.'s Motion for Severance;
    (2) Defendant James Rein's Motion to Dismiss;
    (3) Defendant Bill Harbert, Sr.'s Motion to Dismiss;
    (4) Defendants William Sharp, Sr. and Sharp & Associates's Motion to Dismiss;
    (5) Defendants BHIC, HIE and HILLC's Motion to Dismiss;

---

[3] Familiarity of the forum with the applicable law is also a factor that the district court may consider under the interests of justice analysis. _Jones v. GNC Franchising, Inc.,_ 211 F.3d 495, 498 (9th.Cir. 200). A balancing of this factor necessarily entails a preliminary determination of which state's laws apply. In the instant case, however, where the balance weighs heavily in favor of transfer, the Court need not make such a determination.

(6) Defendant Allan Hall's Motion to Dismiss;

(7) Defendant Evangeline Hoover's Motion to Dismiss; and

(8) Defendant Billy Harbert, Jr.'s Motion to Dismiss.

**IT IS SO ORDERED.**

SCANNED

Initials of
Preparer



slw

# EXHIBIT 3

1 | **Brian J. Jacobs** (State Bar No. 107788)
2 | 467 South Arnaz Drive, Suite 319A
Los Angeles, California 90048
(310) 770-6874 (Telephone)
3 | (310) 858-6489 (Facsimile)

4 | Attorneys for Plaintiff
Dr. Hoda Elemary



# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| DR. HODA ELEMARY, | Case No. |
| Plaintiff, | **COMPLAINT FOR LIQUIDATED DAMAGES (BREACH OF CONTRACT)** |
| vs. | DEMAND FOR JURY TRIAL |
| BILL L. HARBERT, SR., BILLY HARBERT, JR., EVANGELINE H. HOOVER and ALAN HALL, | SACV07-0217 CJC (FFMX) |
| Defendants. | |

DOCKETED ON CM
MAR 2 2007
BY _____ 074

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction under 28 U.S.C. §1332, in that Plaintiff DR. HODA ELEMARY ("Plaintiff") is a citizen of the State of California, while defendants BILL L. HARBERT, SR. ("Mr. Harbert Sr."), BILLY HARBERT, JR. ("Billy Harbert Jr."), EVANGELINE H. HOOVER ("Hoover") and ALAN HALL ("Hall") are citizens of the State of Alabama. The matter in controversy exceeds, exclusive of interest and costs, the sum of Seventy-Five Thousand Dollars.

2.     Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district.

1    3.   Plaintiff, at all times herein mentioned, was an individual residing in

2  the State of California.

3    4.   Defendants Mr. Harbert Sr., Billy Harbert Jr., Hoover and Hall

4  (collectively, "Defendants"), at all times herein mentioned, were each individuals

5  residing in the State of Alabama.

6                **FACTS COMMON TO ALL CAUSES OF ACTION**

7    5.   On November 3, 2003, Plaintiff and Defendant were counseled to

8  enter into that certain Laguna Niguel Beach House 2005 Revocable Trust, dated

9  November 3, 2003 (the "November 3 Trust"), a true and correct copy of which

10 is annexed to this Complaint as Exhibit "A" and incorporated herein by this

11 reference.

12            **THE OPERATIVE AGREEMENT FOR THE LIQUIDATED**

13              **DAMAGES IS THE NOVEMBER 3 TRUST**

14   6.   Conditions on doubling the liquidated damages are stated herein.

15 Jurisdiction and venue are in particular proper in the Western Division of this

16 District because the November 3 Trust stipulated "Any potential lawsuit arising

17 out of this Personal Arrangement Contract or business guarantees and agreements,

18 as well as potential counter-claims shall be governed and construed according to

19 the laws of the State of California. Any lawsuit to enforce the terms of this

20 Personal Arrangement and business agreements shall be commenced, and litigated

21 (for personal disputes) in the Family Court -- Superior Court of Los Angeles,

22 California, and (for business disputes) in U.S. District Court, Central Division in

23 Los Angeles, California, in the County of Los Angeles. Any and all potential

24 lawsuits, as well as compulsory counter-claims will be without exception, litigated

25 in California as though all the parties and witnesses to such lawsuits were

26 California citizens and that the subject matter of the dispute upon which these

27 lawsuits are based occurred in their entirety in the State of California, County of

28 Los Angeles. In the event that either party to this contract -- or their co-

2

03/08/2007 THU 11:31  [TX/RX NO 7359]

1   defendants or co-plaintiffs -- file a motion to change this understanding on venue
2   and jurisdiction (for any potential lawsuit) the violating party will unconditionally
3   and unequivocally assume liability to pay the other party liquidated damages of
4   three million dollars.   Clearly, it is difficult to assess such damages.
5   Nevertheless, the parties have determined that the liquidated damages are at least
6   $3 million dollars.  The parties confirm their agreement herein that the violating
7   party will pay $3 million dollars to the other party.  In the event that Harbert
8   breaches any of the Business Agreements or Personal contract, Elemary will
9   exclusively decide whether to pursue an expedited trial schedule, which include
10  binding arbitration by a retired judge and/or a twenty five weeks expedited trial,
11  whose cost will be born equally by Harbert and Elemary.  Harbert's breach of
12  this agreement for an expedited trial schedule will result in a one week demand
13  for payment of $3 million.  Otherwise, Harbert agrees to Elemary to demand
14  double that amount from his LLC or bank accounts in Alabama and Switzerland."

15  **I.   DEFENDANTS' CHALLENGE OF VENUE AND JURISDICTION**

16  7.   Commencing in April 2001, Mr. Harbert Sr. had retained Plaintiff
17  as exclusive case manager for the action United States ex rel. Richard F. Miller
18  v. Philipp Holzmann, A.G. et al., United States District Court for the District of
19  Columbia case no. 95CV01231 RCL/JMF (the "False Claims Case").  Among
20  other documents exchanged between the parties, Plaintiff and Mr. Harbert Sr.
21  memorialized this relationship in that certain Agreement, dated September 21,
22  2004 (the "September 21 Agreement").

23  8.   On February 14, 2005, Mr. Harbert Sr. terminated the September 21
24  Agreement, effective April 5, 2005.  On July 30, 2006, Plaintiff filed the action
25  Dr. Hoda Elemary, Plaintiff, vs. Billy Harbert, Jr. et al., United States District
26  Court for the Central District of California case no. CV06-4723 RGK (DJWx)
27  (the "Prior Action"), seeking damages for the wrongful termination of the
28  September 21 Agreement and related causes of action.  As provided in the

November 3 Trust, venue for the Prior Action was set in the United States District Court for the Central District of California, Western Division. Paragraphs 4, 5 and 6 of the First Amended Complaint, filed October 30, 2006 in the Prior Action, specifically cited the jurisdiction and venue provisions of the November 3 Trust.

9.    Nevertheless, motions to dismiss for want of personal jurisdiction were filed in the Prior Action on December 11, 2006 on behalf of each of defendants Billy Harbert, Jr., Evangeline H. Hoover, Alan Hall, James Rein, William M. Sharp, Sr., Sharp & Associates, P.A., B.L. Harbert International, LLC, Bill Harbert International Construction, Inc., Harbert International Establishment, Inc. and Barry Coburn; on December 18, 2006 on behalf of defendant Matthew B. Lembke; and on January 12, 2007 on behalf of defendants Harbert International, Inc., Bryan B. Lavine, June Ann Sauntry and Troutman Sanders LLP.

10.    In addition, a motion to change venue from the Central District of California to the Northern District of Alabama was filed on December 11, 2006 in the Prior Action on behalf of defendants Billy Harbert, Jr., Evangeline H. Hoover, Alan Hall, James Rein, William M. Sharp, Sr., Sharp & Associates, P.A., B.L. Harbert International, LLC, Bill Harbert International Construction, Inc. and Harbert International Establishment, Inc.

11.    The Court's determination on jurisdiction and venue is paramount to an equitable resolution of the instant case, as expounded in paragraphs 13-14 hereinafter. Accordingly, the particular security concerns applicable to this action are stated by United States Senators and inherent in Defendants' physical threats (and are corroborated by non-party Mr. Thomas R. Kitchens, who sought to avoid the threats and physical attacks by Defendant Billy Harbert Jr. when Mr. Kitchens agreed to testify in support of the United States anti-trust case against Defendants, for which the Harbert Contractors (as defined hereinafter) eventually paid a $54

COMPLAINT FOR LIQUIDATED DAMAGES (BREACH OF CONTRACT)

1   million criminal fine for bid-rigging government contracts. Mr. Kitchens, who
2   oversaw the operations of the Harbert Contractors' conglomerate for 30 years,
3   secretly requested and received participation in the Government Protection
4   Program. The United States will continue to focus on the Harbert Defendants'
5   bid-rigging, corporate corruption, physical threats, tax evasion and collusion until
6   the conclusion of the trial of the False Claims Case -- defined in paragraph 8,
7   below -- set for January, 2007).

8       12.   Jurisdiction and venue are proper in the Western Division of this
9   District because Plaintiff and Mr. Harbert Sr.'s execution of the November 3
10  Trust expressly conveyed their will for jurisdiction and venue. Mr. Harbert Sr.
11  was eager to choose the Western Division of this District with respect to personal
12  jurisdiction and venue and to establish a $3 million penalty to discourage any
13  challenge of his choice in this matter. During the inception and the discussion
14  phase of the terms of their agreement, Mr. Harbert Sr. wished to shield Plaintiff
15  from his son, Billy Harbert Jr.'s and his personal and business attorneys pattern
16  of placing his adversaries in the cross-fire of his renowned verbal battles with his
17  father over the finances of their construction business. On this basis, Mr. Harbert
18  Sr. wished to settle the question of jurisdiction and venue to curb his son's flaring
19  temper from causing damage to Plaintiff in either Birmingham, Alabama, the
20  District of Columbia or Orange County, California, where his son had lived -- in
21  all three locations -- establishing contacts with mercenaries and thugs. (With
22  respect to Plaintiff, the United States has exerted a great deal of effort to protect
23  Plaintiff, who, according to documents from the White House and the National
24  Security Council has enhanced U.S. national security by making " . . . her unique
25  contributions to the formulation of the United States government's policies in the
26  Middle East . . . and the education of the American public about Middle East
27  issues." The United States Congress intervened to expedite the receipt of
28  Plaintiff's U.S. citizenship in 2001 due to Plaintiff's unique contacts with Middle

COMPLAINT FOR LIQUIDATED DAMAGES (BREACH OF CONTRACT)

03/08/2007 THU 11:31  [TX/RX NO 7359]

East heads of state, which contacts Plaintiff used to help Defendants secure contracts in the transactions detailed below. The United States' commitment to protect Plaintiff for her crucial assistance in the war on terrorism comprises, among other things, the whereabouts of Plaintiff, which is affected by the venue of the instant case. Plaintiff's work received written endorsement by an overwhelming majority of the United States Senators, as confirmed in writing by California Senator Dianne Feinstein. Senator Feinstein's letter is exhibited as Exhibit "B.") The parties' (master and personal) agreements specified jurisdiction and venue as an important consideration of their agreement, without which said agreement would not have been acceptable nor executed by either party. Accordingly, sacrifices made by Plaintiff in compliance with the terms of the jurisdiction and venue agreement would not have been made if Plaintiff was not guaranteed her personal security. To this end, any changes in the jurisdiction and venue agreement between the parties would jeopardize Plaintiff's security and would be tantamount to altering key terms of the agreement after the fact -- namely, after Plaintiff had fulfilled her part of the bargain.

13.    Jurisdiction and venue are proper in this District because Plaintiff resided in Bel Air, California when the November 3 Trust was executed. The primary Defendant, Mr. Harbert Sr., and Plaintiff had an agreement within the trust instrument that specifically provided for the jurisdiction and venue applicable to potential future litigation. On November 4, 2003, Mr. Harbert Sr. executed a letter to Plaintiff reconfirming the $3 million penalty payment to Plaintiff in the event he violates the jurisdiction and venue agreement stipulated in the November 3 Trust. In particular, Mr. Harbert Sr. stated that "[i]n the event any of my heirs would challenge this trust or should I be placed in a position to revoke or modify [the November 3 Trust] . . . either I or my estate will be irrevocably and unconditionally obligated to pay you the sum of three million dollars. This agreement to pay said amount is in consideration of your assistance on my behalf

over the past few years in dealing with the DOJ in connection with the U.S. v. Bilhar, et al. case, which involves both criminal fine of fifty-four million dollars and civil fine of thirty million dollars. [¶] You have taken great risks in dealing with the DOJ and therefore earned the sum of money referenced above only in the event that I or any of my heirs, should challenge, revoke or modify the [November 3 Trust]." This writing was acknowledged on November 4, 2003 by Guillaume Tourniaire, a Notary Public. A true and correct copy of this document (the November 4, 2003 letter) is attached hereto as Exhibit "C" and incorporated herein by this reference.

14.    (Mr. Kitchens, after 30 years of working on a day-to-day basis with the Harbert Contractors, knew enough about them to seek government protection.) Venue therefore is proper in the Western Division of this District because in Birmingham, Alabama, the Harbert Defendants have a corrupt influence on the local law enforcement community rendering Alabama an unsafe place for Plaintiff, her witnesses and attorneys. (On behalf of the Harbert Contractors, Mr. Kitchens had earlier threatened Plaintiff that "men in white sheets will finish you up" and subsequently apologized to Plaintiff on record for such threat. Plaintiff's security has been and remains a primary concern of the United States, as expressed by United States Senate leaders, including, but not limited to, the former Chairman of the Judiciary Committee, Orrin G. Hatch, the ranking member of the Armed Services Committee, Carl Levin, and minority leader Harry Reid, as well as three California Senators, Dianne Feinstein, Barbara Boxer and the late Alan Cranston.) True and correct copies of these letters are collectively attached hereto as Exhibit "B" and incorporated herein by this reference.

## II.    PLAINTIFF'S SATISFACTION OF CONDITIONS PRECEDENT TO HER SUIT

15.    Plaintiff issued a demand letter addressed to Defendants but mailed to Mr. Harbert Sr. on February 8, 2007, requesting Mr. Harbert Sr.'s secretary

1  to forward said demand to all the other Defendants to whom Plaintiff deemed it
2  inappropriate to mail directly due to the Prior Action. However, Mr. Harbert Sr.
3  has excused himself from involvement in the Prior Action, ostensibly in favor of
4  family support and on account of the deterioration of his health.

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

**(Against Bill H. Harbert, Sr.)**

8      16.    Plaintiff refers to and incorporates by this reference each allegation
9  set forth in paragraphs 1-15 hereof, inclusive, as if alleged herein in full.

10      17.    Plaintiff has performed all conditions, covenants and provisions
11  required of her to be performed in accordance with the terms and conditions of
12  the November 3 Trust, or has been excused from doing so by Mr. Harbert Sr.'s
13  breach.

14      18.    During the period commencing December 11, 2006 to the present,
15  Mr. Harbert Sr. breached the November 3 Trust by permitting his co-defendants
16  in the Prior Action to file motions challenging both the District Court's personal
17  jurisdiction over them and seeking a transfer of venue to the Northern District of
18  Alabama, thereby seeking to change the November 3 Trust's understanding on
19  both jurisdiction and venue.

20      19.    Mr. Harbert Sr. agreed in the November 3 Trust that in the event
21  either party to the November 3 Trust, or such party's co-defendants or co-
22  plaintiffs, should seek to change the understanding of the November 3 Trust on
23  jurisdiction and venue in any potential lawsuit, that party would be liable for
24  $3,000,000 in liquidated damages to the other.

25      20.    Furthermore, by virtue of Mr. Harbert Sr.'s breach of his obligation
26  under the November 3 Trust to pursue an expedited trial schedule arising out of
27  his failure to respond to Plaintiff's demand of February 8, 2007, Mr. Harbert Sr.
28  is liable to Plaintiff for an additional $6,000,000.

1    21.  Mr. Harbert Sr., by virtue of the filing in the Action of the motions

2    described in paragraphs 8 and 9, supra, and, further, by virtue of his refusal to

3    respond to Plaintiff's demand for an expedited trial schedule as described in

4    paragraph 20, supra, has breached the November 3 Trust, entitling Plaintiff to the

5    sum of $9,000,000 as liquidated damages.

6                    **SECOND CAUSE OF ACTION**

7               **INTENTIONAL INTERFERENCE WITH CONTRACT**

8          **(Against Billy Harbert, Jr., Evangeline H. Hoover and Alan Hall)**

9    22.  Plaintiff refers to and incorporates by this reference each allegation

10   set forth in paragraphs 1-15 and 17-20 hereof, inclusive, as if alleged herein in

11   full.

12   23.  Each of Billy Harbert Jr., Hoover and Hall knew of the provisions

13   of the November 3 Trust, both because the provisions of the November 3 Trust

14   are described in the Complaint in the Prior Action and because Plaintiff's counsel

15   in the Prior Action advised Roger S. Goldman, Esq. of Latham & Watkins LLP,

16   such Defendants' counsel in the Prior Action, of the existence of the provisions

17   recited in paragraph 6 hereof, and in addition, forwarded a copy of the entire

18   agreement to Mr. Goldman prior to the filing of any of the motions referenced in

19   paragraphs 9 and 10 hereof.

20   24.  Pursuant to the provisions of the November 3 Trust recited in

21   paragraph 6 hereof, the filing on behalf of each of Billy Harbert Jr., Hoover and

22   Hall of each of the motions referenced in paragraphs 9 and 10 hereof resulted, as

23   a matter of law, in Mr. Harbert Sr. being in breach of the above-referenced

24   provisions of the November 3 Trust.

25   25.  As a result of the interference by each of Billy Harbert, Jr., Hoover

26   and Hall with the November 3 Trust, Plaintiff has suffered actual damages,

27   liquidated in the November 3 Trust at $9,000,000.

28   ///

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.    For liquidated damages in the amount of $9,000,000.

2.    For costs of suit herein incurred.

3.    For such other and further relief as the Court deems just.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: February 16, 2007

                                          Brian J. Jacobs
                                          Attorney for Plaintiff
                                          Dr. Hoda Elemary

COMPLAINT FOR LIQUIDATED DAMAGES (BREACH OF CONTRACT)

# LAGUNA NIGUEL BEACH HOUSE 2003
# REVOCABLE TRUST
### ARTICLE ONE

Bill L. Harbert, called The Settlor and Trustee, declares that he has set aside the property described in Schedule A, attached to this instrument. All property and Securities subject to this instrument from time to time are respectively referenced as the "Property Estate" and "Stock Estate". THE TRUST ESTATE is inclusive of the property and stocks held together in the trust created in this instrument and shall be managed and distributed according to the terms of the Personal Arrangement Contract "Personal Arrangement".

### ARTICLE TWO

This instrument (in addition to creating a trust) sets the contract's terms and documents a five year old Secret agreement of a personal financial arrangement made by and between Bill L. Harbert (Harbert) and Dr. Hoda Elemary (Elemary) on November 3, 2003.

### ARTICLE THREE
### RECITALS

The parties' mutual benefits for conveying properties and stocks are:

I. On or about November 1998, the parties entered into a secret personal agreement that was further defined in 2002, whereby at Harbert's request, Elemary committed to Harbert to assist him with his personal affairs including his litigation troubles and to provide him-on a more permanent basis-with companionship, love, friendship and comfort as she had from time to time since 1991. Accordingly, Harbert's reasons for purchasing Elemary a house in Laguna Niguel, CA are: a).The personal aspect of their relationship b).An approximately $50 million Harbert earned in profit from Elemary's contacts with international senior Governments officials-who awarded Harbert lucrative oil pipelines and Mega Mid-East development contracts and c). "The great career risks" Elemary had assumed by enlisting her friends in Washington to shield Harbert from prosecution by the Department of Justice (DOJ) for 3 years.

II. On February 4, 2002 Harbert pled guilty on behalf of his corporation's, Bilhar, violation of one count of the Sherman Antitrust Act for bid rigging. Harbert paid the United States a $54 million fine. Harbert therefore eagerly sought Elemary's intervention on his behalf. Elemary was advised By Senator Orrin Hatch that "representing anyone associated with bid rigging to the DOJ, White House or Congress is tantamount to taking great career risks". Elemary cautiously agreed to Harbert's request on strict conditions. Harbert officially named Elemary as exclusive case manager to benefit from her high powered political contacts, which included personally advising five Consecutive U.S. Presidents on Mid-East terrorism. In July 2002 Elemary retained her personal friend, former Senate Majority Leader, BOB DOLE, to assist her in dealing with the DOJ.

III. With the exception of Elemary's deposit into escrow, the parties initiated discussions on August 16-18, and agreed on October 22, 2003 that the Laguna Niguel beach house would be paid in full by Harbert including real estate taxes at purchase time.

1

## ARTICLE FOUR
### (Personal Arrangement)

NOW, THEREFORE, in consideration of this personal arrangement as well as the business agreements and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties covenant and agree as follows:

1- Any potential lawsuit arising out of this Personal Arrangement Contract or business guarantees and agreements, as well as potential counter claims shall be governed and construed according to the laws of the state of California. Any lawsuit to enforce the terms of this Personal Arrangement and business agreements shall be commenced, and litigated (for personal disputes) in the Family Court – Superior Court in Los Angeles, California, and (for business disputes) in U.S. District Court, Central Division in Los Angeles, CA, in the County of Los Angeles. Any and all potential lawsuits, as well as compulsory counter claims will be without exception, litigated in California as though all the parties and witnesses to such lawsuits were California citizens and that the subject matter of the dispute upon which these lawsuits are based occurred in their entirety in the State of California, County of Los Angeles. In the event that either party to this contract or their co-defendants or co-plaintiffs file a motion to change this understanding on venue and jurisdiction (for any potential lawsuit) the violating party will unconditionally and unequivocally assume liability to pay the other party liquidated damages of three million dollars. Cleary, it is difficult to asses such damages. Nevertheless the parties have determined that the liquidated damages are at least $3 millon. The parties confirm their agreement herein that the violating party will pay $3 million to the other party. In the event that Harbert breaches any of the Business Agreements or Personal contract, Elemary will exclusively decide whether to pursue an expedited trial schedule, which include binding arbitration by a retired judge and/or a twenty five weeks expedited trial, whose cost will be born equally by Harbert and Elemary. Harbert's breach of this agreement for an expedited trial schedule will result in a one week demand for payment of $3 million. Otherwise, Harbert agrees to Elemary to demand double that amount from his LLC or bank accounts in Alabama and Switzerland.

2- Harbert unequivocally and unconditionally guarantees Elemary to overcome his current problems with cash flow that resulted in Harbert taking out a mortgage on the subject property. As a direct and proximate result of the drastic impact on Elemary on account of Harbert's cash flow problems, Harbert committed himself to the following:
   A. To provide Elemary with a monthly payment to cover the mortgage payment and real estate taxes.
   B. To divide in equal parts of fifty percent (50%) each with Elemary any and all profits arising out of his securities and stocks holdings beyond and above, i- accrued interest, ii- a seven percent (7%) annual increase of stock holdings for a two year period between the date of the execution of this document and Nov. 3rd 2005.

3- Harbert is hereby committed to compensate Elemary for his delay in paying fully for the beach house and agrees that at the earliest possible date, but no later than March 31st, 2005, Harbert will pay back the mortgage in full on the Beach House in compliance with his unwavering guarantee to fully pay for the beach house to satisfy his

2

part of the bargain in exchange for his acknowledgement of the receipt of 12 years of companionship and personal services and 25 years of business service.

    4. Harbert confirms his unconditional commitment to fulfill written guarantees stipulated herein to provide the promised minimum security for Elemary irrespective of any third party interference (including son Billy Harbert) or change of circumstances.

## ARTICLE FIVE

In the event the parties, convey the subject property through their <u>own names</u>, such transactions shall be legally titled as referenced below in article nine. The use of this legal title is necessary to insure this Personal Arrangement or (TRUST ESTATE) is consistent with other guarantees and agreements executed by the parties that refer to THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST as the instrument for transmuting real estate property. However, this Personal Arrangement Contract is legally <u>not</u> revocable despite the word revocable in the title. Each party hereby represents, warrants, and agrees to the other as follows:

    A. Each party has received independent legal advice from his or her attorney with respect to the advisability of entering into this Personal Arrangement Contract and TRUST ESTATE.

    B. Each party carefully read this Personal Arrangement Contract/ Trust created by this instrument and understands contents and legal effects of each provision hereof.

## ARTICLE SIX

Harbert is referenced in this document as the current Settlor and Trustee, Harbert will resign on November 3, 2003. Elemary will become the Settlor and Trustee two weeks after Harbert's execution of this document.

## ARTICLE SEVEN

    The Settlor may not revoke the Personal Arrangement (Contract). However, Schedule B, attached, describes the necessary measures to be implemented when the parties elect to utilize the trust created in this instrument, to convey property & stocks.

## ARTICLE EIGHT

    The Settlor appoints for life in the office of Settlor & Trustee, the person listed herein who shall effective the date of execution of this document, serve as the Settlor/Trustee first: Dr. Hoda Elemary. Elemary shall have power to designate one or more individuals or corporate fiduciaries to serve concurrently or serially to succeed the trustee in the event of her inability or unwillingness to act. The Trustee may revoke this instrument in whole or in part at any time. The Trustee may at any time amend any terms of this trust. Upon the trustee's death, the entire undistributed principal and income of the trust estate shall go to Elemary's designee. The Trustee shall have the full power to sell, encumber, convey, exchange, invest, reinvest, partition, divide, improve, sever and repair the property or stocks constituting the Trust Estate from time to time. The Settlor/Trustee shall have all powers conferred on the Settlor &Trustee by law and all powers contained in California Probate Code sections 16200-16249. If any provision of this instrument is unenforceable, the remaining provisions shall remain in full effect.

*Bruce Harbert*

3

## ARTICLE NINE

The trust created in this instrument may be referred to as THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST.

Executed on November _3_, 2003.

_Bill L. Harbert_

BILL L. HARBERT, Trustee

I certify that I have read the foregoing declaration of trust and that it correctly states the terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustee. I approve the declaration of trust in all particulars and request that the trustee execute it.

Date: November _3_, 2003     _Bill L. Harbert_

BILL L. HARBERT, Settlor

_City of Washington_

DISTRICT OF COLUMBIA          }
                             }
UNITED STATES OF AMERICA     }

On November _3rd_, 2003, before me, _Guillaume Tourniaire GCT_, ~~BILL L. HARBERT~~, personally appeared BILL L. HARBERT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity on behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.                    SEAL



[Signature]

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

4

# SCHEDULE A

Fifty-percent (50%) undivided interest in single family residence located at 21 LE CONTE, LAGUNA NIGUEL, CALIFORNIA 92677, and more particularly described as follows:

LOT 16 OF TRACT NO. 8551, IN THE CITY OF LAGUNA NIGUEL, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A SUBDIVISION MAP, RECORDED FEBRUARY 29, 1984, IN BOOK 522, PAGES 1 TO 17, INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 658-251-07

5

# Bill L. Harbert

November 4, 2003

Ms. Hoda Elemary
2252 Caliente Road
Palm Springs, California 92264

Re:   *21 Le Conte, Laguna Niguel, California 92677*
      *APN 658-251-07*

Dear Hoda:

The purpose of this letter is to confirm the fact that I have no intention whatsoever to revoke now or in the future The Laguna Niguel Beach House 2003 Revocable Trust. However, if any of my heirs challenge this trust or should I be placed in a position to revoke or modify The Laguna Niguel Beach House 2003 revocable trust concerning the above-referenced property, either I or my estate will be irrevocably and unconditionally obligated to pay you the sum of three million dollars  This agreement to pay said amount is in consideration of your assistance on my behalf over the past few years in dealing with the DOJ in connection with the U.S. v. Bilhar, et al. case, which involves both criminal fine of fifty-four million dollars and civil fine of thirty million dollars.

You have Taken great risks in dealing with the DOJ and therefore earned the sum of money referenced above only in the event that I or any of my heirs, should challenge, revoke or modify the Laguna Niguel Beach House 2003 revocable trust.

With kind regards

Sincerely,

*[signature: Bill L. Harbert]*

Bill L. Harbert

City of Washington
District of Columbia

Bill L. Harbert appeared personally before me, presenting an Alabama drivers license as identification

*[signature]*

Guillaume Toumiaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

# EXHIBIT 4
# Part 1

1  **Brian J. Jacobs (State Bar No. 107788)**
   **467 South Arnaz Drive, Suite 319A**
2  **Los Angeles, California 90048**
   **(310) 770-6874 (Telephone)**
3  **(310) 858-6489 (Facsimile)**

4  Attorneys for Plaintiff
   Dr. Hoda Elemary

5

6

7                  **UNITED STATES DISTRICT COURT**

8                  **CENTRAL DISTRICT OF CALIFORNIA**

9                        **WESTERN DIVISION**

10  DR. HODA ELEMARY,                    )  Case No. CV06-4723 RGK (PJWx)
                                         )
11           Plaintiff,                  )  **FIRST AMENDED COMPLAINT FOR**
                                         )  **DAMAGES FOR:**
12  vs.                                  )
                                         )  1.   **SUPPRESSION OF FACTS**
13  BILLY HARBERT, JR.; B.L.             )       **(FRAUD)**
    HARBERT INTERNATIONAL, LLC, a )       2.   **CONSPIRACY (WRONGFUL**
14  Delaware limited liability company;  )       **TERMINATION)**
    BILL HARBERT INTERNATIONAL   )       3.   **VIOLATION OF 18 U.S.C. §1964**
15  CONSTRUCTION, INC., a Delaware       )       **(CIVIL RICO)**
    corporation; HARBERT                 )  4.   **INTENTIONAL INTERFERENCE**
16  INTERNATIONAL ESTABLISHMENT,)            **WITH CONTRACT**
    INC., a Liechtenstein corporation;   )  5.   **BREACH OF CONTRACT**
17  HARBERT INTERNATIONAL, INC., a)       6.   **QUANTUM MERUIT**
    Delaware corporation; ROY            )  7.   **TERMINATION IN VIOLATION**
18  ANDERSON; HARBERT U.K.               )       **OF PUBLIC POLICY**
    SERVICES, LTD., an English company; )  8.   **BREACH OF IMPLIED**
19  BILL L. HARBERT, SR.; SABBIA         )       **CONTRACT OF CONTINUED**
    AKTIENGESELLSCHAFT, a                )       **EMPLOYMENT**
20  Liechtenstein corporation; TROUTMAN )   9.   **INTENTIONAL INFLICTION OF**
    SANDERS LLP, a Georgia limited       )       **EMOTIONAL DISTRESS**
21  liability partnership; BRYAN B.      )  10.  **SLANDER**
    LAVINE; JUNE ANN SAUNTRY;            )  11.  **LIBEL**
22  SHARP AND HARRISON, P.A., a          )
    Florida professional association;    )  **DEMAND FOR JURY TRIAL**
23  WILLIAM M. SHARP, SR.;               )
    MATTHEW H. LEMBKE;                   )
24  WACHOVIA BANK, N.A., a national      )
    banking association; KEN POLK;       )
25  EVANGELINE H. HOOVER; SAM            )
    POINTER; BARRY COBURN; ALAN          )
26  HALL; and JAMES REIN,                )
                                         )
27           Defendants.                 )
    _____)

28

                                    1
                 **FIRST AMENDED COMPLAINT FOR DAMAGES**

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction under 28 U.S.C. §1332, in that Plaintiff DR. HODA ELEMARY ("Plaintiff") is a citizen of the State of California, while defendants BILL L. HARBERT, SR. and BILLY HARBERT, JR. are citizens of the State of Alabama; defendant ROY ANDERSON is a citizen of the State of New Jersey; defendant HARBERT U.K. SERVICES, LTD. is an English company with its principal place of business in the United Kingdom; defendant HARBERT INTERNATIONAL ESTABLISHMENT, INC. is a Liechtenstein corporation having its principal place of business in the Swiss Confederation; defendant TROUTMAN SANDERS LLP is a Georgia limited liability partnership having its principal place of business in the State of Georgia; defendants BRYAN B. LAVINE and JUNE ANN SAUNTRY are citizens of the State of Georgia; defendant SHARP AND HARRISON, P.A. is a Florida professional association having its principal place of business in the State of Florida; defendant WILLIAM M. SHARP, SR. is a citizen of the State of Florida; defendant BARRY COBURN is a citizen of the District of Columbia; defendant JAMES REIN is a citizen of the Republic of South Africa; defendant SABBIA AKTIENGESELLSCHAFT is a Liechtenstein corporation having its principal place of business in the Duchy of Liechtenstein; defendant WACHOVIA BANK, N.A. is a national banking association having its designated main office in the State of North Carolina; defendant B.L. HARBERT INTERNATIONAL, LLC is a Delaware limited liability company having its principal place of business in the State of Alabama; defendant MATTHEW H. LEMBKE, KEN POLK, EVANGELINE H. HOOVER, SAM POINTER and ALAN HALL are citizens of the State of Alabama; and defendants BILL HARBERT INTERNATIONAL CONSTRUCTION, INC. and HARBERT INTERNATIONAL, INC. are each Delaware corporations having their respective principal places of business in the State of Alabama (collectively hereinafter, "Defendants").     The matter in

1 controversy exceeds, exclusive of interest and costs, the sum of Seventy-Five
2 Thousand Dollars.

3     2.    Venue is proper in this district because a substantial part of the events
4 or omissions giving rise to the claim occurred in this district.

5     3.    The Court's determination on jurisdiction and venue is paramount to
6 an equitable resolution of the instant case, as expounded in paragraphs 3-7
7 hereinafter. Accordingly, the particular security concerns applicable to this action
8 are stated by United States Senators and inherent in Defendants' physical threats
9 and are corroborated by non-party Mr. Thomas R. Kitchens, who sought to avoid
10 the threats and physical attacks by Defendant Billy Harbert Jr. when Mr. Kitchens
11 agreed to testify in support of the United States anti-trust case against Defendants,
12 for which the Harbert Contractors (as defined hereinafter) eventually paid a $54
13 million criminal fine for bid-rigging government contracts. Mr. Kitchens, who
14 oversaw the operations of the Harbert Contractors' conglomerate for 30 years,
15 secretly requested and received participation in the Government Protection
16 Program. The United States will continue to focus on the Harbert Defendants'
17 bid-rigging, corporate corruption, physical threats, tax evasion and collusion until
18 the conclusion of the trial of the False Claims Case -- defined in paragraph 8,
19 below -- set for January, 2007.

20     4.    Jurisdiction and venue are proper in the Western Division of this
21 District because Plaintiff and primary Defendant Bill L. Harbert, Sr. ("Mr.
22 Harbert Sr.") were counseled to have an agreement (the "November 3 Trust") that
23 expressly conveyed their will for jurisdiction and venue. Mr. Harbert Sr. was
24 eager to choose the Western Division of this District with respect to personal
25 jurisdiction and venue and to establish a $3 million penalty to discourage any
26 challenge of his choice in this matter. During the inception and the discussion
27 phase of the terms of their agreement, Mr. Harbert Sr. wished to shield Plaintiff
28 from his son, Billy Harbert Jr.'s pattern of placing his adversaries in the cross-fire

1  of his renowned verbal battles with his father over the finances of their

2  construction business.    On this basis, Mr. Harbert Sr. wished to settle the

3  question of jurisdiction and venue to curb his son's flaring temper from causing

4  damage to Plaintiff in either Birmingham, Alabama, the District of Columbia or

5  Orange County, California, where his son had lived -- in all three locations --

6  establishing contacts with mercenaries and thugs.  The United States has exerted

7  a great deal of effort to protect Plaintiff, who, according to documents from the

8  White House and the National Security Council has enhanced U.S. national

9  security by making " . . . her unique contributions to the formulation of the

10 United States government's policies in the Middle East . . . and the education of

11 the American public about Middle East issues."   The United States Congress

12 intervened to expedite the receipt of Plaintiff's U.S. citizenship in 2001 due to

13 Plaintiff's unique contacts with Middle East heads of state, which contacts

14 Plaintiff used to help Defendants secure contracts in the transactions detailed

15 below.    The United States' commitment to protect Plaintiff for her crucial

16 assistance in the war on terrorism comprises, among other things, the whereabouts

17 of Plaintiff, which is affected by the venue of the instant case.  Plaintiff's work

18 received written endorsement by an overwhelming majority of the United States

19 Senators, as confirmed in writing by California Senator Dianne Feinstein.  Senator

20 Feinstein's letter is exhibited in paragraph 28, below.  The parties' (master and

21 personal)  agreements  specified  jurisdiction  and  venue  as  an  important

22 consideration of their agreement, without which said agreement would not have

23 been acceptable nor executed by either party.  Accordingly, sacrifices made by

24 Plaintiff in compliance with the terms of the jurisdiction and venue agreement

25 would not have been made if Plaintiff was not guaranteed her personal security.

26 To this end, any changes in the jurisdiction and venue agreement between the

27 parties would jeopardize Plaintiff's security and would be tantamount to altering

28 key terms of the agreement after the fact -- namely, after Plaintiff had fulfilled her

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1    part of the bargain.

2        5.    Jurisdiction and venue are in particular proper in the Western

3    Division of this District because the November 3 Trust stipulated "Any potential

4    lawsuit arising out of this Personal Arrangement Contract or business guarantees

5    and agreements, as well as potential counter-claims shall be governed and

6    construed according to the laws of the State of California. Any lawsuit to enforce

7    the terms of this Personal Arrangement and business agreements shall be

8    commenced, and litigated (for personal disputes) in the Family Court -- Superior

9    Court of Los Angeles, California, and (for business disputes) in U.S. District

10   Court, Central Division in Los Angeles, California, in the County of Los

11   Angeles. Any and all potential lawsuits, as well as compulsory counter-claims

12   will be without exception, litigated in California as though all the parties and

13   witnesses to such lawsuits were California citizens and that the subject matter of

14   the dispute upon which these lawsuits are based occurred in their entirety in the

15   State of California, County of Los Angeles. In the event that either party to this

16   contract -- or their co-defendants or co-plaintiffs -- file a motion to change this

17   understanding on venue and jurisdiction (for any potential lawsuit) the violating

18   party will unconditionally and unequivocally assume liability to pay the other

19   party liquidated damages of three million dollars. Clearly, it is difficult to assess

20   such damages. Nevertheless, the parties have determined that the liquidated

21   damages are at least $3 million dollars. The parties confirm their agreement

22   herein that the violating party will pay $3 million dollars to the other party."

23        6.    Jurisdiction and venue are proper in this District because Plaintiff

24   resided in Bel Air, California when the November 3 Trust was executed. The

25   primary Defendant, Mr. Harbert Sr., and Plaintiff had an agreement within the

26   trust instrument that specifically provided for the jurisdiction and venue applicable

27   to potential future litigation. On November 4, 2003, Mr. Harbert Sr. executed

28   a letter to Plaintiff reconfirming the $3 million penalty payment to Plaintiff in the

1    event he violates the jurisdiction and venue agreement stipulated in the November
2    3 Trust. In particular, Mr. Harbert Sr. stated that "[i]n the event any of my heirs
3    would challenge this trust or should I be placed in a position to revoke or modify
4    [the November 3 Trust] . . . either I or my estate will be irrevocably and
5    unconditionally obligated to pay you the sum of three million dollars. This
6    agreement to pay said amount is in consideration of your assistance on my behalf
7    over the past few years in dealing with the DOJ in connection with the U.S. v.
8    Bilhar, et al. case, which involves both criminal fine of fifty-four million dollars
9    and civil fine of thirty million dollars. [¶] You have taken great risks in dealing
10   with the DOJ and therefore earned the sum of money referenced above only in the
11   event that I or any of my heirs, should challenge, revoke or modify the
12   [November 3 Trust]." This writing was acknowledged on November 4, 2003 by
13   Guillaume Tourniaire, a Notary Public. A true and correct copy of this document
14   (the November 4, 2003 letter) is attached hereto as Exhibit "A" and incorporated
15   herein by this reference.

16        7.    Mr. Kitchens, after 30 years of working on a day-to-day basis with
17   the Harbert Contractors, knew enough about them to seek government protection.
18   Venue therefore is proper in the Western Division of this District because in
19   Birmingham, Alabama, the Harbert Defendants have a corrupt influence on the
20   local law enforcement community rendering Alabama an unsafe place for Plaintiff,
21   her witnesses and attorneys. On behalf of the Harbert Contractors, Mr. Kitchens
22   had earlier threatened Plaintiff that "men in white sheets will finish you up" and
23   subsequently apologized to Plaintiff on record for such threat. Plaintiff's security
24   has been and remains a primary concern of the United States, as expressed by
25   United States Senate leaders, including, but not limited to, the former Chairman
26   of the Judiciary Committee, Orrin G. Hatch, the ranking member of the Armed
27   Services Committee, Carl Levin, and minority leader Harry Reid, as well as three
28   California Senators, Dianne Feinstein, Barbara Boxer and the late Alan Cranston.

1  True and correct copies of these letters are collectively attached hereto as Exhibit
2  "B" and incorporated herein by this reference.

3  ## FACTS COMMON TO ALL CAUSES OF ACTION

4  8.    Plaintiff's action is in support of and arises in part out of the
5  transactions stated in the United States' pending false claims case No.
6  19CV0123WBB in the United States District Court for the District of Columbia
7  (the "False Claims Case"), which cites the primary defendants named in this
8  action for bid-rigging government contracts.  To this end, the documents and
9  discovery anticipated to be produced in this action will provide crucial evidence
10  for the False Claims Case.

11  9.    The Camp David Peace Accords provided funding for construction
12  projects, including the subject project, the waste water treatment project in Cairo,
13  Egypt (the "Subject Project").  The Egyptian government awarded the contracts
14  to U.S. companies that had been pre-qualified to bid.  The United States Agency
15  for International Development ("USAID") paid the winning bidders on each
16  contract.  As a direct and proximate result of Plaintiff's personal contacts among
17  Middle East heads of state, the joint venture of which the Harbert Contractors
18  owned 60% was awarded approximately $200 million worth of contracts from the
19  Subject Project, which included pump stations, pipelines, and waste water
20  treatment facilities.  Plaintiff was in a unique position (as former special advisor
21  to President Anwar Sadat during the Camp David negotiations) to provide tangible
22  results to the Harbert Contractors.

23  10.    In particular, non-party John M. Harbert and his brother, Defendant
24  Bill L. Harbert, intentionally sought Plaintiff's assistance and intervention to
25  secure contracts from the Subject Project for four reasons detailed in paragraph
26  I of the Schedule attached hereto (the "Incorporated Schedule").  Chief among
27  these reasons, John and Bill Harbert wished to secure political cover by using
28  Plaintiff's contacts with former Presidents Ford, Carter and Reagan, Dr. Kissinger

1  and Messrs. Kaiser and Rockefeller as a necessary protection for their conspiracy
2  to bid-rig the USAID contracts.  In addition, Plaintiff convinced the Egyptian
3  Prime Minister, her uncle, Dr. Atef Sedky, to remove the Harbert Contractors'
4  names from a catalogue of black-listed corporations (for a $79 million earlier
5  action brought by the Egyptian government against Defendants, which Plaintiff
6  had resolved in favor of the Harbert Contractors at the International Court in
7  Paris, France) so they could do business in Egypt on the Subject Project.

8      11.  The United States later filed two separate actions against and
9  suspended Defendants from future bidding on government contracts.  One of these
10  two actions was an antitrust case, that was settled on February 4, 2002 under a
11  plea agreement in which Defendants pleaded guilty to one count of violation of
12  the Sherman Antitrust Act.

13      12.  Between April 2001 through April 2005, Defendants sought Plaintiff's
14  intervention once again, primarily in the False Claims Case and later in the
15  declaratory relief case, in which the Harbert Contractors sought to reduce the $54
16  million criminal fine imposed on them by the antitrust case.  Plaintiff became the
17  sole spokesperson and exclusive case manager for Mr. Harbert Sr. for four years.
18  Plaintiff worked in conjunction with former U.S. Senate Majority Leader,
19  SENATOR BOB DOLE, whom she retained in 2002 through 2005 to assist her
20  in negotiating a settlement and a three-year extension of time with senior officials
21  from the Department of Justice (the "DOJ") concerning the prosecution of the
22  Harbert Contractors on the False Claims Case.

23      13.  The two main defendants in this action are Billy Harbert ("Billy
24  Harbert Jr."), acting in his personal capacity as well as on behalf of B.L. Harbert
25  International, LLC, and his father Mr. Harbert Sr., acting in his personal capacity
26  and on behalf of Bill Harbert International Construction Inc., Harbert International
27  Establishment Inc., Harbert U.K. Services, Ltd. and Harbert International, Inc.
28  Mr. Roy Anderson executed a substantial part of the bid-rigging scheme, for

1  which wrongdoing he was convicted by a jury. Mr. Harbert Sr. and Billy Harbert
2  Jr. of Birmingham, Alabama; Mr. Roy Anderson of New Jersey; and their
3  corporate entities, are hereinafter referenced together as the "Harbert
4  Contractors". The remaining Defendants are listed on page 2 and in detail in
5  paragraph V of the Incorporated Schedule.

6      14.   At the risk of Plaintiff's life, this action entails a rare and daring view
7  from inside of the Harbert corporate structure of their criminal activities,
8  including masterminding bid-rigging, the receipt of large sums of unreported
9  income in specific Swiss bank accounts -- the proceeds of bid-rigging, unjust
10  enrichment and the use of a rogue Federal Bureau of Investigation agent to
11  threaten violent acts against Plaintiff and Defendants' adversaries, including offers
12  by the aforesaid FBI agent to "terminate" for a lofty price the Harbert
13  Contractors' perceived adversaries, including Plaintiff.       The Harbert
14  Contractors and Defendant Lavine threatened Plaintiff's life if Plaintiff divulged
15  to the United States the Harbert Contractors' banking documents sent to Plaintiff
16  by Ferrier Lullin & Cie SA, a Swiss bank headquartered in Geneva, Switzerland
17  and acquired by Bank Julius Baer in Zurich in 2005, relating to the activities of
18  the Harbert Contractors in the False Claims Case (the "Swiss Bank Records").

19      15.   Defendants in particular defrauded the United States and Plaintiff
20  through unjust enrichment and unlawful pocketing of $40 million beyond the
21  profit stipulated in the contracts between Defendants and the United States. The
22  Harbert Contractors' margin of profit on the Subject Contracts was 65%, rather
23  than the negotiated 15%. Moreover, the Harbert Contractors encouraged foreign
24  corporations to join them in defrauding the American taxpayer and the recipient
25  Middle East governments with the effect of severely undermining Plaintiff's
26  credibility with Middle East heads of states with whom Plaintiff had enjoyed a
27  very lucrative business relationship.

28      16.   Plaintiff sustained substantial losses in her theaters of operation,

1  including, but not limited to, permanent damages as the direct and proximate
2  result of the fraud and concealment by Defendants of the facts of the bid-rigging
3  scheme.  In particular, Defendants' damages inflicted on Plaintiff arose through
4  four categories of unlawful actions:

5          a.    demanding that Plaintiff either break the law by altering
6  evidence detrimental to the Harbert Contractors that was required to be
7  surrendered to the United States, or have her employment terminated.  This
8  evidence included, but was not limited to, the Harbert Contractors' balance sheets,
9  unlawfully transferring funds into limited liability companies and tax evasion --
10 large sums of unreported income in numbered Swiss bank accounts;

11         b.    completely and intentionally discrediting Plaintiff in the
12 presence of many United States Senators, the White House and DOJ officials who
13 had earlier supported Plaintiff's activities in writing and who would have
14 continued to benefit her career economically;

15         c.    coercing by the Harbert Contractors and Defendant Bryan
16 Lavine ("Lavine") of Plaintiff to dramatically reduce her income and expenses and
17 lose her position as exclusive case manager, or agree to cover up crucial evidence
18 concerning Defendants' Swiss Bank Records in connection with a potential trial
19 of the False Claims Case, consequently threatening Plaintiff with physical harm
20 if she did not relinquish her position by April 4, 2005 after Defendant Billy
21 Harbert Jr. harassed Plaintiff's counsel's family and office staff in March, 2005,
22 demanding that Congressman Earl Hilliard withdraw his representation while
23 former Congressman Hilliard was in a coma; and

24         d.    physically assaulting and pushing Plaintiff down the stairs by
25 a hired Myrmidon of the Harbert Contractors on April 14, 2005, causing Plaintiff
26 to break her shoulder and suffer incapacitation and intolerable physical pain for
27 over seven months following the assault.  Defendants sought to instill terror and
28 fear to prevent Plaintiff from filing this action or revealing any information that

1  would be detrimental to their claim of innocence in the False Claims Case.

2  Plaintiff suffered severe mental anguish and emotional distress in addition to

3  physical incapacitation as a direct and proximate result of Defendants' face-to-face

4  and telephonic threats on her life, accompanied by warning to do her bodily injury

5  and then making good on that warning.

6      17.    During and after the bid-rigging, Mr. Harbert Sr. and Billy Harbert

7  Jr. insisted on maintaining a facade of lack of knowledge of the crimes that they

8  were committing or requesting their subordinates to commit on their behalf.

9  However, the factual evidence coupled with Plaintiff's legal recordings of Mr.

10  Harbert Sr. shows deep involvement in such conspiracy, as current counsel

11  representing the defendants in the False Claims Case (Defendants Lavine and

12  Sauntry) have also admitted in evidence.  In particular, in a specific conversation

13  that was legally recorded by Plaintiff, concerning hush money that the Harbert

14  Contractors paid to a government minister in the Middle East, Mr. Harbert Sr.

15  notified Plaintiff of his need to keep his distance from the payment to that

16  minister, who was aware of the Harbert contractors' bid-rigging of the Subject

17  Project in Egypt.  <u>On the recorded tape, Mr. Harbert Sr. is heard stating to</u>

18  <u>Plaintiff, "I would go to jail if anyone finds out that I knew, I cannot know about</u>

19  <u>this".  Mr. Harbert Sr. then states to Plaintiff, "You handle it"</u>.  Unmistakably,

20  Mr. Harbert Sr. understood the nature of the crime he was demanding Plaintiff

21  to execute on his behalf.    Moreover, Mr. Harbert Sr. convicted himself in his

22  own voice, "I would go to jail", which confirms his knowledge of the illegality

23  of the acts in which he was personally involved, and that he wished to distance

24  himself from them by demanding that Plaintiff assume the risks of committing a

25  crime by saying, "You take care of it".

26      18.    Defendants' willful and malicious disregard for conforming with

27  various written guarantees, commitments and promises previously provided to

28  Plaintiff was intended to punish Plaintiff for refusing to go along with Defendants'

1  cover up of their original crime of bid-rigging the United States taxpayer in the
2  amount of $40 million.  The impact of Defendants' punishment was as follows:
3  a) Plaintiff was deprived of continued employment despite the fact that Defendants
4  issued written documents confirming their full satisfaction with Plaintiff's job
5  performance, only one week before Plaintiff refused to implement Defendants'
6  illegal cover-up plan.  Defendants were also satisfied with Plaintiff's dealings with
7  the DOJ as stated in writing by Mr. Harbert Sr.; b) Plaintiff and her associates
8  were terrorized from publicly exposing the Harbert Contractors' bid-rigging until
9  Plaintiff elected to take the risk of filing this action; and c) Plaintiff was prevented
10 from publicly demanding that Defendants cease and desist from carrying on their
11 self-serving conspiracy as well as making threats to any employee that would
12 discuss the Harbert Contractors' modus operandi for bid-rigging and consequent
13 cover-up conspiracy, as well as terrorizing employees that learned of the Harbert
14 Contractors' crimes.

15     19.    Plaintiff and Senator Dole were successful in a) securing a low
16 settlement figure through their negotiations with the most senior U.S. government
17 officials.   The Harbert Contractors rejected three settlement offers negotiated
18 among Plaintiff, Senator Dole and the United States, including a $15 million
19 offer.   The United States initially demanded $56 million in a settlement
20 conference, stating that its proven $25 million in damages would be trebled at trial
21 to $75 million, now set for January, 2007.  That $56 million was comprised of
22 $22 million from nonparty Harbert Corporation, for which Mr. Harbert Sr. is
23 responsible to pay under an agreement with Harbert Corporation in which he
24 assumed liability for the bid-rigging, and $34 million from Mr. Harbert Sr.
25 personally, as demanded during the settlement conference in court by Carolyn G.
26 Mark, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, and
27 b) extending by three years the DOJ's prosecution of the False Claims Case,
28 thereby enabling Mr. Harbert Sr. to retain in his South Trust Bank stock portfolio

1   $56 million (the lesser amount requested by the government) in South Trust Bank

2   shares, which more than doubled in value immediately after Wachovia Bank,

3   N.A. acquired South Trust Bank.

4       20.   Defendant Billy Harbert Jr. engaged in three sets of unlawful acts,

5   including, but not limited to, abuse of an elderly person, blackmail and

6   misrepresentration:

7       (a)   Defendants Billy Harbert Jr. and Rein deemed it necessary for

8   the financial survival of their corporate entity, HILLC, to continue to collect

9   multi-million dollar loans on an annual basis from Mr. Harbert Sr., which greatly

10   distressed him. Mr. Harbert Sr. therefore sought Plaintiff's assistance in 2003 to

11   protect him from what he described as "being blackmailed and coerced by Billy

12   [Harbert Jr.] and Jim [Rein]." Mr. Harbert Sr. instructed Plaintiff not to forward

13   documents relating to the purchase of a property in Laguna Niguel, California for

14   Plaintiff and issued letters with Plaintiff intended to disguise the purpose of such

15   real estate and other transactions because he feared that Billy Harbert Jr. would

16   use such transactions to demand additional financing for his company.

17   Ultimately, however, Billy Harbert Sr. learned of the Laguna Niguel transaction

18   from Defendant Sharp and used this information to secure substantial funding

19   from Mr. Harbert Sr. and demanded that Mr. Harbert Sr. breach his agreement

20   with Plaintiff. However, the primary Defendant, Mr. Harbert Sr., had already

21   confirmed his position in writing to the effect that no triable issue of fact existed

22   as to Mr. Harbert Sr.'s liability to Plaintiff with respect to breach of contract and

23   unlawful termination. In particular, Mr. Harbert Sr. stated in a November 11,

24   2004 letter to Defendant William M. Sharp, Sr., "I am writing to bring to your

25   attention to [sic] the fact that when I accepted your help to manage the qui tam

26   and declaratory relief cases I had forgotten that I had a confirmed agreement with

27   Dr. Elemary under liability to me to manage these cases to their conclusions. . .

28   . [H]er position as exclusive case manager was guaranteed by me. I therefore

1  have no choice but to honor my agreements with Dr. Elemary . . . to limit my

2  liability . . . ."  A true and correct copy of this letter is attached hereto as Exhibit

3  "C" and incorporated herein by this reference.

4        (b)   In 2005, Defendants' determined obsession to obtain the Swiss

5  Bank Records from Plaintiff was and remains today the cause of threats,

6  blackmail, and physical violence, resulting in serious bodily injuries, perpetrated

7  by Defendants on Plaintiff, including Plaintiff's broken shoulder on April 14,

8  2005, and the attempt on Plaintiff's counsel, Congressman Earl Hilliard's life on

9  March 2, 2005, who was retained by Plaintiff, which left the Congressman

10  incapacitated with 67 broken bones for over one year and a half.

11        (c)   Misrepresentation, physical threats, exiling Plaintiff to Saudi

12  Arabia to conceal from her the Harbert Contrctors' bid-rigging until they collected

13  on the benefits thereof and additional damages from Defendants' violations beyond

14  these stated herein are cited in paragraph VI of the Incorporated Schedule.

**PARTIES**

15  

16      21.   The parties hereto are listed in paragraph 1 hereof.  In addition, a

17  more detailed description is set forth in paragraph V of the Incorporated Schedule.

**FIRST CAUSE OF ACTION**

**SUPPRESSION OF FACTS (FRAUD)**

**(Against Mr. Harbert Sr., BHIC, Bilhar, HII,**

**Billy Harbert Jr., HILLC, Anderson, Harbert U.K.,**

**Sabbia, Sharp, Sharp and Harrison, P.A., Lavine, Sauntry,**

**Troutman Sanders LLP, Rein, Hall and Hoover)**

18  

19  

20  

21  

22  

23  

24      22.   Plaintiff refers to and incorporates by this reference each allegation

25  set forth in paragraphs 1-21 hereof, inclusive, as if alleged herein in full.

26      23.   At the time Plaintiff acted on the Harbert Defendants' behalf to

27  enable them to bid on the Subject Project in Egypt, each of Mr. Harbert Sr.,

28  BHIC, Bilhar, HII, non-party Harbert Corporation, Billy Harbert Jr., HILLC,

1  Anderson, Harbert U.K., Sabbia, Rein and Hoover and non-parties Peter Schmidt,

2  Harbert Jones Joint Venture, Phillip Holtzmann A.G. and ABB intended to engage

3  in illegal bid-rigging or were aware of such intentions.

4      24.    The USAID administrator confirmed that the awarding of the major

5  contracts in the Subject Project was based on two factors. It is public knowledge

6  in Egypt that Plaintiff and her uncle, the Egyptian Prime Minister Atef Sedky,

7  played a major role in the awarding of the Subject Project to the Harbert

8  Contractors by notifying USAID that Harbert Jones, the joint venture set up by

9  the Harbert Contractors to bid on various contracts, was acceptable to the

10  government of Egypt for contracts 27 and 33, as well as the three contracts 20A,

11  07 and 29, which were the subject of indictments brought by the United States.

12  USAID approved the Harbert Contractors' bid on account of its being the lowest

13  bid and the Egyptian Government's approval of the Harbert Contractors'

14  participation in the Subject Project after their names were removed by Plaintiff's

15  efforts from the itemized blacklisted corporations that would have prevented them

16  from doing business in Egypt.

17      25.    Defendants' bid-rigging included obtaining a collusive, artificially

18  inflated, and noncompetitive price for the Subject Project and an illegal and

19  inflated profit thereon. As a result of the bid-rigging conspiracy, Defendants

20  submitted and caused to be submitted false and inflated claims for payment to the

21  USAID for work done on the Subject Project. Defendants' conspiracy conflicted

22  with U.S. foreign policy by perverting the noble purpose of the Accords, which

23  sought to bring peace to the troubled Middle East. Defendants acted without

24  regard to the impact of their actions on their association with Plaintiff who, as

25  referenced above, helped clear the way for securing the major contracts of the

26  Subject Project for the Harbert Contractors.

27      26.    At the time Plaintiff sought approvals for the Harbert Contractors to

28  work on the Subject Project, Defendants did not disclose to her their intentions

# EXHIBIT 4
# Part 2

1   to engage in bid-rigging and disgrace Plaintiff by violating United States law and

2   the spirit of the Accords.  Later, when Plaintiff agreed to become the exclusive

3   case manager for the False Claims Case, Defendants concealed from Plaintiff the

4   extent of their culpability in the bid-rigging scheme.  Defendants knew of such

5   intentions and culpability and, at the time Plaintiff performed such services,

6   Plaintiff was ignorant of Defendants' intentions to engage in, and subsequent

7   participation in, bid-rigging.  Plaintiff could not, in the exercise of reasonable

8   diligence, have discovered Defendants' actual intentions and subsequent

9   culpability, which Defendants ensured was a well-kept secret.

10       27.    Defendants' suppression from Plaintiff of their intentions to engage

11  in, and subsequent participation in, bid-rigging was intended to induce Plaintiff

12  to use her high-level political connections and influence to cause the Harbert

13  Contractors to be eligible to bid for and be awarded contracts 20A, 07 and 29,

14  and, later, to assist Defendants to delay prosecution of the False Claims Case.

15  If Plaintiff had been aware of Defendants' actual intentions and culpability,

16  Plaintiff would not, as she did, have vouched for Defendants' integrity to secure

17  such approvals and participated in such defense.

18       28.    As a proximate result of the revelation of the fraud practiced upon

19  Plaintiff by Defendants as hereinabove set forth, Plaintiff's lucrative relationship

20  with the Egyptian government, USAID, U.S. corporations and some members of

21  the Congress was destroyed.  Plaintiff had earned her living (according to a letter

22  from U.S. Senator Dianne Feinstein)" . . . based on the vital services Ms.

23  Elemary provides Congress, which have been determined to serve U.S. national

24  interests.  A majority of the United States Senators have overwhelmingly endorsed

25  Ms. Elemary's work [in writing] . . . ."  This letter is attached hereto as Exhibit

26  "B."  Plaintiff has also promoted the passage of multi-billion dollar legislation and

27  assisted U.S. corporations to secure lucrative contracts in the Middle East.  When

28  Defendants concealed from Plaintiff their intentions to rig the bids and isolated her

1  by dispatching her to Saudi Arabia during the execution of their conspiracy,

2  Defendants knowingly interfered with Plaintiff's special contacts and violated the

3  trust vested by U.S. government officials and Senate leaders and the most senior

4  Egyptian government officials in Plaintiff as their own private inspector on the

5  ground.  To this end, the bid-rigging conspiracy severely tarnished the status of

6  Plaintiff's reputation as an honest broker between the United States business

7  community and the Middle East as well as within the U.S. Senate.  Defendants

8  effectively, and knowingly, destroyed Plaintiff's source of income for life in an

9  amount to be ascertained, but Plaintiff is informed and believes, and thereon

10  alleges, that such damages exceed Three Million Dollars ($3,000,000).

11      29.    The aforementioned acts and omissions of Defendants were willful,

12  wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the

13  intention on the part of Defendants to deprive Plaintiff of property, legal rights

14  and otherwise cause injury, and was despicable conduct that subjected Plaintiff to

15  a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to

16  justify an award of exemplary and punitive damages in an amount according to

17  proof.

## SECOND CAUSE OF ACTION

## CONSPIRACY (WRONGFUL TERMINATION)

**(Against Billy Harbert Jr., HILLC, Sharp, Sharp and Harrison,**

**P.A., Lavine, Sauntry, Troutman Sanders LLP, Lembke,**

**Rein, Hall, Pointer, Polk, Wachovia, Hoover and Coburn)**

23      30.    Plaintiff refers to and incorporates by this reference each allegation

24  set forth in paragraphs 1-21 hereof, inclusive, as if alleged herein in full.

25      31.    Senator Bob Dole performed invaluable services in backing up

26  Plaintiff's negotiation of a resolution to the False Claims Case.  In addition, in

27  August, 2002, Plaintiff was exclusive case manager for the False Claims Case,

28  and, later, the declaratory relief action, having primary responsibility and

17

1  authority concerning the retention, oversight, management and compensation of

2  the thirteen lawyers engaged by Plaintiff on behalf of the Harbert Contractors on

3  these cases.

4      32.    The Harbert three primary heirs (children) gravely feared the loss of

5  their inheritance to Plaintiff, with whom Mr. Harbert Sr. was spending more time

6  following the death of his wife in 1998.    Separate remedies concerning the

7  contract arising out of the personal relationship between Mr. Harbert Sr. and

8  Plaintiff are being pursued in the Superior Court of the State of California.

9  Meanwhile, Defendant Billy Harbert Jr. has, at all times relevant herein, exhibited

10 and acted upon a hatred for Plaintiff, as have Mr. Harbert Sr.'s two daughters,

11 non-parties Anne Moulton ("Moulton") and Elizabeth Harbert Cornay ("Cornay"),

12 who secretly granted their brother, Defendant Billy Harbert Jr., power of attorney

13 to act on behalf of their interests.    These three individuals, in conjunction with

14 their counsel Defendants Lavine and Sauntry (both in their individual capacities

15 and on behalf of their firm Troutman Sanders LLP), and Sharp (both in his own

16 capacity and on behalf of his firm Sharp and Harrison, P.A.), as well as

17 Defendants Rein, Chief Executive Officer of HILLC, and Hall, Chief Financial

18 Officer of HILLC (both in their individual capacities and on behalf of HILLC),

19 as well as Mr. Harbert Sr.'s secretary for 60 years, Defendant Hoover, who was

20 saddened by Mr. Harbert Sr.'s extensive travel to be with Plaintiff, knowingly

21 and willfully conspired and agreed among themselves to remove and, in

22 connection therewith, to terminate the employment by Mr. Harbert Sr. of

23 Plaintiff, who was and is a California resident and therefore was not present at all

24 times to halt Defendants' conspiracy to terminate Plaintiff's employment by illicit

25 means, including forgery and undue influence on an elderly person -- Mr. Harbert

26 Sr.

27      33.    In particular, an agreement between Mr. Harbert Sr. and Plaintiff was

28 executed on September 21, 2004.    A true and correct copy of this document (the

1 "September 21 Agreement") is attached hereto as Exhibit "D" and incorporated

2 herein by this reference. Mr. Harbert Sr. subsequently confirmed this agreement

3 six weeks later on November 11, 2004, after Mr. Harbert Sr. conferred with

4 Alabama counsel.

5       34.     Defendants referenced in paragraph 32, above, made several attempts

6 to accomplish the goal of their conspiracy without success, including repeated

7 one-on-one and conference telephone calls with Plaintiff. Defendants then agreed

8 among themselves to employ forgery. Paragraph IV of the Incorporated Schedule

9 details a sequence of letters dated October 5, October 21 and November 11, 2004

10 which were declared to be forged by their ostensible signatory, Mr. Harbert Sr.

11 In particular, Mr. Harbert Sr. labelled these letters as "<u>FORGERY</u>" in addition

12 to issuing a letter to Plaintiff to the same effect. True and correct copies of this

13 letter (the "November 11 Letter") and the referenced letters with Mr. Harbert

14 Sr.'s acknowledged signature confirming that they were forgeries are attached

15 hereto as Exhibit "E" and incorporated herein by this reference. In written

16 confirmation of the conspiracy, Defendant Sharp revealed the orchestrated

17 sequence of events when he advised his co-conspirators of the text of the forged

18 October 21, 2004 letter, which he describes as "the attached letter [which] is

19 being delivered to Dr. Elemary, who . . . will be meeting with Mr. Harbert this

20 afternoon." A true and correct copy of this email is attached hereto as Exhibit

21 "F" and incorporated herein by this reference. So confident were the conspirators

22 of their eventual success that they did not attempt to conceal their conspiracy, as

23 evidenced by their copying of this email to Plaintiff's then counsel.

24       35.     In furtherance of the aforesaid conspiracy to interfere with Plaintiff's

25 employment by Mr. Harbert Sr., Defendant Lembke actively took part in such

26 conspiracy and ratified and adopted the acts previously performed in connection

27 therewith by assisting in the formation of a body known as the "Dispute

28 Resolution Committee" (the "Committee"), the purpose of which was to usurp and

1  exercise the powers previously granted to Plaintiff by the September 21
2  Agreement as the exclusive case manager for the False Claims Case and the
3  declaratory relief action. In an act of unprecedented sang froid, Defendants, in
4  effect, formally denominated themselves a "Board of Conspirators."

5      36.   In furtherance of aforesaid conspiracy, Defendant Polk (both in his
6  individual capacity and on behalf of Defendant Wachovia), joined the Committee
7  and thereby actively took part in such conspiracy, furthered it by cooperation or
8  request, lent aid or encouragement to the other conspirators and ratified and
9  adopted the acts previously performed by them in connection therewith.

10     37.   In furtherance of the aforesaid conspiracy, Defendant Pointer sought
11  to induce, and did induce, Mr. Harbert Sr. to transfer the management of the
12  declaratory relief action from Plaintiff to himself by claiming that he golfed
13  regularly with District Judge Robert Proabst, the bench officer then presiding over
14  the declaratory relief action, and that, through ex parte communications with
15  Judge Proabst, Defendant Pointer could procure a favorable resolution of the
16  action. Following the transfer of the prosecution of the declaratory relief action
17  to Pointer, the case was dismissed against Mr. Harbert Sr.'s interests.

18     38.   In furtherance of the aforesaid conspiracy, Defendant Coburn,
19  previously counsel to and a confidant of Plaintiff from when Plaintiff sought
20  advice and counsel, ceased all communications with Plaintiff at the urging of
21  Defendant Sharp, and in so doing furthered the aforesaid conspiracy by such
22  cooperation, lent aid and encouragement to the other conspirators and ratified or
23  adopted the acts previously performed by them in connection therewith.

24     39.   As a result of Defendants' conspiracy, Plaintiff has suffered actual
25  damages, in an amount to be ascertained, but not less than Five Hundred Forty
26  Thousand Dollars ($540,000), representing Plaintiff's monthly stipend from
27  February, 2005 through July, 2006 (the filing date of this action), plus Two
28  Million Fifty Thousand Dollars ($2,050,000), representing Plaintiff's success fee

1   computed on her obtaining of a settlement offer of $15,000,000 from the DOJ on
2   Mr. Harbert Sr.'s original liability, or Two Million Five Hundred Ninety
3   Thousand Dollars ($2,590,000), and Thirty Thousand Dollars ($30,000) per
4   month thereafter while the False Claims Case is pending.

5       40.    The aforementioned acts and omissions of Defendants were willful,
6   wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the
7   intention on the part of Defendants to deprive Plaintiff of property or legal rights
8   or otherwise causing injury, and was despicable conduct that subjected Plaintiff
9   to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to
10  justify an award of exemplary and punitive damages in an amount according to
11  proof.

12                    **THIRD CAUSE OF ACTION**
13              **VIOLATION OF 18 U.S.C. §1964 (CIVIL RICO)**
14      **(Against Mr. Harbert Sr., Billy Harbert Jr., Lavine, Hall and Rein)**

15      41.    Plaintiff refers to and incorporates by this reference each allegation
16  set forth at paragraphs 1-21 hereof, inclusive, as if alleged herein in full.

17      42.    Each of Defendants Mr. Harbert Sr., Billy Harbert Jr., Lavine, Hall
18  and Rein is a "person" within the meaning of 18 U.S.C. §1961(3).

19      43.    HILLC is an "enterprise" within the meaning of 18 U.S.C. §1961(4).

20      44.    Each of Defendants was "associated with" the aforesaid enterprise in
21  that each such Defendant either actively took part in the scheme to extort Plaintiff
22  as herein alleged, furthered such scheme by cooperation or request, lent aid or
23  encouragement to the wrongdoers or ratified and adopted acts committed by other
24  Defendants for such Defendant's benefit.

25      45.    During the relevant times, the activities of the enterprise alleged
26  herein have affected interstate commerce in that HILLC is located in Delaware
27  and Alabama and Plaintiff is located in California.

28      46.    As set forth hereinbelow, Defendants Billy Harbert Jr., Lavine, Hall

1  and Rein initially engaged in repeated one-on-one and conference telephone calls
2  with Plaintiff in an effort to effectuate the premature termination of the September
3  21 Agreement, following which they turned to more extreme measures.
4  Defendants referenced in paragraph 42 displayed the same modus operandi as did
5  Defendants in the aforementioned conspiracy cause of action herein, in that they
6  begin with tortious acts as described in paragraph 47-49, below, and, when such
7  unethical activity did not achieve the desired result, Defendants resorted to
8  criminal activity as described in paragraphs 50-54, below, including physical
9  threats and violence, as did Defendants in the conspiracy when they resorted to
10  forgery. Defendant Billy Harbert Jr. was intimidated by the success of Senator
11  Bob Dole and Plaintiff in assisting his father, Defendant Mr. Harbert Sr., in the
12  False Claims Case. Billy Harbert Jr. was cautioned by his mentor, Defendant
13  Rein to take immediate action to bring the involvement of plaintiff and Senator
14  Dole to an end before Mr. Harbert Sr. excluded Billy Harbert Jr. from his will
15  or ceased to finance or guarantee financing for HILLC's construction projects.

16      47.    Defendants Billy Harbert Jr. and Rein first interfered with several
17  settlement attempts by Senator Dole and Plaintiff, including, but not limited to,
18  with the Honorable Alberto Gonzales, at the time counsel to the President, and
19  with William D. Dillon, the prosecutor of the antitrust case. On or about April,
20  2002, Billy Harbert Jr. and his counsel, Defendant Lavine of Defendant Troutman
21  Sanders, interfered with and stymied Plaintiff's successful earlier negotiations with
22  the United States prosecutor in the antitrust case, Mr. Dillon, who had agreed
23  with Plaintiff to work out more lenient terms on behalf of the United States. Mr.
24  Dillon requested Plaintiff to have her counsel Charles F. Rule of Fried, Frank,
25  Jacobson & Shriver contact him at once to work out the details of the
26  understanding he on behalf of the United States had reached with Plaintiff, who
27  was acting on behalf of Mr. Harbert Sr. Ironically, on that same day, Defendant
28  Lavine, at the request of Billy Harbert Jr., contacted Mr. Dillon to misinform him

1  that Mr. Harbert Sr. had agreed to withdraw the appeal and discharge Mr. Rule.
2  However, upon learning of Defendant Lavine's conversation with Mr. Dillon, Mr.
3  Harbert Sr. directed a letter to Mr. Rule urging him to continue to prosecute the
4  appeal.

5       48.    On account of the continued involvement and achievements of Senator
6  Dole and Plaintiff despite Billy Harbert Jr.'s attempts to thwart their way, the
7  Billy Harbert Jr. group of Defendants conspired amongst themselves to use more
8  aggressive tactics to force Plaintiff and her associates to end their involvement
9  with the False Claims Case.

10      49.    Unwarranted and severe criticism of Senator Dole and Plaintiff were
11  thereupon initiated by Defendants Billy Harbert Jr., Hall, Hoover, Rein and their
12  counsel, Pointer, Lavine and non-party Mr. Henry F. Frohsin (these attorneys
13  were paid by Mr. Harbert Sr. but considered Billy Harbert Jr. to be their client,
14  and not Defendant Mr. Harbert Sr., and have referred to Billy Harbert Jr. as the
15  "client" in writing), who were retained by Mr. Harbert Sr. for his own cases,
16  causing Mr. Harbert Sr. to correct Mr. Frohsin in a letter on this intentional
17  confusion -- an example of Defendant's abuse of an elderly person.

18      50.    Billy Harbert Jr., in consultation with his mentor Rein and his
19  counsel Lavine, elected to frighten Plaintiff to deprive her of the benefit of her
20  good work as acknowledged by Mr. Harbert Sr. and Sharp in writing on
21  September 1, 2004, after using her and her contacts to delay the execution of
22  justice in the False Claims Case.

23      51.    Defendant Billy Harbert Jr. engaged in repeated career and life
24  threats against Plaintiff and her contacts between 1997 and 2006.  Billy Harbert
25  Jr. strongly objected to the involvement of Senator Bob Dole.  From 2003 until
26  April 2005, Billy Harbert Jr.'s threats became increasingly more alarming as he
27  sought to substantially damage Plaintiff and her associates. On or about March 1,
28  2005, Plaintiff received a call advising her that Robert Southby of Dothan,

1  Alabama was associated with Billy Harbert Jr. through his brother-in-law, Rusty

2  Moulton, who was in the scrap metal business as was Robert Southby.  Two days

3  later, Plaintiff learned of a preplanned car accident of Plaintiff's lawyer in

4  Alabama, former United States Congressman Earl Hilliard.  Mr. Robert Southby

5  was the driver of the tractor that hit Congressman Hilliard.

6  52.    On March 2, 2005, Robert A. Southby of Dothan, Alabama was

7  apparently waiting for Plaintiff's counsel, Earl Hilliard, in a construction tractor,

8  which he parked across a darkened, narrow highway, at approximately 1:00 a.m.,

9  two minutes before Congressman Hilliard was driving his car back to his home.

10  The accident was intended to be fatal, were it not for Congressman Hilliard's

11  veering his steering wheel at the last instant to the right away from Mr. Southby's

12  tractor wheel, and resulted in compound injuries with 67 broken bones.  A police

13  report of the accident was dismissed without the investigation required by law and

14  the police thenceforth refused to cooperate on this matter with the public.  The

15  doctors have suggested that it will be at least one year before Mr. Hilliard is able

16  to walk again.  Following the accident, while Congressman Hilliard was in a

17  coma, Billy Harbert Jr. harassed his family and office staff with demands that he

18  withdraw his representation.

19  53.    In particular, on April 14, 2005, Billy Harbert Jr. dispatched a

20  hitman to Plaintiff's home in California, who then awaited Plaintiff in her front

21  courtyard while she drove her car into the garage.  He approached Plaintiff

22  stating, "I am here to pick up the Harbert Swiss bank account records".  Plaintiff

23  notified the Harbert hitman that she was not in possession of them at her home,

24  at which time he indicated that he would come into the house . . . to search for

25  them".  Plaintiff firmly stated that she would call 911 if he came into the house

26  and asked the Harbert hitman to leave her property immediately while proceeding

27  to climb two steps from the garage into the house.  Plaintiff was thereupon pushed

28  down from the back, falling on the steps and fractured her scapula (right shoulder)

1   which was displaced, requiring seven months of intensive physical therapy to heal
2   sufficiently so Plaintiff could function again.   To this date, according to Dr.
3   Alexander H. Tischler of the Newport Orthopedic Institute, Plaintiff's internal
4   rotation is not yet 100 degrees.

5       54.   In 1997, Mr. Harbert Sr. notified Plaintiff that Federal Bureau of
6   Investigation agent Billy Bryan had stated to Mr. Harbert Sr., "That he would
7   exterminate Hoda Elemary for a price of several hundred thousand dollars." FBI
8   agent Billy Bryan is a friend of defendant Billy Harbert Jr.

9       55.   During the relevant times, the attempts by each of Mr. Harbert Sr.,
10  Billy Harbert Jr. and Lavine to obtain the Swiss Bank Records and to induce
11  Plaintiff to relinquish her claims presented herein by threatening Plaintiff with
12  physical harm or death constituted an attempt to obtain property from Plaintiff,
13  with Plaintiff's consent, induced by fear, therefore constituting in each such case
14  an attempt at "extortion" within the meaning of 18 U.S.C. §1951(b)(2).

15      56.   During the relevant times, Mr. Harbert Sr.'s statement to Plaintiff
16  that he could have had her "eliminated" by rogue FBI agent Billy Bryan, as stated
17  herein in paragraph 54; the preplanned car accident with Congressman Hilliard
18  on March 2, 2005, as stated herein in paragraphs 51-52; and the physical attack
19  on Plaintiff on April 14, 2005, as stated herein in paragraph 53, therefore
20  constituted in each case an attempt to affect commerce by extortion, as proscribed
21  and prohibited by the Hobbs Act, 18 U.S.C. §1951(a).

22      57.   Each of the aforesaid violations by Mr. Harbert Sr., Billy Harbert
23  Jr., Lavine and Rein of the extortion statute as hereinabove alleged constitutes an
24  instance of "racketeering activity" within the meaning of 18 U.S.C. §1961(1).

25      58.   The multiple acts of racketeering activity by Defendants were
26  interrelated, part of a common and continuous pattern of fraudulent schemes, and
27  perpetuated for the same or similar purposes, thus constituting a "pattern of
28  racketeering activity" within the meaning of 18 U.S.C. §1961(5).

59. In engaging in the above said actions, each of the aforesaid Defendants have become associated with and have conducted or participated in the conduct of the affairs of said enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(a), to wit, multiple instances of attempted extortion in violation of 18 U.S.C. §1951(a), as more particularly set forth in paragraph 56 of this Complaint.

60. In engaging in the aforesaid actions, each of the aforesaid Defendants have violated the provisions of 18 U.S.C. §1962(c).

61. By reason of the violation of 18 U.S.C. §1962(c) committed by Defendants, Plaintiff was injured in her business and property in a sum at present unknown, but in excess of $2,590,000, including, but not limited to, by payment of attorney's fees. Plaintiff will amend this Complaint to set forth said damages at such time as they have been ascertained.

## FOURTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH CONTRACT

**(Against Billy Harbert Jr., HILLC, Sharp, Sharp and Harrison, P.A.,**

**Lavine, Sauntry, Troutman Sanders LLP, Lembke,**

**Rein, Hall, Pointer and Hoover)**

62. Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-21 and 31-38 hereof, inclusive, as if alleged herein in full.

63. On September 21, 2004, Plaintiff and Mr. Harbert Sr. elected to document some of their shorter agreements executed after the November 3 Trust and entered into the September 21 Agreement, whereby Mr. Harbert Sr. agreed, inter alia, to pay Plaintiff a success fee equal to five percent (5%) of the amount of any savings negotiated from Mr. Harbert Sr.'s Thirty-Four Million Dollars ($34,000,000) and Twenty-Two Million Dollars ($22,000,000) (on behalf of Harbert Corporation) obligations.

64.   Defendants knew of the existence of the September 21 Agreement because Sharp had reviewed it at Mr. Harbert Sr.'s request and because Plaintiff had been working with John Harbert since 1979 and had been acting as exclusive case manager on the False Claims Case since April, 2001.

65.   On October 5, October 21 and November 11, 2004, Defendants caused letters to be prepared and transmitted, ostensibly under Mr. Harbert Sr.'s signature, purporting to deprive Plaintiff of her stipend and status as exclusive case manager, which letters Mr. Harbert Sr. stated in writing were unauthorized and forged.   Finally, on February 14, 2005, Mr. Harbert Sr. did, in fact, terminate the September 21 Agreement, effective April 5, 2005.  Such termination was at the special instance and request of Billy Harbert Jr., who had always hated Plaintiff, and notwithstanding Mr. Harbert Sr.'s October 1, 2003 written covenant to Plaintiff that he would not allow Billy Harbert Jr. to interfere with Plaintiff's performance of her duties as exclusive case manager.  A true and correct copy of this document is attached hereto as Exhibit "G" and incorporated herein by this reference.

66.   As a result of Defendants' interference with the September 21 Agreement, Plaintiff has suffered actual damages, in an amount to be ascertained, but not less than Five Hundred Forty Thousand Dollars ($540,000), representing Plaintiff's monthly stipend from February, 2005 through July, 2006 (the filing date of this action), plus Two Million Fifty Thousand Dollars ($2,050,000), representing Plaintiff's success fee computed on her obtaining of a settlement offer of $15,000,000 from the DOJ on Mr. Harbert Sr.'s original liability of $56,000,000, or Two Million Five Hundred Ninety Thousand Dollars ($2,590,000), and Thirty Thousand Dollars ($30,000) per month thereafter while the False Claims Case is pending.

67.   The aforementioned acts and omissions of Defendants were willful, wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the

1  intention on the part of Defendants to deprive Plaintiff of property or legal rights

2  or otherwise causing injury, and was despicable conduct that subjected Plaintiff

3  to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to

4  justify an award of exemplary and punitive damages in an amount according to

5  proof.

6  ### FIFTH CAUSE OF ACTION

7  ### BREACH OF CONTRACT

8  **(Against Mr. Harbert Sr.)**

9  68.    Plaintiff refers to and incorporates by this reference each allegation

10  set forth in paragraphs 1-21 and 31-37 hereof, inclusive, as if alleged herein in

11  full.

12  69.    The September 21 Agreement provided, _inter alia_, that Plaintiff was

13  the exclusive case manager for the False Claims Case and the declaratory relief

14  action, reporting to Mr. Harbert Sr. personally (paragraph 1); that Mr. Harbert

15  Sr.'s then currently outstanding obligations with respect to his cases were

16  $22,000,000 and $34,000,000 (paragraph 3); that Defendant Sharp (Billy Harbert

17  Jr.'s personal counsel), at Mr. Harbert Sr.'s request, had been asked to evaluate

18  Plaintiff's performance to date as case manager at the insistence of Billy Harbert

19  Jr., describing it as "extremely satisfactory and promising" (paragraph 4); that if

20  the cases were not resolved, Defendant Sharp would be asked to review Plaintiff's

21  progress one year from the date of the agreement, _i.e._, September 21, 2005

22  (paragraph 5); that until the cases were resolved, Plaintiff was to continue to be

23  paid Thirty Thousand Dollars ($30,000) per month (paragraph 6); that subject to

24  conferring with Plaintiff, Sharp was given sole authority to communicate with

25  Moulton and Cornay and Defendants Billy Harbert Jr. and Hall concerning the

26  cases (paragraph 10); that Moulton, Cornay, Billy Harbert Jr. and Hall would

27  communicate concerning the cases solely with Sharp (paragraph 11); that

28  communications regarding the cases would be made to Mr. Harbert Sr. solely by

1 Plaintiff and Sharp (paragraph 12); and that Plaintiff would receive a five percent
2 (5%) success fee, in addition to her monthly compensation, on any savings
3 negotiated from Mr. Harbert Sr.'s $34,000,000 and $22,000,000 (on behalf of
4 Harbert Corporation) obligations under the False Claims Case (paragraph 16).

5     70.   Plaintiff has performed all conditions, covenants and promises
6 required of her to be performed in accordance with the terms and conditions of
7 the September 21 Agreement, or has been excused from doing so by Defendant's
8 breach.

9     71.   During the period commencing February 14, 2005 to the present, Mr.
10 Harbert Sr. breached the September 21 Agreement by terminating it without cause
11 and prior to the resolution of the False Claims Case; by refusing to accept, in bad
12 faith, advantageous settlement terms obtained on Mr. Harbert Sr.'s behalf by
13 Plaintiff and Senator Dole; and by failing to pay both the monthly stipend and the
14 success fee earned by Plaintiff pursuant to the terms and conditions of the
15 September 21 Agreement.

16     72.   As a result of Mr. Harbert Sr.'s breach of contract, Plaintiff has
17 suffered actual damages, in an amount to be ascertained, but not less than Five
18 Hundred Forty Thousand Dollars ($540,000), representing Plaintiff's monthly
19 stipend from February, 2005 through July, 2006 (the filing date of this action),
20 plus Two Million Fifty Thousand Dollars ($2,050,000), representing Plaintiff's
21 success fee computed on her obtaining of a settlement offer of $15,000,000 from
22 the DOJ on Mr. Harbert Sr.'s original liability of $56,000,000, or Two Million
23 Five Hundred Ninety Thousand Dollars ($2,590,000), and Thirty Thousand
24 Dollars ($30,000) per month thereafter while the False Claims Case is pending.

25     73.   As a result of Mr. Harbert Sr.'s breach of contract, Plaintiff is
26 further entitled to liquidated damages in the amount of One Million Dollars
27 ($1,000,000), as provided in the Guarantee.

28 ///

## SIXTH CAUSE OF ACTION

## QUANTUM MERUIT

### (Against Mr. Harbert Sr.)

74.    Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-21 and 31-37 hereof, inclusive, as if alleged herein in full.

75.    On March 18, 2005, Defendant Mr. Harbert Sr. became indebted to Plaintiff in the amount of Two Million Fifty Thousand Dollars ($2,050,000) for the reasonable value of services rendered by Plaintiff at the special instance and request of said Defendant.

76.    Neither the whole nor any part of this sum has been paid although demand therefor has been made, and there is now due, owing and unpaid the sum of $2,050,000, with interest thereon at the legal rate from March 18, 2005.

## SEVENTH CAUSE OF ACTION

## TERMINATION IN VIOLATION OF PUBLIC POLICY

### (Against Mr. Harbert Sr., BHIC, Bilhar, HII,

### Billy Harbert Jr., HILLC, Sharp, Sharp and Harrison, P.A.,

### Lavine, Sauntry, Troutman Sanders LLP, Lembke,

### Rein, Hall and Hoover)

77.    Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-21 and 31-36 hereof, inclusive, as if alleged herein in full.

78.    From August, 2002 to April, 2005, Plaintiff was employed by Mr. Harbert Sr. as exclusive case manager for the False Claims Case and the declaratory relief action, having primary responsibility and authority concerning the retention, oversight, management and compensation of the thirteen lawyers engaged by the Harbert Contractors on these cases.

79.    In or around November, 2004, the Harbert Contractors and Lavine

FIRST AMENDED COMPLAINT FOR DAMAGES

# EXHIBIT 4
# Part 3

1   attempted to coerce Plaintiff either to resign her position as exclusive case
2   manager, or agree to cover up crucial evidence urgently requested by the DOJ
3   from the Harbert Contractors in connection with the False Claims Case, including,
4   but not limited to, withholding from the United States Plaintiff's copies of the
5   Swiss Bank Records. At that time and at all subsequent times, Plaintiff refused
6   to conceal evidence from the United States as requested by Defendants. In 2005,
7   Defendants' determined obsession to obtain original Swiss Bank Records of their
8   corporate banking from Plaintiff, and later to retrieve recordings of statements
9   made by Defendants, and other evidence in Plaintiff's possession, was and
10  remains today the cause of threats, blackmail, and physical violence, resulting in
11  serious bodily injuries, although Defendants were informed that several copies
12  were placed in trust at various other locations, perpetrated by Defendants on
13  Plaintiff and certain members of Congress, including, but not limited to,
14  Plaintiff's broken shoulder on April 14, 2005, and an attempt on Congressman
15  Earl Hilliard's life on March 2, 2005, which left the Congressman incapacitated
16  with 67 broken bones.

17      80.  As a proximate result of Defendants' conduct as described in
18  paragraph 79, above, and in violation of public policy as set forth in paragraph
19  83, below, Mr. Harbert Sr. terminated Plaintiff's employment effective April 5,
20  2005.

21      81.  Plaintiff was protected from termination pursuant to the provisions of
22  31 U.S.C. §3730(h).

23      82.  As a result of Defendants' conduct, Plaintiff has suffered actual
24  damages, in an amount to be ascertained, but not less than Five Hundred Forty
25  Thousand Dollars ($540,000), representing Plaintiff's monthly stipend from
26  February, 2005 through July, 2006 (the filing date of this action), plus Two
27  Million Fifty Thousand Dollars ($2,050,000), representing Plaintiff's success fee
28  computed on her obtaining of a settlement offer of $15,000,000 from the DOJ on

1  Mr. Harbert Sr.'s original liability of $56,000,000, or Two Million Five Hundred

2  Ninety Thousand Dollars ($2,590,000), and Thirty Thousand Dollars ($30,000)

3  per month thereafter while the False Claims Case is pending.

4      83.   In doing the acts set forth above, Defendants knew that the conduct

5  they would have required of Plaintiff was unlawful, and required Plaintiff to

6  choose between violating the law and losing her employment.  Notwithstanding

7  this knowledge, Defendants despicably subjected Plaintiff to cruel and unjust

8  hardship in conscious disregard of Plaintiff's rights by insisting that Plaintiff

9  violate the law, and terminating Plaintiff's employment when Plaintiff refused to

10  do so.  This oppressive conduct was committed by Mr. Harbert Sr. in his personal

11  capacity and on behalf of BHIC, Establishment and HII; by Billy Harbert Jr.,

12  Rein and Hall in their personal capacities and on behalf of HILLC; by Lavine and

13  Sauntry in their respective personal capacities and on behalf of Troutman Sanders

14  LLP; and by Lembke and by Hoover at the direction of Billy Harbert Jr.

15  Defendants' conduct warrants the assessment of punitive damages.

16  ## EIGHTH CAUSE OF ACTION

17  ## BREACH OF IMPLIED COVENANT OF CONTINUED EMPLOYMENT

18  ### (Against Mr. Harbert Sr.)

19      84.   Plaintiff refers to and incorporates by this reference each allegation

20  set forth in paragraphs 1-21 and 31-37 hereof, inclusive, as if alleged herein in

21  full.

22      85.   Plaintiff was employed by Mr. Harbert Sr. on many projects for over

23  26 years, consistently received either good or excellent performance evaluations

24  and, regrettably, a dismal compensation, when compared with the tens of millions

25  of dollars in profits that Mr. Harbert Sr. earned as a direct result of Plaintiff's

26  acute ability to change a court's position to favor Mr. Harbert Sr.'s interests,

27  including, but not limited to, (a) altering a Saudi Court decree granting the

28  Harbert Contractors "a legal victory at no monetary compensation" to a

1    $7,000,000 payment to the Harbert Contractors in addition to future lucrative
2    contracts, and (b) on June 10, 2004, at the U.S. District Court for the District of
3    Columbia, changing the Magistrate Judge's announced ruling from terminating
4    settlement talks to granting Plaintiff's request for a 10-month extension of time
5    in which Plaintiff managed to negotiate a $15,000,000 settlement between the
6    parties, which Mr. Harbert Sr. accepted and would have signed with the United
7    States, were it not for Billy Harbert Jr.'s interference.  Plaintiff was assured on
8    numerous occasions that she would not be terminated arbitrarily, so as to conclude
9    that Plaintiff and said Defendant had entered into an implied contract that Plaintiff
10   would not be discharged unless there was good cause to do so.

11       86.   Based on the representations and promises and the conduct of Mr.
12   Harbert Sr., as set forth in paragraph 85, above, Plaintiff had an employment
13   contract with said Defendant that she would continue to be employed by
14   Defendant so long as her performance was satisfactory, and that Defendant would
15   not discharge her without good and just cause.

16       87.   Plaintiff at all times fulfilled her duties and conditions under the
17   aforesaid contract and has been ready, willing and able to continue performing
18   them in a competent and satisfactory manner as confirmed in writing by Mr.
19   Harbert Sr. and counsel Sharp two weeks prior to the issuance of the first letter
20   purporting to terminate Plaintiff.

21       88.   Notwithstanding the implied promise to terminate the employment
22   contract only for good cause, on or about February 14, 2005, Defendant finally,
23   and under pressure, terminated Plaintiff's employment effective April 5, 2005,
24   without specifying any cause for the termination.

25       89.   As a result of Defendant's breach of contract, Plaintiff has suffered
26   actual damages, in an amount to be ascertained, but not less than Five Hundred
27   Forty Thousand Dollars ($540,000), representing Plaintiff's monthly stipend from
28   February, 2005 through July, 2006 (the filing date of this action), plus Two

1   Million Fifty Thousand Dollars ($2,050,000), representing Plaintiff's success fee
2   computed on her obtaining of a settlement offer of $15,000,000 from the DOJ on
3   Mr. Harbert Sr.'s original liability of $56,000,000, or Two Million Five Hundred
4   Ninety Thousand Dollars ($2,590,000), and Thirty Thousand Dollars ($30,000)
5   per month thereafter while the False Claims Case is pending.

## NINTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(Against Billy Harbert Jr., HILLC, Sharp, Sharp and Harrison, P.A.,**

**Lavine, Sauntry, Troutman Sanders LLP, Lembke,**

**Rein, Hall, Pointer and Hoover)**

11      90.     Plaintiff refers to and incorporates by this reference each allegation
12  set forth in paragraphs 1-21 and 31-37 hereof, inclusive, as if alleged herein in
13  full.

14      91.     The conduct of the above-named Defendants, and each of them, in
15  procuring the termination of Plaintiff's 26-year association with Mr. Harbert Sr.
16  and Plaintiff's employment as evidenced, inter alia, by the September 21
17  Agreement, in the manner and under the circumstances hereinabove set forth,
18  including, but not limited to, the conduct of Defendants Billy Harbert Jr., Sharp,
19  Lavine, Sauntry and Hoover in acting secretly to remove Plaintiff from the
20  position guaranteed to her by the September 21 Agreement; Billy Harbert Jr.'s
21  commissioning of the maid Sandy to spy on Plaintiff and Mr. Harbert Sr.'s
22  conversations at his residence; and Plaintiff's seven months of recuperation from
23  the attack carried out on her at her residence, resulting in Plaintiff's affliction with
24  doubts and reservations about her status and being terrorized by the extent to
25  which Defendants would go to procure Plaintiff's removal, constituted extreme
26  and outrageous conduct with the intention of, and with reckless disregard for,
27  causing emotional distress to Plaintiff.

28      92.     As a result of the aforesaid Defendants' actions, Plaintiff suffered and

1 │ continues to suffer severe and extreme emotional distress.

2 │     93.   The aforementioned acts and omissions of Defendants were willful,

3 │ wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the

4 │ intention on the part of Defendants to deprive Plaintiff of property or legal rights

5 │ or otherwise causing injury, and was despicable conduct that subjected Plaintiff

6 │ to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to

7 │ justify an award of exemplary and punitive damages in an amount according to

8 │ proof.

9 │ **TENTH CAUSE OF ACTION**

10 │ **SLANDER**

11 │ **(Against Billy Harbert Jr. and HILLC)**

12 │     94.   Plaintiff refers to and incorporates by this reference each allegation

13 │ set forth in paragraphs 1-21 and 31-37 hereof, inclusive, as if alleged herein in

14 │ full.

15 │     95.   In or around November, 2004, Billy Harbert Jr. began to claim, and

16 │ thereafter has continued to claim through the filing date of this action, that

17 │ Plaintiff was Mr. Harbert Sr.'s "whore," that Plaintiff illegitimately conceived

18 │ Mr. Harbert Sr.'s son and was raising him, that Plaintiff was a gold-digger who

19 │ was not accomplishing anything, and that Plaintiff would hand $100 bills to

20 │ Senators and Congressmen from a brown paper bag in order to obtain political

21 │ favors.

22 │     96.   These words were spoken to Jerry Steering, Mr. Harbert Sr. and

23 │ Hoover, as well as to U.S. Senators and Congressmen whom Billy Harbert Jr.

24 │ knows socially.

25 │     97.   These words were slanderous per se because they accused Plaintiff

26 │ of unchastity and with having committed crimes and because they tended to injure

27 │ Plaintiff in her business by reflecting falsely on her conduct, motives and

28 │ integrity.

1       98.   As a result of the above-described words, Plaintiff has suffered
2   general damages to her reputation.

3       99.   As a proximate result of the acts and conduct of Defendants as
4   hereinabove alleged, Plaintiff's contacts and business relationships with foreign
5   heads of state and officials, as well as the President of the United States, members
6   of the Senate and the House of Representatives, State Department officials,
7   corporate leaders and others, have been disrupted, undermined and destroyed,
8   causing Plaintiff to suffer special damages in an amount according to proof at
9   trial, but, on information and belief, in excess of Three Million Dollars
10  ($3,000,000).

11      100.   The aforementioned acts and omissions of Defendants were willful,
12  wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the
13  intention on the part of Defendants to deprive Plaintiff of property or legal rights
14  or otherwise causing injury, and was despicable conduct that subjected Plaintiff
15  to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to
16  justify an award of exemplary and punitive damages in an amount according to
17  proof.

18      **ELEVENTH CAUSE OF ACTION**
19      **LIBEL**
20      **(Against Lembke)**

21      101.   Plaintiff refers to and incorporates by this reference each allegation
22  set forth in paragraphs 1-21 and 31-37 hereof, inclusive, as if alleged herein in
23  full.

24      102.   On March 22, 2006, Lembke transmitted to Senator Bob Dole a letter
25  (the "March 22 Letter") in which he claimed Plaintiff had, during the preceding
26  week, contacted Mr. Harbert Sr. for the purpose of using Mr. Harbert Sr. to
27  involve Senator Dole in the False Claims Case; that these communications
28  violated certain purported "instructions" given by Lembke to Plaintiff; that Mr.

1  Harbert Sr. did not wish Senator Dole to have further involvement in the False
2  Claims Case; and that "Dr. Elemary's refusal to adhere to his [i.e., Mr. Harbert
3  Sr.'s] instructions has made this [i.e., Lembke's letter to Mr. Dole advising him
4  not to be involved in the False Claims Case] necessary." In fact, Mr. Harbert Sr.
5  had requested Plaintiff to arrange for a meeting with Senator Dole to re-involve
6  him in the False Claims Case, and a recording of Mr. Harbert Sr. making this
7  request had been played to Defendant Lembke before he issued the March 22
8  Letter, in which he diametrically and maliciously altered the facts.

9      103.  These words were libelous <u>per se</u> because they expose Plaintiff to
10  hatred, contempt, ridicule and obloquy.

11      104.  The statement in the March 22 Letter, that it was necessary for
12  Lembke to communicate directly with Senator Dole, a key political contact of
13  Plaintiff, because of Plaintiff's purported inability to comply with Mr. Harbert
14  Sr.'s "instructions" was false and intended to convey the impression that Plaintiff
15  was a "loose cannon" whose judgment and discretion in conducting high-level
16  negotiations could not be trusted. Senator Dole is the most respected senior
17  Republican in the country. Previously, Plaintiff had been able to convince
18  Senators Dole and D'Amato to place a hold on the Senate confirmation of
19  President Clinton's nomination for ambassador to Saudi Arabia, pending the
20  resolution of another Harbert claim against Saudi Arabia. A true and correct copy
21  of the July 25, 1995 response of the President of the United States to Senator
22  D'Amato is attached hereto as Exhibit "H" and incorporated herein by this
23  reference.

24      105.  These words were libelous <u>per quod</u> because they have a tendency to
25  injure Plaintiff in her occupation as an information transmitter between
26  governments.

27      106.  As a result of March 22 Letter, Plaintiff has suffered general and
28  special damages to her reputation.

1  107. As a proximate result of the acts and conduct of Defendants as

2 hereinabove alleged, Plaintiff's contacts and business relationships with foreign

3 heads of state and officials, as well as the President of the United States, members

4 of the Senate and the House of Representatives, State Department officials,

5 corporate leaders and others, have been disrupted, undermined and destroyed,

6 causing Plaintiff to suffer special damages in an amount according to proof at

7 trial, but, on information and belief, in excess of Three Million Dollars

8 ($3,000,000).

9  108. The aforementioned acts and omissions of Defendants were willful,

10 wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the

11 intention on the part of Defendants to deprive Plaintiff of property or legal rights

12 or otherwise causing injury, and was despicable conduct that subjected Plaintiff

13 to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to

14 justify an award of exemplary and punitive damages in an amount according to

15 proof.

16  WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

17      **FOR THE FIRST CAUSE OF ACTION**

18  1. For compensatory damages in an amount to be proved at trial, but in

19 excess of $3,000,000.

20  2. For an award of punitive and exemplary damages in a sum to be later

21 determined.

22     **FOR THE SECOND CAUSE OF ACTION**

23  1. For compensatory damages in an amount to be proved at trial, but in

24 excess of $2,590,000, plus interest thereon.

25  2. For an award of punitive and exemplary damages in a sum to be later

26 determined.

27      **FOR THE THIRD CAUSE OF ACTION**

28  1. For compensatory damages in an amount to be proved at trial, but in

1  excess of $2,590,000, plus interest thereon.

2      2.    For an award of punitive and exemplary damages in a sum to be later

3  determined.

### FOR THE FOURTH CAUSE OF ACTION

5      1.    For compensatory damages in an amount to be proved at trial, but in

6  excess of $2,590,000, such sum to be duly trebled in accordance with 18 U.S.C.

7  §1964(c).

8      2.    For equitable and injunctive relief as might be appropriate in

9  accordance with 18 U.S.C. §1964(c), including:

10          a.    reasonable restrictions on the future activities of Defendants;

11          b.    an equitable accounting of all benefits, consideration and profits

12  received directly or indirectly or underlying, including, but not limited to, the

13  imposition of a constructive trust with tracing; and

14          c.    the imposition and execution of equitable liens.

### FOR THE FIFTH AND EIGHTH CAUSES OF ACTION

16      1.    For compensatory damages in an amount to be proved at trial, but in

17  excess of $2,590,000, plus interest thereon.

### FOR THE SIXTH CAUSE OF ACTION

19      1.    For the sum of $2,050,000, plus interest thereon.

### FOR THE SEVENTH CAUSE OF ACTION

21      1.    For compensatory damages in an amount to be proved at trial, but in

22  excess of $2,590,000.

23      2.    For an award of punitive and exemplary damages in a sum to be later

24  determined.

### FOR THE NINTH CAUSE OF ACTION

26      1.    For compensatory damages in an amount to be proved at trial.

27      2.    For an award of punitive and exemplary damages in a sum to be later

28  determined.

## FOR THE TENTH CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial, but in excess of $3,000,000.

2.    For an award of punitive and exemplary damages in a sum to be later determined.

## FOR THE ELEVENTH CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial, but in excess of $3,000,000.

2.    For an award of punitive and exemplary damages in a sum to be later determined.

## FOR ALL CAUSES

1.    For costs of suit herein incurred.

2.    For such other and further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:  October 30, 2006


Brian J. Jacobs
Attorney for Plaintiff
Dr. Hoda Elemary

FIRST AMENDED COMPLAINT FOR DAMAGES

# Bill L. Harbert

November 4, 2003

Ms. Hoda Elemary
2252 Caliente Road
Palm Springs, California 92264

>    Re:    *21 Le Conte, Laguna Niguel, California 92677*
>           *APN 658-251-07*

Dear Hoda:

The purpose of this letter is to confirm the fact that I have no intention whatsoever to revoke now or in the future The Laguna Niguel Beach House 2003 Revocable Trust. However, if any of my heirs challenge this trust or should I be placed in a position to revoke or modify The Laguna Niguel Beach House 2003 revocable trust concerning the above-referenced property, either I or my estate will be irrevocably and unconditionally obligated to pay you the sum of three million dollars  This agreement to pay said amount is in consideration of your assistance on my behalf over the past few years in dealing with the DOJ in connection with the U.S. v. Bilhar, et al. case, which involves both criminal fine of fifty-four million dollars and civil fine of thirty million dollars.

You have Taken great risks in dealing with the DOJ and therefore earned the sum of money referenced above only in the event that I or any of my heirs, should challenge, revoke or modify the Laguna Niguel Beach House 2003 revocable trust.

With kind regards

Sincerely,

*Bill L. Harbert*

Bill L. Harbert

City of Washington
District of Columbia

Bill L. Harbert personally appeared before me, presenting an Alabama drivers license as identification.

**Guillaume Tourniaire**
Notary Public, District of Columbia
My Commission Expires 01-01-2008

DIANNE FEINSTEIN
CALIFORNIA

COMMITTEE ON APPROPRIATIONS
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND ADMINISTRATION



# United States Senate

WASHINGTON, DC 20510-0504

(202) 224-3841

May 27, 1999

The Honorable Amr Moussa
Minister of Foreign Affairs
Ministry of Foreign Affairs
Arab Republic of Egypt,

Dear Mr. Moussa:

I am writing to ask you to provide me with a response concerning the Egyptian Government's position in ensuring that Ms. Hoda Elemary can travel safely in and out of Egypt at this time.

The purpose of this request is not to question Egypt's sovereign privileges over Ms. Elemary. It is based on the vital services Ms. Elemary provides Congress, which have been determined to serve U.S. national interests. A majority of the United States Senators have overwhelmingly endorsed Ms. Elemary's work and have credited her with playing a pivotal role in lobbying the Congress to support Operation Desert Storm, as it did on January 12, 1991; forgive Egypt's $7 billion debt, as it did on October 19, 1990; and, undertake many supportive initiatives in favor of advancing the peace process and enhancing close relations between the United States and Egypt.

I understand that she is the target of threats from political groups that oppose Egypt's cooperation with the U.S. and Israel. Because of her involvement in the Middle East peace process, I am requesting any information you may have concerning any political reasons that may prevent Ms. Elemary's safe return to the United States. I understand she will be traveling to Egypt in early June, 1999.

I look forward to Your Excellency's response regarding Ms. Elemary's secured return to the United States from Egypt.

With warmest personal regards.

Sincerely yours,

Dianne Feinstein
United States Senator

DF:rwh

HARRY REID
NEVADA

# United States Senate
WASHINGTON, DC 20510-2803

July 21, 2000

Dona Coultice
Director, California Service Center
Immigration and Naturalization Service
Post Office Box 30014
Laguna Niguel, CA 92607

Dear Director Coultice:

I write today to request the expedition of Ms. Hoda Elemary's application for naturalization. Ms. Elemary (A# 72917452) is the founder of the Sadat Peace Foundation to Egypt, which advances the dialogue and cooperation between the United States and the people of the Middle East. She and the Foundation provide vital services of national interest to Congress, and I hope that you will give this request for expedition every serious consideration.

Ms. Elemary travels to Egypt and other countries in the Middle East on a variety of peace missions. Previous trips have required the assistance of the State Department and Members of Congress to ensure her safety and security. Expediting her naturalization application will provide her with the automatic protection of our embassies and consulates overseas, thereby promoting her peace missions and negating the need for additional assistance by the State Department and the Congress. An expedited review of her application takes on additional significance in light of the fact that Ms. Elemary is expected to travel to the Middle East again this fall.

On a more personal note, I understand that Hoda will be choosing my home State of Nevada as the first place that she will call home as an American citizen. I am proud that she has made this decision, and I look forward to calling her a fellow Nevadan in the very near future.

Should you have any questions or require additional information, please do not hesitate to call Eddie Ayoob of my staff at (202) 224-3542. Thank you for your assistance in this matter.

With all best wishes,

Sincerely,

HARRY REID
United States Senator

E-Mail: senator_reid@reid.senate.gov
Web: http://reid.senate.gov

PRINTED ON RECYCLED PAPER

ORRIN G. HATCH
UTAH

WENDY J. HIGGINBOTHAM
ADMINISTRATIVE ASSISTANT

135 Russell Senate Office Building
Telephone (202) 224-5251
TDD (202) 224-2849

# United States Senate
### WASHINGTON, DC 20510-4402

January 25, 1995

Mr. Joseph L. Thomas
Immigration and Naturalization Service
Western Service Center
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677-8111

Dear Mr. Thomas:

I am writing on behalf of Mrs. Hoda Elemary, who I understand has filed a National Interest Petition with the INS.

Mrs. Elemary is the founder and executive director of the Sadat Peace Foundation, named for the late Egyptian President Anwar Sadat, whose historic contributions to Middle East peace and stability the Foundation is committed to advancing. I first met Mrs. Elemary in 1988 and I have been a supporter of the Foundation and its efforts to promote dialogue and cooperation between the U.S. and the states of the Middle East.

Mrs. Elemary has worked with members of both parties to support bipartisan goals of strong U.S. diplomatic and economic relations with Israel and the moderate Arab nations of the Middle East. Through the Foundation, she has convened conferences in Washington as well as helped to organize a congressional delegation visit to the Middle East in 1990. Unfortunately, I am told that, because of her support for U.S. relations with the governments in the Middle East, she now has reason to fear fundamentalist forces who have demonstrated their ability to destroy those dedicated to open and moderate approaches to the Middle East's problems.

By dedicating herself to furthering Anwar Sadat's aims of a peaceful and stable Middle East, Mrs. Elemary has also served U.S. interests. For this reason, I believe her petition should be awarded favorable consideration.

Sincerely,

Orrin G. Hatch
United States Senator

OGH:pmm

BARBARA BOXER
CALIFORNIA

COMMITTEES:
BUDGET
ENVIRONMENT
AND PUBLIC WORKS
FOREIGN RELATIONS

# United States Senate

HART SENATE OFFICE BUILDING
SUITE 112
WASHINGTON, DC 20510-0505
(202) 224-3553
senator@boxer.senate.gov
http://boxer.senate.gov

June 3, 1999

His Excellency Amr Moussa
Minister of Foreign Affairs
Cairo, Arab Republic of Egypt

Dear Mr. Minister:

I write regarding one of my constituents, Ms. Hoda Elemary. I respectfully request that you direct the appropriate agencies to ensure her safety and security when she travels to Egypt this month.

As you may know, Ms. Elemary is the founder of the Sadat Peace Foundation, an internationally recognized organization that has works for peace in the Middle East. Ms. Elemary also worked to convince the Congress to support Operation Desert Storm and forgive Egypt's $7 billion debt.

Ms. Elemary now permanently resides in my state of California. However, I understand that she continues to be a target of threats from political groups opposed to Egypt's cooperation with the United States and Israel.

I respectfully request that you take all necessary steps to ensure Ms. Elemary's safety and security when she travels to and from Egypt this month. If there is any reason that you believe she may not be able to travel safely to Egypt and promptly return to the United States, I ask that you notify me as soon as possible.

Sincerely,

Barbara Boxer
United States Senator

1700 MONTGOMERY STREET
SUITE 240
SAN FRANCISCO, CA 94111
(415) 403-0100

312 N. SPRING STREET
SUITE 1748
LOS ANGELES, CA 90012
(213) 894-5000

650 CAPITOL MALL
SUITE 6544
SACRAMENTO, CA 95814
(916) 448-2787

2300 TULARE STREET
SUITE 130
FRESNO, CA 93721
(209) 497-5109

600 B STREET
SUITE 2240
SAN DIEGO, CA 92101
(619) 239-3884

201 NORTH E STREET
SUITE 210
SAN BERNARDINO, CA 92401
(909) 888-8525

PRINTED ON RECYCLED PAPER

# EXHIBIT 4
# Part 4

. TIM JOHNSON
SOUTH DAKOTA

COMMITTEES:
· AGRICULTURE, NUTRITION
AND FORESTRY
BANKING HOUSING AND
URBAN AFFAIRS
BUDGET
ENERGY AND NATURAL
RESOURCES

# United States Senate

WASHINGTON, DC 20510-4104

WASHINGTON OFFICE:
324 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510-4104
202-224-5642
TDD: 202-224-6273

RAPID CITY OFFICE:
PO BOX 1098
RAPID CITY, SD 57709
(605) 341-3970

ABERDEEN OFFICE:
PO BOX 1554
ABERDEEN, SD 57402
(866) 226-3440

SIOUX FALLS OFFICE:
PO BOX 1424
SIOUX FALLS, SD 57101
(605) 332-6896

TOLL FREE
1-800-537-0025

June 6, 2000

The Honorable Doris Meissner
Immigration and Naturalization Service
425 I Street NW
Washington, D.C. 20536

Dear Commissioner Meissner:

I am writing on behalf of Hoda Elemary, Executive Director of the Sadat Peace Foundation, regarding the expeditious determination of her application for naturalization.

The Sadat Peace Foundation is an internationally recognized organization that has worked toward a complete peace in the Middle East. Since 1995, several Members of Congress have contacted your office in support of Ms. Elemary's request for naturalization. I am enclosing copies of some of these letters, marked Exhibit "A", to illustrate the level of support for Ms. Elemary's work on behalf of peace in the Middle East. I am also enclosing copies of correspondence between Senators Feinstein and Boxer and the State Department and Egypt regarding Ms. Elemary's concern for safety while traveling on peace missions to Egypt. These letters are marked Exhibit "B".

Thank you for your immediate consideration of this request, and please do not hesitate to contact me or Ian Marquardt in my Washington, D.C. office if I can be of further assistance.

Sincerely,

Tim Johnson
United States Senate

**SENATOR ALAN CRANSTON**
27080 Fremont
Los Altos Hills, CA 94022
Tel: 650-948-6556
FAX: 650-948-6516

July 31, 2000

Mr. Thomas J. Schlitgen
District Director
U. S. Dept. Of Justice - INS
300 N. Los Angeles St.
Los Angeles, CA 90012

Re: Justification for Expediting Hoda Elemary's
    N-400 Application for Citizenship

Dear Mr. Schlitgen:

I am writing to request the expedition of Ms. Hoda Elemary's (A72917452) application for naturalization. Ms. Elemary is scheduled to travel to the Middle East in the Fall of 2000. The expedition of her naturalization will negate the need for additional assistance by the State Department and U. S. Senators by providing for automatic protection by the Embassy.

Ms. Elemary is the Foundress and President of the Sadat Peace Foundation, an organization that has played an invaluable role in the Middle East peace process. As a former United States Senator, I have known Ms. Elemary and her work for over fourteen years.

As you know, no region in the world has been such a potential flash point for conflict as the Middle East. Since its founding in 1984, the Sadat Peace Foundation has dedicated itself to promote peace in that troubled region and to secure U. S. interests in a peaceful Middle East. The Sadat Peace Foundation has accomplished much to foster peace, from publishing treatises espousing the benefits of resolution, to hosting conferences to increase mutual awareness of the different sides of the conflict, to encouraging behind-the-scenes meetings of top political leaders. Without the work of the Sadat Peace Foundation, the political breakthroughs of the past ten years simply may not have been possible.

The invaluable work of the Sadat Peace Foundation would itself not have been possible without the tireless dedication of the woman who founded it. The Sadat Peace Foundation was in large part borne of Ms. Elemary's vision to continue the work of that world leader, and she made the Foundation a reality in 1984 by enlisting the support and endorsement of the most prominent figures in Washington, including Presidents Jimmy Carter and Ronald Reagan. Over the past decade she has developed the Foundation into an internationally recognized and respected institution and made it an important player in the ongoing peace process. Through her professionalism and personal conviction, and her patience and perseverance, she personally is bringing

Mr. Thomas J. Schlitgen
July 31, 2000
Page 2

Anwar Sadat's hopes for a lasting peace into being.

I was contacted frequently by Ms. Elemary during my tenure in the United States Senate and can provide the INS with an eye witness perspective of Ms. Elemary's specific role in impacting the Middle East peace process.

Mrs. Elemary met with me personally and with many other Senators in the Fall of 1990. Through her professionalism and personal conviction she helped convince some undecided Senators to support the United States' forgiveness of Egypt's $7 billion debt. Mr. Elemary was present on October 19, 1990 and witnessed the close vote on the Senate floor in favor of the position she espoused. Consequently, several Senators acknowledged Ms. Elemary's role in helping to secure enough votes towards the forgiveness of Egypt's debt in 1990. In January 1991, the *Washington Post* published the enclosed article in which the Sadat Peace Foundation encouraged members of Congress to vote in favor of Operation Desert Storm. This article accurately provided members of Congress a visionary perspective that the Middle East peace process would be greatly enhanced following Operation Desert Storm provided Congress approved it. Clearly, Ms. Elemary's vital efforts encouraged the United States government to play a pivotal role in the Middle East peace process over the past few years.

I have first hand knowledge that Ms. Elemary worked closely with senior U. S. Senators and administration officials as well as with Middle East heads of state in advancing the peace process. During my tenure in the United States Senate, the chairmen of the Foreign Relations and Armed Services Committees, respectively Claiborne Pell and Sam Nunn, issued the enclosed letters to Ms. Hoda Elemary in praise of her efforts to ... ... ... letters to Ms. Elemary and the Sadat Peace Foundation from former President Ronald Reagan, a senior aide at the National Security Council, former Israeli Prime Minister Yitzhak Rabin and former Minister Shimon Peres, Bush administration officials, Colin Powell and Frank Carlucci, Jon Glassman, the House of Representatives Chairman of the Committee on Foreign Affairs, Lee Hamilton, as well as my former colleague, Sen. Paul Simon.

Our country needs people of the caliber and dedication of Ms. Elemary. She is contributing to our nation's understanding and influence in the troubled Middle East region. It is most certainly in our national interest for her to have the protection of being a U. S. citizen during her September mission to the Middle East. For these reasons, I urge you to expedite Ms. Elemary's application.

With kind regards,

Alan Cranston

Enclosures

# United States Senate

**WASHINGTON, DC 20510**

November 9, 2001

The Honorable Tom Ridge
Director of Homeland Security
The White House
Washington, DC 20500

Dear Governor Ridge:

We are writing on behalf of Hoda Elemary, the President of the Sadat Peace Foundation, to urge you or your staff to meet with Ms. Elemary to discuss the current situation in the Middle East, and a possible diplomatic and educational initiative to reach out, engage, and neutralize Muslim fundamentalists who support terrorism.

We have known Ms. Elemary for many years, during which time she has offered important services to the U.S. Congress, including building support in the Arab world for Operation Desert Storm and in bettering U.S.-Egyptian relations. The Sadat Peace Foundation seeks to build on the legacy of President Sadat's work and is dedicated to peace in the Middle East.

Given the current crisis facing the world community in combating terrorism, Ms. Elemary has asked us to intercede on her behalf and facilitate a meeting with your office to discuss these matters.

Our thanks for your consideration. Please know that you have our support in your efforts to protect U.S. national security and the lives and safety of American citizens.

Sincerely,

Dianne Feinstein

Carl Levin

# BILL HARBERT

William M. Sharp, Esq.                                          November 11, 2004
SHARP AND HARRISON, P.A.
Two Urban Centre, Suite 900
4890 West Kennedy Boulevard
Tampa, Florida 33609-1850

   Re: *Qui Tam and Declaratory Relief Actions*

Dear Bill:

I appreciate all of your fine work in assisting my family and me, and look forward to continuing to work with you on these personal issues.

I am writing to bring to your attention to the fact that when I accepted your help to manage the qui tam and declaratory relief cases I had forgotten that I had a confirmed agreement with Dr. Elemary under liability to me to manage these cases to their conclusions. Although I have only agreed to make payments to her for a limited period of time, her position as exclusive case manager was guaranteed by me. I therefore have no choice but to honor my agreements with Dr. Elemary (which preceded any understanding between us concerning these two matter) to limit my liability.

Although I have appreciated your work in the above matters, I simply cannot continue with the recent confusion and disruption that has arisen between you and several key members of my legal team, namely, Jerry Steering, Barry Coburn and David Schertler, as well as the confusion over the responsibilities of you and Dr. Hoda Elemary in my qui tam and declaratory judgment matters. I have therefore made the decision that Dr. Elemary is to be the sole case manager/resolutions for these matters, as stated by you in your letter of September 27, 2004.

I know you can appreciate that all decisions concerning the qui tam and declaratory judgment proceedings are mine and mine alone to make, and that the final decision as to who will be my case manager is mine and mine alone.

*[signature]*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*[notary signature]*
November 11, 2004

820 SHADES CREEK PARKWAY, 35209    POST OFFICE BOX 531390    BIRMINGHAM, ALABAMA 35253
TELEPHONE (205) 802-2800

William M. Sharp, Esq.
SHARP AND HARRISON, P.A.
November 11, 2004
Page Two

I believe that the current arrangement will not serve my interests for the reasons stated above. We need to work together and stop all the distractions, which is why I have decided to unify the existing legal team under Dr. Elemary's leadership. You and I will continue to work together on various aspects of this case. Based on my long relationship with her and her effective work on my behalf in the past, I am comfortable with Dr. Elemary as the sole case manager.

I have asked Dr. Elemary to be available in three months so we can sit together and review the progress made to date and together with you make necessary decisions if changes are called for. It is imperative that we allow time to heal the rifts that currently exist. You must appreciate that there has been too much non-productive, costly and disruptive activity surrounding my legal team and their efforts. This must stop. I need unification, not division, if we are to prevail against the government. An effective team cannot be pulled from both ends or have conflicting leadership.

That said, I know we can rise above this difficult and awkward moment, and can continue working together on other matters.

Very truly yours,

Bill L. Harbert

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

November 11, 2004

# AGREEMENT

This agreement is made on September 21, 2004 by and between Bill L. Harbert and Dr. Hoda Elemary. The purpose of this agreement is to confirm the parties' relevant prior agreements on key issues and to establish a forum to transact their business and communicate more efficiently and thus be able to spend more time on resolving Mr. Bill L. Harbert's complex legal matters . The parties agree as follows:

1.  Dr. Elemary had been acknowledged as the case manager and has primary responsibility over retention, oversight and management of the legal team (the "Legal Team") as well as arranging for meetings, conference calls and inviting the appropriate members of the Legal Team, the Harbert staff and U.S. Government officials that is necessary to provide the optimum results in these meetings. Dr. Elemary is also responsible for working with, influencing and negotiating a settlement with the U.S. Government on the behalf of Bill L. Harbert and to report from time to time to Bill Harbert, with respect to the current civil proceedings between Bill L. Harbert and the U.S. Government (the "Qui Tam Matter") as well as the status of the criminal fine as such Dr. Elemary retained the services of Senator Bob Dole and the leading anti-trust and qui tam lawyers in the United States to assist Mr. Harbert.

2.  With respect to the criminal fine, Dr. Elemary is currently working with Mr. Harbert on the unpaid balance of said fine in the sum of approximately $22 million on the basis of "The Declaration of Bill L. Harbert Regarding Plea Agreement" dated July 17, 2003, a copy of which is attached hereto as exhibit "A" and made a part hereof (the "Declaration"). (In the Declaration, Bill L. Harbert acknowledges that he was coerced into signing a guarantee to pay any unpaid portion of the Criminal Fine due by defendant Bilhar).

3.  Previous agreements executed by the parties detail that Mr. Harbert fully understood based on earlier financial concessions and payments that he made to Dr. Elemary, the Herculean task that would be required of Dr. Elemary to influence the U.S. Government to amend it's prior agreement and accept the circumstances that compelled Mr. Harbert to sign said personal guarantee, which due to Bilhar's lack of funds at this time, would require Mr. Harbert to personally pay an amount equivalent to $22 million on the Criminal Fine, in addition to the government's requested minimum amount for a settlement of $34 million in the Qui Tam Matter, for a grand total payment to the government of $56 million.

4.  Mr. Harbert fully understands that if he elects to proceed to trial on the Qui Tam Matter, he could be compelled to pay over $100 million should treble damages be assessed. Mr. Harbert further acknowledges that he was not made aware when he signed the personal guarantee of the future impact of the Qui Tam Matter on his personal estate. After employing Dr. Elemary

*9/21/04*

CARLA L. FAILE

Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007      *9/21/04*

*City of Washington*
*District of Columbia*

*Carla L. Faile*
*November 11, 2004*

*Confirmed*
*on 11/11/04*
*Bill Harbert*

*On this 21st day of September, 2004*
*Bill L. Harbert personally appeared before me*
*& acknowledged that he executed the foregoing document*

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

for two years, Mr. Bill L. Harbert engaged attorney Mr. William Sharp to evaluate the work in progress achieved by Dr. Elemary to date. Mr. Sharp traveled to California to conduct this assessment, and together with Mr. Harbert, concluded that Dr. Elemary's work and case management skills were and are extremely satisfactory and promising. Mr. Harbert, in consultation with Mr. Sharp, has agreed to reconfirm Mr. Harbert's original agreement with Dr. Elemary to allow her to bring the Qui Tam Matter and Criminal Fine matter to a satisfactory conclusion.

5.  Mr. Harbert understands that it may take several months or longer to reach a satisfactory settlement with the U.S. Government. Previous agreements between Mr. Harbert and Dr. Elemary do not provide for a termination date since the parties had agreed that any such termination date would occur only upon obtaining a satisfactory resolution of the above referenced two matters. It is evident that based on earlier agreements signed by Mr. Bill L. Harbert that Dr. Elemary had every reason to depend on Mr. Harbert's written guarantee and has involved her high level government contacts to achieve satisfactory progress to date. In addition, Dr. Elemary has now consented to be directed by Mr. Harbert. Only in the event that the two above referenced matters are not resolved within the next few months, Mr. Harbert will ask Mr. Sharp to review Dr. Elemary's progress one year from the date of this agreement.

6.  With respect to the termination date of this agreement, Mr. Harbert will determine the termination date of this Agreement only by entering into a settlement with the U.S. Government with respect to the above-referenced two matters based on his consent to pay the Government an amount, if any, with which he is comfortable. Until such termination of this Agreement, Mr. Harbert unconditionally and unequivocally hereby agrees and commits to pay Dr. Hoda Elemary the sum of Thirty Thousand Dollars ($30,000.00) per month, commencing either on October 1, 2004 or a mutually agreed upon date in October 2004 and continuing each month thereafter until such a time as Mr. Harbert settles the above two referenced matters with the Government.

7.  Due to the fact that Dr. Elemary is often called upon to undertake a project or to travel internationally within a 24 hour notice as a result of the involvement of Senator Bob Dole and other dignitaries who assist Dr. Elemary in seeking a settlement of the two above referenced matters, Mr. Harbert personally guarantees Dr. Elemary that said monthly payments will be paid within 24 hours following presentations of a monthly invoice by Dr. Elemary to Mr. Harbert.

8.  Mr. Sharp has concluded, and Bill L. Harbert agrees, that Bill L. Harbert's quitclaim deed of Mr. Harbert's interest in the single family residence located at 21 Le Conte, Laguna Niguel, California to Dr. Elemary was valid, legal and proper, and without undue influence or

*Dr. El*
*9/21/04*          *Confirmed*
                   *on 11/11/04*        *2of4*       *Bill Harbert*
                   *Bill Harbert*                    *9/21/04*

                                                     CARLA D FAILE
                                                     Notary Public, Jefferson County, Alabama
                                                     My Commission Expires March 21, 2007
                   *City of Washington*              *Carla D Faile*
                   *District of Columbia*            *November 11, 2004*

                   *On this 21st day of September, 2004*
                   *Bill L HARBERT personally appeared before me*
                   *and acknowledged that he executed the foregoing document —*



                                                     Guillaume Tourniaire
                                                     Notary Public, District of Columbia
                                                     My Commission E...

coercion, and was Mr. Harbert's intention. Mr. Harbert therefore understands that he cannot convey his interest in said property to any other person or entity, including Mr. Harbert's son, Billy Harbert. William Sharp has reviewed the arrangement between Mr. Harbert and Dr. Elemary regarding said Le Conte property, and finds that arrangement in order.

9. Effective September 1, 2004, William Sharp is a member of the Legal Team, with responsibilities of working with Dr. Elemary to achieve the goals of Bill L. Harbert with respect to the above-referenced cases.

10. Subject to conferring with Dr. Elemary, William Sharp has the sole authority to communicate with Anne Maltin, Elizabeth Cornay, Billy Harbert, as well as Alan Hall and Jim Rein, regarding the above-referenced cases.

11. Based on discussions among the parties, Anne Maltin, Elizabeth Cornay, Bill Harbert, Alan Hall and Jim Rein will communicate exclusively with William Sharp regarding the above-referenced cases.

12. For the sake of Bill L. Harbert's peace of mind, no communications regarding the above-referenced cases will be made to Bill L. Harbert, except through either William Sharp or Dr. Elemary.

13. While considerable progress has been made to date in connection to the above-referenced cases, substantial government resistance is anticipated and/or setbacks may arise. Dr. Elemary, Mr. Sharp and the legal team will use their best efforts to overcome such resistance and/or setbacks and achieve the best possible results.

14. It is understood that every effort will be made by Dr. Elemary to continue to keep the legal fees of the legal team as they are at present.

15. Payments to Dr. Hoda Elemary stipulated herein, are based on the assumption that Bill L. Harbert will take his time before he settles these cases, consistent with his concept of fairness. However, the government may very well wish, in short order, to re-negotiate the terms of it's earlier plea agreement with Mr. Harbert on the basis that Bilhar has not made the September 1, 2004 payment. Indeed, the government may consider entering into a different agreement that will not require Mr. Harbert to put out large sums of money (to settle the above referenced two matters) but rather the government may seek the assistance of the Harbert Group. In such a case, a different financial arrangement mutually acceptable by both parties to this agreement may be necessary to negotiate in the future

*[handwritten annotations and notary seal]*

*9/21/04*

*3 of 4*

City of Washington
District of Columbia

On this 21st day of September,
Bill L. HARBERT personally app
and acknowledged that he executed the ... document.

CARLA D FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007
*Carla D Faile*
*November 11, 2004*

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

16. It is hereby acknowledged that the sacrifices made by Dr. Elemary and Mr. Harbert to overturn the government's current official demand of $56 million are substantial and immensely impactful on the lives of the parties. It is evident that the progress being achieved by Dr. Elemary today will not only effect Bill L. Harbert but his entire estate. To this end, Dr. Elemary is therefore unconditionally guaranteed to receive five percent (5%) – in addition to her monthly fee – of any funds she saves Mr. Harbert from ultimately paying the government in a settlement. In other words, in the event Dr. Elemary reduces Mr. Harbert's current payment plan of $22 million on the criminal fine and $34 million of the requested minimum settlement amount by the DOJ on the qui tam case, Mr. Harbert will pay Dr. Elemary five percent of any amount of reduction from either the $22 million or the $34 million amounts. If Dr. Elemary does not save Mr. Harbert any funds, Mr. Harbert is not obligated to pay Dr. Elemary the five percent.

17. William Sharp has reviewed the August 27, 2004 letter from Bill L. Harbert to Dr. Elemary, and has reported to Mr. Harbert his conclusion that he is satisfied with the progress in the above-referenced cases achieved by Dr. Elemary and the Legal Team, and has addressed Bill L. Harbert's estate and succession plans as set forth in that letter.

Dated: September 2/, 2004

_____
Bill L. Harbert

Dated: September 2/, 2004

_____
Dr. Hoda Elemary

*I confirmed this master contract agreement on 11/11/04*

*Bill Harbert*

CARLA D FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D Faile*
*November 11, 2004*

4 of 4

*City of Washington*
*District of Columbia*

*On this 21st day of September, 2004*
*Bill L Harbert personally appeared before me*
*and acknowledged that he executed the foregoing document.*

Guillaume Tourniaire
Notary Public, District of Colun
My Commission Expires 01-01-2

**BILL
HARBERT**

November 10, 2004

Dr. Hoda Elemary
21 LeConte
Laguna Niguel, CA 92677

Dear Hoda:

I am writing to reaffirm my guarantee of several agreements between us that were
detailed in the notarized confirmation document "Master Agreement" dated September
21, 2004. You may disregard William Sharp's correspondence including his September
27, 2004 letter to you that attempted to void said confirmation.

I would like you to know that I did not sign nor authorize that my name be signed on my
behalf the October 5 and October 21, 2004 letters sent to you by Mr. Sharp under the
pretense that I signed and authorized these letters be sent to you.

With Kind Regards

Sincerely,

*Bill Harbert* (signature)

Bill L. Harbert

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D. Faile* (signature)
*November 11, 2004*

Bill L. Harbert
P.O. Box 531390
Birmingham, AL  35253
205-802-2810
Fax:  205-802-2815

October 21, 2004

Confidential

<u>Via Hand Delivery</u>

Dr. Hoda Elemary
World Peace Today, Inc.
2252 South Caliente Road
Palm Springs, CA 92264

*I did not write this letter not authorize anyone to sign it on my behalf.*

*[signature]*

Dear Hoda:

This letter updates and supersedes my October 5, 2004 letter to you. As you know, at the end of September I made the decision to move the case manager job for the qui tam and declaratory judgment matters over to Bill Sharp. Therefore, Bill has management authority over the qui tam and declaratory judgment matters.

In order for Bill to do his job, you are not to take any action without first clearing it with him. Furthermore, all communications to me, Van Hoover or other members of my business team or family shall be through Bill Sharp.

Once again I have directed Bill Sharp to make clear to the legal team that he is serving as case manager. I also have directed Bill to make clear to the legal team that there should be no further contact regarding the declaratory judgment proceeding with the Department of Justice, any judicial authorities or their clerks, or any other parties outside the legal team by you or anyone else without Bill's prior review and authorization. I have also asked Bill to review and authorize all legal and consulting fees. I will not be responsible for fees and costs unless Bill reviews these in advance of the services being rendered for them.

I have asked Bill Sharp to make it clear to the Department of Justice attorneys and others involved in this case that Bill has the sole authority to make settlement offers or other commitments (whether as to substantive matters, procedural matters or otherwise). I have already asked Bill to appoint and oversee my local counsel in Birmingham as well as to determine when and who shall be involved in various upcoming conference

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

Dr. Hoda Elemary
October 21, 2004
Page 2                                                                        Confidential

calls, hearings and meetings regarding the declaratory judgment
proceeding.

I would still ask that you or your counsel discuss your
continuing role  in the qui tam matter with Bill Sharp.  Again,
you are not to take any action without first clearing it with
Bill.  Thank you for your continued cooperation.

                              Yours very truly,

                              *[signature]*

                              Bill L. Harbert

cc:  Legal Team

BLH:vh

*I did not write this letter nor authorize anyone to sign on my behalf – Forgery*

*[signature]*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*[signature] November 11, 2004*

11/12/2004 02:05  9494741883                     JERRY L STEERING                    PAGE  03

NOV 12 '04 09:35AM B HARBERT INTL CONS 205 802 2815                                  P.2

*To THE LEGAL TEAM*
*Kindly* ~~disregard~~ *disregard*
*this letter. I have no*
*intention of*
*terminating Hoda*
*Elemary or any member*
*of the Legal Team*

*Eric L Harbert*

Bill L. Harbert
P.O. Box 531390
Birmingham, AL 35253
205-802-2810
Fax: 205-802-2815

November 11, 2004

*State of Alabama*
*County of Jefferson*
*Sworn and subscribed before me*
*Marsha H. Fifer, Notary Public*
*on this 13th day of Nov. 2004*
*personally appeared Bill L. Har-*
*who is known to me to be the same*
*Marsha H. Fifer*

Privileged &
Confidential

*My Commission Expires*
*September 19, 2006*

**VIA FACSIMILE**

Barry Coburn, Esq. - 202-628-4177
Marshall Harris, Esq. - 202-756-3333
Bryan B. Lavine, Esq. - 404-962-6613
Sam C. Pointer, Jr., Esq. - 205-581-0799
June Ann Sauntry, Esq. - 404-962-6613
David Schertler, Esq. - 202-628-4177
Jerry L. Steering, Esq. - 949-474-1883

Ladies and Gentlemen:

I am attaching a copy of my October 21, 2004 letter to Dr. Hoda
Elemary that was previously sent to you. I know that there has been some
friction regarding the management of the qui tam action and the declaratory
judgment action. I know that the friction has worsened since I appointed
Bill Sharp as case manager on October 21, 2004.

I am writing this letter to you in order to reconfirm and more clearly
define my directives as described in my October 21, 2004 letter because of
some events that have occurred during the past couple of days.

I met with Jerry Steering and Dr. Hoda Elemary yesterday evening and
this morning in Birmingham. Dr. Elemary claimed that she is still in
charge as case manager, that Bill Sharp is not in charge, and that none of
you are cooperating with Bill and all of you are still working with Hoda.

I wanted to let all of you know that I am reconfirming the mandate
set forth in my October 21, 2004 letter. Pure and simple, Bill Sharp is in
charge of the management of the qui tam action and the declaratory judgment
cases. He is the case manager and Dr. Hoda Elemary is not the case
manager. I told this today to Dr. Elemary and Mr. Steering and I told Dr.
Hoda Elemary that she must report to Bill Sharp and to no one else. She
must clear any action with Bill Sharp before taking any action. She has no
authority to discuss my matters with you, to attend or schedule meetings,
to talk to any third party about the cases, or to take any other action
until Bill Sharp approves any matter in advance. I also told Dr. Elemary
to follow the above mandate in my October 21, 2004 letter. Again, pure and
simple, Bill Sharp is the case manager.

In particular, no one is to take any calls, directives, or other
instructions from Dr. Hoda Elemary unless Bill Sharp first says that it is

# EXHIBIT 4
# Part 5

OCT 20 2004 5:41PM     HP LASERJET 3200

P. 4

Bill L. Harbert
P.O. Box 531330
Birmingham, AL 35253
205-802-2810
Fax: 205-802-2815

October 5, 2004

**Confidential**

Dr. Hoda Elemary
World Peace Today, Inc.
2252 South Caliente Road
Palm Springs, CA 92264

Dear Hoda:

As you know, at the end of September I made the decision to move the case manager job for the qui tam and declaratory judgment matters over to Bill Sharp.

Bill explained to me that based on the discussion the two of you had that Bill is now serving executive case manager and that you are serving as case resolution manager. I am okay with these titles so long as Bill has management authority over the qui tam and declaratory judgment matters.

Because the declaratory judgment litigation is now headed to Birmingham, I have directed Bill to make clear to the legal team that he is serving as executive case manager. I also have directed Bill to make clear to the legal team that there should be no further contact regarding the declaratory judgment proceeding with the Department of Justice, any judicial authorities or their clerks, or any other parties outside the legal team by you or anyone else without Bill's prior authorization. In addition, and in order to avoid any confusion, I am asking Bill to appoint and oversee my local counsel in Birmingham as well as to determine when and who shall be involved in various upcoming conference calls, hearings and meetings regarding the declaratory judgment proceeding.

I would still ask that you continue your role as case resolution manager for the qui tam proceeding though anything you want to do should be reviewed first with Bill. On the declaratory judgment proceeding I would like you to take no action unless Bill asks for your involvement.

Yours very truly,

*[signature]*
Bill L. Harbert

BLH:vh

*[handwritten:]* I did not write this letter
we authorize
any one to sign it   Bill L Harbert

CARLA L. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*[handwritten signature]*
November 11, 2004

## Main Identity

**From:** "Joe Roman" <romanlaw@gte.net>
**To:** "William M. Sharp, Sr." <wsharp@shtaxlaw.com>
**Sent:** Thursday, October 21, 2004 4:28 PM
**Subject:** Re: Bill L. Harbert

Bill:

The PDF attachment of the October 21, 2004 letter is too small to read when printed. Adobe shows the document as only 2.08 x 2.89 inches. Please re-scan and email it, or simply fax the letter to me at (760) 323-2816.

Thanks.

Joe Roman

----- Original Message -----
From: "William M. Sharp, Sr." <wsharp@shtaxlaw.com>
To: <spointer@lfwlaw.com>; <Barry.Coburn@worldnet.att.net>;
<info@steeringlaw.com>; "June Ann Sauntry"
<juneann.sauntry@troutmansanders.com>; "David Schertler"
<dschertler@coburnandschertler.com>; <romanlaw@gte.net>
Cc: "Van Hoover" <vhoover@bharbert.com>
Sent: Thursday, October 21, 2004 2:57 PM
Subject: Bill L. Harbert


> Ladies and Gentlemen:
>
> As all of you are well aware, there has been some confusion lately
> regarding
> the management of Bill L. Harbert's qui tam and declaratory judgment
> proceedings.
>
> Attached to this e-mail in a PDF format is an October 21, 2004 letter from
> Bill L. Harbert which hopefully clarifies this matter once and for all.
>
> Please note that the attached letter is being delivered to Dr. Elemary,
> who
> along with Mr. Jerry Steering, will be meeting with Mr. Harbert this
> afternoon. I will be participating via conference call.
>
> Please feel free to call me if you have any questions or comments.
>
> Sincerely,
>
> William M. Sharp, Sr.
>
> Sharp and Harrison, P.A.

**Bill L. Harbert**

Ms. Hoda Elemary
World Peace Today, Inc.
2252 S. Caliente Road
Palm Springs, CA 92264

Dear Ms. Elemary,

This letter unequivocally and unconditionally guarantees you that my son, Billy Harbert,
will not effectuate or impact any decisions to be made regarding the D.O.J matter or your
faithful commitment to assist me in reaching an amicable resolution with the government
on both the criminal personal guarantee of *Bilhar* fine and the civil case. You are assured
that you have the authority to finish your work in accordance with our agreement.

With Kind Regards

Sincerely,

Bill L. Harbert

District of Columbia
On this  1st  day of  October  ,2003
    Bill L. Herbert
personally appeared before me and acknowledged
that he/she executed the foregoing instrument.
    Michael McClu    Notary Public
My commission expires  June 14, 2003

THE WHITE HOUSE

WASHINGTON

July 25, 1995

Dear Mr. Chairman:

Thank you for writing about the Harbert case.
I appreciate that this has been a long and
difficult process. Ambassador Mabus has
worked hard to reengage the Saudi
authorities, and I hope his efforts will bear
fruit. We would like to see a prompt
resolution of this case.

Thanks again for letting me know your
thoughts on this case.

Sincerely,

Bill Clinton

The Honorable Alfonse D'Amato
United States Senate
Washington, D.C. 20510

THE WASHINGTON POST

# D'Amato Gets Message Across With Hold on Envoy to Riyadh

### By Thomas W. Lippman
Washington Post Staff Writer

In the late hours Friday before its recess for Independence Day week, the Senate confirmed the nomination of Raymond Mabus as U.S. ambassador to Saudi Arabia after Sen. Alfonse M. D'Amato (R-N.Y.) dropped his opposition.

By putting a hold on the nomination the day before, an aide to D'Amato said, "we got the State Department's attention to something the senator is very concerned about."

That "something" is a long-simmering dispute between members of Congress and the desert kingdom over treatment of U.S. businesses.

D'Amato and dozens of other senators and House members have been pressing the Saudis for at least three years to reconsider their rejection of multimillion-dollar claims by two U.S. corporations, but the Saudis have refused.

D'Amato wielded the blunt instrument of a "hold" on a key appointment not to criticize Mabus, a former Democratic governor of Mississippi who sailed through his confirmation hearing, but to register impatience with the Saudi Arabian ambassador, Prince Bandar Bin Sultan—and with the Clinton administration for its perceived failure to put enough heat on Bandar over the issue.

Holding up confirmation of ambassadorial nominees is a traditional Senate method of delivering foreign policy messages.

Members of Congress have said in repeated letters to Bandar and to Saudi King Fahd that they believe two U.S. corporations—an Alabama construction consortium and a New York engineering firm—have been treated unfairly and that they resent Saudi Arabia's refusal to reopen their cases.

"Three years after our nation led the fight to protect the sovereign integrity of the countries of the Persian Gulf, including Saudi Arabia, it is unacceptable that a close ally should fail to honor its commercial obligations to an American citizen," wrote Sen. Daniel K. Inouye (D-Hawaii).

"Ambassador Bandar and the government he represents continue to mock our requests for justice and fair play," Rep. Earl F. Hilliard (D-Ala.) complained in an April 29 speech



**SEN. ALFONSE M. D'AMATO**
... U.S. business claims at issue

Robert H. Pelletreau, assistant secretary of state for Near East affairs, promised the House Foreign Affairs Committee two weeks ago he would raise the issue in a meeting with Bandar.

He has since done so, a State Department official said, although no change in the Saudi position is apparent. An aide to D'Amato said the senator received no promises from Bandar or from the State Department but "will follow their progress closely."

The Saudis have told Congress repeatedly the claims are not justified. The companies pressed their claims through Saudi Arabia's legal system, disliked the results and are trying unfairly to overturn the outcome, according to Bandar and to Washington lawyer Frederick G. Dutton, who represents the Saudi Embassy.

In a March 11 letter to House members, Bandar said it "serves no purpose to continue engaging in discussions about fairness of another nation's courts after one has availed oneself of them, obtained the judgment and collected the judgment," referring to partial settlement one of the companies decided to accept.

Members of Congress, however, have told the Saudis they believe the Saudi legal process was corrupt. They cite an affidavit given to a U.S. diplomat in Saudi Arabia by a member of a Saudi claims consulting firm saying the minister of agriculture threatened to "exert his influence to destroy" the firm if it validated one of the claims in

There is "undisputed evidence" implicating the minister of agriculture in putting pressure on the consultants, 37 members of Congress complained in a January 1992 letter to King Fahd.

The United States and Saudi Arabia agreed in 1992 on a "special claims process" to resolve disputes between U.S. companies and Saudi Arabia. Such disputes proliferated in the 1980s as Americans rushed to obtain development contracts there, only to find the Saudis difficult business partners who frequently jailed foreigners over business disputes.

The only two claims not settled by the 1992 process are the ones that led to the hold on the Mabus nomination.

One involves Harbert-Howard Cos., the Alabama firm, which claims the ministry of agriculture refused to pay $13.8 million owed for work done in the late 1970s.

After the claim was processed in the Saudi legal system, Harbert-Howard was paid $6.8 million. Saudi Arabia said that settled the case, but Harbert argues—and several members of Congress say the evidence shows—that government pressure corrupted the proceedings.

The second claim involves the New York firm Gibbs & Hill Inc., which says it "sustained losses resulting in its demise after the Saudis failed to pay" in full for work on a desalination plant at the port of Yanbu in the early 1980s. Gibbs & Hill puts the "current value" of its claim at $44 million.

Clinton has praised the Saudis for their commitment to spend billions to acquire U.S.-made aircraft and communications equipment, and Democrats have appeared reluctant to exert public pressure on the administration over the claims issue.

Some members of Congress and supporters of the claimants have said they think such commercial considerations have caused the administration to be less than vigorous in trying to persuade the Saudis to reconsider.

In a June 10 letter to Bandar, D'Amato said he was "very concerned that American companies may learn of the difficulties faced by firms such as these and become reluctant to do business in Saudi Arabia, depriving both countries of a valuable form of

ALFONSE M. D'AMATO
NEW YORK

# United States Senate
### WASHINGTON, DC 20510-3202

July 6, 1995

President Bill Clinton
The White House
Washington, D.C. 20500

Dear Mr. President

Last year, you might remember, Assistant Secretary of State for Near East and South East Asia Affairs, Robert Pelletreau, requested me to lift a hold I placed on the nominee for Ambassador to Saudi Arabia, Raymond E. Mabus, Jr., to help focus attention on the plight of U.S. claimants there. Assured there would be progress on the issue, I agreed to lift the hold. The State Department's commitment was later reaffirmed by Ambassador Mabus to one such claimant, Bill L. Harbert of Harbert-Howard Co. Despite Ambassador Mabus' commitment, no results have been provided by the State Department to date.

It is of concern to me that the Saudi government has been allowed to evade Congress' wishes in this regard as expressed in various pieces of legislation since 1992 as well as repeated joint letters to the Saudi government signed by a majority of the members of Congress. I have specifically requested and continue to request, the fair resolution of this claim in Saudi Arabia concerning Harbert-Howard Cos.' case. Thank you for your help in this important matter.

Sincerely,

Alfonse M. D'Amato
United States Senator

AMD:gjr/jrf

**INCORPORATED SCHEDULE**

I.    a) Plaintiff removed the Harbert Contractors' name from a list of corporations blacklisted by Egypt (for an earlier $79 million dispute between Defendants and the Egyptian government, which Plaintiff had amicably resolved at the international court in Paris at no monetary fine to the Harbert Contractors), so that Defendants could be eligible to do business in Egypt and bid on the Subject Project; b) Plaintiff assisted in drafting parts of the Accords concerning the funding of such projects as the Subject Project; c) Plaintiff was able to enlist the support and backing of the Egyptian Prime Minister, Dr. Atef Sedki, Plaintiff's uncle; and d) Defendants wished to discourage investigation of the Harbert Contractors' activities by securing themselves with a watertight coverup for their secret bid-rigging operation by benefiting from the political protection of Plaintiff's association with Presidents Gerald Ford, Jimmy Carter and later, Ronald Reagan, as well as Dr. Henry Kissinger and Messrs. Rockefeller and Kaiser, who sat on the Board of Directors with Plaintiff on a New York-based organization founded by Plaintiff -- The Sadat Peace Foundation, Inc.  Each of these four reasons severely damaged Plaintiff during Defendants' execution of the bid-rigging plan and, afterwards, when the bid-rigging became public knowledge. To this end, the Harbert Contractors' bid-rigging directly impacted and severely damaged Plaintiff, who had used her credibility internationally when she vouched for the Harbert Contractors' character and integrity to secure the awarding of the subject five contracts to Defendants.

II.    Defendants elected to bid rig approximately $40 million in illegal profits, destroying Plaintiff's lucrative relations with Egyptian leaders and swiftly moving to implement their Machiavellian master plan that deliberately banished and quarantined Plaintiff from learning of their bid-rigging schemes to which Defendants correctly anticipated Plaintiff would object.  Accordingly, the Harbert Contractors willfully exiled Plaintiff to their claim in Saudi Arabia before the

i

1  Saudi Royal Board of Grievances between 1990 and 1997 to ensure that Plaintiff
2  had no knowledge of Defendants' conspiracy to obtain a collusive, artificially
3  inflated, and non-competitive price for the subject contracts the Harbert
4  Contractors had obtained by using Plaintiff's contacts and illegal and inflated
5  profit thereon. As a result of this conspiracy, Defendants submitted and caused
6  to be submitted false and inflated claims for payment to the United States,
7  including the operation of Defendant Sabbia -- Defendant Mr. Harbert Sr.'s
8  brainchild. Such operations were extracted from a Swiss banker's memorandum
9  of meetings with Mr. Harbert Sr., who described in great detail the operation of
10  masterminding the bid-rigging. During the course of Plaintiff's pursuit of
11  payment of the Saudi Claim in Saudi Arabia, Plaintiff had no knowledge of
12  Defendants' deep involvement and culpability in masterminding the bid-rigging
13  conspiracy in which the Harbert Contractors were engaged during that time.

14       III.    The monetary loss to the United States and Plaintiff as a direct result
15  of Defendants' fraudulent activities pales in comparison to the political
16  hemorrhage that the Harbert Contractors have caused through their betrayal of the
17  United States.    Defendants' remorseless pursuit of enriching themselves,
18  notwithstanding the interests of Plaintiff or the United States in the world's most
19  troubled region -- the Middle East, have negated the purpose for which the United
20  States Congress has authorized substantial funding to combat the Islamic
21  fundamentalists' campaign to damage the United States' image.    Instead, the
22  Harbert Contractors have aided and abetted Islamic terrorists' false statements
23  against the United States, and confirmed Osama bin Laden's misguided
24  propaganda that Americans are untrustworthy.

25            Plaintiff's political contacts in the Middle East were deliberately and
26  willfully damaged by the Harbert Contractors. In the Subject Project, Plaintiff
27  played the major role in securing the bids in the late 1980's and delaying the
28  False Claims Case for three years between 2002 and 2005 and negotiated with

1 Senator Dole a low settlement that the Department of Justice is no longer prepared

2 to entertain. The United States will accept today either a $56 million settlement

3 or a $75 million judgment if the False Claims Case is litigated.

4      The Harbert Contractors intentionally concealed from Plaintiff the

5 facts of Defendants' activities. Defendants knowingly interfered with Plaintiff's

6 special contacts and violated the trust vested by the most senior Egyptian and

7 Arab government officials in Plaintiff as their own private inspector on the ground

8 while the Harbert Contractors unjustly enriched themselves by stealing funds

9 intended for Egypt's development. To this end, the bid-rigging conspiracy

10 severely tarnished the status of Plaintiff's reputation as an honest broker between

11 the United States business community and the Middle East. As a result of the

12 actions of Billy Harbert Jr. and his cabal, however, the arrangement contemplated

13 by the September 21 Agreement fell promptly into disarray, Sharp sending a letter

14 to Plaintiff on September 27, 2004 (the "September 27 Letter") announcing that

15 Sharp was now the case manager and that Plaintiff's monthly compensation would

16 only be guaranteed through the end of 2004. On October 5, 2004, a letter was

17 purportedly sent by Mr. Harbert Sr. to Plaintiff demoting Plaintiff to "case

18 resolution manager" and requiring all of Plaintiff's actions to be approved by

19 Sharp (the "October 5 Letter"). These sentiments were reiterated in a subsequent

20 letter, dated October 21, 2004, purportedly sent by Mr. Harbert Sr. to Plaintiff

21 (the "October 21 Letter").

22      Thereafter, on November 11, 2004, another letter (the "November

23 11 Letter") purportedly signed by Mr. Harbert Sr., addressed to seven of Mr.

24 Harbert Sr.'s lawyers and acknowledged by Defendant Hoover on that date,

25 reiterated the statements made in the October 21 Letter and concluded, "Again,

26 pure and simple, Bill Sharp is the case manager."

27      That same day, however, Mr. Harbert Sr. repudiated the October 5

28 Letter, the October 21 Letter, and the November 11 Letter. In statements

1  notarized by Carla D. Faile, a notary public in Jefferson County, Alabama, Mr.

2  Harbert Sr. wrote on the October 5 Letter "I DID <u>NOT</u> WRITE THIS LETTER

3  OR AUTHORIZE ANYONE TO SIGN IT", and on the October 21 letter, on the

4  first page, "I DID NOT WRITE THIS LETTER NOT [SIC] AUTHORIZE

5  ANYONE TO SIGN IT ON MY BEHAVE [SIC]" and, on the second page, "I

6  DID NOT WRITE THIS LETTER NOR AUTHORIZE ANYONE TO SIGN IT

7  ON MY BEHALF -- <u>FORGERY</u>."  Finally, on the first page of the November

8  11 Letter, Mr. Harbert Sr. wrote, "TO THE LEGAL TEAM [:] KINDLY

9  DISREGARD THIS LETTER.  I HAVE NO INTENTION OF TERMINATING

10  HODA ELEMARY OR ANY MEMBER OF THE LEGAL TEAM," which

11  writing was acknowledged on November 13, 2004 by Marsha H. Fifer, a notary

12  public.

13       Moreover, also on November 11, 2004, Mr. Harbert Sr. sent Plaintiff

14  a letter specifically disavowing Sharp's statements concerning Plaintiff's

15  contractual arrangements in the September 27 Letter and reconfirming the

16  September 21 Agreement; sent separate letters to each of Keith Morgan, William

17  D. Dillon and Carolyn G. Mark at the United States Department of Justice (the

18  "DOJ"), confirming Plaintiff's status as "exclusive case manager"; on each of the

19  four pages of the September 21 Agreement, wrote "Confirmed on 11/11/04 Bill

20  Harbert," which signature was acknowledged on each page by Ms. Faile; and sent

21  a letter addressed to Plaintiff and four other parties referencing the "recent

22  confusion and uncertainty regarding the management and direction of my legal

23  team" and stating that if he "remove[s]" Plaintiff, he will be liable in damages to

24  the amount of one million dollars ($1,000,000) (the "Guarantee").

25       On February 14, 2005, Mr. Harbert Sr., acting under pressure by

26  Billy Harbert Jr., wrote to Plaintiff stating that he was terminating the September

27  21 Agreement effective April 5, 2005.

28       On March 18, 2005, Ms. Mark submitted an offer, in writing, to

1 | Plaintiff, by which Mr. Harbert Sr. could settle the False Claims Case for

2 | $15,000,000. This offer was accepted by Mr. Harbert Sr. but rejected by Billy

3 | Harbert Jr.

4 | IV.    During a heated argument between Mr. Harbert Sr. and Billy Harbert

5 | Jr., Plaintiff became compromised, both morally and physically, when she was

6 | a firsthand witness to an exchange of accusations between Mr. Harbert Sr. and

7 | Billy Harbert Jr., who admitted during the argument their personal involvement

8 | in defrauding the United States of $40 million, the accrued benefits of their bid-

9 | rigging. Billy Harbert Jr. then accused his father of stealing $7 million from his

10 | uncle, the late John Harbert, demanding immediate repayment from his father to

11 | his late uncle's estate.

12 | Between 1991 and 1998, during the course of her pursuit of payment

13 | of the Harbert claim in Saudi Arabia, Plaintiff had no knowledge of Defendants'

14 | deep involvement in and culpability with respect to the bid-rigging conspiracy in

15 | which the Harbert Contractors were engaged during that time. It was not until

16 | 2004 and 2005 that Plaintiff became aware of the extent of Defendants'

17 | culpability.

18 | V.    The following defendants are agents, officers, counsel who also acted

19 | as culpable participants in the Harbert Contractors' decisions and conspiracies to

20 | defraud and coerce Plaintiff to refuse to surrender crucial evidence requested

21 | directly of her by the United States in various correspondence and in person

22 | concerning the bid-rigging and tax evasion schemes for which the Harbert

23 | Contractors were indicted or be unlawfully terminated.

24 | Plaintiff, Dr. Hoda Elemary, is a citizen of the State of California.

25 | Defendant Bill L. Harbert, Sr. is a citizen of the State of Alabama.

26 | Defendant Bill Harbert International Construction, Inc. ("BHIC") is

27 | a corporation organized and existing under the laws of the State of Delaware, with

28 | its principal place of business in the State of Alabama.

1    Defendant Harbert International Establishment, Inc. ("Bilhar") is a

2    corporation organized and existing under the laws of the Duchy of Liechtenstein,

3    with its principal place of business in the Swiss Confederation.

4    Defendant Harbert International, Inc. ("HII") is a corporation

5    organized and existing under the laws of the State of Delaware, with its principal

6    place of business in the State of Alabama.

7    Defendant Billy Harbert, Jr. is a citizen of the State of Alabama.

8    Defendant B.L. Harbert International, LLC ("HILLC") is a limited

9    liability company organized and existing under the laws of the State of Delaware,

10   with its principal place of business in the State of Alabama.

11   Defendant Roy Anderson ("Anderson") is a citizen of the State of

12   New Jersey.

13   Defendant Harbert U.K. Services, Ltd. ("Harbert U.K.") is a

14   company organized and existing under the laws of England, with its principal

15   place of business located in England.

16   Defendant Sabbia Aktiengesellschaft is a corporation organized and

17   existing under the laws of the Duchy of Liechtenstein, with its principal place of

18   business in the Duchy of Liechtenstein.

19   Defendant Troutman Sanders LLP is a limited liability partnership

20   organized and existing under the laws of the State of Georgia, with its principal

21   place of business in the State of Georgia.

22   Defendant Bryan B. Lavine is a citizen of the State of Georgia and,

23   on information and belief, is a principal of Defendant Troutman Sanders LLP, and

24   in all matters recited herein acted within the course and scope of such capacity.

25   Defendant June Ann Sauntry ("Sauntry") is a citizen of the State of

26   Georgia and, on information and belief, is a principal of Defendant Troutman

27   Sanders LLP, and in all matters recited herein acted within the course and scope

28   of such capacity.

1        Defendant Sharp and Harrison, P.A. is a professional association
2   organized and existing under the laws of the State of Florida, with its principal
3   place of business in the State of Florida.

4        Defendant William M. Sharp, Sr. ("Sharp") is a citizen of the State
5   of Florida and, on information and belief, is a principal of Defendant Sharp and
6   Harrison, P.A., and in all matters recited herein acted within the course and scope
7   of such capacity.

8        Defendant Matthew H. Lembke ("Lembke") is a citizen of the State
9   of Alabama.

10       Defendant Wachovia Bank, N.A. ("Wachovia") is a national banking
11  association organized and existing under the laws of the United States of America,
12  with its designated main office in the State of North Carolina.

13       Defendant Ken Polk ("Polk") is a citizen of the State of Alabama.

14       Defendant Evangeline H. Hoover ("Hoover") is a citizen of the State
15  of Alabama.

16       Defendant Sam Pointer ("Pointer") is a citizen of the State of
17  Alabama.

18       Defendant Barry Coburn ("Coburn") is a citizen of the District of
19  Columbia.

20       Defendant James Rein ("Rein") is a citizen of the Republic of South
21  Africa.

22       Defendant Alan Hall ("Hall") is a citizen of the State of Alabama.

23   VI.    Plaintiff's career was destroyed as a consequence of her vouching for
24  the Harbert Contractors to enable them to participate in the Subject Project, as a
25  result of which Plaintiff lost credibility both with the United States government
26  and Middle East officials.  In addition, (a) Defendants Billy Harbert Jr., Lavine
27  and Sauntry derailed Plaintiff's imminent arrival at a mutually satisfactory
28  settlement to renegotiate the terms of the $54 million plea bargain with Assistant

1  United States Attorney William Dillon when such Defendants conspired to

2  misrepresent facts to him during a telephone call between Lavine and Mr. Dillion

3  to thwart Plaintiff's efforts; (b) Sabbia was created at Mr. Harbert Sr.'s

4  inspiration to engage in a bogus sale-leaseback transaction in order to reduce the

5  apparent profitability of the Subject Project as well as provide a slush fund for the

6  other participants in the bid-rigging scheme; (c) Defendants Billy Harbert Jr. and

7  Hall falsely claimed on HILLC's website that their company HILLC (rather than

8  Mr. Harbert Sr.'s corporate entity Bilhar) was responsible for upgrading the

9  sewer system in Cairo, Egypt, so that Plaintiff's existing clients, including, but

10 not limited to, Bechtel, suspected Plaintiff of embellishing her credentials when

11 she stated that she assisted Mr. Harbert Sr. to secure the contracts in developing

12 the Subject Project; and (d) the Harbert Contractors' counsel, Sharp, admitted in

13 a memorandum that pre-settlement indictments for bid-rigging, tax fraud, money

14 laundering, violation of the Racketeer Influenced and Corrupt Organizations Act,

15 wire fraud and related crimes would likely be pursued by the DOJ against Mr.

16 Harbert Sr. and other individuals and entities if the False Claims Case went to

17 trial.

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 5
# Part 1

1 | Brian J. Jacobs (State Bar No. 107788)
467 South Arnaz Drive, Suite 319A
2 | Los Angeles, California 90048
(310) 770-6874 (Telephone)
3 | (310) 858-6489 (Facsimile)

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 2 7 2007

4 | Attorneys for Plaintiff
Dr. Hoda Elemary

John A. Clarke, Executive Officer/Clerk

5 |

By _____, Deputy

6 |

7 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

8 | FOR THE COUNTY OF LOS ANGELES

9 | BC370218

10 | DR. HODA ELEMARY,                    )   Case No.
                                        )
11 |            Plaintiff,               )   COMPLAINT FOR DAMAGES FOR:
                                        )
12 | vs.                                 )   1.   NEGLIGENCE
                                        )   2.   INTENTIONAL INTERFERENCE
13 | JERRY L. STEERING; BILL L.          )        WITH CONTRACT
    HARBERT, SR.; BILLY HARBERT,        )   3.   CONSPIRACY (INTERFERENCE
14 | JR.; and DOES 1 through 25, inclusive, )      WITH CONTRACT)
                                        )   4.   BREACH OF IMPLIED
15 |            Defendants.              )        COVENANT OF CONTINUED
                                        )        EMPLOYMENT
16 | _____ )   5.   INTENTIONAL INFLICTION OF
                                             EMOTIONAL DISTRESS
17 |                                      6.   SLANDER
                                         7.   INVASION OF PRIVACY
18 |                                      8.   FALSE LIGHT
                                         9.   CONSPIRACY TO DEFRAUD
19 |                                      10.  VIOLATION OF THE BANE
                                              ACT
20 |

21 |

22 |        1.    Plaintiff Dr. Hoda Elemary ("Plaintiff") at all times herein mentioned

23 | was an individual residing in the State of California.  In particular, during the

24 | relevant times, Plaintiff resided in the County of Los Angeles.  Plaintiff now

25 | resides in Orange and Los Angeles Counties.

26 |        2.    Defendant Jerry L. Steering ("Steering") at all times herein mentioned

27 | was an individual residing in the State of California, in the Counties of Los

28 | Angeles and Orange.

1

**COMPLAINT FOR DAMAGES**

1    3.    Defendant Bill L. Harbert, Sr. ("Mr. Harbert Sr.") is now an

2    individual residing in the State of Alabama.

3    4.    Defendant Billy Harbert, Jr. ("Billy Harbert Jr."), who was a resident

4    of the State of California, is now an individual residing in the State of Alabama.

5    5.    Plaintiff is unaware of the true names and capacities, whether

6    individual, corporate, associate or otherwise, of defendants named in this action

7    as Does 1 through 25, inclusive, and therefore sues said defendants by such

8    fictitious names. Plaintiff will amend this Complaint to show the true names and

9    capacities of Does 1 through 25, inclusive, when the same become known to

10   Plaintiff. Plaintiff is informed and believes, and thereon alleges, that each of

11   defendants designated as Does 1 through 25, inclusive, is legally responsible in

12   some manner for the acts and occurrences alleged herein, and was an actual and

13   proximate cause, and substantial factor, of the injuries and damages to Plaintiff,

14   as herein alleged.

15   6.    Plaintiff is informed and believes, and thereon alleges, that each of

16   the defendants named in this Complaint, including all defendants named as Does

17   1 through 25, inclusive, was at all times herein relevant the authorized agent,

18   employee or representative of one or more of the remaining defendants, and that,

19   in doing the things herein alleged, was acting within the course and scope of such

20   agency, employment or representation.

21   7.    Defendants Steering, Mr. Harbert Sr., Billy Harbert Jr. and Does 1

22   through 25, inclusive, unless referred to specifically, will hereinafter be referred

23   to collectively as "Defendants." Mr. Harbert Sr. and Billy Harbert Jr. and their

24   corporate entities (non-parties hereto) are hereinafter referenced together as the

25   "Harbert Contractors."

26                                    SUMMARY

27   8.    Plaintiff is a citizen of California and a former employee of Bill L.

28   Harbert, Sr. for 27 years, in which time Plaintiff provided the Harbert Defendants

1  with $51,330,000 in profits.  The named Harbert Defendants in this Complaint
2  were indicted in two United States cases for bid-rigging government contracts.
3  Bill Harbert Sr., counselled by his son Billy Harbert Jr., entered into a plea
4  agreement with the United States and paid $54,000,000 in criminal penalties in
5  settlement of the first of the two cases (an anti-trust case).  The second case (the
6  "False Claims Case") is currently in trial.  Plaintiff incurred severe damages,
7  physical violence and termination of her career as a direct and proximate result
8  of the Harbert Defendants' bid-rigging and their consequent cover-up conspiracy.
9  Because of Plaintiff's personal contacts among the Middle East heads of state,
10  Plaintiff was retained to overcome obstacles in securing construction project
11  contracts in Egypt for the Harbert Defendants.  Plaintiff convinced the Egyptian
12  Prime Minister, her uncle, to remove Defendants' names from a catalogue of
13  black-listed corporations so they could do business in Cairo, Egypt on the waste
14  water project.

15        9.     The Harbert Defendants also used Plaintiff's United States contacts,
16  including her Board of Directors members Presidents Jimmy Carter, Gerald Ford
17  and Ronald Reagan and Messrs. Rockefeller and Kaiser, to secure political cover
18  as an insurance protection for their conspiracy to defraud the United States and
19  Plaintiff by bid-rigging the contracts.  The fraud led to unjust enrichment at the
20  expense of the American taxpayer and unlawful pocketing of $40 million beyond
21  the profit stipulated in the contracts between the Harbert Defendants and the
22  United States.  As a result, a False Claims Case was instituted against the Harbert
23  Defendants.  Defendants' unlawful conduct tarnished Plaintiffs reputation as a
24  reliable broker between the United States business community and the Middle
25  East.

26        10.    Between April 2001 and April 2005, the Harbert Defendants sought
27  Plaintiff's intervention again to delay the government's prosecution of their False
28  Claims Case and to manage their declaratory relief case.  Plaintiff, working with

1  her partner, former Senate majority leader Bob Dole, was able to negotiate a
2  settlement and a four-year extension of time with senior officials from the
3  Department of Justice ("DOJ") in the False Claims Case.

4       11.   On November 3, 2003, Mr. Harbert Sr. and Plaintiff entered into the
5  Laguna Niguel Beach House 2003 Revocable Trust (the "November 3 Trust"), in
6  consideration for Plaintiff's silent arrangements concerning her personal
7  relationship with Mr. Harbert Sr.  A true and correct copy of the November 3
8  Trust is attached to this Complaint as Exhibit "A" and incorporated herein by this
9  reference.  On September 21, 2004, Plaintiff and Mr. Harbert Sr. entered into
10  another agreement (the "September 21 Agreement") to document some of their
11  shorter agreements (including Mr. Harbert Sr.'s unequivocal commitment to
12  prevent his son Billy Harbert Jr. from interfering with these contractual
13  arrangements with Plaintiff), in which Mr. Harbert Sr. agreed to pay Plaintiff a
14  success fee of 5% of the amount of any savings negotiated from his $56,000,000
15  liability in the False Claims Case.  A true and correct copy of the September 21
16  Agreement is attached to this Complaint as Exhibit "B" and incorporated herein
17  by this reference.  Defendants thereafter, through fraud and undue influence,
18  deprived Plaintiff of her stipend and employment under the September 21
19  Agreement, while she resided in California.

20       12.   Accordingly, this Complaint is primarily based on the November 3
21  Trust as well as the September 21 Agreement.  Plaintiff's action is in support of
22  and arises in part out of the transactions referenced in the United States' false
23  claims case, Civil Action No. 95-1231 (RCL/JMF), in the United States District
24  Court for the District of Columbia.  Mr. Harbert Sr. (and his corporate entity
25  Harbert International Establishment, Inc.)'s installment payments of $54 million
26  to satisfy a criminal fine imposed by the United States in respect of the anti-trust
27  case commenced on February 4, 2002.

28       13.   The United States consequently began prosecuting the False Claims

1  Case on the same subject matter.    Plaintiff was immediately contracted by
2  Defendants to delay the prosecution of the False Claims Case for a period of
3  approximately four years on terms stipulated in the November 3 Trust and the
4  September 21 Agreement, which Plaintiff did.    Plaintiff was also contracted to
5  negotiate a settlement, which Plaintiff also did.    A true and correct copy of the
6  DOJ's confirmation letter of the negotiated $15 million settlement is attached to
7  this Complaint as Exhibit "C" and incorporated herein by this reference.    In a
8  written document, Mr. Harbert Sr. approved the payment of a $15 million
9  settlement to the United States negotiated on March 15, 2005.    However, his son
10  Billy Harbert Jr. declined to obey his father's wishes and refused to make the
11  payment to the United States to avoid paying Plaintiff her substantial success fee
12  to which she was entitled under the September 21 Agreement.

13      14.    The September 21 Agreement was executed by Mr. Harbert Sr. and
14  Plaintiff, confirming in writing Plaintiff's duties as exclusive case manager of the
15  False Claims Cause and the declaratory judgment action.    Billy Harbert Jr.
16  insisted that he could do a better job than Plaintiff in negotiating a lower figure
17  than $15 million, and thereupon negotiated through counsel for several months to
18  no avail with the Department of Justice, which repeatedly told his counsel, Bryan
19  B. Lavine, Esq. of Troutman Sanders LLP, the lowest figure the United States
20  would accept was the $15 million negotiated with (Plaintiff) Dr. Hoda Elemary.

21      15.    Non-party William M. Sharp, Sr., Esq. ("Sharp") was brought in to
22  the Harbert group as personal counsel for Billy Harbert Jr., and on August 15,
23  2004 was forced by Mr. Harbert Sr.'s three children as advisor to Mr. Harbert
24  Sr. on his business transactions with Plaintiff.

25      16.    Previously thereto, Mr. Harbert Sr. had sought to restrict his son,
26  Defendant Billy Harbert Jr.'s involvement in his transactions with Plaintiff.  On
27  this basis, Mr. Harbert Sr. wished to settle the question of jurisdiction and venue
28  to curb his son's flaring temper from causing damage to Plaintiff primarily in

1  Birmingham, Alabama, where his son lives, establishing contacts with mercenaries
2  and thugs.   The parties chose Los Angeles, California as a forum for any
3  litigation that may arise.  The United States has exerted a great deal of effort to
4  protect Plaintiff, who, according to documents from the White House and the
5  National Security Council has enhanced U.S. national security by making " . . .
6  her unique contributions to the formulation of the United States government's
7  policies in the Middle East . . . and the education of the American public about
8  Middle East issues."  Senator Dianne Feinstein also stated, "It is based on the
9  vital services Ms. Elemary provides Congress, which have been determined to
10  serve U.S. national interests.  A majority of the United States Senators have
11  overwhelmingly endorsed Ms. Elemary's work and have credited her with playing
12  a pivotal role in lobbying the Congress to support Operation Desert Storm, as it
13  did on January 12, 1991 . . . ."
14
15  ## FACTS COMMON TO ALL CAUSES OF ACTION
16       17.    At Billy Harbert Jr.'s demand, Sharp issued four forged letters, dated
17  (September 27,) October 5, October 21, and November 11, 2004.  These letters
18  were provided to him personally by Billy Harbert Jr., which Evangeline H.
19  Hoover, executive assistant to both Mr. Harbert Sr. and Billy Harbert Jr.
20  ("Hoover"), signed on behalf of Mr. Harbert Sr. without his knowledge. These
21  letters were intended to summarily dismiss Plaintiff from her job.  When Plaintiff
22  called the last three letters to Mr. Harbert Sr.'s attention, Mr. Harbert Sr. wrote
23  on these letters, "FORGERY", and stated in separate correspondence as well as
24  in a paragraph written on each of the three letters that he never signed his name
25  to these letters, nor authorized anyone to sign on his behalf.  As if this were not
26  sufficient prima facie evidence of Defendant Billy Harbert Jr.'s concerted actions
27  against Plaintiff, in an email Sharp gleefully boasted to all the conspirators
28  employed by Billy Harbert Jr., as well as to Plaintiff's counsel, that Hoover was

1 │ going to hand over an attached letter to Plaintiff when Plaintiff walked in for her
2 │ briefing of Mr. Harbert Sr. of the developments in the False Claims Case.
3 │     18.    Moreover, Mr. Harbert Sr. complained verbally and in writing to
4 │ Plaintiff of his son's abuse of an elderly person as a result of Billy Harbert Jr.'s
5 │ blackmailing his father.  Mr. Harbert Sr. instructed Plaintiff on a daily basis,
6 │ either in person or by telephone, to not involve Billy Harbert Jr. in their affairs.
7 │     19.    Plaintiff witnessed unusual and abusive verbal exchanges between
8 │ father and son in which Billy Harbert Jr. exhibited his fundamental fears that his
9 │ father would write him off as an heir and instead give Plaintiff his share of the
10 │ inheritance. Billy Harbert Jr. therefore developed an obsession seeking to destroy
11 │ Plaintiff financially and physically and to deprive her of her peace of mind and
12 │ her right to pursue her career or any form of employment or happiness, and
13 │ attempted to destroy the reputations of Plaintiff and Plaintiff's partner, Senator
14 │ Bob Dole, as well as Howard Teicher and Congressman Earl Hilliard, at every
15 │ opportunity, going so far as to exhibit streaks of madness as confirmed by his
16 │ father.
17 │     20.    Between April 2001 through April 2005, Plaintiff became the sole
18 │ spokesperson and exclusive case manager for Mr. Harbert Sr.  For four years,
19 │ Plaintiff's relevant standing in Washington, together with the endorsement of the
20 │ overwhelming majority of the U.S. Congress for Plaintiff's work, as confirmed
21 │ by Senior Senator of California Dianne Feinstein, is set forth in Section II of the
22 │ Incorporated Schedule of this Complaint.  Plaintiff worked in conjunction with
23 │ former U.S. Senate Majority Leader, SENATOR BOB DOLE, whom she retained
24 │ in 2002 through 2005 to assist her in negotiating a settlement and an extension of
25 │ time with senior officials from the DOJ concerning the prosecution of the Harbert
26 │ Contractors on the False Claims Case.
27 │     21.    At the risk of Plaintiff's life, this action entails a rare and daring view
28 │ from inside of the Harbert corporate structure of their criminal activities,

1   including masterminding bid-rigging, the receipt of large sums of unreported

2   income in specific Swiss bank accounts – the proceeds of bid-rigging, unjust

3   enrichment and the use of a rogue Federal Bureau of Investigation agent to

4   threaten violent acts against Plaintiff and Defendants' adversaries, including offers

5   by the aforesaid FBI agent to "terminate" for a lofty price the Harbert

6   Contractors' perceived adversaries, including Plaintiff.  The Harbert Contractors

7   and non-party Bryán B. Lavine ("Lavine") threatened Plaintiff's life if Plaintiff

8   divulged to the United States the Harbert Contractors' banking documents sent to

9   Plaintiff by Ferrier Lullin & Cie SA, a Swiss bank headquartered in Geneva,

10  Switzerland and acquired by Bank Julius Baer in Zurich in 2005, relating to the

11  activities of the Harbert Contractors in the False Claims Case (the "Swiss Bank

12  Records").

13      22.    The Harbert Contractors' margin of profit on the Subject Contracts

14  was 65%, rather than the negotiated 15%.  Moreover, the Harbert Contractors

15  encouraged foreign corporations to join them in defrauding the American taxpayer

16  and the recipient Middle East governments with the effect of severely undermining

17  Plaintiff's credibility with Middle East heads of states with whom Plaintiff had

18  enjoyed a very lucrative business relationship.

19      23.    Plaintiff sustained substantial losses in her theaters of operation,

20  including, but not limited to, permanent damages as the direct and proximate

21  result of the fraud and concealment by Defendants of the facts of the bid-rigging

22  scheme.  In particular, Defendants' damages inflicted on Plaintiff arose through

23  four categories of unlawful actions:

24          a.      demanding that Plaintiff either break the law by altering

25  evidence detrimental to the Harbert Contractors that was required to be

26  surrendered to the United States, or have her employment terminated.  This

27  evidence included, but was not limited to, the Harbert Contractors' balance sheets,

28  unlawfully transferring funds into limited liability companies and tax evasion --

1  large sums of unreported income in numbered Swiss bank accounts;

2       b.    invasion of Plaintiff's privacy by completely and intentionally

3  discrediting Plaintiff in the presence of many United States Senators, the White

4  House and DOJ officials who had earlier supported Plaintiff's activities in writing

5  and who would have continued to benefit her career economically;

6       c.    coercing by the Harbert Contractors and Lavine of Plaintiff to

7  dramatically reduce her income and expenses and lose her position as exclusive

8  case manager, or agree to cover up crucial evidence concerning Defendants' Swiss

9  Bank Records in connection with the then forthcoming trial of the False Claims

10  Case, consequently threatening Plaintiff with physical harm if she did not

11  relinquish her position by April 4, 2005 after Defendant Billy Harbert Jr. harassed

12  Plaintiff's counsel, former Congressman Earl Hilliard's family and office staff in

13  March, 2005, demanding that former Congressman Earl Hilliard withdraw his

14  representation while he was in a coma in the emergency room; and

15       d.    <u>physically assaulting and pushing Plaintiff down the stairs by</u>

16  <u>a hired Myrmidon of the Harbert Contractors on April 14, 2005, causing Plaintiff</u>

17  <u>to break her shoulder and suffer incapacitation and intolerable physical pain for</u>

18  <u>over seven months following the assault.  Defendants sought to instill terror and</u>

19  <u>fear to prevent Plaintiff from filing this action or revealing any information that</u>

20  <u>would be detrimental to their claim of innocence in the False Claims Case.</u>

21  <u>Plaintiff suffered severe mental anguish and emotional distress in addition to</u>

22  <u>physical incapacitation as a direct and proximate result of Defendants' face-to-face</u>

23  <u>and telephonic threats on her life, accompanied by warning to do her bodily injury</u>

24  <u>and then making good on that warning.</u>

25      24.    During and after the bid-rigging, Mr. Harbert Sr. and Billy Harbert

26  Jr. insisted on maintaining a facade of lack of knowledge of the crimes that they

27  were committing or requesting their subordinates to commit on their behalf.

28  However, the evidence coupled with Plaintiff's legal recordings of Mr. Harbert

1  Sr. shows deep involvement in such conspiracy, as current counsel representing
2  the defendants in the False Claims Case (non-parties Lavine and June Ann Sauntry
3  ("Sauntry")) have also admitted in evidence.    In particular, in a specific
4  conversation that was legally recorded by Plaintiff, concerning hush money that
5  the Harbert Contractors paid to a government minister in the Middle East, Mr.
6  Harbert Sr. notified Plaintiff of his need to keep his distance from the payment
7  to that minister, who was aware of the Harbert contractors' bid-rigging of the
8  Subject Project in Egypt.  <u>On the recorded tape, Mr. Harbert Sr. is heard stating</u>
9  <u>to Plaintiff, "I would go to jail if anyone finds out that I knew, I cannot know</u>
10  <u>about this".    Mr. Harbert Sr. then states to Plaintiff, "You handle it".</u>
11  Unmistakably, Mr. Harbert Sr. understood the nature of the crime he was
12  demanding Plaintiff to execute on his behalf.       Moreover, Mr. Harbert Sr.
13  convicted himself in his own voice, "I would go to jail", which confirms his
14  knowledge of the illegality of the acts in which he was personally involved, and
15  that he wished to distance himself from them by demanding that Plaintiff assume
16  the risks of committing a crime by saying, "You take care of it".

17       25.    Defendants' willful and malicious disregard for conforming with
18  various written guarantees, commitments and promises previously provided to
19  Plaintiff was intended to punish Plaintiff for refusing to go along with Defendants'
20  cover up of their original crime of bid-rigging the United States taxpayer in the
21  amount of $40 million.  The impact of Defendants' punishment was as follows:
22  a) Plaintiff was deprived of continued employment despite the fact that Defendants
23  issued written documents confirming their full satisfaction with Plaintiff's job
24  performance, only one week before Plaintiff refused to implement Defendants'
25  illegal cover-up plan. Defendants were also satisfied with Plaintiff's dealings with
26  the DOJ as stated in writing by Mr. Harbert Sr.; b) Plaintiff and her associates
27  were terrorized from publicly exposing the Harbert Contractors' bid-rigging until
28  Plaintiff elected to take the risk of filing an action in the Central District of

California on July 28, 2006; and c) Plaintiff was prevented from publicly demanding that Defendants cease and desist from carrying on their self-serving conspiracy as well as making threats to any employee that would discuss the Harbert Contractors' modus operandi for bid-rigging and consequent cover-up conspiracy, as well as terrorizing employees that learned of the Harbert Contractors' crimes.

26.    Plaintiff and Senator Dole were successful in a) securing a low settlement figure through their negotiations with the most senior U.S. government officials.    The Harbert Contractors rejected three settlement offers negotiated among Plaintiff, Senator Dole and the United States, including a $15 million offer.    The United States initially demanded $56 million in a settlement conference, stating that its proven $25 million in damages would be trebled at the trial of the False Claims Case to $75 million, now in progress.    That $56 million was comprised of $22 million from nonparty Harbert Corporation, for which Mr. Harbert Sr. is responsible to pay under an agreement with Harbert Corporation in which he assumed liability for the bid-rigging, and $34 million from Mr. Harbert Sr. personally, as demanded during the settlement conference in court by Carolyn G. Mark, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, and b) extending by three years the DOJ's prosecution of the False Claims Case, thereby enabling Mr. Harbert Sr. to retain in his South Trust Bank stock portfolio $56 million (the lesser amount requested by the government) in South Trust Bank shares, which more than doubled in value immediately after Wachovia Bank, N.A. acquired South Trust Bank.

27.    Defendant Billy Harbert Jr. engaged in three sets of unlawful acts, including, but not limited to, abuse of an elderly person, blackmail and misrepresentation:

(a)    Defendant Billy Harbert Jr. deemed it necessary for the financial survival of his corporate entity, non-party B.L. Harbert International,

11
COMPLAINT FOR DAMAGES

1  LLC, a Delaware limited liability company ("HILLC"), to continue to collect
2  multi-million dollar loans on an annual basis from Mr. Harbert Sr., which greatly
3  distressed him.  Mr. Harbert Sr. therefore sought Plaintiff's assistance in 2003 to
4  protect himself from what he described as "being blackmailed and coerced by
5  Billy [Harbert Jr.] . . . ."  Mr. Harbert Sr. instructed Plaintiff to maintain secrecy
6  on the true nature of their personal legal relationship and not to forward
7  documents relating to the purchase of a property in Laguna Niguel, California for
8  Plaintiff.  Mr. Harbert Sr. issued letters with Plaintiff intended to disguise the
9  purpose of such real estate and other transactions because he feared that Billy
10 Harbert Jr. would use such information concerning the parties' personal
11 relationship and transactions to demand additional financing for his company.
12 However, Billy Harbert Jr. learned only of the Laguna Niguel transaction from
13 Sharp and used this information to secure substantial funding from Mr. Harbert
14 Sr. and demanded that Mr. Harbert Sr. breach his agreement with Plaintiff.
15 However, Mr. Harbert Sr. had already confirmed his position in writing to the
16 effect that no triable issue of fact existed as to Mr. Harbert Sr.'s liability to
17 Plaintiff with respect to breach of contract and unlawful termination.    In
18 particular, Mr. Harbert Sr. stated in a November 11, 2004 letter to Sharp, "I am
19 writing to bring to your attention to [sic] the fact that when I accepted your help
20 to manage the qui tam and declaratory relief cases I had forgotten that I had a
21 confirmed agreement with Dr. Elemary under liability to me to manage these
22 cases to their conclusions. . . .  [H]er position as exclusive case manager was
23 guaranteed by me.  I therefore have no choice but to honor my agreements with
24 Dr. Elemary . . . to limit my liability . . . ."  A true and correct copy of this
25 letter is attached hereto as Exhibit "G" and incorporated herein by this reference.
26         (b)    In 2005, Defendants' determined obsession to obtain the Swiss
27 Bank Records from Plaintiff was and remains today the cause of threats,
28 blackmail, and physical violence, resulting in serious bodily injuries, perpetrated

by Defendants on Plaintiff, including Plaintiff's broken shoulder on April 14, 2005, and the attempt on Plaintiff's counsel, former Congressman Earl Hilliard's life on March 2, 2005, who was retained by Plaintiff, which left the Congressman incapacitated with fractures and broken bones throughout his body for over two years.

(c)     Misrepresentation, physical threats, exiling Plaintiff to Saudi Arabia to conceal from her the Harbert Contractors' bid-rigging until they collected on the benefits thereof and additional damages from Defendants' violations beyond these stated herein are cited in paragraph V of the Incorporated Schedule.

## FIRST CAUSE OF ACTION
## NEGLIGENCE
### (Against Steering and Does 1-25)

28.     Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-27 hereof, inclusive, as if alleged herein in full.

29.     Since August, 2002, Plaintiff was exclusive case manager for the False Claims Case, and, later, the declaratory relief action, having primary responsibility and authority concerning the retention, oversight, management and compensation of the thirteen lawyers engaged by Plaintiff on behalf of the Harbert Contractors on these cases. Senator Bob Dole performed invaluable services in backing up Plaintiff's negotiation of a resolution to the False Claims Case, reducing what was anticipated in Washington to be a $100 million damage to Defendants down to $15 million.

30.     Mr. Harbert Sr. and Plaintiff executed the September 21 Agreement, setting forth Plaintiff's duties as exclusive case manager of the False Claims Cause and the declaratory judgment action, on September 21, 2004. Mr. Harbert Sr. subsequently confirmed this agreement six weeks later on November 11, 2004, after Mr. Harbert Sr. conferred with his counsel.

31.    On July 28, 2004, Steering transmitted a letter to Mr. Harbert Sr. (the "July 28 Letter") in which he recommended that Mr. Harbert Sr. discontinue payment to the United States of his installment obligations under the $54 million criminal fine referred to in paragraph 12, above, as a means of coercing the DOJ into negotiating a more favorable settlement of the False Claims Case and the declaratory relief action.  A true and correct copy of the July 28 Letter is attached to this Complaint as Exhibit "D" and incorporated herein by this reference.

32.    Mr. Harbert Sr. accepted Steering's advice and ceased making the payments to the United States.  However, Steering thereupon ceased to monitor the status and progress of the False Claims Case and the declaratory relief action, which were adversely affected by Mr. Harbert Sr.'s actions.

33.    As a direct and proximate result of Steering's failure to monitor the status and progress of the False Claims Case and the declaratory relief action following his transmittal to Mr. Harbert Sr. of the July 28 Letter, both of these actions took turns for the worse, as a result of which Mr. Harbert Sr. changed Plaintiff's title as exclusive case manager of the declaratory relief action.

34.    Steering so carelessly and negligently conducted himself with respect to the oversight of the False Claims Case and the declaratory relief action, in which regards he was under Plaintiff's supervision, that as a proximate result of Steering's negligence in the premises, Plaintiff lost her title as exclusive case manager of the declaratory relief action, all to Plaintiff's damage in an amount to be ascertained, but in excess of $270,000.

## SECOND CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH CONTRACT

### (Against Billy Harbert Jr. and Does 1-25)

35.    Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-27 and 29-30 hereof, inclusive, as if alleged herein in full.

36.     Pursuant to the September 21 Agreement, Mr. Harbert Sr. agreed, inter alia, to pay Plaintiff a success fee equal to five percent (5%) of the amount of any savings negotiated from Mr. Harbert Sr.'s Thirty-Four Million Dollars ($34,000,000) and Twenty-Two Million Dollars ($22,000,000) (on behalf of Harbert Corporation) obligations.

37.     The existence of the November 3 Trust and the September 21 Agreement was known to Defendants because Plaintiff had been working with John Harbert since 1979 and had been acting as exclusive case manager on the False Claims Case since April, 2001.

38.     Meanwhile, the Harbert three heirs (children) gravely feared the loss of their inheritance to Plaintiff, with whom Mr. Harbert Sr. was spending more time following the death of his wife in 1998. Separate remedies concerning the contract arising out of the personal relationship between Mr. Harbert Sr. and Plaintiff are being pursued in the Superior Court of the State of California. Meanwhile, Defendant Billy Harbert Jr. has, at all times relevant herein, exhibited and acted upon a hatred for Plaintiff, as have Mr. Harbert Sr.'s two daughters, non-parties Anne Moulton ("Moulton") and Elizabeth Harbert Cornay ("Cornay"), who secretly granted their brother, Defendant Billy Harbert Jr., power of attorney to act on behalf of their interests. These three individuals, in conjunction with non-party Sharp (both in his own capacity and on behalf of his firm, non-party Sharp and Harrison, P.A.), as well as Mr. Harbert Sr.'s secretary for 60 years, Hoover, who was saddened by Mr. Harbert Sr.'s extensive travel to be with Plaintiff, knowingly and willfully conspired and agreed among themselves to remove and, in connection therewith, to terminate the employment by Mr. Harbert Sr. of Plaintiff, who was and is a California resident and therefore was not present at all times to halt Defendants'_ conspiracy to terminate Plaintiff's employment by illicit means, including forgery and undue influence on an elderly person -- Mr. Harbert Sr.

39.    Defendants and non-parties referenced in paragraph 62, above, made several attempts to accomplish the goal of their conspiracy without success, including repeated one-on-one and conference telephone calls with Plaintiff. Defendants then agreed among themselves to employ forgery.  Paragraph III of the Incorporated Schedule details a sequence of letters dated October 5, October 21 and November 11, 2004 which were declared to be forged by their ostensible signatory, Mr. Harbert Sr.  In particular, Mr. Harbert Sr. labelled these letters as "FORGERY" in addition to issuing a letter to Plaintiff to the same effect. True and correct copies of this letter (the "November 11 Letter") and the referenced letters with Mr. Harbert Sr.'s acknowledged signature confirming that they were forgeries are attached hereto as Exhibit "E" and incorporated herein by this reference.  In written confirmation of the conspiracy, Sharp revealed the orchestrated sequence of events when he advised his co-conspirators of the text of the forged October 21, 2004 letter, which he describes as "the attached letter [which] is being delivered to Dr. Elemary, who . . . will be meeting with Mr. Harbert this afternoon."  A true and correct copy of this email is attached hereto as Exhibit "F" and incorporated herein by this reference.  So confident were the conspirators of their eventual success that they did not attempt to conceal their conspiracy, as evidenced by their copying of this email to Plaintiff's then counsel.

40.    Finally, on February 14, 2005, Mr. Harbert Sr. did, in fact, terminate the September 21 Agreement, effective April 5, 2005.  Such termination was at the special instance and request of Billy Harbert Jr., who had always hated Plaintiff, and notwithstanding Mr. Harbert Sr.'s October 1, 2003 written covenant to Plaintiff that he would not allow Billy Harbert Jr. to interfere with Plaintiff's performance of her duties as exclusive case manager.  A true and correct copy of this document is attached hereto as Exhibit "H" and incorporated herein by this reference.

41.    As a proximate result of Defendants' interference with the September

21 Agreement, Plaintiff has suffered actual damages, in an amount to be ascertained, but not less than Seven Hundred Eighty Thousand Dollars ($780,000), representing Plaintiff's monthly stipend from February, 2005 through April, 2007 (the filing date of this action), plus Two Million Fifty Thousand Dollars ($2,050,000), representing Plaintiff's success fee computed on her obtaining of a settlement offer of $15,000,000 from the DOJ on Mr. Harbert Sr.'s original liability of $56,000,000, or Two Million Eight Hundred Thirty Thousand Dollars ($2,830,000), and Thirty Thousand Dollars ($30,000) per month thereafter while the False Claims Case is pending.

42.     The aforementioned acts and omissions of Defendants were willful, wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the intention on the part of Defendants to deprive Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages in an amount according to proof.

### THIRD CAUSE OF ACTION
### CONSPIRACY (INTERFERENCE WITH CONTRACT)
### (Against Steering, Billy Harbert Jr. and Does 1-25)

43.     Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-27 and 38-40 hereof, inclusive, as if alleged herein in full.

44.     Since August, 2002, Plaintiff was exclusive case manager for the False Claims Case, and, later, the declaratory relief action, having primary responsibility and authority concerning the retention, oversight, management and compensation of the thirteen lawyers engaged by Plaintiff on behalf of the Harbert Contractors on these cases.  Senator Bob Dole performed invaluable services in backing up Plaintiff's negotiation of a resolution to the False Claims Case..

45.    Mr. Harbert Sr. and Plaintiff executed the September 21 Agreement, setting forth Plaintiff's duties as exclusive case manager of the False Claims Cause and the declaratory judgment action, on September 21, 2004. Mr. Harbert Sr. subsequently confirmed this agreement six weeks later on November 11, 2004, after Mr. Harbert Sr. conferred with his counsel. As a result of Defendants' conspiracy, the September 21 Agreement was wrongfully terminated by Mr. Harbert Sr. on April 5, 2005.

46.    As a result of Defendants' conspiracy, Plaintiff has suffered actual damages, in an amount to be ascertained, but not less than Seven Hundred Eighty Thousand Dollars ($780,000), representing Plaintiff's monthly stipend from February, 2005 through April, 2007 (the filing date of this action), plus Two Million Fifty Thousand Dollars ($2,050,000), representing Plaintiff's success fee computed on her obtaining of a settlement offer of $15,000,000 from the DOJ on Mr. Harbert Sr.'s original liability, or Two Million Eight Hundred Thirty Thousand Dollars ($2,830,000), and Thirty Thousand Dollars ($30,000) per month thereafter while the False Claims Case is pending.

47.    The aforementioned acts and omissions of Defendants were willful, wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the intention on the part of Defendants to deprive Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages in an amount according to proof.

## FOURTH CAUSE OF ACTION

## BREACH OF IMPLIED COVENANT OF CONTINUED EMPLOYMENT

### (Against Mr. Harbert Sr. and Does 1-25)

48.    Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-27 and 29-30 hereof, inclusive, as if alleged herein in

1  full.

2      49.   Plaintiff was employed by Mr. Harbert Sr. on many projects for over
3  26 years, consistently received either good or excellent performance evaluations
4  and, regrettably, a dismal compensation, when compared with the $51,330,000
5  in profits that Mr. Harbert Sr. earned as a direct result of Plaintiff's acute ability
6  to change a court's position to favor Mr. Harbert Sr.'s interests, including, but
7  not limited to, (a) altering a Saudi Court decree granting the Harbert Contractors
8  "a legal victory at no monetary compensation" to a $7,000,000 payment to the
9  Harbert Contractors in addition to future lucrative contracts, and (b) on June 10,
10  2004, at the U.S. District Court for the District of Columbia, changing the
11  Magistrate Judge's announced ruling from terminating settlement talks to granting
12  Plaintiff's request for a 10-month extension of time in which Plaintiff managed to
13  negotiate a $15,000,000 settlement between the parties, which Mr. Harbert Sr.
14  accepted and would have signed with the United States, were it not for Billy
15  Harbert Jr.'s interference. Plaintiff was assured on numerous occasions that she
16  would not be terminated arbitrarily, so as to conclude that Plaintiff and said
17  Defendant had entered into an implied contract that Plaintiff would not be
18  discharged unless there was good cause to do so.

19      50.   Based on the representations and promises and the conduct of Mr.
20  Harbert Sr., as set forth in paragraph 49, above, Plaintiff had an employment
21  contract with said Defendant that she would continue to be employed by
22  Defendant so long as her performance was satisfactory, and that Defendant would
23  not discharge her without good and just cause.

24      51.   Plaintiff at all times fulfilled her duties and conditions under the
25  aforesaid contract and Plaintiff performed her tasks in a competent and
26  satisfactory manner as confirmed in writing by Mr. Harbert Sr. and counsel Sharp
27  two weeks prior to the issuance of the first letter purporting to terminate Plaintiff.

28      52.   Notwithstanding the implied promise to terminate the employment

contract only for good cause, on or about February 14, 2005, Defendant finally, and under pressure, terminated Plaintiff's employment effective April 5, 2005, without specifying any cause for the termination.

53.    As a result of Defendant's breach of contract, Plaintiff has suffered actual damages, in an amount to be ascertained, but not less than Seven Hundred Eighty Thousand Dollars ($780,000), representing Plaintiff's monthly stipend from February, 2005 through March, 2007 (the filing date of this action), plus Two Million Fifty Thousand Dollars ($2,050,000), representing Plaintiff's success fee computed on her obtaining of a settlement offer of $15,000,000 from the DOJ on Mr. Harbert Sr.'s original liability of $56,000,000, or Two Million Eight Hundred Thirty Thousand Dollars ($2,830,000), and Thirty Thousand Dollars ($30,000) per month thereafter while the False Claims Case is pending.

## FIFTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against Steering, Billy Harbert Jr. and Does 1-25)

54.    Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-27 and 29-30 hereof, inclusive, as if alleged herein in full.

55.    The conduct of the above-named Defendants in procuring the termination of Plaintiff's 26-year association with Mr. Harbert Sr. and Plaintiff's employment as evidenced, inter alia, by the September 21 Agreement, in the manner and under the circumstances hereinabove set forth, including, but not limited to, the conduct of Defendant Billy Harbert Jr., Sharp and Hoover in acting secretly to remove Plaintiff from the position guaranteed to her by the September 21 Agreement; Billy Harbert Jr.'s commissioning of the maid Sandy to spy on Plaintiff and Mr. Harbert Sr.'s conversations at his residence; and Plaintiff's seven months of recuperation from the attack carried out on her at her residence, resulting in Plaintiff's affliction with doubts and reservations about her status and

1  being terrorized by the extent to which Defendants would go to procure Plaintiff's

2  removal, constituted extreme and outrageous conduct with the intention of, and

3  with reckless disregard for, causing emotional distress to Plaintiff.

4      56.    As a result of the aforesaid Defendants' actions, Plaintiff suffered and

5  continues to suffer severe and extreme emotional distress.

6      57.    The aforementioned acts and omissions of Defendants were willful,

7  wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the

8  intention on the part of Defendants to deprive Plaintiff of property or legal rights

9  or otherwise causing injury, and was despicable conduct that subjected Plaintiff

10 to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to

11 justify an award of exemplary and punitive damages in an amount according to

12 proof.

## SIXTH CAUSE OF ACTION

## SLANDER

### (Against Billy Harbert Jr. and Does 1-25)

16     58.    Plaintiff refers to and incorporates by this reference each allegation

17 set forth in paragraphs 1-27 and 29-30 hereof, inclusive, as if alleged herein in

18 full.

19     59.    In or around November, 2004, Billy Harbert Jr. began to claim, and

20 thereafter has continued to claim through the filing date of this action, that

21 Plaintiff was Mr. Harbert Sr.'s "whore," that Plaintiff illegitimately conceived

22 Mr. Harbert Sr.'s son and was raising him, that Plaintiff was a gold-digger who

23 was not accomplishing anything, and that Plaintiff would hand $100 bills to

24 Senators and Congressmen from a brown paper bag in order to obtain political

25 favors.

26     60.    These words were spoken to Steering, Mr. Harbert Sr. and Hoover,

27 as well as to U.S. Senators and Congressmen whom Billy Harbert Jr. knows

28 socially.

61.   These words were slanderous per se because they accused Plaintiff of unchastity and with having committed crimes and because they tended to injure Plaintiff in her business by reflecting falsely on her conduct, motives and integrity.

62.   As a result of the above-described words, Plaintiff has suffered general damages to her reputation.

63.   As a proximate result of the acts and conduct of Defendants as hereinabove alleged, Plaintiff's contacts and business relationships with foreign heads of state and officials, as well as the President of the United States, members of the Senate and the House of Representatives, State Department officials, corporate leaders and others, have been disrupted, undermined and destroyed, causing Plaintiff to suffer special damages in an amount according to proof at trial, but, on information and belief, in excess of Three Million Dollars ($3,000,000).

64.   The aforementioned acts and omissions of Defendants were willful, wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the intention on the part of Defendants to deprive Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages in an amount according to proof.

## SEVENTH CAUSE OF ACTION

## INVASION OF PRIVACY

### (Against Billy Harbert Jr. and Does 1-25)

65.   Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-27 hereof, inclusive, as if alleged herein in full.

66.   In or around December 2003 and thereafter, Billy Harbert Jr., without Plaintiff's consent, invaded Plaintiff's right to privacy by making

COMPLAINT FOR DAMAGES

statements to various highly-placed political figures in the District of Columbia crucial to Plaintiff's work, including, but not limited to, members of the U.S. Senate and House of Representatives, insuring that Plaintiff became the subject of gossip in Washington's high circles.

67.    The statements that are the basis for the invasion of privacy are not just that Plaintiff has a close personal relationship with Mr. Harbert Sr., but that Defendant Billy Harbert Jr. suspected that Plaintiff was secretly married to Mr. Harbert Sr., questioning Plaintiff's subordinates "if [Plaintiff] conceived a child by my father" while criticizing Plaintiff of having a parallel relationship to Anna Nicole Smith in her relationship with Mr. Koch.

68.    These disclosures by Defendant were public disclosures to a large number of people in that Billy Harbert Jr. engaged in a systematic campaign calculated to reach a majority of key Congressman and Senators and their staff.

69.    The facts disclosed about Plaintiff were private facts that Plaintiff desired to keep private, as requested by her spouse.

70.    These disclosures by Billy Harbert Jr. of the above facts were offensive and objectionable to Plaintiff and to a reasonable person of ordinary sensibilities in that Plaintiff's personal relationships are no business of the public's.

71.    The private facts disclosed by Defendant were not of legitimate public concern, or newsworthy. The California Supreme Court has ruled, "The right to pursue and obtain happiness is guaranteed to all by the fundamental law of our state. This right by its very nature includes the right to live free from the unwarranted attack of others upon one's liberty, property, and reputation. Any person living a life of rectitude has that right to happiness, which includes freedom from unnecessary attacks on his character, social standing, or reputation."

72.    As a proximate result of the above disclosures, Plaintiff was scorned

1    and abandoned by friends and business associates, exposed to contempt and
2    ridicule, and suffered loss of reputation and standing in the community, all of
3    which caused Plaintiff humiliation, embarrassment, hurt feelings, mental anguish
4    and suffering, all to her general damage in an amount according to proof.

5         73.    As a proximate result of the acts and conduct of Defendant as
6    hereinabove alleged, Plaintiff's contacts and business relationships with foreign
7    heads of state and officials, as well as the President of the United States, members
8    of the Senate and the House of Representatives, State Department officials,
9    corporate leaders and others, have been disrupted, undermined and destroyed,
10   causing Plaintiff to suffer special damages in an amount according to proof at
11   trial, but, on information and belief, in excess of Three Million Dollars
12   ($3,000,000).

13        74.    The aforementioned acts and omissions of Defendants were willful,
14   wanton, fraudulent, oppressive and malicious, inflicted by Defendant with the
15   intention on the part of Defendant to deprive Plaintiff of property or legal rights
16   or otherwise causing injury, and was despicable conduct that subjected Plaintiff
17   to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to
18   justify an award of exemplary and punitive damages in an amount according to
19   proof.

20        75.    The reason this Cause of Action was not filed previously is set forth
21   in paragraphs 85-87, below.

22        76.    Billy Harbert Jr. personally threatened Plaintiff in the early Spring
23   2005 to refrain from litigation for the time necessary while the Harbert group
24   engaged the government in settlement talks in an attempt to reach a better
25   arrangement than Plaintiff's $15 million settlement or until the conclusion of the
26   trial of the False Claims Case.  As a result of Defendant's threats as stated
27   verbatim in paragraphs 85-87, below, Plaintiff was deterred out of fear for her
28   life from filing any action for at least two years.

COMPLAINT FOR DAMAGES

# EIGHTH CAUSE OF ACTION

## FALSE LIGHT

### (Against Billy Harbert Jr. and Does 1-25)

77.    Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-27 hereof, inclusive, as if alleged herein in full.

78.    In or around November 2004, Billy Harbert Jr. began to dispatch multiple letters to various highly-placed political figures in the District of Columbia crucial to Plaintiff's work, including, but not limited to, members of the U.S. Senate and House of Representatives, impugning Plaintiff's character, status and reputation by stating, among other things, that Plaintiff "threw money" at members of Congress.

79.    Billy Harbert Jr. also contacted the chief writers and the editorial staff of major publications for the purpose of defaming Plaintiff.  In one such instance, on December 8, 2006, the Birmingham News published the leading story in their Business Section on the Harbert Contractors' False Claims Case.  However, at Billy Harbert Jr.'s insistence, the Birmingham News was pressured to print that Plaintiff had made "secret recordings" of her conversations with Bill Harbert Sr., thus putting Plaintiff in the false light of making illegal secret recordings, when, in fact, Plaintiff had advised the Birmingham News that the recordings were neither secret nor illegal, but were made lawfully by Plaintiff when she was in Alabama, in which State one-party consents of recordings of telephone conversations are legal.

80.    Plaintiff immediately demanded a retraction of the subject allegations, including writing a letter to the Governor of the State of Alabama, from Billy Harbert Jr. as well as the newspaper, but neither Billy Harbert Jr. nor the Birmingham News complied.

81.    The allegations referred to in paragraphs 51 and 52 above were libelous per se because they accused Plaintiff of having committed crimes and

1   because they tendered to injure Plaintiff in her business by reflecting falsely on

2   her conduct, motives and integrity.

3       82.    As a result of the above-described words, Plaintiff has suffered

4   general damages to her reputation.

5       83.    As a proximate result of the acts and conduct of Defendants as

6   hereinabove alleged, Plaintiff's contacts and business relationships with foreign

7   heads of state and officials, as well as the President of the United States, members

8   of the Senate and the House of Representatives, State Department officials,

9   corporate leaders and others, have been disrupted, undermined and destroyed,

10  causing Plaintiff to suffer special damages in an amount according to proof at

11  trial, but, on information and belief, in excess of Three Million Dollars

12  ($3,000,000).

13      84.    The aforementioned acts and omissions of Defendants were willful,

14  wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the

15  intention on the part of Defendants to deprive Plaintiff of property or legal rights

16  or otherwise causing injury, and was despicable conduct that subjected Plaintiff

17  to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to

18  justify an award of exemplary and punitive damages in an amount according to

19  proof.

20      85.    Defendant Billy Harbert Jr. engaged in repeated career and life

21  threats against Plaintiff and her contacts between 1997 and 2006.  Billy Harbert

22  Jr. strongly objected to the involvement of Senator Bob Dole.  From 2003 until

23  April 2005, Billy Harbert Jr.'s threats became increasingly more alarming as he

24  sought to substantially damage Plaintiff and her associates. On or about March 1,

25  2005, Plaintiff received a call advising her that Robert Southby of Dothan,

26  Alabama was associated with Billy Harbert Jr. through his brother-in-law, Rusty

27  Moulton, who was in the scrap metal business as was Robert Southby in the south

28  of Alabama.  Two days later, Plaintiff learned of a preplanned car accident of

1  Plaintiff's lawyer in Alabama, former United States Congressman Earl Hilliard.

2  Mr. Robert Southby was the driver of the tractor that hit Congressman Hilliard.

3      86.   On March 2, 2005, Robert A. Southby of Dothan, Alabama was

4  apparently waiting for Plaintiff's counsel, Earl Hilliard, in a construction tractor,

5  which he parked across a darkened, narrow highway, at approximately 1:00 a.m.,

6  two minutes before Congressman Hilliard was driving his car back to his home.

7  The accident was intended to be fatal, were it not for Congressman Hilliard's

8  veering his steering wheel at the last instant to the right away from Mr. Southby's

9  tractor wheel, and resulted in compound injuries with shattered broken bones

10  throughout his body.  A police report of the accident was dismissed by the

11  Birmingham police, who failed to conduct the investigation required by law, and

12  the police thenceforth refused to cooperate on this matter with the public.

13  Congressman Hilliard was unable to walk for two years after his accident.

14  Following the accident, while Congressman Hilliard was in a coma, Billy Harbert

15  Jr. harassed his family and daughter-in-law with demands that the Congressman

16  withdraw his legal representation.

17      87.   In particular, on April 14, 2005, Billy Harbert Jr. dispatched a

18  hitman to Plaintiff's home in California, who then awaited Plaintiff in her front

19  courtyard while she drove her car into the garage.  He approached Plaintiff

20  stating, "I am here to pick up the Harbert Swiss bank account records".  Plaintiff

21  notified the Harbert hitman that she was not in possession of them at her home,

22  at which time he indicated that he would "come into the house . . . to search for

23  them".  Plaintiff firmly stated that she would call 911 if he came into the house

24  and asked the Harbert hitman to leave her property immediately while proceeding

25  to climb two steps from the garage into the house.  Plaintiff was thereupon pushed

26  down from the back, falling on the steps and fractured her scapula (right shoulder)

27  which was displaced, requiring seven months of intensive physical therapy to heal

28  sufficiently so Plaintiff could function again.  To this date, according to Dr.

1  Alexander H. Tischler of the Newport Orthopedic Institute, Plaintiff's internal
2  rotation is not yet 100 degrees.

3      88.    Billy Harbert Jr. personally threatened Plaintiff in the early Spring
4  2005 to refrain from litigation for the time necessary while the Harbert group
5  engaged the government in settlement talks in an attempt to reach a better
6  arrangement than Plaintiff's $15 million settlement or the conclusion of the trial
7  of the False Claims Case.  As a result of Defendant's threats as described in
8  paragraphs 85-87, above, Plaintiff was deterred out of fear for her life from filing
9  any action for at least two years.

10               **NINTH CAUSE OF ACTION**
11               **CONSPIRACY TO DEFRAUD**
12      **(Against Steering, Billy Harbert Jr. and Does 1-25)**

13      89.    Plaintiff refers to and incorporates by this reference each allegation
14  set forth in paragraphs 1-27 and 37-39 hereof, inclusive, as if alleged herein in
15  full.

16      90.    Since August, 2002, Plaintiff was exclusive case manager for the
17  False Claims Case, and, later, the declaratory relief action, having primary
18  responsibility and authority concerning the retention, oversight, management and
19  compensation of the thirteen lawyers engaged by Plaintiff on behalf of the Harbert
20  Contractors on these cases.  Senator Bob Dole performed invaluable services in
21  backing up Plaintiff's negotiation of a resolution to the False Claims Case.

22      91.    As a proximate result of the fraudulent mailing by Defendants of
23  forged communications from Mr. Harbert Sr. as described in paragraphs 17 and
24  39, above,  Plaintiff believed that she had lost her status as exclusive case
25  manager, so that, at a conference telephone call in October, 2004, among the
26  bench officer in the anti-trust case in which Mr. Harbert Sr. had been making
27  payments on the $54 million penalty hereinabove described, Billy Harbert Jr.'s
28  counsel Sharp and Lavine and the prosecutor for the anti-trust case, William

1  Dillon, and other participants, Plaintiff was forced to keep quiet, in consequence

2  of which agreements were reached which caused the Harbert Defendants to lose

3  the declaratory relief case, thus losing the remaining $30,000,000 in payments.

4  Accordingly, Plaintiff was forced to lose her 5% fee on such amount, which she

5  would not have lost if she was in charge of conducting this conference call in her

6  rightful capacity as exclusive case manager.

7      92.    As a result of Defendants' conspiracy described in paragraphs 37

8  through 39, above, Plaintiff has suffered actual damages, in an amount to be

9  ascertained, but not less than One Million Five Hundred Thousand Dollars

10  ($1,500,000), representing Plaintiff's success fee computed on her reducing Mr.

11  Harbert Sr.'s original liability by $30,000,000.

12      93.    The aforementioned acts and omissions of Defendants were willful,

13  wanton, fraudulent, oppressive and malicious, inflicted by Defendants with the

14  intention on the part of Defendants to deprive Plaintiff of property or legal rights

15  or otherwise causing injury, and was despicable conduct that subjected Plaintiff

16  to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to

17  justify an award of exemplary and punitive damages in an amount according to

18  proof.

19              **TENTH CAUSE OF ACTION**

20              **VIOLATION OF THE BANE ACT**

21          **(Against Billy Harbert Jr. and Does 1-25)**

22      94.    Plaintiff refers to and incorporates by this reference each allegation

23  set forth in paragraphs 1-27, 76 and 85-87 hereof, inclusive, as if alleged herein

24  in full.

25      95.    The acts that are the subject of this Cause of Action occurred from

26  1997 through 2006, in, among other places, Bel Air, California, Laguna Niguel,

27  California and Birmingham, Alabama, including, but not limited to, the March 2,

28  2005 attack on Plaintiff's counsel, Congressman Earl Hilliard, as alleged in

paragraphs 85 and 86, above; the April 14, 2005 attack on Plaintiff by a hitman hired by Defendants, as alleged in paragraph 87, above; and Billy Harbert Jr.'s threat to Plaintiff in the Spring of 2005, as alleged in paragraph 76, above.

96.    At the aforesaid times and places, Billy Harbert Jr. interfered with the exercise and enjoyment of Plaintiff's civil right to petition the government for redress of grievances as guaranteed by Article I, Section 3(a) of the Constitution of the State of California and Plaintiff's civil right to be protected from bodily restraint or harm as guaranteed by Civil Code section 43.  Billy Harbert Jr. interfered with Plaintiff's aforesaid rights by the use of threats, intimidation and coercion, in that the attack on Plaintiff was perpetrated with physical violence (constituting a violation of Plaintiff's rights under Civil Code section 43), and the aforesaid Defendant personally threatened Plaintiff with violence if she filed a lawsuit to redress her grievances as further set forth herein (constituting, along with the aforesaid physical attack on Congressman Hilliard and Plaintiff, deterrence from, and therefore interference with, Plaintiff's exercise of her right to file suit and thereby seek redress of grievances from the government under Article I, Section 3(a) of the California Constitution).

97.    As a direct and proximate result of the conduct of the foregoing designated Defendant, Plaintiff has suffered bruising and physical injuries as above alleged, has lost sleep, has become apprehensive, has generally lost her peace of mind, is taking prescription drugs for this condition, and has suffered, and continues to suffer, undue mental anguish as a result of the events described below.

98.    The foregoing designated Defendant's violation of Plaintiff's rights as guaranteed by Civil Code section 52.1 entitled Plaintiff, inter alia, to compensatory and punitive damages, a $25,000 civil penalty and attorney's fees, all of which are provided for in Civil Code section 52.1(b), and are requested hereinafter.

99.    In doing the acts alleged herein, Billy Harbert Jr. knew or should have known that his actions were likely to injure Plaintiff.  Plaintiff is informed and believes, and thereon alleges, that the aforesaid Defendant intended to cause injury to Plaintiff and acted with a willful and conscious disregard of Plaintiff's rights as secured by Civil Code section 52.1, thus entitling Plaintiff to recover punitive damages against such Defendant pursuant to Civil Code section 52(b)(1).

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

### FOR THE FIRST CAUSE OF ACTION

1.    For general damages according to proof, but in excess of $270,000.

### FOR THE SECOND CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial, but in excess of $2,830,000, plus interest thereon.

2.    For an award of punitive and exemplary damages in a sum to be later determined.

### FOR THE THIRD CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial, but in excess of $2,830,000, plus interest thereon.

2.    For an award of punitive and exemplary damages in a sum to be later determined.

### FOR THE FOURTH CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial, but in excess of $2,830,000, plus interest thereon.

2.    For an award of punitive and exemplary damages in a sum to be later determined.

### FOR THE FIFTH CAUSE OF ACTION

1.    For compensatory damages in an amount to be proved at trial.

2.    For an award of punitive and exemplary damages in a sum to be later determined.

## FOR THE SIXTH CAUSE OF ACTION

1.     For compensatory damages in an amount to be proved at trial.

2.     For an award of punitive and exemplary damages in a sum to be later determined.

## FOR THE SEVENTH CAUSE OF ACTION

1.     For general damages according to proof.

2.     For special damages according to proof, but in excess of $3,000,000.

3.     For an award of punitive damages in a sum to be later determined.

## FOR THE EIGHTH CAUSE OF ACTION

1.     For compensatory damages in an amount to be proved at trial, but in excess of $1,300,000.

2.     For an award of punitive and exemplary damages in a sum to be later determined.

## FOR THE NINTH CAUSE OF ACTION

1.     For compensatory damages in an amount to be proved at trial.

2.     For an award of punitive and exemplary damages in a sum to be later determined.

## FOR THE TENTH CAUSE OF ACTION

1.     For general damages according to proof.

2.     For special damages for medical and related expenses according to proof.

3.     For punitive damages against Billy Harbert Jr. pursuant to Civil Code section 52(b)1.

4.     For a civil penalty of $25,000 pursuant to Civil Code section 52(b)(2).

5.     For an award of reasonable attorney's fees pursuant to Civil Code section 52(b)(3).

///

1

## FOR ALL CAUSES

2     1.     For costs of suit herein incurred.

3     2.     For such other and further relief as the Court deems just.

4

5     Dated:   April 6, 2007

6                                  Brian J. Jacobs
                                   Attorney for Plaintiff

7                                    Dr. Hoda Elemary

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES**

## INCORPORATED SCHEDULE

1

2    I.    a) Plaintiff removed the Harbert Contractors' name from a list of

3 corporations blacklisted by Egypt (for an earlier $79 million dispute between

4 Defendants and the Egyptian government, which Plaintiff had amicably resolved

5 at the international court in Paris at no monetary fine to the Harbert Contractors),

6 so that Defendants could be eligible to do business in Egypt and bid on the

7 Subject Project; b) Plaintiff assisted in drafting parts of the Accords concerning

8 the funding of such projects as the Subject Project; c) Plaintiff was able to enlist

9 the support and backing of the Egyptian Prime Minister, Dr. Atef Sedki,

10 Plaintiff's uncle; and d) Defendants wished to discourage investigation of the

11 Harbert Contractors' activities by securing themselves with a watertight coverup

12 for their secret bid-rigging operation by benefiting from the political protection

13 of Plaintiff's association with Presidents Gerald Ford, Jimmy Carter and later,

14 Ronald Reagan, as well as Dr. Henry Kissinger and Messrs. Rockefeller and

15 Kaiser, who sat on the Board of Directors with Plaintiff on a New York-based

16 organization founded by Plaintiff -- The Sadat Peace Foundation, Inc. Each of

17 these four reasons severely damaged Plaintiff during Defendants' execution of the

18 bid-rigging plan and, afterwards, when the bid-rigging became public knowledge.

19 To this end, the Harbert Contractors' bid-rigging directly impacted and severely

20 damaged Plaintiff, who had used her credibility internationally when she vouched

21 for the Harbert Contractors' character and integrity to secure the awarding of the

22 subject five contracts to Defendants. Billy Harbert Jr.'s persistent interference

23 damaged Plaintiff and is noticeable in forcing counsel to mislead the court in

24 another case.    These misrepresentations provide proof of Defendants'

25 untrustworthiness together with evidence herein.

26    II.    The Egyptian government awarded contracts to U.S. companies that

27 had been pre-qualified to bid.   The United States Agency for International

28 Development ("USAID") paid the winning bidders on each contract. As a direct

1    and proximate result of Plaintiff's personal contacts among Middle East heads of
2    state, the joint venture of which the Harbert Contractors (hereinafter defined)
3    owned 60% was awarded approximately $200 million worth of contracts from the
4    waste water project in Cairo, Egypt, which included pump stations, pipelines, and
5    waste water treatment facilities.  Plaintiff was in a unique position (as former
6    special advisor to President Anwar Sadat during the Camp David negotiations) to
7    provide tangible results to the Harbert Contractors.

8         In particular, non-party John M. Harbert and his brother, Mr. Harbert Sr.,
9    intentionally sought Plaintiff's assistance and intervention to secure contracts from
10   the Subject Project for four reasons detailed in paragraph I of the Schedule
11   attached hereto (the "Incorporated Schedule").  Chief among these reasons, John
12   and Bill Harbert wished to secure political cover by using Plaintiff's contacts with
13   former Presidents Ford, Carter and Reagan, Dr. Kissinger and Messrs. Kaiser and
14   Rockefeller as a necessary protection for their conspiracy to bid-rig the USAID
15   contracts.  In addition, Plaintiff convinced the Egyptian Prime Minister, her
16   uncle, Dr. Atef Sedky, to remove the Harbert Contractors' names from a
17   catalogue of black-listed corporations (for a $79 million earlier action brought by
18   the Egyptian government against Defendants, which Plaintiff had resolved in favor
19   of the Harbert Contractors at the International Court in Paris, France) so they
20   could do business in Egypt on the Subject Project.

21        The United States later filed two separate actions against and suspended
22   Defendants from future bidding on government contracts.  One of these two
23   actions was an antitrust case, that was settled on February 4, 2002 under a plea
24   agreement in which Defendants pleaded guilty to one count of violation of the
25   Sherman Antitrust Act.

26        Defendants elected to bid rig approximately $40 million in illegal
27   profits, destroying Plaintiff's lucrative relations with Egyptian leaders and swiftly
28   moving to implement their Machiavellian master plan that deliberately banished

1  and quarantined Plaintiff from learning of their bid-rigging schemes to which
2  Defendants correctly anticipated Plaintiff would object. Accordingly, the Harbert
3  Contractors willfully exiled Plaintiff to their claim in Saudi Arabia before the
4  Saudi Royal Board of Grievances between 1990 and 1997 to ensure that Plaintiff
5  had no knowledge of Defendants' conspiracy to obtain a collusive, artificially
6  inflated, and non-competitive price for the Subject Contracts the Harbert
7  Contractors had obtained by using Plaintiff's contacts and illegal and inflated
8  profit thereon. As a result of this conspiracy, Defendants submitted and caused
9  to be submitted false and inflated claims for payment to the United States,
10 including the operation of non-party Sabbia Aktiengesellschaft -- Defendant Mr.
11 Harbert Sr.'s brainchild. Such operations were extracted from a Swiss banker's
12 memorandum of meetings with Mr. Harbert Sr., who described in great detail the
13 operation of masterminding the bid-rigging. During the course of Plaintiff's
14 pursuit of payment of the Saudi Claim in Saudi Arabia, Plaintiff had no
15 knowledge of Defendants' deep involvement and culpability in masterminding the
16 bid-rigging conspiracy in which the Harbert Contractors were engaged during that
17 time.

18      III.   The monetary loss to the United States and Plaintiff as a direct result
19 of Defendants' fraudulent activities pales in comparison to the political
20 hemorrhage that the Harbert Contractors have caused through their betrayal of the
21 United States. Defendants' remorseless pursuit of enriching themselves,
22 notwithstanding the interests of Plaintiff or the United States in the world's most
23 troubled region -- the Middle East, have negated the purpose for which the United
24 States Congress has authorized substantial funding to combat the Islamic
25 fundamentalists' campaign to damage the United States' image. Instead, the
26 Harbert Contractors have aided and abetted Islamic terrorists' false statements
27 against the United States, and confirmed Osama bin Laden's misguided
28 propaganda that Americans are untrustworthy.

1          Plaintiff's political contacts in the Middle East were deliberately and

2  willfully damaged by the Harbert Contractors.  In the Subject Project, Plaintiff

3  played the major role in securing the bids in the late 1980's and delaying the

4  False Claims Case for four years between 2001 and 2005 and negotiated with

5  Senator Dole a low settlement that the Department of Justice is no longer prepared

6  to entertain.  The United States will accept today either a $56 million settlement

7  or a $75 million judgment if the False Claims Case is tried to a verdict.

8          The Harbert Contractors intentionally concealed from Plaintiff the

9  facts of Defendants' activities.  Defendants knowingly interfered with Plaintiff's

10  special contacts and violated the trust vested by the most senior Egyptian and

11  Arab government officials in Plaintiff as their own private inspector on the ground

12  while the Harbert Contractors unjustly enriched themselves by stealing funds

13  intended for Egypt's development.  To this end, the bid-rigging conspiracy

14  severely tarnished the status of Plaintiff's reputation as an honest broker between

15  the United States business community and the Middle East.  As a result of the

16  actions of Billy Harbert Jr. and his cabal, however, the arrangement contemplated

17  by the September 21 Agreement fell promptly into disarray, Sharp sending a letter

18  to Plaintiff on September 27, 2004 (the "September 27 Letter") announcing that

19  Sharp was now the case manager and that Plaintiff's monthly compensation would

20  only be guaranteed through the end of 2004.  On October 5, 2004, a letter was

21  purportedly sent by Mr. Harbert Sr. to Plaintiff demoting Plaintiff to "case

22  resolution manager" and requiring all of Plaintiff's actions to be approved by

23  Sharp (the "October 5 Letter").  These sentiments were reiterated in a subsequent

24  letter, dated October 21, 2004, purportedly sent by Mr. Harbert Sr. to Plaintiff

25  (the "October 21 Letter").

26          Thereafter, on November 11, 2004, another letter (the "November

27  11 Letter") purportedly signed by Mr. Harbert Sr., addressed to seven of Mr.

28  Harbert Sr.'s lawyers and acknowledged by Hoover on that date, reiterated the

1  statements made in the October 21 Letter and concluded, "Again, pure and
2  simple, Bill Sharp is the case manager."

3      That same day, however, Mr. Harbert Sr. repudiated the October 5
4  Letter, the October 21 Letter, and the November 11 Letter.  In statements
5  notarized by Carla D. Faile, a notary public in Jefferson County, Alabama, Mr.
6  Harbert Sr. wrote on the October 5 Letter "I DID <u>NOT</u> WRITE THIS LETTER
7  OR AUTHORIZE ANYONE TO SIGN IT", and on the October 21 letter, on the
8  first page, "I DID NOT WRITE THIS LETTER NOT [SIC] AUTHORIZE
9  ANYONE TO SIGN IT ON MY BEHAVE [SIC]" and, on the second page, "I
10  DID NOT WRITE THIS LETTER NOR AUTHORIZE ANYONE TO SIGN IT
11  ON MY BEHALF -- <u>FORGERY</u>."  Finally, on the first page of the November
12  11 Letter, Mr. Harbert Sr. wrote, "TO THE LEGAL TEAM [:] KINDLY
13  DISREGARD THIS LETTER.  I HAVE NO INTENTION OF TERMINATING
14  HODA ELEMARY OR ANY MEMBER OF THE LEGAL TEAM," which
15  writing was acknowledged on November 13, 2004 by Marsha H. Fifer, a notary
16  public.

17      Moreover, also on November 11, 2004, Mr. Harbert Sr. sent Plaintiff
18  a letter specifically disavowing Sharp's statements concerning Plaintiff's
19  contractual arrangements in the September 27 Letter and reconfirming the
20  September 21 Agreement; sent separate letters to each of Keith Morgan, William
21  D. Dillon and Carolyn G. Mark at the DOJ, confirming Plaintiff's status as
22  "exclusive case manager"; on each of the four pages of the September 21
23  Agreement, wrote "Confirmed on 11/11/04 Bill Harbert," which signature was
24  acknowledged on each page by Ms. Faile; and sent a letter addressed to Plaintiff
25  and four other parties referencing the "recent confusion and uncertainty regarding
26  the management and direction of my legal team" and stating that if he "remove[s]"
27  Plaintiff, he will be liable in damages to the amount of one million dollars
28  ($1,000,000) (the "Guarantee").

1    On February 14, 2005, Mr. Harbert Sr., acting under pressure by
2  Billy Harbert Jr., wrote to Plaintiff stating that he was terminating the September
3  21 Agreement effective April 5, 2005.

4    On March 18, 2005, Ms. Mark submitted an offer, in writing, to
5  Plaintiff, by which Mr. Harbert Sr. could settle the False Claims Case for
6  $15,000,000.  This offer was accepted by Mr. Harbert Sr. but rejected by Billy
7  Harbert Jr.

8    IV.    During a heated argument between Mr. Harbert Sr. and Billy Harbert
9  Jr., Plaintiff became compromised, both morally and physically, when she was
10  a firsthand witness to an exchange of accusations between Mr. Harbert Sr. and
11  Billy Harbert Jr., who admitted during the argument their personal involvement
12  in defrauding the United States of $40 million, the accrued benefits of their bid-
13  rigging.  Billy Harbert Jr. then accused his father of stealing $7 million from his
14  uncle, the late John Harbert, demanding immediate repayment from his father to
15  his late uncle's estate.

16    Between 1991 and 1998, during the course of her pursuit of payment
17  of the Harbert claim in Saudi Arabia, Plaintiff had no knowledge of Defendants'
18  deep involvement in and culpability with respect to the bid-rigging conspiracy in
19  which the Harbert Contractors were engaged during that time.  It was not until
20  2004 and 2005 that Plaintiff became aware of the extent of Defendants'
21  culpability.

22    V.    Plaintiff's career was destroyed as a consequence of her vouching for
23  the Harbert Contractors to enable them to participate in the Subject Project, as a
24  result of which Plaintiff lost credibility both with the United States government
25  and Middle East officials.  In addition, (a) Billy Harbert Jr. derailed Plaintiff's
26  imminent arrival at a mutually satisfactory settlement to renegotiate the terms of
27  the $54 million plea bargain with Assistant United States Attorney William Dillon
28  when such Defendant conspired to misrepresent facts to him during a telephone

1  call with Mr. Dillion to thwart Plaintiff's efforts; (b) Sabbia was created at Mr.

2  Harbert Sr.'s inspiration to engage in a bogus sale-leaseback transaction in order

3  to reduce the apparent profitability of the Subject Project as well as provide a

4  slush fund for the other participants in the bid-rigging scheme; (c) Defendants

5  Billy Harbert Jr. and Hall falsely claimed on HILLC's website that their company

6  HILLC (rather than Mr. Harbert Sr.'s corporate entity Harbert International

7  Establishment, Inc.) was responsible for upgrading the sewer system in Cairo,

8  Egypt, so that Plaintiff's existing clients, including, but not limited to, Bechtel,

9  suspected Plaintiff of embellishing her credentials when she stated that she assisted

10 Mr. Harbert Sr. to secure the contracts in developing the Subject Project; and (d)

11 the Harbert Contractors' counsel, Sharp, admitted in a memorandum that pre-

12 settlement indictments for bid-rigging, tax fraud, money laundering, violation of

13 the Racketeer Influenced and Corrupt Organizations Act, wire fraud and related

14 crimes would likely be pursued by the DOJ against Mr. Harbert Sr. and other

15 individuals and entities if the False Claims Case went to trial.

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES**

# EXHIBIT 5
# Part 2

# LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST

### ARTICLE ONE

Bill L. Harbert, called The Settlor and Trustee, declares that he has set aside the property described in Schedule A, attached to this instrument. All property and Securities subject to this instrument from time to time are respectively referenced as the "Property Estate" and "Stock Estate". THE TRUST ESTATE is inclusive of the property and stocks held together in the trust created in this instrument and shall be managed and distributed according to the terms of the Personal Arrangement Contract "Personal Arrangement".

### ARTICLE TWO

This instrument (in addition to creating a trust) sets the contract's terms and documents a five year old Secret agreement of a personal financial arrangement made by and between Bill L. Harbert (Harbert) and Dr. Hoda Elemary (Elemary) on November 3, 2003.

### ARTICLE THREE
### RECITALS

The parties' mutual benefits for conveying properties and stocks are:

I. On or about November 1998, the parties entered into a secret personal agreement that was further defined in 2002, whereby at Harbert's request, Elemary committed to Harbert to assist him with his personal affairs including his litigation troubles and to provide him-on a more permanent basis-with companionship, love, friendship and comfort as she had from time to time since 1991. Accordingly, Harbert's reasons for purchasing Elemary a house in Laguna Niguel, CA are: a).The personal aspect of their relationship b).An approximately $50 million Harbert earned in profit from Elemary's contacts with international senior Governments officials-who awarded Harbert lucrative oil pipelines and Mega Mid-East development contracts and c). "The great career risks" Elemary had assumed by enlisting her friends in Washington to shield Harbert from prosecution by the Department of Justice (DOJ) for 3 years.

II. On February 4, 2002 Harbert pled guilty on behalf of his corporation's, Bilhar, violation of one count of the Sherman Antitrust Act for bid rigging. Harbert paid the United States a $54 million fine. Harbert therefore eagerly sought Elemary's intervention on his behalf. Elemary was advised By Senator Orrin Hatch that "representing anyone associated with bid rigging to the DOJ, White House or Congress is tantamount to taking great career risks". Elemary cautiously agreed to Harbert's request on strict conditions. Harbert officially named Elemary as exclusive case manager to benefit from her high powered political contacts, which included personally advising five Consecutive U.S. Presidents on Mid-East terrorism. In July 2002 Elemary retained her personal friend, former Senate Majority Leader, BOB DOLE, to assist her in dealing with the DOJ.

III. With the exception of Elemary's deposit into escrow, the parties initiated discussions on August 16-18, and agreed on October 22, 2003 that the Laguna Niguel beach house would be paid in full by Harbert including real estate taxes at purchase time.

*Bill Harbert*                    *Hoda El*

## ARTICLE FOUR
### (Personal Arrangement)

NOW, THEREFORE, in consideration of this personal arrangement as well as the business agreements and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties covenant and agree as follows:

1- Any potential lawsuit arising out of this Personal Arrangement Contract or business guarantees and agreements, as well as potential counter claims shall be governed and construed according to the laws of the state of California. Any lawsuit to enforce the terms of this Personal Arrangement and business agreements shall be commenced, and litigated (for personal disputes) in the Family Court – Superior Court in Los Angeles, California, and (for business disputes) in U.S. District Court, Central Division in Los Angeles, CA, in the County of Los Angeles. Any and all potential lawsuits, as well as compulsory counter claims will be without exception, litigated in California as though all the parties and witnesses to such lawsuits were California citizens and that the subject matter of the dispute upon which these lawsuits are based occurred in their entirety in the State of California, County of Los Angeles. In the event that either party to this contract-or their co-defendants or co-plaintiffs-file a motion to change this understanding on venue and jurisdiction (for any potential lawsuit) the violating party will unconditionally and unequivocally assume liability to pay the other party liquidated damages of three million dollars. Cleary, it is difficult to asses such damages. Nevertheless the parties have determined that the liquidated damages are at least $3 millon. The parties confirm their agreement herein that the violating party will pay $3 million to the other party. In the event that Harbert breaches any of the Business Agreements or Personal contract, Elemary will exclusively decide whether to pursue an expedited trial schedule, which include binding arbitration by a retired judge and/or a twenty five weeks expedited trial, whose cost will be born equally by Harbert and Elemary. Harbert's breach of this agreement for an expedited trial schedule will result in a one week demand for payment of $3 million. Otherwise, Harbert agrees to Elemary to demand double that amount from his LLC or bank accounts in Alabama and Switzerland.

2- Harbert unequivocally and unconditionally guarantees Elemary to overcome his current problems with cash flow that resulted in Harbert taking out a mortgage on the subject property. As a direct and proximate result of the drastic impact on Elemary on account of Harbert's cash flow problems, Harbert committed himself to the following:

A. To provide Elemary with a monthly payment to cover the mortgage payment and real estate taxes.

B. To divide in equal parts of fifty percent (50%) each with Elemary any and all profits arising out of his securities and stocks holdings beyond and above, i- accrued interest, ii- a seven percent (7%) annual increase of stock holdings for a two year period between the date of the execution of this document and Nov. 3rd 2005.

3- Harbert is hereby committed to compensate Elemary for his delay in paying fully for the beach house and agrees that at the earliest possible date, but no later than March 31st, 2005, Harbert will pay back the mortgage in full on the Beach House in compliance with his unwavering guarantee to fully pay for the beach house to satisfy his

2

part of the bargain in exchange for his acknowledgement of the receipt of 12 years of companionship and personal services and 25 years of business service.

4. Harbert confirms his unconditional commitment to fulfill written guarantees stipulated herein to provide the promised minimum security for Elemary irrespective of any third party interference (including by son Billy Harbert) or change of circumstances.

## ARTICLE FIVE

In the event the parties, convey the subject property through their <u>own names</u>, such transactions shall be legally titled as referenced below in article nine. The use of this legal title is necessary to insure this Personal Arrangement or (TRUST ESTATE) is consistent with other guarantees and agreements executed by the parties that refer to THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST as the instrument for transmuting real estate property. However, this Personal Arrangement Contract is legally <u>not</u> revocable despite the word revocable in the title. Each party hereby represents, warrants, and agrees to the other as follows:

A. Each party has received independent legal advice from his or her attorney with respect to the advisability of entering into this Personal Arrangement Contract and TRUST ESTATE.

B. Each party carefully read this Personal Arrangement Contract/ Trust created by this instrument and understands contents and legal effects of each provision hereof.

## ARTICLE SIX

Harbert is referenced in this document as the current Settlor and Trustee, Harbert will resign on November 3, 2003. Elemary will become the Settlor and Trustee two weeks after Harbert's execution of this document.

## ARTICLE SEVEN

The Settlor may not revoke the Personal Arrangement (Contract). However, Schedule B, attached, describes the necessary measures to be implemented when the parties elect to utilize the trust created in this instrument, to convey property & stocks.

## ARTICLE EIGHT

The Settlor appoints for life in the office of Settlor & Trustee, the person listed herein who shall effective the date of execution of this document, serve as the Settlor/Trustee first: Dr. Hoda Elemary. Elemary shall have power to designate one or more individuals or corporate fiduciaries to serve concurrently or serially to succeed the trustee in the event of her inability or unwillingness to act. The Trustee may revoke this instrument in whole or in part at any time. The Trustee may at any time amend any terms of this trust. Upon the trustee's death, the entire undistributed principal and income of the trust estate shall go to Elemary's designee. The Trustee shall have the full power to sell, encumber, convey, exchange, invest, reinvest, partition, divide, improve, sever and repair the property or stocks constituting the Trust Estate from time to time. The Settlor/Trustee shall have all powers conferred on the Settlor &Trustee by law and all powers contained in California Probate Code sections 16200-16249. If any provision of this instrument is unenforceable, the remaining provisions shall remain in full effect.

3

## ARTICLE NINE

The trust created in this instrument may be referred to as THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST.

Executed on November 3, 2003.

*Bill L. Harbert*

_____
BILL L. HARBERT, Trustee

I certify that I have read the foregoing declaration of trust and that it correctly states the terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustee. I approve the declaration of trust in all particulars and request that the trustee execute it.

Date: November 3, 2003            *Bill L. Harbert*

_____
BILL L. HARBERT, Settlor

City of Washington

DISTRICT OF COLUMBIA            }
                               }
UNITED STATES OF AMERICA       }

On November 3rd, 2003, before me, ~~GUILLAUME TOURNIAIRE GCT~~ ~~BILL L. HARBERT~~ personally appeared BILL L. HARBERT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity on behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.                    SEAL

[Signature]

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

4

# SCHEDULE A

**Fifty-percent (50%) undivided interest in single family residence located at 21 LE CONTE, LAGUNA NIGUEL, CALIFORNIA 92677, and more particularly described as follows:**

LOT 16 OF TRACT NO. 8551, IN THE CITY OF LAGUNA NIGUEL, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A SUBDIVISION MAP, RECORDED FEBRUARY 29, 1984, IN BOOK 522, PAGES 1 TO 17, INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 658-251-07

# SCHEDULE B

1. In order to add property to this Trust, the Parties shall sign a separate document, other than this Trust, confirming the description of those properties and/or stocks to be added to this Trust, in addition to the Property described in Schedule A, attached hereto.

2. Each of the Parties hereto agrees to execute such other and further documents as are necessary and appropriate to accomplish the transfer of said additional properties and/or stocks into this Trust, i.e., assignments, deeds, etc.

Executed on November 3 , 2003.

_____
DR. HODA ELEMARY, Successor Trustee

    I certify that I have read the foregoing declaration of trust and that it correctly states the terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustee. I approve the declaration of trust in all particulars and request that the trustee execute it.

Date:  November 3 , 2003

_____
DR. HODA ELEMARY, Successor Settlor

7

# AGREEMENT

This agreement is made on September 21, 2004 by and between Bill L. Harbert and Dr. Hoda Elemary. The purpose of this agreement is to confirm the parties' relevant prior agreements on key issues and to establish a forum to transact their business and communicate more efficiently and thus be able to spend more time on resolving Mr. Bill L. Harbert's complex legal matters. The parties agree as follows:

1. Dr. Elemary had been acknowledged as the case manager and has primary responsibility over retention, oversight and management of the legal team (the "Legal Team") as well as arranging for meetings, conference calls and inviting the appropriate members of the Legal Team, the Harbert staff and U.S. Government officials that is necessary to provide the optimum results in these meetings. Dr. Elemary is also responsible for working with, influencing and negotiating a settlement with the U.S. Government on the behalf of Bill L. Harbert and to report from time to time to Bill Harbert, with respect to the current civil proceedings between Bill L. Harbert and the U.S. Government (the "Qui Tam Matter") as well as the status of the criminal fine as such Dr. Elemary retained the services of Senator Bob Dole and the leading anti-trust and qui tam lawyers in the United States to assist Mr. Harbert.

2. With respect to the criminal fine, Dr. Elemary is currently working with Mr. Harbert on the unpaid balance of said fine in the sum of approximately $22 million on the basis of "The Declaration of Bill L. Harbert Regarding Plea Agreement" dated July 17, 2003, a copy of which is attached hereto as exhibit "A" and made a part hereof (the "Declaration"). (In the Declaration, Bill L. Harbert acknowledges that he was coerced into signing a guarantee to pay any unpaid portion of the Criminal Fine due by defendant Bilhar.

3. Previous agreements executed by the parties detail that Mr. Harbert fully understood based on earlier financial concessions and payments that he made to Dr. Elemary, the Herculean task that would be required of Dr. Elemary to influence the U.S. Government to amend it's prior agreement and accept the circumstances that compelled Mr. Harbert to sign said personal guarantee, which due to Bilhar's lack of funds at this time, would require Mr. Harbert to personally pay an amount equivalent to $22 million on the Criminal Fine, in addition to the government's requested minimum amount for a settlement of $34 million in the Qui Tam Matter, for a grand total payment to the government of $56 million.

4. Mr. Harbert fully understands that if he elects to proceed to trial on the Qui Tam Matter, he could be compelled to pay over $100 million should treble damages be assessed. Mr. Harbert further acknowledges that he was not made aware when he signed the personal guarantee of the future impact of the Qui Tam Matter on his personal estate. After employing Dr. Elemary

*[handwritten]* 地紀
9/21/04

*[handwritten]* City of Washington
District of Columbia

*[handwritten]* On this 21st day of September, 2004
BILL L. HARBERT personally appeared before me
and acknowledged that he executed the foregoing document

*[signature]*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*[handwritten signature]* Bill Harbert
9/21/04

*[handwritten]* Carla D Faile
November 11, 2004

*[handwritten]* Confirmed
on 11/11/04
*[signature]* Bill Harbert

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2006

for two years, Mr. Bill L. Harbert engaged attorney Mr. William Sharp to evaluate the work in progress achieved by Dr. Elemary to date. Mr. Sharp traveled to California to conduct this assessment, and together with Mr. Harbert, concluded that Dr. Elemary's work and case management skills were and are extremely satisfactory and promising. Mr. Harbert, in consultation with Mr. Sharp, has agreed to reconfirm Mr. Harbert's original agreement with Dr. Elemary to allow her to bring the Qui Tam Matter and Criminal Fine matter to a satisfactory conclusion.

5. Mr. Harbert understands that it may take several months or longer to reach a satisfactory settlement with the U.S. Government. Previous agreements between Mr. Harbert and Dr. Elemary do not provide for a termination date since the parties had agreed that any such termination date would occur only upon obtaining a satisfactory resolution of the above referenced two matters. It is evident that based on earlier agreements signed by Mr. Bill L. Harbert that Dr. Elemary had every reason to depend on Mr. Harbert's written guarantee and has involved her high level government contacts to achieve satisfactory progress to date. In addition, Dr. Elemary has now consented to be directed by Mr. Harbert. Only in the event that the two above referenced matters are not resolved within the next few months, Mr. Harbert will ask Mr. Sharp to review Dr. Elemary's progress one year from the date of this agreement.

6. With respect to the termination date of this agreement, Mr. Harbert will determine the termination date of this Agreement only by entering into a settlement with the U.S. Government with respect to the above-referenced two matters based on his consent to pay the Government an amount, if any, with which he is comfortable. Until such termination of this Agreement, Mr. Harbert unconditionally and unequivocally hereby agrees and commits to pay Dr. Hoda Elemary the sum of Thirty Thousand Dollars ($30,000.00) per month, commencing either on October 1, 2004 or a mutually agreed upon date in October 2004 and continuing each month thereafter until such a time as Mr. Harbert settles the above two referenced matters with the Government.

7. Due to the fact that Dr. Elemary is often called upon to undertake a project or to travel internationally within a 24 hour notice as a result of the involvement of Senator Bob Dole and other dignitaries who assist Dr. Elemary in seeking a settlement of the two above referenced matters, Mr. Harbert personally guarantees Dr. Elemary that said monthly payments will be paid within 24 hours following presentations of a monthly invoice by Dr. Elemary to Mr. Harbert.

8. Mr. Sharp has concluded, and Bill L. Harbert agrees, that Bill L. Harbert's quitclaim deed of Mr. Harbert's interest in the single family residence located at 21 Le Conte, Laguna Niguel, California to Dr. Elemary was valid, legal and proper, and without undue influence or



*H.E.* 
9/21/04

Confirmed on 11/11/04
*H.R. Harbert*

2of4

*Mox Harbert*
9/21/04

City of Washington
District of Columbia

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007
*Carla D. Faile*
November 11, 2004

On this 21st day of September, 2004
BILL L. HARBERT personally appeared before me
and acknowledged that he executed the foregoing document

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

coercion, and was Mr. Harbert's intention. Mr. Harbert therefore understands that he cannot convey his interest in said property to any other person or entity, including Mr. Harbert's son, Billy Harbert. William Sharp has reviewed the arrangement between Mr. Harbert and Dr. Elemary regarding said Le Conte property, and finds that arrangement in order.

9.  Effective September 1, 2004, William Sharp is a member of the Legal Team, with responsibilities of working with Dr. Elemary to achieve the goals of Bill L. Harbert with respect to the above-referenced cases.

*ANNE MOULTON*

10. Subject to conferring with Dr. Elemary, William Sharp has the sole authority to communicate with Anne Maltin, Elizabeth Cornay, Billy Harbert, as well as Alan Hall and Jim Rein, regarding the above-referenced cases.

11. Based on discussions among the parties, Anne Maltin, Elizabeth Cornay, Bill Harbert, Alan Hall and Jim Rein will communicate exclusively with William Sharp regarding the above-referenced cases.

12. For the sake of Bill L. Harbert's peace of mind, no communications regarding the above-referenced cases will be made to Bill L. Harbert, except through either William Sharp or Dr. Elemary.

13. While considerable progress has been made to date in connection to the above-referenced cases, substantial government resistance is anticipated and/or setbacks may arise. Dr. Elemary, Mr. Sharp and the legal team will use their best efforts to overcome such resistance and/or setbacks and achieve the best possible results.

14. It is understood that every effort will be made by Dr. Elemary to continue to keep the legal fees of the legal team as they are at present.

15. Payments to Dr. Hoda Elemary stipulated herein, are based on the assumption that Bill L. Harbert will take his time before he settles these cases, consistent with his concept of fairness. However, the government may very well wish, in short order, to re-negotiate the terms of it's earlier plea agreement with Mr. Harbert on the basis that Bilhar has not made the September 1, 2004 payment. Indeed, the government may consider entering into a different agreement that will not require Mr. Harbert to put out large sums of money (to settle the above referenced two matters) but rather the government may seek the assistance of the Harbert Group. In such a case, a different financial arrangement mutually acceptable by both parties to this agreement may be necessary to negotiate in the future

*HE   Confirmed*
*9/21/04        on 11/11/04*
*Bill Harbert*          3 of 4          *Bill Harbert*
*9/21/04*

*City of Washington*
*District of Columbia*

*On this 21st day of September, 2004*
*Bill E. Harbert personally appeared before me*
*and acknowledged that he executed the foregoing document.*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007
*Carla D Faile*
*November 11, 2004*

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

16. It is hereby acknowledged that the sacrifices made by Dr. Elemary and Mr. Harbert to overturn the government's current official demand of $56 million are substantial and immensely impactful on the lives of the parties. It is evident that the progress being achieved by Dr. Elemary today will not only effect Bill L. Harbert but his entire estate. To this end, Dr. Elemary is therefore unconditionally guaranteed to receive five percent (5%) - in addition to her monthly fee - of any funds she saves Mr. Harbert from ultimately paying the government in a settlement. In other words, in the event Dr. Elemary reduces Mr. Harbert's current payment plan of $22 million on the criminal fine and $34 million of the requested minimum settlement amount by the DOJ on the qui tam case, Mr. Harbert will pay Dr. Elemary five percent of any amount of reduction from either the $22 million or the $34 million amounts. If Dr. Elemary does not save Mr. Harbert any funds, Mr. Harbert is not obligated to pay Dr. Elemary the five percent.

17. William Sharp has reviewed the August 27, 2004 letter from Bill L. Harbert to Dr. Elemary, and has reported to Mr. Harbert his conclusion that he is satisfied with the progress in the above-referenced cases achieved by Dr. Elemary and the Legal Team, and has addressed Bill L. Harbert's estate and succession plans as set forth in that letter.


Dated: September 24, 2004          _____
                                   Bill L. Harbert

Dated: September 21, 2004          _____
                                   Dr. Hoda Elemary

*I confirmed this master contract agreement on 11/11/04*

*Bill Harbert*


CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D Faile*
*November 11, 2004*


4 of 4


*City of Washington*
*District of Columbia*
*On this 21st day of September, 2004*
*Bill L. Harbert personally appeared before me*
*and acknowledged that he executed the foregoing document.*

Guillaume Tourniaire
Notary Public, District of Colum
My Commission Expires 01-01-2



U.S. Department of Justice

Civil Division
Commercial Litigation Branch

CGMark
06-16-3472

Tel. (202) 307-0256

801 D Street, NW, Room 8820
Washington, D.C. 20004

March 18, 2005

<u>BY FAX – (949) 715-2060</u>

Dr. Hoda Elemary
P.O. Box 7952
Beverly Hills, CA 90212

Re:  U.S. ex rel. Miller v. Holzmann A.G., et al.
1:95CV01231 (D.C.D.C., filed Jun 30, 1995)

Dear Dr. Elemary:

I am writing in response to your letter of today concerning the telephone conversation on March 17th among you, Howard Teicher, AUSA Keith Morgan, and myself concerning settlement of the above-referenced matter with Bill L. Harbert Sr. Based upon our various discussions and Mr. Harbert's letter of November 11, 2004, we understand that you represent Mr. Harbert in connection with the settlement of this matter.

AUSA Morgan and I agreed to recommend a settlement whereby Mr. Harbert pays Fifteen Million ($15,000,000.00) within 10 days of the execution of a settlement agreement. The United States would thereupon release its claims against Mr. Harbert. As we discussed, any agreement would have to be authorized and approved by officials of the Department of Justice.

As we advised you, as a matter of policy, this office does not ever agree to any language that pertains to the tax treatment of a payment to be made by a defendant in a settlement. All our settlements are tax neutral -- neither side characterizes the payment.

The United States takes no position with regard to how Mr. Harbert liquidates his assets to pay the settlement amount. Our discussion of possible sources whereby Mr. Harbert could make the settlement payment was not intended to be all inclusive but merely to illustrate that Mr. Harbert is able to make the payment at the time of settlement and that payment over time is not necessary. We note that there is almost $2 million of Group 2 Wachovia shares described in Table F of the documents previously provided by Bill Sharp, Esq. which would be available

- 2 -

for the settlement, over and above the $20.7 million discussed during our telephone conversation.

We look forward to hearing from you.

Sincerely,

CAROLYN G. MARK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division

cc:    AUSA Keith Morgan

. The Law Offices Of

**Jerry L. Steering**
4063 Birch Street
Suite 100
Newport Beach, CA 92660
949-474-1849
(Fax) 949-474-1883

Also Admitted In Georgia

OF COUNSEL
Melvin M. Belli
(1907-1996)
Andrew M. Stein
Kevin R. McLean
Alexander J. Perez
Duncan Campbell Webb

VIA FED EX
July 28, 2004

Bill L. Harbert
820 Shades Creek Parkway, Suite 3000
Birmingham, AL 35209
Washington, D.C. 20036

Re:    Discontinuation of fine payments for *United States of America v. Bill Harbert International Construction, Inc.; Bilhar International Establishment; f/k/a Harbert International Establishment and Elmore Roy Anderson*; United States District Court for the Northern District of Alabama; Case Number CR-01-PT-302-S.

Dear Bill:

For the past year and one half we have been working to attempt to relieve you of the great burden of paying the government their $54,000,000.00 fine, that was forced upon you in early 2002. Since March of 2002 you have actually paid the government approximately $31,000,000.00. As you have repeatedly informed me, you have decided not make the September 1, 2004 fine payment for Bilhar, which is now without sufficient monies to make that payment. No one can scientifically calculate what will happen in either the false claims act / *qui tam* action or in the Declaratory Judgment action, or even the government's reaction to Bilhar's discontinuance of its monthly fine payments. However, as you were not a party to the criminal case against Bilhar, the district court is more limited in what it can do to you personally than to Bilhar, upon a default in Bilhar's monthly fine payments.

As I have discussed with you many times, I have raised the issue of your having to personally pay for Bilhar's criminal fine with all of your lawyers.

Most people look at "the law" as some sort of set of rules that can be relied upon to predict a particular legal result when the facts of a particular case are applied to the established rules. In many cases, the facts of a given case are typical enough and have been dealt with by the courts long enough, for lawyers to be comfortable in predicting what the ultimate end result of a particular case will be. However, in the case of the

Bill L. Harbert
July 27, 2004
Page 2

criminal fine against Bilhar and your "personal guarantee" of the same, at least some of "the rules" have yet to be made, and probably will be made in your cases.

## FINE ACCELERATION:

### Fine Acceleration As To Bilhar:

Under 18 U.S.C. § 3572(h) a criminal fine is deemed "delinquent" if it is more than 30 days late. 18 U.S.C. § 3612(g) provides for a 10% penalty for the principal amount that is delinquent.

Under 18 U.S.C. § 3572(i), a criminal fine is deemed to be in default "if a payment is delinquent for more than 90 days". 18 U.S.C. § 3612(g) provides for a 15% penalty for the principal amount in default. Accordingly, there is at least a 90 day "grace" period before the fine payments are deemed to be in "default".

In addition, 18 U.S.C. § 3572(i) also provides that: "Notwithstanding any installment schedule, when a fine or payment of restitution is in default, the entire amount of the fine or restitution is due within 30 days after notification of the default, subject to the provisions of 3613A." Accordingly, normally, fines that become in default are supposed to be automatically accelerated, with the unpaid fine balance becoming immediately due and payable. However, at the February 4, 2002 proceeding before Judge Probst in Birmingham[1], Assistant United States Attorney Bill Dillon told Judge Probst that the parties had agreed that there would be no acceleration of the $733,333.34 monthly fine payments.[2]

In addition, at the February 25, 2004 actual sentencing hearing before Judge Probst, a hearing that you did not personally attend, the issue of fine acceleration was again discussed with Bill Dillon, Bryan Lavine and Judge Probst. During that hearing[3], the court resolved the issue by making fine acceleration upon fine default a term and condition of probation[4].

However, pursuant to Bryan Lavine's (Bilhar's) motion to amend the judgment of conviction entered against Bilhar, to delete that portion of the sentence placing Bilhar on probation, on March 6, 2004 Judge Probst granted that motion. Accordingly, now, fine acceleration is not a condition of probation, because Judge Probst took Bilhar off probation.

---

[1] The proceeding involving Judge Probst accepting Bilhar's plea. Not the February 25, 2002 actual sentencing hearing.
[2] See attached pages 43-44 of the Reporter's Transcript of Oral Proceedings of February 2, 2004.
[3] A copy of the transcript of which I obtained via fax from Alan Hall.
[4] See attached pages 8-15 of the Reporter's Transcript of Oral Proceedings of February 25, 2004.

Bill L. Harbert
July 27, 2004
Page 3

That is not the end of the inquiry, however. Because the fine acceleration upon default provisions of the U.S. Code seem to be unequivocal, it may be the case that an Assistant United States Attorney cannot waive the provisions of the U.S. Code that provides for the acceleration of the unpaid balance of a criminal fine that is in default[5] Even if that is the case, however, that issue still does not, however, end the inquiry, because even if Mr. Dillon can't waive the acceleration provisions of the U.S. Code for criminal fines in default, there still may be some sort of an estoppel[6] that prevents the government from enforcing the fine default provisions of the U.S. Code. Moreover, in *Santabello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), the U.S. Supreme Court basically stated that a Plea Agreement is really a "contract" between the government and the defendant; both sides being entitled to get what they bargained for.

Accordingly, although no one can realistically predict whether in light of the above and foregoing, a default in Bilhar's fine payments can or will result in acceleration of the entire amount of the unpaid balance of the fine, with 15% interest, our position is that it should not.

Fine Acceleration As To Bill L. Harbert Personally:

Even if the criminal fine could be accelerated as Bilhar, that does not mean that the fine can be accelerated as to you. The language of "personal guarantee" signed by you only seems to guarantee monthly payments; not an accelerated fine amount. So, for example, it may turn out that a judge rules that the unpaid balance of Bilhar's criminal fine is immediately due and payable by Bilhar, but not as to you personally.

In addition, in the event that Bilhar did default on its criminal fine payments, and in the event that the fine payments were accelerated as to Bilhar, it does not appear that Judge Probst could issue any orders as to you personally, and that the government would have to sue you to enforce your guarantee of any unpaid portions of Bilhar's criminal fine. That process would most likely take a good bit of time.

Present Plan Of Action:

---

[5] The U.S. Code also requires that for any criminal fine in excess of $2,500.00 that is being paid in installments, there must be interest added to the fine. However, Bilhar's Plea Agreement is silent as to any interest on the fine, and no one has complained or otherwise raised that issue with the district court or with anyone else.

[6] In other words, notwithstanding any mandatory fine acceleration provisions of Title 18, because of Bill Dillon's agreement with your former lawyers and his statement to the district court that the fine installment will not be accelerated, the government may be precluded by its statements, "estopped", from enforcing any fine payment acceleration.

Bill L. Harbert
July 27, 2004
Page 4

As you know, on June 10, 2004, after Judge Facciola unequivocally announced that the mediation process was now officially over, Dr. Elemary's twenty minute monologue persuaded Judge Facciola to change his order into extending the mediation process in the false claims / *qui tam* action. Dr. Elemary's "iron will" was simply too much for the Judge.

As you also know, during our discussions of July 15, 16 and 27, 2004, you indicated that the monthly criminal fine payments will at least temporarily cease; at least for the 89 day grace period. That way, you can at least hopefully save a couple of million dollars while the government reacts to the non-payment. You can always keep the payments less than 90 days in default. In the meantime, the hiatus in the flow of cash from you to the government may result in the government revealing their position on these issues. Meanwhile, we will continue to pursue the Declaratory Judgment action, and pursuant to your wishes and your directions to me, I am making arrangements to become associate counsel in the *qui tam* case.

Very truly yours,

Jerry L. Steering

# BILL HARBERT

November 10, 2004

Dr. Hoda Elemary
21 LeConte
Laguna Niguel, CA 92677

Dear Hoda:

I am writing to reaffirm my guarantee of several agreements between us that were detailed in the notarized confirmation document "Master Agreement" dated September 21, 2004. You may disregard William Sharp's correspondence including his September 27, 2004 letter to you that attempted to void said confirmation.

I would like you to know that I did not sign nor authorize that my name be signed on my behalf the October 5 and October 21, 2004 letters sent to you by Mr. Sharp under the pretense that I signed and authorized these letters be sent to you.

With Kind Regards

Sincerely,

Bill L. Harbert

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

November 11, 2004

Bill L. Harbert
P.O. Box 531390
Birmingham, AL  35253
205-802-2810
Fax:  205-802-2815

October 21, 2004

<u>Confidential</u>

<u>Via Hand Delivery</u>

Dr. Hoda Elemary
World Peace Today, Inc.
2252 South Caliente Road
Palm Springs, CA 92264

*I did not write this letter, not authorize anyone to sign it on my behalf.*

*Bill Harbert*

Dear Hoda:

This letter updates and supersedes my October 5, 2004 letter to you. As you know, at the end of September I made the decision to move the case manager job for the qui tam and declaratory judgment matters over to Bill Sharp. Therefore, Bill has management authority over the qui tam and declaratory judgment matters.

In order for Bill to do his job, you are not to take any action without first clearing it with him. Furthermore, all communications to me, Van Hoover or other members of my business team or family shall be through Bill Sharp.

Once again I have directed Bill Sharp to make clear to the legal team that he is serving as case manager. I also have directed Bill to make clear to the legal team that there should be no further contact regarding the declaratory judgment proceeding with the Department of Justice, any judicial authorities or their clerks, or any other parties outside the legal team by you or anyone else without Bill's prior review and authorization. I have also asked Bill to review and authorize all legal and consulting fees. I will not be responsible for fees and costs unless Bill reviews these in advance of the services being rendered for them.

I have asked Bill Sharp to make it clear to the Department of Justice attorneys and others involved in this case that Bill has the sole authority to make settlement offers or other commitments (whether as to substantive matters, procedural matters or otherwise). I have already asked Bill to appoint and oversee my local counsel in Birmingham as well as to determine when and who shall be involved in various upcoming conference

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

Dr. Hoda Elemary
October 21, 2004
Page 2                                                                    Confidential
_____

calls, hearings and meetings regarding the declaratory judgment
proceeding.

I would still ask that you or your counsel discuss your
continuing role in the qui tam matter with Bill Sharp. Again,
you are not to take any action without first clearing it with
Bill. Thank you for your continued cooperation.

Yours very truly,

*Bill Harbert*

Bill L. Harbert

cc: Legal Team

BLH:vh

*I did not write this letter
nor authorize anyone to sign
on my behalf — Forgery*

*Bill Harbert*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D. Faile*
*November 11, 2004*

11/12/2004  02:05    9494741883                    JERRY L STEERING                    PAGE  03

NOV 12 '04  09:35AM B HARBERT INTL CONS 205 802 2815                P.2

*To THE LEGAL TEAM*

*Kindly ~~disregard~~ disregard this letter. I have no intention of terminating Hoda Elemary or any member of the legal Team.*

*Eric L Harbert*

Bill L. Harbert
P.O. Box 531390
Birmingham, AL  35253
205-802-2810
Fax:  205-802-2815

November 11, 2004

*State of Alabama*
*County of Jefferson*
*Sworn and subscribed before m[e]*
*Marsha H. Fifer, Notary Publi[c]*
*on this 13th day of Nov. 200[4]*
*Personally appeared Bill L. Ha[rbert]*
*who is known to me to be those*
*Marsha H. Fi[fer]*

**Privileged &**
**Confidential**

*My Commission Expires:*
*September 19, 2006*

**VIA FACSIMILE**

Barry Coburn, Esq. - 202-628-4177
Marshall Harris, Esq. - 202-756-3333
Bryan B. Lavine, Esq. - 404-962-6613
Sam C. Pointer, Jr., Esq. - 205-581-0799
June Ann Sauntry, Esq. - 404-962-6613
David Schertler, Esq. - 202-628-4177
Jerry L. Steering, Esq. - 949-474-1883

Ladies and Gentlemen:

I am attaching a copy of my October 21, 2004 letter to Dr. Hoda Elemary that was previously sent to you. I know that there has been some friction regarding the management of the qui tam action and the declaratory judgment action. I know that the friction has worsened since I appointed Bill Sharp as case manager on October 21, 2004.

I am writing this letter to you in order to reconfirm and more clearly define my directives as described in my October 21, 2004 letter because of some events that have occurred during the past couple of days.

I met with Jerry Steering and Dr. Hoda Elemary yesterday evening and this morning in Birmingham. Dr. Elemary claimed that she is still in charge as case manager, that Bill Sharp is not in charge, and that none of you are cooperating with Bill and all of you are still working with Hoda.

I wanted to let all of you know that I am reconfirming the mandate set forth in my October 21, 2004 letter. Pure and simple, Bill Sharp is in charge of the management of the qui tam action and the declaratory judgment cases. He is the case manager and Dr. Hoda Elemary is not the case manager. I told this today to Dr. Elemary and Mr. Steering and I told Dr. Hoda Elemary that she must report to Bill Sharp and to no one else. She must clear any action with Bill Sharp before taking any action. She has no authority to discuss my matters with you, to attend or schedule meetings, to talk to any third party about the cases, or to take any other action until Bill Sharp approves any matter in advance. I also told Dr. Elemary to follow the above mandate in my October 21, 2004 letter. Again, pure and simple, Bill Sharp is the case manager.

In particular, no one is to take any calls, directives, or other instructions from Dr. Hoda Elemary unless Bill Sharp first says that it is

Bill L. Harbert
P.O. Box 531390
Birmingham, AL 35253
205-802-2810
Fax 205-802-2815

October 5, 2004

**Confidential**

Dr. Hoda Elemary
World Peace Today, Inc.
2252 South Caliente Road
Palm Springs, CA 92264

Dear Hoda:

As you know, at the end of September I made the decision to move the case manager job for the qui tam and declaratory judgment matters over to Bill Sharp.

Bill explained to me that based on the discussion the two of you had that Bill is now serving executive case manager and that you are serving as case resolution manager. I am okay with these titles so long as Bill has management authority over the qui tam and declaratory judgment matters.

Because the declaratory judgment litigation is now headed to Birmingham, I have directed Bill to make clear to the legal team that he is serving as executive case manager. I also have directed Bill to make clear to the legal team that there should be no further contact regarding the declaratory judgment proceeding with the Department of Justice, any judicial authorities or their clerks, or any other parties outside the legal team by you or anyone else without Bill's prior authorization. In addition, and in order to avoid any confusion, I am asking Bill to appoint and oversee my local counsel in Birmingham as well as to determine when and who shall be involved in various upcoming conference calls, hearings and meetings regarding the declaratory judgment proceeding.

I would still ask that you continue your role as case resolution manager for the qui tam proceeding though anything you want to do should be reviewed first with Bill. On the declaratory judgment proceeding I would like you to take no action unless Bill asks for your involvement.

Yours very truly,

*[signature]*
Bill L. Harbert

BLH:vh

CARLA L. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*[signature]*
November 11, 2004

*[handwritten:]* I did not write this letter
we authorize
any one to sign it.    Bill L Harbert

COPY

**Main Identity**

| | |
|---|---|
| From: | "Joe Roman" <romanlaw@gte.net> |
| To: | "William M. Sharp, Sr." <wsharp@shtaxlaw.com> |
| Sent: | Thursday, October 21, 2004 4:28 PM |
| Subject: | Re: Bill L. Harbert |

Bill:

The PDF attachment of the October 21, 2004 letter is too small to read when printed. Adobe shows the document as only 2.08 x 2.89 inches. Please re-scan and email it, or simply fax the letter to me at (760) 323-2816.

Thanks.

Joe Roman

----- Original Message -----
From: "William M. Sharp, Sr." <wsharp@shtaxlaw.com>
To: <spointer@lfwlaw.com>; <Barry.Coburn@worldnet.att.net>;
<info@steeringlaw.com>; "June Ann Sauntry"
<juneann.sauntry@troutmansanders.com>; "David Schertler"
<dschertler@coburnandschertler.com>; <romanlaw@gte.net>
Cc: "Van Hoover" <vhoover@bharbert.com>
Sent: Thursday, October 21, 2004 2:57 PM
Subject: Bill L. Harbert

> Ladies and Gentlemen:
>
> As all of you are well aware, there has been some confusion lately
> regarding
> the management of Bill L. Harbert's qui tam and declaratory judgment
> proceedings.
>
> Attached to this e-mail in a PDF format is an October 21, 2004 letter from
> Bill L. Harbert which hopefully clarifies this matter once and for all.
>
> Please note that the attached letter is being delivered to Dr. Elemary,
> who
> along with Mr. Jerry Steering, will be meeting with Mr. Harbert this
> afternoon. I will be participating via conference call.

> Please feel free to call me if you have any questions or comments.
>
> Sincerely,
>
> William M. Sharp, Sr.
>
> Sharp and Harrison, P.A.

# BILL HARBERT

William M. Sharp, Esq.
SHARP AND HARRISON, P.A.
Two Urban Centre, Suite 900
4890 West Kennedy Boulevard
Tampa, Florida 33609-1850

November 11, 2004

Re: *Qui Tam and Declaratory Relief Actions*

Dear Bill:

I appreciate all of your fine work in assisting my family and me, and look forward to continuing to work with you on these personal issues.

I am writing to bring to your attention to the fact that when I accepted your help to manage the qui tam and declaratory relief cases I had forgotten that I had a confirmed agreement with Dr. Elemary under liability to me to manage these cases to their conclusions. Although I have only agreed to make payments to her for a limited period of time, her position as exclusive case manager was guaranteed by me. I therefore have no choice but to honor my agreements with Dr. Elemary (which preceded any understanding between us concerning these two matter) to limit my liability.

Although I have appreciated your work in the above matters, I simply cannot continue with the recent confusion and disruption that has arisen between you and several key members of my legal team, namely, Jerry Steering, Barry Coburn and David Schertler, as well as the confusion over the responsibilities of you and Dr. Hoda Elemary in my qui tam and declaratory judgment matters. I have therefore made the decision that Dr. Elemary is to be the sole case manager/resolutions for these matters, as stated by you in your letter of September 27, 2004.

I know you can appreciate that all decisions concerning the qui tam and declaratory judgment proceedings are mine and mine alone to make, and that the final decision as to who will be my case manager is mine and mine alone.

*[signature]*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*[notary signature]*
November 11, 2004

William M. Sharp, Esq.
SHARP AND HARRISON, P.A.
November 11, 2004
Page Two

I believe that the current arrangement will not serve my interests for the reasons stated above. We need to work together and stop all the distractions, which is why I have decided to unify the existing legal team under Dr. Elemary's leadership. You and I will continue to work together on various aspects of this case. Based on my long relationship with her and her effective work on my behalf in the past, I am comfortable with Dr. Elemary as the sole case manager.

I have asked Dr. Elemary to be available in three months so we can sit together and review the progress made to date and together with you make necessary decisions if changes are called for. It is imperative that we allow time to heal the rifts that currently exist. You must appreciate that there has been too much non-productive, costly and disruptive activity surrounding my legal team and their efforts. This must stop. I need unification, not division, if we are to prevail against the government. An effective team cannot be pulled from both ends or have conflicting leadership.

That said, I know we can rise above this difficult and awkward moment, and can continue working together on other matters.

Very truly yours,

*Bill L. Harbert*

Bill L. Harbert

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D. Faile*

*November 11, 2004*

FEB 14 '05  01:57PM B HARBERT INTL CONS 205 802 2815                    P.2

*Bill L. Harbert*
February 14, 2005                        P. O. Box 531390
Birmingham, AL 35253
205-802-2810
Fax: 205-802-2815

Dr. Hoda Elemary -- Fax No. 949-715-2060
William M. Sharp, Sr. -- Fax No. 813-286-4197
Howard Telcher -- Fax No. 202-237-8097
Barry Coburn -- Fax No. 202-628-4177

Dear Hoda, Bill, Howard, and Barry:

As members of my Executive Committee, please be advised as follows:

1 -- You are authorized to schedule and complete settlement meetings with DOJ senior officials on or before April 5, 2005 to attempt to settle the qui tam case at no more than $6 million payable over 5 years.

2 -- No more fees or expenses will be paid to qui tam lawyers/consultants (including Senator Dole) for services rendered after February 15, 2005 in view of the significant payments that have already been made to date (other than the conditional July, 2004 incentive fee arrangement).

3 -- I direct the Executive Committee to complete the settlement efforts as stated in (1) above and then report to me in writing as to the outcome of these efforts. If necessary, we will then convene a conference call to discuss the results of such DOJ meetings.

4 -- Assuming no settlement is reached by April 5, 2005, I have authorized Bryan Lavine to handle the qui tam proceeding.

5 -- I have authorized Judge Sam Pointer and his law firm to serve as local counsel in Birmingham for the declaratory action.

I thank all of you in carrying out these directives. If you have any questions or comments please submit them to me in writing.

Sincerely,

Bill L. Harbert

BLH:vh

Sworn to and subscribed before me this 14th day of February, 2005

Notary Public    8-8-08

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

*Received 5-6-07*

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
JERRY L. STEERING; BILL L. HARBERT, SR.; BILLY HARBERT,
JR.; and DOES 1 through 25, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
DR. HODA ELEMARY

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 27 2007

John A. Clarke, Executive Officer/Clerk

BY_____, Deputy

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.   There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.   If you cannot pay the filing fee, ask the court clerk for a fee waiver form.   If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es)*<br>Los Angeles County Superior Court<br>111 North Hill Street<br>Los Angeles, California  90048 | CASE NUMBER:<br>*(Número del Caso):*   **BC370218** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brian J. Jacobs (State Bar No. 107788)
467 South Arnaz Drive, Suite 319A, Los Angeles, California  90048                    (310) 770-6874

DATE:                                        **JOHN A. CLARKE**         Clerk, by _____, Deputy
*(Fecha)* APRIL 27 2007                       *(Secretario)*  EUGENA LOPEZ   *(Adjunto)*

For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc. | www.USCourtForms.com

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Brian J. Jacobs (State Bar No. 107788)<br>467 South Arnaz Drive<br>Suite 319A<br>Los Angeles, California 90048<br>TELEPHONE NO.: (310) 770-6874       FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*:  plaintiff Dr. Hoda Elemary | FOR COURT USE ONLY<br><br>CONFORMED COPY<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>APR 27 2007<br><br>John A. Clarke, Executive Officer/Clerk<br><br>By_____, Deputy |
|---|---|

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF  LOS ANGELES |
|---|
| STREET ADDRESS: 111 North Hill Street |
| MAILING ADDRESS: 111 North Hill Street |
| CITY AND ZIP CODE: Los Angeles, California 90048 |
| BRANCH NAME: Central District |

| PLAINTIFF/PETITIONER:  DR. HODA ELEMARY | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:  JERRY L. STEERING et al. | JUDICIAL OFFICER:  BC370218 |
| **NOTICE OF RELATED CASE** | DEPT.: |

**The following case or cases are related to the above-captioned case:**

1. a. Title:  Dr. Hoda Elemary v. Billy Harbert, Jr. et al.
   b. Court: [ ] same as above  [✓] other *(name and address)*:
      United States District Court for the Central District of California, 312 S. Spring St., L.A., CA 90012
   c. Case number:  CV06-4723 RGK (PJWx)
   d. Filing date:  July 28, 2006
   e. Relationship to this case:
      Five causes of action are the same.  This case was transferred to Alabama and dismissed by the plaintiff.
   f. If the related case is pending in the same court as this case, explain why the assignment of the cases to a
      single judge is likely to result in efficiencies:

      [ ]   Additional explanation is attached in Attachment 1.

2. a. Title:  Dr. Hoda Elemary v. Bill L. Harbert, Sr. et al.
   b. Court: [ ] same as above  [✓] other *(name and address)*:
      United States District Court for the Central District of California, 312 S. Spring St., L.A., CA 90012
   c. Case number:  SACV 07-0217 RGK (PJWx)
   d. Filing date:  February 20, 2007
   e. Relationship to this case:
      Asserts different causes of action arising out of Defendants' actions in the case described in Item #1.
   f. If the related case is pending in the same court as this case, explain why the assignment of the cases to a
      single judge is likely to result in efficiencies:

      [ ]   Additional explanation is attached in Attachment 2.

3. [ ]   Additional related cases are described in Attachment 3.

Date:  April 6, 2007

_____        ▶ _____
Brian J. Jacobs
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)              (SIGNATURE OF PARTY OR ATTORNEY)

Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. January 1, 2007]                **NOTICE OF RELATED CASE**                Page 1 of 2<br>Cal. Rules of Court, rule 3.300<br>www.courtinfo.ca.gov<br>American LegalNet, Inc.

CM-015

| PLAINTIFF: DR. HODA ELEMARY | CASE NUMBER: |
|---|---|
| DEFENDANT: JERRY L. STEERING et al. | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service.)*

1.  I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2.  I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with postage fully prepaid and *(check one):*

    a. ☐ deposited the sealed envelope with the United States Postal Service.

    b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3.  The *Notice of Related Case* was mailed:

    a. on *(date):*

    b. from *(city and state):*

4.  The envelope was addressed and mailed as follows:

    a. Name of person served:                              c. Name of person served:

       Street address:                                        Street address:
       City:                                                  City:
       State and zip code:                                    State and zip code:

    b. Name of person served:                              d. Name of person served:

       Street address:                                        Street address:
       City:                                                  City:
       State and zip code:                                    State and zip code:

☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____        ▶        _____
(TYPE OR PRINT NAME OF DECLARANT)                          (SIGNATURE OF DECLARANT)

CM-015

| | CASE NUMBER: |
|---|---|
| ∟AINTIFF:  DR. HODA ELEMARY | |
| ⊃EFENDANT:  JERRY L. STEERING et al. | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

**NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service.)**

I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with postage fully prepaid and *(check one):*

a. ☐  deposited the sealed envelope with the United States Postal Service.

b. ☐  placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

The *Notice of Related Case* was mailed:

a.  on *(date):*

b.  from *(city and state):*

The envelope was addressed and mailed as follows:

a.  Name of person served:                                 c.  Name of person served:

   Street address:                                             Street address:
   City:                                                       City:
   State and zip code:                                         State and zip code:

b.  Name of person served:                                 d.  Name of person served:

   Street address:                                             Street address:
   City:                                                       City:
   State and zip code:                                         State and zip code:

☐  Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____          _____
(TYPE OR PRINT NAME OF DECLARANT)                    (SIGNATURE OF DECLARANT)

| SHORT TITLE: | CASE NUMBER | BC 370218 |
|---|---|---|
| Dr. Hoda Elemary v. Jerry L. Steering et al. | | |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

is form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

1. Check the types of hearing and fill in the estimated length of hearing expected for this case:

RY TRIAL? ☑ YES   CLASS ACTION? ☐YES   LIMITED CASE? ☐YES   TIME ESTIMATED FOR TRIAL 5 _____ ☐ HOURS/ ☑ DAYS

II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

p 1: After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

p 2: Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

p 3: In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

> **Applicable Reasons for Choosing Courthouse Location (see Column C below)**
>
> 1. Class Actions must be filed in the County Courthouse, Central District.
> 2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
> 3. Location where cause of action arose.
> 4. Location where bodily injury, death or damage occurred.
> 5. Location where performance required or defendant resides.
> 6. Location of property or permanently garaged vehicle.
> 7. Location where petitioner resides.
> 8. Location wherein defendant/respondent functions wholly.
> 9. Location where one or more of the parties reside.
> 10. Location of Labor Commissioner Office.

ep 4: Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| A<br>Civil Case Cover Sheet<br>Category No. | Type of Action<br>(Check only one) | B | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| Auto (22) | ☐ A7100 | Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| Uninsured Motorist (46) | ☐ A7110 | Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Asbestos (04) | ☐ A6070 | Asbestos Property Damage | 2. |
| | ☐ A7221 | Asbestos - Personal Injury/Wrongful Death | 2. |
| Product Liability (24) | ☐ A7260 | Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| Medical Malpractice (45) | ☐ A7210 | Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | ☐ A7240 | Other Professional Health Care Malpractice | 1., 2., 4. |
| Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250 | Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | ☐ A7230 | Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | ☐ A7270 | Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | ☐ A7220 | Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| Business Tort (07) | ☐ A6029 | Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| Civil Rights (08) | ☐ A6005 | Civil Rights/Discrimination | 1., 2., 3. |
| Defamation (13) | ☐ A6010 | Defamation (slander/libel) | 1., 2., 3. |
| Fraud (16) | ☐ A6013 | Fraud (no contract) | 1., 2., 3. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

SHORT TITLE:
Dr. Hoda Elemary v. Jerry L. Steering et al.

CASE NUMBER

| A<br>Civil Case Cover<br>Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>-See Step 3 Above |
|---|---|---|
| **Non-Personal Injury/Pro./Wrongful Death Tort (Con** | | |
| Professional<br>Negligence<br>(25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | | |
| Wrongful Termination<br>(36) | ☑ A6037  Wrongful Termination | 1., 2., 3. |
| Other Employment<br>(15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | | |
| Breach of Contract/<br>Warranty<br>(06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| Collections<br>(09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| Insurance Coverage<br>(18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| Other Contract<br>(37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | | |
| Eminent<br>Domain/Inverse<br>Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation        Number of parcels_____ | 2. |
| Wrongful Eviction<br>(33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| Other Real Property<br>(26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | ☐ A6032  Quiet Title | 2., 6. |
| | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | | |
| Unlawful Detainer-<br>Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer-<br>Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer-<br>Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** | | |
| Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| Petition re Arbitration<br>(11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |

# SUMMONS
## (CITACION JUDICIAL)

<table>
<tr><td>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
JERRY L. STEERING; BILL L. HARBERT, SR.; BILLY HARBERT, JR.; and DOES 1 through 25, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
DR. HODA ELEMARY

</td><td>

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 2 7 2007

John A. Clarke, Executive Officer/Clerk

BY_____, Deputy

</td></tr>
</table>

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

<table>
<tr><td>

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Los Angeles County Superior Court
111 North Hill Street
Los Angeles, California 90048

</td><td>

CASE NUMBER:
*(Número del Caso):*
BC370218

</td></tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brian J. Jacobs (State Bar No. 107788)
467 South Arnaz Drive, Suite 319A, Los Angeles, California 90048                    (310) 770-6874

DATE: JOHN A. CLARKE                    Clerk, by _____, Deputy
*(Fecha)* APR 27 2007    *(Secretario)*    RUGENA LOPEZ    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]    **SUMMONS**    Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc. | www.USCourtForms.com

EXHIBIT 6

1 | **Brian J. Jacobs (State Bar No. 107788)**
**467 South Arnaz Drive, Suite 319A**
2 | **Los Angeles, California 90048**
**(310) 770-6874 (Telephone)**
3 | **(310) 858-6489 (Facsimile)**

4 | Attorneys for Plaintiff
Dr. Hoda Elemary

5

6

7 | ## UNITED STATES DISTRICT COURT

8 | ## CENTRAL DISTRICT OF CALIFORNIA

9 | ## WESTERN DIVISION

10 | DR. HODA ELEMARY,                        )   Case No. CV06-4723 RGK (PJWx)
                                          )
11 |              Plaintiff,                 )   **MEMORANDUM OF POINTS AND**
                                          )   **AUTHORITIES IN OPPOSITION TO**
12 | vs.                                      )   **MOTION OF DEFENDANT BILLY**
                                          )   **HARBERT, JR. TO DISMISS**
13 | BILLY HARBERT, JR.; B.L.                 )
HARBERT INTERNATIONAL, LLC, a )   [Declaration of Plaintiff Filed Concurrently
14 | Delaware limited liability company;      )   Herewith]
BILL HARBERT INTERNATIONAL         )
15 | CONSTRUCTION, INC., a Delaware           )   Date:  February 5, 2007
corporation; HARBERT                 )   Time:  9:00 a.m.
16 | INTERNATIONAL ESTABLISHMENT,)   Ctrm.  U.S. District Judge
INC., a Liechtenstein corporation;    )           R. Gary Klausner
17 | HARBERT INTERNATIONAL, INC., a )
Delaware corporation; ROY            )
18 | ANDERSON; HARBERT U.K.                   )
SERVICES, LTD., an English company; )
19 | BILL L. HARBERT, SR.; SABBIA             )
AKTIENGESELLSCHAFT, a              )
20 | Liechtenstein corporation; TROUTMAN )
SANDERS LLP, a Georgia limited       )
21 | liability partnership; BRYAN B.          )
LAVINE; JUNE ANN SAUNTRY;          )
22 | SHARP AND HARRISON, P.A., a             )
Florida professional association;      )
23 | WILLIAM M. SHARP, SR.;                   )
MATTHEW H. LEMBKE;                  )
24 | WACHOVIA BANK, N.A., a national        )
banking association; KEN POLK;        )
25 | EVANGELINE H. HOOVER; SAM              )
POINTER; BARRY COBURN; ALAN         )
26 | HALL; and JAMES REIN,                    )
                                          )
27 |              Defendants.                 )
                                          )
28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF DEFENDANT BILL HARBERT, JR...

## TABLE OF CONTENTS

Page #

I.     STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . 1

II.    CASE SUMMARY . . . . . . . . . . . . . . . . . . . 6

III.   LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . 6

IV.    THIS COURT HAS LIMITED JURISDICTION OVER
       HARBERT AND THE MOTION SHOULD BE DENIED
       WITH RESPECT TO RELIEF UNDER RULE 12(b)(2) . . . . . . 7

V.     PLAINTIFF'S CHOICE OF VENUE WAS PROPER AND
       THE MOTION SHOULD BE DENIED WITH RESPECT TO
       RULE 12(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       A.    Venue Is Proper In This District Under 28 U.S.C.
             §1391(a)(2) . . . . . . . . . . . . . . . . . . . . . . . 9

       B.    Venue Is Also Proper In This District Because Of
             A Valid Forum Selection Agreement . . . . . . . . . . . . . . 11

VI.    PLAINTIFF ADEQUATELY PLEADED THE FIRST AND
       THIRD CAUSES OF ACTION, AND THE MOTION
       SHOULD BE DENIED WITH RESPECT THERETO . . . . . . 14

VII.   PLAINTIFF ADEQUATELY PLEADED THE SECOND
       AND SEVENTH CAUSES OF ACTION, AND THE
       MOTION SHOULD BE DENIED WITH RESPECT
       THERETO . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VIII.  PLAINTIFF ADEQUATELY PLEADED THE FOURTH
       CAUSE OF ACTION, AND THE MOTION SHOULD BE
       DENIED WITH RESPECT THERETO . . . . . . . . . . . . . 15

IX.    PLAINTIFF ADEQUATELY PLEADED THE NINTH
       CAUSE OF ACTION, AND THE MOTION SHOULD BE
       DENIED WITH RESPECT THERETO . . . . . . . . . . . . . 16

X.     PLAINTIFF REVEALS DEFENDANTS' "LACK OF
       CREDIBILITY" IN FALSE STATEMENTS INTENDED TO
       MISLEAD THE COURT TO GRANT MOTIONS TO
       DISMISS, TO CHANGE VENUE AND TO SEVER . . . . . . . 16

XI.    CONCLUSION . . . . . . . . . . . . . . . . . . 26

i

# TABLE OF AUTHORITIES

## Cases

Page #

Bates v. C&S Adjusters, Inc.,
980 F.2d 865, 867 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . 10

Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,
232 F.3d 1082, 1087-88 (9th Cir. 2000) . . . . . . . . . . . . . . 8

Burger King Corp. v. Rudzewich,
471 U.S. 462, 479-80, 105 S.Ct. 2174,
2186, 85 L.Ed.2d 528 (1985) . . . . . . . . . . . . . . . . . . . 7

Calder v. Jones,
465 U.S. 783, 785, 104 S.Ct. 1482,
1485, 70 L.Ed.2d 804 (1984) . . . . . . . . . . . . . . . . . . 8, 9

Docksider, Ltd. v. Sea Technology, Ltd.,
875 F.2d 762, 764 (9th Cir. 1989) . . . . . . . . . . . . . . . . 12

Dole Food Co., Inc. v. Watts,
303 F.3d 1104, 1111 (9th Cir. 2002) . . . . . . . . . . . . . . . 7

First of Mich. Corp. v. Bramlet,
141 F.3d 260, 264 (6th Cir. 1998) . . . . . . . . . . . . . . . . 10

Gordy v. Daily News L.P.,
95 F.3d 829, 834 (9th Cir. 1996) . . . . . . . . . . . . . . . . . 9

Gulf Ins. Co. v. Glasbrenner,
417 F.3d 353, 356 (2d Cir. 2005) . . . . . . . . . . . . . . . . 10

Hunt Wesson Foods, Inc. v. Supreme Oil Co.,
817 F.2d 75, 77 (9th Cir. 1987) . . . . . . . . . . . . . . . . . 13

Jenkins Brick Co. v. Bremmer,
321 F.3d 1366, 1371 (11th Cir. 2003) . . . . . . . . . . . . . . 10

Keeton v. Hustler Magazine, Inc.
465 U.S. 770, 773, 779-80, 104 S.Ct. 1473,
1477-78, 1481, 79 L.Ed.2d 790 (1984) . . . . . . . . . . . . . 8

Lewis v. Fresne,
252 F.3d 352, 359 (5th Cir. 2001) . . . . . . . . . . . . . . . . 7

M/S Bremen v. Zapata Off-Shore Company,
407 U.S. 1, 15, 92 S.Ct. 1907, 1916,
32 L.Ed.2d 513 (1972) . . . . . . . . . . . . . . . . . . . 13, 14

Manetti-Farrow, Inc. v. Gucci America, Inc.,
858 F.2d 509, 513 (9th Cir. 1988) . . . . . . . . . . . . . . 12, 13

ii

| | Page # |
|---|---|
| *Moore v. AT&T Latin America Corp.*, 177 F.Supp.2d 785, 789 (N.D.Ill. 2001) . . . . . . . . . . . . . . . . | 10 |
| *Murphy v. Schneider National, Inc.*, 362 F.3d 1133, 1191 (9th Cir. 2004) . . . . . . . . . . . . . . . . | 14 |
| *Myers v. Barnett Law Offices*, 238 F.3d 1068, 1076 (9th Cir. 2001) . . . . . . . . . . . . . . . . | 10 |
| *Newton v. Thomason*, 22 F.3d 1455, 1463-64 (9th Cir. 1994) . . . . . . . . . . . . . . . . | 10 |
| *P&S Business Machines, Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807-08 (11th Cir. 2003) . . . . . . . . . . . . . . . . | 14 |
| *Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1195-98 (9th Cir. 1988) . . . . . . . . . . . . . . . . | 8 |
| *TAAG Linhas Aereas de Angola v. Transamerica*, 915 F.2d 1351, 1354 (9th Cir. 1990) . . . . . . . . . . . . . . . . | 13 |
| *TIG Ins. Co. v. NAFCO Ins. Co., Ltd.*, 177 F.Supp.2d 561, 567 (N.D.Tex. 2001) . . . . . . . . . . . . . . . . | 10 |
| *TruServ Corp. v. Neff*, 6 F.Supp.2d 790, 792 (N.D.Ill. 1998) . . . . . . . . . . . . . . . . | 10 |
| *WNS, Inc. v. Farron*, 884 F.2d 200, 204 (5th Cir. 1989) . . . . . . . . . . . . . . . . | 8 |

Statutes

| | |
|---|---|
| 28 U.S.C. §1391(a)(2) . . . . . . . . . . . . . . . . | 9 |
| Federal Rules of Civil Procedure 12(b)(2) . . . . . . . . . . . . . . . . | 6, 7, 8, 9 |
| Federal Rules of Civil Procedure 12(b)(3) . . . . . . . . . . . . . . . . | 6, 9, 11 |
| Federal Rules of Civil Procedure 12(b)(6) . . . . . . . . . . . . . . . . | 6, 14 |

## I.    STATEMENT OF FACTS

*Plaintiff's legal analysis in opposition to Defendant Billy Harbert, Jr.'s motion to dismiss is on page 6 of this document. Incorporated as an integral part of this opposition is the following Statement of Facts necessary for understanding the principal problem at the heart of this particular dispute. This Statement of Facts applies to each of the Defendants' seven motions to dismiss, the motion to transfer venue and the motion for severance, as well as for background purposes and to place crucial issues in perspective, including pointing out issues deliberately concealed by Defendants from the Court in their motions to dismiss and transfer venue.*

It is imperative for the Court to acknowledge that the Harbert Defendants' character, according to the United States Government Department of Justice, is untrustworthy and misleading. In the instant case, according to the U.S. Department of Justice, the lead two Defendants' unconscionable conduct has been likened to that of Ken Lay and Jeffrey Skilling of Enron. The Department of Justice is in receipt of a payment for a $54 million fine from the Harbert Defendants as punishment for stealing approximately $40 million from American taxpayers by bid-rigging United States construction contracts. Unaware of Defendants' intent to rig bids, Plaintiff was responsible for removing the hurdles and thus enabling Defendants' to secure government approval for the subject bid-rigged contracts. Defendants' arguments to the Court in their motions to dismiss, to transfer venue and for severance necessarily implicate the Harbert Defendants' credibility.

In the above-referenced motions, Defendants have concealed relevant information and misled this Court by repeatedly providing "confirmed" allegations, which have no basis in fact or in law, as itemized hereinbelow.

At the heart of the dispute between the parties for this Court's favorable decision rests the fact that the Court cannot ascertain at this early stage of

1  litigation whether or not Defendant Billy Harbert, Jr. and the other Defendants

2  are guilty of a tort to commit violence against a United States Congressman and

3  a Mid-East expert evaluated by the Congress to provide vital services for the

4  United States National Security interests, particularly in the war on terrorism.

5      The within action arises in its entirety out of the contractual arrangements,

6  negotiated in California, between Plaintiff and Defendants.  As a first of many

7  examples of relevant information deliberately concealed from the Court by

8  Defendants, the Harbert Defendants, counseled by the remaining Defendants,

9  entered into a plea agreement with the United States on February 2, 2002 on one

10 count of the Sherman Antitrust Act based on indictment for bid rigging, as well

11 as tax evasion, money laundering, civil RICO, wire fraud and related areas.

12 Decisions made jointly by Defendants Billy Harbert, Jr. and his father, Bill L.

13 Harbert, Sr., required that Defendants dispatch Bill L. Harbert, Sr. to California

14 to convince and secure the services of Plaintiff and the use of her contacts in

15 Washington to delay the prosecution of the United States' False Claims Case

16 against the Harbert Defendants on the same subject matter under the Civil

17 Division of the Department of Justice.  Accordingly, claims made by these

18 Defendants that no business contacts took place between them and Plaintiff in

19 California are false and misleading.

20     As a second example, demonstrating Defendants' repeated intent to mislead

21 this Court, Defendants have elected to take a dramatic approach by making

22 allegations to the Court that Defendants knew were false.  Many contacts occurred

23 with both Harbert Defendants.  Defendants' actions were executed without regard

24 to the November 3, 2003 contract's stipulations on venue and jurisdiction – to be

25 in the Western Division of the Central District of California – as well as on

26 liquidated damages.  Moreover, Defendants' motions to dismiss are fraught with

27 cries of objection to travel to California.  At the suggestion of Defendant's

28 Alabama counsel (who had earlier participated in Defendants' conspiracy against

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF DEFENDANT BILL HARBERT, JR.

1  Plaintiff), each Defendant named in the Complaint deliberately misled this Court

2  when they cited in unison serious travel hardship in their Motions to Dismiss,

3  when, in fact, Defendants knew only four young and able Defendants might be

4  subpoenaed to travel to California.    Defendants also had knowledge that the

5  remaining eighteen Defendants would be deposed in their home towns.

6      On October 30, 2006, concurrent with filing the first Amended Complaint,

7  notice was served on Defendants to the effect that Plaintiff had agreed to subpoena

8  *only four out of the twenty-two named Defendants in the Complaint to travel to*

9  *California to testify.*  This will eliminate Defendants' most repeated argument in

10  support of their Motions to Dismiss and their Motion to Transfer Venue out of

11  this District.

12      Depositions will be conducted at the cities where the remaining eighteen

13  Defendants reside.  The majority of the four Defendants who could be called to

14  testify by Plaintiff in California own second homes and travel frequently in pursuit

15  of their business and personal interests to California, Telluride, Colorado and Las

16  Vegas, Nevada.  Therefore, this would present no hardship for each of those four

17  Defendants to travel to California

18      Accordingly, the Court may wish to take into consideration that until and

19  unless issues brought by Plaintiff for fraud, civil RICO, money laundering, tax

20  evasion  and wire fraud are properly litigated in a neutral forum  - outside of the

21  State of Alabama, where Defendants have used oppressive influence in the past

22  – the  Court's discretionary decision to approve any of Defendants' proposed

23  orders in light of the nature of the character of Defendants according to the

24  United States, as well as the jurisdictional mandates cited in paragraphs 2 through

25  7 of the First Amended Complaint, would in effect be assisting alleged corporate

26  criminals to escape the rule of law.

27      In the event the Court grants Defendants' proposed orders to dismiss the

28  instant case, the Court would be perceived to have absolved the potential liability

1  of Defendant Billy Harbert, Jr. and other Defendants, granting them exoneration.

2  On the other hand, should the Court grant the proposed order to transfer venue

3  to Birmingham, Alabama, the Court would be condemning Plaintiff and her

4  associates to the same legal forum -- in which the influence of the powerful and

5  not justice -- would determine the outcome of the litigation.

6      In light of congressional and media interest (including <u>The New York Times</u>

7  article on April 13th and <u>The Birmingham News</u> cover story on the front business

8  section of December 12, 2006), it is respectfully suggested that the Court would

9  be wise to refrain from rushing to grant Defendants' proposed orders to either

10  dismiss or to transfer venue to Alabama and thereby create an unnecessary

11  political fracas due to Congressional interest in the execution of justice in this

12  matter.

13      It is incumbent upon Plaintiff to acknowledge that a substantial amount of

14  misinformation provided to the Court came from Defendants and their (nearly) in-

15  house counsel, namely Mathew H. Lembke, Esq., whom Plaintiff has corrected

16  on a regular basis for knowingly and deliberately compromising the facts in the

17  process of appeasing his client, Defendant Billy Harbert, Jr.,'s goal of ousting

18  Plaintiff, which actions include his dealings with the Department of Justice and

19  Plaintiff's counsel and partner, Senator Bob Dole, to whom he wrote many letters,

20  and as presented in Count 11 of the First Amended Complaint.  On the other

21  hand, the Harbert Defendants bought the best possible legal representation when

22  they retained Latham & Watkins, who regrettably innocently accepted the

23  fabrications conveyed by Defendants and their local counsel in Alabama.  In an

24  earlier time, Al Capone also retained the best attorney in the United States of his

25  day, Melvin Belli.  Mr. Belli could not save Al Capone from the rule of law,

26  resulting in the San Francisco Examiner's publishing the following headline,

27  "Belli Could Not Save Al Capone From the Rule of Law."   If the facts of the

28  instant case are allowed to be aired in a fair courtroom, Latham & Watkins will

1 | not be able to save Defendants Billy and Bill Harbert from the rule of law.

## II.    CASE SUMMARY

The First Cause of Action (Suppression of facts) (Complaint, ¶¶22-29) arises out of events which led to the filing of the False Claims Case; the Second Cause of Action (conspiracy) (id., ¶¶30-40) arises of a conspiracy by defendants to cause the wrongful termination of the September 21 Agreement; the third Cause of Action (Civil RICO) (id., ¶¶41-61) alleges the commission of violations of the Hobbs Act, 18 U.S.C. section 1951, in an attempt to effectuate such termination; the Fourth Cause of Action (intentional interference with contract) (id., ¶¶62-67) alleges the successful interference by non-parties with the September 21 Agreement; the Fifth Cause of Action (breach of contract) (id., ¶¶68-73) alleges the breach of the September 21 Agreement by defendant Bill L. Harbert, Sr.; the Sixth Cause of Action (quantum meruit) (id., ¶¶74-76) seeks compensation for the reasonable value of services performed by Plaintiff under the September 21 Agreement; and the Seventh Cause of Action (termination in violation of public policy) (id., ¶¶77-83), the Eighth Cause of Action (breach of the implied convent of continued employment) (id., ¶¶84-89) and the Ninth Cause of Action (intentional infliction of emotional distress) (id., ¶¶90-93) seek relief for the termination of the September 21 Agreement under different theories.  Finally, the Tenth Cause of Action (slander) (id., ¶¶94-100) and the Eleventh Cause of Action (libel) (id., ¶¶101-108) seek relief for defamation against Plaintiff in connection with her activities under the September 21 Agreement.  During all of the relevant times, Plaintiff has been a resident of California.    Declaration of Plaintiff ("Decl."), ¶2.

## III.    LEGAL ANALYSIS

Defendant Billy L. Harbert, Jr. ("Harbert") seeks dismissal of the Complaint as against him under Federal Rules of Civil Procedure ("Rules") 12(b)(2), (3) & (6) (the "Motion").  As shown hereinafter, however, not only is

1  Harbert subject to the jurisdiction of this Court by virtue of having committed
2  tortious acts directed at Plaintiff, a California resident; Harbert is also bound by
3  a forum selection clause which designates the United States District Court for the
4  Central District of California, Western Division, as the exclusive forum for
5  resolution of the parties' business disputes.  Moreover, the First, Second, Third,
6  Fourth, Seventh and Ninth Causes of Action are adequately pleaded against
7  Harbert.  The Motion should be denied.

8  ## IV.    THIS COURT HAS LIMITED JURISDICTION OVER HARBERT
9  AND THE MOTION SHOULD BE DENIED WITH RESPECT TO
10 RELIEF UNDER RULE 12(b)(2)

11      Harbert first seeks relief under Rule 12(b)(2) on the ground that he is not
12 subject to the personal jurisdiction of the courts of the State of California and,
13 therefore, of this Court.  Motion, p. 1, l. 23 - p. 7, l. 21.  While Plaintiff does
14 not claim that Harbert is subject to general jurisdiction in California (see, Motion,
15 p. 2, ll. 8-18), the Motion's discussion of specific jurisdiction ignores most of the
16 jurisprudence developed under tort law with respect to in personam jurisdiction.
17 A non-resident may be subject to personal jurisdiction in California for liability-
18 producing acts having foreseeable consequences in the forum state.  Burger King
19 Corp. v. Rudzewich, 471 U.S. 462, 479-80, 105 S.Ct. 2174, 2186, 85 L.Ed.2d
20 528 (1985).  In that regard, "[a] single act by a defendant can be enough to confer
21 personal jurisdiction if that act gives rise to the claim being asserted."  Lewis v.
22 Fresne, 252 F.3d 352, 359 (5th Cir. 2001.)  The first prong of the three-part test
23 discussed in the Motion, also known as the "purposeful availment" test, is met
24 when (1) the defendant committed a "wrongful intentional act," (2) "expressly
25 aimed" at the forum state, (3) causing harm that the defendant knew or should
26 have known was likely to be suffered in the forum state.  Dole Food Co., Inc. v.
27 Watts, 303 F.3d 1104, 1111 (9th Cir. 2002).  For this purpose, "wrongful
28 intentional acts" include defamation, intentional infliction of emotional distress,

1    and invasion of privacy. <u>Calder v. Jones</u>, 465 U.S. 783, 785, 104 S.Ct. 1482,

2    1485, 70 L.Ed.2d 804 (1984).  Since the subject Causes of Action sound in fraud

3    (First), conspiracy (wrongful termination) (Second), violation of 18 U.S.C. §1964

4    (civil RICO) (Third), intentional interference with contract (Fourth), termination

5    in violation of public policy (Seventh) and intentional infliction of emotional

6    distress (Ninth), this element of the first prong has been properly pleaded.

7        The (second) "expressly aimed" element of the "purposeful availment"

8    prong is satisfied when it is alleged that the nonresident engaged in "wrongful

9    conduct targeted at a plaintiff whom the defendant knows to be a resident of the

10   forum state."  <u>Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.</u>, 232 F.3d 1082,

11   1087-88 (9th Cir. 2000).  At all relevant times, Harbert knew that Plaintiff was

12   a resident of California.  Decl., ¶7.  It should be noted that for purposes of

13   adjudicating a Rule 12(b)(2) motion, all uncontroverted allegations in the

14   Complaint are deemed true, and factual conflicts in the parties' declarations are

15   resolved in the plaintiff's favor.  <u>WNS, Inc. v. Farron</u>, 884 F.2d 200, 204 (5th

16   Cir. 1989).  As Harbert has not denied any of the allegations of the Complaint,

17   and Plaintiff has provided evidence that Harbert knew Plaintiff was a California

18   resident at the times the alleged acts were committed, the "expressly aimed"

19   element of the first prong of the limited jurisdiction test is met.

20       This leaves the third and last element of the "purposeful availment" prong,

21   <u>i.e.</u>, that harm was suffered by the plaintiff in the forum state.  This element is

22   satisfied even if the plaintiff suffers "only a small proportion of her claimed

23   injury" within the forum state, and "the bulk of the harm done" occurs outside the

24   forum state.  <u>Keeton v. Hustler Magazine, Inc.</u> 465 U.S. 770, 773, 779-80, 104

25   S.Ct. 1473, 1477-78, 1481, 79 L.Ed.2d 790 (1984).  Since Plaintiff, as a result

26   of Harbert's and the other Defendants' actions, was deprived of income in

27   California, this element of the test is also satisfied.  <u>See</u>, <u>e.g.</u>. <u>Sinatra v. National</u>

28   <u>Enquirer, Inc.</u>, 854 F.2d 1191, 1195-98 (9th Cir. 1988) (Swiss clinic which

1  falsely told a magazine reporter in Switzerland that Frank Sinatra had been a

2  patient was subject to personal jurisdiction in California for misappropriation of

3  Mr. Sinatra's name as the "purposeful direction of a foreign act having effect in

4  the forum state").

5      The second prong of the limited jurisdiction inquiry, i.e., that the plaintiff's

6  claim "arise[] out of or relate[] to the defendant's forum related activities' (see,

7  Motion, p. 5, ll. 8-14) is clearly met here, since the forum-related activities are

8  the wrongful acts pleaded in the Complaint.    As to the third prong of

9  "reasonableness" (see, Motion, p. 5, ll. 18-20), it has been held that personal

10  jurisdiction on a non-resident who, acting outside the state, intentionally causes

11  injuries within the state, is presumptively not unreasonable.  Calder v. Jones,

12  supra, 465 U.S. at 789-790, 104 S.Ct. at 1487; Gordy v. Daily News L.P., 95

13  F.3d 829, 834 (9th Cir. 1996).  While the Motion purports to engage in a multi-

14  factor analysis of the "reasonableness" prong (Motion, p. 5, l. 15 - p. 7, l. 21),

15  the only meaningful factor in favor of the Motion is the claimed burden on

16  Harbert personally (see, id., p. 6, l. 15 - p. 7, l. 5).  Harbert is, however, a

17  wealthy individual who can much better afford to attend proceedings in California

18  than Plaintiff can attend proceedings in Alabama.  Decl., ¶5.  The other factors

19  weigh in favor of Plaintiff's forum.  As above indicated, there is no legal or

20  factual basis for granting relief against Plaintiff under Rule 12(b)(2), and the

21  Motion should be denied.

22  **V.    PLAINTIFF'S CHOICE OF VENUE WAS PROPER AND THE**

23  **MOTION SHOULD BE DENIED WITH RESPECT TO RULE 12(b)(2)**

24      A.    Venue Is Proper In This District Under 28 U.S.C. §1391(a)(2).

25      Harbert next seeks relief under Rule 12(b)(3) or the ground that the

26  venue of this action was not properly laid in this Court.  Motion, p. 7, l. 22 - p.

27  8, l. 18.  Plaintiff has two responses to this claim.  First, contrary to the Motion's

28  cursory analysis, venue is, in fact, proper under 28 U.S.C. §1391(a)(2), which

1  references, in pertinent part, "a judicial district in which a substantial part of the

2  events or omissions giving rise to the claim occurred . . . ." <u>See</u>, Motion, p. 8,

3  ll. 2-3. In this regard, the statute does not require that a "majority" of the "events

4  or omissions" occur in the district for which venue is claimed, or even that those

5  events or omissions "predominate"; it is sufficient if a "substantial part" occurs

6  there. <u>Gulf Ins. Co. v. Glasbrenner</u>, 417 F.3d 353, 356 (2d Cir. 2005); <u>Jenkins</u>

7  <u>Brick Co. v. Bremmer</u>, 321 F.3d 1366, 1371 (11th Cir. 2003). A plaintiff is

8  entitled to choose any of several districts having relatively equal connections with

9  the dispute. <u>First of Mich. Corp. v. Bramlet</u>, 141 F.3d 260, 264 (6th Cir. 1998)

10  (mail fraud committed in Los Angeles damaged plaintiff's business in San

11  Francisco); <u>TruServ Corp. v. Neff</u>, 6 F.Supp.2d 790, 792 (N.D. Ill. 1998)

12  (personal guarantee signed in one state for payment in another). A plaintiff has

13  no obligation to file in the forum most convenient to the defendant. <u>Newton v.</u>

14  <u>Thomason</u>, 22 F.3d 1455, 1463-64 (9th Cir. 1994).

15        In tort actions, the district in which the injuries were suffered, and

16  in contract actions, the district where the performance was due, are properly

17  deemed to be the districts in which a "substantial part" of the events or omissions

18  occurred. <u>Jenkins Brick Co. v. Bremmer</u>, <u>supra</u>, at <u>ibid</u>.; <u>Myers v. Barnett Law</u>

19  <u>Offices</u>, 238 F.3d 1068, 1076 (9th Cir. 2001); <u>Bates v. C&S Adjusters, Inc.</u>, 980

20  F.2d 865, 867 (2d Cir. 1992). Plaintiff's loss of income, both arising from the

21  damages to her standing within the political community resulting from the fraud

22  and her loss of income from the September 21 Agreement resulting from the

23  wrongful termination of her employment, as well as her emotional distress, took

24  place in this District. Moreover, it has been held that where a plaintiff sent

25  communications from and received communications in the forum state as part of

26  the parties' negotiations, and numerous communications were directed at the

27  plaintiff in the forum, a "substantial part" of the subject events is deemed to have

28  taken place there. <u>Moore v. AT&T Latin America Corp.</u>, 177 F.Supp.2d 785,

1    789 (N.D.Ill. 2001); <u>TIG Ins. Co. v. NAFCO Ins. Co., Ltd.</u>, 177 F.Supp.2d
2    561, 567 (N.D.Tex. 2001).  At the time of the negotiation of the September 21
3    Agreement, Plaintiff was living in this District. Decl., ¶2. Accordingly, for each
4    of the First, Second, Third, Fourth, Seventh and Ninth Causes of Action, a
5    "substantial part" of the events or omissions took place in this District, and the
6    Motion must be denied.

7         B.    <u>Venue Is Also Proper In This District Because Of A Valid Forum</u>
8            <u>Selection Agreement</u>.

9         As a separate, additional ground for denying Movants' Rule 12(b)(3)
10   Motion, the parties are governed by a valid forum selection agreement.   On
11   November 3, 2003, Plaintiff and Mr. Harbert Sr. executed that certain Laguna
12   Niguel Beach House 2003 Revocable Trust (the "November 3 Trust"), a true and
13   correct copy of which is attached to this Memorandum of Points and Authorities
14   as Exhibit "A" hereto. Decl., ¶3 & Exh. "A."  This instrument, which included
15   a declaration of trust with respect to the assets described in Schedule A thereto,
16   contains in its Article Four a "Personal Arrangement" contract which has the
17   following provision:

18        Any potential lawsuit arising out of this Personal
19        Arrangement Contract or business guarantees and
20        agreements, as well as potential counter-claims shall be
21        governed and construed according to the laws of the
22        State of California.  Any lawsuit to enforce the terms of
23        this Personal Arrangement and business agreements shall
24        be commenced, and litigated (for personal disputes) in
25        the Family Court -- Superior Court of Los Angeles,
26        California, and <u>(for business disputes) in U.S. District</u>
27        <u>Court, Central Division in Los Angeles, California, in</u>
28        <u>the County of Los Angeles</u>.  Any and all potential

1  lawsuits, as well as compulsory counter-claims will be
2  <u>without exception</u>, litigated in California as though all
3  the parties and witnesses to such lawsuits were
4  California citizens and that the subject matter of the
5  dispute upon which these lawsuits are based occurred in
6  their entirety in the State of California, County of Los
7  Angeles.  In the event that either party to this contract -
8  - or their co-defendants or co-plaintiffs -- file a motion
9  to change this understanding on venue and jurisdiction
10  (for any potential lawsuit) the violating party will
11  unconditionally and unequivocally assume liability to pay
12  the other party liquidated damages of three million
13  dollars.  Clearly, it is difficult to assess such damages.
14  Nevertheless, the parties have determined that the
15  liquidated damages are at least $3 million dollars.  The
16  parties confirm their agreement herein that the violating
17  party will pay $3 million dollars to the other party.

18  November 3 Trust, Article Four, Section 1 (emphasis added).

19      The designation of venue for business disputes in this Court and this
20  District is valid and binding on the parties.  As a threshold matter, the Ninth
21  Circuit applies federal law in determining the validity and effect of forum
22  selection clauses in diversity cases.  <u>Manetti-Farrow, Inc. v. Gucci America, Inc.</u>,
23  858 F.2d 509, 513 (9th Cir. 1988) ("<u>Manetti</u>").  Coupled with mandatory
24  language in the forum selection clause, the designated district is deemed to be the
25  exclusive forum.  <u>Docksider, Ltd. v. Sea Technology, Ltd.</u>, 875 F.2d 762, 764
26  (9th Cir. 1989) ("The prevailing rule is clear from these and other cases that
27  where venue is specified with mandatory language the clause will be enforced.
28  [Citations.]").  The use of the word "exclusive" in the parties' agreement will

1   have the same effect. <u>Hunt Wesson Foods, Inc. v. Supreme Oil Co.</u>, 817 F.2d
2   75, 77 (9th Cir. 1987).  Unless the language compels a contrary interpretation,
3   the forum selection clause will be deemed to apply to tort claims as well.
4   <u>Manetti</u>, 858 F.2d at 514.  The claim is also enforceable against other parties so
5   closely related to the contracting parties that they "should benefit from and be
6   subject to" the clause.  <u>TAAG Linhas Aereas de Angola v. Transamerica</u>, 915
7   F.2d 1351, 1354 (9th Cir. 1990) (internal quotation marks omitted).  Under these
8   principles, the terms of the forum selection clause in the November 3 Trust,
9   which employs the word "shall," states that all potential lawsuits will be litigated
10  in California "without exception," and sets up a $3,000,000 liquidated damages
11  provision in the event any party files a motion for change of venue, lead
12  inexorably to the conclusion that all the Causes of Action in the Complaint must
13  be litigated in this District.  Noting that Harbert, by his own admission, is Mr.
14  Harbert Sr.'s son (Harbert Decl., ¶8), the forum selection clause is seen to be
15  applicable to her as well.

16          Not only is the forum selection clause of the November 3 Trust
17  facially valid and applicable to Harbert; none of the recognized grounds for
18  challenging the enforceability of a contractual forum selection clause are
19  applicable.  Forum selection clauses are presumed valid, unless it can be "clearly
20  shown that enforcement would be unreasonable and unjust, or that the clause was
21  invalid for such reasons as fraud or overreaching."  <u>M/S Bremen v. Zapata Off-</u>
22  <u>Shore Company</u>, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972)
23  ("<u>Bremen</u>"); <u>see also</u>, <u>Manetti</u>, 858 F.2d at 512.  In particular, courts may decline
24  to enforce a forum selection clause when transfer to the designated forum would
25  "contravene a strong public policy of the forum in which the suit is brought,
26  whether declared by statute or by judicial decision."  <u>Bremen</u>, at <u>ibid</u>.  Since
27  Plaintiff filed the Complaint in the forum designated by the November 3 Trust,
28  this ground for unenforceability is not applicable here.  The doctrine of fraud or

1 │ overreaching is also inapplicable here, in that Mr. Harbert Sr. took pains to

2 │ express his commitment for the November 3 Trust's forum selection clause in a

3 │ later separate instrument.  Decl., ¶4 & Exh. "B."

4 │          Finally, enforcement of a forum selection clause may be denied if

5 │ shown to be so "gravely difficult and inconvenient" for one party that for all

6 │ practical purposes the party will be denied his day in court.  <u>Bremen</u>, 407 U.S.

7 │ at 18, 92 S.Ct. at 1917; <u>Murphy v. Schneider National, Inc.</u>, 362 F.3d 1133,

8 │ 1191 (9th Cir. 2004).  The showing needed to establish this defense has been

9 │ described as a "heavy burden" of proof.  <u>Bremen</u>, 407 U.S. at 19, 92 S.Ct. at

10 │ 1918.  Nor is financial hardship, without more, a sufficient ground for denying

11 │ enforcement.  <u>P&S Business Machines, Inc. v. Canon USA, Inc.</u>, 331 F.3d 804,

12 │ 807-08 (11th Cir. 2003) ("<u>P&S</u>").  In the present case, Harbert's appearance

13 │ herein by Latham & Watkins LLP renders unconvincing any such potential

14 │ defense on the grounds of "grave[] difficult[y]" and financial hardship.

15 │ **VI.   PLAINTIFF ADEQUATELY PLEADED THE FIRST AND THIRD**

16 │ **       CAUSES OF ACTION, AND THE MOTION SHOULD BE DENIED**

17 │ **       WITH RESPECT THERETO**

18 │          Harbert, finally, moves to dismiss the First, Second, Third, Fourth, Seventh

19 │ and Ninth Causes of Action under Rule 12(b)(6) (Motion, p. 8, l. 19 - p. 16, l.

20 │ 1), citing to Mr. Harbert Sr.'s concurrently-filed motion with respect to the First

21 │ (<u>see</u>, Motion, p. 8, l. 23 - p. 9, l. 1) and the Third (<u>see</u>, Motion, p. 9, l. 16 - p.

22 │ 10, l. 1) Causes of Action.  For the reasons set forth in Plaintiff's opposition to

23 │ Mr. Harbert Sr.'s motion, incorporated herein by this reference, the Motion

24 │ should be denied with respect to the First and Third Causes of Action.

25 │ **VII. PLAINTIFF ADEQUATELY PLEADED THE SECOND AND**

26 │ **       SEVENTH CAUSES OF ACTION, AND THE MOTION SHOULD BE**

27 │ **       DENIED WITH RESPECT THERETO**

28 │          In moving to dismiss the Seventh Cause of Action herein, Harbert cites to

1  Mr. Harbert Sr.'s concurrently-filed motion (see, Motion, p. 11, ll. 15-16) to
2  argue that Plaintiff has failed to allege an employment relationship with any
3  defendant. For the reasons set forth in Plaintiff's opposition to Mr. Harbert Sr.'s
4  motion, incorporated herein by this reference, that contention is incorrect. See,
5  Motion, p. 11, ll. 3-8 & p. 11, l. 15 - p. 11,l. 15 - p. 12, l. 4. Next, Harbert
6  argues that only Mr. Harbert Sr. is the employer, and that Harbert cannot be
7  liable. Motion, p. 12, ll. 5-18. Similarly, Harbert argues that the Second Cause
8  of Action, sounding in conspiracy, must fail because a non-employer cannot be
9  liable for conspiracy to terminate wrongfully. Id., p. 11, ll. 9-14.

10  In this case, the conspiracy alleged in paragraph 31 was a conspiracy to
11  effectuate the breach by Mr. Harbert Sr. of the September 21 Agreement. See,
12  Complaint, ¶¶33-34. As there is no prohibition against a conspiracy to interfere
13  with a contract, the Motion's argument fails with respect to the Second and
14  Seventh Causes of Action.

15  **VIII. PLAINTIFF ADEQUATELY PLEADED THE FOURTH CAUSE OF**
16  **ACTION, AND THE MOTION SHOULD BE DENIED WITH**
17  **RESPECT THERETO**

18  The Motion's attack on the Fourth Cause of Action, denoting intentional
19  interference with the September 21 Agreement, first claims that Plaintiff
20  inadequately alleged Defendants' knowledge of the existence of the contract.
21  Motion, p. 13, ll. 3-16. Once again confusing a plaintiff's task at the pleading
22  stage with his task at trial, the Motion also seems to overlook the last one and
23  one-half lines of paragraph 64 of the Complaint:  "Defendants knew of the
24  existence of the September 21 Agreement . . . because Plaintiff . . . had been
25  working as exclusive case manager on the False Claims Case since April, 2001."
26  Contrary to Defendants' carefully-posed incredulity, it is only reasonable that after
27  five years, everybody at top management of the Harbert enterprises would know
28  of Plaintiff's contract.

1    Second, it is claimed that it is not alleged that any of the named Defendants
2  took action to remove Plaintiff, or that such action in fact caused Plaintiff to be
3  removed.    Motion, p. 13, ll. 17-20.    Once again, the flurry of coerced
4  termination letters described in paragraph 65 of the Complaint and paragraph III
5  of the Incorporated Schedule, culminating in Plaintiff's termination three months
6  later, admit of no other interpretation.   The Motion's objections to the Fourth
7  Cause of Action are invalid.

8  **IX.   PLAINTIFF ADEQUATELY PLEADED THE NINTH CAUSE OF**
9    **ACTION, AND THE MOTION SHOULD BE DENIED WITH**
10   **RESPECT THERETO**
11    The gravamen of the Motion's attack on the Ninth Cause of Action is that
12  the actions pleaded were not extreme enough to justify relief. Motion, p. 15, n.
13  8.  Plaintiff argues that being accosted in one's own residence, being pushed
14  down the stairs and suffering a broken shoulder followed by months of painful
15  recuperation constitute sufficiently outrageous conduct for the pleaded theory of
16  relief. The Motion should be denied with respect to the Seventh Cause of Action.

17  **X.   PLAINTIFF REVEALS DEFENDANTS' "LACK OF CREDIBILITY"**
18    **IN FALSE STATEMENTS INTENDED TO MISLEAD THE COURT**
19    **TO GRANT MOTIONS TO DISMISS, TO CHANGE VENUE AND**
20    **TO SEVER**
21    Independent of the specific evidentiary burdens attendant on the referenced
22  motions, the credibility or lack thereof of the moving parties will necessarily
23  influence the Court's determinations on the merits, the supporting facts for which
24  have been provided by Defendants herein.  Of necessity, the Court has no means
25  of verifying to its satisfaction the accuracy of these statements at this stage of the
26  litigation. However, Plaintiff's role in placing the facts in perspective based on
27  the evidence provided herein will assist the Court in evaluating the United States'
28  conclusion that Defendants are untrustworthy.  Plaintiff begins with an in-depth

1    analysis of specific misstatements in the moving papers.

2         Following Mr. Harbert Sr.'s payment of $54 million to satisfy the
3    criminal fine imposed by the United States in the plea agreement on the anti-trust
4    case (half of which came from his personal account), the United States began
5    prosecuting a false claims case on the same subject matter from a civil
6    perspective. Plaintiff was then requested to delay the prosecution for a period of
7    approximately four years, which Plaintiff did. Plaintiff was also requested to
8    negotiate a settlement, which Plaintiff also did. Decl., ¶9 & Exh. "C."

9         Plaintiff is presenting herein a written document in which Mr. Harbert Sr.
10   approved the payment of this $15 million to the United States. However, his son
11   Billy Harbert, Jr. declined to obey his father's wishes and refused to make the
12   payment to the United States to avoid paying Plaintiff her substantial success fee
13   to which she was entitled under the September 21 Agreement.

14        Billy Harbert, Jr. insisted that he could do a better job than Plaintiff in
15   negotiating a lower figure than $15 million, and thereupon negotiated through
16   counsel for several months to no avail with the Department of Justice, who
17   repeatedly told his counsel the lowest figure the United States would accept was
18   the $15 million negotiated with (Plaintiff) Dr. Hoda Elemary. Decl., ¶10 & Exh.
19   "D" (containing the United States' complaint in intervention describing its
20   conclusion that Defendants are untrustworthy).  In contrast with these
21   demonstrable facts are the spin on those facts propounded by Defendants, an
22   example of which is the Motion to Dismiss filed by Defendant William M. Sharp,
23   Sr., whose assertions we now review.  The three Harbert heirs and a majority of
24   Defendants have frequently gathered together at Defendant Sharp's Colorado
25   home for holidays.  Defendant Sharp is regarded as the head of the young
26   generation of the Harbert Group.  Accordingly, this section of the opposition is
27   focused on the motion filed by Defendant Sharp.

28        Mr. Sharp first stated in his Motion to Dismiss on p. 9, ll. 5-8 that

1    "Defendant Bill L. Harbert, Sr.'s Motion to Dismiss (the "Harbert, Sr. Motion"),

2    filed concurrently herewith explained in detail why this Court should dismiss

3    Plaintiff's fraud claim, and the Sharp Defendants hereby join the Harbert, Sr.

4    Motion in its entirety.""

5        Mr. Sharp secondly stated in his Motion to Dismiss on p. 11, ll. 13-20 that

6    "Plaintiff's vague and conclusory allegations regarding the conduct and

7    circumstances that allegedly had injured her, as well as the nature of her distress,

8    are precisely the sort of scattershot and conclusory pleadings – 'float[ing] freely

9    on a sea of bombast' -- that Rule 12(b)(6) is designed to screen out.  <u>Miranda v.

10   Fonce Federal Bank</u>, 948 F.2d 41, 44 (1st Cir. 1991). These allegations fail to

11   meet even the basic pleading requirements of the Federal Rules of Civil Procedure

12   and Plaintiff's IIED claim should be dismissed."

13       Mr. Sharp thirdly stated in his Motion to Dismiss on p. 10 ". . . Plaintiff

14   has not plead any facts demonstrating that she had an employment relationship

15   with any defendants – the necessary predicate to both her conspiracy and

16   termination claims. See Harbert, Sr. Motion at 18-20 (Harbert, Jr. Motion at 11-

17   12.) In any event, Plaintiff at most was potentially employed by defendant Bill L.

18   Harbert, Sr. and not the other 18 individual defendants she had named under

19   either or both the termination and conspiracy claims."

20       It is incumbent upon the Court to know that all the main defendants are

21   employees, advisors and an heir to defendant Mr. Harbert Sr.  In light of Mr.

22   Harbert's age it is impossible to work with Defendant's business establishment

23   without intermingling, instructing and being instructed by various employees with

24   seniority who act from time to time with power of attorney from Mr. Harbert Sr.

25       While Plaintiff was exclusive case manager for four years, Plaintiff had a

26   power of attorney over most of the named Defendants, who, as stated above, were

27   also employees or advisors of Mr. Harbert Sr. Mr. Harbert Sr. controls 51

28   percent of each trust created to protect his estate in the United States from the

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF DEFENDANT BILL HARBERT, JR.

1  United States and, potentially, from Plaintiff's lawsuit. Based on a sequence of
2  correspondence from Defendants, who anticipated the filing of such lawsuit since
3  they knew that they had unlawfully terminated, threatened, and conducted other
4  illicit acts against Plaintiff. For example, Defendant Matthew H. Lembke issued
5  a letter in the Spring of 2005 offering Plaintiff a settlement of nearly $100,000 in
6  return for a full release of any claims by Plaintiff against Billy Harbert, Jr.
7  (apparently in fear of Plaintiff's taking legal action against Billy Harbert Jr. for
8  the attempted murder of Congressman Hilliard and her broken shoulder).

9      In the last quotation by Defendant Sharp, he questioned the existence of
10 Plaintiff's employment relationship with Mr. Harbert Sr., who signed contracts
11 with Plaintiff imposing conditions on the remaining Defendants who, as stated
12 above, are Mr. Harbert Sr.'s employees. In rebuttal, Plaintiff provides the
13 September 2, 2004 Laguna Beach Agreement, signed by Defendant Sharp himself
14 as well as by Mr. Harbert Sr., confirming the position held by Plaintiff and
15 proposing a closer working relationship between Defendant Sharp and Plaintiff.
16 Decl., ¶11 & Exh. "E." The mendacity of each of Defendants' motions is
17 evidenced by one such example by Sharp, suggesting that Plaintiff had no
18 employment relationship in the light of this document, signed by the protesting
19 Defendant himself.

20      Defendant Sharp was brought in to the Harbert group as personal counsel
21 for Billy Harbert, Jr., and later was advisor to Mr. Harbert Sr. as well.
22 However, Mr. Harbert Sr. later dismissed Defendant Sharp for siding with Billy
23 Harbert, Jr. at a substantial financial loss to Mr. Harbert Sr. However, prior to
24 that incident, Mr. Harbert Sr. had fired Defendant Sharp for conspiring with other
25 Defendants to take over Plaintiff's position. Decl., ¶12 & Exh. "F" (containing
26 Mr. Harbert Sr.'s letter firing Defendant Sharp).

27      Defendant Sharp issued three forged letters, at Billy Harbert, Jr.'s demand,
28 dated October 5, October 21, and November 11, 2004. These letters were

1  provided to him personally by Billy Harbert, Jr., which Defendant Hoover signed

2  on behalf of Mr. Harbert Sr. without his knowledge. These letters were intended

3  to summarily dismiss Plaintiff from her job.  When Plaintiff called these three

4  letters to Mr. Harbert Sr.'s attention, Mr. Harbert Sr. wrote on these letters,

5  "FORGERY", and stated in separate correspondence as well as in a paragraph

6  written on each of the three letters that he never signed his name to these letters.

7  Decl., ¶13 & Exh. "G."  As if this were not sufficient prima facie evidence of

8  Defendants' concerted actions against Plaintiff, in an email Defendant Sharp

9  gleefully boasts to all the conspirators, as well as to Plaintiff's counsel, that

10  Defendant Hoover is to hand over an attached letter to Plaintiff when she walks

11  in for her bi-weekly briefing of Mr. Harbert Sr. of the developments in the False

12  Claims Case.  Decl., ¶14 & Exh. "H."

13      Moreover, Mr. Harbert Sr. complained verbally and in writing to Plaintiff

14  of his son's abuse of an elderly person as a result of Billy Harbert, Jr.'s

15  blackmailing his father.  Mr. Harbert Sr. instructed Plaintiff on a daily basis,

16  either in person or by telephone, to not involve Billy Harbert, Jr. in their affairs.

17  Billy Harbert, Jr.'s persistent interference damaged Plaintiff and is noticeable even

18  in forcing counsel to mislead the court.  These misrepresentations provide proof

19  of Defendants' untrustworthiness together with evidence herein and are rebutted

20  separately point by point in the attached Exhibit "L" to Plaintiff's Declaration.

21      Plaintiff witnessed unusual and abusive verbal exchanges between father and

22  son in which Billy Harbert, Jr. exhibited his fundamental fears that his father

23  would write him off as an heir and instead give Plaintiff his share of the

24  inheritance.  Billy Harbert, Jr. therefore developed an obsession seeking to

25  destroy Plaintiff financially, physically and deprive her of her peace of mind or

26  her right to pursue her career, and attempted to destroy the reputations of Plaintiff

27  and Senator Bob Dole at every opportunity.

28      Billy Harbert, Jr. often screamed at the top of his lungs at Plaintiff,

repeatedly reminding her of his conviction that she was the cause of all his misery and that he could only succeed in life if Plaintiff were no longer involved with his father, whom he referred to as a "mumbling idiot." Billy Harbert, Jr. acted on his conviction by hiring body guards to insure that his father did not have the freedom to travel to California to be with Plaintiff when he wished or to allow Plaintiff to come to Alabama whenever Mr. Harbert Sr. phoned her and asked her to do so.

Billy Harbert, Jr. began to threaten Plaintiff that "terrible things" would happen to her if she did not adhere to his will and in particular if she was ever seen in Birmingham, Alabama. Mr. Harbert Sr., knowing his son, has always been eager to insure that Billy Harbert, Jr. is to be excluded from any involvement with Plaintiff for her own protection. Decl., ¶15 & Exh. "I" (containing letters and agreements executed by Mr. Harbert Sr. and providing that Billy Harbert, Jr. would be excluded from any involvement in their proposed business or personal arrangements). To this day, Mr. Harbert Sr. from time to time requests Plaintiff to take action to prevent Billy Harbert, Jr. from restricting his father's activities and engaging in the abuse of an elderly person.

It is in the nature of conspiracy, fraud, civil RICO and defamation causes of action to allow for less than fully-pleaded facts of the plaintiff's claim, since these causes include a factor of secrecy among the conspirators or perpetrators of the fraud or conspiracy at issue, and the plaintiff is often not present when plans are being made and defamatory utterances are published. Therefore, the various assertions by Defendants that Plaintiff's claims are not sufficiently pleaded is obviated by the material presented above and by the nature of the causes of action and the hushed secrecy in which the Harbert group functions within and the fear instilled in Plaintiff to avoid disclosing certain private facts about Defendants that could cost her life. Nevertheless, the threats are real. Decl., ¶16 & Exh. "J" (containing the various police and medical reports concerning Plaintiff's fractured

1  shoulder incident, and the physical threats Plaintiff received from several
2  Defendants, which Defendants sarcastically discount, including an assessment of
3  Plaintiff's credibility as stated in the police report).  In the event the Court grants
4  Defendants' motions to dismiss or transfer venue despite Plaintiff's presentation
5  of the foregoing misleading actions by Defendants, the Court would be
6  disagreeing with the primary Defendant, Mr. Harbert Sr., who confirmed in his
7  letter of November 11, 2004 that Defendants are misleading, including Mr. Sharp,
8  with respect to the forged letters, in which Mr. Harbert Sr. stated, "You may
9  disregard . . . letters sent to you by Mr. Sharp under the pretense that I signed
10  and authorized these letters to be sent to you."  Decl., ¶17 & Exh. "K."

11  **XI.    CONCLUSION**

12        For the foregoing reasons, Plaintiff respectfully requests that the Motion be
13  denied in its entirety.

14

15                                    Respectfully submitted,

16        Dated:  January 22, 2007

17                                    Brian J. Jacobs
                                      Attorney for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

# LAGUNA NIGUEL BEACH HOUSE 2003
# REVOCABLE TRUST

## ARTICLE ONE

Bill L. Harbert, called The Settlor and Trustee, declares that he has set aside the property described in Schedule A, attached to this instrument. All property and Securities subject to this instrument from time to time are respectively referenced as the "Property Estate" and "Stock Estate". THE TRUST ESTATE is inclusive of the property and stocks held together in the trust created in this instrument and shall be managed and distributed according to the terms of the Personal Arrangement Contract "Personal Arrangement".

## ARTICLE TWO

This instrument (in addition to creating a trust) sets the contract's terms and documents a five year old Secret agreement of a personal financial arrangement made by and between Bill L. Harbert (Harbert) and Dr. Hoda Elemary (Elemary) on November 3, 2003.

## ARTICLE THREE
## RECITALS

The parties' mutual benefits for conveying properties and stocks are:

I. On or about November 1998, the parties entered into a secret personal agreement that was further defined in 2002, whereby at Harbert's request, Elemary committed to Harbert to assist him with his personal affairs including his litigation troubles and to provide him-on a more permanent basis-with companionship, love, friendship and comfort as she had from time to time since 1991. Accordingly, Harbert's reasons for purchasing Elemary a house in Laguna Niguel, CA are: a).The personal aspect of their relationship b).An approximately $50 million Harbert earned in profit from Elemary's contacts with international senior Governments officials-who awarded Harbert lucrative oil pipelines and Mega Mid-East development contracts and c). "The great career risks" Elemary had assumed by enlisting her friends in Washington to shield Harbert from prosecution by the Department of Justice (DOJ) for 3 years.

II. On February 4, 2002 Harbert pled guilty on behalf of his corporation's, Bilhar, violation of one count of the Sherman Antitrust Act for bid rigging. Harbert paid the United States a $54 million fine. Harbert therefore eagerly sought Elemary's intervention on his behalf. Elemary was advised By Senator Orrin Hatch that "representing anyone associated with bid rigging to the DOJ, White House or Congress is tantamount to taking great career risks". Elemary cautiously agreed to Harbert's request on strict conditions. Harbert officially named Elemary as exclusive case manager to benefit from her high powered political contacts, which included personally advising five Consecutive U.S. Presidents on Mid-East terrorism. In July 2002 Elemary retained her personal friend, former Senate Majority Leader, BOB DOLE, to assist her in dealing with the DOJ.

III. With the exception of Elemary's deposit into escrow, the parties initiated discussions on August 16-18, and agreed on October 22, 2003 that the Laguna Niguel beach house would be paid in full by Harbert including real estate taxes at purchase time.

ARTICLE FOUR
(Personal Arrangement)

NOW, THEREFORE, in consideration of this personal arrangement as well as the business agreements and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties covenant and agree as follows:

1- Any potential lawsuit arising out of this Personal Arrangement Contract or business guarantees and agreements, as well as potential counter claims shall be governed and construed according to the laws of the state of California. Any lawsuit to enforce the terms of this Personal Arrangement and business agreements shall be commenced, and litigated (for personal disputes) in the Family Court – Superior Court in Los Angeles, California, and (for business disputes) in U.S. District Court, Central Division in Los Angeles, CA, in the County of Los Angeles. Any and all potential lawsuits, as well as compulsory counter claims will be without exception, litigated in California as though all the parties and witnesses to such lawsuits were California citizens and that the subject matter of the dispute upon which these lawsuits are based occurred in their entirety in the State of California, County of Los Angeles. In the event that either party to this contract-or their co-defendants or co-plaintiffs-file a motion to change this understanding on venue and jurisdiction (for any potential lawsuit) the violating party will unconditionally and unequivocally assume liability to pay the other party liquidated damages of three million dollars. Cleary, it is difficult to asses such damages. Nevertheless the parties have determined that the liquidated damages are at least $3 millon. The parties confirm their agreement herein that the violating party will pay $3 million to the other party. In the event that Harbert breaches any of the Business Agreements or Personal contract, Elemary will exclusively decide whether to pursue an expedited trial schedule, which include binding arbitration by a retired judge and/or a twenty five weeks expedited trial, whose cost will be born equally by Harbert and Elemary. Harbert's breach of this agreement for an expedited trial schedule will result in a one week demand for payment of $3 million. Otherwise, Harbert agrees to Elemary to demand double that amount from his LLC or bank accounts in Alabama and Switzerland.

2- Harbert unequivocally and unconditionally guarantees Elemary to overcome his current problems with cash flow that resulted in Harbert taking out a mortgage on the subject property. As a direct and proximate result of the drastic impact on Elemary on account of Harbert's cash flow problems, Harbert committed himself to the following:
A. To provide Elemary with a monthly payment to cover the mortgage payment and real estate taxes.
B. To divide in equal parts of fifty percent (50%) each with Elemary any and all profits arising out of his securities and stocks holdings beyond and above, i- accrued interest, ii- a seven percent (7%) annual increase of stock holdings for a two year period between the date of the execution of this document and Nov. 3rd 2005.

3- Harbert is hereby committed to compensate Elemary for his delay in paying fully for the beach house and agrees that at the earliest possible date, but no later than March 31st, 2005, Harbert will pay back the mortgage in full on the Beach House in compliance with his unwavering guarantee to fully pay for the beach house to satisfy his

2

part of the bargain in exchange for his acknowledgement of the receipt of 12 years of companionship and personal services and 25 years of business service.

4. Harbert confirms his unconditional commitment to fulfill written guarantees stipulated herein to provide the promised minimum security for Elemary irrespective of any third party interference (including by son Billy Harbert) or change of circumstances.

## ARTICLE FIVE

In the event the parties, convey the subject property through their own names, such transactions shall be legally titled as referenced below in article nine. The use of this legal title is necessary to insure this Personal Arrangement or (TRUST ESTATE) is consistent with other guarantees and agreements executed by the parties that refer to THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST as the instrument for transmuting real estate property. However, this Personal Arrangement Contract is legally not revocable despite the word revocable in the title. Each party hereby represents, warrants, and agrees to the other as follows:

A. Each party has received independent legal advice from his or her attorney with respect to the advisability of entering into this Personal Arrangement Contract and TRUST ESTATE.

B. Each party carefully read this Personal Arrangement Contract/ Trust created by this instrument and understands contents and legal effects of each provision hereof.

## ARTICLE SIX

Harbert is referenced in this document as the current Settlor and Trustee, Harbert will resign on November 3, 2003. Elemary will become the Settlor and Trustee two weeks after Harbert's execution of this document.

## ARTICLE SEVEN

The Settlor may not revoke the Personal Arrangement (Contract). However, Schedule B, attached, describes the necessary measures to be implemented when the parties elect to utilize the trust created in this instrument, to convey property & stocks.

## ARTICLE EIGHT

The Settlor appoints for life in the office of Settlor & Trustee, the person listed herein who shall effective the date of execution of this document, serve as the Settlor/Trustee first: Dr. Hoda Elemary. Elemary shall have power to designate one or more individuals or corporate fiduciaries to serve concurrently or serially to succeed the trustee in the event of her inability or unwillingness to act. The Trustee may revoke this instrument in whole or in part at any time. The Trustee may at any time amend any terms of this trust. Upon the trustee's death, the entire undistributed principal and income of the trust estate shall go to Elemary's designee. The Trustee shall have the full power to sell, encumber, convey, exchange, invest, reinvest, partition, divide, improve, sever and repair the property or stocks constituting the Trust Estate from time to time. The Settlor/Trustee shall have all powers conferred on the Settlor &Trustee by law and all powers contained in California Probate Code sections 16200-16249. If any provision of this instrument is unenforceable, the remaining provisions shall remain in full effect.

*Mill Harbert*          *Dr. H. Ely*

3

ARTICLE NINE

The trust created in this instrument may be referred to as THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST.

Executed on November _3_, 2003.

_Bill L. Harbert_
BILL L. HARBERT, Trustee

I certify that I have read the foregoing declaration of trust and that it correctly states the terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustee. I approve the declaration of trust in all particulars and request that the trustee execute it.

Date: November _3_, 2003

_Bill L. Harbert_
BILL L. HARBERT, Settlor

City of Washington
DISTRICT OF COLUMBIA                    }
                                        }
UNITED STATES OF AMERICA  }

On November _3rd_, 2003, before me, _Guillaume Tourniaire GCT._ ~~Bill L. Harbert~~, personally appeared BILL L. HARBERT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity on behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.                    SEAL

_[Signature]_

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

4

# SCHEDULE A

Fifty-percent (50%) undivided interest in single family residence located at 21 LE CONTE, LAGUNA NIGUEL, CALIFORNIA 92677, and more particularly described as follows:

LOT 16 OF TRACT NO. 8551, IN THE CITY OF LAGUNA NIGUEL, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A SUBDIVISION MAP, RECORDED FEBRUARY 29, 1984, IN BOOK 522, PAGES 1 TO 17, INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 658-251-07

# SCHEDULE B

1. In order to add property to this Trust, the Parties shall sign a separate document, other than this Trust, confirming the description of those properties and/or stocks to be added to this Trust, in addition to the Property described in Schedule A, attached hereto.

2. Each of the Parties hereto agrees to execute such other and further documents as are necessary and appropriate to accomplish the transfer of said additional properties and/or stocks into this Trust, i.e., assignments, deeds, etc.

6

Executed on November 3 , 2003.

<u>                                                       </u>
DR. HODA ELEMARY, Successor Trustee

      I certify that I have read the foregoing declaration of trust and that it correctly states the terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustee. I approve the declaration of trust in all particulars and request that the trustee execute it.

Date:  November 3 , 2003         <u>                                           </u>
                              DR. HODA ELEMARY, Successor Settlor

7

# Bill L. Harbert

November 4, 2003

Ms. Hoda Elemary
2252 Caliente Road
Palm Springs, California 92264

      Re:    *21 Le Conte, Laguna Niguel, California 92677*
                  *APN 658-251-07*

Dear Hoda:

The purpose of this letter is to confirm the fact that I have no intention whatsoever to revoke now or in the future The Laguna Niguel Beach House 2003 Revocable Trust. However, if any of my heirs challenge this trust or should I be placed in a position to revoke or modify The Laguna Niguel Beach House 2003 revocable trust concerning the above-referenced property, either I or my estate will be irrevocably and unconditionally obligated to pay you the sum of three million dollars  This agreement to pay said amount is in consideration of your assistance on my behalf over the past few years in dealing with the DOJ in connection with the U.S. v. Bilhar, et al. case, which involves both criminal fine of fifty-four million dollars and civil fine of thirty million dollars.

You have Taken great risks in dealing with the DOJ and therefore earned the sum of money referenced above only in the event that I or any of my heirs, should challenge, revoke or modify the Laguna Niguel Beach House 2003 revocable trust.

With kind regards

Sincerely,

*[signature]*
Bill L. Harbert

*City of Washington*
*District of Columbia*

*Bill L. Harbert appeared personally before me, presenting an Alabama drivers license as identification*

*[signature]*

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

1

## PROOF OF SERVICE

2    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

3        I am employed in the County of Los Angeles, State of California.  I am
         over the age of 18 and not a party to the within action; my business address
4        is 467 South Arnaz Drive, Suite 319A, Los Angeles, California 90048.

5        On January 22, 2007, I served the foregoing document described as
         **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
6        **TO MOTION OF DEFENDANT BILLY HARBERT, JR. TO DISMISS**
         on the interested parties in this action by placing true copies thereof
7        enclosed in (a) sealed envelope(s) addressed as follows:

8                        [Please See Attached Service List]

9        I deposited this envelope in the mail at Los Angeles, California.  The
10       envelope was mailed with postage thereon fully prepaid.

11       I declare under penalty of perjury under the laws of the State of California
         that the forgoing is true and correct.

12

13       BRIAN J. JACOBS                          
14       Type or Print Name                       Signature

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. [UNDER SEAL]<br><br>Plaintiff,<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendants. | No. C-95-1231 WBB<br><br>FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3770(b)(2) |

## SECOND AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS AND DEMAND FOR JURY TRIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. RICHARD F. MILLER, <br><br> Plaintiff, <br><br> v. <br><br> PHILIPP HOLZMANN A.G., <br><br> BILL HARBERT INTERNATIONAL CONSTRUCTION, INC., <br><br> HARBERT INTERNATIONAL ESTABLISHMENT, INC., <br><br> HARBERT CORPORATION, <br><br> HARBERT INTERNATIONAL, INC., <br><br> HARBERT U.K. SERVICES, LTD., <br><br> J.A. JONES CONSTRUCTION COMPANY, <br><br> FRU-CON CONSTRUCTION CORP., <br><br> AMERICAN INTERNATIONAL CONTRACTORS, INC., <br><br> GEORGE A. FULLER COMPANY, <br><br> SABBIA A.G., <br><br> BILL L. HARBERT, and <br><br> ROY ANDERSON, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> No. 95-1231 WBB <br><br><br> FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |

## SECOND AMENDED COMPLAINT FOR FALSE CLAIMS
## ACT VIOLATIONS AND DEMAND FOR JURY TRIAL

Plaintiff United States of America, for its Complaint against Defendants Philipp Holzmann A.G., Bill Harbert International Construction, Inc., Harbert International Establishment, Inc., Harbert Corporation, Harbert International, Inc., Harbert U.K. Services, Ltd., J.A. Jones Construction Company, Fru-Con Construction Corp., American International Contractors, Inc., George A. Fuller Company, Sabbia A.G., Bill L. Harbert, and Roy Anderson, alleges as follows:

### NATURE OF THE CASE

1.    This is a qui tam action brought on behalf of the United States by Relator Richard F. Miller pursuant to the False Claims Act, 31 U.S.C. §§ 3729-32.  Defendants conspired to rig the bidding for construction contracts paid for by the United States Agency for International Development ("AID").  The particular transaction about which most is known is Contract 20A. This contract, which was awarded to a Joint Venture between Defendants Harbert International, Inc. and J.A. Jones Construction Co., was valued at over $100 million.  As a consequence of Defendants' conspiracy and the submission of inflated claims for payment, AID overpaid for the construction performed pursuant to Contract 20A by more than $50 million.  Pursuant to 31 U.S.C. § 3729(a), Defendants are liable for three times this amount (at least $150 million), plus civil penalties and other appropriate remedies.

## PARTIES

2.    The Plaintiff is the United States of America ("United States"), acting on behalf of the United States Agency for International Development ("AID"). The headquarters of AID is located in the District of Columbia.

3.    The Relator is Richard F. Miller. Mr. Miller, who resides in Minnesota, was Vice President and Treasurer of J.A. Jones, Inc., the parent company of Defendant J.A. Jones Construction Company, from September 1991 until March 1996. During 1986 through August 1991 Mr. Miller was Vice-President and Controller of J.A. Jones Construction Co.

4.    Defendant Philipp Holzmann Aktiengesellschaft ("Philipp Holzmann") is a German corporation with its principal place of business in Frankfurt, Germany.

5.    Defendant Bill Harbert International Construction, Inc., a Delaware corporation, controls and operates Defendant Harbert International Establishment, Inc. Bill Harbert International Construction, Inc. and Harbert International Establishment, Inc. have as their principal place of business Birmingham, Alabama.

6.    Defendant Harbert International Establishment, Inc. is a Liechtenstein corporation which, upon information and belief, has as its principal place of business Birmingham, Alabama.

7.    Defendant Harbert Corporation ("Harbert") is a Delaware corporation with its principal place of business in Birmingham, Alabama.

8.    Defendant Harbert International, Inc. ("Harbert International") is a wholly-owned Delaware subsidiary of Harbert Corporation with its principal place of business in Birmingham, Alabama.

- 3 -

9.    Defendant Harbert U.K. Services, Ltd. ("Harbert U.K."), is an English corporation, in which Defendant Harbert International Establishment holds a 49 percent share. Harbert U.K. has as its principal place of business London, England.

10.    Defendant J.A. Jones Construction Company ("Jones") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.   Jones is an indirect wholly owned subsidiary of Defendant Philipp Holzmann and is registered to do business and transact business in the District of Columbia.

11.    Defendant Sabbia Aktiengesellschaft ("Sabbia") is a Liechtenstein corporation with a principal place of business in Liechtenstein.   Sabbia is directly or indirectly owned by Defendant Philipp Holzmann.

12.    Defendant Fru-Con Construction Corp. ("Fru-Con") is a Missouri corporation with its principal place of business in Ballwin, Missouri.

13.    Defendant American International Contractors, Inc. ("American International") is a Maryland corporation with its principal place of business in Arlington, Virginia and with branch offices in, among other places, Cairo and Alexandria, Egypt. American International was originally incorporated under the name George A. Fuller Company.   George A. Fuller Company's name was changed to American International on May 11, 1989 by a corporate charter amendment in connection with the sale of certain assets, including the name George A. Fuller Company, to a newly-formed corporation which took the name George A. Fuller Company.

14.    Defendant George A. Fuller Company ("Fuller") is a Delaware corporation with its principal place of business in New York, New York.

- 4 -

15.    Defendant Bill L. Harbert is Chairman of defendant Bill Harbert International Construction, Inc., and was Chariman of defendant Harbert International Establishment, Inc.

16.    Defendant Roy Anderson was President of defendant Harbert International Establishment, Inc. He was also President of defendant Harbert U.K. Services, Ltd. and was defendant Harbert International, Inc.'s sponsor representative to the Harbert/Jones Joint Venture.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction pursuant to 31 U.S.C. § 3732(a) (False Claims Act cases), 28 U.S.C. § 1331 (claims arising under the laws of the United States), and 28 U.S.C. § 1345 (claims brought by the United States). The underlying facts substantiating this Court's jurisdiction are set forth in greater detail below.

18.    Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because, as was described above, certain Defendants transact business and are found in this judicial District and because acts proscribed by 31 U.S.C. § 3729 occurred in this District. The underlying facts substantiating the assertion of venue in this District are set forth in greater detail below.

## BACKGROUND FACTS

19.    The United States seeks recovery under the False Claims Act, 31 U.S.C. §§ 3729-3732. The False Claims Act, which originally was enacted during the Civil War, was substantially amended by the False Claims Amendments Act of 1986, which was signed into law on October 27, 1986. Pub. L. No. 99-562, 100 Stat. 3153 (1986). As amended, the Act provides that any person who, with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, conspires to or submits a false or fraudulent claim to the United States Government for payment or approval is liable to the United States for a civil penalty of up to $10,000.00 for each

claim, plus three times the amount of the damages sustained by the United States because of the false claim. The False Claims Act allows any person having knowledge of a false or fraudulent claim against the United States to bring an action in the District Court for himself and for the United States, and to share in any recovery. The party bringing the action is known as a relator and the action that a relator brings is called a qui tam action.

20. The United States Agency for International Development ("AID") is a United States agency charged with distributing international aid for the United States. AID oversees the provision of United States aid to Egypt and other countries around the world. The headquarters of AID are located in the District of Columbia.

21. The particular AID project at issue in this action involved the construction of approximately twenty-seven miles of wastewater collectors and sewers in Cairo, Egypt. In early 1989, the Organization for Execution of the Greater Cairo Wastewater Project ("Cairo Wastewater Organization") issued an Invitation to Tender for the project, known as "Contract 20A." On information and belief, this Invitation to Tender was expressly authorized and approved by AID, which was responsible for 100% of the funding of the project.

22. To ensure that the lowest possible price was obtained, the Cairo Wastewater Organization entertained competitive bids.

23. The contractors' responses to the Invitation to Tender for Contract 20A were rigged. In particular, upon information and belief, Defendant Philipp Holzmann conspired with Defendants Harbert, Fru-Con, and American International and/or Fuller, and possibly others to ensure that the lowest bid was submitted by an unincorporated Joint Venture between Defendant Harbert International, Inc. (a subsidiary of Defendant Harbert) and Defendant Jones, an indirect wholly-owned subsidiary of Defendant Philipp Holzmann. The Joint Venture, known as

- 6 -

Harbert/Jones, was owned 60% by Harbert and 40% by Jones. Harbert was designated as the managing venturer, and as such Harbert had the power to control the Joint Venture's finances and management. In 1991, as a consequence of a reorganization of the Harbert entities, Contract 20A was assigned to Harbert International Establishment, which is owned and controlled by Bill Harbert International Construction, and these companies began participating directly in the conspiracy.

24.    Pursuant to the conspiracy, Harbert/Jones submitted a bid of $114,914,339.43, far greater than it would have bid in a competitive market. Upon information and belief, Defendant Fru-Con was paid to submit a "complimentary" bid that was higher than the bid submitted by Harbert/Jones. Upon information and belief, Defendants Fuller and/or American International were paid not to submit a bid. Upon information and belief, no other companies submitted bids for Contract 20A, despite the fact that several other companies were qualified to bid on Egyptian AID projects.

25.    As a result of the agreement among the conspirators, Harbert/Jones' excessive bid was the lowest received by the Cairo Wastewater Organization. Accordingly, on April 12, 1989, AID approved the award of the contract to Harbert/Jones for the entire amount bid. The Cairo Wastewater Organization subsequently issued an April 16, 1989 Letter of Intent to Award Contract 20A to Harbert/Jones. The Agreement between Harbert/Jones and the Cairo Wastewater Organization was entered into on July 11, 1989.

26.    Construction on Contract 20A began in the spring of 1989. Managerial personnel on the project were provided by Defendant Harbert, while the construction workers were local Egyptians and other foreign nationals. Jones did not supply managerial personnel. The project was substantially completed in March 1992.

27.     To obtain payment, Harbert/Jones was required to and did submit invoices to the Greater Cairo Wastewater Authority ("Cairo Wastewater Authority").

28.     Harbert submitted the first partial invoice for payment on behalf of Harbert/Jones in August 1989. During the course of the project, Harbert submitted 33 partial invoices totaling $107,071,327.00 to the Cairo Wastewater Authority. Defendants knew, or acted in deliberate ignorance or reckless disregard of the truth, that each of the invoices submitted was false or fraudulent because each was based on the inflated contract price that resulted from Defendants' bid rigging conspiracy.

29.     Based on Harbert's submission of false or fraudulent invoices for Contract 20A, and pursuant to the requirements of the Agreement between AID and the Cairo Wastewater Organization, AID reimbursed and made payments to the Cairo Wastewater Authority. These reimbursement payments by the United States resulting from Defendants' false or fraudulent claims total at least $107,071,327.00. In making payments to the Cairo Wastewater Authority, AID relied on the invoices submitted by Harbert/Jones and Defendants knew that AID would rely on such invoices.

30.     As a consequence of the illegal conspiracy to rig the bidding for Contract 20A, Harbert/Jones (and its owners, Defendants Harbert and Jones) made a profit far in excess of the profit that would have been possible in an open competition. Harbert/Jones made more than a 60% profit on Contract 20A, or in excess of $65 million. This is far in excess of normal profits on international contracts.

31.     Upon information and belief, pursuant to the agreement of the conspirators, Defendants Fru-Con, Fuller and/or American International, and possibly others were paid for their complicity in the bid rigging process. Upon information and belief, Defendant Sabbia has

- 8 -

participated in the conspiracy as a conduit for at least some of these payoffs made in furtherance of the conspiracy. All Defendants have conspired to receive and/or transfer funds in furtherance of the conspiracy.

32. Defendants have engaged in numerous acts of subterfuge to conceal the excess profits from Contract 20A. In particular:

(a) Defendants Philipp Holzmann and Harbert International, Inc. refused to allow a Jones cost engineer to be assigned to Contract 20A;

(b) The Jones internal audit group was not permitted to visit the site and audit the project;

(c) Defendants Harbert U.K. Services, Ltd. and Philipp Holzmann charged the Harbert/Jones Joint Venture for "pre-bid consulting services" and "U.S. consulting services." Upon information and belief, the purpose of this transfer was to pay other contractors pursuant to the conspiracy;

(d) Defendant Harbert wire-transferred approximately $3.35 million to Philipp Holzmann for fictitious "preconstruction costs";

(e) As managing venturer of the Harbert/Jones Joint Venture, Defendant Harbert entered a "sale/leaseback" transaction for construction equipment used on Contract 20A with Defendant Sabbia, a separate corporation controlled by Philipp Holzmann. However, while Harbert/Jones made eighteen lease payments of $800,000.00 each to Sabbia, the $4 million for the "sale" portion of the transaction was never received by Harbert/Jones but instead was maintained in a Swiss bank account in the name of Sabbia;

(f)     Upon information and belief, individuals received additional compensation to maintain their silence concerning the conspiracy; and

(g)     To reduce the stated profit, administrative costs that pertained to another Egyptian contract were charged to Contract 20A, despite the fact that Contract 20A was already substantially completed.

33.     As a consequence of Defendants' actions, the United States has been defrauded and suffered damages. Such damages include at least Harbert/Jones' actual excess profits, which have been underreported, plus any amounts paid to co-conspirators in the bid rigging scheme.

34.     Defendants' actions alleged above were intended to defraud the United States and to gain allowance and payment of false or fraudulent claims. Defendants had actual knowledge or acted in deliberate ignorance or reckless disregard of the truth that their actions would result in the submission of false or fraudulent claims to the United States for approval and payment.

35.     The facts material to this right of action were not known and reasonably should not have been known by a Government official charged with responsibility to act in the circumstances prior to the submission of this Complaint. None of the allegations pertaining to Defendants' wrongdoing is based upon public disclosure of allegations or transactions as such disclosure is defined in 31 U.S.C. § 3230(e)(4).

36.     Relator Miller brings this action based upon his direct and independent knowledge and upon information and belief. Prior to filing this Complaint, Miller brought the substance of the allegations in this Complaint to the attention of the United States Government.

37.     Plaintiff has received information that there was a "club" in Frankfurt, Germany of contractors qualified to perform AID contracts in Egypt; the club was organized to control prices in what should have been full and open competition for AID contracts. Upon information

and belief, discovery in this case will reveal that other AID contracts in Egypt were subject to similar and related collusive agreements on price that resulted in the submission of other false or fraudulent claims to the U.S. Government.

## COUNT I: SUBMISSION OF FALSE CLAIMS

38.    The United States incorporates the allegations of Paragraphs 1-35 as if fully set forth herein.

39.    The foregoing acts and omissions by Defendants constitute the knowing presentation of a false or fraudulent claim to the United States or the knowing use of a false statement to get a false or fraudulent claim paid or approved in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)-(2).

40.    As a consequence of Defendants' conduct, the United States has suffered actual damages in an amount to be proven at trial.

## COUNT II: CONSPIRACY TO SUBMIT FALSE CLAIMS

41.    The United States incorporates the allegations of Paragraphs 1-35 as if fully set forth herein.

42.    The foregoing acts and omissions by Defendants constitute a conspiracy to present a false or fraudulent claim to the United States or to use a false statement to get a false or fraudulent claim paid or approved in violation of the False Claims Act, 31 U.S.C. § 3729(a)(3).

43.    As a consequence of Defendants' conduct, the United States has suffered actual damages in an amount to be proven at trial.

## RELIEF SOUGHT

WHEREFORE, the United States requests that this Court grant the following relief:

(a)    That the United States be awarded damages in the amount of three' times the damages sustained by the United States as a result of the Defendants' acts and omissions alleged within this Complaint;

(b)    That civil penalties of $10,000.00 be imposed for each and every false statement used to get a false claim paid, each and every false claim presented by Defendants to the United States, and each and every conspiracy;

(c)    That this Court award pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses that the Relator necessarily incurred in bringing this Complaint and conducting this litigation; and

(d)    That this Court grant such other relief as it deems just and proper.

## JURY REQUEST

Plaintiff requests a trial by jury of all issues so triable.

*Robert B. Bell*

Robert B. Bell
D.C. Bar No. 338368

WILMER, CUTLER & PICKERING
2445 M Street, N.W.
Washington, DC  20037
(202) 663-6533

Attorney for Relator Richard F. Miller

## CERTIFICATE OF SERVICE

This is to certify that a copy of Relator Richard F. Miller's Motion for Leave to File Second Amended Complaint, Memorandum in Support thereof, proposed Order, and the Second Amended Complaint, all filed under seal, have been served by first class mail postage prepaid, this 29th of December, 2000 on:

> Keith Morgan, D.C. Bar #422665
> Assistant U.S. Attorney
> 555 4th Street, N.W.
> Washington, D.C. 20001
>
> Carolyn G. Mark, D.C. Bar #254177
> Attorney, Civil Division
> U.S. Department of Justice
> Post Office Box 261
> Ben Franklin Station
> Washington, D.C. 20044

> *Robert B. Bell*
> ROBERT B. BELL, D.C. Bar #338368

- 13 -

EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA )
ex rel. Richard F. Miller, )
)
Plaintiffs, )
)
v. )  Case No. 1:95CV01231 WBB
)
PHILIPP HOLZMANN A.G., )
BILL HARBERT INTERNATIONAL )
CONSTRUCTION, INC., BILHAR )
INTERNATIONAL ESTABLISHMENT )
f/k/a HARBERT INTERNATIONAL )
ESTABLISHMENT, HARBERT )
INTERNATIONAL ESTABLISHMENT, )
HARBERT CORPORATION, HARBERT )
INTERNATIONAL, INC., HARBERT )
CONSTRUCTION SERVICES (U.K.) LTD., )
J.A. JONES CONSTRUCTION COMPANY, )
SABBIA A.G., and ROY ANDERSON )
)
Defendants. )

RECEIVED
DEC 1 0 2002
NANCY MAYER WHITTINGTON CLERK
U.S. DISTRICT COURT

## UNITED STATES' FIRST AMENDED COMPLAINT

Plaintiff, United States of America, by its undersigned counsel, represents as

follows:

### Introduction

1.    This is an action brought by plaintiff, United States of America, to recover

treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, and

to recover damages under common law theories of breach of contract, unjust enrichment,

and payment by mistake.

2.    Relator, Richard F. Miller, originally filed this action, on behalf of plaintiff United States, pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. §3730(b)(1). The United States files this First Amended Complaint in Intervention pursuant to 31 U.S.C. § 3730(b)(4)(A).

3.    The action arises out of a conspiracy entered into between defendants through their respective agents, to cause the submission of false and inflated claims to the United States.

4.    Defendants conspired to rig bids on wastewater treatment projects located in the Arab Republic of Egypt ("Egypt"). The United States Agency for International Development ("AID") funded the projects at issue.

5.    The purpose of the conspiracy was to obtain a collusive, artificially inflated, and noncompetitive price for the projects and an illegal and inflated profit thereon. As a result of the conspiracy, the defendants submitted and caused to be submitted false and inflated claims for payment to the United States for work done on the wastewater treatment projects.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3730 and 3732.

7.    This Court has personal jurisdiction over defendants, pursuant to 31 U.S.C. §3732 (a) because certain defendants transact business and are found in this District.

- 2 -

8.    Venue is proper in this District pursuant to 31 U.S.C. §3732(a), and under 28 U.S.C. §§1391(b) and 1395(a).

## PARTIES

9.    Plaintiff in this action is the United States of America, acting on behalf of the U.S. Agency for International Development, an agency of the U.S. Department of State.

10.    The person who brought the action under the qui tam provisions of the False Claims Act, 31 U.S.C. §3730 (b), is Richard F. Miller.

11.    Defendant Philipp Holzmann Aktiengesellschaft ("Holzmann") is a German corporation with its principal place of business in Frankfurt, Germany.

12.    Defendant J.A. Jones Construction Company ("Jones") is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Jones is an indirect wholly owned subsidiary of defendant Holzmann and is registered to do business and transact business in the District of Columbia.

13.    Defendant Harbert Corporation is a Delaware corporation with its principal place of business in Birmingham, Alabama.

14.    Defendant Harbert International, Inc. ("HII") is a wholly-owned Delaware subsidiary of Harbert Corporation with its principal place of business at One Riverchase Parkway South, Birmingham, Alabama.

15.    Defendant Bill Harbert International Construction, Inc. ("BHIC"), is a Delaware corporation, that engaged in international construction, including in Egypt,

- 3 -

during the period of the complaint. Beginning on or about December 10, 1991, and continuing throughout the rest of the conspiracy period, BHIC was the *de facto* joint venture partner with defendant Jones on USAID-funded contracts in Egypt. BHIC is owned and controlled by Bill L. Harbert. BHIC has its principal place of business at 820 Shades Creek Parkway, Birmingham, Alabama. From December 10, 1991, until at least the end of the conspiracy period, BHIC was also known as Harbert International.

16.    Defendant Bilhar International Establishment f/k/a Harbert International Establishment ("HIE"), is a Liechtenstein corporation, with its principal place of business at 820 Shades Creek Parkway, Birmingham, Alabama. On or about September 21, 1993, Harbert International Establishment changed its name to Bilhar International Establishment. During the period of the complaint, HIE engaged in the international construction business, including in Egypt. Before December 10, 1991, HIE was owned fifty percent by Harbert International, Inc., and fifty percent by Bill L. Harbert. Since December 10, 1991, Bill L. Harbert has owned twenty-one percent of HIE and BHIC has owned seventy-nine percent. During the conspiracy period, HIE was also known as Harbert International.

17.    Defendant Harbert Construction Services (U.K.) Ltd. ("Harbert U.K."), is an English corporation, in which HIE holds a 49 percent share. Harbert U.K. has its principal place of business in London, England.

- 4 -

18.    Defendant Sabbia Aktiengesellschaft ("Sabbia") is a Liechtenstein corporation with a principal place of business in Liechtenstein.  Sabbia is directly or indirectly owned by defendant Holzmann.

19.    Defendant Roy Anderson was president of defendant HIE and defendant Harbert U.K.  Defendant Anderson also acted as vice president of defendant HII with overall responsibility and authority for HII's performance and administration of contracts, including those with agencies of the United States.  Defendant Anderson was the Harbert companies' representative to the joint ventures with defendant Jones on USAID-funded contracts in Egypt.  From on or about December 10, 1991, until the end of the conspiracy period, defendant BHIC represented to others that Roy Anderson was the president of its international division in matters affecting United States-funded construction contracts in Egypt.

20.    ABB ASEA Brown Boveri, Ltd., is a Swiss company with its principal place of business in Zurich, Switzerland.  ABB ASEA Brown Boveri, Ltd., is the ultimate parent company of ABB SUSA, Inc., formerly known as Sadelmi U.S.A., Inc., a New York company with its principal place of business in North Brunswick, New Jersey.

21.    Archirodon Group, Inc. was, during the conspiracy period, a Panamanian company headquartered in Geneva, Switzerland.  Archirodon Group, Inc. was the owner of the George A. Fuller Company, a Maryland company with its principal place of business in Virginia.

- 5 -

22.    Bilfinger + Berger Bauaktiengesellschaft is a German company with its

principal place of business in Mannheim, Germany. Bilfinger + Berger is the parent

company of Fru-Con Construction, Inc., a Missouri corporation with its principal place of

business in Ballwin, Missouri.

23.    The Harbert-Jones Companies were joint ventures that were created to bid

on and, if the bids were successful, perform USAID-funded contracts in Egypt.

Defendant J.A. Jones Construction Company held a forty percent share of each of these

joint ventures. Defendant HII held a sixty percent share of each joint venture during the

prequalification stage of each USAID-funded contract in Egypt. After USAID awarded

Contracts 20A and 07 to the Harbert-Jones Companies, defendant HII assigned its interest

in the contracts to defendant HIE for one dollar.

## STATEMENT OF FACTS

### CONTRACT 20A

24.    In early 1988, the Organization for Execution of the Greater Cairo

Wastewater Project ("Cairo Wastewater Organization") issued an Invitation to Tender for

the project known as Contract 20A.

25.    The Invitation to Tender indicated that Contract 20A was to be funded by

AID.

26.    The Invitation to Tender indicated that bids for Contract 20A were to be

submitted in sealed packages.

27.    In or about May 1988, conspirators acting on behalf of the Harbert-Jones Companies held a meeting in the Frankfurt, Germany offices of defendant Philipp Holzmann AG during which competitors discussed the submission of non-competitive bids on Contract 20A.

28.    In or about June 1988, conspirators acting on behalf of the Harbert-Jones Companies negotiated a bid-rigging agreement with Bilfinger + Berger, under which it was agreed that Fru-Con Construction, Inc. would submit an artificially inflated bid on Contract 20A in exchange for payment of money.

29.    On or about June 30, 1988, defendants HII and Jones formed an unincorporated joint venture known as the Harbert-Jones Companies to bid on Contract 20A. The joint venture was owned 60% by HII and 40% by Jones. HII was designated to undertake the overall duties of sponsor and coordinator for Contract 20A.

30.    On or about August 3, 1988, defendant Philipp Holzmann AG, acting on behalf of the Harbert-Jones Companies, negotiated an agreement with Archirodon Group, Inc., under which it was agreed that the George A. Fuller Company would not bid on Contract 20A in exchange for payment of money.

31.    On or about August 3, 1988, defendant Anderson, acting on behalf of the Harbert-Jones Companies, submitted a letter to the project owner of Contract 20A increasing the previously submitted Harbert-Jones Companies' bid on Contract 20A by 3.5 percent to approximately $129 million.

32.    On or about August 4, 1988, conspirators made bid submissions in accordance with the bid-rigging agreement on Contract 20A.

33.    The Harbert-Jones Companies submitted a bid on Contract 20A, as did Fru-Con Construction, Inc.

34.    The Harbert-Jones Companies' bid was the lowest received on Contract 20A.

35.    On or about April 12, 1989, AID approved the award of Contract 20A to the Harbert-Jones Companies.

36.    On or about April 16, 1989, a Letter of Intent to Award Contract 20A was issued to the Harbert-Jones Companies.

37.    On or about April 16, 1989, defendant HII sold, assigned, and transferred all its rights under Contract 20A to defendant HIE.

38.    The Harbert-Jones Companies entered into Contract 20A on or about July 11, 1989.

39.    During the period between August 1989 and December 10, 1991, agents for defendant HII, and from December 10, 1991, until June 20, 1993, agents for defendant BHIC, acting on behalf of the Harbert-Jones Companies, submitted 33 invoices, as further identified by Schedule A attached hereto and incorporated herein, to the Greater Cairo Wastewater Authority ("Cairo Wastewater Authority").

- 8 -

40.    During the period between August 1989 and December 10, 1991, agents for defendant HII, and from December 10, 1991, until June 20, 1993, agents for defendant BHIC, acting on behalf of the Harbert-Jones Companies, submitted to USAID a total of 33 material false representations in documents entitled "Contractor's Certificate and Agreement with Agency for International Development – Contractor's Invoice and Contract Abstract" on Contract 20A in which they falsely certified that no one had been compensated in order to obtain the contract, when in fact more than $5,226,000 had been paid to conspirators in order for the Harbert-Jones Companies to obtain the contract.

41.    The Cairo Wastewater Authority submitted the 33 invoices to AID.

42.    AID paid the Harbert-Jones Companies for each of the 33 invoices submitted on Contract 20A.

43.    Unknown to plaintiff United States, each of the 33 invoices submitted on Contract 20A were inflated because the defendants, pursuant to their secret agreement, had obtained Contract 20A at an artificially high price.

44.    Pursuant to its agreement on Contract 20A with its co-conspirators, defendants caused payments to be made to the co-conspirators for submitting a higher bid or not bidding at all.

45.    On or about December 7, 1988, defendant Anderson, acting on behalf of the Harbert-Jones Companies, and a co-conspirator renegotiated the payment terms of the bid-rigging agreement with Archirodon Group, Inc. on Contract 20A.

46.    On or about January 16, 1990, defendant Anderson, acting on behalf of HIE and others, met with agents from Archirodon Group, Inc. to discuss the payment schedule under the bid-rigging agreement on Contract 20A.

47.    On or about January 17, 1990, defendant Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A.

48.    On or about January 30, 1990, defendant Philipp Holzmann AG paid $1,000,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A.

49.    On or about June 1, 1990, defendant Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A.

50.    On or about June 11, 1990, defendant Philipp Holzmann AG paid $1,026,029 to Bilfinger + Berger under the bid-rigging agreement on Contract 20A.

51.    On or about October 29, 1990, defendant Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A.

52.    During the period between March 1990 and the end of October 1990, defendant Anderson and others instructed the Harbert-Jones Companies to pay approximately $3,361,503 to various Swiss bank accounts controlled by defendant Philipp Holzmann AG in order to reimburse it for the payments to Archirodon Group, Inc. and Bilfinger +Berger under the bid-rigging agreements.

53.    On or about December 18, 1990, defendant Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A.

54.    On or about June 10, 1991, defendant Philipp Holzmann AG paid $1,200,000 to Bilfinger + Berger under the bid-rigging agreement on Contract 20A.

55.    Defendants have engaged in acts to conceal profits from Contract 20A.    In particular:

a.    Defendants Harbert U.K. and Holzmann charged the Harbert-Jones Companies for "pre-bid consulting services" and "U.S. consulting services";

b.    As managing venturer of the Harbert-Jones Companies, defendant Harbert caused the Harbert-Jones Companies to wire-transfer approximately $3.35 million to Holzmann for fictitious "preconstruction costs";

c.    As managing venturer of the Joint Venture, defendant Harbert entered a "sale/leaseback" transaction for construction equipment used on Contract 20A with defendant Sabbia.  The Harbert-Jones Companies made eighteen lease payments of $800,000 each to Sabbia, the "sale" portion of $4 million was never paid to the Harbert-Jones Companies but instead was maintained in a Swiss bank account in the name of Sabbia;

d.    Administrative costs that pertained to another Egyptian contract were charged to Contract 20A.

- 11 -

## CONTRACT 07

56.    In or about 1989, the Alexandria General Organization for Sanitary Drainage("AGOSD") issued an Invitation to Tender for the project known as Contract 07.

57.    The Invitation to Tender indicated that Contract 07 was to be funded by AID.

58.    The Invitation to Tender indicated that bids for Contract 07 were to be submitted in sealed packages.

59.    In or about October 1990, defendants Holzmann, Harbert, and Anderson, on behalf of the Joint Venture, conspired together and with Bilfinger + Berger to rig the bids on Contract 07, under which it was agreed that Fru-Con Construction, Inc. would submit an artificially inflated bid on Contract 07.

60.    Defendants Holzmann, Harbert, and Anderson agreed with Bilfinger + Berger that the winning bidder would pay the losing bidder a sum certain.  The amount to be paid to the losing bidder was a "loser's fee."

61.    Fru-Con Construction, Inc. did not submit a bid on Contract 07.

62.    The Harbert-Jones Companies submitted the lowest bid on Contract 07.

63.    On or about March 8, 1991, HII sold, ~~assigned~~, and transferred all its rights under Contract 07 to HIE.

64.    The Harbert-Jones Companies entered into Contract 07 on or about May 14, 1991.

- 12 -

65.    Between September 1991 and December 1994, Defendant Holzmann paid Bilfinger + Berger a loser's fee of 1,500,000 German marks under the bid-rigging agreement on Contract 07.

66.    During the period between July 1991 and December 10, 1991, agents for defendant HII, and from December 10, 1991, until January 18, 1995, agents for BHIC, on behalf of the Harbert-Jones Companies, submitted 22 invoices, as further identified by Schedule B attached hereto and incorporated herein, to the Alexandria General Organization for Sanitary Drainage("AGOSD").

67.    During the period between July 1991 and December 10, 1991, agents for defendant HII, and from December 10, 1991, until January 18, 1995, agents for defendant BHIC, acting on behalf of the Harbert-Jones Companies, submitted to USAID a total of 22 material false representations in documents entitled "Contractor's Certificate and Agreement with Agency for International Development – Contractor's Invoice and Contract Abstract" on Contract 07 in which they falsely certified that no one had been compensated in order to obtain the contract, when in fact 1,500,000 German marks had been paid to conspirators in order for the Harbert-Jones Companies to obtain the contract.

68.    The AGOSD submitted the 22 invoices to AID.

69.    AID paid the Harbert-Jones Companies for each of the 22 invoices submitted on Contract 07.

- 13 -

70.    Unknown to plaintiff United States, each of the 22 invoices submitted on Contract 07 were inflated because the defendants, pursuant to their secret agreement, had obtained Contract 07 at an artificially high price.

71.    Due to the self-concealing nature of the conspiracy between defendants and their co-conspirator, the facts material to its right of action as to Contract 07 were not known and reasonably should not have been known by the official of the United States charged with responsibility to act in the circumstances prior to 1999. In 1999, the Civil Division of the U.S. Department of Justice learned facts material to the bid rigging on Contract 07.

## CONTRACT 29

72.    The Cairo Wastewater Organization also issued an Invitation to Tender for the project known as Contract 29, to build a wastewater treatment facility at Abu Rawash, Egypt.

73.    Contract 29 was also to be funded by AID.

74.    In or about April 1989, defendants Holzmann, Harbert, and Anderson conspired with each other and with Sadelmi U.S.A., Inc. to rig the bids on Contract 29.

75.    Defendants Holzmann, Harbert, and Anderson agreed that the Harbert-Jones Companies would submit an artificially inflated bid on Contract 29 in exchange for the payment of money from ABB ASEA Brown Boveri, Ltd.

76.    On or about July 2, 1989, defendant Anderson, acting on behalf of the

Harbert-Jones Companies, and Sadelmi U.S.A., Inc., submitted bids on Contract 29, in

accordance with the bid-rigging agreement on Contract 29. The Harbert-Jones

Companies' bid was higher than the bid submitted by Sadelmi U.S.A., Inc.

77.    On or about December 24, 1989, AID approved the award of Contract 29 to

Sadelmi U.S.A., Inc.

78.    On or about December 24, 1989, a Notice of Award of Contract 29 was

issued to Sadelmi U.S.A., Inc.

79.    On or about August 27, 1990, defendant Holzmann received $3.4 million

from ABB ASEA Brown Boveri, Ltd. under the bid-rigging agreement on Contract 29.

80.    On or about January 4, 1991, defendant Philipp Holzmann AG paid

approximately $1.34 million to a co-conspirator as its share of the proceeds under the bid-

rigging agreement on Contract 29.

81.    On or about January 29, 1991, defendant Philipp Holzmann AG paid $2.01

million to a co-conspirator as its share of the proceeds under the bid-rigging agreement

on Contract 29 .

82.    During the period between May 1990 and September 20, 1996, Sadelmi

U.S.A., Inc. submitted 56 payment requests on Contract 29.

83.    During the period between May 1990 and September 20, 1996, Sadelmi

U.S.A., Inc. submitted to USAID 56 material false representations in documents entitled

"Contractor's Certificate and Agreement with Agency for International Development –

Contractor's Invoice and Contract Abstract" on Contract 29 in which its agents falsely

certified that no one had been compensated in order to obtain the contract, when in fact

$3.4 million dollars had been paid to defendant Philipp Holzmann AG in order to obtain

the contract.

84.    During the course of Contract 29, AID made payments for work performed,

as further identified by Schedule C attached hereto and incorporated herein.

85.    Unknown to plaintiff United States, each of the payments by AID for

Contract 29 were inflated because the defendants, pursuant to their secret agreement, had

caused Contract 29 to be bid at an artificially high price.

86.    Due to the self-concealing nature of the conspiracy between defendants and

their co-conspirator, the facts material to its right of action as to Contract 29 were not

known and reasonably should not been known by the official of the United States charged

with responsibility to act in the circumstances prior to January 2001. In January 2001, the

Civil Division of the U.S. Department of Justice learned facts material to the bid rigging

on Contract 29.

## PRIOR CRIMINAL PROSECUTION OF DEFENDANTS

87.    On August 18, 2000, an Information was filed in the Northern District of

Alabama, Southern Division, against defendant Holzmann alleging that at least as early as

June 1988 and continuing until at least January 18, 1995, defendant Holzmann and co-

conspirators entered into and participated in a combination and conspiracy to suppress and eliminate competition by rigging the bids on certain wastewater construction contracts, specifically Contracts 20A and Contract 07. The information alleged that, in furtherance of the conspiracy, defendant Holzmann and co-conspirators, among other things, met and agreed to bid at certain levels on Contract 20A and Contract 07, and agreed that the co-conspirators would be compensated by defendant Holzmann in exchange for their commitments to reduce or eliminate competition on Contract 20A and Contract 07.

88.     On August 18, 2000, defendant Holzmann, pursuant to a plea agreement with the United States, pled guilty to the charges set forth in the Information.

89.     The allegations contained in the Information and plea agreement are hereby incorporated by reference into this First Amended Complaint in Intervention.

90.     On or about July 25, 2001, a grand jury sitting in the Northern District of Alabama issued an indictment against defendants BHIC, Bilhar International Establishment f/k/a Harbert International Establishment, and Roy Anderson. United States v. Bill Harbert International Construction, Inc., et al., CR-01-PT-302-S (N.D. Ala.). The indictment alleged that beginning at least as early as May 1988 and continuing at least until September 20, 1996, defendants BHIC, HIE, Anderson, and co-conspirators entered into and participated in a combination and conspiracy to suppress and eliminate competition on construction contracts funded by the United States, through the USAID in

the Arab Republic of Egypt, specifically Contract20A, Contract 07, and Contract 29, in

violation of Section 1 of the Sherman Act, 15 U.S.C. §1. The indictment further charged

that defendants BHIC, HIE, Anderson and co-conspirators beginning at least as early as

May 1988 and continuing at least until September 20, 1996, knowingly and wilfully

conspired to defraud USAID in the procurement of construction services on Contract

20A, Contract 29, and Contract 07, in violation of 18 U.S.C. §371.

91.     On or about February 4, 2002, Bilhar International Establishment f/k/a

Harbert International Establishment entered a plea of guilty to conspiring to rig bids on

AID-funded contracts in Egypt, in violation of 15 U.S.C. §1.

92.     On February 12, 2002, defendant Anderson was found guilty by a federal

jury on both counts of the federal indictment. Judgment in *United States v. Anderson*,

CR-01-PT-302-S (N.D. Ala.).

93.     The allegations contained in the Indictment and plea agreement are hereby

incorporated by reference into this First Amended Complaint in Intervention.

## FIRST CAUSE OF ACTION

### (False Claims Act)

94.     This is a claim for treble damages and civil penalties under the False

Claims Act, 31 U.S.C. § 3729, as amended.

95.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1

through 93 as if set forth fully herein.

96.    By virtue of the acts set forth above, defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment, in violation of 31 U.S.C. § 3729(a)(1).    Defendants knew that these claims for payment were false, fraudulent or fictitious, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false. These claims, therefore, were false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. §3729 (a) (1).

97.    By virtue of the acts set forth above, defendants knowingly made and used, or caused to be made or used, false statements to get false or fraudulent claims paid by the United States, in violation of 31 U.S.C. § 3729(a)(2).

98.    By virtue of the acts set forth above, defendants conspired with each other and other unnamed co-conspirators, to defraud the United States by getting false or fraudulent claims paid or approved, in violation of 31 U.S.C. § 3729(a)(3).

99.    By virtue of the acts set forth above, plaintiff United States paid false or fraudulent claims.

100.    By reason of these payments, the United States has incurred damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

101.    This is an action by the United States for damages to recover money paid to defendants by which defendants have been unjustly enriched.

- 19 -

102. Plaintiff incorporates by reference the allegations set forth above in paragraphs 1 through 93 as if set forth fully herein.

103. By reason of its payments on Contract 20A, Contract 07, and Contract 29, defendants have received money to which they were not entitled and by which defendants have been unjustly enriched, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
(Money Paid Under Mistake Of Fact)

104. This is an action by the United States to recover money paid to defendants under a mistake of fact on Contract 20A and Contract 07.

105. Plaintiff incorporates by reference the allegations set forth above in paragraphs 1 through 93 as if set forth fully herein.

106. Plaintiff made payments on the defendants' claims for payment on Contract 20A and Contract 07 under the erroneous beliefs that defendants' invoices were non-collusive, competitive bids.

107. Plaintiff's erroneous beliefs were material to the amount of the payments made by plaintiff.

108. Because of these mistakes of fact, defendants have received money to which they are not entitled.

109. By reason of these overpayments, plaintiff is entitled to damages in an amount to be determined at trial.

WHEREFORE, plaintiff demands judgment against the defendant as follows:

- 20 -

A. On Count One, judgment against all defendants for triple the damages sustained by plaintiff, a total still to be determined, plus civil penalties as are allowable by law in the amount of $5,000 to $10,000 per violation, costs, and all other proper relief;

B. On Count Two, judgment against all defendants in the amount of the unjust enrichment, a total still be to determined, pre-judgment interest, costs, and all other proper relief.

C. On Count Three, judgment against all defendants for the damages sustained, pre-judgment interest, costs, and all other proper relief.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

ROSCOE HOWARD , DC Bar #
United States Attorney
District of Columbia

MARK E. NAGLE, DC Bar # 416264
Assistant United States Attorney

KEITH MORGAN, D.C. Bar #422665
Assistant United States Attorney

MICHAEL F. HERTZ, D.C. Bar #965780
STEPHEN D. ALTMAN, D.C. Bar #226886
CAROLYN G. MARK, D.C. Bar #254177
Attorneys, Civil Division
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0256

Attorneys for The

- 21 -

— United States of America

Dated: _____

## SCHEDULE A

## CONTRACT 20A

| NO. | DATE OF CLAIM | AMOUNT OF CLAIM |
|---|---|---|
| 1 | 10/03/89 | $4,016,982.31 |
| 2 | 11/06/89 | $3,311,441.94 |
| 3 | 12/10/89 | $2,551,555.53 |
| 4 | 01/08/90 | $1,183,721.07 |
| 5 | 02/13/90 | $2,836,835.50 |
| 6 | 03/07/90 | $2,306,280.00 |
| 7 | 04/05/90 | $3,580,539.00 |
| 8 | 05/09/90 | $2,999,733.00 |
| 9 | 06/05/90 | $4,501,373.00 |
| 10 | 06/27/90 | $3,352,551.00 |
| 11 | 08/14/90 | $3,150,081.00 |
| 12 | 09/06/90 | $2,813,958.00 |
| 13 | 10/17/90 | $3,593,299.00 |
| 14 | 11/07/90 | $4,175,496.00 |
| 15 | 12/04/90 | $4,659,610.00 |
| 16 | 01/16/91 | $4,121,559.00 |
| 17 | 02/05/91 | $6,268,099.00 |
| 18 | 02/27/91 | $5,301,639.00 |
| 19 | 04/09/91 | $5,691,495.00 |
| 20 | 05/19/91 | $6,046,839.00 |
| 21 | 06/13/91 | $5,629,663.00 |
| 22 | 07/11/91 | $5,503,716.00 |
| 23 | 08/06/91 | $5,129,167.00 |
| 24 | 09/05/91 | $2,587,875.00 |
| 25 | 10/16/91 | $839,233.00 |
| 26 | 11/21/91 | $2,072,370.00 |
| 27 | 12/09/91 | $1,628,765.00 |
| 28 | 01/16/92 | $755,210.00 |
| 29 | 03/10/92 | $714,146.00 |
| 30 | 04/12/92 | $2,587,495.00 |
| 31 | 12/08/92 | $457,252.00 |
| 32 | 03/30/93 | $2,676,102.00 |
| 33 | 06/20/93 | $27,243.00 |

**TOTAL PAID:**     **$ 107,071,324.35**

## SCHEDULE B

## CONTRACT 07

| NO. | DATE OF CLAIM | AMOUNT OF CLAIM |
|-----|---------------|-----------------|
| 1 | 09/05/91 | $4,005,232.00 |
| 2 | 03/10/92 | $445,156.93 |
| 3 | 03/30/92 | $400,135.31 |
| 4 | 04/16/92 | $751,857.40 |
| 5 | 05/13/92 | $921,713.64 |
| 6 | 06/17/92 | $2,129,590.03 |
| 7 | 07/16/92 | $948,390.76 |
| 8 | 07/27/92 | $726,827.76 |
| 9 | 08/30/92 | $2,122,687.98 |
| 10 | 10/15/92 | $2,780,571.44 |
| 11 | 11/16/92 | $1,998,006.62 |
| 12 | 12/17/92 | $2,552,396.22 |
| 13 | 01/26/93 | $3,321,699.40 |
| 14 | 02/08/93 | $2,979,567.22 |
| 15 | 03/04/93 | $2,760,991.07 |
| 16 | 03/30/93 | $2,337,611.42 |
| 17 | 05/09/93 | $2,911,152.61 |
| 18 | 06/27/93 | $4,070,215.50 |
| 19 | 07/19/93 | $741,108.90 |
| 20 | 09/26/93 | $1,169,000.40 |
| 21 | 10/18/93 | $2,195,075.55 |
| 22 | 01/18/95 | $967,603.47 |

**TOTAL PAID:**        **$ 43,236,591.63**

## SCHEDULE C

## CONTRACT 29

| NO. | DATE OF PAYMENT | AMOUNT OF CLAIM |
|-----|-----------------|-----------------|
| 1 | 7/09/90 | $4,200,325.00 |
| 2 | 7/30/90 | $4,374,305.00 |
| 3 | 9/06/90 | $1,822,341.00 |
| 4 | 10/09/90 | $2,745,042.00 |
| 5 | 11/05/90 | $3,991,571.00 |
| 6 | 11/19/90 | $5,067,454.00 |
| 7 | 12/18/90 | $3,317,918.00 |
| 8 | 1/21/91 | $5,154,415.00 |
| 9 | 2/18/91 | $5,243,185.00 |
| 10 | 3/14/91 | $6,880,074.00 |
| 11 | 4/09/91 | $5,058,072.00 |
| 12 | 5/21/91 | $4,938,854.00 |
| 13 | 6/11/91 | $2,466,239.00 |
| 14 | 7/24/91 | $4,737,599.00 |
| 15 | 8/13/91 | $3,764,746.00 |
| 16 | 9/11/91 | $3,891,003.00 |
| 17 | 10/16/91 | $4,779,653.00 |
| 18 | 11/19/91 | $4,222,541.00 |
| 19 | 12/16/91 | $4,207,250.00 |
| 20 | 1/23/92 | $5,515,178.00 |
| 21 | 2/24/92 | $5,198,184.00 |
| 22 | 3/30/92 | $2,144,230.00 |
| 23 | 4/20/92 | $2,802,685.00 |

| NO. | DATE OF PAYMENT | AMOUNT OF CLAIM |
|-----|----------------|------------------|
| 24 | 5/25/92 | $5,938,216.00 |
| 25 | 6/25/92 | $3,420,560.00 |
| 26 | 8/03/92 | $2,906,453.00 |
| 27 | 9/03/92 | $3,137,254.00 |
| 28 | 9/28/92 | $2,284,612.00 |
| 29 | 10/27/92 | $2,193,404.00 |
| 30 | 12/09/92 | $1,610,297.00 |
| 31a | 12/29/92 | $ 999,999.00 |
| 31b | 12/29/92 | $ 999,999.00 |
| 31c | 12/29/92 | $ 999,999.00 |
| 31d | 12/29/92 | $ 999,999.00 |
| 31e | 12/29/92 | $ 999,999.00 |
| 31f | 12/29/92 | $ 999,999.00 |
| 31g | 12/29/92 | $ 96,299.00 |
| 32 | 1/93 | $1,684,695.00 |
| 33 | 3/14/93 | $1,772,838.00 |
| 34a | 4/12/93 | $ 657,884.98 |
| 34b | 4/12/93 | $ 770,231.02 |
| 35 | 5/11/93 | $ 353,035.00 |
| 36 | 6/16/93 | $ 368,172.00 |
| 37 | 7/13/93 | $ 342,113.00 |
| 38 | 8/10/93 | $ 730,252.00 |
| 39 | 9/12/93 | $ 338,306.00 |
| 40 | 11/29/93 | $ 614,678.00 |

Schedule C, page 2

| NO. | DATE OF PAYMENT | AMOUNT OF CLAIM |
|-----|-----------------|-----------------|
| 41 | 12/27/93 | $ 427,680.00 |
| 42 | 1/12/94 | $ 123,500.00 |
| 43 | 2/15/94 | $ 331,961.00 |
| 44 | 3/17/94 | $ 142,645.00 |
| 45 | 4/18/94 | $ 206,150.00 |
| 46 | 5/09/94 | $ 68,583.00 |
| 47 | 6/22/94 | $ 415,068.00 |
| 48 | 7/13/94 | $ 101,432.00 |
| 49 | 8/07/94 | $ 119,700.00 |
| 50 | 9/06/94 | $ 47,500.00 |
| 51 | 10/17/94 | $ 95,000.00 |
| 52 | 12/26/94 | $ 218,500.00 |
| 53 | 2/02/95 | $ 380,057.00 |
| 54 | 4/26/95 | $203,715.00 |
| 55 | 8/18/95 | $ 86,948.00 |
| 56 | 9/20/96 | $ 77,564.00 |

**TOTAL PAID:**          **$134,788,161.00**

## CERTIFICATE OF SERVICE

This is to certify that a copy of the forgoing has been served by first class mail postage prepaid, this 10th day of December 2002 on:

Robert B. Bell
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, D.C. 20037-1420

John H. Shenefield,
Donald Klautier,
Phillip Zane
Morgan, Lewis & Bockius, LLP
1800 M Street, N.W.
Washington, D.C.    20036

June Ann Sauntry
Bryan B. Lavine
Troutman Sanders Attorneys at Law
401 9th Street, NW
Suite 1000
Washington, DC 20004

Charles Leeper,
Spriggs & Hollingsworth
1350 Eye Street, N.W.
Washington, D.C.    20005-3305

Kent Gardiner
Alan W.H. Gourley
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C.    20004-2595

Charles C. Murphy, Jr.
Vaughan & Murphy
233 Peachtree Street, N.E.
Suite 700
Harris Tower
Atlanta, Georgia    30303

Stephen P. Murphy
Andrew L. Hurst
Reed Smith LLP
Suite 1100 - East Tower

1301 K Street, NW
Washington, D.C.    2005-3317

KEITH MORGAN, D.C. Bar #422665
Assistant U. S. Attorney
555 4th Street, N.W.
Washington, D. C.   20001

- 7 -

**Sauntry, June Ann**

| | |
|---|---|
| **From:** | DCD_ECFNotice@dcd.uscourts.gov |
| **Sent:** | Wednesday, March 22, 2006 1:36 PM |
| **To:** | DCD_ECFNotice@dcd.uscourts.gov |
| **Subject:** | Activity in Case 1:95-cv-01231-RCL MILLER, et al v. HOLZMANN, et al "Amended Complaint" |

***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.

## U.S. District Court

### District of Columbia

Notice of Electronic Filing

The following transaction was received from entered on 3/22/2006 at 1:35 PM EDT and filed on 3/9/2006

| | |
|---|---|
| **Case Name:** | MILLER, et al v. HOLZMANN, et al |
| **Case Number:** | 1:95-cv-1231 |
| **Filer:** | UNITED STATES OF AMERICA |
| **Document Number:** | 237 |

**Docket Text:**
FIRST AMENDED COMPLAINT against PHILIPP HOLZMANN A.G., BILL HARBERT INTERNATIONAL CONSTRUCTION, INC., BILHAR INTERNATIONAL ESTABLISHMENT f/k/a HARBERT INTERNATIONAL ESTABLISHMENT, HARBERT INTERNATIONAL ESTABLISHMENT, HARBERT CORPORATION, HARBERT INTERNATIONAL INC., HARBERT CONSTRUCTION SERVICES (U.K.) LTD., J.A. JONES CONSTRUCTION COMPANY, SABBIA A.G., and ROY ANDERSONfiled by UNITED STATES OF AMERICA.(tg, )

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**O:\Scan Repository\gumiel\95-1231.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=3/22/2006] [FileNumber=1057020-0]
[9a999400b63d7ecb05847a4c1c8490eaf351f6f84531c8dcde964483e7be8e9e1935
52b277aa0efc42141374d91fabf74eac4c67ec84708470724930541add03]]

**1:95-cv-1231 Notice will be electronically mailed to:**

Robert B. Bell    robert.bell@wilmerhale.com

Barry Coburn    bcoburn@troutcacheris.com

Alan William Hugh Gourley    agourley@crowell.com,

3/23/2006

Michael F. Hertz    michael.hertz@usdoj.gov,

Andrew Lawrence Hurst    ahurst@reedsmith.com,

Charles Samuel Leeper    charles.leeper@dbr.com

Carolyn Gail Mark    carolyn.mark@usdoj.gov, Geraldine.Hopson@usdoj.gov

Michael Reilly Miner    michael.miner@dbr.com

Keith V. Morgan    keith.morgan@usdoj.g! ov

Stephen Printiss Murphy    smurphy@reedsmith.com,

June Ann Sauntry    juneann.sauntry@troutmansanders.com, james.mills@troutmansanders.com;
bryan.lavine@troutmansanders.com

David Schertler    dschertler@coburnandschertler.com,

John H. Shenefield    jshenefield@morganlewis.com,

Brian J. Sonfield    brian.sonfield@exim.gov

Phillip Craig Zane    pzane@bakerdonelson.com

Charles Anthony Zdebski    charles.zdebski@troutmansanders.com

**1:95-cv-1231 Notice will be delivered by other means to:**

Bryan B. Lavine
TROUTMAN & SANDERS
5200 Bank of America Plaza
600 Peachtree Street, NE
Atlanta, GA 30308

James J. Mills
TROUTMAN SANDERS LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308-2216

Charles C. Murphy , Jr
VAUGHAN & MURPHY
260 Peachtree Street, NW
Suite 1600
Atlanta, GA 30303

3/23/2006

LODGED
CLERK, U.S. DISTRICT COURT

DEC 11 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DR. HODA ELEMARY,<br><br>Plaintiff,<br><br>v.<br><br>BILLY HARBERT, JR., ET AL.,<br><br>Defendants. | CASE NO. CV06-4723 RGK (PJWX)<br><br>**[PROPOSED] ORDER GRANTING CERTAIN DEFENDANTS' REQUEST FOR JUDICIAL NOTICE** |

The Matter came before the Court on _____, 2007 for a hearing on Certain Defendants' Request for Judicial Notice.

The Court, having considered the Motion, the parties' memoranda, the arguments of counsel, and all other argument and evidence submitted, **HEREBY ORDERS** that the Certain Defendants' Request for Judicial Notice is **GRANTED.**

**IT IS SO ORDERED.**

Dated: _____, 2007          By: _____

Honorable R. Gary Klausner

United States District Judge

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to this action. My business address is Latham & Watkins LLP, 633 West Fifth Street, Suite 4000, Los Angeles, CA 90071-2007.

On **December 11, 2006,** I served the following document described as:

**[PROPOSED] ORDER GRANTING CERTAIN DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**

by serving a true copy of the above-described document in the following manner:

**BY HAND DELIVERY**

I am familiar with the office practice of Latham & Watkins LLP for collecting and processing documents for hand delivery by a messenger courier service or a registered process server. Under that practice, documents are deposited to the Latham & Watkins LLP personnel responsible for dispatching a messenger courier service or registered process server for the delivery of documents by hand in accordance with the instructions provided to the messenger courier service or registered process server; such documents are delivered to a messenger courier service or registered process server on that same day in the ordinary course of business. I caused a sealed envelope or package containing the above-described document and addressed as set forth below in accordance with the office practice of Latham & Watkins LLP for collecting and processing documents for hand delivery by a messenger courier service or a registered process server.

BRIAN J. JACOBS
467 SOUTH ARNAZ DRIVE
SUITE 319A
LOS ANGELES, CA 90048

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **December 11, 2006,** at Los Angeles, California.

Lisa R. Perez

EXHIBIT 9

DTP-GJ#4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No.: |
| v. | ) | |
| | ) | |
| BILL HARBERT INTERNATIONAL | ) | Violations: |
| CONSTRUCTION, INC.; BILHAR | ) | 15 U.S.C. § 1 |
| INTERNATIONAL ESTABLISHMENT | ) | 18 U.S.C. § 371 |
| f/k/a HARBERT INTERNATIONAL | ) | |
| ESTABLISHMENT; and ELMORE | ) | |
| ROY ANDERSON; | ) | CR-01-PT-0302-S |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INDICTMENT

### COUNT ONE

### CONSPIRACY TO RESTRAIN TRADE
(15 U.S.C. § 1)

The Grand Jury charges:

I

### DESCRIPTION OF THE OFFENSE

1.    BILL HARBERT INTERNATIONAL CONSTRUCTION, INC.,

BILHAR INTERNATIONAL ESTABLISHMENT f/k/a HARBERT

INTERNATIONAL ESTABLISHMENT, and ELMORE ROY ANDERSON are

hereby indicted and made defendants in this Count.

2.    Beginning at least as early as May 1988 and continuing at least until

September 20, 1996, the exact dates being unknown to the Grand Jury, the

defendants and others entered into and engaged in a combination and conspiracy to suppress and eliminate competition on construction contracts funded by the United States, through the United States Agency for International Development ("USAID") and the United States Army Corps of Engineers ("USCOE"), in the Arab Republic of Egypt in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3.   The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendants and co-conspirators, the substantial terms of which were to rig the bids on certain United States-funded construction contracts in Egypt to ensure that the designated winner would be awarded the contract and would receive payment from the United States Treasury.

4.   For the purpose of forming and carrying out the charged combination and conspiracy, the defendants and co-conspirators did those things that they combined and conspired to do, including, among other things:

(a)   participating in meetings and conversations to discuss rigging the bids on USAID-funded Contracts 20A, 29, and 07 and USCOE-funded contract Peace Vector IV, Phase II;

(b)   agreeing, during those meetings and conversations, to bid at certain levels, to not bid, or otherwise to increase the price level of bids on USAID-funded Contracts 20A, 29, and 07;

2

∴ Dbt'f !3;12.ds.11413.SCQ.I HE!!!!!Epdvn f oU2!!!!!Gjrhe!18C3608112!!!!!Qbhf !4!pg2:

      (c)    agreeing, during those meetings and conversations, to reduce or eliminate competition on USAID-funded Contracts 20A, 29, and 07 and USCOE-funded contract Peace Vector IV, Phase II;

      (d)    agreeing, during those meetings and conversations, that certain co-conspirators would be compensated by the designated winning bidder in exchange for their commitments to reduce or eliminate competition on USAID-funded Contracts 20A, 29, and 07;

      (e)    submitting bids on USAID-funded Contracts 20A, 29, and 07 pursuant to the terms of the bid-rigging conspiracy;

      (f)    making payments to co-conspirators who agreed to not compete for USAID-funded Contracts 20A and 07 pursuant to the bid-rigging conspiracy;

      (g)    receiving payment from a co-conspirator for agreeing not to compete on USAID-funded Contract 29 pursuant to the bid-rigging conspiracy; and

      (h)    performing USAID-funded Contracts 20A, 29, and 07, submitting payment requests, and receiving progress payments from the United States Treasury.

3

Dbt f !3;12.ds.11413.SCQ.l HE!!!!!Epdvn f ou2!!!!!Gjrhe!18Œ06Œ112!!!!!Qbhf !5!pg2:

## II

## BACKGROUND

5.    As a result of the Camp David Peace Accords in the late 1970s, the United States and other Western countries committed to fund extensive rehabilitation work on the water treatment and disposal facilities in Egypt. Pursuant to this commitment, USAID, acting on behalf of the United States, funded nearly a billion dollars in construction work by United States-based companies in Egypt in the late 1980s and early 1990s. In addition, during the same period, the United States funded certain other construction projects in Egypt through USCOE, including Peace Vector IV, Phase II. Harbert International, Inc. and J.A. Jones Construction Company, two of the prequalified contractors, bid on these projects as partners in a series of joint ventures known as the Harbert-Jones Companies.

## III

## THE DEFENDANTS AND CO-CONSPIRATORS

6.    Defendant BILL HARBERT INTERNATIONAL CONSTRUCTION, INC. ("BHIC") is organized and exists under the laws of the State of Delaware and has its principal place of business in Birmingham, Alabama. During the period covered by this Indictment, BHIC engaged in the international construction business in Egypt. Beginning on or about December 10, 1991, and continuing throughout the rest of the conspiracy period, BHIC was the *de facto* joint venture partner with J.A.

4

Dbt f !3;12.ds 11413.SCQ.I HE!!!!!Epdvn f oJ2!!!!!Gjrhe!180360311 2!!!!!Qbhf !6!pg2:

Jones Construction Company on USAID-funded Contracts 20A and 07, and other

United States-funded projects bid on and performed by the Harbert-Jones

Companies in Egypt. BHIC is owned one hundred percent by Bill L. Harbert. From

December 10, 1991, until at least the end of the conspiracy period, BHIC was also

known as Harbert International.

7.    Defendant BILHAR INTERNATIONAL ESTABLISHMENT formerly

known as HARBERT INTERNATIONAL ESTABLISHMENT is organized and

exists under the laws of Liechtenstein and has its principal place of business in

Birmingham, Alabama. During the period covered by this Indictment, HARBERT

INTERNATIONAL ESTABLISHMENT engaged in the international construction

business in Egypt. Before December 10, 1991, HARBERT INTERNATIONAL

ESTABLISHMENT was owned fifty percent by Harbert International, Inc. ("HII"),

a Birmingham, Alabama-based company, and fifty percent by Bill L. Harbert.

Since December 10, 1991, Bill L. Harbert has owned twenty-one percent of

HARBERT INTERNATIONAL ESTABLISHMENT and BHIC has owned seventy-

nine percent. On or about September 21, 1993, the exact date being unknown to

the Grand Jury, HARBERT INTERNATIONAL ESTABLISHMENT changed its

name to BILHAR INTERNATIONAL ESTABLISHMENT. During the conspiracy

period, it was also known as Harbert International.

8.    Defendant ELMORE ROY ANDERSON served as the president and

chief executive officer of BILHAR INTERNATIONAL ESTABLISHMENT formerly

5

known as HARBERT INTERNATIONAL ESTABLISHMENT ("HIE") throughout the conspiracy period. From on or about December 10, 1991, until the end of the conspiracy period, BHIC represented to others that ELMORE ROY ANDERSON was the president of its international division in matters affecting United States-funded construction contracts in Egypt.

9.    ABB ASEA Brown Boveri, Ltd. is, and was during the conspiracy period, a Swiss company with its principal place of business in Zurich, Switzerland. ABB ASEA Brown Boveri, Ltd., is the ultimate parent company of ABB SUSA, Inc., formerly known as Sadelmi U.S.A., Inc., a New York company with its principal place of business in North Brunswick, New Jersey.

10.    Archirodon Group, Inc. was, during the conspiracy period, a Panamanian company headquartered in Geneva, Switzerland. Archirodon Group, Inc. was the owner of the George A. Fuller Company, a Maryland company with its principal place of business in Virginia.

11.    Bilfinger + Berger BmbH is, and was during the conspiracy period, a German company with its principal place of business in Mannheim, Germany. Bilfinger + Berger BmbH is the parent company of Fru-Con Construction, Inc., a Missouri corporation with its principal place of business in Ballwin, Missouri.

12.    J.A. Jones Construction Company is, and was during the conspiracy period, a Delaware corporation with its principal place of business in Charlotte, North Carolina.

6

13.    The Harbert-Jones Companies were joint ventures that were created to bid on and, if the bids were successful, perform USAID-funded Contracts 20A, 29, and 07, among others.  J.A. Jones Construction Company held a forty percent share of each of these joint ventures.  HII held a sixty percent share of each joint venture during the prequalification stage of each contract.  After USAID awarded Contracts 20A and 07 to the Harbert-Jones Companies, HII assigned its interest in the contracts to HIE for one dollar.

14.    Philipp Holzmann AG is, and was during the conspiracy period, a German company with its principal place of business in Frankfurt, Germany. Philipp Holzmann is the ultimate parent company of J.A. Jones Construction Company.

15.    Various business organizations and individuals not made defendants in this Indictment participated as co-conspirators in the offense charged and performed acts and made statements in furtherance thereof.

16.    Whenever in this Indictment reference is made to any act, deed, or transaction of a corporation or joint venture, the allegation means that the corporation or joint venture engaged in the act, deed, or transaction by or through its officers, directors, employees, agents, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

7

Dbtf !3;12.ds 11413.SCQ.I HE!!!!!Epdvn f ou2!!!!!Gjrfhe!18C8C8112!!!!!Qbhf !9!pg2:

IV

TRADE AND COMMERCE

17.    During the period covered by this Count, conspirator companies purchased substantial quantities of supplies, materials, and equipment in anticipation of bidding on and performing the United States-funded construction contracts in Egypt that are the subject of this Indictment. These supplies, materials, and pieces of equipment were shipped from the United States to Egypt in a continuous and uninterrupted flow of interstate and foreign trade and commerce for use on those contracts.

18.    Between August 1989 and June 20, 1993, the exact dates being unknown to the Grand Jury, the Harbert-Jones Companies received $107,071,324 in progress payments from the United States Treasury as payment on Contract 20A. The Harbert-Jones Companies deposited these funds into its bank account in Birmingham, Alabama. The funds were in the flow of, and substantially affected, interstate and foreign trade and commerce.

19.    Between July 1991 and January 18, 1995, the exact dates being unknown to the Grand Jury, the Harbert-Jones Companies received $43,236,591 in progress payments from the United States Treasury as payment on Contract 07. The Harbert-Jones Companies deposited these funds into its bank account in Birmingham, Alabama. The funds were in the flow of, and substantially affected, interstate and foreign trade and commerce.

8

Dbtf !3;12.ds 11413.SCQ.l HE!!!!!Epdvn f oJ2!!!!!Gjrhe!18@36@3112!!!!!Qbhf !: lpg2:

20.    Between May 1990 and September 20, 1996, the exact dates being unknown to the Grand Jury, Sadelmi U.S.A., Inc. received $134,775,817 in progress payments from the United States Treasury as payment on Contract 29.  The funds were in the flow of, and substantially affected, interstate and foreign trade and commerce.

## V

### JURISDICTION AND VENUE

21.    The combination and conspiracy charged in this Count was carried out, in part, within the five years preceding the return of this Indictment and, in part, within the Northern District of Alabama.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

9

· Dbt f !3;12.ds.11413.SCQ.I HE!!!!!Epdvn f ou2!!!!!Gjrhe!18086C3112!!!!!Qbhf !21!pg2:

## COUNT TWO

### CONSPIRACY TO DEFRAUD THE UNITED STATES
### (18 U.S.C. § 371)

The Grand Jury further charges:

I

### DESCRIPTION OF THE OFFENSE

1.     BILL HARBERT INTERNATIONAL CONSTRUCTION, INC.
("BHIC"), BILHAR INTERNATIONAL ESTABLISHMENT f/k/a HARBERT
INTERNATIONAL ESTABLISHMENT ("HIE"), and ELMORE ROY ANDERSON
are hereby indicted and made defendants in this Count.

2.     Each and every allegation contained in Paragraphs 5 through 16 of
Count One of this Indictment is here realleged with the same force and effect as if
fully set forth in this Count.

3.     Beginning at least as early as May 1988 and continuing at least until ·
September 20, 1996, the exact dates being unknown to the Grand Jury, within the
Northern District of Alabama and elsewhere, the defendants and others known and
unknown to the Grand Jury knowingly and wilfully conspired to defraud the
United States Agency for International Development ("USAID"), an agency of the
United States, in the procurement of construction services on Contracts 20A, 29,
and 07, in violation of Title 18, United States Code, Section 371.

10

Dbt f !3;12.ds.11413.SCQ.I HE!!!!!Epdvn f ou2!!!!!Gjrhel18CB6CB112!!!!!Qbhf !22!pg2:

## II

## THE CONSPIRACY

4.     It was a part and object of the aforesaid conspiracy to defraud USAID that the defendants and co-conspirators would and did agree to inflate and manipulate the prices bid on USAID-funded construction contracts in Egypt to ensure that the Harbart-Jones Companies would be the low bidder on Contracts 20A and 07, and that Sadelmi U.S.A., Inc. would be the low bidder on Contract 29.

5.     It was further a part and object of the aforesaid conspiracy to defraud USAID that the defendants and co-conspirators would and did deceive the United States into believing that the prices bid on Contracts 20A, 29, and 07 were arrived at independently, competitively, and without consultation or agreement with competing bidders, when, in fact, the prices bid were non-competitive and collusive and resulted from communications and agreements between and among the defendants and co-conspirators.

## III

## OVERT ACTS

6.     In furtherance of the conspiracy described in this Count, and to effect the objects thereof, defendants BHIC, HIE, and ELMORE ROY ANDERSON and their co-conspirators committed overt acts in the Northern District of Alabama and elsewhere, including, but not limited to, the following:

11

Dbt'f !3;12.ds.11413.SCQ.l HE!!!!!Epdvn f ou2!!!!!Gjrhe!18C36C3112!!!!!Qbhf !23!pg2:

(a)     In or about May 1988, the exact date being unknown to the Grand Jury, conspirators acting on behalf of the Harbert-Jones Companies held a meeting in the Frankfurt, Germany, offices of Philipp Holzmann AG during which competitors discussed the submission of non-competitive bids on Contract 20A;

(b)     In or about June 1988, the exact date being unknown to the Grand Jury, conspirators acting on behalf of the Harbert-Jones Companies negotiated a bid-rigging agreement with Bilfinger + Berger BmbH, under which it was agreed that Fru-Con Construction, Inc. would submit an artificially inflated bid on Contract 20A in exchange for the payment of money from Philipp Holzmann AG;

(c)     On or about August 3, 1988, the exact date being unknown to the Grand Jury, Philipp Holzmann AG and others known and unknown to the Grand Jury acting on behalf of the Harbert-Jones Companies negotiated a bid-rigging agreement with Archirodon Group, Inc., under which it was agreed that George A. Fuller Company would not bid on Contract 20A in exchange for the payment of money from Philipp Holzmann AG;

(d)     On or about August 3, 1988, defendant ELMORE ROY ANDERSON, acting on behalf of the Harbert-Jones Companies, submitted a letter to the project owner of Contract 20A increasing the previously submitted Harbert- Jones Companies' bid on Contract 20A by 3.5 percent to

12

`· Dbtf !3;12.ds.11413.SCQ.I HE!!!!!Epdvn f oU2!!!!!Gjrhe!18C3608112!!!!!Qbhf !24!pg2:`

approximately $129 million;

    (e)    On or about August 4, 1988, conspirators made bid submissions in accordance with the bid-rigging agreement on Contract 20A;

    (f)    On or about December 7, 1988, defendant ELMORE ROY ANDERSON, acting on behalf of the Harbert-Jones Companies, and a co-conspirator renegotiated the payment terms of the bid-rigging agreement with Archirodon Group, Inc. on Contract 20A;

    (g)    In or about April 1989, the exact date being unknown to the Grand Jury, a conspirator acting on behalf of the Harbert-Jones Companies negotiated a bid-rigging agreement with Sadelmi U.S.A., Inc. under which it was agreed that the Harbert-Jones Companies would submit an artificially inflated bid on Contract 29 in exchange for the payment of money from ABB ASEA Brown Boveri, Ltd.;

    (h)    On or about July 2, 1989, defendant ELMORE ROY ANDERSON, acting on behalf of the Harbert-Jones Companies, and Sadelmi U.S.A., Inc., made bid submissions in accordance with the bid-rigging agreement on Contract 29;

    (i)    On or about January 16, 1990, the exact date being unknown to the Grand Jury, defendant ELMORE ROY ANDERSON, acting on behalf of defendant HIE, and others known and unknown to the Grand Jury met with agents from Archirodon Group, Inc. to discuss the payment schedule under

13

Dbtf f !3;12.ds.11413.SCQ.I HE!!!!!Epdvn f ou2!!!!!Gjrhe!18086081112!!!!!Qbhf !25!pg2:

the bid-rigging agreement on Contract 20A;

(j)     On or about January 17, 1990, Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A;

(k)     On or about January 30, 1990, Philipp Holzmann AG paid $1,000,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A;

(l)     On or about June 1, 1990, Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A;

(m)     On or about June 11, 1990, Philipp Holzmann AG paid $1,026,029 to Bilfinger + Berger BmbH under the bid-rigging agreement on Contract 20A;

(n)     On or about August 27, 1990, ABB ASEA Brown Boveri, Ltd. paid $3.4 million to Philipp Holzmann AG under the bid-rigging agreement on Contract 29;

(o)     In or about October 1990, the exact date being unknown to the Grand Jury, defendant ELMORE ROY ANDERSON and other conspirators acting on behalf of the Harbert-Jones Companies negotiated a bid-rigging agreement with Bilfinger + Berger BmbH, under which it was agreed that Fru-Con Construction, Inc. would submit an artificially inflated bid on Contract 07 in exchange for the payment of money from Philipp Holzmann

14

Dbt'f !3;12.ds.11413.SCQ.l HE!!!!!Epdvn f ou2!!!!!Gjrhel18C3608112!!!!!Qbhf !26!pg2:

AG;

(p)    On or about October 29, 1990, Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A;

(q)    On or about November 25, 1990, defendant ELMORE ROY ANDERSON, acting on behalf of the Harbert-Jones Companies, made a bid submission in accordance with the bid-rigging agreement on Contract 07;

(r)    During the period between March 1990 and the end of October 1990, the exact dates being unknown to the Grand Jury, defendant ELMORE ROY ANDERSON and others known and unknown to the Grand Jury instructed the Harbert-Jones Companies to pay approximately $3,361,503 to various Swiss bank accounts controlled by Philipp Holzmann AG in order to reimburse it for the payments made to Archirodon Group, Inc. and Bilfinger + Berger BmbH under the bid-rigging agreements;

(s)    On or about December 18, 1990, Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A;

(t)    On or about January 4, 1991, the exact date being unknown to the Grand Jury, Philipp Holzmann AG paid approximately $1.34 million to a co-conspirator as its share of the proceeds under the bid-rigging agreement on Contract 29;

Dbt f !3;12.ds.11413.SCQ.I HE!!!!!Epdvn f oU2!!!!!Gjrhe!1808608112!!!!Qbhf !27!pg2:

(u)    On or about January 29, 1991, the exact date being unknown to the Grand Jury, Philipp Holzmann AG paid $2.01 million to a co-conspirator as its share of the proceeds under the bid-rigging agreement on Contract 29;

(v)    On or about June 10, 1991, Philipp Holzmann AG paid $1,200,000 to Bilfinger + Berger BmbH under the bid-rigging agreement on Contract 20A;

(w)    Between September 1991 and December 1994, the exact date being unknown to the Grand Jury, Philipp Holzmann AG paid 1,500,000 German marks to Bilfinger + Berger BmbH under the bid-rigging agreement on Contract 07;

(x)    During the period between August 1989 and December 10, 1991, agents for HII, and from December 10, 1991, until June 20, 1993, agents for defendant BHIC, acting on behalf of the Harbert-Jones Companies, submitted to USAID a total of thirty-three payment requests on Contract 20A and received payments from the United States Treasury totaling $107,071,324;

(y)    During the period between August 1989 and December 10, 1991, agents for HII, and from December 10, 1991, until June 20, 1993, agents for defendant BHIC, acting on behalf of the Harbert-Jones Companies, submitted to USAID a total of thirty-three material false representations in documents entitled "Contractor's Certificate and Agreement with Agency for

16

Dbt f !3;12.ds 11413.SCQ.l  HE!!!!!Epdvn f oU2!!!!!Gjrhe!18C36C3112!!!!!Qbhf !28!pg2:

International Development — Contractor's Invoice and Contract Abstract" on Contract 20A in which they falsely certified that no one had been compensated in order to obtain the contract, when in fact more than $5.226 million had been paid to conspirators in order for the Harbert-Jones Companies to obtain the contract, thus materially undermining the ability of USAID to procure construction services at a competitive price;

(z)    During the period between July 1991 and December 10, 1991, agents for HII, and from December 10, 1991, until January 18, 1995, agents for defendant BHIC, on behalf of the Harbert-Jones Companies, submitted to USAID a total of twenty-two payment requests on Contract 07 and received payments from the United States Treasury totaling $43,236,591;

(aa)    During the period between July 1991 and December 10, 1991, agents for HII, and from December 10, 1991, until January 18, 1995, agents for defendant BHIC, acting on behalf of the Harbert-Jones Companies, submitted to USAID a total of twenty-two material false representations in documents entitled "Contractor's Certificate and Agreement with Agency for International Development -- Contractor's Invoice and Contract Abstract" on Contract 07 in which they falsely certified that no one had been compensated in order to obtain the contract, when in fact 1,500,000 German marks had been paid to conspirators in order for the Harbert-Jones Companies to obtain the contract, thus materially undermining the ability of USAID to procure

17

construction services at a competitive price;

(bb)    During the period between May 1990 and September 20, 1996, the exact dates being unknown to the Grand Jury, Sadelmi U.S.A., Inc. submitted to USAID fifty-six payment requests on Contract 29 and received payments from the United States Treasury totaling $134.775 million; and

(cc)    During the period between May 1990 and September 20, 1996, the exact dates being unknown to the Grand Jury, Sadelmi U.S.A., Inc. submitted to USAID fifty-six material false representations in documents entitled "Contractor's Certificate and Agreement with Agency for International Development -- Contractor's Invoice and Contract Abstract" on Contract 29 in which its agents falsely certified that no one had been compensated in order to obtain the contract, when in fact $3.4 million dollars had been paid to Philipp Holzmann AG in order to obtain the contract, thus

18

Dbt f l3;12. ds 11413.SCQ.I HE!!!!!Epdvn f oU2!!!!!Gjrhe!18G3603112!!!!!Qbhf !2: !pg2:

materially undermining the ability of USAID to procure construction services at a

competitive price.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE,

SECTION 371.

Dated this 25ᵗʰ day of _____ July _____, 2001.

A TRUE BILL

FOREPERSON

CHARLES A. JAMES
Assistant Attorney General

JAMES M. GRIFFIN
Deputy Assistant Attorney General

SCOTT D. HAMMOND
Director of Criminal Enforcement

Antitrust Division
U.S. Department of Justice

HERBERT H. HENRY, III
United States Attorney
Northern District of Alabama

JOHN T. ORR
Chief, Atlanta Field Office

WILLIAM D. DILLON
JAMES J. KUROSAD

Attorneys
Antitrust Division
U.S. Department of Justice
75 Spring St., S.W., Suite 1176
Atlanta, GA  30303
404/331-7100

19

EXHIBIT 10
Part 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

**FILED**

FEB 4  2002

J..... D STATES DISTRICT COUR.
NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| BILL HARBERT INTERNATIONAL | ) |
| CONSTRUCTION, INC.; BILHAR | ) Case No. CR-01-PT-302-S |
| INTERNATIONAL ESTABLISHMENT | ) |
| f/k/a HARBERT INTERNATIONAL | ) Violation:    15 U.S.C. § 1 |
| ESTABLISHMENT; and ELMORE | ) |
| ROY ANDERSON, | ) |
| | ) |
| _____Defendants._____ | ) |

### PLEA AGREEMENT

The United States and defendant BILHAR INTERNATIONAL ESTABLISHMENT

f/k/a HARBERT INTERNATIONAL ESTABLISHMENT ("Bilhar") hereby enter into the

following Plea Agreement pursuant to Rule 11(e)(1)(C) of the Federal Rules of

Criminal Procedure ("Fed. R. Crim. P."):

### RIGHTS OF DEFENDANT

1.    Bilhar understands its rights:

(a)    to be represented by an attorney;

(b)    to be charged by indictment;

(c)    as a corporation organized and existing under the laws of

Liechtenstein, to contest jurisdiction of the United States to prosecute this

136

case against it in the United States District Court for the Northern District of Alabama;

    (d)    to plead not guilty to any criminal charge brought against it;

    (e)    to have a trial by jury, at which it would be presumed not guilty of the charge and the United States would have to prove every essential element of the charged offenses beyond a reasonable doubt for it to be found guilty;

    (f)    to confront and cross-examine witnesses against it and to subpoena witnesses in its defense at trial;

    (g)    to appeal its conviction if it is found guilty at trial; and

    (h)    to appeal the imposition of sentence against it.

### AGREEMENT TO PLEAD GUILTY
### AND WAIVE CERTAIN RIGHTS

    2.    Bilhar waives the rights set out in Paragraph 1(b)-(g) above. Bilhar also waives the right to appeal the imposition of the sentence against it, so long as the sentence imposed is consistent with the recommendation in Paragraph 8 of this Plea Agreement. Pursuant to Fed. R. Crim. P. 7(b), Bilhar will plead guilty under Fed. R. Crim. P. 11(e)(1)(C) to a one-count Indictment in the United States District Court for the Northern District of Alabama. Accordingly, the Indictment charges Bilhar with participating in a conspiracy to suppress and eliminate competition by rigging the bids on certain United States-funded

2

construction projects in the Arab Republic of Egypt, beginning at least as early as May 1988 and continuing at least until September 20, 1996, in violation of 15 U.S.C. § 1.

3.     Pursuant to the terms of this Plea Agreement, Bilhar will plead guilty to the criminal charges described in Paragraph 2 above and will make a factual admission of guilt to the Court in accordance with Fed. R. Crim. P. 11.

### FACTUAL BASIS FOR OFFENSES CHARGED

4.     Had this case gone to trial, the United States would have presented evidence to prove the following facts.

(a)     For purposes of this Plea Agreement, the "relevant period" is that period beginning at least as early as May 1988 and continuing at least until September 20, 1996. During the relevant period, Bilhar was an entity organized and existing under the laws of the Liechtenstein.

(b)     During the relevant period, Bilhar participated in a conspiracy among some of the prequalified bidders to rig bids on certain USAID-funded construction contracts in Egypt. In furtherance of the conspiracy, Bilhar, through its officers and employees, engaged in conversations and attended meetings with other members of the bid-rigging conspiracy. During those conversations the conspirators reached agreements relating to the bids on Contracts 20A, 29, and 07, USAID-funded construction contracts in Egypt, in an effort to eliminate or reduce competition.

3

(c)     During the relevant period, the equipment, materials, and supplies necessary to the bidding and performance of Contracts 20A, 29, and 07 as well as the payments made by the United States under these contracts, moved in interstate and foreign commerce. The business activities of Bilhar and co-conspirators in connection with the bidding and performance of Contracts 20A, 29, and 07 were within the flow of, and substantially affected, interstate and foreign trade and commerce.

(d)     Substantial activities in furtherance of the conspiracy occurred within the Northern District of Alabama.

### POSSIBLE MAXIMUM SENTENCE

5.     Bilhar understands that the maximum penalty that may be imposed against it upon conviction for a violation of the Sherman Antitrust Act is a fine in an amount equal to the largest of:

(a)     ten million dollars (15 U.S.C. § 1);

(b)     twice the gross pecuniary gain derived from the crime (18 U.S.C. § 3571(d)); or

(c)     twice the gross pecuniary loss caused to the victims of the crime (18 U.S.C. § 3571(d)).

6.     In addition, Bilhar understands that:

(a)     pursuant to § 8B1.1(a)(2) of the United States Sentencing Commission Guidelines ("U.S.S.G."), the Court may order it to pay restitution

4

to the victims of the offense;

(b)    pursuant to 18 U.S.C. § 3013(a)(2)(B) and U.S.S.G. § 8E1.1, the Court is required to order Bilhar to pay a four hundred dollar ($400) special assessment upon conviction for the charged offense; and

(c)    pursuant to 18 U.S.C. § 3561(c)(1), the Court may order a term of probation of at least one year, but not more than five years.

### SENTENCING GUIDELINES

7.    Sentencing for the offense to be charged will be conducted pursuant to the Federal Sentencing Guidelines Manual in effect on the day of sentencing. Pursuant to U.S.S.G. § 1B1.8, self-incriminating information provided to the United States pursuant to this Plea Agreement will not be used to increase the volume of commerce attributable to Bilhar or to determine the applicable Guidelines range, except to the extent provided for in U.S.S.G. § 1B1.8(b). For purposes of calculating the volume of commerce in U.S.S.G. § 2R1.1 under this Plea Agreement, only evidence relating to Contracts 20A, 29, and 07 is attributable to Bilhar.

### SENTENCING AGREEMENT

8.    Pursuant to Fed. R. Crim. P. 11(e)(1)(C), the United States and Bilhar agree that the appropriate disposition of the Indictment is, and agree jointly to recommend, that the Court impose a sentence requiring Bilhar to pay a fine to the United States in the amount of fifty-four million dollars ($54,000,000)

5

under 18 U.S.C. § 3571(d). The fine should be payable under the following terms and conditions:

(a)    Ten million dollars ($10,000,000) shall be due and payable within thirty (30) days of sentencing;

(b)    The remaining balance shall be payable in fifty-nine (59) equal monthly installments of seven-hundred thirty-three thousand three-hundred thirty-three dollars and thirty-three cents ($733,333.33) and one final payment of seven-hundred thirty-three thousand three-hundred thirty-three dollars and fifty-three cents ($733,333.53) without interest, in accordance with 18 U.S.C. § 3612(h) and U.S.S.G. § 8C3.2. The first and second monthly installments shall be due and payable sixty days from sentencing, and each additional monthly installment shall be due and payable on the first of each month thereafter.

(c)    Bilhar understands that the Court will order it to pay a four hundred dollar ($400) special assessment for the charged offense in the Indictment pursuant to U.S.C. § 3013(a)(2)(B) and U.S.S.G. § 8E1.1 in addition to any fine imposed.

(d)    The United States and Bilhar understand that the Court retains complete discretion to accept or reject the agreed-upon recommendation provided for in this Plea Agreement. If the Court does not accept the recommended sentence, this Plea Agreement will be

6

void and Bilhar will be free to withdraw its guilty plea. (Fed. R. Crim. P.

11(e)(4)). If Bilhar withdraws its plea of guilty, this Plea Agreement, the

guilty plea, and any statements made in connection with or in

furtherance of the plea or this Plea Agreement, or in the course of

discussions leading to the pleas or the Plea Agreement, shall not be

admissible against Bilhar, in any criminal or civil proceeding. (Fed. R. Crim.

P. 11(e)(6)).

    (e)    Bilhar agrees that it will maintain sufficient funds to timely pay

the criminal fine installment payments imposed by this agreement without

substantially jeopardizing the continued viability of the organization.

(U.S.S.G. § 8C3.2). Attached to this Plea Agreement is a letter from

Bill L. Harbert, President of Bilhar, guaranteeing that he personally will

provide any and all financial support necessary for Bilhar to maintain an

adequate level of funding to pay the fine imposed by the Court.

(Attachment A).

    9.    The United States and Bilhar jointly submit that this Plea Agreement,

together with the record that will be created by the United States and Bilhar at

sentencing and the further disclosure described in Paragraph 10 of this Plea

Agreement, provides sufficient information concerning Bilhar, the offense

charged in this case, and Bilhar's role in the offense to enable the meaningful

exercise of sentencing authority by the Court under 18 U.S.C. § 3553. The United

7

States and Bilhar will jointly request that the Court accept Bilhar's guilty plea and immediately impose sentence pursuant to the provisions of Fed. R. Crim. P. 32(b)(1) and U.S.S.G. § 6A1.1. The Court's denial of the request to impose sentence immediately based upon the record provided by Bilhar and the United States will not void this Plea Agreement.

10.    The United States, prior to the sentencing in this case, will fully advise the Court of:  all facts relating to Bilhar's involvement in the charged offense; all other relevant conduct; the fact, manner, and extent of Bilhar's cooperation pursuant to Paragraph 11 of this Plea Agreement; and its commitment to prospective cooperation with the United States' investigation and prosecutions.

### BILHAR'S COOPERATION

11.    Bilhar and its ultimate parent organization, subsidiaries and affiliates will provide full and truthful continuing cooperation to the United States in the prosecution of this case, the conduct of the current federal criminal investigation of violations of the federal antitrust and related criminal laws in the international construction industry in the Arab Republic of Egypt, any other federal criminal investigation resulting therefrom, and any criminal litigation or other criminal proceedings arising or resulting from any such investigation to which the United States is a party ("Federal Proceeding"). Such cooperation shall include, but not be limited to:

8

(a)    producing to the United States all documents, information, and other materials not privileged under United States law, in the possession, custody, or control of Bilhar or Bilhar's ultimate parent organization, subsidiaries or affiliates, as requested by the United States in connection with any Federal Proceeding; and

(b)    using its best efforts to secure the ongoing, full, and truthful cooperation, as defined in Paragraph 12 of this Plea Agreement, of the current and former directors, officers, or employees of Bilhar or its ultimate parent organization, subsidiaries and affiliates as may be requested by the United States, including making such persons available in the United States and at other mutually agreed-upon locations, at Bilhar's expense, for interviews and the provision of testimony in grand jury, trial, and other judicial proceedings in connection with any Federal Proceeding.

12.    The ongoing, full, and truthful cooperation of each person described in Paragraph 11(b) above will be subject to the procedures and protections of this paragraph, and shall include, but not be limited to:

(a)    producing in the United States and at other mutually agreed-upon locations all documents (including claimed personal documents) and other materials requested by attorneys and agents of the United States, except for documents privileged under United States law;

(b)    making himself or herself available on reasonable notice for

9

interviews, not at the expense of the United States, in the United States
and at other mutually agreed-upon locations, upon the request of
attorneys and agents of the United States;

    (c)    responding fully and truthfully to all inquiries of the United
States in connection with any Federal Proceeding, without falsely
implicating any person or intentionally withholding any information;

    (d)    otherwise voluntarily providing the United States with any
materials or information, not requested in Paragraphs 12(a)-(c) above,
that he or she may have related to any such Federal Proceeding; and

    (e)    when called upon to do so by the United States, testifying in
trial, grand jury, or other proceedings in the United States, fully, truthfully,
and under oath, subject to the penalties of perjury (18 U.S.C. § 1621),
making false statements or declarations in grand jury or court
proceedings (18 U.S.C. § 1623), obstruction of justice (18 U.S.C. § 1503),
and contempt (18 U.S.C. §§ 401-402), in connection with any such Federal
Proceeding.

### GOVERNMENT'S AGREEMENT

13.    The United States agrees to the following:

    (a)    Subject to the exceptions noted in Paragraph 13(c), the
United States will not bring criminal charges against any current or former
director, officer, or employee of Bilhar or its ultimate parent organization,

10

subsidiaries or affiliates, except for Elmore Roy Anderson, who is specifically excluded from each and every term of Paragraphs 11(b), 12, and 13 of this Plea Agreement for any act or offense committed prior to the date of this Plea Agreement while the person was a director, officer, employee, or agent of Bilhar or its ultimate parent organization, subsidiaries or affiliates arising out of the investigation of violations of the federal antitrust and related criminal laws in the international construction industry in the Arab Republic of Egypt, during the relevant period ("Relevant Offense"). Relevant offense does not include civil matters of any kind, any violation of the federal tax or securities laws, or any crime of violence.

(b)    Should the United States determine that any current or former director, officer, or employee of Bilhar or its ultimate parent organization, subsidiaries or affiliates may have information relevant to any Federal Proceeding, the United States may request such person's cooperation pursuant to the terms of this Plea Agreement by written request delivered to counsel for the individual (with a copy to the undersigned counsel for Bilhar) or, if the individual is not known by the United States to be represented, to the undersigned counsel for Bilhar.

(c)    In the event that any person requested to provide cooperation pursuant to Paragraph 13(b) fails to comply with such

11

person's obligations under Paragraph 12 of this Plea Agreement, then the terms of this Plea Agreement as they pertain to such person shall be rendered null and void, and the agreement not to prosecute such person granted in this Plea Agreement shall be void.

(d)    Except as provided in Paragraph 13(e), information provided to the United States pursuant to the terms of this Plea Agreement pertaining to any Relevant Offense committed while the person providing the information was a director, officer, employee, or agent of Bilhar and its ultimate parent organization, subsidiaries and affiliates, or any information directly or indirectly derived from such information, may not be used against such person in a criminal case, except a prosecution for perjury (18 U.S.C. § 1621), making a false statement or declaration in grand jury or court proceedings (18 U.S.C. § 1623), obstruction of justice (18 U.S.C. § 1503), or contempt (18 U.S.C. §§ 401-402).

(e)    In the event a person who provides information to the United States pursuant to this Plea Agreement fails to comply fully with his or her obligations under Paragraph 12 of this Plea Agreement, the agreement in Paragraph 13(d) not to use such information, or any information directly or indirectly derived from such information, against such person in a criminal case shall be void.

(f)    The non-prosecution terms of this paragraph do not apply to

12

any civil liability to the United States, to any violation of the federal tax or securities laws, or to any crime of violence.

14.    Upon tender of the guilty plea called for by this Plea Agreement and imposition of the sentence, and subject to the cooperation requirements of Paragraph 11 of this Plea Agreement, the United States agrees that it will not bring further criminal charges against Bilhar International Establishment and its ultimate parent organization, subsidiaries and affiliates or any criminal charges against B.L. Harbert International, LLC., for any Relevant Offense. When Bilhar's guilty plea is accepted and subject to the terms of this Plea Agreement, the United States agrees to dismiss all charges against Bill Harbert International Construction, Inc. in the same Indictment and dismiss the charges in Count Two of the Indictment under 18 U.S.C. § 371 against Bilhar.

15.    The United States agrees that when any person travels to the United States for interviews, court appearances, or grand jury appearances pursuant to this Plea Agreement, or for meetings with counsel in preparation thereof, the United States will take no action, based upon any Relevant Offense, to subject such person to arrest or service of process, or to prevent such person from departing the United States. This paragraph does not apply to an individual's commission of perjury (18 U.S.C. § 1621), making a false statement or declaration in grand jury or court proceedings (18 U.S.C. § 1623), obstruction of justice (18 U.S.C. § 1503), or contempt (18 U.S.C. §§ 401-402) in connection with any

13

testimony provided in trial, grand jury, or other judicial proceedings in the United States.

16.    Bilhar understands that it may be subject to administrative or other action by federal or state agencies other than the United States Department of Justice, Antitrust Division, based upon any conviction resulting from this Plea Agreement, and that this Plea Agreement in no way controls whatever action, if any, such other agencies may take.  However, the United States Department of Justice, Antitrust Division, agrees that, if requested, it will advise the appropriate officials of any government agency considering administrative action against Bilhar, based upon any conviction resulting from this Plea Agreement, of the fact, manner, and extent of Bilhar's cooperation, as described herein, as a matter for such agency to consider before determining what administrative action, if any, to take with regard to Bilhar.

### REPRESENTATION BY COUNSEL

17.    Bilhar has been represented by counsel and is fully satisfied that its attorneys have provided competent legal representation.  Bilhar has thoroughly reviewed this Plea Agreement and acknowledges that counsel has advised it of the nature of the charges, any possible defenses to the charges, and the nature and range of possible sentences.

### VOLUNTARY PLEA

18.    Bilhar's decision to enter into this Plea Agreement and

14

Bilhar's decision to tender its guilty pleas are freely and voluntarily made and

are not the result of force, threats, assurances, promises, or representations other

than the representations contained in this Plea Agreement. The United States

has not made any promises or representations to Bilhar as to whether the Court

will accept or reject this Plea Agreement.

### VIOLATION OF PLEA AGREEMENT

19.    Bilhar agrees that, should the United States determine in good faith,

while any Federal Proceeding is pending, that Bilhar or its ultimate parent

organization, and its subsidiaries and affiliates have failed to provide full

cooperation (as described in Paragraph 11 of this Plea Agreement) or otherwise

has violated any other provision of this Plea Agreement, the United States may

notify counsel for Bilhar in writing by personal or overnight delivery or facsimile

transmission of its intention to void any of its obligations under this Plea

Agreement (except its obligations under this paragraph), and Bilhar and its

ultimate parent organization, and its subsidiaries and affiliates shall be subject to

prosecution for any federal crime of which the United States has knowledge

including, but not limited to, the substantive offenses relating to the investigation

resulting in this Plea Agreement. Bilhar may seek Court review of any

determination by the United States of violation of the Plea Agreement. In the

event of any further prosecution of Bilhar resulting from a breach of this

agreement, Bilhar and its ultimate parent organization, subsidiaries and affiliates

15

will not interpose the statute of limitations as a defense with regard to any period of time which passes after the date of this Plea Agreement.

### ENTIRETY OF AGREEMENT

20.    This Plea Agreement constitutes the entire agreement between the United States and Bilhar concerning the disposition of the criminal charges in this case. This Plea Agreement cannot be modified except in writing signed by the United States and Bilhar. Bill L. Harbert, Chairman of Bilhar, has personally made certain additional commitments in connection with this Plea Agreement, as reflected in Attachment A.

21.    The undersigned, Bill L. Harbert, the Chairman of Bilhar, is authorized to enter this Plea Agreement on behalf of Bilhar as evidenced by the Resolution of the Board of Directors of Bilhar, attached hereto and incorporated herein by reference.

16

22.    The undersigned attorneys for the United States have been authorized by

the Assistant Attorney General of the United States to enter this Plea Agreement

on behalf of the United States.

DATED: *February 4, 2002*     Respectfully submitted,

_____

BILL L. HARBERT, Chairman
BILHAR INTERNATIONAL
ESTABLISHMENT f/k/a
HARBERT INTERNATIONAL
ESTABLISHMENT

_____

BRYAN B. LAVINE
JUNE ANN SAUNTRY
Counsel for BILHAR INTERNATIONAL
ESTABLISHMENT f/k/a HARBERT
INTERNATIONAL ESTABLISHMENT

_____

WILLIAM D. DILLON
JAMES KUROSAD
JAMES A. CROWELL IV

Attorneys, U.S. Department of Justice
Antitrust Division
Richard B. Russell Building
75 Spring St., S.W., Suite 1176
Atlanta, GA 30303
Tel.: (404) 331-7100

17

# EXHIBIT 10
# Part 2

**EXHIBIT 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA                  )
ex rel. Richard F. Miller,                )
                                          )
        Plaintiffs,                       )
                                          )
        v.                                )        Case No. 1:95CV01231 WBB
                                          )
PHILIPP HOLZMANN A.G.,                    )
BILL HARBERT INTERNATIONAL                )
CONSTRUCTION, INC., BILHAR                )
INTERNATIONAL ESTABLISHMENT               )
f/k/a HARBERT INTERNATIONAL               )
ESTABLISHMENT, HARBERT                    )
INTERNATIONAL ESTABLISHMENT,              )
HARBERT CORPORATION, HARBERT              )
INTERNATIONAL, INC., HARBERT              )
CONSTRUCTION SERVICES (U.K.) LTD.,        )
J.A. JONES CONSTRUCTION COMPANY,          )
SABBIA A.G., and ROY ANDERSON             )
                                          )
        Defendants.                       )

RECEIVED
DEC 10 2002
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES' FIRST AMENDED COMPLAINT

Plaintiff, United States of America, by its undersigned counsel, represents as

follows:

### Introduction

1.    This is an action brought by plaintiff, United States of America, to recover

treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, and

to recover damages under common law theories of breach of contract, unjust enrichment,

and payment by mistake.

2.    Relator, Richard F. Miller, originally filed this action, on behalf of plaintiff

United States, pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C.

§3730(b)(1).  The United States files this First Amended Complaint in Intervention

pursuant to 31 U.S.C. § 3730(b)(4)(A).

3.    The action arises out of a conspiracy entered into between defendants

through their respective agents, to cause the submission of false and inflated claims to the

United States.

4.    Defendants conspired to rig bids on wastewater treatment projects located

in the Arab Republic of Egypt ("Egypt").  The United States Agency for International

Development ("AID") funded the projects at issue.

5.    The purpose of the conspiracy was to obtain a collusive, artificially inflated,

and noncompetitive price for the projects and an illegal and inflated profit thereon.  As a

result of the conspiracy, the defendants submitted and caused to be submitted false and

inflated claims for payment to the United States for work done on the wastewater

treatment projects.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action under 31 U.S.C.

§§ 3730 and 3732.

7.    This Court has personal jurisdiction over defendants, pursuant to 31 U.S.C.

§3732 (a) because certain defendants transact business and are found in this District.

– 2 –

8.    Venue is proper in this District pursuant to 31 U.S.C. §3732(a), and under 28 U.S.C. §§1391(b) and 1395(a).

## PARTIES

9.    Plaintiff in this action is the United States of America, acting on behalf of the U.S. Agency for International Development, an agency of the U.S. Department of State.

10.    The person who brought the action under the qui tam provisions of the False Claims Act, 31 U.S.C. §3730 (b), is Richard F. Miller.

11.    Defendant Philipp Holzmann Aktiengesellschaft ("Holzmann") is a German corporation with its principal place of business in Frankfurt, Germany.

12.    Defendant J.A. Jones Construction Company ("Jones") is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Jones is an indirect wholly owned subsidiary of defendant Holzmann and is registered to do business and transact business in the District of Columbia.

13.    Defendant Harbert Corporation is a Delaware corporation with its principal place of business in Birmingham, Alabama.

14.    Defendant Harbert International, Inc. ("HII") is a wholly-owned Delaware subsidiary of Harbert Corporation with its principal place of business at One Riverchase Parkway South, Birmingham, Alabama.

15.    Defendant Bill Harbert International Construction, Inc. ("BHIC"), is a Delaware corporation, that engaged in international construction, including in Egypt,

– 3 –

during the period of the complaint. Beginning on or about December 10, 1991, and continuing throughout the rest of the conspiracy period, BHIC was the *de facto* joint venture partner with defendant Jones on USAID-funded contracts in Egypt. BHIC is owned and controlled by Bill L. Harbert. BHIC has its principal place of business at 820 Shades Creek Parkway, Birmingham, Alabama. From December 10, 1991, until at least the end of the conspiracy period, BHIC was also known as Harbert International.

16.    Defendant Bilhar International Establishment f/k/a Harbert International Establishment ("HIE"), is a Liechtenstein corporation, with its principal place of business at 820 Shades Creek Parkway, Birmingham, Alabama. On or about September 21, 1993, Harbert International Establishment changed its name to Bilhar International Establishment. During the period of the complaint, HIE engaged in the international construction business, including in Egypt. Before December 10, 1991, HIE was owned fifty percent by Harbert International, Inc., and fifty percent by Bill L. Harbert. Since December 10, 1991, Bill L. Harbert has owned twenty-one percent of HIE and BHIC has owned seventy-nine percent. During the conspiracy period, HIE was also known as Harbert International.

17.    Defendant Harbert Construction Services (U.K.) Ltd. ("Harbert U.K."), is an English corporation, in which HIE holds a 49 percent share. Harbert U.K. has its principal place of business in London, England.

- 4 -

18.    Defendant Sabbia Aktiengesellschaft ("Sabbia") is a Liechtenstein corporation with a principal place of business in Liechtenstein.  Sabbia is directly or indirectly owned by defendant Holzmann.

19.    Defendant Roy Anderson was president of defendant HIE and defendant Harbert U.K.  Defendant Anderson also acted as vice president of defendant HII with overall responsibility and authority for HII's performance and administration of contracts, including those with agencies of the United States.  Defendant Anderson was the Harbert companies' representative to the joint ventures with defendant Jones on USAID-funded contracts in Egypt.  From on or about December 10, 1991, until the end of the conspiracy period, defendant BHIC represented to others that Roy Anderson was the president of its international division in matters affecting United States-funded construction contracts in Egypt.

20.    ABB ASEA Brown Boveri, Ltd., is a Swiss company with its principal place of business in Zurich, Switzerland.  ABB ASEA Brown Boveri, Ltd., is the ultimate parent company of ABB SUSA, Inc., formerly known as Sadelmi U.S.A., Inc., a New York company with its principal place of business in North Brunswick, New Jersey.

21.    Archirodon Group, Inc. was, during the conspiracy period, a Panamanian company headquartered in Geneva, Switzerland.  Archirodon Group, Inc. was the owner of the George A. Fuller Company, a Maryland company with its principal place of business in Virginia.

22.    Bilfinger + Berger Bauaktiengesellschaft is a German company with its

principal place of business in Mannheim, Germany. Bilfinger + Berger is the parent

company of Fru-Con Construction, Inc., a Missouri corporation with its principal place of

business in Ballwin, Missouri.

23.    The Harbert-Jones Companies were joint ventures that were created to bid

on and, if the bids were successful, perform USAID-funded contracts in Egypt.

Defendant J.A. Jones Construction Company held a forty percent share of each of these

joint ventures. Defendant HII held a sixty percent share of each joint venture during the

prequalification stage of each USAID-funded contract in Egypt. After USAID awarded

Contracts 20A and 07 to the Harbert-Jones Companies, defendant HII assigned its interest

in the contracts to defendant HIE for one dollar.

## STATEMENT OF FACTS

### CONTRACT 20A

24.    In early 1988, the Organization for Execution of the Greater Cairo

Wastewater Project ("Cairo Wastewater Organization") issued an Invitation to Tender for

the project known as Contract 20A.

25.    The Invitation to Tender indicated that Contract 20A was to be funded by

AID.

26.    The Invitation to Tender indicated that bids for Contract 20A were to be

submitted in sealed packages.

27.    In or about May 1988, conspirators acting on behalf of the Harbert-Jones

Companies held a meeting in the Frankfurt, Germany offices of defendant Philipp

Holzmann AG during which competitors discussed the submission of non-competitive

bids on Contract 20A.

28.    In or about June 1988, conspirators acting on behalf of the Harbert-Jones

Companies negotiated a bid-rigging agreement with Bilfinger + Berger, under which it

was agreed that Fru-Con Construction, Inc. would submit an artificially inflated bid on

Contract 20A in exchange for payment of money.

29.    On or about June 30, 1988, defendants HII and Jones formed an

unincorporated joint venture known as the Harbert-Jones Companies to bid on Contract

20A. The joint venture was owned 60% by HII and 40% by Jones. HII was designated to

undertake the overall duties of sponsor and coordinator for Contract 20A.

30.    On or about August 3, 1988, defendant Philipp Holzmann AG, acting on

behalf of the Harbert-Jones Companies, negotiated an agreement with Archirodon Group,

Inc., under which it was agreed that the George A. Fuller Company would not bid on

Contract 20A in exchange for payment of money.

31.    On or about August 3, 1988, defendant Anderson, acting on behalf of the

Harbert-Jones Companies, submitted a letter to the project owner of Contract 20A

increasing the previously submitted Harbert-Jones Companies' bid on Contract 20A by

3.5 percent to approximately $129 million.

32.    On or about August 4, 1988, conspirators made bid submissions in accordance with the bid-rigging agreement on Contract 20A.

33. .   The Harbert-Jones Companies submitted a bid on Contract 20A, as did Fru-Con Construction, Inc.

34.    The Harbert-Jones Companies' bid was the lowest received on Contract 20A.

35.    On or about April 12, 1989, AID approved the award of Contract 20A to the Harbert-Jones Companies.

36.    On or about April 16, 1989, a Letter of Intent to Award Contract 20A was issued to the Harbert-Jones Companies.

37.    On or about April 16, 1989, defendant HII sold, assigned, and transferred all its rights under Contract 20A to defendant HIE.

38.    The Harbert-Jones Companies entered into Contract 20A on or about July 11, 1989.

39.    During the period between August 1989 and December 10, 1991, agents for defendant HII, and from December 10, 1991, until June 20, 1993, agents for defendant BHIC, acting on behalf of the Harbert-Jones Companies, submitted 33 invoices, as further identified by Schedule A attached hereto and incorporated herein, to the Greater Cairo Wastewater Authority ("Cairo Wastewater Authority").

40.     During the period between August 1989 and December 10, 1991, agents for defendant HII, and from December 10, 1991, until June 20, 1993, agents for defendant BHIC, acting on behalf of the Harbert-Jones Companies, submitted to USAID a total of 33 material false representations in documents entitled "Contractor's Certificate and Agreement with Agency for International Development – Contractor's Invoice and Contract Abstract" on Contract 20A in which they falsely certified that no one had been compensated in order to obtain the contract, when in fact more than $5,226,000 had been paid to conspirators in order for the Harbert-Jones Companies to obtain the contract.

41.     The Cairo Wastewater Authority submitted the 33 invoices to AID.

42.     AID paid the Harbert-Jones Companies for each of the 33 invoices submitted on Contract 20A.

43.     Unknown to plaintiff United States, each of the 33 invoices submitted on Contract 20A were inflated because the defendants, pursuant to their secret agreement, had obtained Contract 20A at an artificially high price.

44.     Pursuant to its agreement on Contract 20A with its co-conspirators, defendants caused payments to be made to the co-conspirators for submitting a higher bid or not bidding at all.

45.     On or about December 7, 1988, defendant Anderson, acting on behalf of the Harbert-Jones Companies, and a co-conspirator renegotiated the payment terms of the bid-rigging agreement with Archirodon Group, Inc. on Contract 20A.

46.    On or about January 16, 1990, defendant Anderson, acting on behalf of HIE and others, met with agents from Archirodon Group, Inc. to discuss the payment schedule under the bid-rigging agreement on Contract 20A.

47.    On or about January 17, 1990, defendant Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A.

48.    On or about January 30, 1990, defendant Philipp Holzmann AG paid $1,000,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A.

49.    On or about June 1, 1990, defendant Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A.

50.    On or about June 11, 1990, defendant Philipp Holzmann AG paid $1,026,029 to Bilfinger + Berger under the bid-rigging agreement on Contract 20A.

51.    On or about October 29, 1990, defendant Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A.

52.    During the period between March 1990 and the end of October 1990, defendant Anderson and others instructed the Harbert-Jones Companies to pay approximately $3,361,503 to various Swiss bank accounts controlled by defendant Philipp Holzmann AG in order to reimburse it for the payments to Archirodon Group, Inc. and Bilfinger +Berger under the bid-rigging agreements.

53.    On or about December 18, 1990, defendant Philipp Holzmann AG paid $500,000 to Archirodon Group, Inc. under the bid-rigging agreement on Contract 20A.

54.    On or about June 10, 1991, defendant Philipp Holzmann AG paid $1,200,000 to Bilfinger + Berger under the bid-rigging agreement on Contract 20A.

55.    Defendants have engaged in acts to conceal profits from Contract 20A.    In particular:

a.    Defendants Harbert U.K. and Holzmann charged the Harbert-Jones Companies for "pre-bid consulting services" and "U.S. consulting services";

b.    As managing venturer of the Harbert-Jones Companies, defendant Harbert caused the Harbert-Jones Companies to wire-transfer approximately $3.35 million to Holzmann for fictitious "preconstruction costs";

c.    As managing venturer of the Joint Venture, defendant Harbert entered a "sale/leaseback" transaction for construction equipment used on Contract 20A with defendant Sabbia.  The Harbert-Jones Companies made eighteen lease payments of $800,000 each to Sabbia, the "sale" portion of $4 million was never paid to the Harbert-Jones Companies but instead was maintained in a Swiss bank account in the name of Sabbia;

d.    Administrative costs that pertained to another Egyptian contract were charged to Contract 20A.

- 11 -

## CONTRACT 07

56.   In or about 1989, the Alexandria General Organization for Sanitary Drainage("AGOSD") issued an Invitation to Tender for the project known as Contract 07.

57.   The Invitation to Tender indicated that Contract 07 was to be funded by AID.

58.   The Invitation to Tender indicated that bids for Contract 07 were to be submitted in sealed packages.

59.   In or about October 1990, defendants Holzmann, Harbert, and Anderson, on behalf of the Joint Venture, conspired together and with Bilfinger + Berger to rig the bids on Contract 07, under which it was agreed that Fru-Con Construction, Inc. would submit an artificially inflated bid on Contract 07.

60.   Defendants Holzmann, Harbert, and Anderson agreed with Bilfinger + Berger that the winning bidder would pay the losing bidder a sum certain.  The amount to be paid to the losing bidder was a "loser's fee."

61.   Fru-Con Construction, Inc. did not submit a bid on Contract 07.

62.   The Harbert-Jones Companies submitted the lowest bid on Contract 07.

63.   On or about March 8, 1991, HII sold, ~~assigned~~, and transferred all its rights under Contract 07 to HIE.

64.   The Harbert-Jones Companies entered into Contract 07 on or about May 14, 1991.

- 12 -

65. Between September 1991 and December 1994, Defendant Holzmann paid Bilfinger + Berger a loser's fee of 1,500,000 German marks under the bid-rigging agreement on Contract 07.

66. During the period between July 1991 and December 10, 1991, agents for defendant HII, and from December 10, 1991, until January 18, 1995, agents for BHIC, on behalf of the Harbert-Jones Companies, submitted 22 invoices, as further identified by Schedule B attached hereto and incorporated herein, to the Alexandria General Organization for Sanitary Drainage("AGOSD").

67. During the period between July 1991 and December 10, 1991, agents for defendant HII, and from December 10, 1991, until January 18, 1995, agents for defendant BHIC, acting on behalf of the Harbert-Jones Companies, submitted to USAID a total of 22 material false representations in documents entitled "Contractor's Certificate and Agreement with Agency for International Development – Contractor's Invoice and Contract Abstract" on Contract 07 in which they falsely certified that no one had been compensated in order to obtain the contract, when in fact 1,500,000 German marks had been paid to conspirators in order for the Harbert-Jones Companies to obtain the contract.

68. The AGOSD submitted the 22 invoices to AID.

69. AID paid the Harbert-Jones Companies for each of the 22 invoices submitted on Contract 07.

- 13 -

70.    Unknown to plaintiff United States, each of the 22 invoices submitted on

Contract 07 were inflated because the defendants, pursuant to their secret agreement, had

obtained Contract 07 at an artificially high price.

71.    Due to the self-concealing nature of the conspiracy between defendants and

their co-conspirator, the facts material to its right of action as to Contract 07 were not

known and reasonably should not have been known by the official of the United States

charged with responsibility to act in the circumstances prior to 1999. In 1999, the Civil

Division of the U.S. Department of Justice learned facts material to the bid rigging on

Contract 07.

## CONTRACT 29

72.    The Cairo Wastewater Organization also issued an Invitation to Tender for

the project known as Contract 29, to build a wastewater treatment facility at Abu Rawash,

Egypt.

73.    Contract 29 was also to be funded by AID.

74.    In or about April 1989, defendants Holzmann, Harbert, and Anderson

conspired with each other and with Sadelmi U.S.A., Inc. to rig the bids on Contract 29.

75.    Defendants Holzmann, Harbert, and Anderson agreed that the Harbert-

Jones Companies would submit an artificially inflated bid on Contract 29 in exchange for

the payment of money from ABB ASEA Brown Boveri, Ltd.

76.    On or about July 2, 1989, defendant Anderson, acting on behalf of the Harbert-Jones Companies, and Sadelmi U.S.A., Inc., submitted bids on Contract 29, in accordance with the bid-rigging agreement on Contract 29. The Harbert-Jones Companies' bid was higher than the bid submitted by Sadelmi U.S.A., Inc.

77.    On or about December 24, 1989, AID approved the award of Contract 29 to Sadelmi U.S.A., Inc.

78.    On or about December 24, 1989, a Notice of Award of Contract 29 was issued to Sadelmi U.S.A., Inc.

79.    On or about August 27, 1990, defendant Holzmann received $3.4 million from ABB ASEA Brown Boveri, Ltd. under the bid-rigging agreement on Contract 29.

80.    On or about January 4, 1991, defendant Philipp Holzmann AG paid approximately $1.34 million to a co-conspirator as its share of the proceeds under the bid-rigging agreement on Contract 29.

81.    On or about January 29, 1991, defendant Philipp Holzmann AG paid $2.01 million to a co-conspirator as its share of the proceeds under the bid-rigging  agreement on Contract 29 .

82.    During the period between May 1990 and September 20, 1996, Sadelmi U.S.A., Inc. submitted 56 payment requests on Contract 29.

83.    During the period between May 1990 and September 20, 1996, Sadelmi U.S.A., Inc. submitted to USAID 56 material false representations in documents entitled

"Contractor's Certificate and Agreement with Agency for International Development –

Contractor's Invoice and Contract Abstract" on Contract 29 in which its agents falsely

certified that no one had been compensated in order to obtain the contract, when in fact

$3.4 million dollars had been paid to defendant Philipp Holzmann AG in order to obtain

the contract.

84.    During the course of Contract 29, AID made payments for work performed,

as further identified by Schedule C attached hereto and incorporated herein.

85.    Unknown to plaintiff United States, each of the payments by AID for

Contract 29 were inflated because the defendants, pursuant to their secret agreement, had

caused Contract 29 to be bid at an artificially high price.

86.    Due to the self-concealing nature of the conspiracy between defendants and

their co-conspirator, the facts material to its right of action as to Contract 29 were not

known and reasonably should not been known by the official of the United States charged

with responsibility to act in the circumstances prior to January 2001. In January 2001, the

Civil Division of the U.S. Department of Justice learned facts material to the bid rigging

on Contract 29.

## PRIOR CRIMINAL PROSECUTION OF DEFENDANTS

87.    On August 18, 2000, an Information was filed in the Northern District of

Alabama, Southern Division, against defendant Holzmann alleging that at least as early as

June 1988 and continuing until at least January 18, 1995, defendant Holzmann and co-

- 16 -

conspirators entered into and participated in a combination and conspiracy to suppress

and eliminate competition by rigging the bids on certain wastewater construction

contracts, specifically Contracts 20A and Contract 07. The information alleged that, in

furtherance of the conspiracy, defendant Holzmann and co-conspirators, among other

things, met and agreed to bid at certain levels on Contract 20A and Contract 07, and

agreed that the co-conspirators would be compensated by defendant Holzmann in

exchange for their commitments to reduce or eliminate competition on Contract 20A and

Contract 07.

88.     On August 18, 2000, defendant Holzmann, pursuant to a plea agreement

with the United States, pled guilty to the charges set forth in the Information.

89.     The allegations contained in the Information and plea agreement are hereby

incorporated by reference into this First Amended Complaint in Intervention.

90.     On or about July 25, 2001, a grand jury sitting in the Northern District of

Alabama issued an indictment against defendants BHIC, Bilhar International

Establishment f/k/a Harbert International Establishment, and Roy Anderson. United

States v. Bill Harbert International Construction, Inc., et al., CR-01-PT-302-S (N.D.

Ala.). The indictment alleged that beginning at least as early as May 1988 and continuing

at least until September 20, 1996, defendants BHIC, HIE, Anderson, and co-conspirators

entered into and participated in a combination and conspiracy to suppress and eliminate

competition on construction contracts funded by the United States, through the USAID in

the Arab Republic of Egypt, specifically Contract20A, Contract 07, and Contract 29, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. The indictment further charged that defendants BHIC, HIE, Anderson and co-conspirators beginning at least as early as May 1988 and continuing at least until September 20, 1996, knowingly and wilfully conspired to defraud USAID in the procurement of construction services on Contract 20A, Contract 29, and Contract 07, in violation of 18 U.S.C. §371.

91.    On or about February 4, 2002, Bilhar International Establishment f/k/a Harbert International Establishment entered a plea of guilty to conspiring to rig bids on AID-funded contracts in Egypt, in violation of 15 U.S.C. §1.

92.    On February 12, 2002, defendant Anderson was found guilty by a federal jury on both counts of the federal indictment. Judgment in *United States v. Anderson*, CR-01-PT-302-S (N.D. Ala.).

93.    The allegations contained in the Indictment and plea agreement are hereby incorporated by reference into this First Amended Complaint in Intervention.

## FIRST CAUSE OF ACTION

### (False Claims Act)

94.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, as amended.

95.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 93 as if set forth fully herein.

96.    By virtue of the acts set forth above, defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment, in violation of 31 U.S.C. § 3729(a)(1).   Defendants knew that these claims for payment were false, fraudulent or fictitious, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false. These claims, therefore, were false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. §3729 (a) (1).

97.    By virtue of the acts set forth above, defendants knowingly made and used, or caused to be made or used, false statements to get false or fraudulent claims paid by the United States, in violation of 31 U.S.C. § 3729(a)(2).

98.    By virtue of the acts set forth above, defendants conspired with each other and other unnamed co-conspirators, to defraud the United States by getting false or fraudulent claims paid or approved, in violation of 31 U.S.C. § 3729(a)(3).

99.    By virtue of the acts set forth above, plaintiff United States paid false or fraudulent claims.

100.    By reason of these payments, the United States has incurred damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
(Unjust Enrichment)

101.    This is an action by the United States for damages to recover money paid to defendants by which defendants have been unjustly enriched.

- 19 -

102. Plaintiff incorporates by reference the allegations set forth above in paragraphs 1 through 93 as if set forth fully herein.

103. By reason of its payments on Contract 20A, Contract 07, and Contract 29, defendants have received money to which they were not entitled and by which defendants have been unjustly enriched, in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
(Money Paid Under Mistake Of Fact)

104. This is an action by the United States to recover money paid to defendants under a mistake of fact on Contract 20A and Contract 07.

105. Plaintiff incorporates by reference the allegations set forth above in paragraphs 1 through 93 as if set forth fully herein.

106. Plaintiff made payments on the defendants' claims for payment on Contract 20A and Contract 07 under the erroneous beliefs that defendants' invoices were non-collusive, competitive bids.

107. Plaintiff's erroneous beliefs were material to the amount of the payments made by plaintiff.

108. Because of these mistakes of fact, defendants have received money to which they are not entitled.

109. By reason of these overpayments, plaintiff is entitled to damages in an amount to be determined at trial.

WHEREFORE, plaintiff demands judgment against the defendant as follows:

- 20 -

A.     On Count One, judgment against all defendants for triple the damages sustained by plaintiff, a total still to be determined, plus civil penalties as are allowable by law in the amount of $5,000 to $10,000 per violation, costs, and all other proper relief;

B.     On Count Two, judgment against all defendants in the amount of the unjust enrichment, a total still be to determined, pre-judgment interest, costs, and all other proper relief.

C.     On Count Three, judgment against all defendants for the damages sustained, pre-judgment interest, costs, and all other proper relief.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

ROSCOE HOWARD , DC Bar #
United States Attorney
District of Columbia

MARK E. NAGLE, DC Bar # 416764
Assistant United States Attorney

KEITH MORGAN, D.C. Bar #422665
Assistant United States Attorney

MICHAEL F. HERTZ, D.C. Bar #965780
STEPHEN D. ALTMAN, D.C. Bar #226886
CAROLYN G. MARK, D.C. Bar #254177
Attorneys, Civil Division
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0256

Attorneys for The

- 21 -

United States of America

Dated: _____

## SCHEDULE A

## CONTRACT 20A

| NO. | DATE OF CLAIM | AMOUNT OF CLAIM |
|-----|---------------|-----------------|
| 1 | 10/03/89 | $4,016,982.31 |
| 2 | 11/06/89 | $3,311,441.94 |
| 3 | 12/10/89 | $2,551,555.53 |
| 4 | 01/08/90 | $1,183,721.07 |
| 5 | 02/13/90 | $2,836,835.50 |
| 6 | 03/07/90 | $2,306,280.00 |
| 7 | 04/05/90 | $3,580,539.00 |
| 8 | 05/09/90 | $2,999,733.00 |
| 9 | 06/05/90 | $4,501,373.00 |
| 10 | 06/27/90 | $3,352,551.00 |
| 11 | 08/14/90 | $3,150,081.00 |
| 12 | 09/06/90 | $2,813,958.00 |
| 13 | 10/17/90 | $3,593,299.00 |
| 14 | 11/07/90 | $4,175,496.00 |
| 15 | 12/04/90 | $4,659,610.00 |
| 16 | 01/16/91 | $4,121,559.00 |
| 17 | 02/05/91 | $6,268,099.00 |
| 18 | 02/27/91 | $5,301,639.00 |
| 19 | 04/09/91 | $5,691,495.00 |
| 20 | 05/19/91 | $6,046,839.00 |
| 21 | 06/13/91 | $5,629,663.00 |
| 22 | 07/11/91 | $5,503,716.00 |
| 23 | 08/06/91 | $5,129,167.00 |
| 24 | 09/05/91 | $2,587,875.00 |
| 25 | 10/16/91 | $839,233.00 |
| 26 | 11/21/91 | $2,072,370.00 |
| 27 | 12/09/91 | $1,628,765.00 |
| 28 | 01/16/92 | $755,210.00 |
| 29 | 03/10/92 | $714,146.00 |
| 30 | 04/12/92 | $2,587,495.00 |
| 31 | 12/08/92 | $457,252.00 |
| 32 | 03/30/93 | $2,676,102.00 |
| 33 | 06/20/93 | $27,243.00 |

### TOTAL PAID:          $ 107,071,324.35

## SCHEDULE B

## CONTRACT 07

| NO. | DATE OF CLAIM | AMOUNT OF CLAIM |
|---|---|---|
| 1 | 09/05/91 | $4,005,232.00 |
| 2 | 03/10/92 | $445,156.93 |
| 3 | 03/30/92 | $400,135.31 |
| 4 | 04/16/92 | $751,857.40 |
| 5 | 05/13/92 | $921,713.64 |
| 6 | 06/17/92 | $2,129,590.03 |
| 7 | 07/16/92 | $948,390.76 |
| 8 | 07/27/92 | $726,827.76 |
| 9 | 08/30/92 | $2,122,687.98 |
| 10 | 10/15/92 | $2,780,571.44 |
| 11 | 11/16/92 | $1,998,006.62 |
| 12 | 12/17/92 | $2,552,396.22 |
| 13 | 01/26/93 | $3,321,699.40 |
| 14 | 02/08/93 | $2,979,567.22 |
| 15 | 03/04/93 | $2,760,991.07 |
| 16 | 03/30/93 | $2,337,611.42 |
| 17 | 05/09/93 | $2,911,152.61 |
| 18 | 06/27/93 | $4,070,215.50 |
| 19 | 07/19/93 | $741,108.90 |
| 20 | 09/26/93 | $1,169,000.40 |
| 21 | 10/18/93 | $2,195,075.55 |
| 22 | 01/18/95 | $967,603.47 |

**TOTAL PAID:**          **$ 43,236,591.63**

# SCHEDULE C

## CONTRACT 29

| NO. | DATE OF PAYMENT | AMOUNT OF CLAIM |
|---|---|---|
| 1 | 7/09/90 | $4,200,325.00 |
| 2 | 7/30/90 | $4,374,305.00 |
| 3 | 9/06/90 | $1,822,341.00 |
| 4 | 10/09/90 | $2,745,042.00 |
| 5 | 11/05/90 | $3,991,571.00 |
| 6 | 11/19/90 | $5,067,454.00 |
| 7 | 12/18/90 | $3,317,918.00 |
| 8 | 1/21/91 | $5,154,415.00 |
| 9 | 2/18/91 | $5,243,185.00 |
| 10 | 3/14/91 | $6,880,074.00 |
| 11 | 4/09/91 | $5,058,072.00 |
| 12 | 5/21/91 | $4,938,854.00 |
| 13 | 6/11/91 | $2,466,239.00 |
| 14 | 7/24/91 | $4,737,599.00 |
| 15 | 8/13/91 | $3,764,746.00 |
| 16 | 9/11/91 | $3,891,003.00 |
| 17 | 10/16/91 | $4,779,653.00 |
| 18 | 11/19/91 | $4,222,541.00 |
| 19 | 12/16/91 | $4,207,250.00 |
| 20 | 1/23/92 | $5,515,178.00 |
| 21 | 2/24/92 | $5,198,184.00 |
| 22 | 3/30/92 | $2,144,230.00 |
| 23 | 4/20/92 | $2,802,685.00 |

| NO. | DATE OF PAYMENT | AMOUNT OF CLAIM |
|-----|-----------------|-----------------|
| 24 | 5/25/92 | $5,938,216.00 |
| 25 | 6/25/92 | $3,420,560.00 |
| 26 | 8/03/92 | $2,906,453.00 |
| 27 | 9/03/92 | $3,137,254.00 |
| 28 | 9/28/92 | $2,284,612.00 |
| 29 | 10/27/92 | $2,193,404.00 |
| 30 | 12/09/92 | $1,610,297.00 |
| 31a | 12/29/92 | $ 999,999.00 |
| 31b | 12/29/92 | $ 999,999.00 |
| 31c | 12/29/92 | $ 999,999.00 |
| 31d | 12/29/92 | $ 999,999.00 |
| 31e | 12/29/92 | $ 999,999.00 |
| 31f | 12/29/92 | $ 999,999.00 |
| 31g | 12/29/92 | $ 96,299.00 |
| 32 | 1/93 | $1,684,695.00 |
| 33 | 3/14/93 | $1,772,838.00 |
| 34a | 4/12/93 | $ 657,884.98 |
| 34b | 4/12/93 | $ 770,231.02 |
| 35 | 5/11/93 | $ 353,035.00 |
| 36 | 6/16/93 | $ 368,172.00 |
| 37 | 7/13/93 | $ 342,113.00 |
| 38 | 8/10/93 | $ 730,252.00 |
| 39 | 9/12/93 | $ 338,306.00 |
| 40 | 11/29/93 | $ 614,678.00 |

Schedule C, page 2

| NO. | DATE OF PAYMENT | AMOUNT OF CLAIM |
|-----|-----------------|-----------------|
| 41 | 12/27/93 | $ 427,680.00 |
| 42 | 1/12/94 | $ 123,500.00 |
| 43 | 2/15/94 | $ 331,961.00 |
| 44 | 3/17/94 | $ 142,645.00 |
| 45 | 4/18/94 | $ 206,150.00 |
| 46 | 5/09/94 | $ 68,583.00 |
| 47 | 6/22/94 | $ 415,068.00 |
| 48 | 7/13/94 | $ 101,432.00 |
| 49 | 8/07/94 | $ 119,700.00 |
| 50 | 9/06/94 | $ 47,500.00 |
| 51 | 10/17/94 | $ 95,000.00 |
| 52 | 12/26/94 | $ 218,500.00 |
| 53 | 2/02/95 | $ 380,057.00 |
| 54 | 4/26/95 | $203,715.00 |
| 55 | 8/18/95 | $ 86,948.00 |
| 56 | 9/20/96 | $ 77,564.00 |

**TOTAL PAID:**          **$134,788,161.00**

## CERTIFICATE OF SERVICE

This is to certify that a copy of the forgoing has been served by first class mail postage prepaid, this 10th day of December 2002 on:

Robert B. Bell
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, D.C. 20037-1420

John H. Shenefield,
Donald Klautier,
Phillip Zane
Morgan, Lewis & Bockius, LLP
1800 M Street, N.W.
Washington, D.C.   20036

June Ann Sauntry
Bryan B. Lavine
Troutman Sanders Attorneys at Law
401 9th Street, NW
Suite 1000
Washington, DC 20004

Charles Leeper,
Spriggs & Hollingsworth
1350 Eye Street, N.W.
Washington, D.C.   20005-3305

Kent Gardiner
Alan W.H. Gourley
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C.   20004-2595

Charles C. Murphy, Jr.
Vaughan & Murphy
233 Peachtree Street, N.E.
Suite 700
Harris Tower
Atlanta, Georgia   30303

Stephen P. Murphy
Andrew L. Hurst
Reed Smith LLP
Suite 1100 - East Tower

1301 K Street, NW
Washington, D.C.    2005-3317

KEITH MORGAN, D.C. Bar #422665
Assistant U. S. Attorney
555 4th Street, N.W.
Washington, D. C.   20001

**Sauntry, June Ann**

---

**From:**    DCD_ECFNotice@dcd.uscourts.gov
**Sent:**    Wednesday, March 22, 2006 1:36 PM
**To:**      DCD_ECFNotice@dcd.uscourts.gov
**Subject:** Activity in Case 1:95-cv-01231-RCL MILLER, et al v. HOLZMANN, et al "Amended Complaint"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

U.S. District Court

District of Columbia

Notice of Electronic Filing

The following transaction was received from entered on 3/22/2006 at 1:35 PM EDT and filed on 3/9/2006
**Case Name:**     MILLER, et al v. HOLZMANN, et al
**Case Number:**   1:95-cv-1231
**Filer:**         UNITED STATES OF AMERICA
**Document Number:** 237

**Docket Text:**
FIRST AMENDED COMPLAINT against PHILIPP HOLZMANN A.G., BILL HARBERT INTERNATIONAL CONSTRUCTION, INC., BILHAR INTERNATIONAL ESTABLISHMENT f/k/a HARBERT INTERNATIONAL ESTABLISHMENT, HARBERT INTERNATIONAL ESTABLISHMENT, HARBERT CORPORATION, HARBERT INTERNATIONAL INC., HARBERT CONSTRUCTION SERVICES (U.K.) LTD., J.A. JONES CONSTRUCTION COMPANY, SABBIA A.G., and ROY ANDERSONfiled by UNITED STATES OF AMERICA.(tg, )

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**O:\Scan Repository\gumiel\95-1231.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=3/22/2006] [FileNumber=1057020-0]
[9a999400b63d7ecb05847a4c1c8490eaf351f6f84531c8dcde964483e7be8e9e1935
52b277aa0efc42141374d91fabf74eac4c67ec84708470724930541add03]]

**1:95-cv-1231 Notice will be electronically mailed to:**

Robert B. Bell     robert.bell@wilmerhale.com

Barry Coburn     bcoburn@troutcacheris.com

Alan William Hugh Gourley     agourley@crowell.com,

3/23/2006

Michael F. Hertz    michael.hertz@usdoj.gov,

Andrew Lawrence Hurst    ahurst@reedsmith.com,

Charles Samuel Leeper    charles.leeper@dbr.com

Carolyn Gail Mark    carolyn.mark@usdoj.gov, Geraldine.Hopson@usdoj.gov

Michael Reilly Miner    michael.miner@dbr.com

Keith V. Morgan    keith.morgan@usdoj.g! ov

Stephen Printiss Murphy    smurphy@reedsmith.com,

June Ann Sauntry    juneann.sauntry@troutmansanders.com, james.mills@troutmansanders.com;
bryan.lavine@troutmansanders.com

David Schertler    dschertler@coburnandschertler.com,

John H. Shenefield    jshenefield@morganlewis.com,

Brian J. Sonfield    brian.sonfield@exim.gov

Phillip Craig Zane    pzane@bakerdonelson.com

Charles Anthony Zdebski    charles.zdebski@troutmansanders.com

**1:95-cv-1231 Notice will be delivered by other means to:**

Bryan B. Lavine
TROUTMAN & SANDERS
5200 Bank of America Plaza
600 Peachtree Street, NE
Atlanta, GA 30308

James J. Mills
TROUTMAN SANDERS LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308-2216

Charles C. Murphy , Jr
VAUGHAN & MURPHY
260 Peachtree Street, NW
Suite 1600
Atlanta, GA 30303

3/23/2006

EXHIBIT 11

FILED
2007 Mar-20  PM 03:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

FILED

**Dr. Hoda Elemary**
**21 Le Conte**
**Laguna Niguel, California 92677**
**(949) 715-2022 (Telephone)**
**(949) 715-2060 (Facsimile)**

07 MAR 20  PM 1: 47

U.S. DISTRICT COURT
N.D. OF ALABAMA

Plaintiff
In Propria Persona

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ALABAMA

## SOUTHERN DIVISION

| | | |
|---|---|---|
| DR. HODA ELEMARY, | ) | CIVIL ACTION NO. 07-AR-0457-5 |
| Plaintiff, | ) ) | **NOTICE OF VOLUNTARY DISMISSAL** |
| vs. | ) ) | |
| BILLY HARBERT, JR., et al., | ) ) | |
| Defendants. | ) ) | |

NOTICE IS HEREBY GIVEN that pursuant to Federal Rule of Civil

Procedure 41(a), plaintiff voluntarily dismisses the above-captioned action

without prejudice.

Dated:  March ~~19~~ 20, 2007     _____
                                                         Plaintiff
                                                         Dr. Hoda Elemary
                                                         In Propria Persona

FILED

Brian J. Jacobs (State Bar No. 107788)
467 South Arnaz Drive, Suite 319A
Los Angeles, California 90048
(310) 770-6874 (Telephone)
(310) 858-6489 (Facsimile)

07 MAR 20 PM 1: 47

U.S. DISTRICT COURT
N.D. OF ALABAMA

Attorneys for Plaintiff
Dr. Hoda Elemary

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ALABAMA

## SOUTHERN DIVISION

| | | |
|---|---|---|
| DR. HODA ELEMARY, | ) | CIVIL ACTION NO. 07-AR-0457-5 |
| | ) | |
| Plaintiff, | ) | **NOTICE OF VOLUNTARY DISMISSAL** |
| | ) | |
| vs. | ) | |
| | ) | |
| BILLY HARBERT, JR., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

NOTICE IS HEREBY GIVEN that pursuant to Federal Rule of Civil

Procedure 41(a), plaintiff voluntarily dismisses the above-captioned action

without prejudice.

Dated: March 20, 2007

Brian J. Jacobs
Attorney for Plaintiff
Dr. Hoda Elemary

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

    I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 467 South Arnaz Drive, Suite 319A, Los Angeles, California 90048.

    On March 19, 2007, I served the foregoing document described as **NOTICE OF VOLUNTARY DISMISSAL** on the interested parties in this action by placing true copies thereof enclosed in (a) sealed envelope(s) addressed as follows:

[Please See Attached Service List]

    I deposited this envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

    I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct.


   BRIAN J. JACOBS
Type or Print Name         Signature

## SERVICE LIST

LATHAM & WATKINS LLP
David J. Schindler
Yasmin N. Best
633 West Fifth Street
Suite 4000
Los Angeles, CA 90071-2007


LATHAM & WATKINS LLP
Roger S. Goldman
Nathaniel A. Vitan
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004


BRADLEY ARANT ROSE & WHITE LLP
Matthew H. Lembke
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203


SEDGWICK, DETERT, MORAN & ARNOLD LLP
Gregory H. Halliday
Steven S. Streger
3 Park Plaza, 17th Floor
Irvine, CA 92614-8540


DRINKER BIDDLE & REATH LLP
Thomas M. Moore
Ronald T. Labriola
Mario Horwitz
333 South Grand Avenue
Suite 1700
Los Angeles, CA 90071-1504

BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, BROOKS & LINCENBERG, P.C.
Joel E. Boxer
Dorothy Wolpert
Bonita D. Moore
1875 Century Park East
23rd Floor
Los Angeles, CA 90067-2561

# EXHIBIT 12

# SUMMONS (Family Law)

FL-110

**CITACIÓN (Derecho familiar)**

**NOTICE TO RESPONDENT** *(Name):* BILL L. HARBERT
**AVISO AL DEMANDADO** *(Nombre):*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

LOS ANGELES SUPERIOR COURT

**FILED**

JUN 0 8 2007

JOHN A. CLARKE, CLERK

BY _____ Julia Roj...

> **You are being sued.** *Lo están demandando.*

**Petitioner's name is:** HODA ELEMARY
*Nombre del demandante:*

SD025050

CASE NUMBER *(NÚMERO DE CASO):*

---

You have **30 calendar days** after this *Summons* and *Petition* are served on you to file a *Response* (form FL-120 or FL-123) at the court and have a copy served on the petitioner. A letter or phone call will not protect you.

If you do not file your *Response* on time, the court may make orders affecting your marriage or domestic partnership, your property, and custody of your children. You may be ordered to pay support and attorney fees and costs. If you cannot pay the filing fee, ask the clerk for a fee waiver form.

If you want legal advice, contact a lawyer immediately. You can get information about finding lawyers at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), at the California Legal Services Web site (*www.lawhelpcalifornia.org*), or by contacting your local county bar association.

*Tiene 30 días corridos después de haber recibido la entrega legal de esta Citación y Petición para presentar una Respuesta (formulario FL-120 ó FL-123) ante la corte y efectuar la entrega legal de una copia al solicitante. Una carta o llamada telefónica no basta para protegerlo.*

*Si no presenta su Respuesta a tiempo, la corte puede dar órdenes que afecten su matrimonio o pareja de hecho, sus bienes y la custodia de sus hijos. La corte también le puede ordenar que pague manutención, y honorarios y costos legales. Si no puede pagar la cuota de presentación, pida al secretario un formulario de exención de cuotas.*

*Si desea obtener asesoramiento legal, póngase en contacto de inmediato con un abogado. Puede obtener información para encontrar a un abogado en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en el sitio Web de los Servicios Legales de California (www.lawhelpcalifornia.org) o poniéndose en contacto con el colegio de abogados de su condado.*

---

**NOTICE:** The restraining orders on page 2 are effective against both spouses or domestic partners until the petition is dismissed, a judgment is entered, or the court makes further orders. These orders are enforceable anywhere in California by any law enforcement officer who has received or seen a copy of them.

*AVISO: Las órdenes de restricción que figuran en la página 2 valen para ambos cónyuges o pareja de hecho hasta que se despida la petición, se emita un fallo o la corte dé otras órdenes. Cualquier autoridad de la ley que haya recibido o visto una copia de estas órdenes puede hacerlas acatar en cualquier lugar de California.*

---

1. The name and address of the court are *(El nombre y dirección de la corte son):*
   SUPERIOR COURT OF CALIFONRIA, COUNTY OF LOS ANGELES
   1725 MAIN STREET

   SANTA MONICA, CALIFONRIA 90401

2. The name, address, and telephone number of petitioner's attorney, or the petitioner without an attorney, are:
   *(El nombre, dirección y número de teléfono del abogado del demandante, o del demandante si no tiene abogado, son):*

   RICHARD E. MASSON, ESQ. (SBN 198331)
   DEHNADI & MASSON, LLP
   ONE PARK PLAZA, SIXTH FLOOR       JOHN A. CLARKE
   IRVINE, CALIFORNIA 92614          JUN 0 8 2007

   (949) 852-4482
   198331

   *Julia Rojas*

Date *(Fecha)* _____          Clerk, by *(Secretario, por)* _____ X _____, Deputy *(Asistente)*

| | |
|---|---|
| [SEAL — SUPERIOR COURT LOS ANGELES COUNTY CALIFORNIA] | **NOTICE TO THE PERSON SERVED:** You are served<br>*AVISO A LA PERSONA QUE RECIBIÓ LA ENTREGA: Esta entrega se realiza*<br>a. ☐ as an individual. *(a usted como individuo.)*<br>b. ☐ on behalf of respondent who is a *(en nombre de un demandado que es):*<br>  (1) ☐ minor *(menor de edad)*<br>  (2) ☐ ward or conservatee *(dependiente de la corte o pupilo)*<br>  (3) ☐ other *(specify)* *(otro – especifique):* |

**(Read the reverse for important information.)**
*(Lea importante información al dorso.)*

---

Form Adopted for Mandatory Use
Judicial Council of California
FL-110 [Rev. January 1, 2006]

**SUMMONS**
**(Family Law)**

Legal Solutions Plus

Page 1 of 2
Family Code §§ 232, 233, 2040, 7700;
Code of Civil Procedure, §§ 412.20, 416.60-416.90

FL-110

## WARNING—IMPORTANT INFORMATION

**WARNING: California law provides that, for purposes of division of property upon dissolution of a marriage or domestic partnership or upon legal separation, property acquired by the parties during marriage or domestic partnership in joint form is presumed to be community property. If either party to this action should die before the jointly held community property is divided, the language in the deed that characterizes how title is held (i.e., joint tenancy, tenants in common, or community property) will be controlling, and not the community property presumption. You should consult your attorney if you want the community property presumption to be written into the recorded title to the property.**

## STANDARD FAMILY LAW RESTRAINING ORDERS

**Starting immediately, you and your spouse or domestic partner are restrained from**

1. removing the minor child or children of the parties, if any, from the state without the prior written consent of the other party or an order of the court;

2. cashing, borrowing against, canceling, transferring, disposing of, or changing the beneficiaries of any insurance or other coverage, including life, health, automobile, and disability, held for the benefit of the parties and their minor child or children;

3. transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life; and

4. creating a nonprobate transfer or modifying a nonprobate transfer in a manner that affects the disposition of property subject to the transfer, without the written consent of the other party or an order of the court. Before revocation of a nonprobate transfer can take effect or a right of survivorship to property can be eliminated, notice of the change must be filed and served on the other party.

You must notify each other of any proposed extraordinary expenditures at least five business days prior to incurring these extraordinary expenditures and account to the court for all extraordinary expenditures made after these restraining orders are effective. However, you may use community property, quasi-community property, or your own separate property to pay an attorney to help you or to pay court costs.

## ADVERTENCIA – INFORMACIÓN IMPORTANTE

***ADVERTENCIA: De acuerdo a la ley de California, las propiedades adquiridas por las partes durante su matrimonio o pareja de hecho en forma conjunta se consideran propiedad comunitaria para los fines de la división de bienes que ocurre cuando se produce una disolución o separación legal del matrimonio o pareja de hecho. Si cualquiera de las partes de este caso llega a fallecer antes de que se divida la propiedad comunitaria de tenencia conjunta, el destino de la misma quedará determinado por las cláusulas de la escritura correspondiente que describen su tenencia (por ej., tenencia conjunta, tenencia en común o propiedad comunitaria) y no por la presunción de propiedad comunitaria. Si quiere que la presunción comunitaria quede registrada en la escritura de la propiedad, debería consultar con un abogado.***

## ÓRDENES DE RESTRICCIÓN NORMALES DE DERECHO FAMILIAR

***En forma inmediata, usted y su cónyuge o pareja de hecho tienen prohibido:***

1. *Llevarse del estado de California a los hijos menores de las partes, si los hubiere, sin el consentimiento previo por escrito de la otra parte o una orden de la corte;*

2. *Cobrar, pedir prestado, cancelar, transferir, deshacerse o cambiar el nombre de los beneficiarios de cualquier seguro u otro tipo de cobertura, tal como de vida, salud, vehículo y discapacidad, que tenga como beneficiario(s) a las partes y su(s) hijo(s) menor(es);*

3. *Transferir, gravar, hipotecar, ocultar o deshacerse de cualquier manera de cualquier propiedad, inmueble o personal, ya sea comunitaria, cuasicomunitaria o separada, sin el consentimiento escrito de la otra parte o una orden de la corte, con excepción las operaciones realizadas en el curso normal de actividades o para satisfacer las necesidades de la vida; y*

4. *Crear o modificar una transferencia no testamentaria de manera que afecte el destino de una propiedad sujeta a transferencia, sin el consentimiento escrito de la otra parte o una orden de la corte. Antes de que se pueda eliminar la revocación de una transferencia no testamentaria, se debe presentar ante la corte un aviso del cambio y hacer una entrega legal de dicho aviso a la otra parte.*

*Cada parte tiene que notificar a la otra sobre cualquier gasto extraordinario propuesto, por lo menos cinco días laborales antes de realizarlo, y rendir cuenta a la corte de todos los gastos extraordinarios realizados después de que estas órdenes de restricción hayan entrado en vigencia. No obstante, puede usar propiedad comunitaria, cuasicomunitaria o suya separada para pagar a un abogado o para ayudarle a pagar los costos de la corte.*



FL-100

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>RICHARD E. MASSON, ESQ. (SBN 198331)<br>DEHNADI & MASSON, LLP<br>ONE PARK PLAZA<br>SIXTH FLOOR<br>IRVINE, CALLIFORNIA 92614<br>TELEPHONE NO. (949) 852-4482    FAX NO. *(Optional):* (949) 852-4483<br>E-MAIL ADDRESS *(Optional):* RMASSON@DEHNADIMASSON.COM<br>ATTORNEY FOR *(Name):* HODA ELEMARY | **FOR COURT USE ONLY** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 1725 MAIN STREET
MAILING ADDRESS:
CITY AND ZIP CODE: SANTA MONICA, CALIFONRIA 90401
BRANCH NAME: WEST DISTRICT

FILED
LOS ANGELES SUPERIOR COURT
JUN 0 8 2007
JOHN A. CLARKE, CLERK
BY _____ Julia Rojas

MARRIAGE OF

PETITIONER: HODA ELEMARY

RESPONDENT: BILL L. HARBERT

**PETITION FOR**

- [ ] **Dissolution of Marriage**
- [X] **Legal Separation**
- [ ] **Nullity of Marriage**     [ ] **AMENDED**

CASE NUMBER:

SD025009

1. **RESIDENCE (Dissolution only)** [X] Petitioner    [ ] Respondent   has been a resident of this state for at least six months and of this county for at least three months immediately preceding the filing of this *Petition for Dissolution of Marriage.*

2. **STATISTICAL FACTS**
   a. Date of marriage: 01/22/1992
   b. Date of separation: 04/05/2005
   c. Time from date of marriage to date of separation *(specify):*
      Years: 13    Months: 3

3. **DECLARATION REGARDING MINOR CHILDREN** *(include children of this relationship born prior to or during the marriage or adopted during the marriage):*
   a. [X] There are no minor children.
   b. [ ] The minor children are:

   | Child's name | Birthdate | Age | Sex |
   |---|---|---|---|
   | | | | |

   [ ] Continued on Attachment 3b.

   c. If there are minor children of the Petitioner and Respondent, a completed *Declaration Under Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA)* (form FL-105) must be attached.
   d. [ ] A completed voluntary declaration of paternity regarding minor children born to the Petitioner and Respondent prior to the marriage is attached.

4. **SEPARATE PROPERTY**

   Petitioner requests that the assets and debts listed [ ] in *Property Declaration* (form FL-160) [ ] in Attachment 4
   [X] below   be confirmed as separate property.

   | Item | Confirm to |
   |---|---|
   | ANY AND ALL PROPERTY ACQUIRED PRIOR TO MARRIAGE, AFTER THE DATE OF SEPARATION, AND/OR BY GIFT, BEQUEST, DEVISE, OR DESCENT. INCLUDING BUT NOT LIMITED TO PETITIONER'S RESIDENCE, LOCATED AT 21 EL CONTE, LAGUNA NIGUEL, CALIFONIA 92677. PETITIONER RESERVES THE RIGHT TO AMEND THIS SECTION UPON FURTHER DISCOVERY. | |

**NOTICE: You may redact (black out) social security numbers from any written material filed with the court in this case other than a form used to collect child or spousal support.**

Form Adopted for Mandatory Use
Judicial Council of California
FL-100 [Rev. January 1, 2005]

**PETITION—MARRIAGE**
**(Family Law)**

Legal
Solutions
Plus

Family Code, §§ 2330, 3409

| NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

RICHARD E. MASSON, ESQ. (SBN 198331)
DEHNADI & MASSON, LLP
ONE PARK PLAZA
SIXTH FLOOR
IRVINE, CALIFORNIA 92614

STATE BAR NUMBER: 198331

**FILED**
LOS ANGELES SUPERIOR COURT

JUN 0 8 2007

JOHN A. CLARKE, CLERK

BY _____ Julia Rojas

ATTORNEY FOR (Name): HODA ELEMARY

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:
1725 MAIN STREET, SANTA MONICA, CALIFORNIA 90401

PETITIONER/PLAINTIFF:
HODA ELEMARY

RESPONDENT/DEFENDANT:
BILL L. HARBERT

| FAMILY LAW CASE COVER SHEET CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO DISTRICT | CASE NUMBER: SD025800 |
|---|---|

### Case Filing Instructions

This cover sheet is required so that the court can assign your case to the correct court district for filing and hearing. It satisfies the requirement for a certificate authorizing filing in the district, as set forth in Los Angeles Superior Court Rules 2(d) and 14.2. It must be completed and submitted to the court along with the original Complaint or Petition in ALL Family cases filed in any district of the Los Angeles County Superior Court. This form is not required in Abandonment & Emancipation cases, which are to be filed at Children's Court.

I. Fill in the requested information.

a) Enter address of Petitioner

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 502 NORTH LINDEN DR., BEVERLY HILLS, CALIFORNIA 90210 | /21 Le Conte, Laguna Niguel, CA 92677 Dual Residency | | |

b) Enter address of Respondent. **DO NOT COMPLETE THIS ITEM IF THIS IS A MINOR'S CONTRACT CASE**

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 205 VESTIVIA CIRCLE, VESTAVIA HILLS-BURMINGHAM, AL 35216 | | | |

MINOR CHILDREN INVOLVED?  ☐ YES   HOW MANY? _____  ☑ NO

II. Select the correct district.

a. Under Column 1 below, check the one type of action which best describes the nature of this case.
b. In Column 2 below, circle the reason for your choice of district that applies to the type of action you have checked.

### Applicable Reason for Choosing District (See Column 2 below)

| | |
|---|---|
| 1. May be filed in Central District. | 3. Child resides within the district. |
| 2. District where one or more of the parties reside. | 4. District where Petitioner resides. |

| **1** TYPE OF ACTION (Check only one) (Continued) | **2** APPLICABLE REASONS (See above) |
|---|---|
| A5520   Dissolution of Marriage | 1. 2 |
| A5525   Summary Dissolution of Marriage | 1. 2 |
| A5521   Dissolution of Domestic Partnership | 1. 2 |
| A5530   Nullity of Void or Voidable Marriage | 1. 2 |
| A5531   Nullity of Void or Voidable Domestic Partnership | 1. 2 |

| Short Title | Case Number |
|---|---|
| ELEMARY V. HARBERT | |

| | | |
|---|---|---|
| ✔ A5510 | Legal Separation | 1 ② |
| A5511 | Legal Separation of Domestic Partnership | 1. 2 |
| A6126 | Petition for Custody and Support of Minor | 1. 2. 3 |
| A6131 | Child Support Services Department (CSSD) Parentage/Support | 1. |
| A6139 | Foreign Support Order | 1. 2. 3 |
| A6136 | Foreign Custody Order | 1. 2. 3 |
| A6138 | Uniform Interstate Family Support Act (UIFSA) Responding Petition | 1. 2. 3 |
| A6122 | Domestic Violence Restraining Order (Civil Harassment – use Civil Cover Sheet) | (Any Court Jurisdiction – DV's only) |
| A6600 | Habeas Corpus Petition – Child Custody | 1. 3 |
| A6080 | Petition to Establish Parentage / Paternity (Non-governmental) | 1. 2. 3 |
| A6111 | Approval of Minor's Contract (6751 Family Code) | 1 |
| A6130 | Other Family Complaint or Petition (Specify): | 1. 2. 3 |
| A6101 | Agency Adoption | 1. 4 |
| A6102 | Independent Adoption | 1. 4 |
| A6104 | Stepparent Adoption | 1. 4 |
| A6103 | Adult Adoption | 1. 4 |
| A6106 | Sole Custody Petition | 1. 4 |

III.   Enter address of minor child if known.  **(DO NOT COMPLETE UNLESS YOU HAVE CIRCLED ITEM 3 AS AN APPLICABLE REASON**

| ADDRESS: Do not complete if this case falls under Family Code §6751 | CITY: | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

IV.   Enter the information below and sign the certificate.

Certificate / Declaration of Assignment:  The undersigned hereby certifies and declares that the above entitled matter is properly filed for assignment to the WEST _____ District of the Los Angles Superior Court under Code of Civil Procedure §392 et seq., 2300 et seq. of the Family Code, and Rule 2(b), (c), and (d) of this court for reason checked above.  I certify and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: JUNE 5, 2007

_____
(SIGNATURE OF ATTORNEY/PARTY WITHOUT ATTORNEY)

FAM 020
(Rev 12/06)

**FAMILY LAW CASE COVER SHEET
CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO DISTRICT**

Page 2 of 2
LASC RULE 14.2