## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DR. HODA ELEMARY,

      Plaintiff,

      vs.

PHILIPP HOLZMANN A.G
WACHOVIA BANK, N.A.; B.L.
HARBERT INTERNATIONAL, LLC;
SABBIA AKTIENGESELLSCHAFT;
HARBERT INTERNATIONAL
ESTABLISHMENT, INC.; BILL L.
HARBERT, SR.; AND BILLY
HARBERT, JR.,

      Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:07-cv-00654-RCL

Hon. Royce C. Lamberth

Oral Argument Requested

**NOTICE OF ERRATA TO MEMORANDUM OF LAW IN OPPOSITION TO
THE MOTION OF DEFENDANTS BILLY HARBERT, JR. AND B.L. HARBERT
INTERNATIONAL LLC TO DISMISS; MEMORANDUM OF LAW IN
OPPOSITION TO THE MOTION OF DEFENDANTS BILL L. HARBERT, SR. AND
HARBERT INTERNATIONAL ESTABLISHMENT, INC. TO DISMISS AND
MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF CERTAIN
DEFENDANTS TO TRANSFER VENUE; REQUEST FOR JUDICIAL NOTICE**

# RECEIVED

AUG 1 0 2007


NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## NOTICE OF ERRATA

**PLEASE TAKE NOTICE** that attached hereto are true and correct copies of plaintiff's Court stamped cover sheets of the --'MEMORANDA OF LAW IN OPPOSITION TO THE HARBERT DEFENDANTS' MOTIONS TO DISMISS AND TRANSFER VENUE'-- timely filed ( ON JULY 30, 2007).

**PLEASE TAKE FURTHER NOTICE** that attached hereto are true and correct copies of each of the Exhibits referenced in Plaintiff's

1). MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF DEFENDANTS **BILLY HARBERT, JR.** AND B.L. HARBERT INTERNATIONAL, LLC TO DISMISS; REQUEST FOR JUDICIAL NOTICE, 2). MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF DEFENDANTS **BILL L. HARBERT, SR**. AND HARBERT INTERNATIONAL ESTABLISHMENT, INC. TO DISMISS AND 3). MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF **CERTAIN DEFENDANTS TO TRANSFER VENUE**.

Respectfully submitted,

Dated: July 30, 2007

Dr. Hoda Elemary
21 Le Conte
Laguna Niguel, CA 92677
Tel.: (949) 715-2022
Fax: (949) 715-2060

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 JUL 30    PM 11: 06

NANCY M.
MAYER-WHITTINGTON
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DR. HODA ELEMARY, | Case No. 1:07-cv-00654-RCL |
| Plaintiff, | |
| vs. | Hon. Royce C. Lamberth |
| PHILIPP HOLZMANN A.G | Oral Argument Requested |
| WACHOVIA BANK, N.A.; B.L. | |
| HARBERT INTERNATIONAL, LLC; | |
| SABBIA AKTIENGESELLSCHAFT; | |
| HARBERT INTERNATIONAL | |
| ESTABLISHMENT, INC.; BILL L. | |
| HARBERT, SR.; AND BILLY | |
| HARBERT, JR., | |
| Defendants | |

## MEMORANDUM IN OPPOSITION TO THE MOTION OF DEFENDANTS BILLY HARBERT, JR. AND B.L. HARBERT INTERNATIONAL, LLC TO DISMISS; REQUEST FOR JUDICIAL NOTICE

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 JUL 30 PM 11:06

NANCY M.
MAYER-WHITTINGTON
CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DR. HODA ELEMARY,                    )
                                     )    Case No. 1:07-cv-00654-RCL
        Plaintiff,                   )
                                     )
    vs.                              )    Hon. Royce C. Lamberth
                                     )
PHILIPP HOLZMANN A.G                 )
WACHOVIA BANK, N.A.; B.L.            )    Oral Argument Requested
HARBERT INTERNATIONAL, LLC;          )
SABBIA AKTIENGESELLSCHAFT;           )
HARBERT INTERNATIONAL                )
ESTABLISHMENT, INC.; BILL L.         )
HARBERT, SR.; AND BILLY              )
HARBERT, JR.,                        )
        Defendants                   )
                                     )
_____      )


**MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION**
**OF DEFENDANTS BILL L. HARBERT, SR. AND**
**HARBERT INTERNATIONAL ESTABLISHMENT, INC. TO DISMISS**

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 JUL 30  PM 11: 08

NANCY M.
MAYER-WHITTINGTON
CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DR. HODA ELEMARY, | ) |
| Plaintiff, | ) Case No. 1:07-cv-00654-RCL |
| | ) |
| vs. | ) Hon. Royce C. Lamberth |
| | ) |
| PHILIPP HOLZMANN A.G | ) Oral Argument Requested |
| WACHOVIA BANK, N.A.; B.L. | ) |
| HARBERT INTERNATIONAL, LLC; | ) |
| SABBIA AKTIENGESELLSCHAFT; | ) |
| HARBERT INTERNATIONAL | ) |
| ESTABLISHMENT, INC.; BILL L. | ) |
| HARBERT, SR.; AND BILLY | ) |
| HARBERT, JR., | ) |
| Defendants | ) |
| | ) |

## MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION

## OF CERTAIN DEFENDANTS TO TRANSFER VENUE

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 JUL 30 PM 11: 07

NANCY M.
MAYER-WHITTINGTON

**INCORPORATED SCHEDULE**

**A FULL REBUTTAL TO DEFENDANTS' SCORCHED EARTH LITIGATION TACTICS ENUMERATING SPECIFIC PRACTICES BY DEFENDANTS:**

**REQUEST FOR JUDICIAL NOTICE**


With a premeditated intent to cause Plaintiff irreparable damage to secure the lion

share of Mr. Harbert's Estate, Defendant Billy Harbert, Jr. convinced Mr. Harbert under

duress enticing him with an illusionary likelihood that the Harbert Defendants would

prevail against the United States in the FalseClaim Case if they go to trial, Mr. Harbert

elected to breach his agreements with Plaintiff, who had negotiated with the Department

of Justice and with the help of Senator Dole and John F. Boese a dramatically lesser

amount of $15,000,000 settlement ( than the ultimate verdict assessed the damages

to be ). Attached hereto is a true and correct copy of the Department of Justice March 18,

2005 confirmation of the $15,000,000 settlement as Exhibit "B" and made a part hereof,

which Mr. Harbert reneged on paying after agreeing to do so.


**II.  AN OVERVIEW OF A REBUTTAL TO DEFENDANTS' SCORCHED**

    **EARTH LITIGATION PRACTICES**


*A LEGAL PRESENTATION* UNDER THE CAPTION "ARGUMENT" IS

PROVIDED HEREINBELOW IN SECTION IV. *A PRESENTATION OF THE*

*FACTS* CAN BE FOUND IN SECTION II PAGE 1 "AN OVERVIEW OF A

REBUTTAL..." AND IN THE 'INCORPORATED SCHEDULE' VALIDATED BY

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

JUL 31 30 PM '07

NANCY M.
MAYER WHITTINGTON
CLERK

PROOF OF SERVICE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 467 South Arnaz Drive, Suite 319A, Los Angeles, California 90048.

On July 30, 2007, I served the foregoing document described as MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF CERTAIN DEFENDANTS TO TRANSFER VENUE on the interested parties in this action by facsimile and by placing true copies thereof enclosed in (a) sealed envelope(s) addressed as follows:

Roger S. Goldman
LATHAM &
WATKINS LLP 555
11th Street, N.W.
Suite 1000
Washington, D.C. 20004

Matthew H. Lembke
BRADLEY ARANT ROSE &
WHITE LLP One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203

I deposited this envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct.



BRIAN J. JACOBS
Type or Print Name                    Signature

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 JUL 30 PM 11: 07

NANCY M.
MAYER WHITTINGTON
CLERK

PROOF OF SERVICE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 467 South Arnaz Drive, Suite 319A, Los Angeles, California 90048.

On July 30, 2007, I served the foregoing document described as **MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF DEFENDANTS BILL L. HARBERT, SR. AND HARBERT INTERNATIONAL ESTABLISHMENT, INC. TO DISMISS** on the interested parties in this action by facsimile and by placing true copies thereof enclosed in (a) sealed envelope(s) addressed as follows:

Roger S. Goldman
LATHAM &
WATKINS LLP 555
11th Street, N.W.
Suite 1000
Washington, D.C. 20004

Matthew H. Lembke
BRADLEY ARANT ROSE &
WHITE LLP One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203

I deposited this envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct.



BRIAN LLOYD
Type or Print Name    Signature

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 JUL 30 PM 11: 07

NANCY M.
MAYER-WHITTINGTON
CLERK

Plaintiff In Propria Persona **PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 467 South Amaz Drive, Suite 319A, Los Angeles, California 90048.

On July 30, 2007, I served the foregoing document described as **MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF DEFENDANTS BILLY HARBERT, JR. AND B.L. HARBERT INTERNATIONAL, LLC TO DISMISS** on the interested parties in this action by facsimile and by placing true copies thereof enclosed in (a) sealed envelope(s) addressed as follows:

Roger S. Goldman
LATHAM & WATKINS, LLP
555 11th Street, N.W.
Suite 100
Washington, D.C. 20004

Matthew H. Lembke
BRADLEY ARANT ROSE & WHITE, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203

I deposited this envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct.

BRIAN J. JACOBS
Type or Print Name                          Signature

# CLARIFICATION OF EXHIBIT "A"

Exhibits "B" through "H" contain a single document referenced in the Memorandum of Law, mostly 1-5 pages.

**However, Exhibit "A" contain multiple documents obtained from the files of Senator Bob Dole, Charles F. (Rick) Rule of Fried, Frank, Harris, Shriver & Jacobson, Bill L. Harbert(defendant) , Dr. Hoda Elemary ("Plaintiff"). These Documents, which lend support to the various aspects of Plaintiff's Opposition to Defendants' Motions to dismiss and transfer venue additionally provide <u>Prima facie</u> evidence to Plaintiff's legal arguments and factual presentation.**

Senator Dole, Rick Rule (and his partners, Michael Bromwich and jack Boese) of Fried, Frank respectively, associates of and Counsel to Plaintiff delayed the prosecution of The False Claims Case. Additionally, Beginning 2002 Plaintiff as well as the above named Counsel strongly cautioned Bill L. Harbert against allowing Billy Harbert Jr. and Bryan Lavine of Troutman Sanders to coerce Mr. Harbert to sign his name to an authorization to take The False Claims Case to trial. The documents, referenced herein, are marked for easy identification as follows:

**1.** Based on proof, obtained from Mr. Harbert's files, true and correct copies of four

letters issued by Mr. Harbert are attached herein above in Exhibit "A-1", which confirm

that 1). Billy Harbert, Jr. and his attorneys have repeatedly continued to misrepresent

facts to the Court and mislead Judges and Counsel into thinking these attorneys represent

Mr. Harbert, causing Mr. Harbert to frequently write these attorneys to cease and desist

from doing so, and 2). Notarized admissions by Mr. Harbert that Billy Harbert's

attorneys were engaged in forgery to deprive Plaintiff of her Constitutional rights and

ultimately blackmailing Mr. Harbert to coerce him to damage Plaintiff, which Mr.

Harbert admitted in writing would render him liable to Plaintiff, stating in one of the

referenced four letters"…I therefore have no choice but to honor my agreements with Dr.

Elemary( which preceded any understanding between us concerning these two matters) to

A

limit my liability".

**2.** True and correct copies of documents executed by Messrs. Harbert and Sharp are provided above in Exhibit "A-2" guaranteeing Senator Dole, Plaintiff and Mr. Rick Rule that Billy Harbert Jr. will <u>not</u> be involved in the False Claims Case since Billy Harbert and a majority of his attorneys were advocating to go to trial. On the other hand Plaintiff, Senator Dole and Rick rule and his partner Jack Boese knew that settling this case was the only reasonable option.

**3.** True and correct copies of documents jointly executed by Senator Bob Dole, Mr.. Harbert, and Dr. Elemary are provided above in Exhibit "A-2" concerning certain guarantees regarding Senator Dole's meetings on The False Claims Case at the Whjite House, Department of Justice, and the U.S. Senate. Additional evidence that constituted The bases of a previous cause of action that further proves Defendants' counsel Systematic and intentional misrepresentation to authorities including Senator Dole.

**4.** True and correct copies of documents executed by Mr. Harbert guarranteing the Payment of the $54,000,000 to William D. Dillion and letter and brief from Messrs. Rick rule and mike bromwich to the United States Attorney General, that futher delayed the legal proceedings in the False Claims Case.

B

EXHIBIT A-1

*Bill L. Harbert*
P. O. Box 531390
Birmingham, AL 35253
205-802-2810
Fax: 205-802-2815

August 28, 2003

Via Facsimile

Mr. Henry Frohsin
Berkowitz, Lefkovits, Isom & Kushner
420 20th Street North, Suite 1600
Birmingham, AL 35203

Dear Mr. Frohsin:

I was alarmed to learn from my lawyer, Jerry Steering, that upon your confirmation to him of the receipt of my enclosed August 27, 2003 letter to you, you made the following statement "I spoke to the client today, who had authorized you to travel to Nashville to meet with Jim Neal and us".

I find it a bit troubling that you referred to talking to the client yesterday, when in fact I have not spoken with you since last week when I was in California. However, what is more troubling to me is the fact that you could possibly have been referring to "the client" by talking with Jim Rein or my son Billy, even though you were responsible for putting together the plea agreement, which clearly stipulates that neither Jim Rein nor Billy are to be involved in the managing of my companies, and vice versa. Indeed, the Department of Justice has emphasized the need to keep the management of our respective companies separate. To this end, your reference to Mr. Steering that you spoke to "the client" yesterday was deliberately misleading and potentially damaging to the plea agreement, which Mr. Steering and I are committed to uphold. For that reason I am requesting you for the last time to speak with Mr. Steering by telephone. I understand from Mr. Steering that this letter may be used in future proceedings. I therefore deem it necessary to point out that it is crucial that you and your partners appear more willing to cooperate with my request to divulge information concerning my case, to avoid the appearance that there is more behind your actions that meets the eye. In light of the development yesterday, I have requested Dr. Hoda Elemary to report back to me while I am abroad the content of your conversations with Mr. Steering.

I therefore reaffirm my request to you in my letter of August 27, 2003, with the addition that I expect you as a lawyer to recognize that with reference to the subject matter of my August 27, 2003 letter, I am the only individual that can be referred to as "the client".

Very Truly Yours,

Bill L. Harbert

**Bill L. Harbert**
**820 Shades Creek Parkway**
**Birmingham AL 35209**
**205-802-2810**
**Fax: 205-802-2815**

June 27, 2002

Bryan B. Lavine, Esq.
Troutman Sanders
600 Peachtree Street, Suite 5200
Atlanta GA 30308

Dear Bryan:

I am writing to extend to you my sincere gratitude for your commitment yesterday during our conference call with Mr. Berl Bernhard to forward the files pertaining to your representation of my companies to Verner, Liipfert, Bernhard.

