**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DR. HODA ELEMARY, *pro se*,** <br> **Plaintiff,** <br> **v.** <br> **PHILIPP HOLZMANN A.G., *et al.*,** <br> **Defendants.** | **Civil Action No. 07-654 (RCL)** |

**MEMORANDUM & ORDER**

Defendants Bill L. Harbert, Sr. ("Harbert"), Harbert International Establishment, Inc., Billy Harbert, Jr., and B.L. Harbert International, LLC moved to transfer venue to the Northern District of Alabama. This Court subsequently ruled [30] on two motions to dismiss, and only Harbert remains a defendant in this action. Hence, the Court will evaluate the present motion as applied to the claims still pending against him. The Court has considered defendants' motion [11], plaintiff's opposition thereto [18], defendants' reply [20], and the applicable law. For the reasons set forth below, defendants' motion is hereby DENIED.

**BACKGROUND**

In the late 1970s, the United States Agency for International Development ("USAID") made funds available to the Egyptian government to complete a wastewater project. (Compl. 9.) The Egyptian government awarded contracts for the project on what were ostensibly sealed, competitive bids. *See Miller v. Holzmann*, No. 95-cv-1231-RCL, 2007 U.S. Dist. LEXIS 16105, at *15-17 (D.D.C. Mar. 6, 2007). In reality, the pre-qualified bidders ("the Contractors")

conspired to manipulate the bidding process by agreeing in advance which company would win each bid. *Id.* at *16-17. The unsuccessful bidders would receive lucrative subcontracts or guarantees of success in bidding for future contracts, and the winning bids incorporated these "costs." *Id.* at *17. As a result, USAID both overpaid the winning bidders and compensated the losers. *Id.* When uncovered, this bid-rigging scheme prompted criminal charges against numerous individual and corporate defendants as well as a *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732. (Compl. 6.)

Defendant Harbert, an Alabama construction magnate, participated in the bid-rigging scheme. (*See id.* at 11.) To launder the scheme's profits, he devised a fraudulent equipment-lending transaction in which Sabbia Aktiengesellschaft, a Liechtenstein corporation, acted as the putative lessee. (*Id.* at 40.) Over three years, Sabbia wired regular lease payments totaling more than $4,000,000 from a Swiss bank to a bank in Alabama. (*Id.* at 41.) These payments reduced Harbert's apparent profits from the wastewater project contract – thus guarding against the scheme's discovery – and created a pool of funds from which to compensate the "losing" bidders. (*Id.* at 40.) In 2002, the Contractors pleaded guilty to criminal charges carrying a $54 million fine, which Harbert agreed to pay from personal funds. (*Id.* at 6.) Harbert was also named in the *qui tam* action, but this Court dismissed all claims against him on statute of limitations grounds. (Order [854] in 95-cv-1231-RCL (May 4, 2007).)

During the wastewater project bidding process in the 1980s, plaintiff Dr. Hoda Elemary ("Elemary"), then an Egyptian citizen, served as the Contractors' liaison with the Egyptian government. (Compl. 10.) Her influence with then-Prime Minister Dr. Atef Sedky, her uncle, proved crucial to the Contractors' success in securing the contract. (*Id.*) She contends that when

she acted on the Contractors' behalf, and for many years afterward, she was wholly ignorant of the bid-rigging conspiracy. (*Id.* at 30, 32.) When the fraud ultimately came to light in the late 1990s, Elemary, an innocent dupe, was tainted by her close association with the schemers and consequently lost significant professional credibility and opportunities. (Incorp. Sched. iii-iv.)