I fully appreciate that you do not agree with my decision of last week to retain Verner, Liipfert, Bernhard. However, you are now in receipt of two letters and a telephone call from me affirming my final decision in retaining that firm. I request you to abide by my decision and respect your duty of confidentiality to me.

In all candor, I was offended when I learned this morning that you have made contacts upon receipt of my letter. Based on your confirmation during the conference call yesterday that you read my letter, I wish to bring to your attention once again that in my letter of June 26, 2002 to you, I stated,

> "I am grateful to you, in advance, for exercising the highest standards of ethics by respecting my choice in this matter. I therefore respectfully request you to accept my final decision in my choice in this matter without undertaking to involve, convey, complain or share my confidence expressed to you in this correspondence with other former or current counsels on this case, government attorneys, family members or anyone else for that matter."

I understand since then, you have raised issues of my competency to retain Verner, Liipfert, Bernhard as a pretext for contacting others and you complained that I have fired you despite my specific request of you to abstain from making such contacts.

Please be assured that I have not fired you but have chosen another firm to represent me exclusively in the government's case against my companies. As I indicated to you yesterday I have other matters that I wish you to handle for me. My decision on retaining Verner, Liipfert, Bernhard is final and therefore there is no reason to discuss the matter at this time. I will be happy to give you my reasons for retaining this firm when we talk

next on July 22, 2002 upon my return to Birmingham, at which time I will discuss with you other legal matters.

I respectfully request you to forward the files to Mr. Bernhard via Federal Express by June 28, 2002 and to contact him this week.  Any delay in the receipt of the files will cause substantial damage to the firm's preparation to handle crucial issues in the resolution of this matter.

With kindest regards.

Sincerely,

Bill L. Harbert

cc:    Mr. Berl Bernhard
       diGenova & Toensing

**BILL
HARBERT**

November 11, 2004

William M. Sharp, Esq.
SHARP AND HARRISON, P.A.
Two Urban Centre, Suite 900
4890 West Kennedy Boulevard
Tampa, Florida 33609-1850

Re: *Qui Tam and Declaratory Relief Actions*

Dear Bill:

I appreciate all of your fine work in assisting my family and me, and look forward to continuing to work with you on these personal issues.

I am writing to bring to your attention to the fact that when I accepted your help to manage the qui tam and declaratory relief cases I had forgotten that I had a confirmed agreement with Dr. Elemary under liability to me to manage these cases to their conclusions. Although I have only agreed to make payments to her for a limited period of time, her position as exclusive case manager was guaranteed by me. I therefore have no choice but to honor my agreements with Dr. Elemary (which preceded any understanding between us concerning these two matter) to limit my liability.

Although I have appreciated your work in the above matters, I simply cannot continue with the recent confusion and disruption that has arisen between you and several key members of my legal team, namely, Jerry Steering, Barry Coburn and David Schertler, as well as the confusion over the responsibilities of you and Dr. Hoda Elemary in my qui tam and declaratory judgment matters. I have therefore made the decision that Dr. Elemary is to be the sole case manager/resolutions for these matters, as stated by you in your letter of September 27, 2004.

I know you can appreciate that all decisions concerning the qui tam and declaratory judgment proceedings are mine and mine alone to make, and that the final decision as to who will be my case manager is mine and mine alone.

*[signature]*

*[notary seal]*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007
*Carla D Faile*
*November 11, 2004*

820 SHADES CREEK PARKWAY, 35209    POST OFFICE BOX 531390    BIRMINGHAM, ALABAMA 35253
TELEPHONE (205) 802-2800

William M. Sharp, Esq.
**SHARP AND HARRISON, P.A.**
November 11, 2004
Page Two

I believe that the current arrangement will not serve my interests for the reasons stated above. We need to work together and stop all the distractions, which is why I have decided to unify the existing legal team under Dr. Elemary's leadership. You and I will continue to work together on various aspects of this case. Based on my long relationship with her and her effective work on my behalf in the past, I am comfortable with Dr. Elemary as the sole case manager.

I have asked Dr. Elemary to be available in three months so we can sit together and review the progress made to date and together with you make necessary decisions if changes are called for. It is imperative that we allow time to heal the rifts that currently exist. You must appreciate that there has been too much <u>non-productive, costly and disruptive</u> activity surrounding my legal team and their efforts. This must stop. I need unification, not division, if we are to prevail against the government. An effective team cannot be pulled from both ends or have conflicting leadership.

That said, I know we can rise above this difficult and awkward moment, and can continue working together on other matters.

Very truly yours,

*Bill Harbert*

Bill L. Harbert

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D Faile*
*November 11, 2004*

# BILL HARBERT

November 10, 2004

Dr. Hoda Elemary
21 LeConte
Laguna Niguel, CA 92677

Dear Hoda:

I am writing to reaffirm my guarantee of several agreements between us that were detailed in the notarized confirmation document "Master Agreement" dated September 21, 2004. You may disregard William Sharp's correspondence including his September 27, 2004 letter to you that attempted to void said confirmation.

I would like you to know that I did not sign nor authorize that my name be signed on my behalf the October 5 and October 21, 2004 letters sent to you by Mr. Sharp under the pretense that I signed and authorized these letters be sent to you.

With Kind Regards

Sincerely,

*[signature]*

Bill L. Harbert

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*[signature]*
November 11, 2004

Dr. Hoda Elemary
October 21, 2004
Page 2                                                    Confidential

calls, hearings and meetings regarding the declaratory judgment
proceeding.

I would still ask that you or your counsel discuss your
continuing role in the qui tam matter with Bill Sharp. Again,
you are not to take any action without first clearing it with
Bill. Thank you for your continued cooperation.

Yours very truly,

*Bill Harbert*

Bill L. Harbert

cc:  Legal Team

BLH:vh

*I did not write this letter nor authorize anyone to sign on my behalf – Forgery*

*Bill Harbert*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D. Faile*
*November 11, 2004*

Bill L. Harbert
P.O. Box 531390
Birmingham, AL  35253
205-802-2810
Fax:  205-802-2815

October 21, 2004

Confidential

<u>Via Hand Delivery</u>

Dr. Hoda Elemary
World Peace Today, Inc.
2252 South Caliente Road
Palm Springs, CA 92264

*I did not write this letter not authorize anyone to sign it on my behalf*

*Bill Harbert*

Dear Hoda:

This letter updates and supersedes my October 5, 2004 letter to you.  As you know, at the end of September I made the decision to move the case manager job for the qui tam and declaratory judgment matters over to Bill Sharp.  Therefore, Bill has management authority over the qui tam and declaratory judgment matters.

In order for Bill to do his job, you are not to take any action without first clearing it with him.  Furthermore, all communications to me, Van Hoover or other members of my business team or family shall be through Bill Sharp.

Once again I have directed Bill Sharp to make clear to the legal team that he is serving as case manager.  I also have directed Bill to make clear to the legal team that there should be no further contact regarding the declaratory judgment proceeding with the Department of Justice, any judicial authorities or their clerks, or any other parties outside the legal team by you or anyone else without Bill's prior review and authorization.  I have also asked Bill to review and authorize all legal and consulting fees.  I will not be responsible for all fees and costs unless Bill reviews these in advance of the services being rendered for them.

I have asked Bill Sharp to make it clear to the Department of Justice attorneys and others involved in this case that Bill has the sole authority to make settlement offers or other commitments (whether as to substantive matters, procedural matters or otherwise).  I have already asked Bill to appoint and oversee my local counsel in Birmingham as well as to determine when and who shall be involved in various upcoming conference

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

EXHIBIT A-2

**Bill L. Harbert**


Ms. Hoda Elemary
World Peace Today, Inc.
2252 S. Caliente Road
Palm Springs, CA 92264


Dear Ms. Elemary,

This letter unequivocally and unconditionally guarantees you that my son, Billy Harbert, will not effectuate or impact any decisions to be made regarding the D.O.J matter or your faithful commitment to assist me in reaching an amicable resolution with the government on both the criminal personal guarantee of *Bilhar* fine and the civil case. You are assured that you have the authority to finish your work in accordance with our agreement.


With Kind Regards

Sincerely,



Bill L. Harbert


District of Columbia
On this 1st day of October, 2003
Bill L. Harbert
personally appeared before me and acknowledged
that he/she executed the foregoing instrument.
Michael McCllin Notary Public
My commission expires June 14/2003

# AGREEMENT

This Agreement is made on September 1, 2004 by and between Dr. Hoda Elemary and B.L. Harbert, as follows:

1. Dr. Elemary is the case manager and has primary responsibility over retention, oversight and management of the legal team, and to report from time to time to Bill Harbert, with respect to the current civil proceedings between B.L. Harbert and the U.S. Government, and the negotiations with respect to any possible payment of Bilhar International Establishment's criminal fine obligation by B.L. Harbert.

2. Effective September 1, 2004, Bill Sharp is a member of said legal team, with responsibilities of working with Dr. Elemary to achieve the goals of B.L. Harbert with respect to the above-referenced cases.

3. Subject to conferring with Dr. Elemary, Bill Sharp has the sole authority to communicate with Anne Moulton, Elizabeth Cornay, Billy Harbert, as well as Alan Hall and Jim Rein, regarding the above-referenced cases.

4. Based on discussions among the parties, Anne Moulton, Elizabeth Cornay, Billy Harbert, Alan Hall and Jim Rein will communicate exclusively with Bill Sharp regarding the above-referenced cases.

5. For the sake of B.L. Harbert's peace of mind, no communications regarding the above-referenced cases will be made to B.L. Harbert, except through either Bill Sharp or Dr. Elemary.

6. While considerable progress has been made to date in connection the above-referenced cases, substantial government resistance is anticipated and/or setbacks may arise. Dr. Elemary, Mr. Sharp and the legal team will use their reasonable best efforts to overcome such resistance and/or setbacks and achieve the best result possible results.

7. It is understood that every effort will be made by Dr. Elemary to continue to keep the legal fees of the legal team as they are at present.

8. Bill Sharp has reviewed the arrangement between B.L. Harbert and Dr. Elemary regarding the Laguna Niguel Property, and finds that arrangement in order. Bill Sharp has also reviewed the matters listed in the August 27, 2004 letter from B.L. Harbert to Dr. Elemary, and has concluded that he is satisfied with the progress in the above-referenced cases achieved by Dr. Elemary and said legal team, and has addressed B.L. Harbert's estate and succession plans as set forth in that letter.

Dated: September 2, 2004

_____
B.L. Harbert

Dated: September 2, 2004

_____
Dr. Hoda Elemary

APPROVED AS TO FORM:

Dated: September 2, 2004

_____
Bill Sharp, Esq.
Attorney for B.L. Harbert

Dated: September 2, 2004

_____
Joseph A. Roman, Esq.
Attorney for Dr. Hoda Elemary

# BILL HARBERT

William M. Sharp, Esq.                                                    November 11, 2004
SHARP AND HARRISON, P.A.
Two Urban Centre, Suite 900
4890 West Kennedy Boulevard
Tampa, Florida 33609-1850

Re: *Qui Tam and Declaratory Relief Actions*

Dear Bill:

I appreciate all of your fine work in assisting my family and me, and look forward to continuing to work with you on these personal issues.

I am writing to bring to your attention to the fact that when I accepted your help to manage the qui tam and declaratory relief cases I had forgotten that I had a confirmed agreement with Dr. Elemary under liability to me to manage these cases to their conclusions. Although I have only agreed to make payments to her for a limited period of time, her position as exclusive case manager was guaranteed by me. I therefore have no choice but to honor my agreements with Dr. Elemary (which preceded any understanding between us concerning these two matter) to limit my liability.

Although I have appreciated your work in the above matters, I simply cannot continue with the recent confusion and disruption that has arisen between you and several key members of my legal team, namely, Jerry Steering, Barry Coburn and David Schertler, as well as the confusion over the responsibilities of you and Dr. Hoda Elemary in my qui tam and declaratory judgment matters. I have therefore made the decision that Dr. Elemary is to be the sole case manager/resolutions for these matters, as stated by you in your letter of September 27, 2004.

I know you can appreciate that all decisions concerning the qui tam and declaratory judgment proceedings are mine and mine alone to make, and that the final decision as to who will be my case manager is mine and mine alone.

*Bill Harbert*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D Faile*
*November 11, 2004*

William M. Sharp, Esq.
SHARP AND HARRISON, P.A.
November 11, 2004
Page Two

I believe that the current arrangement will not serve my interests for the reasons stated above. We need to work together and stop all the distractions, which is why I have decided to unify the existing legal team under Dr. Elemary's leadership. You and I will continue to work together on various aspects of this case. Based on my long relationship with her and her effective work on my behalf in the past, I am comfortable with Dr. Elemary as the sole case manager.

I have asked Dr. Elemary to be available in three months so we can sit together and review the progress made to date and together with you make necessary decisions if changes are called for. It is imperative that we allow time to heal the rifts that currently exist. You must appreciate that there has been too much non-productive, costly and disruptive activity surrounding my legal team and their efforts. This must stop. I need unification, not division, if we are to prevail against the government. An effective team cannot be pulled from both ends or have conflicting leadership.

That said, I know we can rise above this difficult and awkward moment, and can continue working together on other matters.

Very truly yours,

Bill L. Harbert

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

November 11, 2004

## Bill L. Harbert

I, Bill L. Harbert, do hereby show that I am obligated to fulfill my agreement with and promise to Hoda Elemary to assist her in purchasing a home for her; said home being the residence at 21 Le Conte, Laguna Niguel, CA 92677. I have undertaken to sign a grant deed on November 3, 2003.

I declare unequivocally under liability to me and to my estate to Hoda Elemary, that it is my will that said grant deed not be revoked by me or by anyone else. Furthermore, I guarantee that I will unconditionally abide by my two year commitment to Hoda Elemary, referenced in my letters to her of April 26, 2002, March 1, 2003, August 17, 2003, October 1, 2003, October 17, 2003, and will not do anything in contravention of said agreements between myself and Hoda Elemary; regardless of the circumstances or the influences of others that may have an interest to see that the grant deed be revoked.

In addition to the above, any of my heirs who unsuccessfully challenge this document and my other agreements with and commitments to Hoda Elemary shall take nothing from me or my estate in the event of my incapacitation or passing.

I am signing this promise and commitment to Hoda Elemary out of my own free will and with the full knowledge that Hoda Elemary has deposited a substantial sum of her own money toward the purchase of the subject property.

Dated: _Nov 3 '03_         _Bill L. Harbert_
                                            Bill L. Harbert

City of Washington
District of Columbia

On this 3rd day of November, 2003
Bill L. Harbert personally appeared before me
and acknowledged that he executed the foregoing document.

_[signature]_
11/03/03

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

Dr. Hoda Elemary
October 21, 2004
Page 2                                                              <u>Confidential</u>

calls, hearings and meetings regarding the declaratory judgment
proceeding.