Elemary's business relationship with Harbert continued throughout the 1990s, and in April 2001 or 2002, he hired her to negotiate with the Department of Justice ("DOJ") concerning the criminal and civil cases then pending against him. (Compl. 27, 32.) During this period, Elemary executed two agreements. Both were "negotiated into their final forms and executed in Washington, D.C." (*Id.* at 21.) The first, dated November 3, 2003, purports to be a revocable trust agreement ("the November 3 Trust"). (Compl. Ex. A at 1.) It provides that in exchange for Elemary's past and continuing personal services and in consideration of profits attributable thereto, Harbert would, *inter alia*, "provide the promised minimum security for Elemary irrespective of any third party interference (including by son Billy Harbert)." (*Id.* at 1, 3.) In relevant part, the second agreement, dated September 21, 2004, defines Elemary's proposed compensation for acting as a negotiator, or "exclusive case manager," in the *qui tam* action ("the September 21 Agreement"). (Compl. Ex. G at 4.) In addition to a monthly "fee," payable until the litigation was resolved, she was "unconditionally guaranteed to receive five percent (5%) . . . of any funds she save[d] Mr. Harbert from ultimately paying the government in a settlement" – essentially, five percent of the difference between the government's then-current demand of $56 million and any ultimate settlement amount. (*Id.*) Elemary claims Harbert stopped paying her monthly "stipend" in or after February 2005. (Compl. 26.)

In March 2005, Elemary alleges she obtained a written offer from DOJ to settle the *qui*

*tam* action for $15 million. (*Id.* at 23.) She asserts this "offer was acceptable to [Harbert], but [his son, Billy Harbert,] . . . caused it to be rejected." (*Id.*) Billy Harbert "declined to obey his father's wishes" and "insisted he could a do a better job than [Elemary] in negotiating a lower [settlement] figure." (*Id.* at 7.) Elemary now claims Harbert "permitt[ed]" his son's interference and refused "to accept, in bad faith, advantageous settlement terms" she had negotiated on his behalf. (*Id.* at 26.) She thus received no "success fee" based on the proposed settlement. (*Id.*)

At some point before November 2004, Elemary acquired banking records implicating the Contractors in the bid-rigging scheme. (*Id.* at 12, 28.) Thereafter, she alleges Harbert and others attempted to coerce her to conceal these documents from DOJ or to resign her "case manager" position, and that they later threatened her life. (*Id.*) When she persistently refused to withhold evidence, Harbert "terminated [her] employment" on April 5, 2005. (*Id.* at 28.)

Elemary filed the present action on April 10, 2007. Of the seven causes of action she originally lodged against seven defendants, three claims against Harbert remain pending: (1) breach of contract; (2) quantum meruit; and (3) violation of 18 U.S.C. section 1964 ("civil RICO"). Harbert's June 27, 2007 motion to transfer venue to the Northern District of Alabama also remains pending, and the Court addresses it now.

## **DISCUSSION**

### **I. Applicable Law**

In a diversity action such as this one, venue is proper "in [] a judicial district where any defendant resides, if all defendants reside in the same State," or where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(a) (2002). The latter alternative, dubbed "transactional venue," may apply to more than one district. 14D Charles

Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3806.1 (3d ed. 2007) (collecting cases recognizing that "there can be more than one district in which a substantial part of the events giving rise to the claim occurred"). If no district satisfies either criterion, venue is proper in "a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(a)(3) (2002).

Generally, a plaintiff must "demonstrate proper venue with respect to each cause of action and each [defendant]." *Lamont v. Haig*, 590 F.2d 1124, 1135 (D.C. Cir. 1978). But when venue lies for some of the plaintiff's claims, the doctrine of pendent venue may allow the court to hear the rest. *Reuber v. United States*, 750 F.2d 1039, 1048 (D.C. Cir. 1984).

> In deciding whether to invoke pendent venue, a district court must consider the same factors that bear on economy and convenience as in deciding whether to exercise pendent jurisdiction: whether the pendent and principal claims arise out of a common nucleus of operative fact; whether they present common issues of proof; [and] whether they involve the same witnesses.

*Id.*

Even when venue is initially proper, however, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer [the] [] action to any other district or division where it might have been brought." *Id.* § 1404(a). *Cf. id.* § 1406(a) (providing for transfer when initial venue not proper). Transfer decisions, while discretionary, should generally rest on an "individualized, case-by-case consideration of convenience and fairness." *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964); *In re Scott*, 709 F.2d 717, 719 (D.C. Cir. 1983).