I would still ask that you or your counsel discuss your
continuing role  in the qui tam matter with Bill Sharp.  Again,
you are not to take any action without first clearing it with
Bill.  Thank you for your continued cooperation.

Yours very truly,

Bill L. Harbert

cc:  Legal Team

BLH:vh

*I did not write this letter nor authorize anyone to sign on my behalf — Forgery*

*Bill Harbert*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

Carla D. Failes
November 11, 2004

11/12/2004 02:05  9494740083                    JERRY L STEERING                    PAGE 03

NOV 12 '04 09:35AM B HARBERT INTL CONS 205 802 2815                              P.2

*To THE LEGAL TEAM*
*Kindly disregard/ disregarded*
*this letter. I have no*
*intention of*
*Terminating Hoda*
*Elemary or any member*
*of the legal Team.*

*Bill L. Harbert*

Bill L. Harbert
P.O. Box 531390
Birmingham, AL 35253
205-802-2810
Fax: 205-802-2815

November 11, 2004

*State of Alabama*
*County of Jefferson*
*Sworn and subscribed before*
*Marsha H. Fifer, Notary Publ*
*on this 13th day of Nov. 20*
*Personally appeared Bill L. H*
*who is known to me to be the sa.*
*Marsha H. F*

**Privileged &
Confidential**

*My Commission Expires*
*September 19, 2006*

**VIA FACSIMILE**

Barry Coburn, Esq. - 202-628-4177
Marshall Harris, Esq. - 202-756-3333
Bryan B. Lavine, Esq. - 404-962-6613
Sam C. Pointer, Jr., Esq. - 205-581-0799
June Ann Sauntry, Esq. - 404-962-6613
David Schertler, Esq. - 202-628-4177
Jerry L. Steering, Esq. - 949-474-1883

Ladies and Gentlemen:

I am attaching a copy of my October 21, 2004 letter to Dr. Hoda Elemary that was previously sent to you. I know that there has been some friction regarding the management of the qui tam action and the declaratory judgment action. I know that the friction has worsened since I appointed Bill Sharp as case manager on October 21, 2004.

I am writing this letter to you in order to reconfirm and more clearly define my directives as described in my October 21, 2004 letter because of some events that have occurred during the past couple of days.

I met with Jerry Steering and Dr. Hoda Elemary yesterday evening and this morning in Birmingham. Dr. Elemary claimed that she is still in charge as case manager, that Bill Sharp is not in charge, and that none of you are cooperating with Bill and all of you are still working with Hoda.

I wanted to let all of you know that I am reconfirming the mandate set forth in my October 21, 2004 letter. Pure and simple, Bill Sharp is in charge of the management of the qui tam action and the declaratory judgment cases. He is the case manager and Dr. Hoda Elemary is not the case manager. I told this today to Dr. Elemary and Mr. Steering and I told Dr. Hoda Elemary that she must report to Bill Sharp and to no one else. She must clear any action with Bill Sharp before taking any action. She has no authority to discuss my matters with you, to attend or schedule meetings, to talk to any third party about the cases, or to take any other action until Bill Sharp approves any matter in advance. I also told Dr. Elemary to follow the above mandate in my October 21, 2004 letter. Again, pure and simple, Bill Sharp is the case manager.

In particular, no one is to take any calls, directives, or other instructions from Dr. Hoda Elemary unless Bill Sharp first says that it is

OCT 20 2004 5:41PM   HP LASERJET 3200                                    P.4

Bill L. Harbert
P.O. Box 531390
Birmingham, AL 35253
205-802-2810
Fax 205-802-2815

October 5, 2004

Confidential

Dr. Hoda Elemary
World Peace Today, Inc.
2252 South Caliente Road
Palm Springs, CA 92264

Dear Hoda:

As you know, at the end of September I made the decision to move the case manager job for the qui tam and declaratory judgment matters over to Bill Sharp.

Bill explained to me that based on the discussion the two of you had that Bill is now serving executive case manager and that you are serving as case resolution manager. I am okay with these titles so long as Bill has management authority over the qui tam and declaratory judgment matters.

Because the declaratory judgment litigation is now headed to Birmingham, I have directed Bill to make clear to the legal team that he is serving as executive case manager. I also have directed Bill to make clear to the legal team that there should be no further contact regarding the declaratory judgment proceeding with the Department of Justice, any judicial authorities or their clerks, or any other parties outside the legal team by you or anyone else without Bill's prior authorization. In addition, and in order to avoid any confusion, I am asking Bill to appoint and oversee my local counsel in Birmingham as well as to determine when and who shall be involved in various upcoming conference calls, hearings and meetings regarding the declaratory judgment proceeding.

I would still ask that you continue your role as case resolution manager for the qui tam proceeding though anything you want to do should be reviewed first with Bill. On the declaratory judgment proceeding I would like you to take no action unless Bill asks for your involvement.

Yours very truly,

*Bill L. Harbert*
Bill L. Harbert

BLH:vh

*I did not write this letter*
*wr authorize*
*any one to sign it.   Bill L Harbert*

CARLA L. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D Faile*
*November 11, 2004*

EXHIBIT A-3

**BOB DOLE**

601 PENNSYLVANIA AVENUE, NW.

NORTH BUILDING, 10TH FLOOR

WASHINGTON, D.C. 20004

February 16, 2005

Dear Mr. Hertz:

I remain grateful for your interest in Mr. Bill Harbert's matter, which is now before your Civil Division. As a follow-on to our meeting in July, and the meeting in December between Mr. Harbert's team and your staff, I am writing now to request a brief meeting, ideally during the first half of April.

I hope you will agree that we have made substantial progress and that this would be a propitious time to meet in an effort to resolve outstanding questions and reach a final settlement. Thank you for your consideration.

Sincerely,

BOB DOLE

Mr. Michael F. Hertz
Director
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
601 D Street, NW – Room 9902
Washington, DC  20530

# SENATOR BOB DOLE

601 PENNSYLVANIA AVENUE, N.W.
NORTH BUILDING, 10TH FLOOR
WASHINGTON, D.C. 20004

~~DRAFT~~ *[signature]*

October 1, 2003

Mr. Bill L. Harbert
BilHar International Establishment
820 Shades Creek Parkway
Birmingham, AL 35209

Dear Mr. Harbert:

This letter sets forth the terms of the engagement of Bob Dole Enterprises, Inc. ("BDE") by Mr. Bill Harbert ("Harbert") and supercedes all prior agreements. BDE commits to continue to work with you to ensure fair treatment of you and your interests by the Department of Justice and related institutions.

As necessary and agreed, BDE will work with you to facilitate meetings with Justice, other Administration, and Congressional officials and to urge these entities and individuals to ensure fair treatment.

BDE will maintain regular contact with Dr. Hoda Elemary and your legal counsel to ensure necessary coordination on all issues. All of BDE's activities within the framework of this agreement will be executed under the direction and supervision of Mr. Bill L. Harbert together with his Exclusive Manager Dr. Hoda Elemary.

As compensation for these services, Harbert shall pay BDE a monthly retainer fee of US $50,000 for the period of October 1, 2003, through March 31, 2004, for a total retainer amount of $300,000. This financial arrangement may be extended by mutual consent of the signatories of this agreement.

Senator Bob Dole will personally engage on your behalf and direct the activities of his staff as well as members of his law firm whom he may enlist at his sole discretion and as necessary to further this representation. BDE will compensate the firm for any such services at no additional cost to Harbert.

An additional fee shall be paid to BDE depending on the outcome of efforts to conclude successfully and reduce fines proposed in your matter. The amount will be determined based on mutual agreement by both parties.

*[signature]*

Mr. Bill Harbert
BilHar International Establishment
October 1, 2003
Page 2 of 2

*As modified by attached addendum*

    If you agree to the terms of this letter, please counter-sign and date both originals of this letter, and return one to me. The other copy is for your files. This engagement letter shall be effective once we have received your signature.

    We look forward to continuing our work on your behalf. We will undertake all activities to advance your agenda with firm dedication and diligence. Thank you.

Sincerely,

ACCEPTED AND AGREED:

_____    Date: *Oct 1, 03*
Bill L. Harbert

_____    Date: *Oct 1. 03*
Hoda Elemary – Exclusive Manager

cc: Senator Bob Dole

_____

*Including the attached Addendum To Agreement For Services By Bob Dole Enterprises of October 1, 2003.*

The Law Offices Of
# Jerry L. Steering
4063 Birch Street
Suite 100
Newport Beach, CA 92660
949-474-1849
(Fax) 949-474-1883

Also Admitted In Georgia

OF COUNSEL
Melvin M. Belli
(1907-1996)
Andrew M. Stein
Kevin R. McLean
Alexander J. Perez

October 1, 2003

## ADDENDUM TO AGREEMENT FOR SERVICES BY BOB DOLE ENTERPRISES

Bill L. Harbert will pay $50,000.00 to Bob Dole Enterprises on or before October 6, 2003. Upon Senator Dole having completed his initial meetings with a senior political advisor to the President and with a high level Department of Justice official, Bill Harbert will pay to Bob Dole Enterprises another payment of $50,000.00. Future monthly payments of $50,000.00 will be made by Bill L. Harbert to Bob Dole Enterprises unless Senator Dole requires more time to complete the items and events further agreed upon by the parties to this agreement.

Dated: _Oct 1, 03_

Dated: _Oct 1, '03_

Dated: _Oct, 1 2003_

_____
Bob Dole

_____
Bill L. Harbert

_____
Hoda Elemary

# SENATOR BOB DOLE

901 15TH STREET, N.W.
SUITE 410
WASHINGTON, D.C. 20005

October 30, 2002

Mr. Bill Harbert
~~Brimingham, AL 35209~~
Birmingham, AL 35209

Dear Mr. Harbert:

I am writing to inform you that Senator Bob Dole appreciates your patience during the election campaign.

On behalf of Bob Dole Enterprises, Inc. I am happy to confirm to you that Senator Dole, in accordance with our agreement, is committed to the following activities and to continue to represent your corporate interests to U.S. Government Officials.

1. Senator Dole is arranging to meet on or before November 18, 2002 with the head of the Corps of Engineering to request a prompt resolution of your Kwajalein claim.

2. Senator Dole will seek a meeting with the administrator of USAID between November 7 - 18, 2002, regarding a global resolution of your anti-trust/civil cases concerning Egypt.

3. Senator Dole is committed to discuss your case and other interests directly with a senior political advisor to the president between December 1-18, 2002.

4. Senator Dole will continue to work with the Attorney General to secure a global resolution of your anti-trust/civil cases.

The Senator would welcome your participation in any or all of these meetings. In addition to these efforts, we look forward to discussing further meetings and other activities in the near future. Thank you for your consideration. With kind regards.

Sincerely,

Marshall

Marshall F. Harris

FROM :

## ELEVENTH CAUSE OF ACTION

## LIBEL

### (Against Lembke)

101.   Plaintiff refers to and incorporates by this reference each allegation set forth in paragraphs 1-21 and 31-37 hereof, inclusive, as if alleged herein in full.

102.   On March 22, 2006, Lembke transmitted to Senator Bob Dole a letter (the "March 22 Letter") in which he claimed Plaintiff had, during the preceding week, contacted Mr. Harbert Sr. for the purpose of using Mr. Harbert Sr. to involve Senator Dole in the False Claims Case; that these communications violated certain purported "instructions" given by Lembke to Plaintiff; that Mr. Harbert Sr. did not wish Senator Dole to have further involvement in the False Claims Case; and that "Dr. Elemary's refusal to adhere to his [i.e., Mr. Harbert Sr.'s] instructions has made this [i.e., Lembke's letter to Mr. Dole advising him not to be involved in the False Claims Case] necessary." In fact, Mr. Harbert Sr. had requested Plaintiff to arrange for a meeting with Senator Dole to re-involve him in the False Claims Case, and a recording of Mr. Harbert Sr. making this request had been played to Defendant Lembke before he issued the March 22 Letter, in which he diametrically and maliciously altered the facts.

103.   These words were libelous per se because they expose Plaintiff to hatred, contempt, ridicule and obloquy.

104.   The statement in the March 22 Letter, that it was necessary for Lembke to communicate directly with Senator Dole, a key political contact of Plaintiff, because of Plaintiff's purported inability to comply with Mr. Harbert Sr.'s "instructions" was false and intended to convey the impression that Plaintiff was a "loose cannon" whose

1   judgment and discretion in conducting high-level negotiations could not be trusted.

2   Senator Dole is the most respected senior Republican in the country.    Previously,

3   Plaintiff had been able to convince Senators Dole and D'Amato to place a hold on the

4   Senate confirmation of President Clinton's nomination for ambassador to Saudi Arabia,

5   pending the resolution of another Harbert claim against Saudi Arabia.  A true and correct

6   copy of the July 25, 1995 response of the President of the United States to Senator

7   D'Amato is attached hereto as Exhibit "H" and incorporated herein by this reference.

8       105.   These words were libelous per quod because they have a tendency to injure

9   Plaintiff in her occupation as an information transmitter between governments.

10      106.   As a result of March 22 Letter, Plaintiff has suffered general and special

11  damages to her reputation.

12      107.   As a proximate result of the acts and conduct of Defendants as hereinabove

13  alleged, Plaintiff's contacts and business relationships with foreign heads of state and

14  officials, as well as the President of the United States, members of the Senate and the

15  House of Representatives, State Department officials, corporate leaders and others, have

16  been disrupted, undermined and destroyed, causing Plaintiff to suffer special damages

17  in an amount according to proof at trial, but, on information and belief, in excess of

18  Three Million Dollars ($3,000,000).

19      108.   The aforementioned acts and omissions of Defendants were willful, wanton,

20  fraudulent, oppressive and malicious, inflicted by Defendants with the intention on the

21  part of Defendants to deprive Plaintiff of property or legal rights or otherwise causing

22  injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship

23  in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and

24  punitive damages in an amount according to proof.

25      WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

26          **FOR THE FIRST CAUSE OF ACTION**

27

28



**Bradley Arant**

BRADLEY ARANT ROSE & WHITE LLP

ONE FEDERAL PLACE
1819 FIFTH AVENUE NORTH
BIRMINGHAM, AL 35203-2119
205.521.8000   FAX 205.521.8800
WWW.BRADLEYARANT.COM

**Matthew H. Lembke**

Direct Dial: 205-521-8560
Direct Fax: 205-488-6560
mlembke@bradleyarant.com

March 22, 2006

<u>Via Fax and FEDEX</u>

The Honorable Bob Dole
Alston & Bird LLP
601 Pennsylvania Avenue NW
North Building, 10th Floor
Washington, D.C. 20004-2601

      Re:    Mr. Bill L. Harbert, Sr.

Dear Senator Dole:

I represent Bill L. Harbert, Sr. in connection with certain disputes he has with Dr. Hoda Elemary. Last year, Mr. Harbert instructed Dr. Elemary to have no further involvement in connection with the qui tam proceeding that is pending against him in the United States District Court for the District of Columbia and to cease all communications with him. Those instructions were contained in my letter dated June 2, 2005, a copy of which is enclosed.