Transfer under section 1404(a) involves a multi-part analysis: first, the court must determine that venue is proper in the transferor district; next, it must ensure both jurisdiction and venue will lie in the proposed transferee district; and finally, it must weigh several private and

public interest factors to determine whether transfer would, indeed, be "in the interest of justice." The private interest factors include:

> (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the plaintiff and defendant, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof.

*Trout Unlimited v. United States Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996) (Urbina, J.). The public interest factors include: "(1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the transferee and transferor courts; and (3) the local interest in deciding local controversies at home." *Id.*

Despite courts' broad discretion in evaluating these factors, a court may not transfer a case "from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff." *Pain v. United Techs. Corp.*, 637 F.2d 775, 783 (D.C. Cir. 1980), *overruled in part on other grounds by Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981). Courts ordinarily accord significant deference to a plaintiff's choice of forum unless the plaintiff is a non-resident who lacks a substantial connection to the chosen forum. *E.g., DeLoach v. Phillip Morris Cos.*, 132 F. Supp. 2d 22, 24–25 (D.D.C. 2000).

## II.  Analysis

### A.  Propriety of Venue in the District of Columbia

Elemary's breach of contract and quantum meruit claims implicate substantially identical series of events, most of which occurred in the District of Columbia. In contract actions, to determine whether a substantial part of the underlying events or omissions occurred in a given district, courts typically look to: "where the contract was negotiated or executed, where it was to

be performed, and where the alleged breach occurred. *PI, Inc. v. Quality Prods.*, 907 F. Supp. 752, 757 (S.D.N.Y. 1995). "The place where the alleged harm occurred is also relevant for purposes of venue." *Kirkpatrick v. Rays Group*, 71 F. Supp. 2d 204, 210 (W.D.N.Y. 1999).

Here, both the September 21 Agreement and the November 3 Trust were "negotiated into their final forms and executed in Washington, D.C." (Compl. 21.) While Elemary and Harbert presumably discussed these agreements at various points prior to their execution, neither party alleges where these preliminary negotiations took place. Further, Elemary's performance under the agreements was to principally occur in the District of Columbia, where she would negotiate with DOJ officials. (*See generally* Compl. Exs. A, G (referring to Elemary's duties as "exclusive case manager" for False Claims Act litigation pending in this Court).) Nothing indicates where Harbert's performance occurred or was to occur.

Finally, the site of the alleged breach weighs heavily in the venue analysis. *Abramoff v. Shake Consulting, L.L.C.*, 288 F. Supp. 2d 1, 2-5 (D.D.C. 2003) (Urbina, J.) (though plaintiff's lawyer negotiated contract by phone from the District of Columbia, and plaintiff executed it and suffered harm here, venue improper because defendants' failure to perform occurred elsewhere). Here, Elemary's complaint does not specify where or how Harbert permitted his son to interfere with her efforts, nor where or how he rejected the proposed settlement. Hence, the Court cannot determine from the pleaded facts where the alleged breach occurred.

Accordingly, because the underlying contracts were negotiated, executed, and principally performed in the District of Columbia, the Court concludes a "substantial part of the events or omissions giving rise to" Elemary's breach of contract and quantum meruit claims occurred here. *See* 28 U.S.C. § 1391(a)(2) (2002). Venue is therefore proper in this district.

By contrast, Elemary's pleading indicates transactional venue does not lie in this district for her civil RICO claim. "Civil RICO is . . . a statutory tort remedy – simply one with particularly drastic remedies." *Brandenburg v. Seidel*, 859 F.2d 1179, 1189 (4th Cir. 1988). *Accord Bieter v. Blomquist*, 987 F.2d 1319, 1329 (8th Cir. 1993); *Kaufman v. Seidman*, 984 F.2d 182, 185 (6th Cir. 1993); *Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249, 1253 (7th Cir. 1989). To determine where transactional venue will lie in a tort action, courts typically look to "where the allegedly tortious actions occurred and . . . where the harms were felt." 14D Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3806.1 (3d ed. 2007). *See*, *e.g.*, *FC Inv. Group LC v. Lichtenstein*, 441 F. Supp. 2d 3, 11 (D.D.C. 2006) (Collyer, J.) (venue was proper in the District of Columbia on fraud claim because defendants communicated misrepresentations intended to induce reliance to plaintiff's District office).