Last week, contrary to the instructions contained in my letter of June 2, 2005, Dr. Elemary began a series of communications with Mr. Harbert in which she urged him to involve you in negotiations concerning his qui tam proceeding. Mr. Harbert advised her that he had a high regard for you, but that he did not wish for you or Dr. Elemary to have any further involvement in the qui tam proceeding or negotiations concerning it. Notwithstanding that instruction, Dr. Elemary has continued to communicate with Mr. Harbert on this point.

Mr. Harbert has asked me to convey to you directly his appreciation for your past involvement in his litigation, but to confirm his desire that you have no further involvement in it. He apologizes for the necessity of my contacting you directly, but Dr. Elemary's refusal to adhere to his instructions has made this necessary.

BIRMINGHAM     CHARLOTTE     HUNTSVILLE     JACKSON     MONTGOMERY     WASHINGTON, DC

The Honorable Bob Dole
March 22, 2006
Page 2

Thank you for your assistance and cooperation.


Very truly yours,

Matthew H. Lembke
MHL:slb

cc:    Dr. Hoda Elemary
       Mr. Bill L. Harbert, Sr.

SENATOR BOB DOLE
601 PENNSYLVANIA AVENUE, N.W.
NORTH BUILDING, 10TH FLOOR
WASHINGTON, D.C. 20004

June 19, 2003

The Honorable John Ashcroft
Attorney General
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Mr. Attorney General:

I hope this letter finds you well. I am writing to request that you initiate a Department review of *United States of America v. Bill Harbert International Construction, Inc; Bilhar International Establishment; f/k/a Harbert International Establishment et al.*; United States District Court for the Northern District of Alabama; Case Number CR-01-PT-302-S.

As your Department is aware, I have been assisting Mr. Bill Harbert and his company, Bilhar International Establishment ("Bilhar") on this matter. I understand that you are unable to meet with me to discuss the case, but Mr. Harbert, his entire legal team – including several former senior officials of your Department – and I believe that a formal review is more than warranted. This is, in essence, because prosecutors and Justice officials, acting in bad faith, effectively extorted Mr. Harbert into approving and to agreeing to personally guarantee a $54 million fine against Bilhar in conjunction with Bilhar's guilty plea.

The government neither suspected nor accused Bill Harbert's son, Billy Harbert, or his company, B.L. Harbert International, L.L.C. ("BLHILLC"), of being involved in any criminal conduct, including the actions complained of in the criminal case against Bilhar. Bill Harbert was nevertheless put on notice that his son's company would remain suspended from U.S. government contracting operations unless he agreed to plead Bilhar guilty and to personally guarantee a $54 million fine against it. The government exacted this demand even though BLHILLC had much earlier shown the U.S. Agency for International Development (AID) that BLHILLC no longer even appeared to be affiliated with Bilhar, and even though AID had represented that BLHILLC's suspension would terminate once that appearance of affiliation was gone.

In order to pressure Mr. Harbert into accepting the government's oppressive demands, prosecutors and Justice officials acted in bad faith by convincing AID to threaten to continue the suspension of BLHILLC (even though, again, AID had no legitimate reason to do so) and, in turn, by using this threat to secure their proposed plea arrangement with Bilhar. Faced with the

The Honorable John Ascheroft
Attorney General
Department of Justice
June 19, 2003
Page 2 of 2

prospect of great financial injury to his son's company, Mr. Harbert authorized Bilhar's guilty plea under the oppressive terms demanded by the government.

In addition, the government's demand that Mr. Harbert and his estate guarantee the fine against the company is without legal basis. As Mr. Harbert was not a party to the criminal action, no liability for any fine or any part thereof could have been imposed on him. The imposition of liability of Mr. Harbert's estate for Bilhar's fine contravenes clearly established federal law, which provides that the death of a defendant abates a criminal action in its entirety, including any liability of the defendant's estate for any unpaid criminal fine.

Charles Rule, former head of Justice's Antitrust Division, Michael Bromwich, former Inspector General of the Department, and our team also feel that there are additional issues that warrant review. These include the size and nature of the fine itself (i.e., the unprecedented imposition of a staggeringly large financial penalty in a case in which the United States suffered no actual loss and the public suffered no harm) and the pendency of a *qui tam / false* claims act action arising out of the same series of incidents complained of in the criminal case against Bilhar.

Collectively, these coercive actions in the Bilhar case constitute overreaching by the government and are inconsistent with the Department of Justice's legitimate law enforcement objectives.

I hope you will agree that a formal review of the case in question is necessary and should be initiated immediately. We are prepared to provide any additional information that you may require. In addition to this request for a review, I am prepared to meet with your designated representatives to discuss this case in greater detail.

Thanks for your consideration. Good luck in your continued service to our nation.

Sincerely,



BOB DOLE

EXHIBIT A-4

February 4, 2002

FILED

FEB 4 2002

UNITED STATES DISTRICT OH
NORTHERN DISTRICT OF A?

William D. Dillon
Trial Attorney
United States Department of Justice
Antitrust Division
75 Spring Street, S. W., Suite 1176
Atlanta, Ga 30303

Dear Mr. Dillon:

This letter confirms the agreement of Bill L. Harbert that he will guarantee payment of the fine levied against Bilhar International Establishment ("Bilhar") of c/o BHIC One Metroplex Dr., Suite 305, Birmingham, AL, 35253, in the criminal case currently pending against Bilhar in the Northern District of Alabama, in consideration for the plea agreement with the United States in that case. Bill L. Harbert hereby agrees that he will guarantee the financial support necessary to Bilhar to make the periodic payments required by the United States District Court in accordance with the Plea Agreement filed in the case.

In the event of bankruptcy or dissolution of Bilhar, or any other event that would prevent payment of the fine imposed by the United States District Court for the Northern District of Alabama in this matter, or upon failure of payment, Bill L. Harbert agrees that he will pay any sums due to be paid by Bilhar in accordance with the sentence imposed by the District court pursuant to the attached Plea Agreement. By execution of this letter, I hereby confirm that this guarantee of payment is binding upon Bill L. Harbert.

In the event that Bill L. Harbert should die before full payment of Bilhar's debt, a lien equal to the remaining balance shall be placed on his estate until such time as Bilhar's debt is paid in full.

Sincerely

Bill L. Harbert, Chairman
Bilhar International
Establishment f/k/a
Harbert International Establishment

Sworn to and subscribed before me this 1st day of February 2002.

Evangeline H. Hoover, Notary Public
My Commission expires April 29, 2002

# FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

1001 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20004-2505
Tel: 202.639.7000
Fax: 202.639.7003
www.ffhsj.com

Direct Line: 202.639.7297
bromwmi@ffhsj.com

October 7, 2002

The Honorable John Ashcroft
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

RE:    Request for Review -- *U.S. v. Bilhar*

Dear Mr. Attorney General:

Enclosed please find evidence and materials related to the handling of *United States v Bilhar* by the Justice Department, together with letters of congressional support calling for a review of the manner in which the case was prosecuted.

The materials enclosed include the following:

1.    a narrative of dealings by this firm with the Antitrust Division relating to the *Bilhar* case;

2.    an analysis of the fine imposed in *Bilhar* compared to fines imposed in comparable cases brought by the Antitrust Division;

3.    an analysis of the basis of jurisdiction to prosecute the *Bilhar* case; and

4.    various supporting materials and documents relevant to the analyses of the fine and jurisdictional issues.

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

The Honorable John Ashcroft
October 7, 2002
Page 2


If you have any questions about any of the evidence, analysis, and supporting materials, please let us know. We anticipate that we will be in a position to provide you with additional materials relevant to this matter after the first of the year.


                    FRIED, FRANK, HARRIS, SHRIVER
                          & JACOBSON


          BY: _____
                    Charles F. Rule


          BY: _____
                    Michael R. Bromwich


Enclosures

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

### *THE FINE IMPOSED ON BILHAR*
### *WAS OBJECTIVELY UNREASONABLE*
### *WHEN MEASURED AGAINST ACTIONS*
### *OF THE ANTITRUST DIVISION IN OTHER CASES*

In light of the Supreme Court's decision in *Apprendi*, the $54 million fine in the criminal antirust case against the Harbert companies -- BilHar and BHIC -- was illegal. The illegality of the fine was known (or should have been known) by the Department of Justice at the time of the indictment and in the subsequent proceedings leading up to the guilty plea, but it was not disclosed to the defendants or to the court prior to sentencing. By itself, the inconsistency of the sentence with the teaching of *Apprendi* should be sufficient to justify action by the Department to reduce the criminal fine, or else, given that the plea did not settle the civil claims against the Harbert companies for alleged bid-rigging on USAID contracts in Egypt, to close the continuing civil investigation of the Harbert companies and Mr. Harbert. However, even apart from the fact that the Antitrust Division refused to acknowledge the application of *Apprendi* to its effort to use the "double the loss, double the gain" provisions of 18 U.S.C. § 3571(d), the uniquely harsh treatment of the Harbert group – when viewed in the context of criminal fines meted out by the Antitrust Division in recent years – cries out for justice.

#### The Imposition of BilHar's Fine Violates *Apprendi*

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that any fact that must be found to increase a defendant's sentence beyond the statutory maximum must be proven to the jury beyond a reasonable doubt. In addition, the Court noted in *Apprendi* and subsequent cases (e.g., *United States v. Cotton*, No. 01-687 (May 20, 2002)) that a defendant is entitled to notice in the indictment that the government is intending to seek the enhanced penalty.

In this case, the statutory maximum for a violation of the Sherman Act is $10 million for a corporation. Alternatively, the fine may be increased beyond the statutory maximum by the greater amount of twice the pecuniary gain to the defendants or twice the pecuniary loss to the victim. In light of the *Apprendi* and *Cotton* decisions, if the government is going to seek a penalty above the statutory $10 million maximum, the government is required to allege the pecuniary gain to the defendants or the pecuniary loss to the victim in the indictment and must also prove that amount to a jury beyond a reasonable doubt. The indictment in this case contained no allegation of pecuniary loss or gain.

#### BilHar's Fine is Unreasonably High Compared to Prior Antitrust Cases

Separate and apart from specific facts and circumstances of this case, the $54 million fine imposed on BilHar is far from being in the mainstream of fines imposed on companies found guilty of similar violations. Indeed, according to the Department's own statistics, prior to 1997, the Antitrust Division had never obtained from *all the corporations fined in an entire year* a total

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

amount of fines as great as the single fine imposed on BilHar.[1]  Despite the fact that the "double the loss, double the gain" provision has been on the books since the 1980s, only 31 corporations have paid fines greater than the statutory maximum of $10 million set forth in the antitrust laws. Moreover, the BilHar fine is the eighth largest fine ever imposed against a corporation in an antitrust case.  To put this in context, in the ten fiscal years ending June 2002, a total of 344 corporations were fined.[2]  Thus, the size of the fine imposed upon BilHar is unusually high and quite anomalous.

When one considers the circumstances surrounding the alleged violation, it is clear that the fine is not just unusual, but also absurdly disproportionate and unfair.  Several aspects of the Harbert case make the $54 million fine grossly inappropriate when compared with the other 30 corporate fines that have exceeded the antitrust statutory maximum of $10 million.  In virtually all of these other cases, the alleged criminal violations involved sustained price-fixing over extended periods of time, almost invariably concerning national and international markets with levels of annual commerce measured in the hundreds of millions, if not billions of dollars.  The difference between a multinational conglomerate such as Archer-Daniels-Midland cynically colluding with its international competitors to raise the price on hundreds of millions of dollars of sales of food additives that affect almost every American consumer, and the Harbert group, which was accused only of rigging bids on three contracts in Egypt, is obvious.  Yet the Harbert group was treated as if there were no differences at all.  This same failure to take account of important differences is apparent when comparing the circumstances surrounding the Harbert fine and virtually all other corporate fines in the antitrust context.  Disregarding the illegal use of the "double the loss, double the gain" provision by the Division under *Apprendi*, it is clear that even if the provision's use is appropriate when there is alleged international price-fixing involving vitamins, food additives, or important industrial products like graphite electrodes, assessing tens of millions of dollars in fines for isolated bid-rigging is not only quite different but wholly unjustified.

The total fines in this case, moreover, are wildly disproportionate compared to the other cases in which fines in excess of the statutory maximum have been levied.  According to the indictment in this case, the contracts at issue totaled approximately $285 million.  BilHar participated in a joint venture that received contracts totaling $150 million in value, and BilHar's share of the joint venture was 60%.  Thus, BilHar's total revenue from the contracts at issue was approximately $90 million.  The fine imposed on BilHar was $54 million and combined with the other defendants, the fines totaled $141 million (BilHar - $54 million; ABB - $53 million; Phillip Holzmann AG - $30 million; American International Contractors, Inc. - $4 million).  Therefore,

---

[1] Total Corporate Fines ($000):

    1992: $22,430    1993: $40,427    1994: $38,996    1995: $40,222    1996: $25,245.

[2] As compared with the previous decade, the number of corporations prosecuted and fined was very low in the 1990s.  Thus, even though the Clinton Administration introduced the "innovation" of causing corporations to pay huge antitrust fines in excess of the statutory maximum (with the result that the total fines that were imposed set new records), the total number of corporations fined during the Clinton Administration actually declined.

2

the fines imposed against the defendants represented 49% of the value of the contracts at issue, and BilHar's fine represented 60% of the total revenue received by BilHar.

*This Is The Only Case of Isolated Bid Rigging With Fines In Excess Of $10 Million*

With the exception of BilHar's co-defendants, all of the other corporations that have paid criminal antitrust fines in excess of $10 million stood accused of engaging in on-going conspiracies involving either widespread price-fixing (with respect to, for example, vitamins, graphite electrodes, or food supplements), or an extensive pattern of bid rigging on a number of solicitations by a variety of customers. In contrast, BilHar and its co-defendants were alleged to have engaged in isolated bid-rigging on three related projects to a single customer, the Egyptian government. Except for the presence of an over-zealous prosecutor caught up in the fever of trying to push the envelope of excessive fines, there is nothing that distinguishes this alleged bid-rig from the hundreds of other bid-rigging conspiracies successfully prosecuted by the Antitrust Division over the last two decades. In no other case of isolated bid-rigging has a court imposed a corporate fine in excess of the statutory maximum. As discussed below, fines above the statutory maximum have only been imposed in bid-rigging cases where the conspiracy was industry-wide, involving bid-rigging to multiple customers throughout the United States, or throughout the world.

In 1997, three companies pled guilty to participating in a conspiracy to allocate contracts in the marine construction and transportation industry by rigging bids on those contracts throughout the world. The conspiracy was systematic and widespread, not limited to a few isolated projects. Yet, despite the fact that the conspiracy was more extensive and widespread than the conspiracy to which BilHar pled, the fines imposed on the companies totaled $65 million while the total revenues on the fixed contracts was well over $1 billion.