Here, the putative RICO enterprise, Sabbia, is a Liechtenstein corporation with its principal place of business there. (Compl. 2, 40.) The counterfeit lease payments comprising the alleged pattern of racketeering activity passed from a Swiss bank to a bank in Alabama. (*Id.* at 41.) Harbert allegedly operated this enterprise to conceal a bid-rigging scheme perpetrated by himself, various foreign corporations, and a New Jersey resident. (*See id.* at 11, 29-30, 40.) These conspirators defrauded the United States government and the government of Egypt by manipulating the bidding process for contracts to build a wastewater treatment facility in Egypt. *Miller*, 2007 U.S. Dist. LEXIS 16105, at *16-17. Thus, the events underlying Elemary's civil RICO claim span the globe and implicate numerous jurisdictions. The United States government channeled funds for the wastewater project through USAID, an agency headquartered in the District of Columbia, and some contract negotiations likely took place, originated in, or were

transmitted to the District. But these hypothetical contacts comprise the sole nexus between Elemary's civil RICO claim and this forum. However measured, "a substantial part" of the underlying "events or omissions" did not occur in the District of Columbia. Because Harbert is not a District resident, and as explained below, this action could have been brought in another district, it satisfies no section of the venue statute. *See* 28 U.S.C. § 1391(a)(1), (3) (2002).

Nonetheless, this Court may exercise pendent venue over Elemary's civil RICO claim. *See Reuber*, 750 F.2d at 1048. While Elemary's contract and civil RICO claims arise from related rather than "common" operative facts, they will likely entail common issues of proof – most obviously, the basis for and progress of the *qui tam* action. On a macro level, all three claims arise from Elemary's multi-faceted business relationship with Harbert and his participation in a complex, international bid-rigging conspiracy. Hence, trial in a single court and in a single action would promote the policy considerations that motivate the pendent venue doctrine: judicial economy and convenience. *See Reuber*, 750 F.2d at 1048.

Thus, under 28 U.S.C. section 1391(a)(2) and the pendent venue doctrine, venue is proper in the District of Columbia as to Elemary's three remaining claims.

**B. Propriety of Venue in the Northern District of Alabama**

Because Elemary's civil RICO claim arises under federal law, she and Harbert are citizens of different states, and Elemary seeks well over $75,000 in damages on each of her remaining claims, federal subject matter jurisdiction clearly exists. 28 U.S.C. § 1332(a)(1) (2002). Furthermore, defendant Harbert is an Alabama domiciliary, (Compl. 2), so a federal district court in that state could exercise personal jurisdiction over him, *see Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).

Under 28 U.S.C. section 1391(a)(1), venue is proper "in [] a judicial district where any defendant resides, if all defendants reside in the same State." 28 U.S.C. § 1391(a)(1) (2002). From Elemary's complaint, it appears that Harbert, the sole remaining defendant in this action, resides in the Northern District of Alabama. (*See*, *e.g.*, Compl. 1 (Birmingham, Alabama, address handwritten beside Harbert's name on caption); Compl. Ex. B (letterhead lists Birmingham, Alabama address for Harbert).) Thus, venue would be proper in that district, and this action "could have been brought" there.

**C. Interest Balancing**

Because the other statutory requirements are met, the Court must assess whether transfer would be "in the interest of justice."

**1. Private Interest Factors**

First, among the six private interest factors, the plaintiff's choice of forum typically receives substantial weight, but when, as here, the plaintiff is a non-resident, it commands less deference. *E.g., DeLoach*, 132 F. Supp. 2d at 24–25. Nonetheless, Elemary pleads that she has lived and worked in the District of Columbia six months out of each of the past thirty years. (Compl. 19.) She thus boasts a substantial connection to this district and consequently has a strong interest in litigating her claims here. This factor weighs against transfer.