Similarly, from 1995-97, the fines imposed on at least 14 corporate defendants in the explosives industry totaled almost $40 million for bid-rigging and price-fixing violations. The conspiracy was extensive and systematic and harmed a range of companies that purchased explosives from the defendants. As in the marine construction industry, total revenues in the explosives industry are about $1 billion annually in the U.S. alone. The highest fine imposed on any one of the defendants was $15 million.

The global conspiracies to fix prices in the marine construction and explosives industries were clearly much more extensive and egregious than BilHar's alleged bid-rigging on Egyptian projects. Last year's case of bid-rigging on frozen food contracts for school lunches in the New York City area is more representative of a typical bid-rigging case and a more apt analogy to BilHar's case; yet, the difference between the fines there and the one levied on BilHar is astounding. The contracts that were at issue in the New York case were worth approximately $230 million. Despite the fact that the value of the food contracts were near the value of the contracts in BilHar's case ($230 million versus $285 million), the combined criminal fine imposed on 15 companies was approximately $10 million. Thus, the fines represented only 4% of the value of those contracts. Even if one includes the $27 million that the 15 companies paid in restitution as part of the penalty, the total fine ($37 million) would be only 12% of the value of the contracts. If the defendants in BilHar's case were fined in proportion to the school lunch bid-

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

riggers, the defendants would pay a combined $11.4 million (4% of $285 million), or at most $34.2 million (12% of $285 million). Instead, the defendants in this case, including BilHar, have been fined a total of $141 million (49% of the value of the contracts). If there ever was a case for imposing a penalty to the full extent the law allowed, it would be in a case where the defendants rigged bids on contracts to feed American schoolchildren. Yet even though BilHar was charged with bid-rigging on three foreign contracts that harmed no U.S. consumers, BilHar has been fined more, in relative and absolute terms, than all 15 of the defendants in the school lunch bid-rigging scheme combined.

## BilHar is Being Punished Twice for the Same Crime

What makes this case particularly egregious is the fact that even after BilHar has been ordered to pay $54 million in fines, the government is still seeking treble damages in a civil proceeding. In prior bid-rigging cases involving government contracts, the government has taken the payment of restitution into account in setting the criminal fine, often lowering the criminal fine when defendants also make restitution. In the case of bid-rigging on the frozen food contracts mentioned above, the conspirators were only required to pay approximately $10 million in fines because they also paid $27 million in restitution. Unlike these prior cases, the government in this case is attempting to recover the maximum penalty under criminal antitrust law as well as punitive damages under the False Claims Act.

The idea that a defendant should not be subject to severe penalties under both criminal and civil laws for the same wrongdoing is not a new one. In prior cases, courts have noted that although high civil penalties imposed on top of criminal penalties may not constitute double jeopardy, they may nevertheless violate the Eighth Amendment of the Constitution, which prohibits excessive fines. Courts have also noted that the penalties imposed by the False Claims Act are punitive in nature. In this case, the government is clearly attempting to penalize BilHar twice for the same wrongdoing by first imposing $54 million in criminal fines, and then seeking treble damages under the False Claims Act.

## The Government Had Questionable Jurisdiction to Prosecute BilHar Under U.S. Antitrust Law

Last but not least, even in the context of bid-rigging cases, jurisdiction to prosecute the case against the Harbert group under U.S. antitrust law was tenuous. The allegedly rigged bids were in Egypt, not in the United States. In addition, the allegations do not involve an overseas project built for the benefit of the United States, such as a naval base or an airfield. Rather, the only connection to the United States was that the government was funding the project to benefit a foreign government, which could itself take whatever antitrust enforcement action was available under its own antitrust laws. In other words, the jurisdiction of the United States and our antitrust laws over these projects is questionable at best. Not surprisingly, we have been unable to find another alleged bid-rig on a U.S. AID project that was prosecuted criminally, much less subjected to fines in excess of the statutory maximum. The last such arrangement of which we are aware that was challenged by the Antitrust Division involved U.S. AID-funded sales of tallow in Egypt. In that case, the Division eventually closed its criminal investigation and chose to bring a civil case.

4

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

**Major Flaws in the Government's Case**

Though this analysis does not address the underlying issues of guilt or innocence in the case relating to the Harbert companies, it is important to note that there were significant flaws in the government's case against the Harbert companies. For the purposes of this paper, we note the following examples by way of illustration. First, despite an extensive investigation, the government presented no evidence that either Mr. Harbert personally or any representative of the Harbert companies was involved at the initiation -- or at the core -- of the bidrigging conspiracy. Second, the Harbert companies were the lowest qualified bidders on the most lucrative contract involved in the case and underbid at least one company (Morrison Knudsen) never alleged to have been a part of the bidrigging conspiracy. Third, the profit of the Harbert companies earned on this contract was attributable to the fact it was a high-risk venture for which significant profits were appropriate, and that the Harbert companies reaped the benefits of pioneering a new technology on the project relating to shoring up trenches, which resulted in significant cost savings.

**Conclusion**

There is no question that the Harbert companies have been singled out for treatment that is unprecedented and unduly harsh by any measure. Therefore it is appropriate that the facts of the Harbert case be reviewed.

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

BY: _____
Charles F. Rule

BY: _____
Michael R. Bromwich



**U.S. Department of Justice**

*Civil Division*
*Commercial Litigation Branch*

CGMark
46-16-2472

Tel. (202) 307-0256

*601 D Street, NW, Room 9930*
*Washington, D.C. 20004*

March 18, 2005

<u>BY FAX – (949) 715-2060</u>

Dr. Hoda Elemary
P.O. Box 7952
Beverly Hills, CA 90212

    Re:    <u>U.S. ex rel. Miller v. Holzmann A.G., et al.</u>
           <u>1:95CV01231 (D.C.D.C., filed Jun 30, 1995)</u>

Dear Dr. Elemary:

    I am writing in response to your letter of today concerning the telephone conversation on March 17th among you, Howard Teicher, AUSA Keith Morgan, and myself concerning settlement of the above-referenced matter with Bill L. Harbert Sr. Based upon our various discussions and Mr. Harbert's letter of November 11, 2004, we understand that you represent Mr. Harbert in connection with the settlement of this matter.

    AUSA Morgan and I agreed to recommend a settlement whereby Mr. Harbert pays Fifteen Million ($15,000,000.00) within 10 days of the execution of a settlement agreement. The United States would thereupon release its claims against Mr. Harbert. As we discussed, any agreement would have to be authorized and approved by officials of the Department of Justice.

    As we advised you, as a matter of policy, this office does not ever agree to any language that pertains to the tax treatment of a payment to be made by a defendant in a settlement. All our settlements are tax neutral -- neither side characterizes the payment.

    The United States takes no position with regard to how Mr. Harbert liquidates his assets to pay the settlement amount. Our discussion of possible sources whereby Mr. Harbert could make the settlement payment was not intended to be all inclusive but merely to illustrate that Mr. Harbert is able to make the payment at the time of settlement and that payment over time is not necessary. We note that there is almost $2 million of Group 2 Wachovia shares described in Table F of the documents previously provided by Bill Sharp, Esq. which would be available

-2-

for the settlement, over and above the $20.7 million discussed during our telephone conversation.

We look forward to hearing from you.

Sincerely,

CAROLYN G. MARK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division

cc:    AUSA Keith Morgan

DIANNE FEINSTEIN
CALIFORNIA

COMMITTEE ON APPROPRIATIONS
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND ADMINISTRATION



# United States Senate

WASHINGTON, DC 20510-0504

(202) 224-3841

May 27, 1999

The Honorable Amr Moussa
Minister of Foreign Affairs
Ministry of Foreign Affairs
Arab Republic of Egypt,

Dear Mr. Moussa:

I am writing to ask you to provide me with a response concerning the Egyptian Government's position in ensuring that Ms. Hoda Elemary can travel safely in and out of Egypt at this time.

The purpose of this request is not to question Egypt's sovereign privileges over Ms. Elemary. It is based on the vital services Ms. Elemary provides Congress, which have been determined to serve U.S. national interests. A majority of the United States Senators have overwhelmingly endorsed Ms. Elemary's work and have credited her with playing a pivotal role in lobbying the Congress to support Operation Desert Storm, as it did on January 12, 1991; forgive Egypt's $7 billion debt, as it did on October 19, 1990; and, undertake many supportive initiatives in favor of advancing the peace process and enhancing close relations between the United States and Egypt.

I understand that she is the target of threats from political groups that oppose Egypt's cooperation with the U.S. and Israel. Because of her involvement in the Middle East peace process, I am requesting any information you may have concerning any political reasons that may prevent Ms. Elemary's safe return to the United States. I understand she will be traveling to Egypt in early June, 1999.

I look forward to Your Excellency's response regarding Ms. Elemary's secured return to the United States from Egypt.

With warmest personal regards.

Sincerely yours,

Dianne Feinstein
United States Senator

DF:rwh

## INTRODUCTION

Defendants Bill L. Harbert, Sr. ("Mr. Harbert, Sr.") and Harbert International Establishment, Inc. ("HIE, Inc.") hereby respectfully move this Court to dismiss them as Defendants under Plaintiff Hoda Elemary's Complaint (the "Complaint"). This Court lacks personal jurisdiction over Defendant HIE, Inc., which has had no contacts with the District of Columbia. Fed. R. Civ. P. 12(b)(2). Even if jurisdiction could be exercised over Defendant HIE, Inc., the District of Columbia is an improper venue for this action because none of the events that give rise to Plaintiff's claims against HIE, Inc. occurred within this District. Fed. R. Civ. P. 12(b)(3); 28 U.S.C. § 1391(a). The Complaint also fails to state a claim upon which relief can be granted against Mr. Harbert, Sr. or HIE, Inc.. The Complaint fails to plead sufficient facts (and, with respect to Plaintiff's Fraud claim, with anywhere near the requisite particularity) to satisfy the necessary elements of Plaintiff's Termination in Violation of Public Policy, Suppression of Facts (Fraud), and Civil RICO claims. Plaintiff has failed to satisfy the requirements of Rules 9(b) and 12(b)(6) with respect to these claims, and this Court should dismiss Mr. Harbert, Sr. as a Defendant under Plaintiff's Fourth, Fifth, and Seventh Causes of Action, and HIE, Inc. as a Defendant under Plaintiff's Fifth Cause of Action.[1]

## PROCEDURAL BACKGROUND

In a spree of repetitive and overlapping litigation, Plaintiff has now filed *four* lawsuits surrounding her purported termination as a "Case Manager" by Mr. Harbert, Sr. Although this is the first time Plaintiff has appeared as a party before this Court, she has made nearly identical claims against Mr. Harbert, Sr., co-Defendant Billy Harbert, Jr. ("Mr. Harbert, Jr."), and other Harbert-related individuals and entities in at least two other actions, spinning a bewildering tale

---

[1] Mr. Harbert, Sr. and HIE, Inc. also incorporate herein the related facts and arguments contained in the Motion of Defendants Billy Harbert, Jr. and B.L. Harbert International, LLC to Dismiss, filed contemporaneously herewith.

1

filled with wild claims of irrelevant self-importance, Compl. ¶ 4 ("A majority of the United States Senators . . .have credited Plaintiff with playing a pivotal role in lobbying Congress to support Operation Desert Storm . . . ."), and outlandish accusations. *See id.* ¶ 20 (accusing Defendants of seeking "a rogue Federal Bureau of Investigation agent to . . . 'terminate' [Plaintiff] for a lofty price . . . ."). (Indeed, in recent correspondence, Plaintiff's counsel has gone so far as to assert that Plaintiff "used her influence and contacts to secure a ruling from the District Court that dismissed Mr. Harbert from the False Claims Case.")[2] These lawsuits are part of Plaintiff's continuing effort to harass Defendants with nonstop frivolous litigation.

In July 2006, Plaintiff filed in the Central District of California a nearly identical complaint, raising nearly identical claims, against Mr. Harbert, Sr. and twenty-one other defendants—including co-Defendants Mr. Harbert, Jr., HILLC, Wachovia Bank, N.A., Sabbia Aktiengessellschaft, and HIE, Inc., and no fewer than nine attorneys and law firms. *Elemary v. Harbert*, No. CV06-4723 RGK (PJWx) (C.D. Cal. filed July 28, 2006). Because the majority of events on which Plaintiff based her claims took place in Alabama, Mr. Harbert, Jr. and several other defendants in that suit moved to transfer the case to the United States District Court for the Northern District of Alabama. Court granted the motion on February 28, 2007. Compl. ¶ 5.[3] By that time, Plaintiff had filed a *second* lawsuit in that court, seeking liquidated damages purportedly triggered by the filing of the motion to transfer and personal jurisdiction challenges by Mr. Harbert, Jr. and other defendants.[4] Mr. Harbert, Jr. and Mr. Harbert, Sr. are contemporaneously filing

---

[2] *See* Letter from Brain J. Jacobs to Yasmin N. Best et al., dated June 14, 2007 (attached as Exhibit 1 to Certain Defendants' Request for Judicial Notice, filed concurrently herewith).

[3] *See* Civil Minutes, *Elemary v. Harbert*, No. CV06-4723 RGK (PJWx) (C.D. Cal. Feb. 28, 2007) (attached as Exhibit 2 to Certain Defendants' Request for Judicial Notice, filed concurrently herewith).

[4] *See* Complaint, *Elemary v. Harbert*, No. SA CV07-0217 RGK (PJWx) (C.D. Cal. filed Feb. 20, 2007) (attached as Exhibit 3 to Certain Defendants' Request for Judicial Notice, filed

# HILLIARD, SMITH & HUNT, LLC.

### ATTORNEYS and COUNSELORS
### 228 18th Street North
### P.O. Box 12445
### Birmingham, Alabama 35202-2445
### (205) 326-5844
### (205) 326-8890 fax

Earl F. Hilliard, Jr. *
Alexia L. Hilliard-Smith

Janine Hunt-Hilliard
Earl F. Hilliard**

March 8, 2005

Judge John M. Facciola
United States District Court
For The District of Columbia
Washington, D.C. 20001

RE:  United States of America, ex rel Richard F. Miller v. Phillip Holzman AG, et al.
     Case No.:  195CV01231 WBB

Your Honor,

As attorney of record for Bill L. Harbert, I am writing to appeal to the Court to consent to mediate the difference between the government and Bill L. Harbert, Sr.  While I was physically able to negotiate with the government, significant progress had been made to date in reducing the number of issues that are still outstanding.

Regrettably, I had a near fatal accident on March 2, 2005, and am writing you from the ICU of the University of Alabama Hospital at Birmingham.  My physicians have indicated to me that it will be as least several weeks before I am able to personally participate in negotiations through electronic communications, and six months to a year before I will be able to walk again.  Accordingly, I am requesting on behalf of Bill L. Harbert, Sr, that the Court remove our appearance on April 5, 2005 from its calendar and commence immediate mediation with the parties in early May 2005.