Second, the defendant's preferred forum, the Northern District of Alabama, likewise shares a nexus with one of the parties. Harbert asserts it also "has significant ties to Plaintiff's allegations" but does not elaborate on this point,[1] and the connection is not evident on the face of

[1] Harbert's motion simply references language from a judicial opinion in a case Elemary filed in the Central District of California, alleging the same or substantially similar claims against Harbert and others. (*See* First Am. Compl. in CV06-4723 RGK (C.D. Cal. Oct. 30, 2006)

Elemary's complaint. (Mem. Supp. Mot. to Transfer 9.) Hence, this factor favors transfer.

Third, as detailed above, Elemary's contract claims arose in the District of Columbia, while her civil RICO claim did not arise in any particular judicial district. This factor therefore weighs against transfer.

Fourth, both parties assert compelling arguments for the convenience of their preferred fora. Harbert is now eighty-three years old, suffers from significant health problems, and rarely travels. (Mem. Supp. Mot. to Transfer 13.) A moving party's medical disability can support a motion to transfer venue, and Harbert's medical condition is indeed serious. *E.g.*, *Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 2d 44, 50 (D.D.C. 2005) (Lamberth, J.). On the other hand, though she does not repeat these claims in opposing Harbert's motion to transfer venue, Elemary's complaint asserts that litigating in Alabama would endanger her life because Harbert's son, who harbors intense personal animosity for her, lives there, "establishing contacts with mercenaries and thugs." (Compl. 2-3.) Taking her allegations as true, litigating in Alabama would significantly inconvenience her. Ensuring her personal safety – assuming, contrary to her implication, that such could be accomplished – could prove quite costly. Hence, this factor weighs both for and against transfer.

---

(alleging, *inter alia*: (1) civil RICO against Harbert and others; (2) breach of contract against Harbert; and (3) quantum meruit against Harbert).) Over Elemary's objections, the California district court transferred the case to the Northern District of Alabama because it found transactional venue would lie there. (Civil Minutes – General in CV06-4723 RGK at 4 (C.D. Cal. Feb. 23, 2007).) Yet the extraordinary similarities between that action and this one do not eclipse a crucial distinction: *here*, Elemary has not alleged that Harbert engaged in the challenged conduct *while in Alabama*, and her remaining claims do not implicate the conspiracy against her cited by the California court. (*Cf. id.* ("Plaintiff alleges, among other things, that the Alabama Defendants, while in Alabama, knowingly and willingly conspired and agreed among themselves to terminate Plaintiff's employment").)

Fifth, the parties disagree as to which forum would be more convenient for potential witnesses. Based on the allegations in Elemary's complaint and the declaration appended to Harbert's motion, it appears some potential witnesses reside in each district, while others reside in different locations.[2] This factor favors neither forum.

Sixth and finally, neither forum boasts easier access to sources of proof. While Harbert maintains his business records in Alabama, (Mem. Supp. Mot. to Dismiss 14), evidence related to the bid-rigging scheme, collected for now-completed criminal and civil litigation in this district, resides in the District of Columbia. Like the previous two, this factor yields a draw.

Thus, only one private interest factor favors transfer, whereas two counsel against it.

**2. Public Interest Factors**

None of the public interest factors weighs strongly for or against transfer. First, the prospective transferee court, the Northern District of Alabama would be required to apply this

---

[2] Elemary complains that Harbert has failed to "identify the witnesses and present a generalized statement of what their testimony would be." (Mem. Opp. Mot. to Transfer 5 (citing *Heller Fin'l, Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1293 (7th Cir. 1989).) To the contrary, Harbert has identified all non-parties named in Elemary's complaint – presumably, the persons who could testify to the truth of her claims – matched them with the relevant factual allegations, and specified their places of residence. (Mem. Supp. Mot. to Transfer 10-12.) As Harbert notes, "it is [] premature for Movant[] to have developed any plan for which witnesses [he] will call in this action." (*Id.* at 10.) Before discovery, it is likewise premature for him to know more particularly which witnesses Elemary will call and on what subjects they will testify.