Thank you for your serious consideration of my request.  I have enclosed the police and medical reports related to my accident for your information.

Sincerely,

Earl F. Hilliard

Earl F. Hilliard
Of Counsel

EFH/jeh
enclosures (2)

---

* Admitted to practice in Georgia and Washington, D.C.
** Of Counsel

Copies To: *Laguna Niguel*

| | |
|---|---|
| **SHERIFF'S DEPARTMENT** | 2. Case No. 05-072937 |
| **ORANGE COUNTY** | |
| **SANTA ANA, CALIFORNIA** | 2a. Citation No. |

Priority: ☐ Yes  ☒ No

3. OFFENSE **ORIGINAL**     **INITIAL CRIME REPORT**

MICHAEL S. CARONA, SHERIFF-CORONER

| 3. OFFENSE | 4. DATE-TIME COMMITTED |
|---|---|
| C.P.C. 240-242- Assault and Battery | 04-14-05/Approximately 2030 hours |

| 5. WHERE COMMITTED | 6. GRID | 7. DATE-TIME REPORTED |
|---|---|---|
| #21 Le Conte  Laguna Niguel, 92677 | 971-D2 | |

| 8. INFORMANT | 9. ADDRESS-PHONE |
|---|---|
| Same as 310 | Same as #11 |

| 10. VICTIM | DOB | 11. ADDRESS-PHONE |
|---|---|---|
| Elemary, Hoda | 02-03-52 | #21 Le Conte  laguna Niguel, 92677 (949-715-2022) |

| 12. BUSINESS ADDRESS-PHONE | 13. CONTACT TIME-ADDRESS |
|---|---|
| | Anytime at home |

| 14. FIRM NAME OF VICTIM | 15. BUSINESS ADDRESS-PHONE |
|---|---|
| | |

| 16. VICTIM'S OCCUPATION | RACE | SEX | AGE | 17. TYPE OF PREMISES OR LOCATION WHERE OFFENSE WAS COMMITTED |
|---|---|---|---|---|
| Retired | B | F | 53 | Driveway of residence |

COMPLETE ON ALL APPLICABLE FELONIES, MISD., SEX AND THEFTS

**CRIMES AGAINST PROPERTY**            **CRIMES AGAINST PERSONS**

| 18. POINT OF ENTRY | 22. WEAPON OR MEANS USED  Hands |
|---|---|
| 19. INSTRUMENT OR MEANS USED | 23. VICTIM'S ACTIVITY AT TIME OF OFFENSE  Walking into residence |
| 20. METHOD USED | 24. EXACT WORDS USED BY SUSPECT  None |
| 21. WHERE WERE OCCUPANTS AT TIME OF OFFENSE? | 25. FORCE OR METHOD USED  Pushed victim from behind |

| 26. APPARENT MOTIVE – TYPE PROPERTY TAKEN | 27. TOTAL VALUE STOLEN |
|---|---|
| Anger | $ |

28. UNIQUE OR UNUSUAL ACTIONS BY SUSPECT(S)
Pushed victim from behind while victim was walking towards residence

29. VEHICLE USED BY SUSPECT(S)   YEAR, MAKE, BODY TYPE, COLOR, LIC. NO., AND ANY OTHER IDENTIFYING MARKS
Unknown

| 30. WITNESSES R/B RESIDENCE/BUSINESS ADDRESS-PHONE | | |
|---|---|---|
| (1) Unknown | R | |
| | B | |
| (2) | R | |
| | B | |
| (3) | R | |
| | B | |

31. SUSPECT(S) (IF ARRESTED, NAME, ADDRESS, AND BOOKING NUMBER)

| | BKG. NBR. |
|---|---|
| (1) Male, white,5-10,180lbs.,brown hair,gray pants | |
| (2) | BKG. NBR. |
| (3) | BKG. NBR. |

| NAME | ADDRESS | SEX | RACE | DOB | HT. | WT. | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|

32. DETAILS OF OFFENSE: EVIDENCE COLLECTED, DESCRIPTION AND VALUE OF PROPERTY TAKEN, LIST ADDITIONAL WITNESSES AND SUSPECTS

| QUAN. | ARTICLE | BRAND | SERIAL NO. | MODEL NO. | MISC. DESCRIPTION | VALUE |
|---|---|---|---|---|---|---|
| INJURIES: | | | | | | |
| BROKEN SHOULDER | | | | | | |

| 33. INVESTIGATING OFFICERS | REPORT BY  Deputy J. Danks #4017 | 34. DATE OF REPORT  4/18/05 | 35. APPROVED |
|---|---|---|---|

PAGE 1 OF 2

1. COPIES TO:
*Laguna Niguel*

2. CASE NO. 05-072937

**SHERIFF'S DEPARTMENT**
ORANGE COUNTY
SANTA ANA, CALIFORNIA

MICHAEL S. CARONA, SHERIFF-CORONER

REPORT CONTINUATION

On Monday, April 18, 2005, at approximately 1810 hours, I arrived at #21 Le Conte in the city of Laguna Niguel and spoke to Elemary, Hoda (02-03-52) regarding an assault and battery.

Elemary told me the following: On 04-14-04 at approximately 2030 hours, she arrived at her residence. She parked her vehicle on the street and walked to her residence. As she walked onto her driveway, she saw a male subject standing near her front door.

The male subject told Elemary he was there to check for Swiss bank account records. Elemary told the subject she did not have any bank records. The male subject stated he was coming inside her residence to check. Elemary told the subject he could not come inside her residence and told him if he did not leave her premises she was going to call the police. Elemary turned away from the subject and began walking towards her front door.

As she walked to the front door, she felt something push her in the back. Elemary fell to the ground, striking her right shoulder on the front steps. Elemary told me she felt an excruciating pain in her right shoulder. She looked for the subject that pushed her but he was gone. Approximately 5 minutes later, Elemary's ex-husband, Awad, arrived at the residence and took her to the hospital.

Elemary suffered a broken shoulder. She feels this incident was related to an on-going government court battle she is involved in with a subject named Mr. Harbert. I gave Elemary a case number and told her to call the Sheriff's Department with any additional information.

| 33. INVESTIGATING OFFICERS | REPORT BY<br>Deputy J. Danks #4017 | DATE OF REPORT<br>4/18/05 | APPROVED |
|---|---|---|---|

PAGE 2 OF 2

# ORIGINAL

1. Copies To: *Laguna Niguel*
F.B.I. & D.O.J.

**SHERIFF'S DEPARTMENT**
**ORANGE COUNTY**
**SANTA ANA, CALIFORNIA**

| 2. Case No. 05-051073 |
| 2a. Citation No. |

Priority: ☐ Yes  ☒ No

**MICHAEL S. CARONA, SHERIFF-CORONER**

**INITIAL CRIME REPORT**

| 3. OFFENSE | 4. DATE-TIME COMMITTED |
|---|---|
| CPC 653M Threatening Phone Call | Fri. 3-18-05-0505 hrs. |

| 5. WHERE COMMITTED | 6. GRID | 7. DATE-TIME REPORTED |
|---|---|---|
| 21 Lu Conte, Laguna Niguel 92677 | 141/971DI | |

| 8. INFORMANT | 9. ADDRESS-PHONE |
|---|---|
| #10 | #11 |

| 10. VICTIM | DOB | 11. ADDRESS-PHONE |
|---|---|---|
| Elemary, Hoda Hisham | 2-3-52 | 21 Lu Conte, Laguna Niguel (949) 715-2022 |

| 12. BUSINESS ADDRESS-PHONE | 13. CONTACT TIME-ADDRESS |
|---|---|
| Same As #11 | M-F 8-5 #11 |

| 14. FIRM NAME OF VICTIM | 15. BUSINESS ADDRESS-PHONE |
|---|---|
| | |

| 16. VICTIM'S OCCUPATION | RACE | SEX | AGE | 17. TYPE OF PREMISES OR LOCATION WHERE OFFENSE WAS COMMITTED |
|---|---|---|---|---|
| Lobbyist | Cau | F | 53 | Single Family Residence |

**COMPLETE ON ALL APPLICABLE FELONIES, MISD., SEX AND THEFTS**

**CRIMES AGAINST PROPERTY**

| 18. POINT OF ENTRY | 22. WEAPON OR MEANS USED |
|---|---|
| 19. INSTRUMENT OR MEANS USED | 23. VICTIM'S ACTIVITY AT TIME OF OFFENSE |
| 20. METHOD USED | 24. EXACT WORDS USED BY SUSPECT |
| 21. WHERE WERE OCCUPANTS AT TIME OF OFFENSE? | 25. FORCE OR METHOD USED |

**CRIMES AGAINST PERSONS**

| 26. APPARENT MOTIVE – TYPE PROPERTY TAKEN | 27. TOTAL VALUE STOLEN |
|---|---|
| | $ |

| 28. UNIQUE OR UNUSUAL ACTIONS BY SUSPECT(S) |
|---|
| None Noted |

| 29. VEHICLE USED BY SUSPECT(S)  YEAR, MAKE, BODY TYPE, COLOR, LIC. NO., AND ANY OTHER IDENTIFYING MARKS |
|---|

| 30. WITNESSES R/B RESIDENCE/BUSINESS ADDRESS-PHONE | | | |
|---|---|---|---|
| (1) Unknown | R | | |
| | B | | |
| (2) | R | | |
| | B | | |
| (3) | R | | |
| | B | | |

| 31. SUSPECT(S) (IF ARRESTED, NAME, ADDRESS, AND BOOKING NUMBER) | | |
|---|---|---|
| (1) Unknown | BKG. NBR. | |
| (2) | BKG. NBR. | |
| (3) | BKG. NBR. | |
| NAME | ADDRESS | SEX  RACE  DOB  HT.  WT.  HAIR  EYES |

**32. DETAILS OF OFFENSE: EVIDENCE COLLECTED, DESCRIPTION AND VALUE OF PROPERTY TAKEN, LIST ADDITIONAL WITNESSES AND SUSPECTS**

| QUAN. | ARTICLE | BRAND | SERIAL NO. | MODEL NO. | MISC. DESCRIPTION | VALUE |
|---|---|---|---|---|---|---|

Narrative:

I talked to Victim Elemary, Hoda at her residence and she told me the following: On 3-18-05, at 0505 hrs, Elemary answered her phone and the un-identified male caller in a muffled voice with a slight southern accent said, "You'll be killed." The caller then hung up the phone. Elemary's phone rang again about 5 minutes later and when she picked it up she heard no one. Elemary didn't recognize the voice on the phone, but she is afraid that the caller may carry out the threat.

| 33. INVESTIGATING OFFICERS | REPORT BY | 34. DATE OF REPORT | 35. APPROVED |
|---|---|---|---|
| | Dep. E. Hutchinson #463 | 3/18/05 | |

PAGE 1 OF 2

1. COPIES TO:
*Laguna Niguel*

2. CASE NO. 05-051073

**SHERIFF'S DEPARTMENT**
ORANGE COUNTY
SANTA ANA, CALIFORNIA

MICHAEL S. CARONA, SHERIFF-CORONER

REPORT CONTINUATION

I asked Elemary to explain and she told me the following: Elemary is a Lobbyist in the U.S. Congress and she is affiliated with the World Peace Group out of Palm Springs. Billy Harbert Sr. of B.L. Harbert International LLC Group a large construction company out of Birmingham Alabama has retained Elemary as a Lobbyist. Elemary has been involved with various government committees, several U.S. Senators and the Department of Justice regarding bid rigging for federal contracts in the construction industry. Elemary and her partner Earl Hilliard assisted the DOJ committee and worked with Criminal Prosecutor Bill Dillon (404-331-7115) in a matter that ruled against B.L. Harbert International for bid rigging. Elemary is also in the process filing a civil suit against B.L. Harbert International and particularly B.L. Harbert Jr. for breach of contract.

Elemary is currently working with attorney Carolyn Mark (202-307-0256) of the Department of Justice in a civil case against B.L. Harbert International. Elemary is greatly concerned about the threatening phone call because of prior incident regarding a threat over the phone that occurred on 11-4-04 (See DR04-022613 for CPC 653M.) Also on 3-2-05, Elemary's partner Hilliard was recently involved in a suspicious car accident, with a piece of heavy construction equipment vehicle that occurred suspiciously in the middle of the night. Hilliard's injuries are so severe that he will not be able to walk for 6- 12 months. Elemary handed me numerous letters from various individuals to support what she was saying (See attached). Sgt. B. Lumm was advised of the situation.

I talked to Department of Justice Attorney Carolyn Mark on the phone later that day. Carolyn Mark confirmed what Elemary had said about working with D.O.J. and she told me that Elemary was a credible individual. Mark told me that Elemary was involved in the Criminal case against B.L Harbert International and she dealt with DOJ Prosecutor Bill Dillon. Sgt. Lumm was advised.

I asked Elemary if she had an idea who may try to harm her. Elemary felt that anyone affiliated with B.L Harbert International or his or her associates are possible but she isn't sure.

| 33. INVESTIGATING OFFICERS | REPORT BY | DATE OF REPORT | APPROVED |
|---|---|---|---|
| | Dep. E. Hutchinson #463 | 3/18/05 |  |

Newport Orthopedic Institute
PO Box 2597
Newport Beach, CA
92659
Phone:(949) 722- 7038 Ext.3604
Fax: (949) 630- 4935



# NEWPORT
## ORTHOPEDIC INSTITUTE

Elemary, Hoda A.
132335
06/28/2006

Hoda is a young lady I saw over a year ago. She had an injury when she was accosted at home and was pushed down and had a minimally displaced scapular fracture. I have not seen her in over a year. She presently states she has a therapist coming 3 times a week to her home, and she swims. She complains of a radicular pain in her shoulder, sort of in her axilla area, and running down her arms with certain motions. It comes and goes. She says when she does a back stroke in swimming, it bothers her.

**PHYSICAL EXAMINATION:**  Her range of motion is not 100% but almost 90% of normal. She is just worried and wondering when this pain in her arm will get better.

**RADIOGRAPHIC EXAMINATION:** No x-rays were taken today.

**TREATMENT PLAN:**  I feel probably her scapular fracture has healed, and the complaints she states are secondary to the trauma she had. At this time, no formal workup was done including neurological evaluation or MRI, which I am not sure would be beneficial at this time, but these symptoms began at the time of her injury and have not gone away.

Alexander H. Tischler, MD

AHT:pb/lm

**SOUTH COAST MEDICAL CENTER**
31872 COAST HIGHWAY, LAGUNA BEACH CA 92651
(949) 499-7193
**Discharge Instructions**

M. Taub MD

HODA ELEMARY
4862694

# SHOULDER FRACTURE

*A FRACTURE is the medical term for a BROKEN BONE.* This may be a small crack in the bone with nothing out of place. It may also be a major break with the broken parts pushed out of position.

If the bone fragments are in place, shoulder fractures are treated with a sling only. Casts are usually not used for this type of fracture. Healing occurs in 4-6 weeks. More serious injuries may require surgery to put the bones back into the correct position for healing.