The Court's dismissal of several claims has narrowed the field of relevant testimony. Among the named non-parties, potential witnesses for Elemary's contract claims include: Elemary's counsel, Congressman Hilliard, and Harbert's personal secretary, Evangeline Hoover – both Alabama residents – and Senator Bob Dole and DOJ attorneys Carolyn Mark and Keith Morgan, all of whom work in the District of Columbia. Her civil RICO claim could involve testimony from these same persons, and to prove damage to her reputation, she may need to call U.S. and foreign government officials based in the District of Columbia.

forum's law.[3] While a court in this forum might have greater familiarity with its law, this

---

[3] Federal law governs Elemary's civil RICO claim, and her quantum meruit claim invokes the Court's equitable powers. Additionally, however, she asserts a common law breach of contract claim. Harbert argues that under District of Columbia choice of law rules, the Court should apply Alabama substantive law. (Mem. Supp. Mot. to Transfer 15-16.) Elemary, however, contends the November 3 Trust contains a valid choice of law provision under which she and Harbert agreed California law would govern any future disputes between them. (Mem. Opp. Mot. to Transfer 5.)

A federal court sitting in diversity follows the choice-of-law rules of the jurisdiction in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). District of Columbia courts give effect to contractual choice of laws provisions "as long as there is some reasonable relationship with the state specified." *Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980). Here, the November 3 Trust provides that California law will govern any "potential lawsuit" arising from the Trust or from undefined "business guarantees or arrangements." (Compl. Ex. A at 2.)

Two factors counsel against applying this rule to Elemary's present claim. First, the November 3 Trust also states that any relevant litigation must be commenced and conducted in California state or federal courts. (*Id.*) Elemary thus asks this Court to enforce one contractual provision, choice of law, despite having violated its companion provision, choice of forum, by filing this suit. Elemary contends she and Harbert later agreed in writing "that the proper and second choice for venue is the United States District Court for the District of Columbia." (*See* Compl. 3.) She has not appended this writing to her complaint, however, and her various filings in California belie such an agreement's existence. *See infra* note 5.

Second, more fundamentally, while their subject matter does somewhat overlap, the September 21 Agreement does not expressly refer to the November 3 Trust or incorporate any of its terms. (*Compare* Compl. Ex. A, *with* Compl. Ex. G.) Hence, the choice of law provision could conceivably govern only any claim for breach of the November 3 Trust. But the damages Elemary seeks for breach of contract consist entirely of compensation she would have received under the September 21 Agreement. (Compl. 26.) Thus, even if the choice of law provision were valid and enforceable, her claim does not invoke it.

Accordingly, because Elemary has not complied with the very provision she urges the Court to enforce, and because it pertains only to an agreement that is tertiary to her claim, the Court will not honor her request that it apply California law.

Where the parties have not effectively agreed which state's law should govern a dispute, District of Columbia courts use a "constructive blending" of the governmental interests analysis and most significant relationship test. *Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 193-94 (D.C. Cir. 1999) (citing *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 566 A.2d 31, 41 n.8 (D.C. 1989)). The factors listed in Restatement (Second) of Conflict of Laws section 188 inform this evaluation. *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997). Among these factors, the place of performance receives "presumptive weight" with regard to a services contract, particularly when it coincides with the place of negotiation. *Stephen A. Goldberg Co.*, 170 F.3d at 194 (citing Restatement (Second) of Conflict

consideration deserves little weight when, as here, "there is no reason to believe that the applicable law of the forum differs markedly from the law of the proposed transferee state."[4]  15 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure § 3854 (3d ed. 2007) (collecting cases).

Second, this district's calendar is not markedly more congested than that of the Northern District of Alabama.  (Mem. Supp. Mot. to Transfer 17 ("A review of federal court management statistics indicates that, in 2006, the Northern District of Alabama had more pending cases per judge than the District of Columbia, but that civil cases filed in the Northern District of Alabama proceeded to disposition somewhat more quickly.").)  Both parties concede this factor does not militate in favor of either forum.  (*See id.*; Mem. Opp. Mot. to Transfer 5.)