## HOME CARE:

1) Leave the sling in place. Keep your injured arm at your side.

2) If the sling becomes loose, adjust it so that your forearm is horizontal (level with the ground) or the hand is slightly higher than the elbow. The shoulder should feel well supported.

3) During the first two days, apply ice packs over the injured area for 20 minutes every 2-4 hours. This will reduce swelling and pain.

4) You may take Tylenol (acetaminophen) or ibuprofen (Advil, Motrin) for pain, unless another pain medicine has been prescribed.

5) Do not remove the sling before your next exam unless you were instructed to do so.

**FOLLOW UP:** Shoulder joints become stiff if left in a sling for too long. Follow up with your doctor in about one week to determine when it is safe to begin range-of-motion exercises.

NOTE: A radiologist will review any X-rays that were taken. We will notify you of any new findings that may affect your care.

**RETURN PROMPTLY** if you develop any of the following:
-- Fingers become swollen, cold, blue, numb or tingly
-- Large amount of swelling or bruising of the shoulder or upper arm
-- Increasing shoulder pain or arm swelling



**Bradley Arant**

BRADLEY ARANT ROSE & WHITE LLP

ONE FEDERAL PLACE
1819 FIFTH AVENUE NORTH
BIRMINGHAM, AL 35203-2119
205.521.8000  FAX 205.521.8800
WWW.BRADLEYARANT.COM

**Matthew H. Lembke**

Direct Dial: 205-521-8560
Direct Fax: 205-488-6560
mlembke@bradleyarant.com

October 12, 2006

<u>**VIA FAX (949-715-2060) and U.S. MAIL**</u>

Dr. Hoda Elemary
21 LeConte
Laguna Niguel, California 92677

    Re:   Bill L. Harbert, Sr.

Dear Dr. Elemary:

We are in receipt of your letter dated October 10, 2006, to Bill L. Harbert, Sr.

I have advised you on numerous occasions that you should cease direct communications with Mr. Harbert and instead direct them to me as counsel for Mr. Harbert and his Dispute Resolution Committee. As you know, Mr. Harbert is an elderly man who has delegated responsibility for handling all matters relating to his qui tam proceedings to a committee, and your persistent refusal to abide by the instructions not to contact Mr. Harbert amounts to harassment.

In your letter, you also repeat your baseless assertions that you were unlawfully terminated as case manager for Mr. Harbert's qui tam proceedings. As spelled out in numerous previous letters, that assertion is completely meritless. To the extent that any contract of employment existed, you breached its terms on numerous occasions.

As for your latest "final" offer to engage in settlement discussions, we simply reiterate what we have stated from the time you filed your frivolous lawsuit: there will be no settlement discussions.

Finally, you state at the end of the letter that you "assume no responsibility whatsoever on the impact of [your] litigation to seek justice for being unlawfully terminated on your case." Notwithstanding that statement, the Federal Rules of Civil Procedure as well as common and statutory law impose responsibility on you and/or your counsel for the filing of frivolous litigation, so you cannot so easily escape that responsibility.

Very truly yours,

Matthew H. Lembke
MHL:slb

BIRMINGHAM    CHARLOTTE    HUNTSVILLE    JACKSON    MONTGOMERY    WASHINGTON, DC

** TOTAL PAGE.02 **

Direct Dial: (202) 637-2253
roger.goldman@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: (202) 637-2200  Fax: (202) 637-2201
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

March 28, 2007

File No. 042624-0000

Brian Jacobs
467 South Arnaz Drive
Suite 319A
Los Angeles, CA 90048

Re:     Hoda Elemary v. Billy Harbert, Jr., et al.

Dear Mr. Jacobs:

I have your letter of March 20, 2007. I found its content surprising and disturbing.

First, you assert that your client directly contacted Mr. Harbert during the week of March 12, 2007. As your client is well aware, Mr. Harbert suffers from dementia and is in no position to respond substantively to issues regarding the on-going claims asserted by you on behalf of your client. Indeed, you and your client have been advised on multiple occasions that she is not to contact Mr. Harbert directly, and that communications should be through counsel. See attached correspondence. Her actions were singularly inappropriate here, where she has sought to appear pro se in an action in which you and she are fully aware he is represented by counsel.

Second, we have consulted Mr. Harbert, and he has stated that he has no recollection of any agreement whatsoever with Dr. Elemary regarding the claims at issue. (Mr. Sharp also disputes the statements attributed to him.)

Third, there is no interest on the part of the Harberts or any of the other previously named defendants we represent to discuss settlement of any of Dr. Elemary's claims. As is appropriate in litigation matters of this sort, communications regarding the position of the defendants we represent can only be made with counsel.

Finally, Mr. Harbert does not in any way request that Dr. Elemary take any action to avoid testifying in the False Claims Act case currently being tried in the District of Columbia. Dr. Elemary should take whatever action she deems appropriate in response to any subpoena or other request to testify. To the extent that Mr. Harbert or any other defendant has objections to her testimony based on privilege or other grounds, such objections will be dealt with in court, the appropriate forum for such issues. In order to ensure there is no misunderstanding with respect to this point, we are transmitting a copy of this letter and your March 20 letter to Mr. Keith Morgan at the Department of Justice.

DC\974811.1

**LATHAM&WATKINS**LLP

Very truly yours,

Roger S. Goldman
of LATHAM & WATKINS LLP

Attachments

cc: Keith Morgan, Esq.

# [ubiqus]

# MR. BILL L. HARBERT
# & DR. HODA ELEMARY

## Audio Transcription
## Track 2

## <u>Telephone conversation frolabeled -</u>
## <u>"Bill 5-16-07"m an audiocassette tape</u>

22 Cortlandt Street, Suite 802, New York, NY 10007
Tel : 212-227-7440 - Fax : 212-227-7524 - EIN# 13-2791733

**Why go with Ubiqus?**

- We are one of the biggest transcription companies in the world, with five offices in three countries. Big projects, tight deadlines and highly confidential projects are routine for us.

- We produce our documents locally because we think this is the only way to ensure quality. Some of our clients have tried offshore suppliers — they have all come back to us.

- All our operations are profitable and growing. We're here to stay and we're not afraid of committing ourselves to long-term contracts.

**New York**

**Los Angeles**

**San Francisco**

**London**

**Paris**

---

**Ubiqus Southern California**
2201 Martin Street
Suite 107
Irvine, CA 92612
Ph: (949) 477 4972
Fax: (949) 553 1302

**Ubiqus New York**
22 Cortlandt Street
Suite 802
New York, NY 10007
Ph: (212) 227 7440
Fax: (212) 227 7524

**Ubiqus Northern California**
1755 E. Bayshore Road
Suite 9A
Redwood City, CA 94063
Ph: (650) 365 9199
Fax: (650) 366 1540

w    w    w    .    u    b    i    q    u    s    .    c    o    m

2      [START TRACK 2]

3

4      BILL L. HARBERT:  Hello.

5      DR. HODA ELEMARY:  Hello darling, how are

6  you?

7      MR. HARBERT:  Fine.

8      DR. ELEMARY:  Bill, this is Hoda.  Can you

9  hear me well?

10      MR. HARBERT:  Yeah, I can hear you.

11      DR. ELEMARY:  I mean, of course, you know,

12  who I am but I haven't spoken to you for a

13  couple of days.  Have you had much thought with

14  respect to this terrible $88 million verdict

15  that came out in Washington on the false claims

16  case?

17      MR. HARBERT:  No I haven't. I know about it,

18  but I haven't thought about it.

19      DR. ELEMARY:  You know about it, yes, we

20  talked; I think we talked; actually we talked

21  Monday after it came out.  You know, I've heard

22  that you're not getting all your information and

23  you really should get your letters and stuff

24  like that.  I mean they should not, you know,

25  just isolate you or just, monitor your letters

2    and stuff like that.  They should let things

3    come through to you.

4         MR. HARBERT:  As far as I know.

5         DR. ELEMARY:  What, I can't hear you baby.

6         MR. HARBERT:  I do as far as I know.

7         DR. ELEMARY:  Well there are some things

8    they kind of take their time and they kind of

9    edit it a little bit.  And, you know, I've

10   always felt that that's not a fair way to treat

11   anybody.  I mean if it's addressed to Bill L.

12   Harbert, you should really get that stuff, so.

13        But darling I wanted to tell you I've been

14   bombarded by **Roger(Goldman)** and all these

15   people, they're going on about how upset you are

16   and so on.  And I know that's not true, you

17   know, but you're not in any way upset because

18   you have, I mean, we'll find some solution to

19   that $88 million.  I mean as it is the companies

20   are bankrupt and so on.  Are you feeling okay?

21        MR. HARBERT:  Oh yes. [Inaudible].

22        DR. ELEMARY:  Well you should but you

23   shouldn't over worry about it, that's the key

24   here.  **They are pushing a lot of stuff Bill and**

25   **the writing on your behalf and so on and so**

2   *forth, they are making a, all kinds of stuff*

3   *that you instructed them that you did not want*

4   *to hear from me, which, you know, I don't know.*

5   *Is that true?*

6       *MR. HARBERT:  No.  [Inaudible]*

7       *DR. ELEMARY:  I can't hear you.*

8       *MR. HARBERT:  That's not true.*

9       DR. ELEMARY:  Well okay, then, you know, I

10  mean what we going to do about them?  I mean

11  between Bradley Arant and Roger, and that Levine

12  is really, you know, he lost everything.  I mean

13  he just—everything he ever said never happened.

14  Brian Lavine [phonetic].

15      MR. HARBERT:  Yes, I know.

16      DR. ELEMARY:  I mean is he—are you guys

17  happy with him or are you kind of fed up with

18  his?

19      MR. HARBERT:  I just don't worry about it.

20      DR. ELEMARY:  (Laugh) Well I like your

21  attitude Bill.  I've been very concerned about

22  Homer.  Has he been in touch with you?

23      MR. HARBERT:  Homer [inaudible]?

24      DR. ELEMARY:  Yes.

25      MR. HARBERT:  No [inaudible].

AUDIO TRANSCRIPTION                    5

2       DR. ELEMARY:   Because I've put a call to

3   him, it's a concern of mine that he needs to

4   kind of deal with that issue that came up and,

5   you know, I don't know, what his disposition is.

6   But he's not getting along with Billy and that

7   doesn't help things.

8       So I don't know.  I've been talking to a

9   couple of people in the company and they are not

10   too happy with the verdict but, you know, that's

11   to be expected.

12      Did you hear what happened to Tommy?

13      MR. HARBERT:   Tommy who?

14      DR. ELEMARY:   Kitchens.

15      MR. HARBERT:   No.

16      DR. ELEMARY:   He came in to testify but they

17   won't let him testify.  I mean, you know, during

18   the trial.  The trial is over, of course.  But

19   they won't let him testify, which is, you know,

20   may be to your benefit that that happened.  But

21   it's neither here nor there Bill.

22      I am a little concerned about when you feel

23   that it's necessary to put an end to Levine

24   because he cannot continue to charge you money

25   when he delivered, you know, such a bad result.

2    I mean, you know, we've got to be honest Bill.

3       And I did have some attempt in communicating

4    with—and I let it be known, the issue regarding

5    Raymond (Harbert).  You remember when Raymond

6    went on the stand, the witness stand and he said

7    "my uncle stole the business from me and so on

8    and construction business and, you know, he and

9    Tommy Kitchens cheated me and all that stuff".

10   I talked to you about it on Monday.

11      MR. HARBERT:  Yes.

12      DR. ELEMARY:  Yes.  And I have been, you

13   know, making it very clear that, you know, this

14   kind of nonsense has got to stop.  I mean I

15   don't know what his purpose of is.  We've never

16   exposed each other publicly, you know.  Let's

17   hope we keep it that way.  I mean, you know,

18   it's sad that he is doing this.  Don't you

19   agree?  I mean it's.

20      MR. HARBERT:  I agree with you.

21      DR. ELEMARY:  There's a lot of issues that

22   are very unsettled because of that verdict.  And

23   a lot of, people are—some are writing, you know,

24   running to hide for cover.  Some are, you know,

25   riding a high horse, et cetera, et cetera, you

2  know.  And we've got to deal with this

3  realistically and I just wish Bill that you kind

4  of monitor whatever it is that Billy is doing.

5  Because, you know, Billy can get a little wild

6  once in a while.  So, you know, is Van

7  [phonetic] keeping an eye on things?

8       MR. HARBERT:  I think so.

9       *DR. ELEMARY:  Well I don't know.  I'm also*

10  *wondering Bill if I should just ignore those*

11  *people that are saying, I should … you know,*

12  *that you instructed them, that you don't want to*

13  *hear from me and all that.  And that, you know,*

14  *they write me that you have a severe case of*

15  *dementia and, you know, you should not be*

16  *contacted.  I mean, you know, like they are*

17  *making you look like a classic, you know.*

18       MR. HARBERT:  [Inaudible].

19       DR. ELEMARY:  What?  I can't hear you.

20       *MR. HARBERT:  Don't pay any attention.  I*

21  *don't know anything about that.*

22       *DR. ELEMARY:  Yes, they are creepy.  I mean*

23  *they are getting into, you know, the issues of*

24  *our relationship and all of that and I just*

25  *don't think they should do that, do you?*

AUDIO TRANSCRIPTION                                    8

 2      MR. HARBERT:  No not at all.

 3      *DR. ELEMARY:  I mean I just, you know, Bill*

 4      *for 15 years we kept our thing very private and*

 5      *sacred and, we have to just go ahead and have*

 6      *attorneys, you know, just, going nuts on me over*

 7      *nothing.*  I mean I think maybe Billy is

 8      instructing them.  Do you think so?

 9      MR. HARBERT:  [Inaudible]

10      DR. ELEMARY:  Huh?

11      MR. HARBERT:  I don't really know.

12      *DR. ELEMARY:  Yes, it is upsetting.  I am, I*

13      *mean Bill do you want me to kind of just divorce*

14      *you … and I mean is that what you want?  You*

15      *want me to just leave you alone?*

16      *MR. HARBERT:  No not at all*

17      *DR. ELEMARY:  You know, Bill, I mean we've*

18      *had quite, I mean you and I were a striking*

19      *couple when we were together.  We just took on*

20      *the House of Saud.  We've done this, we kind of—*

21      *did you get my card?  I'm back in the States now*

22      *but I was—in fact, you won't believe where I am.*

23      *I'm in Mobile, Alabama.  I'm going from Florida*

24      *to a place called Tunica, Mississippi, your*

25      *birth state.  Maybe if I run into Indianola*

AUDIO TRANSCRIPTION

9

2       *[phonetic] I'll, you know.*

3           **MR. HARBERT:    [Laughs]**

4           **DR. ELEMARY:    I'll stop and say a prayer,**

5       **you know.  Because I just think you need**

6       **strength and you'll be just fine.**  I just think

7       a lot of people are just like, oh "Bill is this

8       and Bill is that".  I don't think there is

9       anything wrong with you.  And, you know, I've

10      always felt that and, you know, I mean, I just,

11      you know, you have been a wonderful, wonderful

12      person.  You by yourself, I mean.  People around

13      you are something else but you are just a top-

14      drawer person and I just won't let these people—

15      don't listen to them Bill.