Finally, as both parties also concede, the present controversy, involving events in the United States and several foreign countries, is anything but "local," and the third public interest

---

of Laws §§ 188, 196).  Yet the court must also "inquire[] independently into which jurisdiction has the greatest interest in the subject."  *Id.*  As the Court of Appeals has observed, assessments using this multiplicity of factors frequently prove inconclusive, and when this occurs, District of Columbia courts apply District law for efficiency's sake.  *Id.*

Here, as discussed in the Court's venue analysis, the places of performance and negotiation are one and the same: the District of Columbia.  *See supra* part II.A.  California and Alabama, as the parties' respective domiciles, also claim an interest in this action.  Yet the District's interest is stronger.  Elemary lives and works part-time in the District of Columbia and performed her contractual duties here, and the contract itself was negotiated and executed here.  Efficiency interests merely underscore this result.  Thus, the Court concludes District of Columbia law should govern Elemary's breach of contract claim.

[4] Both Alabama and the District of Columbia generally follow the Restatement (Second) of Contracts absent contrary binding judicial precedent.  *Gallimore v. Washington*, 666 A.2d 1200, 1214 (D.C. 1995); *see Edwards v. Allied Home Mortg. Capital Corp.*, 962 So. 2d 194, 207 (Ala. 2007) (relying on Restatement to frame analysis and for propositions of law).  At this early stage in the litigation, the Court cannot discern any particular issues or defenses that might invoke unique, forum-specific contract rules.

factor is, similarly, a draw.

At this stage in the litigation, the interest-balancing assessment weighs – if slightly – against transfer. Further factual development may alter this calculus.[5] At present, however, particularly given the deference owed to a plaintiff's choice of forum, *e.g., DeLoach*, 132 F. Supp. 2d at 24–25, Harbert has not shown that transfer to the Northern District of Alabama would promote "the interests of justice."

**CONCLUSION**

For the forgoing reasons, the Court concludes venue is proper in this district, and while venue would also be proper in the Northern District of Alabama, the balance of interests weighs against transfer. Therefore, it is hereby

ORDERED that defendants' motion to transfer venue [11] is DENIED.

Signed by Royce C. Lamberth, United States District Judge, February 6, 2008.

---

[5] Harbert has directed the Court's attention to several lawsuits Elemary filed against him in California state and federal courts, all implicating the same or substantially similar claims. (*See*, *e.g.*, Notice of Removal in CV07-3644 RGK (C.D. Cal. June 5, 2007); Compl. in 07CV-217 RGK (C.D. Cal. Feb. 20, 2007); First Am. Compl. in CV06-4723 RGK (C.D. Cal. Oct. 30, 2006).) After the U.S. District Court for the Central District of California transferred one case to the Northern District of Alabama, Elemary voluntarily dismissed her complaint. (Civil Minutes – General in CV06-4723 RGK at 4 (C.D. Cal. Feb. 23, 2007); Notice of Voluntary Dismissal in 07-CV-457 (N.D. Ala. Mar. 20, 2007).) When Harbert filed his reply in the instant case, Elemary had just conceded a motion to transfer a second suit to Alabama. (*See* Reply 2; Statement of Non-Opposition in CV07-3644 RGK (C.D. Cal. July 31, 2007).) Rather than transfer the case, the court instead granted the defendants' motions to dismiss the suit entirely. (Civil Minutes – General in CV07-3644 RGK (C.D. Cal. Aug. 22, 2007).) Days before, it had dismissed a third suit. (Civil Minutes – General in CV07-217 RGK (C.D. Cal. Aug. 17, 2007).)

Considerations of judicial economy suggest a single court should hear Elemary's various, interrelated claims. Because none of her claims against Harbert remains pending in any other federal court, however, her numerous other filings do not impact the present transfer assessment.