16          MR. HARBERT:    No.

17          DR. ELEMARY:    You don't do you?

18          MR. HARBERT:    No.

19          DR. ELEMARY:    Good for you.  I mean it just—

20      it's such a short time that we have had since,

21      you know, we have—you were in control of

22      everything and now *I guess Billy is in control*

23      *and I don't like it and you know that.  But, you*

24      *know, I don't think he's really in control.  I*

25      *just think he's doing his thing and if he can*

1   AUDIO TRANSCRIPTION                    10

2   *just stop interfering with us, things will be*

3   *fine but that's becoming impossible.*

4        *I mean he's a—you know, I was asked by his*

5   *people, you know, they wanted to know about, the*

6   *marriage we had in Egypt and stuff.  And, you*

7   *know, I wouldn't deal with them, you know.  I*

8   *mean I'm not interested.  Do you think I should*

9   *deal with Billy's people when they ask me*

10  *personal questions?*

11       *MR. HARBERT:  No not at all.  Don't say*

12  *anything.*

13       *DR. ELEMARY:  Well it's over 15 years and I*

14  *kept this whole marriage thing secret but, you*

15  *know, and that's how long you asked me to keep*

16  *it secret.  But Bill I'm not happy with the way*

17  *these attorneys are writing me, you know.  Mr.*

18  *Harbert doesn't want you to contact* him and all

19  of that and he's incapable of this and that and

20  he has this.

21       And, you know, I think that's all wrong.

22  And I think you should just tell them to—well

23  I'm not going to tell you what to do but anyway

24  let me work some more on Raymond to get him

25  around and, you know.  I mean that—he shouldn't

2    take the stand and fight you.

3         MR. HARBERT:  Okay.

4         *DR. ELEMARY:  You know, you remember the*

5    *good times we had Bill?*

6         **MR. HARBERT:  Oh yes.**

7         *DR. ELEMARY:  You remember Geneva and Paris*

8    *and…*

9         **MR. HARBERT:  Ya.**

10        *DR. ELEMARY:  You remember our union in*

11   *Egypt?*

12        **MR. HARBERT:  Yes.**

13        DR. ELEMARY:  Well you should really—you

14   want to go traveling to Europe?  I would love—

15   you want to go?

16        MR. HARBERT:  No I'm not traveling at all.

17   I quit that.

18        DR. ELEMARY:  You quit traveling?  Okay.

19   Well you take care of yourself Bill.  But I'm

20   mighty unhappy with these lawyers writing me all

21   that stuff.  But I'll try—would you like me to

22   send you what they write me or you don't want to

23   get upset with it?

24        MR. HARBERT:  [Inaudible]

25        DR. ELEMARY:  Okay.  I'll handle it.

AUDIO TRANSCRIPTION    12

2    MR. HARBERT:  Okay.

3    DR. ELEMARY:  All right darling.

4    MR. HARBERT:  Okay.

5    DR. ELEMARY:  Bye.

6    MR. HARBERT:  Bye.

7        [END TRACK 2]

C E R T I F I C A T E

I, Matt Williams, certify that the foregoing transcript of

Dr. Hoda Elemary was prepared using standard electronic

transcription equipment and is a true and accurate record.

Signature  _M Willia_____

Date  _____6-19-07_____

# Kent Gibson Forensic Audio
## A Declaration

---

**Regarding the copying of an audio cassette tape of a telephone conversation between Bill L. Harbert and Dr. Hoda Elemary. Tape provided by Dr. Elemary.**

|  | DECLARATION OF KENT GIBSON |
|--|----------------------------|
|  |                            |

I, Kent Gibson, state the following, of which I have personal knowledge:

1.    I am the founder of Kent Gibson Forensic Audio, which is a company based in Los Angeles, California. This company specializes in preparing audio and visual evidence for use during litigation

2.    In the present litigation, I was contracted by Dr. Hoda Elemary to copy an audio recording (the "Audio Recording") delivered to me, which was labeled as "Bill 5-16-07".

3.    In dubbing the Audio Recording, I did not alter or modify the content of the recording. Rather, I simply made the speech contained in the Audio Recording slightly more understandable using light filtration and peak limiting. Mr. Harbert's voice seems naturally soft and he is speaking from a distant telephone making his voice more muffled than Dr. Elemary's. The content of the conversation is in my judgment internally consistent and I find no evidence of editing of the original tape.



4.     The accompanying compact disc, includes one file: the entire phone conversation from pick up - to hang up between a man who was identified by Dr. Elemary as Bill L. Harbert, and Dr. Elemary herself, whose voice I know and can identify. The recording is twelve minutes and twenty-five seconds. I made no edits in the digital file transferred to CD.

I hereby declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this Declaration was executed on 22nd day of June, 2007.

Kent Gibson

**Kent Gibson**

Digitally signed by Kent Gibson
DN: cn=Kent Gibson, c=US, email=kent@kentgibson.com
Reason: Declatation - ForensicAudio.org
Location: Los Angeles, CA
Date: 2007.06.22 11:16:23 -07'00'

# LAGUNA NIGUEL BEACH HOUSE 2003
# REVOCABLE TRUST
## ARTICLE ONE

Bill L. Harbert, called The Settlor and Trustee, declares that he has set aside the property described in Schedule A, attached to this instrument. All property and Securities subject to this instrument from time to time are respectively referenced as the "Property Estate" and "Stock Estate". THE TRUST ESTATE is inclusive of the property and stocks held together in the trust created in this instrument and shall be managed and distributed according to the terms of the Personal Arrangement Contract "Personal Arrangement".

## ARTICLE TWO

This instrument (in addition to creating a trust) sets the contract's terms and documents a five year old Secret agreement of a personal financial arrangement made by and between Bill L. Harbert (Harbert) and Dr. Hoda Elemary (Elemary) on November 3, 2003.

## ARTICLE THREE
## RECITALS

The parties' mutual benefits for conveying properties and stocks are:

I. On or about November 1998, the parties entered into a secret personal agreement that was further defined in 2002, whereby at Harbert's request, Elemary committed to Harbert to assist him with his personal affairs including his litigation troubles and to provide him-on a more permanent basis-with companionship, love, friendship and comfort as she had from time to time since 1991. Accordingly, Harbert's reasons for purchasing Elemary a house in Laguna Niguel, CA are: a).The personal aspect of their relationship b).An approximately $50 million Harbert earned in profit from Elemary's contacts with international senior Governments officials-who awarded Harbert lucrative oil pipelines and Mega Mid-East development contracts and   c). "The great career risks" Elemary had assumed by enlisting her friends in Washington to shield Harbert from prosecution by the Department of Justice (DOJ) for 3 years.

II. On February 4, 2002 Harbert pled guilty on behalf of his corporation's, Bilhar, violation of one count of the Sherman Antitrust Act for bid rigging. Harbert paid the United States a $54 million fine. Harbert therefore eagerly sought Elemary's intervention on his behalf. Elemary was advised By Senator Orrin Hatch that "representing anyone associated with bid rigging to the DOJ, White House or Congress is tantamount to taking great career risks". Elemary cautiously agreed to Harbert's request on strict conditions. Harbert officially named Elemary as exclusive case manager to benefit from her high powered political contacts, which included personally advising five Consecutive U.S. Presidents on Mid-East terrorism. In July 2002 Elemary retained her personal friend, former Senate Majority Leader, BOB DOLE, to assist her in dealing with the DOJ.

III. With the exception of Elemary's deposit into escrow, the parties initiated discussions on August 16-18, and agreed on October 22, 2003 that the Laguna Niguel beach house would be paid in full by Harbert,including real estate taxes at purchase time.

1

## ARTICLE FOUR
### (Personal Arrangement)

NOW, THEREFORE, in consideration of this personal arrangement as well as the business agreements and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties covenant and agree as follows:

1- Any potential lawsuit arising out of this Personal Arrangement Contract or business guarantees and agreements, as well as potential counter claims shall be governed and construed according to the laws of the state of California. Any lawsuit to enforce the terms of this Personal Arrangement and business agreements shall be commenced, and litigated (for personal disputes) in the Family Court – Superior Court in Los Angeles, California, and (for business disputes) in U.S. District Court, Central Division in Los Angeles, CA, in the County of Los Angeles. Any and all potential lawsuits, as well as compulsory counter claims will be <u>without exception,</u> litigated in California as though all the parties and witnesses to such lawsuits were California citizens and that the subject matter of the dispute upon which these lawsuits are based occurred in their entirety in the State of California, County of Los Angeles. In the event that either party to this contract-or their co-defendants or co-plaintiffs-file a motion to change this understanding on venue and jurisdiction (for any potential lawsuit) the violating party will unconditionally and unequivocally assume liability to pay the other party liquidated damages of three million dollars. Cleary, it is difficult to asses such damages. Nevertheless the parties have determined that the liquidated damages are at least $3 millon. The parties confirm their agreement herein that the violating party will pay $3 million to the other party. In the event that Harbert breaches any of the Business Agreements or Personal contract, Elemary will exclusively decide whether to pursue an expedited trial schedule, which include binding arbitration by a retired judge and/or a twenty five weeks expedited trial, whose cost will be born equally by Harbert and Elemary. Harbert's breach of this agreement for an expedited trial schedule will result in a one week demand for payment of $3 million. Otherwise, Harbert agrees to Elemary to demand double that amount from his LLC or bank accounts in Alabama and Switzerland.

2- Harbert unequivocally and unconditionally guarantees Elemary to overcome his current problems with cash flow that resulted in Harbert taking out a mortgage on the subject property. As a direct and proximate result of the drastic impact on Elemary on account of Harbert's cash flow problems, Harbert committed himself to the following:

A. To provide Elemary with a monthly payment to cover the mortgage payment and real estate taxes.

B. To divide in equal parts of fifty percent (50%) each with Elemary any and all profits arising out of his securities and stocks holdings beyond and above, i- accrued interest, ii- a seven percent (7%) annual increase of stock holdings for a two year period between the date of the execution of this document and Nov. 3rd 2005.

3- Harbert is hereby committed to compensate Elemary for his delay in paying fully for the beach house and agrees that at the earliest possible date, but no later than March 31st, 2005, Harbert will pay back the mortgage in full on the Beach House in compliance with his unwavering guarantee to fully pay for the beach house to satisfy his

2

part of the bargain in exchange for his acknowledgement of the receipt of 12 years of companionship and personal services and 25 years of business service.

    4. Harbert confirms his unconditional commitment to fulfill written guarantees stipulated herein to provide the promised minimum security for Elemary irrespective of any third party interference (including by son Billy Harbert) or change of circumstances.

## ARTICLE FIVE

In the event the parties, convey the subject property through their <u>own names,</u> such transactions shall be legally titled as referenced below in article nine. The use of this legal title is necessary to insure this Personal Arrangement or (TRUST ESTATE) is consistent with other guarantees and agreements executed by the parties that refer to THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST as the instrument for transmuting real estate property. However, this Personal Arrangement Contract is legally <u>not</u> revocable despite the word revocable in the title. Each party hereby represents, warrants, and agrees to the other as follows:

    A. Each party has received independent legal advice from his or her attorney with respect to the advisability of entering into this Personal Arrangement Contract and TRUST ESTATE.

    B. Each party carefully read this Personal Arrangement Contract/ Trust created by this instrument and understands contents and legal effects of each provision hereof.

## ARTICLE SIX

Harbert is referenced in this document as the current Settlor and Trustee, Harbert will resign on November 3, 2003. Elemary will become the Settlor and Trustee two weeks after Harbert's execution of this document.

## ARTICLE SEVEN

    The Settlor may not revoke the Personal Arrangement (Contract). However, Schedule B, attached, describes the necessary measures to be implemented when the parties elect to utilize the trust created in this instrument, to convey property & stocks.

## ARTICLE EIGHT

    The Settlor appoints for life in the office of Settlor & Trustee, the person listed herein who shall effective the date of execution of this document, serve as the Settlor/Trustee first: Dr. Hoda Elemary. Elemary shall have power to designate one or more individuals or corporate fiduciaries to serve concurrently or serially to succeed the trustee in the event of her inability or unwillingness to act. The Trustee may revoke this instrument in whole or in part at any time. The Trustee may at any time amend any terms of this trust. Upon the trustee's death, the entire undistributed principal and income of the trust estate shall go to Elemary's designee. The Trustee shall have the full power to sell, encumber, convey, exchange, invest, reinvest, partition, divide, improve, sever and repair the property or stocks constituting the Trust Estate from time to time. The Settlor/Trustee shall have all powers conferred on the Settlor & Trustee by law and all powers contained in California Probate Code sections 16200-16249. If any provision of this instrument is unenforceable, the remaining provisions shall remain in full effect.

3

## ARTICLE NINE

The trust created in this instrument may be referred to as THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST.

Executed on November **3**, 2003.

_Bill L. Harbert_

BILL L. HARBERT, Trustee

I certify that I have read the foregoing declaration of trust and that it correctly states the terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustee. I approve the declaration of trust in all particulars and request that the trustee execute it.

Date: November **3**, 2003            _Bill L. Harbert_

BILL L. HARBERT, Settlor

City of Washington

DISTRICT OF COLUMBIA            }
                                }
UNITED STATES OF AMERICA        }

On November **3rd**, 2003, before me, ~~Guillaume Tourniaire GCT.~~ ~~Bill L. Harbert~~, personally appeared BILL L. HARBERT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity on behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.                    SEAL

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

[Signature]

4

# SCHEDULE A

Fifty-percent (50%) undivided interest in single family residence located at 21 LE CONTE, LAGUNA NIGUEL, CALIFORNIA 92677, and more particularly described as follows:

LOT 16 OF TRACT NO. 8551, IN THE CITY OF LAGUNA NIGUEL, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A SUBDIVISION MAP, RECORDED FEBRUARY 29, 1984, IN BOOK 522, PAGES 1 TO 17, INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 658-251-07

# SCHEDULE B

1. In order to add property to this Trust, the Parties shall sign a separate document, other than this Trust, confirming the description of those properties and/or stocks to be added to this Trust, in addition to the Property described in Schedule A, attached hereto.

2. Each of the Parties hereto agrees to execute such other and further documents as are necessary and appropriate to accomplish the transfer of said additional properties and/or stocks into this Trust, i.e., assignments, deeds, etc.

6

Executed on November 3 , 2003.

_Hoda El_
DR. HODA ELEMARY, Successor Trustee

I certify that I have read the foregoing declaration of trust and that it correctly states the terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustee. I approve the declaration of trust in all particulars and request that the trustee execute it.

Date:  November 3 , 2003

_Hoda El_
DR. HODA ELEMARY, Successor Settlor

7