## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

APR 2 9 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

```
                                        )
DR. HODA ELEMARY, in propria persona   )
Plaintiff,                              )
    v.                                  )
PHILIPP HOLZMANN A.G., et al.,          )        Civil Action No. 07-654 (RCL)
Defendants.                             )
                                        )
_____)
```

## PLAINTIFF'S ANSWERS TO DEFENDANT'S COUNTERCLAIMS
## AND ANALYSIS OF DEFENDANT'S RESPONSE TO THE COMPLAINT

I.

### <u>Plaintiff's Constitutional Rights Were Violated</u>

Evidence of Opposing Counsel's misleading the Court by replacing fact with fiction is

confirmed in this section by the exhibited documents, which demonstrates a stark contrast

between Opposing counsel's letter to Dr. Hoda Elemary ( "Plaintiff" ) and their deliberately

false report to the Court on the same subject, which the Court fortunately cited as a basis for its

order to Plaintiff <u>"to show cause in writing why her complaint should not be dismissed for</u>

<u>failure to comply with the Court Order"</u>, (which Plaintiff had not received until the Court

mentioned it to her last week). Attached collectively hereto as Exhibit "A" and incorporated

herein by this reference are true and correct copies of a March 18, 2008 letter from Matthew H.

Lembke, April 8, 2008 Court Order and Plaintiff's March 31, 2008 compliance letter.

1). ***Correction:*** Mr. Lembke, who erroneously reported to the Court <u>"his unsuccessful attempts</u>

<u>to confer with Plaintiff"</u>, as the Court reiterated in its April 8, 2008 order, ***stated the very***

opposite in his letter to plaintiff including the following language *"we have made the revisions you requested...as we discussed we will have another phone call"*. Based on Mr. Lembke's March 18, 2008 letter, it is evident that the parties conferred. To that end, Mr. Lembke intentionally and knowingly misled the Court with a falsified and fabricated report to turn the Court against Plaintiff, causing the Court to Unnecessarily issue 'order to show cause', and

2). *Correction:* The court also affirmed "In that report, defendant represented that Plaintiff had refused to discuss the matters set forth in Local Rule 16.3(c), indicting she would only address these matters in writing." Not so-Mr. Lembke provide this horrendous report to the Court because he did not like the dates offered in Plaintiff's letter faxed to Mr. Lembke on time in compliance with the Court order . In summation, on the basis of an erroneous report, which the Court believed, the Court was compelled to order Plaintiff to show cause or her case would be dismissed. More importantly, based on earlier misrepresentations, that once again the Court had believed, the Court granted Billy Harbert, Jr.'s motion to dismiss (together with two other such motions on false premise provided by the same opposing counsel), which caused an uproar in Congress as it was seen that the Court forfeited execution of the law against a defendant who made an attempt on the life of a black congressman while Billy Harbert, Jr. was simultaneously harassing the Congressman's daughter in law based on Department of Justice letter attached in Exhibit "I" hereinbelow. Requests for vacating said order concerning the dismissal of Billy Harberrt, Jr. are concurrently being filed with this document.]

**THE SUBSTANCE OF PLAINTIFF'S PRESENTATION IS ON PAGE 5 IN SECTION "IV. SUMMARY: RESPONSE TO COUNTERCLAIMS".**

## II.  Introduction: Civility in Litigation

Establishing a level of trust among the parties, to secure the integrity of the facts presented to the Court, through disciplinary orders is mandatory prior to evaluating Plaintiff's arguments and answers to the subject Court's order "to show cause". [Based on the clear example that illustrated, hereinabove opposing counsel's undeniable duplicity through knowingly providing the Court with an erroneous report to mislead it into initially ordering Plaintiff on March 3, 2008, "to show cause" or have her case dismissed, at a time when opposing counsel knew that Plaintiff was away under medical orders and did not see her mail and to which Plaintiff could not have responded since there is an investigation underway due to the lack of receipt by Plaintiff of said Court order (one of many Court orders that Plaintiff had not received since she filed this case.), Plaintiff respectfully requests the Honorable Court to set a standard demanding the parties adhere to the rules of civil litigation with the warning for imposing sanctions on any party that seeks to present fiction instead of fact to the Court].

When the facts presented in litigation have been trifled with or are lacking in authenticity, it is incumbent upon a Court to correct the situation to insure the Parties will henceforth avoid falsifying facts in their filings (It is evident opposing counsel gambled that neither the Court nor Plaintiff will notice their duplicity. However, in this case, Plaintiff has noticed the opposing counsel's trickery and mendacity . Based on the belief that this Court may be insistent to exercise its discretion to rule only on fact not fabricated fiction and that it would give serious consideration to vacate one of its order if it can be proved to the Court that it ruled before on compromised or manipulated facts presented to it by opposing counsel, Plaintiff respectfully requests the Court to clarify to the parties the need to consider   the consequences of future

3

presentation of fabricated non-facts. The five consecutive Chairmen of the Senate Judiciary

Committee have each requested Dr. Hoda Elemary ("Plaintiff") to review legislation before it

is introduced. Plaintiff is a painstakingly meticulous inspector of the interpretation of

legislative language, despite her limited legal vocabulary. Letters in  Exhibit "P", cited herein

below, which offer high praise for Plaintiff, are issued by 1). Senator Orrin G. Hatch-the

Judiciary Committee's former Chairman-who approved the nomination of more Bench Officers

than any living chairman today-and 2). Senators Dianne Feinstien, Harry Reid, Hillary Clinton,

Carl Levin, John McCain and Bob Dole confirming a sample of "a majority of the United

States Senators have Overwhelmingly endorsed (Plaintiff's) work" and "…the vital services

she provides Congress, which have been determined to serve U.S. National

interests".

### III.  MORAL IMERATIVE

IT IS  IMPARATIVE  FOR THE COURT TO FIRST DETRMINE MR. HARBERT'S

WISHES IN THIS MATTER RATHER THAN DEPEND ON HIS SON'S (OPPOSING)

COUNSEL'S  ALLEGED REPRESENTATION  WITHOUT MR. HARBERT'S CONSENT.

MR. HARBERT FEARS SAID  OPPOSING COUSEL ARE ACTING IN THE INTEREST

OF THE SON'S INHERITANCE RATHER THAN MR.  HARBERT'S OWN INTERESTS-

A CLEAR CONFLICT OF INTEREST. THIS WOULD NOT BE THE FIRST TIME THIS

OCCURRED. i.e. MESSRS. LAVINE AND FROHSIN.  MR. HARBERT'S LETTERS ON

THIS SUBECT ARE ATTACHED,  HEREINBELOW TOGETHER WITH LETTERS

ISSUED BY MR. HARBERT'S SON AND HIS COUNSEL, EXHIBIT "B" THAT MR.

HARBERT DEFINED AS BEING "FORGED". TO THAT END, THE COURT HAS THE

4

MORAL OBLIGATION TO ORDER BILL L. HARBERT'S TESTIMONY IN PERSON

{NOTICE IS HEREBY GIVEN TO OPPOSING COUNSEL THAT DOCUMENTS AND

LETTERS FROM BILL L. HARBERT, THAT ARE (OR APPEAR) TO BE

ACKNOWLEDGED AND SIGNED BY HIM IN LEU OF PERSONAL TESTIMONY ARE

MORE THAN LIKELY TO BE COERCED AND THEREFORE UNACCEPTABLE], AS

THIS WOULD NOT BE THE FIRST TIME THAT MR. HARBERT, WHO SUFFERS

'ABUSE OF AN ELDER PERSON' AT THE HANDS OF HIS CHILDREN, WROTE ON

THE EVIDENCE ATTACHED IN EXHIBIT "B" HEREINBELOW, THE WORD "

FORGERY" O N LETTERS PROVIDED TO HIM PY BILLY HARBERT, JR. AND HIS

COUNSEL (THERE ARE NO LAWS ON 'ABUSE OF AN ELDER PERSON' IN

ALABAMA.

UPON HEARING MR.HARBERT'S TESTIMONY, IT BEHOOVES THE COURT (FOR

THE SAKE OF JUDICIAL ECONOMY) TO DETERMINE IF MR. HARBERT WISHED TO

BE REPRESENTED BY OPPOSING COUNSEL OR TO FILE SAID COUNTER CLAIMS

AGAINST PLAINTIFF AFTER HE ADMITTED HIS LIABILITY IN WRITING TO

PLAINTIFF ON THIS MATTER AS SUPPORTED BY HARD EVIDENCE IN EXHIBIT "C"

HEREINBELOW AND IN "1V SUMMARY OF RESPONSE TO COUNTERCLAIMS" ON

THIS PAGE. (THE COURT SHOULD FIRST HEAR FROM MR. HARBERT TO DECIDE

ON SAVING RESOURCES BEFORE PROCEEDING WITH HEARING OPPOSING

COUSEL COUNTRCLAIMS).

## IV.  SUMMARY:  RESPONSE TO COUNTERCLAIMS

*Presented hereinbelow is a briefing of the issues raised through out this document to oppose*
*Defendant's counterclaims:*

COUNT I -FRAUDULENT INDUCEMENT: *{Plaintiff categorically denies any fraudulent inducement occurred as fabricated in count I Of opposing counsel's (Defendant) counterclaims. Bill L. Harbert stated on record concerning count I " it is forgery" that he neither instructed anyone nor authorized the content of this count to be filed in his name against plaintiff and that his claim of forgery on this count applies to the remainder of the counterclaims. This is not the only time Bill L. Harbert accused his son's counsel of committing forgery and false representation against his own interests. Moreover, Mr. Harbert submitted in writing in more than one occasion his charge of forgery with respect to his son and his counsel- two examples of fraud.*

*Attached collectively hereto as <u>Exhibit "B"</u> and incorporated herein by this reference are true and correct copies of written documents and letters 1). <u>confirming that Mr. Harbert wrote the word "FORGERY" on several documents, on which his signature was forged. In addition, 2). written directives issued by Mr. Harbert to his son's counsel including Bryan Lavine to cease and desist from falsely claiming, at his son's instructions, they represent Bill L.Harbert when they dont are also attached.</u> Note another fabrication-there is no September 2 Agreement as falsely alleged in count I on paragraph 22, second line.}*

COUNT II - BREACH OF CONTRACT- SEPTEMBER 21 AGREEMNT : *{Plaintiff denies opposing counsel's absurd attempt to turn the table around falsely placing the blame on her for "breach of contract" when they were responsible for terminating her during the agreed upon time span of the contract. Prior to the filing of this case, opposing counsel wrote and stated the official reason for Plaintiff's termination was her high end negotiated $15 Million settlement, they claimed they could have done better going to court, and so they did exercising their folly at a cost of $90 Million (Judgment), which they now claim they would*

*never be forced to pay. Plaintiff did not commit any act to Breach the Contract as opposing*

*counsel concocted. Opposing counsel have on evidence to back up their false allegations*

*referenced in this count and throughout their counterclaims. Instead, Plaintiff presents the*

*following evidence, in which Bill L. Harbert acknowledges his liability in the event*

*Plaintiff's contract is terminated. Attached hereto as* <u>*Exhibit "C"*</u> *and incorporated herein*

*by this reference is a true and correct copy of Mr. Harbert November 11, 2003 letter*

*confirming he acknowledged his liability to plaintiff for breach of contract to William*

*sharp:*

## <u>*V. DEFENDANT ACKNOWLEDGES LIABILITY TO*</u>

## <u>*PLAINTIFF FOR BREACH OF CONTRACT*</u>

<u>*"I am writing to bring to your attention to the fact that when I accepted your*</u>

<u>*help to manage the qui tam and declaratory relief cases I had forgotten that I*</u>

<u>*gas a confirmed agreement with Dr, Elemary under liability to me to manage*</u>

<u>*these cases to their conclusion…I therefore have no choice but to honor my*</u>

<u>*agreements with Dr. Elemary (which preceded any understanding between us*</u>

<u>*concerning these two matters) to limit my liability."}*</u>

<u>COUNT III</u>- BREACH OF CONFIDENTIAL RELATIONSHIP

<u>COUNT IV</u> -  BREACH OF FIDUCIARY DUTY -(AND)

<u>COUNT V</u> -  UNJUST ENRICHMENT

*{ Counts III, IV and V are denied without reservation. Opposing counsel has not and can*

*not provide a shred of evidence to justify their fictional charges made against Plaintiff in*

*any paragraph contained with in counts III, IV and V, (which are repetitive and do not*

7

bring forth any new significant charges beyond those referenced in Count I and II ) other than to divert the Court's attention from the substance of Plaintiff's action.

In summation, Billy Harbert, Jr. and his counsel used Plaintiff for a scapegoat blaming her for their failure and error of Judgment by filing a frivolous law suit without any bases in law or in fact, in their feeble attempt to turn the table around for a host of breeches when it was the Harberts that breached the contract and terminated her during the time span stipulated in the contract. Attached hereto as Exhibit "D" and incorporated herein by this reference are true and correct copies of several singed and acknowledged letters reflecting Mr. Harbert's instructions to keep his son out of his business and the November 3 2003 trust by Bill L. Harbert, contradicting allegations that defame Plaintiff as stated in Counts III, IV and V.} This is a very simple case that if the law is fair;y applied to the various agreements and trusts including the November 3, 2008 Trust it would be relatively easy to to determined the amounts owed.

COUNT VI - MALICIOUS PROSECUTION - SUCCESSIVE SUITS

{Opposing counsel falsely claimed that they are innocent of the reason plaintiff filed several suits instead they blamed Plaintiff. The fact is Plaintiff filed one suit on July 28, 2006, for 11 counts naming several defendants from Alabama. The Judge did not rule on the substance of the action but transferred the case to the Northern District of Alabama, where Defendants threatened to physically harm Plaintiff if she came to Alabama to litigate. Attached hereto as Exhibit "E" and incorporated herein by this reference is a true and correct copy of a letter from the Honorable William M. Acker, Jr. of Alabama stating "Plaintiff, Hoda Elemary, having voluntarily dismissed her above entitled action without prejudice, All pending Motions are Moot." This case, due to its size was divided into three

8

*lawsuits. The filing of a previously voluntarily dismissed Case in another district is legal and does not constitute Malicious Prosecution as opposing counsel would like to mislead the Court into believing. Plaintiff also exercised her legal right by filing a personal petition and a personal lawsuit, which she could not by law file in a U.S. District Court but had to file in a state court.}*

## VI. COERCION OF DEFENDANT AT TAX PAYERS EXPENCE

*In 2008- Opposing counsel are working under instruction of Billy Harbert, Jr. Today, their conduct is understandably influenced by him. Bill L, Harbert does is not aware of the proceedings of this case whatsoever and has not talked with opposing counsel for several months. In 2001- The suspension of the Harbert corporate entities and the indictment of the Harberts themselves in the False Claims Case compelled Bill L. Harbert to request Plaintiff in April, 2001 to put together a battery of attorneys and secure congressional backing. Chief among these attorneys, who reported directly to Plaintiff, was the Senate Former Majority Leader Bob Dole, Fried Frank's Richard F. Rule, counsel to Bill Gates in the breakup of Microsoft trial, Michael Bromwich, former Department of Justice Inspector General, Barry Coburn - Clearly Washington's finest. Plaintiff dismissed all of Billy Harbert, Jr.'s counsel, some of whom did not go willingly including Bryan Lavine and June ann Sauntry, causing Mr. Harbert to issue letters to them exhibited hereinbelow. Enmity between Plaintiff's 12 lawyers and Billy Harbert, Jr.'s counsel grew culminating in today's circumstances. Opposing Counsel obstructed on a daily basis an ongoing negotiations between Plaintiff, Senator Dole and the Department of Justice. Attached hereto as Exhibit "F" and incorporated herein by this reference is a true and correct copy of a letter from CAROLYN G. MARK, Senior Trial Counsel confirming to Plaintiff a $15 Million proposed settlement.*

## VII. A. Mr. Harbert Approved the $15 Million settlement

A. In the concurrently filed transcript filed on April 18, 2008, of Plaintiff's conversation with

9

Mr. Harbert, who expresses his resentment for opposing counsel and advises Plaintiff to ignore opposing counsel. There are several other conversations legally recorded confirming that Mr. Harbert had accepted the Department of Justice's order prior and after it was made, his son refused to make the payment and assured plaintiff he would prevail with Mr. Bryan Lavine's representation "with 0 payment", which he said " I would like to pay you (Plaintiff) 0 for your losses" . Instead they received a judgment of $90 Million. In 2005 Plaintiff predicted the Harberts would receive a judgment of just under $100 Million if they failed to pay $15 million in settlement by May 2005. *Attached hereto as **Exhibit "G"** and incorporated herein by this reference are true and correct copies **1)**. a letter from Plaintiff from Evian Royal Resort in the French Alps during the summer of 2006, in which Plaintiff confirmed the above stated sound advise to Bill L. Harbert concerning the $ 100 Million Judgment in response to opposing counsel's counter claim that Plaintiff gave the wrong advise to Mr. Harbert and otherwise acted without loyalty "BREACH OF CONFIDENTIAL RELATIONSHIP", WHICH Plaintiff categorically denies. Moreover, opposing counsel has no evidence to support this counterclaim**2)**. Bill L. Harbrt's affidavit signed and thumb printed contradicts opposing counsel while confirms-just before He was coerced to terminate Plaintiff-his gratitude to Plaintiff's loyalty " ( **which have profited me and my companies tens of Millions of dollars)"** . Instead **3)**. Plaintiff presents to the Court a March 22, 2006 letter to **SENATOR BOB DOLE** issued by Mr. Lembke falsely charging Plaintiff of conduct, that caused Mr. Harbert to call Senator Dole to apologize and categorically negate the content of Mr. Lembke's letter, and **4)**. relevant documents on the False Claims Case and Senator Dole's Participation with Plaintiff to amicably resolve this with the Department of Justice the alleged bid rigging .*

B.  filings by opposing counsel Roger Goldman and Matthew Lembke

In the brevity of time and judicial economy the Court should disregard filings by opposing counsel Roger Goldman and Matthew Lembke. They represent a new cadre of attorneys, who strayed away from civility in litigation-a matter of great concern to Congress-to prevail at any cost, Damned be the truth and the facts. Plaintiff will not continue to litigate under these oppressive circumstances without the Court's intervention. Out of revered respect for the Court, Plaintiff complied with this Court's April 8, 2008 order and elected to spend the time to dissect the "ANSWER AND COUNTERCLAIMS OF BILL L. HARBERT." Plaintiff has not found one word of truth in Defendant's answer. Plaintiff has however examined minutely his answer part by part and compiled evidence which *she interjected into the text of Defendant's answers in italicized letters to differentiate it from Defendant's writing so as to guarantee that every sentence in Defendant's answers and counterclaims has been negated by hard evidence* in the form of an official letter, document, agreement and trust with acknowledged signature so as to  categorically prove Defendant's allegations to be false or without merit.

There is no just Court in the land, that can review Plaintiff's explanation and corresponding evidence then fairly rule to dismiss this case.

The text prepared by opposing counsel of "ANSWER AND COUNTERCLAIMS OF BILL L. HARBERT" has been reviewed with the facts being corrected on the spot by Plaintiff's evidence. Accordingly, The Court is in a position to simultaneously review the allegations (the Defendant wished for the Court to consider), while looking at Plaintiff's contradictory evidence on the same page without the cumbersome exercise of comparing two separate documents. In so doing the Court will soon realize that Messrs. Goldman and lembke deliberately falsified and misled the Court into issuing orders that the Court would not have otherwise issued. The purpose of their unethical conduct is to divert the Court from the  substance of Plaintiff's

complaint, due to Mr. Harbert 's well documented acknowledgement of his liability to Plaintiff, as detailed herein below. In particular, Opposing Counsel have done everything in their power since the summer of 2007 1). to obviate the Court orders from being delivered by U.S. mail to Plaintiff. They succeeded in this endeavor with two exceptions. 2). During several Months when Messrs Goldman and Lembke knew Plaintiff was unavailable for medical reasons a).they filed several Motions including Partial Summary Judgment and b). they misled the Court in their Motion into issuing an order to show cause. The filing dates of these documents coincide with the time when Plaintiff was medically indisposed. They preplanned their fillings was Plaintiff ill so she would default for lack of knowledge of the filed Motions or the Court's deadlines.

Several weeks before Christmas, Plaintiff learned the clerk of the Court did not receive a Motion she forwarded for filling because of Defendant's interference with Plaintiff's mail.

## VIII.   TEXT OF "ANSWER AND COUNTERCLAIMS OF BILL L. HARBERT" A ND PLAINTIFF'S CORRECTION OF DEFENDANT'S FALSE  ALLEGATIONS

Defendant Bill L. Harbert, Sr. ("Mr. Harbert") makes the following answer to Plaintiff's Complaint:

1. Mr. Harbert admits that this Court has jurisdiction over this matter. He further admits that Plaintiff is a citizen of the State of California and that he is a citizen of the State of Alabama. He further admits that the matter in controversy exceeds the sum of Seventy-Five Thousand Dollars. He further admits that B.L. Harbert International, LLC is a Delaware limited liability company with its principal place of business in the State of Alabama He denies that Harbert International Establishment, Inc. is a Liechtenstein corporation with its principal place

of business in the Swiss Confederation. *[Correction: This is a clear example of opposing*

*Counsel's (Goldman and Lembke) participation in changing the truth to mislead the Court*

*by falsifying the facts to protect their client from paying Plaintiff for his breach of contract*

*the United States on the Judgment for Case No. 1:95 CV 01231 (RCL/JMF).Two categories*

*of Evidence:*

*A).Eye witness - Plaintiff is in contact with special counsel to Bill L. Harbert ("BLH")-*

*Maurice Turrettini Esq. of Geneva, Switzerland, who negates Opposing Counsel's false*

*denial that Harbert International Establishment ("HIE") is in fact a  Liechtenstein*

*corporation. plaintiff frequently met with M. Turrettini to review his expenditures, on behalf*

*of Mr. Harbert, one such expenditure was annually paid to the principality of Liechtenstein*

*for $50, 000.00 for taxes.] However, due to a tax issue and a fraction payment owed by BLH*

*and HIE contracted to plaintiff on the amount of claims of contract 20A totaling $107,071,*

*324.00 rather than tell the truth and let the chips fall where they may, Opposing Counsel*

*elected to continue to cheat Plaintiff and the United States.*

*B).United States Legal records- In the "United  States' complaint in intervention" filed on*

*March 13,2001 by AUSA Keith Morgan, on page 3, paragraph 12 stipulates that Harbert*

*International Establishment "…("HIE"), a Liechtenstein corporation…"]*

He admits that Billy L. Harbert, Jr. is a citizen of Alabama. .

He lacks knowledge or information sufficient to form a belief as to the remaining averments in

this paragraph, so they are denied. **[Evidence disproving Opposing Counsel's deliberately**

**falsified answers is presented herein. Based on eye witness testimony, the remainder of**

**paragraph 1 is common knowledge, such as the business location of WACHOVIA BANK,**

**N.A. Corporate Headquarters, where the Parties traveled to North Carolina for an**

investment update. Yet opposing counsel denied this fact on the basis that ]

2. Mr. Harbert denies the first, second, and third sentences of this paragraph. As to

the fourth sentence, Mr. Harbert is without knowledge or information sufficient to form a belief

as to its truth, so it is denied. *[Evidence to the contrary is offered herewith: Based on eye*

*witness testimony, Proof negating opposing counsel's uninformed response is presented*

*herewith to the effect that Mr. Lembke admitted in person that venue is proper in the District*

*of Columbia but has recently been ordered by Billy Harbert, Jr. to transfer the case to*

*Alabama, where he can manipulate and threaten Plaintiff to abandon her pursuit of her*

*legal rights through moving this case forward or risk her life]*

3. Denied. *[For Mr. Lembke's invalid denial, plaintiff presents the same reason as stated in*

*Paragraph 2 of this document]*

4. Mr. Harbert . denies the first sentence of this paragraph. As to the second sentence,

Mr. Harbert lacks knowledge or information sufficient to form a belief as to the truth of this

sentence, so it is denied. Mr. Harbert denies the averments contained in the third, fourth, fifth,

and sixth sentences. As to the remaining sentences contained in this paragraph, Mr. Harbert is

without knowledge or information sufficient to form a belief as to the truth of the averments

contained in them, so they are denied.

*[Evidence proving Opposing Counsel's deliberately falsified answers is presented on page 3,*

*in section 'Plaintiff's Constitutional Rights Were Violated' and throughout this document*

*Opposing counsel seeks to hide the truth from this proceedings- in fact Mr. Harbert does not*

*"lack the knowledge or information sufficient to form a belief as to the truth of the*

*averments contained in them " Concerning the remainder of the paragraphs provided*

*hereinbelow , Mr. Goldman's invalid denials in this as well as in most of the other*

*paragraphs are misleading. (However in further analysis of Pages 1-10 above, Plaintiff presents the same reason as stated in Paragraph 2 of the complaint.) Accordingly, opposing counsel has failed to answer the complaint with any measure of professional integrity to the facts. Plaintiff' facts are supported with evidence enabling her to effectively negate opposing Counsel' flimsy and deliberately mislead'ng reasoning and any Court that may accept opposing counsel's answer, irrespective of whether such answer is based on fact (supported by evidence) or on mendacity and fabricated allegations ]*

5. Mr. Harbert denies the averments contained in the first sentence of this paragraph.

Mr. Harbert admits the averments contained in the second and third sentences of this paragraph. Mr. Harbert denies the averments contained in the fourth, fifth, and sixth sentences of this paragraph. *[Proof negating opposing counsel's uninformed response is presented herewith, For Mr. Lembke's invalid denial, plaintiff presents the same reason as stated hereinabove in Pages 1-10 above. ]*

6. Mr. Harbert denies the averments contained in the first and second sentences of this paragraph. As to the third sentence, Mr. Harbert lacks knowledge or information sufficient to form a belief as to the truth or veracity of the averments contained in that sentence, so they are denied. Mr. Harbert denies the averments contained in the fourth and fifth sentences of this paragraph. Mr. Harbert is without knowledge or information sufficient to form a belief as to the truth of the averments contained in the sixth sentence of this paragraph, so it is denied. *[Evidence disproving Opposing Counsel's deliberately falsified answers is presented herein below. For Mr. Lembke's invalid denial, plaintiff presents the same reason as stated hereinabove in of Pages 1-10 above. and paragraph 8 of the complaint]*

7. Mr. Harbert denies the averments contained in the first, second, third, and fourth

sentences of this paragraph. Mr. Harbert denies that he has been involved in any violence

directed to Plaintiff. Mr. Harbert is without knowledge or information sufficient to form a

belief as to the truth of the remaining averments contained in the fifth and sixth sentences of

this paragraph, so they are denied. As to the last sentence of the paragraph, Mr. Harbert denies

it. [*Evidence to the contrary is offered herewith: Proof negating opposing counsel's*

*uninformed response is presented herewith to the effect that Mr. Lembke admitted in person*

*that venue is proper in the District of Columbia but has recently been ordered by Billy*

*Harbert, Jr. to transfer the case to Alabama, where he can manipulate and threaten Plaintiff*

*to abandon her pursuit of her legal rights through moving this case forward or risk her life]*

8. Denied. *[Evidence to the contrary has been offered in the complaint . Argument: For Mr.*

*Lembke's invalid denial, plaintiff presents the same reason as stated in Paragraphs 2 and 4]*

9. Denied. *[Evidence to the contrary has been offered in the complaint . Argument: For Mr.*

*Lembke's invalid denial, plaintiff presents the same reason as stated in Pages 3-5.]*

10.Denied. *[Evidence to the contrary has been offered in the complaint . Argument: For Mr.*

*Lembke's invalid denial, plaintiff presents the same reason as stated in Pages 1-4.]*

11. Denied.:

*[ ANOTHER PRIME EXAMPLE OF OPPOSING COUNSEL'S ENDEAVORS TO*

*CORRUPT AND CONFUSE THESE PROCEEDINGS TO PREVENT THE COURT*

*FROM ADDREESSING THE ISSUES, THAT COMPELLED PLAINTIFF TO COME*

*SEEKING TO BE MADE WHOLE AGAIN IN THIS HALL OF JUSTICE.*

*OPPOSING COUNSEL CATAGORICALLY DENIED MR.HARBERT'S OWN STATED*

*REASON FOR FIRING MR.WILLIAM SHARP. IT IS UNITELLIGENT TO RANDOMLY*

*STATE "DENIED" WHEN THIS COUNSEL'S (ALLEDGED) CLIENT , MR. HARBERT*

*HAS STATED THE CONTRARY. Attached above in Exhibit "C" is copy of a letter*

*confirming Mr. Harbert acknowledged signature on among other issues the following*

*language to William sharp:*

*"I am writing to bring to your attention to the fact that when I accepted your help to manage*

*the qui tam and declaratory relief cases I had forgotten that I gas a confirmed agreement*

*with Dr, Elemary under liability to me to manage these cases to their conclusion...I*

*therefore have no choice but to honor my agreements with Dr. Elemary (which preceded any*

*understanding between us concerning these two matters) to limit my liability"*

*OPPOSING COUNSEL DENIED PARAGRAPHS, 11,12,13, 14 ,15,16 AND*

*19,20,21,22 AND 42-47,58-104 OF THE COMPLAINT TO FALSELY CONVINCE THE*

*COURT,  DESPITE THEIR KNOWLEDGE-CONFIEMED IN WRITING, OF THE*

*EXISTANCE OF DIAMETRICALLY CONTRIDICTING EVEDECE, WHICH PROVES*

*PLAINTIFF'S CORE  LOSSES BASED ON DEFENDANTS' PRIMARY CAUSES OF*

*ACTION, SOME WERE DISMISSED DUE TO OPPOSING COUNSEL'S FALSE AND*

*FRAUDULENT REPRESENTATION TO THE COURT, INCLUDING: BREACH OF*

*CONTRACT, FRAUD, VIOLATION OF 18 U.S.C. $ 1964 (CIVIL RICO ) AGAINST*

*BILLY HARBERT, Jr. AND VIOLATION OF 18 U.S.C. $ 1964 (CIVIL RICO ) AGAINST*

*BILL l. HARBERT  Evidence to the contrary has been  offered in the complaint . Argument:*

*For Mr. Lembke's  invalid denial, plaintiff presents the same reason as stated in Paragraph*

*2]*

12. Mr. Herbert denies the averments contained in the first, second, third, and fourth

sentences of this paragraph. Mr. Harbert is without knowledge or information sufficient to form

a belief as to the truth of the averments contained in the last two sentences of this paragraph, so

they are denied. *[Proof negating opposing counsel's uninformed response is presented herewith. Mr. Harbert does not "lacks the knowledge or information" However For Mr. Lembke's invalid denial, plaintiff presents the above referenced Exhibit and Pages 1-8.]*

13. Denied. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Pages 4-6.]*

*14. Denied. [Evidence to the contrary is offered herewith. For Mr. Lembke's invalid denial, plaintiff presents the same reason as stated in Page 4.]*

15. Mr. Harbert is without knowledge or information sufficient to form a belief as to

the truth of the averments contained in the first, second, and third sentences of this paragraph

.Mr. Harbert denies the averments contained in the last two sentences of this paragraph.

*[Evidence to the contrary is offered herewith: Based on eye witness testimony, Proof negating opposing counsel's uninformed response is presented herewith to the effect that Mr. Lembke has recently been ordered by Billy Harbert, Jr. to transfer the case to Alabama, where he can manipulate and threaten Plaintiff to abandon her pursuit of her legal rights through moving this case forward or risk her life]*

16.*[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Pages 4 and 11]*

17. Mr. Harbert lacks knowledge or information as to the identity of "Harbert

Defendants." Accordingly, the averments in this paragraph are denied as framed. *[Proof negating opposing counsel's uninformed response is presented herewith Mr. Harbert does not "lacks the knowledge or information" However For Mr. Lembke's invalid denial, plaintiff presents the same reason as stated in Pages 4 and 11]*

18. Denied. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial,*

*compels plaintiff to reintroduce the proof presented in Pages8- 11]*

19. Mr. Harbert lacks knowledge or information sufficient to form a belief as to the

truth of the averments contained in the first sentence of this paragraph, so they are denied.

Mr.Harbert denies the second and third sentences. Mr. Harbert lacks knowledge or information

sufficient to form a belief as to the averments contained in fourth sentence, so they are denied.*[*

*Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels*

*plaintiff to reintroduce the proof presented in Parges 10 and 11]*

 As to the fifth sentences, Mr. Harbert admits that Plaintiff characterizes the defendants in the

stated manner As to the sixth sentence, Mr. Harbert incorporates his response to Paragraph V

of Incorporated Schedule.

20. Denied. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial,*

*compels plaintiff to reintroduce the proof presented in Page 11]*

 21. Denied. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial,*

*compels plaintiff to reintroduce the proof presented in Pages 7-9]*

22. Denied. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial,*

*compels plaintiff to reintroduce the proof presented :· Pages 3-10.]*

23. Denied. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial,*

*compels plaintiff to reintroduce the proof presented in Pages 3 and 11]*

24. Denied. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial,*

*compels plaintiff to reintroduce the proof presented in Pages 7,9,i2.]*

 25. Mr. Harbert admits that he rejected pursuing a $15 million settlement. Mr.

Harbert denies the remaining allegations in this paragraph.

Mr. Matthew H Lembke, the ghostwriter for Mr. Roger S. Goldman stated on paragraph 25 of

the Answer to the complaint "Mr. Harbert admits that he rejected pursuing a $15 million

settlement. Mr.Harbert denies the remaining allegations in this paragraph."

### *Mr. Harbert   Approved the $15 million settlement*

*In 2008- Opposing counsel are working under instruction of Billy Harbert, Jr. Today, their*

*conduct is  understandably influenced by him. Mr. Harbert does not know of the*

*proceedings of this case whatsoever and has not talked with opposing counsel for several*

*months. In 2001- The suspension of the Harbert corporate entities and the indictment of  the*

*Harberts  themselves in the False Claims Case compelled Bill L. Harbert to request Plaintiff*

*in April, 2001 to put together a battery of attorneys and secure congressional backing. Chief*

*among these attorneys, who reported directly to Plaintiff, was the Senate Former Majority*

*Leader Bob Dole, Fried Frank's Richard F. Rule, counsel to Bill Gates in the breakup of*

*Microsoft trial, Michael Bromwich, former Department of Justice Inspector General, Barry*

*Coburn - Clearly Washington's finest. Plaintiff dismissed all of Billy Harbert, Jr.'s counsel,*

*some of  whom did not go willingly including Bryan Lavine and June ann Sauntry, causing*

*Mr. Harbert to issue letters to them exhibited hereinbelow. Enmity between Plaintiff's 12*

*lawyers and Billy Harbert, Jr.'s counsel grew culminating in today's circumstances.*

*Opposing Counsel obstructed on a daily basis an ongoing negotiations between Plaintiff,*

*Senator Dole and the Department of Justice. A copy of a letter from CAROLYN G. MARK,*

*Senior Trial Counsel confirming a $15 Million proposed settlement is attached herein*

*above. In the concurrently filed transcript of Plaintiff's conversation with Mr. Harbert on*

*May 16, 2007,with this Court  and several other conversations legally recorded, in which*

*Mr. Harbert accepted to pay this Settlement offer of $15 Million  prior to and after the*

*Department of Justice confirmed it in writing. Billy Harbert, Jr. refused to make the*

*payment and assured plaintiff he would do better negotiating and possibly prevail with*

*Bryan Lavine's representation "with 0 payment", which he said " I would like to pay you*

*(Plaintiff) 0 for your work" . Instead a  $90 Million Judgment sits today over Billy Harbert,*

*Jr. conscience. Plaintiff has conducted herself professionally and often acted beyond the call*

*of duty. For example  In 2005 Plaintiff predicted to the Harberts they would receive a*

*judgment of just under $100 Million if they failed to pay $15 million in settlement.*

*Plaintiff's warned to Bill L. Harbert  on the $ 100 Million.*

*ACCORDINGLY, PLAINTIFF ACCOMPLISHED HER MISSION WITHOUT A*

*SINGLE ERROR AND WAS BILL I. HARBERT'S LOYLIST CONFIDENT  TO THE*

*EXTENT HE ASSURED HER IN WRITING HE WOULD PROTECT  FROM HIS SON'S*

*RAGE AND DEATH CONTRACTS ON HIS OPPONENTS UNTIL HE WAS*

*BLACKMAILED FOR A $7 MILLION  PAYMENT AND COERCED TO TERMINATE*

*PLAINTIFF BY HIS SON AND ASSOCIATES. DR. ELEMARY'S WORK IS*

*IMPECABLE AND APPRECIATED WORLDWIDE, SEE DEFENDNT EXHIBIT OF*

*SEPTEMBER1, 2004 SIGNED BY MR.. HARBERT  AND MR. SHARP HIGHLY*

*APPRAISING PLAINTIFF'S JOB PERFORM- ANCE*

26. The introductory sentence of this paragraph is denied. **[Evidence to the contrary is offered herewith. For Mr. Lembke's  invalid denial, plaintiff presents the same reason as stated in Pages 18-20]**

a. Mr. Harbert is without knowledge or information sufficient to form a belief as to

the truth of the last sentence in this paragraph, so it is denied. The remaining

averments contained in this paragraph are denied, except that Mr. Harbert admits

that the November 11, 2004, letter contains the quoted language, which was

21

written by Plaintiff. [*That is not true. Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 25, 2, 4 and 11]*

b. Denied. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 25,2, 4 and 11]*

c. Denied *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 25,2, 4 and 11]*

27. Denied *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 25,2, 4 and 11]*

28. Mr. Harbert lacks knowledge or information sufficient to form a belief as to the truth of the averments contained in the first two sentences of this paragraph, so they are denied. Mr. Harbert denies the remaining allegations of this paragraph. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 25,2, 4 and 11]*

29. Mr. Harbert denies the first sentence of this paragraph. Mr. Harbert denies the second sentence of the paragraph as framed. Mr. Harbert admits that he executed the letter referred to in the third sentence, but denies the remainder of the sentence as framed. Mr. Harbert denies the fourth through the sixth sentences to the extent that they allege that the quoted words were drafted by or otherwise attributable to Mr. Harbert. Mr. Harbert admits the seventh sentence of the paragraph. Mr. Harbert is without knowledge or information sufficient to form a belief as to the truth of the final sentence of the paragraph, so it is denied *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

22

30. Denied *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

31. Mr. Harbert denies the first three sentences of this paragraph. Mr. Harbert is without knowledge or information sufficient to form a belief as to the truth of the averments contained in the fourth and fifth sentences of the paragraph, so they are denied. Mr. Harbert denies that the materials attached as Exhibit E stand for the proposition plaintiff attributes to them. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

32. Mr. Harbert denies that the forum designated in the November 3 Trust is applicable to this action. Mr. Harbert denies the averments contained in the second sentence of the paragraph to the extent they are directed to him, and he is without knowledge or information sufficient to form a belief as to the truth of the averments contained in the second sentence that are not directed to him. Mr. Harbert admits that the California federal court's Minute Order dated February 23, 2007, contains the quoted language (except that the word "that" has been omitted from the quote) contained in the third sentence of this paragraph. Mr. Harbert denies the allegations contained in the fourth sentence. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

33. Mr. Harbert admits that he is a party to this lawsuit, although he denies that plaintiff is entitled to any relief from him. Mr. Harbert incorporates herein his responses to Paragraph V of the Incorporated Schedule. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

FIRST CAUSE OF ACTION

34.-41. This cause of action has been dismissed by the Court, so Mr. Harbert makes no response to the allegations contained in it. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

SECOND CAUSE OF ACTION

42. Mr. Harbert realleges and incorporates as if set out in full herein his responses to paragraphs 1 through 33 of plaintiff's complaint. [*Plaintiff affirms and incorporates as if set out in full herein the evidence <u>correcting</u> the opposing Counsel's unethical and intentionally misleading response and fabricated facts to paragraphs 1 through 33 of plaintiff's complaint.*]

43. Mr. Harbert admits that the September 21 agreement contains the phrase "extremely satisfactory and promising." Mr. Harbert further admits that the September 21 agreement states that Mr. Sharp had sole authority to communicate with Mrs. Moulton, Mrs. Cornay, Mr. Harbert, Jr., and Mr. Hall; that those individuals would communicate regarding the cases exclusively with Mr. Sharp; that communications regarding the cases would be made to Mr. Harbert by Mr. Sharp or Plaintiff. Mr. Harbert lacks knowledge or information as to the truth of the last sentence in the paragraph, so it is denied. The remaining allegations of this paragraph are denied as framed. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

44. Denied *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

45. Denied *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

46. Denied. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

47. Denied. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].* :

THIRD CAUSE OF ACTION

48. Mr. Harbert alleges and incorporates as if set out in full herein his responses to paragraphs 1 through 33 of plaintiff's complaint. *[Plaintiff affirms and incorporates as if set out in full herein, the evidence correcting the opposing Counsel's unethical and intentionally misleading the court (in knowingly responding) with fabricated facts to paragraphs 1 through 33 of plaintiff's complaint]*

49. Denied. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

50. Denie *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

FOURTH CAUSE OF ACTION

51.-57. The Court has dismissed this cause of action, so Mr. Harbert makes no response to it.. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25].*

FIFTH CAUSE OF ACTION

58.-65. The Court has dismissed this cause of action, so Mr. Harbert makes no response to it. *[Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels*

*plaintiff to reintroduce the proof presented in Paragraphs 2, 4, 11 and 25]. .*

SIXTH CAUSE OF ACTION

66.-85. The Court has dismissed this cause of action, so Mr. Harbert makes no response

to it.. *Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels*

*plaintiff to .*    See Paragraph 102 herein below.

SEVENTH CAUSE OF ACTION

86. Mr. Harbert realleges and incorporates as if set out in full herein his responses to

paragraph 1 through 33 of plaintiff's complaint. *[See **Paragraph 102 herein below.***

***Plaintiff affirms and incorporates as if set out in full herein, the evidence <u>correcting</u> the***

***opposing Counsel's unethical and intentionally misleading the court (in knowingly***

***responding) with fabricated facts to paragraphs 1 through 33 of plaintiff's complaint]***

87. Admitted.

88. Denied.   *{ <u>See Paragraph 102 herein below</u>. For Paragraphs 88 through 104 Evidence to*

*the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to*

*reintroduce the proof presented in pages 3 and 20, Paragraphs 2, 4, 11 and 25}.*

89. Denied. [ for Paragraph 89 through 101*<u>See Paragraph 102 herein below}</u>.*

90. Denied.

91. Denied.

92. Mr. Harbert lacks knowledge or information sufficient to form a belief as to the

truth of the averments contained in this paragraph, so they are denied.

93. Mr. Harbert denies the averment referring to a fraudulent character of the

transaction. Mr. Harbert lacks knowledge or information sufficient to form a belief as to the

remaining averments in this paragraph.

94. Denied.

95. Denied.

96. Denied.

97. Mr. Harbert is without knowledge or information sufficient to form a belief as to the truth of this averment, so it is denied.

98. Denied.

99. Denied.

100. Denied

.101. Denied

102. Denied. *[Attached hereto as <u>Exhibit "H"</u> and incorporated herein by this reference are true and correct copies of written documents and letters contradicting opposing counsel's denials of Paragraphs 66 through 102 ( the sixth and seven counts on 18 U.S.C. $ i964 ( CIVIL RICO) while confirming attacks on Plaintiff and Congressman Earl Hilliard, the first black congressman from Alabama since reconstruction, who appointed a black Judge for every white judge former Governor George Wallace appointed. Documents attached: 1). A December 13, 2004 letter from Carolyn G Mark, Department of Justice, which required counsel to hand over records according to United States laws. That upset Billy Harbert, Jr. to the extent he harassed and made an attempt on Congressman Hilliard's life 2). Congressman Hilliard's March 8, 2005 letter, 3). Plaintiff's reports to the Police and 4). a*

*transcribed telephone conversation legally recorded between Plaintiff and Congressman Hilliard on Billy Harbert's responsibility concerning the "near fatal accident" of Congressman Hilliard and the subsequent disappearance of the Police Record from Birmingham, Alabama.*

104. Denied.

REQUEST FOR RELIEF

Mr. Harbert denies that plaintiff is entitled to any of the relief that she requests from him in her complaint.

INCORPORATED SCHEDULE

*{For Paragraphs "incorporated Schedule" through "TWENTIETH AFFIRMATIVE DEFENSE" Ending on page 22 Evidence to the contrary is offered herein. Opposing counsel's invalid denial, compels plaintiff to reintroduce the proof presented in pages 3 and 20, Paragraphs 2, 4, 11, 25 }.*

I. a. Denied

b. Mr. Harbert lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this subsection, so it is denied.

c. Denied.

d. Denied.

The remaining sentences in this section are denied.

II. Mr. Harbert lacks knowledge or information sufficient to form a belief as to the truth of the averments concerning a Swiss Bankers Memorandum of Meetings so those allegations are denied. Mr. Harbert also lacks knowledge or information sufficient to form a

belief as to the averments concerning Plaintiff's knowledge while pursuing the Saudi claim, although Mr. Harbert denies that the Harbert Contractors were involved in bid-rigging. The remaining allegations of this paragraph are denied.

III. Mr. Harbert denies the allegations contained in the first paragraph of this section.

Mr. Harbert denies the allegations contained in the second paragraph of this

section. As to the third paragraph of this section, Mr. Harbert denies the first, second, and

third sentences. Mr. Harbert lacks knowledge or information sufficient to form a belief as to the

allegations in the fourth sentence concerning a September 27 letter, and Mr. Harbert denies the

remaining averments in the fourth sentence. Mr. Harbert admits that he sent the October 5

letter. Mr. Harbert admits that he sent the October 21 letter. Any remaining averments in this

paragraph are denied.

As to the fourth paragraph of this section, Mr. Harbert admits that he sent the

November 11 letter; that it was acknowledged by Ms. Hoover on that date; that the letter

confirmed the October 21 letter; and that the letter contained the quoted language. Mr. Harbert

denies that the letter was addressed to seven of his lawyers.

As to the fifth paragraph, Mr. Harbert admits that the referenced letters contained

the quoted language and that the letters indicate that they were notarized as referenced. The

remaining averments of this paragraph are denied.

As to the sixth paragraph, Mr. Harbert denies that he sent Plaintiff the referenced

letter on November 11, 2004. He further denies that each of the four pages of the September 21

Agreement bear the words, "Confirmed on 11/11/04 Bill Harbert." He lacks knowledge or

information sufficient to form a belief as to the truth of the averments concerning letters sent to

Keith Morgan, William D. Dillon, and Carolyn G. Mark. He further denies that he sent the

referenced letter to Plaintiff and four other parties with the quoted language. To the extent that

there are any remaining allegations in this paragraph, they are denied.

As for the seventh paragraph of this section, Mr. Harbert denies that he was acting

under pressure by Billy Harbert, Jr. in writing to plaintiff. The remaining averments contained

in this paragraph are admitted. Mr. Harbert denies the allegations contained in the eighth

paragraph of this section.

IV. Mr. Harbert denies the allegations in the first paragraph of this section.

Mr. Harbert lacks knowledge or information sufficient to form a belief as to the

truth of the averments in the second paragraph of this section referencing Plaintiff's knowledge

in 1991-1998. The remaining averments in this paragraph are denied.

V. Mr. Harbert admits the allegation related to the citizenship of plaintiff.

Mr. Harbert makes no response as to the allegations concerning the defendants

who have been dismissed. Mr. Harbert admits that he is a citizen of the State of Alabama.

VI. Mr. Harbert lacks knowledge or information sufficient to form a belief as to the

allegation concerning the contents of HILLC's website and as to the allegation concerning a

memorandum written by Mr. Sharp. The remaining averments in this section are denied.

Any averment contained in the Complaint not expressly admitted above is denied.

AFFIRMATIVE DEFENSES

*{For Paragraphs "incorporated Schedule" through "TWENTIETH AFFIRMATIVE*

*DEFENSE" Ending on page 22 Evidence to the contrary is offered herein. Opposing*

*counsel's invalid denial, compels plaintiff to reintroduce the proof presented in pages 3 and*

*20 Paragraphs 2, 4, 11, 25 and pages 3}.*

FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted against Mr.

Harbert.

SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims against Mr. Harbert are invalid in that Mr. Harbert fully complied with

his contractual obligations, and is otherwise discharged from any such obligations.

AFFIRMATIVE DEFENSE

Plaintiff's claims against Mr. Harbert are barred by Plaintiff's own breaches of contract,

breaches of fiduciary duties, and negligence.

FOURTH AFFIRMATIVE DEFENSE

Plaintiff has not suffered any legally cognizable injury.

FIFTH AFFIRMATIVE DEFENSE

Each of Plaintiff's claims against Mr. Harbert is barred by the applicable statute of

limitations and is otherwise untimely.

SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Mr. Harbert are barred by the applicable statute of repose.

SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Mr. Harbert are barred by laches.

EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Mr. Harbert are barred by the doctrines of release, accord and

satisfaction, payment, failure of consideration, and failure to satisfy conditions precedent.

NINTH AFFIRMATIVE DEFENSE

Each of Plaintiff's claims against Mr. Harbert is barred by the doctrines of estoppel and

waiver.

TENTH AFFIRMATIVE DEFENSE

Mr. Harbert pleads the general issue and denies that he is liable or responsible for any alleged damages to Plaintiffs.

ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Mr. Harbert are barred by the doctrines of preclusion, res judicata, and collateral estoppel. Mr. Harbert also pleads merger and bar.

TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Mr. Harbert are barred, in whole or in part, by Plaintiff's failure to mitigate her alleged damages.

THIRTEENTH AFFIRMATIVE DEFENSE

To the extent this action purports to hold one defendant liable for the acts of another, such attempt violates the Due Process clause of the United States Constitution.

FOURTEENTH AFFIRMATIVE DEFENSE

Any injuries to Plaintiff alleged in the Complaint were caused directly and proximately, in whole or in part, by Plaintiff's own negligence or fault in and about the matters alleged in the Complaint.

FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Mr. Harbert were caused in whole or in part by the intervening and supervening acts of others.

SIXTEENTH AFFIRMATIVE DEFENSE

Mr. Harbert denies that he owes any monies to Plaintiff and demands strict proof thereof.

SEVENTEENTH AFFIRMATIVE DEFENSE

Venue is improper.

EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims in Count VII of her Complaint is barred because she lacks capacity and standing to bring that claim.

NINETEENTH AFFIRMATIVE DEFENSE

Mr. Harbert incorporates his counterclaim as his nineteenth affirmative defense. [*Mr. Harbert stated he has no basis to bring a counter claim against Dr. Hoda Elemary, and in fact he did not, the opposing counsel brought the counterclaim with out Mr. Harbert's knowledge. Mr. Harbert requested Plaintiff to ignore Messrs. Goldman and Lembke as they do not represent him. Evidence disproving Opposing Counsel's deliberately falsified answers is presented hereinabove*]

TWENTIETH AFFIRMATIVE DEFENSE

Mr. Harbert hereby gives notice that he intends to rely upon such other defenses as may become available or appear during discovery proceeding in this case or any related case. Mr. Harbert hereby reserves the right to amend his Answer to assert any such defense.

Inasmuch as the Complaint does not describe the alleged underlying claims with sufficient particularity to enable Mr. Harbert to determine all of his legal and equitable rights, Mr. Harbert reserves the right to amend and supplement the averments of his Answer to assert any and all pertinent liability defenses ascertained through further investigation and discovery of this action. Mr. Harbert will rely on all defenses that may become available during discovery or trial.

[*Mr. Harbert gives no such notice that would prevent him from participating in discovery or trial. Mr. Harbert, who today is capable, lucid, reasonable and speaks logically and intelligently, would be willing to personally testify with plaintiff for himself if the court*

*orders his testimony, the court order is necessary due to the restrictions imposed on him concerning leaving Alabama--Mr. Harbert, is monitored by a team of men hired to watch him twenty four hours a day. Mr. Harbert stated he feels he is imprisoned by his son. Alabama has no laws for the "abuse of an elder person". Mr. Harbert has been blackmailed and coerced repeatedly into signing over tens of Millions of dollars to Billy Harbert, Jr., who oversee a ring of criminals including the majority of his counsel. Mr. Harbert complained in some length to plaintiff that these attorneys cheated him of substantial funds last year. That not withstanding, Billy Harbert, Jr. was recently aided and abetted by this Court, which ironically dismissed Billy Harbert, Jr. from facing up to his criminal conduct in a court of law. The court overlooked that Billy Harbert, Jr.'s own primary and personal counsel Messrs. Goldman and Lembke fully acknowledged and admitted in the (above paragraph) of The Document Entitled]\* "ANSWERS AND COUNTERCLAIMS OF BILL L. HARBERT,* SR" in the "THIRTEENTH AFFIRMATIVE DEFENSE: To the extent this action purports to hold one defendant liable for the acts of another, such attempt violates the Due Process clause of the United States Constitution." and in the " FIFTEENTH AFFIRMATIVE DEFENSE: Plaintiff's claims against Mr. Harbert were caused in whole or in part by the intervening and supervening acts of others (including Billy Harbert, Jr.).", who was erroneously dismissed by the court and could now be exclusively blamed for the damages the Harberts caused Plaintiff.

## IX.  COUNTERCLAIMS OF BILL L. HARBERT

## IV. SUMMARY:  RESPONSE TO COUNTERCLAIMS IS LISTED ON PAGE 7.

*[Opposing counsel's illusionary counterclaims, of which defendant does not approve and has not authorized to be filed against plaintiff, are non the less corrected herein. Plaintiff is*

34

*compelled to reintroduce evidence cited on pages 3 and 20 as well as paragraphs 1,2,4,11,*
*and 25 from her analysis of the answer to the complaint to respond to said fabricated*
*counterclaims and prove that these counterclaims have no basis in fact or in law]*

Pursuant to Federal Rule of Civil Procedure 13(a), Defendant and Counter-Plaintiff Bill

L. Harbert, Sr. asserts the following counterclaims against Plaintiff and Counter-Defendant

Hoda Elemary, and in support thereof alleges as follows:

**Parties**

1. Counter-Plaintiff Bill L. Harbert, Sr. ("Mr. Harbert") is an adult resident citizen of

Jefferson County, Alabama, and may be served with an Answer to the Counterclaim upon the

undersigned attorney.

2. On information and belief, Plaintiff and Counter-Defendant Hoda Elemary

("Elemary") is an adult resident citizen of Orange County, California.

3. This Court has jurisdiction over the parties and subject matter of this

Counterclaim.

**Facts:** *{Opposing counsel provided fraudulent misquotation and slander of plaintiff and the*
*language and intent of the various agreements. Their purpose is slanted to withhold making*
*payments based on Mr. Harbert admitted liability to Plaintiff on the crux of her complaint.*
*Plaintiff is compelled to reintroduce evidence cited on pages 3, 20 and 21 as well as*
*paragraphs 1,2,4,11, and 25 from her analysis of the answer to the complaint to respond to*
*said fabricated counterclaims and prove that these counterclaims have no basis in fact or in*
*law]*

*Opposing counsel will do whatever it takes to insure this court dismisses Plaintiff's*
*complaint to avoid coming to Court to argue against one of the most documented business*

35

*and personal transactions confirmed by legal recordings and professionally taped videos. This is a very simple case that if the law is equitably applied to the various agreements and trusts including the November 3, 2008 Trust it would be relatively easy to bring to determined the amounts owed. Attached hereto as Exhibit "D" and incorporated herein by this reference are true and correct copies of the November 3, 2003 Trust and several letters reflecting Mr. Harbert's instructions to keep his son out of his business. These letters also caution his son of transference and penalties on inheritance should his son continue to harass his father or Plaintiff, which understandably left opposing counsel with little else than to mislead the Court with imaginary counterclaims that are ludicrous such as COUNT V – UNJUST ENRICHMENT to falsely portraying Mr. Harbert to be of a character as to be willful, wanton, grossly negligent, or intentional. Illustrating their limited creativity, opposing counsel thought to deflect Mr. Harbert's heavily documented liability by baseless charges of the same counts contained in plaintiff's complaint such as COUNT II- BREACH OF CONTRACT, COUNT III – BREACH OF CONFIDENTIAL RELATIONSHIP, COUNT IV – BREACH OF FIDUCIARY DUTY. Regrettably, they lack the evidence and documentation to prove their flimsy allegations of their malicious prosecution of Plaintiff for asking for her withheld pay.}*

4. Elemary's complaint in this lawsuit was based on seven claims against a total of

seven defendants. Four of those defendants have been dismissed from this case pursuant to this

Court's granting of their motions to dismiss (Docs. 28, 30-31), while two others were

dismissed because Elemary never served them with the summons and complaint. (Docs. 27,

29). *[The opposing counsel and Billy Harbert , Jr. have caused the dismissal through unethical conduct including interference with the U.S. mail services]*

5. Mr. Harbert is thus the only remaining defendant. Three of Elemary's five claims

against him still remain pending. (See Doc. 30). Those claims are for breach of contract (Count

II), quantum meruit (Count III), and Violation of 18 U.S.C. § 1964 (Civil RICO). (See id., p.

2). [*The opposing counsel and Billy Harbert , Jr. have caused the dismissal through*

*unethical conduct including interference with the delivery of court orders. Therefore*

*Plaintiff was unaware of the filed motions]*

6. Elemary bases her claims in Counts II and III on her purported termination as a

"Case Manager" for Mr. Harbert in a lawsuit that took place in Washington, D.C. (the "D.C.

Litigation"). Her Civil RICO claim in Count VII is based on an alleged "phantom equipment

lending transaction" between Mr. Harbert and former co-defendant Sabbia Aktiengesellschaft

that purportedly occurred between September 1989 and December 1992.[*The opposing*

*counsel and Billy Harbert , Jr. forged letters to to cause Plaintiff's termination and coerced*

*Mr. Harbert to fire her.*

7. Elemary was retained by Mr. Harbert to serve as an independent contractor to

assist with the management of the D.C. Litigation. They purported to enter into a written,

notarized contract on September 21, 2004 (the "September 21 Agreement"). *See* Exhibit A

hereto; *see also* Complaint, Ex. G (Doc. 1-9).[ *this is false]*

8. That agreement stated that Elemary "consented to be directed by Mr. Harbert"

with respect to her role as case manager. Ex. A, ¶ 5. It further contemplated that Mr. Harbert

might decide to settle that litigation after "consent[ing] to pay the Government an amount, if

any, with which he is comfortable." *Id.*, ¶ 6.[*this is false, It is selective interpretation not*

*taking other paragraphs into account or background/ other agreements ]*

9. While serving in her capacity as independent contractor, Elemary took actions on

numerous occasions that were clearly beyond her authority, or even directly contrary to her

instructions. For example, {based on Mr. Harbert.s written instructions} she made an offer to

settle the lawsuit for $15 million despite the fact that she had been expressly instructed*{ by*

***Billy Harbert, who was not to instruct or intervene with plaintiff's personal or business***

***arrangements with Defendant . Evidence is offered to that effect. More importantly, Billy***

***Harbert did not turn down the offer until the Department of Justice's Senior Trial Counsel,***

***Carolyh G. Mark and AUSA Keith Morgan issued the above referenced letter of march 18,***

***2005 confirming they would accept $15 Million (far better than if the Harberts would pay***

***$90 Million or settle on the basis of the Judgment} that Mr. Harbert would not settle for that***

***amount. {this is a false and fabricated fact by opposing counsel, Plaintiff has the legal***

***recording to prove it}***

1 The September 21 Agreement purportedly updated and superseded a similar previous

agreement between Elemary and Mr. Harbert. That agreement was executed by the parties on

September 2, 2004. ***{this is a falsified fact}***

10. Furthermore, during the course of her service as independent contractor, Elemary

repeatedly disclosed to third parties, without permission, confidential or privileged information

or documents. ***{only as instructed and approved by B'l L. Harbert}***

11. These actions of Elemary as described above constituted breaches of the

September 21 Agreement and were in contradiction to the purposes of Elemary's role in

assisting with the D.C. Litigation. Such actions, among other things, were the reasons for

Elemary's termination. {false defense with no basis in fact or in law}

12. Elemary was terminated on April 4, 2005. Since that time, she has continued to

ignore her duty to maintain the confidentiality of certain information obtained in her role with

Mr. Harbert. She also continues to ignore basic principles of the attorney-client privilege. *{this is a falsified fact, there are volumes of legal analysis and documents on this subject}.*

13. Since Elemary's termination, Mr. Harbert has learned that certain representations that she made to him in the September 21 Agreement regarding one of his attorneys, William Sharp, were untrue. Specifically, Elemary represented to Mr. Harbert, and wrote into the September 21 Agreement, that William Sharp has reviewed the arrangement between Mr. Harbert and Dr.Elemary regarding said Le Conte property, and finds that arrangement in order. Ex. A, ¶ 8. In fact, Elemary had failed to disclose the Laguna Niguel Beach House 2003 Revocable Trust to Mr. Sharp, and Mr. Harbert did not learn this until after March 1, 2005. *{a separate signed agreement by Mr. Sharp will suffice to prove that Mr. Sharp reviewed each and every document on this subject including the trust}. Opposing counsel are doing what they do best fabricate a falsified factual bases to use it as a spring board to leap into misleading the Court with " harassing litigation"*

**Harassing Litigation**

*14. Elemary has brought these claims against Mr. Harbert on several occasions previously. Elemary has made nearly identical claims against Mr. Harbert, and many of his former co-defendants in this action, on at least two other actions. These lawsuits are part of Elemary's continuing effort to harass Mr. Harbert and others with nonstop frivolous litigation.*

*15. In July 2006, Elemary filed in the Central District of California a nearly identical complaint, raising nearly identical claims, against Mr. Harbert, and twenty-one other defendants– including former co-defendants Billy Harbert, Jr.; B.L. Harbert International, LLC; Wachovia Bank, N.A.; Sabbia Aktiengessellchaft; and Harbert International Establishment, Inc., and no fewer than nine attorneys and law firms. Elemary v. Harbert, No.*

CV06-4723 RGK (PJWx) (C.D. Cal. filed July 28, 2006). Because the majority of events on which Elemary based her claims took place in Alabama, Mr. Harbert and several other defendants in that suit moved to transfer the case to the United States District Court for the Northern District of Alabama. The court granted the motion on February 28, 2007. Compl. ¶ 5.2 Refusing to accept the Central District of California's determination that her claims properly belong in Alabama, Plaintiff quickly dismissed the complaint after her initial suit was transferred. Id.3 16. Even before her first case was transferred, Plaintiff had filed a second lawsuit in the same California federal court, seeking liquidated damages purportedly triggered by the filing of the motion to transfer and personal jurisdiction challenges by Billy Harbert, Jr. and other defendants.4 On July 27, 2007, one month after defendants had filed motions to dismiss, a supporting declaration, and a request for judicial notice, Elemary filed a notice of voluntary

dismissal without prejudice. The court denied this motion as moot on August 8, 2007. The court dismissed this lawsuit, on the same grounds as the first lawsuit, in an order entered August 10, 2007. 2 See Civil Minutes, Elemary v. Harbert, No. CV06-4723 RGK (PJWx) (C.D. Cal. Feb. 28, 2007) (attached as Exhibit 2 to Certain Defendants' Request for Judicial Notice ("Doc. 12")).3 Notice of Voluntary Dismissal, Elemary v. Harbert, Civil Action No. 07-AR-0457-5 (filed March 20, 2007) (attached as Exhibit 11 to Doc. 12).

4 See Complaint, Elemary v. Harbert, No. SA CV07-0217 RGK (PJWx) (C.D. Cal. filed Feb. 20, 2007) (attached as Exhibit 3 to Doc. 12).[self serving alteration of the truth. Fabricatd and false allegation]

17. After dismissing the action transferred to Alabama, Elemary filed this action – her third lawsuit – on April 10, 2007, against Mr. Harbert, Billy Harbert Jr., and several Harbert

related entities she had previously joined as defendants in the now-dismissed suit. The seven count Complaint in this case contains nearly identical claims and allegations as Plaintiff's original (and now-dismissed) complaint.5 {[this is a deliberate exaggeration of the facts concerning three actions (a business and two personal law suits) ]

18. Elemary filed a fourth lawsuit on April 27, 2007 in the Superior Court of the State

of California for the County of Los Angeles.6 Instead of naming the same defendants whom she named in her prior complaints, however, Elemary this time brought suit against only three named defendants – Mr. Harbert, his son Billy Harbert, Jr., and Jerry L. Steering – and twenty-five other "Doe" defendants. On June 5, 2007, Mr. Harbert and Billy Harbert, Jr. removed the case to the Central District of California, which later granted the Harberts' separate motions to dismiss on venue grounds and dismissed the case on August 22, 2007. [this is a deliberate exaggeration of the facts concerning three actions (a business and two personal law suits)] **{Opposing counsel provided fraudulent misquotation and slander of plaintiff and the language and intent of the various agreements. Their purpose is slanted to withhold making payments based on Mr. Harbert admitted liability to Plaintiff on the crux of her complaint. _Plaintiff is compelled to reintroduce evidence cited on pages 3, 20 and 21 as well as paragraphs 1,2,4,11, and 25 from her analysis of the answer to the complaint to respond to said fabricated counterclaims and prove that these counterclaims have no basis in fact or in law]_**

19. Elemary's multiple lawsuits related to her alleged claims against the Harberts

have been virtually completely unsuccessful and have imposed substantial costs on Mr. Harbert and his related entities. { the substance of the lawsuits have never been addressed or ruled on due to defendant manipulation of the proceedings }

41

*COUNT I – FRAUDULENT INDUCEMENT {Opposing counsel provided fraudulent misquotation and slander of plaintiff and the language and intent of the various agreements. Their purpose is slanted to withhold  making payments based on Mr. Harbert admitted liability to Plaintiff on the crux of her complaint. <u>Plaintiff is compelled to reintroduce evidence cited on pages 3 and 20 as well as paragraphs 1,2,4,11, and 25 from her analysis of the answer to the complaint to respond to said fabricated counterclaims and prove that these counterclaims have no basis in fact or in law]</u>*

20. Mr. Harbert incorporates and reasserts, as if fully set forth herein, each and every allegation in the preceding paragraphs, and further alleges that:

5 Compare Complaint, Doc. 1, with First Amended Complaint for Damages, Elemary v. Harbert, No. CV06-4732

RGK (PJWx) (C.D. Cal. filed Oct. 30, 2006) (attached as Exhibit 4 to Doc. 12).

6 See Complaint, Elemary v. Steering, No. BC370218 (L.A. Super. Ct. filed Apr. 27, 2007) (attached as Exhibit 5 to

Doc. 12).  {  the substance of the lawsuits have never been addressed or ruled on due to defendant manipulation of the proceedings }

21. While she was drafting and then negotiating the aforementioned September 21

Agreement, Elemary made material representations to Mr. Harbert regarding facts purportedly known by one of Mr. Harbert's attorneys, William Sharp.

22. Specifically, paragraphs 8 of that document contains such a representation. The September 2 Agreement, which was superseded by the September 21 Agreement, contains similar representations. 7 Ex. B, ¶ 8.{these false allegations are standard ambulance   chasing attorneys' language, which is often applied in Lawsuits, Plaintiff rejects and denies each and

42

*every fabricated allegation on pages 27 through 32}*

23. *These representations by Elemary were false, and were known by Elemary to be false.*

24. *These misrepresentations were made willfully to deceive.*

25. *Elemary intended the above-referenced misrepresentations to induce Mr. Harbert to act in reliance thereon by entering into the September 21 Agreement.*

26. *Mr. Harbert did in fact act in reliance on Elemary's misrepresentations by entering into the September 21 Agreement. Had Elemary not made those misrepresentations, Mr. Harbert would not have entered into the September 21 Agreement.*

27. *Such reliance by Mr. Harbert was justified and reasonable based on the knowledge available to him and the circumstances at the time. Mr. Harbert did not learn that these representations were fraudulent until after March 1, 2005.*

28. *As a proximate result of the above-described fraudulent misrepresentations, Mr. Harbert has suffered direct and consequential damages in an amount to be determined at trial.*

29. *Elemary's actions were of a kind and character as to be willful, wanton, grossly negligent, or intentional, and, thus, in bad faith. Accordingly, Mr. Harbert is entitled to both* 7 *The fact that Mr. Harbert does not base any claim on the September 2 Agreement should not be construed to mean that he was aware of the falsity of any representation therein at any time prior to becoming aware of the falsity of representations in the September 21 Agreement.*

*compensatory and punitive damages. Alternatively, or in conjunction, Mr. Harbert is entitled to a complete rescission of all contract documents, notes, and deeds of trust underlying this lawsuit.*

**{Messrs. Goldman and Lembke provided fraudulent misquotation and slander of plaintiff**

*and the language and intent of the various agreements. Their purpose is slanted to withhold making payments based on Mr. Harbert admitted liability to Plaintiff on the crux of her complaint. <u>Plaintiff is compelled to reintroduce evidence cited on pages 3, 20 and 21 as well as paragraphs 1,2,4,11, and 25 from her analysis of the answer to the complaint to respond to said fabricated counterclaims and prove that these counterclaims have no basis in fact or in law}]</u>*

*WHEREFORE, Mr. Harbert demands judgment against Elemary for compensatory damages in an amount in excess of $75,000, exclusive of interest, fees and costs (to which Mr. Harbert is also entitled), as well as mental anguish and punitive damages, and for such further and different relief as the Court deems just and proper. Alternatively, Mr. Harbert demands rescission of all contract documents, notes, and deeds of trust underlying this lawsuit.*

*COUNT II – BREACH OF CONTRACT – SEPTEMBER 21 AGREEMENT*

*{these false allegations are standard ambulance    chasing attorneys' language, which is often applied in Lawsuits, Plaintiff rejects and denies each and every fabricated allegation on pages 22 through 32}*

30. Mr. Harbert incorporates and reasserts, as if fully set forth herein, each and every allegation in the preceding paragraphs, and further alleges that:

31. On or about September 21, 2004, Mr. Harbert and Elemary entered into an agreement, described hereinabove and referred to as the September 21 Agreement, regarding Elemary's role as case manager for the D.C. Litigation. *See* Exhibit A hereto; *see also* Complaint, Ex. G (Doc. 1-9).

This agreement, drafted by Elemary, contains numerous subjective, evaluative statements and is largely narrative in substance. However, the agreement notes that in exchange for Mr.

44

Harbert's promise that Elemary could continue in her role as case manager, she "consented to be directed by Mr. Harbert." Ex. A, ¶ 5. The agreement further contemplates that Mr. Harbert might decide to settle the litigation after "consent[ing] to pay the Government an amount, if any, with which he is comfortable." *Id.*, ¶ 6.

32. Mr. Harbert complied with his obligations the September 21 Agreement by continuing to retain and compensate Elemary for her role as case manager. Mr. Harbert did not cease doing so until it became clear that Elemary had taken actions that not only constituted material breaches of the September 21 Agreement, but that were in violation of her duties as a fiduciary.

33. Elemary materially breached the September 21 Agreement by, *inter alia*, making an offer, purportedly on behalf of Mr. Harbert, to settle the litigation when she knew she had no authority to make such an offer. In addition, Elemary repeatedly disclosed, without permission, confidential or privileged information or documents that were proprietary to Mr. Harbert or related entities to third-parties. Such actions, among other things, were the reasons for Elemary's termination.

34. By reason of Elemary's breach, Mr. Harbert has been damaged in a manner and in an amount to be determined at trial.

WHEREFORE, Mr. Harbert demands judgment for compensatory damages in an amount in excess of $75,000, exclusive of interest, fees and costs (to which Mr. Harbert is also entitled), and for such further and different relief as the Court deems just and proper.

## COUNT III – BREACH OF CONFIDENTIAL RELATIONSHIP

*{Opposing counsel provided fraudulent misquotation and slander of plaintiff and the language and intent of the various agreements. Their purpose is slanted to withhold making payments based on Mr. Harbert admitted liability to Plaintiff on the crux of her complaint.*

*Plaintiff is compelled to reintroduce evidence cited on pages 3, 20 and 21 as well as*

*paragraphs 1,2,4,11, and 25 from her analysis of the answer to the complaint to respond to*

*said fabricated counterclaims and prove these counterclaims have no basis in fact or in law]*

35. Mr. Harbert incorporates and reasserts, as if fully set forth herein, each and every

allegation in the preceding paragraphs, and further alleges that:

36. Elemary's role as case manager, which required her to work with Mr. Harbert and

his attorneys to defend him and related entities in a lawsuit, constituted the type of relationship

understood to carry an obligation of confidentiality.

37. Both during her service as case manager for Mr. Harbert and since her

termination, Elemary has repeatedly disclosed nonpublic information that she learned in her

role as case manager for the D.C. Litigation, or through her previous work as an advisor to Mr.

Harbert and related entities. Many of these disclosures have only occurred in the last few weeks

or were only discovered by Mr. Harbert and his counsel in the last few weeks or months.

38. Mr. Harbert did not consent to the disclosure or otherwise waive his interest in the

confidentiality of any of the confidential information and documents that Elemary has

improperly disclosed.

39. As a proximate result of Elemary's above-described breaches of her confidential

relationship, Mr. Harbert suffered direct and consequential damages in an amount to be

determined at trial.

40. Elemary's actions were of a kind and character as to be willful, wanton, grossly

negligent, or intentional, and, thus, in bad faith. Accordingly, Mr. Harbert is entitled to both

compensatory and punitive damages.

WHEREFORE, Mr. Harbert demands judgment against Elemary for compensatory

damages in an amount in excess of $75,000, exclusive of interest, fees and costs (to which Mr. Harbert is also entitled), as well as mental anguish and punitive damages, and for such further and different relief as the Court deems just and proper.

## COUNT IV – BREACH OF FIDUCIARY DUTY

*{these false allegations are standard ambulance chasing attorneys' language, which is often applied in Lawsuits, Plaintiff rejects and denies each and every fabricated allegation on pages 22 through 32}*

41. Mr. Harbert incorporates and reasserts, as if fully set forth herein, each and every allegation in the preceding paragraphs, and further alleges that:

42. By virtue of Elemary's role as case manager, in which she managed, coordinated, and otherwise oversaw the defense of a lawsuit against Mr. Harbert, Elemary owed a duty to provide faithful, competent, and vigorous representation of Mr. Harbert and related entities in carrying out the functions of that role.

43. Elemary breached her fiduciary duty to Mr. Harbert by acting in contravention to his direction when she offered to settle the D.C. Litigation on terms she did not have authority to offer.

44. Elemary further breached her fiduciary duty to Mr. Harbert by disclosing confidential information and documents that she had obtained in her role as case manager.

45. As a proximate result of Elemary's above-described breaches of her fiduciary duty, Mr. Harbert suffered direct consequential damages in an amount to be determined at trial.

46. Elemary's actions were of a kind and character as to be willful, wanton, grossly negligent, or intentional, and, thus, in bad faith. Accordingly, Mr. Harbert is entitled to both

compensatory and punitive damages.

WHEREFORE, Mr. Harbert demands judgment against Elemary for compensatory

damages in an amount in excess of $75,000, exclusive of interest, fees and costs (to which Mr.

Harbert is also entitled), as well as mental anguish and punitive damages, and for such further

and different relief as the Court deems just and proper.

## COUNT V – UNJUST ENRICHMENT

*{Opposing counsel provided fraudulent misquotation and slander of plaintiff and the*

*language and intent of the various agreements. Their purpose is slanted to withhold making*

*payments based on Mr. Harbert admitted liability to Plaintiff on the crux of her complaint.*

*Plaintiff is compelled to reintroduce evidence cited on pages 3, 20 and 21 as well as*

*paragraphs 1,2,4,11, and 25 from her analysis of the answer to the complaint to respond to*

*said fabricated counterclaims and prove that these counterclaims have no basis in fact or in*

*law]*

47. Mr. Harbert incorporates and reasserts, as if fully set forth herein, each and every

allegation in the preceding paragraphs, and further alleges that:

48. Pursuant to the September 21 Agreement, Mr. Harbert paid Elemary $30,000 per

month from October 1, 2004 until her termination in April 2005. *See* Ex. A, ¶ 6. Elemary

received a full payment for April, so in sum she received $210,000 in accordance with the

September 21 Agreement.

49. As described above, Elemary fraudulently induced Mr. Harbert to enter into the

September 21 Agreement by making material misrepresentations and fraudulently suppressing

material facts that she had a duty to disclose.

50. In addition, during the time between the execution of the September 21

Agreement and the termination of Elemary's role as case manager, Elemary repeatedly disclosed confidential or privileged information and documents that were proprietary to Mr. Harbert and his entities. She also repeatedly violated her fiduciary duty to Mr. Harbert.

51. Because Elemary fraudulently induced Mr. Harbert to enter into the agreement that provided for her payment and then breached her most basic duties under that agreement, Elemary is unjustly enriched by her retention of the funds paid to her for her role as case manager pursuant to that agreement between October 1, 2004, and the termination of that role in April 2005.

WHEREFORE, Mr. Harbert demands judgment against Elemary for compensatory damages in an amount in the amount of $210,000, exclusive of interest, fees and costs (to which Mr. Harbert is also entitled), and for such further and different relief as the Court deems just and proper.

## COUNT VI – MALICIOUS PROSECUTION – SUCCESSIVE SUITS

*{Opposing counsel provided fraudulent misquotation and slander of plaintiff and the language and intent of the various agreements. Their purpose is slanted to withhold making payments based on Mr. Harbert admitted liability to Plaintiff on the crux of her complaint. Plaintiff is compelled to reintroduce evidence cited on pages 3, 20 and 21 as well as paragraphs 1,2,4,11, and 25 from her analysis of the answer to the complaint to respond to said fabricated counterclaims and prove these counterclaims have no basis in fact or in law]*

52. Mr. Harbert incorporates and reasserts, as if fully set forth herein, each and every allegation in the preceding paragraphs, and further alleges that:

53. Elemary has brought at least four lawsuits against Mr. Harbert in the past two years. All of these lawsuits are based on virtually identical allegations, and all arise out of the

49

termination of her role as case manager for the D.C. Litigation. These lawsuits are discussed in further detail in paragraphs 16-21 *supra*.

54. Elemary's first lawsuit, filed in the United States District Court for the Central District of California, was transferred to the Northern District of Alabama, at which point Elemary voluntarily dismissed that case without prejudice. Two other lawsuits have been dismissed by the Central District of California. In the present case, Elemary's original case of seven causes of action presented against seven defendants has been reduced, prior to any defendant's answering, to three claims against a single defendant. Elemary's tactic of filing and dismissing multiple unfounded lawsuits has clearly been intended to harass the defendants involved and to drive up Mr. Harbert's litigation costs.

55. Under the law of the District of Columbia, "one who twice sues another maliciously and without probable cause is responsible to him in damages." *Soffos v. Eaton*, 152 F.2d 682, 683 (D.C. Cir. 1946) (citing cases).

56. All of Elemary's lawsuits against Mr. Harbert have been filed maliciously and without probable cause.

57. As a proximate result of Elemary's above-described harassing, successive lawsuits, Mr. Harbert suffered direct and consequential damages in an amount to be determined at trial.

58. Elemary's actions were of a kind and character as to be willful, wanton, grossly negligent, or intentional, and, thus, in bad faith. Accordingly, Mr. Harbert is entitled to both compensatory and punitive damages.

WHEREFORE, Mr. Harbert demands judgment against Elemary for compensatory damages in an amount in excess of $75,000, exclusive of interest, fees and costs (to which Mr.

Harbert is also entitled); mental anguish and punitive damages; his attorneys' fees and costs for the defense of all of the lawsuits discussed in paragraphs 16-21, *supra*, excluding the first filed, to-wit: *Elemary v. Harbert*, No. CV06-4723 RGK (PJWx) (C.D. Cal. filed July 28, 2006); and for such further and different relief as the Court deems just and proper. *{Messrs Goldman and lembke provided fradulent misquotation and slander of plaintiff and the language and intent of the various agreements. Their purpose is slanted to withhold making payments based on Mr. Harbert admitted liability to Plaintiff on the primary counts of her complaint.* <u>*Plaintiff is compelled to reintroduce evidence cited on pages 3,20 and 21 as well as paragraphs 1,2,4,11, and 25 from her analysis of the answer to the complaint to respond to said fabricated counterclaims and prove that these counterclaims have no basis in fact or in law*</u> *Opposing counsel will do whatever it takes to insure this court dismisses Plaintiff's complaint to avoid coming to Court to argue against one of the most documented business transactions confirmed by innumerable documents, legal recordings and professionally taped videos. The only alternative for opposing counsel to prevail against Plaintiff's strong evidence was to physically harm Plaintiff and her Counsel, as they did.* **Attached collectively hereto as** <u>**Exhibit "I"**</u> **and incorporated herein by this reference are true and correct copies of the** May 16, 2007 **legal transcription of the conversation between Plaintiff and Mr. Harbert in which he tells Plaintiff "to ignore (Messrs. Goldman and Lembke)" and corresponding tape.** *This transcript in Exhibit "I" understandably left opposing counsel with little else than to mislead the Court with imaginary counterclaims that are ludicrous such as COUNT V – UNJUST ENRICHMENT to falsely portraying Mr. Harbert to be of a character as to be willful, wanton, grossly negligent, or intentional. Illustrating their limited creativity, opposing counsel thought to deflect Mr. Harbert's heavily documented liability by*

*baseless charges of the same counts contained in plaintiff's complaint such as COUNT II-BREACH OF CONTRACT, COUNT III – BREACH OF CONFIDENTIAL RELATIONSHIP, COUNT IV – BREACH OF FIDUCIARY DUTY. Regrettably, they lack the evidence and documentation to prove their flimsy allegations of their malicious prosecution of Plaintiff for asking for her withheld pay.}*

### MORAL CODE

**Our Moral Obligation to present honest facts to the Court and the issue of civil litigation are of paramount importance to Plaintiff several reasons.**

**Due to a fatal disease, Plaintiff's inability to focus for long periods deemed it necessary to refrain from squandering her time, often choosing between spending it on her <u>litigation</u> or in <u>serving U.S. National interests</u> as** Attached hereto as <u>Exhibit "P" below</u> and incorporated herein by this reference are true and correct copies of letters of high praise for Plaintiff issued by 1). Senator Orrin G. Hatch-the Judiciary Committee's former Chairman-who approved the nomination of more Bench Officers than any living chairman today-and 2). Senators Dianne Feinstien, Harry Reid, Hillary Clinton, Carl Levin, John McCain and Bob Dole confirming "a majority of the United States Senators have Overwhelmingly endorsed (Plaintiff's) work" and "…the vital services she provides Congress, which have been determined to serve U.S. National interests".

**she has been evaluated in Exhibit "P" by U.S. Senators' input.**

**Respectfully submitted,**

Dated: April 18, 2008

Dr. Hoda Elemary

52

PROOF OF SERVICE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 467 South Arnaz Drive, Suite 319, Los Angeles, California 90048.

**On April 18, 2008,** I served the foregoing document described as on interested parties in this action by placing true copies thereof enclosed in (a) sealed envelope (s) addressed as follows:

> Matthew H. Lembke
> BRADLEY ARANT ROSE &
> WHITE LLP One Federal Place
> 1819 Fifth Avenue North
> Birmingham, AL 35203
>
> Roger S. Goldman
> Latham & Watkins LLP
> 555 11th street, N.W.
> Suite 1000
> Washington, D.C. 20004

I deposited this envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct.

April 18, 2008



BRIAN J. JACOBS
Type or Print Name    Signature



**Bradley Arant**

BRADLEY ARANT ROSE & WHITE LLP

ONE FEDERAL PLACE
1819 FIFTH AVENUE NORTH
BIRMINGHAM, AL 35203-2119
205.521.8000  FAX 205.521.8800
WWW.BRADLEYARANT.COM

Matthew H. Lembke

Direct Dial: (205) 521-8560
Direct Fax: (205) 488-6560
mlembke@bradleyarant.com

March 18, 2008

## VIA FEDERAL EXPRESS

Ms. Hoda Elemary
21 Le Conte
Laguna Niguel, CA 92677

RE:   Elemary v. Harbert; CV-07-654
United States District Court for the District of Columbia

Dear Hoda:

Enclosed please find a revised copy of the Joint Report of Parties Pursuant to Local Rule 16.3. We have made the revisions you requested and have included blanks for you to state your position. As we discussed, we will have another phone call at 10:30 a.m. Pacific time on Thursday, March 27, to attempt to reach compromise on our respective positions. We anticipate that you will send me your proposal prior to that call. If you choose to fax it to me, my fax number if 205-488-6560.

Although you had requested that I send a copy of this to Brian Jacobs at the Fedex station in Beverly Hills, I have elected not to do that. As you know, Mr. Jacobs is not counsel of record in the case. Until he enters an appearance, I do not believe it is appropriate for me to send anything to him.

I also enclose a copy of the Answer and Counterclaim that was filed by Mr. Harbert on February 21, 2008. That pleading, along with others, has been served on you by Certified Mail. We have received at least one of those Certified Mail packages back showing it was unclaimed. Please be aware that the Federal Rules of Civil Procedure state that service by U.S. Mail is effective. If you desire to have pleadings served on you at some other address, please advise us immediately.

Very truly yours,

Matthew H. Lembke
MHL:slb
Enclosure
cc:   Nathan Vitan, Esq. (w/encl.)

BIRMINGHAM    CHARLOTTE    HUNTSVILLE    JACKS(    MONTGOMERY    WASHINGTON, DC
1/1683271.1

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DR. HODA ELEMARY, *pro se*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Civil Action No. 07-654 (RCL) |
| PHILLIP HOLZMANN A.G., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

On March 3, 2008, this Court ordered [36] the parties to hold a Local Rule 16.3

Conference within fifteen (15) days and to submit a joint discovery plan and scheduling order

within fourteen (14) days thereafter. On April 1, 2008, defendant unilaterally filed a report [37]

outlining his unsuccessful attempts to confer with plaintiff and requesting the Court hold a

scheduling conference. In that report, defendant represented that plaintiff had refused to discuss

the matters set forth in Local Rule 16.3(c), insisting she would only address these matters in

writing, and had ultimately failed to provide the promised writing to defendant before this

Court's April 1 deadline. Plaintiff has filed nothing responsive to this Court's Order of March 3,

2008, or in answer to defendant's report. Accordingly, it is hereby

ORDERED that plaintiff shall, within ten (10) days of this date, show cause in writing

why her complaint should not be dismissed for failure to comply with this Court's Order of

March 3, 2008.

SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, on April 8, 2008.

*Dr. Hoda Elemary*
*21 Le Conte Estates/Gold Reviera*
*Laguna Niguel, CA 92677*
*(949) 499-1010*
*(949) 4994141 * Fax*

March 31, 2008

Roger S. Goldman                           Matthew H. Lembke
**Latham & Watkins**                       BRADLEY ARANT
555  11th St., Ste.1000                    One Federal Place,
 Washington, D.C. 20004                    1819 Fifth Avenue North
                                           Birmingham, AL 35203

Dear Messrs. Goldman and Lembke:

Based on our compromise during our telephonic conversation two weeks ago, I am
affirming to you the preferred dates and the earliest date Plaintiff ("Dr. Hoda Elemary")
can be released either from assignments by the United States or Medical Procedures.

As I informed you, Plaintiff's schedule is unavailable for this season until the general
election and the inauguration are accomplished in January 2009. It would not only be
unconstitutional but you will not be allowed by the United States to deprive Plaintiff from
serving her Country or earning a meager living during this political season in light of the
fact that your client Billy Harbert, Jr. had frozen Plaintiff's funds, ruined my credit and
forced his father under coercion from making the agreed upon (in writing) monthly
financial installments to Plaintiff. By forcing his father to breach his contract with
Plaintiff through a legally recorded threat to expose his father of the seven Million dollars
taken from John Murdock Harbert, Your client has no right to demand expeditious
conclusion of this case. It is the Plaintiff's prerogative to affirm "Justice delayed is
Justice denied", but she chose not to do so. It would be a colossal injustice that would
merit publicity, if Billy Harbert, Jr., who had saved the funds owed plaintiff, under seven
contacts, for himself, would now interfere with Plaintiff by manipulating the Court to
apply preference while he is withholding Plaintiff's funds.

In summation of our lengthy conversation Plaintiff's position is that while she
categorically opposes the language of your enclosed four page Joint report. To be
practical, Plaintiff agrees with the factual content of points1-3,disagrees with the factual
content and language of Points4-7. Point 7 date would be in  May 2009 and the earliest
March 30, 2009.Plaintif agrees with the compliance part of Point 8 the earliest date for
discovery would be completed by July 31, 2009. Plaintiff disagrees with points 9-13. On
Point 13 trial would be concluded on September 20, 2009 or before. Plaintiff agrees with
point  14 as it is written in Rule16.3 but objects to your writing in response to Point 14.

Dr. Hoda Elemary
In Propria Persona

# BILL
# HARBERT

November 10, 2004

Dr. Hoda Elemary
21 LeConte
Laguna Niguel, CA 92677

Dear Hoda:

I am writing to reaffirm my guarantee of several agreements between us that were
detailed in the notarized confirmation document "Master Agreement" dated September
21, 2004. You may disregard William Sharp's correspondence including his September
27, 2004 letter to you that attempted to void said confirmation.

I would like you to know that I did not sign nor authorize that my name be signed on my
behalf the October 5 and October 21, 2004 letters sent to you by Mr. Sharp under the
pretense that I signed and authorized these letters be sent to you.

With Kind Regards

Sincerely,

Bill L. Harbert

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

November 11, 2004

Dr. Hoda Elemary
October 21, 2004
Page 2 _____ Confidential

calls, hearings and meetings regarding the declaratory judgment proceeding.

I would still ask that you or your counsel discuss your continuing role in the qui tam matter with Bill Sharp. Again, you are not to take any action without first clearing it with Bill. Thank you for your continued cooperation.

Yours very truly,

*Bill Harbert*

Bill L. Harbert

cc:  Legal Team

BLH:vh

*I did not write this letter nor authorize anyone to sign on my behalf — Forgery*

*Bill Harbert*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D Faile*
*November 11, 2004*

Bill L. Harbert
P.O. Box 531390
Birmingham, AL  35253
205-802-2810
Fax:  205-802-2815

October 21, 2004

Confidential

Via Hand Delivery

Dr. Hoda Elemary
World Peace Today, Inc.
2252 South Caliente Road
Palm Springs, CA 92264

*I did not write this letter not authorize anyone to sign it on my behalf.*

*Bill Harbert*

Dear Hoda:

This letter updates and supersedes my October 5, 2004 letter
to you.  As you know, at the end of September I made the decision
to move the case manager job for the qui tam and declaratory
judgment matters over to Bill Sharp.  Therefore, Bill has
management authority over the qui tam and declaratory judgment
matters.

In order for Bill to do his job, you are not to take any
action without first clearing it with him.  Furthermore, all
communications to me, Van Hoover or other members of my business
team or family shall be through Bill Sharp.

Once again I have directed Bill Sharp to make clear to the
legal team that he is serving as case manager.  I also have
directed Bill to make clear to the legal team that there should
be no further contact regarding the declaratory judgment
proceeding with the Department of Justice, any judicial
authorities or their clerks, or any other parties outside the
legal team by you or anyone else without Bill's prior review and
authorization.  I have also asked Bill to review and authorize
all legal and consulting fees.  I will not be responsible for
fees and costs unless Bill reviews these in advance of the
services being rendered for them.

I have asked Bill Sharp to make it clear to the Department
of Justice attorneys and others involved in this case that Bill
has the sole authority to make settlement offers or other
commitments (whether as to substantive matters, procedural
matters or otherwise).  I have already asked Bill to appoint and
oversee my local counsel in Birmingham as well as to determine
when and who shall be involved in various upcoming conference

Bill L. Harbert
P.O. Box 531290
Birmingham, AL 35253
205-802-2510
Fax: 205-802-2515

October 5, 2004

Confidential

Dr. Hoda Elemary
World Peace Today, Inc.
2252 South Caliente Road
Palm Springs, CA 92264

Dear Hoda:

As you know, at the end of September I made the decision to move the case manager job for the qui tam and declaratory judgment matters over to Bill Sharp.

Bill explained to me that based on the discussion the two of you had that Bill is now serving executive case manager and that you are serving as case resolution manager. I am okay with these titles so long as Bill has management authority over the qui tam and declaratory judgment matters.

Because the declaratory judgment litigation is now headed to Birmingham, I have directed Bill to make clear to the legal team that he is serving as executive case manager. I also have directed Bill to make clear to the legal team that there should be no further contact regarding the declaratory judgment proceeding with the Department of Justice, any judicial authorities or their clerks, or any other parties outside the legal team by you or anyone else without Bill's prior authorization. In addition, and in order to avoid any confusion, I am asking Bill to appoint and oversee my local counsel in Birmingham as well as to determine when and who shall be involved in various upcoming conference calls, hearings and meetings regarding the declaratory judgment proceeding.

I would still ask that you continue your role as case resolution manager for the qui tam proceeding though anything you want to do should be reviewed first with Bill. On the declaratory judgment proceeding I would like you to take no action unless Bill asks for your involvement.

Yours very truly,

Bill L. Harbert

BLH:vh

*I did not write this letter
we authorize
any one to sign it.    Bill L Harbert*

CARLA L. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

Carla D Faile
November 11, 2004

**Bill L. Harbert**
P. O. Box 381390
Birmingham, AL 35253
205-802-2810
Fax: 205-802-2815

August 28, 2003

Via Facsimile

Mr. Harry Frohsin
Berkowitz, Lefkovitz, Isom & Kushner
420 20th Street North, Suite 1600
Birmingham, AL 35203

Dear Mr. Frohsin:

I was alarmed to learn from my lawyer, Jerry Steering, that upon your confirmation to him of the receipt of my enclosed August 27, 2003 letter to you, you made the following statement "I spoke to the client today, who had authorized you to travel to Nashville to meet with Jim Neal and us".

I find it a bit troubling that you referred to talking to the client yesterday, when in fact I have not spoken with you since last week when I was in California. However, what is more troubling to me is the fact that you could possibly have been referring to "the client" by talking with Jim Rein or my son Billy, even though you were responsible for putting together the plea agreement, which clearly stipulates that neither Jim Rein nor Billy are to be involved in the managing of my companies, and vice versa! Indeed, the Department of Justice has emphasized the need to keep the management of our respective companies separate. To this end, your reference to Mr. Steering that you spoke to "the client" yesterday was deliberately misleading and potentially damaging to the plea agreement, which Mr. Steering and I are committed to uphold. For that reason I am requesting you for the last time to speak with Mr. Steering by telephone. I understand from Mr. Steering that this letter may be used in future proceedings. I therefore deem it necessary to point out that it is crucial that you and your partners appear more willing to cooperate with my request to divulge information concerning my case, to avoid the appearance that there is more behind your actions that meets the eye. In light of the development yesterday, I have requested Dr. Hoda Elemary to report back to me while I am abroad the content of your conversations with Mr. Steering.

I therefore reaffirm my request to you in my letter of August 27, 2003, with the addition that I expect you as a lawyer to recognize that with reference to the subject matter of my August 27, 2003 letter, I am the only individual that can be referred to as "the client".

Very Truly Yours,

Bill L. Harbert

**Bill L. Harbert**
**820 Shades Creek Parkway**
**Birmingham AL 35209**
**205-802-2810**
**Fax: 205-802-2815**

June 27, 2002

Bryan B. Lavine, Esq.
Troutman Sanders
600 Peachtree Street, Suite 5200
Atlanta GA 30308

Dear Bryan:

I am writing to extend to you my sincere gratitude for your commitment yesterday during our conference call with Mr. Berl Bernhard to forward the files pertaining to your representation of my companies to Verner, Liipfert, Bernhard.

I fully appreciate that you do not agree with my decision of last week to retain Verner, Liipfert, Bernhard. However, you are now in receipt of two letters and a telephone call from me affirming my final decision in retaining that firm. I request you to abide by my decision and respect your duty of confidentiality to me.

In all candor, I was offended when I learned this morning that you have made contacts upon receipt of my letter. Based on your confirmation during the conference call yesterday that you read my letter, I wish to bring to your attention once again that in my letter of June 26, 2002 to you, I stated,

> "I am grateful to you, in advance, for exercising the highest standards of ethics by respecting my choice in this matter. I therefore respectfully request you to accept my final decision in my choice in this matter without undertaking to involve, convey, complain or share my confidence expressed to you in this correspondence with other former or current counsels on this case, government attorneys, family members or anyone else for that matter."

I understand since then, you have raised issues of my competency to retain Verner, Liipfert, Bernhard as a pretext for contacting others and you complained that I have fired you despite my specific request of you to abstain from making such contacts.

Please be assured that I have not fired you but have chosen another firm to represent me exclusively in the government's case against my companies. As I indicated to you yesterday I have other matters that I wish you to handle for me. My decision on retaining Verner, Liipfert, Bernhard is final and therefore there is no reason to discuss the matter at this time. I will be happy to give you my reasons for retaining this firm when we talk

next on July 22, 2002 upon my return to Birmingham, at which time I will discuss with
you other legal matters.

I respectfully request you to forward the files to Mr. Bernhard via Federal Express by
June 28, 2002 and to contact him this week. Any delay in the receipt of the files will
cause substantial damage to the firm's preparation to handle crucial issues in the
resolution of this matter.

With kindest regards.

Sincerely,

Bill L. Harbert

cc:     Mr. Berl Bernhard
        diGenova & Toensing

# BILL
# HARBERT

William M. Sharp, Esq.                                            November 11, 2004
SHARP AND HARRISON, P.A.
Two Urban Centre, Suite 900
4890 West Kennedy Boulevard
Tampa, Florida 33609-1850

        Re: *Qui Tam and Declaratory Relief Actions*

Dear Bill:

I appreciate all of your fine work in assisting my family and me, and look forward to
continuing to work with you on these personal issues.

I am writing to bring to your attention to the fact that when I accepted your help to
manage the qui tam and declaratory relief cases I had forgotten that I had a confirmed
agreement with Dr. Elemary under liability to me to manage these cases to their
conclusions. Although I have only agreed to make payments to her for a limited period of
time, her position as exclusive case manager was guaranteed by me. I therefore have no
choice but to honor my agreements with Dr. Elemary (which preceded any understanding
between us concerning these two matter) to limit my liability.

Although I have appreciated your work in the above matters, I simply cannot continue
with the recent confusion and disruption that has arisen between you and several key
members of my legal team, namely, Jerry Steering, Barry Coburn and David Schertler, as
well as the confusion over the responsibilities of you and Dr. Hoda Elemary in my qui
tam and declaratory judgment matters. I have therefore made the decision that Dr.
Elemary is to be the sole case manager/resolutions for these matters, as stated by you in
your letter of September 27, 2004.

I know you can appreciate that all decisions concerning the qui tam and declaratory
judgment proceedings are mine and mine alone to make, and that the final decision as to
who will be my case manager is mine and mine alone.

*[signature]*

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*[signature]*
November 11, 2004

820 SHADES CREEK PARKWAY, 35209    POST OFFICE BOX 531390    BIRMINGHAM, ALABAMA 35253
TELEPHONE (205) 802-2800

William M. Sharp, Esq.
SHARP AND HARRISON, P.A.
November 11, 2004
Page Two

I believe that the current arrangement will not serve my interests for the reasons stated above. We need to work together and stop all the distractions, which is why I have decided to unify the existing legal team under Dr. Elemary's leadership. You and I will continue to work together on various aspects of this case. Based on my long relationship with her and her effective work on my behalf in the past, I am comfortable with Dr. Elemary as the sole case manager.

I have asked Dr. Elemary to be available in three months so we can sit together and review the progress made to date and together with you make necessary decisions if changes are called for. It is imperative that we allow time to heal the rifts that currently exist. You must appreciate that there has been too much <u>non-productive, costly and disruptive</u> activity surrounding my legal team and their efforts. This must stop. I need unification, not division, if we are to prevail against the government. An effective team cannot be pulled from both ends or have conflicting leadership.

That said, I know we can rise above this difficult and awkward moment, and can continue working together on other matters.

Very truly yours,

*Bill L. Harbert*

Bill L. Harbert

CARLA D. FAILE
Notary Public, Jefferson County, Alabama
My Commission Expires March 21, 2007

*Carla D. Faile*
*November 11, 2004*

**Main Identity**

| | |
|---|---|
| **From:** | "Joe Roman" <romanlaw@gte.net> |
| **To:** | "William M. Sharp, Sr." <wsharp@shtaxlaw.com> |
| **Sent:** | Thursday, October 21, 2004 4:28 PM |
| **Subject:** | Re: Bill L. Harbert |

Bill:

The PDF attachment of the October 21, 2004 letter is too small to read when printed. Adobe shows the document as only 2.08 x 2.89 inches. Please re-scan and email it, or simply fax the letter to me at (760) 323-2816.

Thanks.

Joe Roman


----- Original Message -----
From: "William M. Sharp, Sr." <wsharp@shtaxlaw.com>
To: <spointer@lfwlaw.com>; <Barry.Coburn@worldnet.att.net>;
<info@steeringlaw.com>; "June Ann Sauntry"
<juneann.sauntry@troutmansanders.com>; "David Schertler"
<dschertler@coburnandschertler.com>; <romanlaw@gte.net>
Cc: "Van Hoover" <vhoover@bharbert.com>
Sent: Thursday, October 21, 2004 2:57 PM
Subject: Bill L. Harbert


> Ladies and Gentlemen:
>
> As all of you are well aware, there has been some confusion lately
> regarding
> the management of Bill L. Harbert's qui tam and declaratory judgment
> proceedings.
>
> Attached to this e-mail in a PDF format is an October 21, 2004 letter from
> Bill L. Harbert which hopefully clarifies this matter once and for all.
>
> Please note that the attached letter is being delivered to Dr. Elemary,
> who
> along with Mr. Jerry Steering, will be meeting with Mr. Harbert this
> afternoon. I will be participating via conference call.
>
> Please feel free to call me if you have any questions or comments.
>
> Sincerely,
>
> William M. Sharp, Sr.
>
> Sharp and Harrison, P.A.



# LAGUNA NIGUEL BEACH HOUSE 2003
# REVOCABLE TRUST
## ARTICLE ONE

Bill L. Harbert, called The Settlor and Trustee, declares that he has set aside the property described in Schedule A, attached to this instrument. All property and Securities subject to this instrument from time to time are respectively referenced as the "Property Estate" and "Stock Estate". THE TRUST ESTATE is inclusive of the property and stocks held together in the trust created in this instrument and shall be managed and distributed according to the terms of the Personal Arrangement Contract "Personal Arrangement".

## ARTICLE TWO

This instrument (in addition to creating a trust) sets the contract's terms and documents a five year old Secret agreement of a personal financial arrangement made by and between Bill L. Harbert (Harbert) and Dr. Hoda Elemary (Elemary) on November 3, 2003.

## ARTICLE THREE
## RECITALS

The parties' mutual benefits for conveying properties and stocks are:

I. On or about November 1998, the parties entered into a secret personal agreement that was further defined in 2002, whereby at Harbert's request, Elemary committed to Harbert to assist him with his personal affairs including his litigation troubles and to provide him-on a more permanent basis-with companionship, love, friendship and comfort as she had from time to time since 1991. Accordingly, Harbert's reasons for purchasing Elemary a house in Laguna Niguel, CA are: a).The personal aspect of their relationship b).An approximately $50 million Harbert earned in profit from Elemary's contacts with international senior Governments officials-who awarded Harbert lucrative oil pipelines and Mega Mid-East development contracts and c). "The great career risks" Elemary had assumed by enlisting her friends in Washington to shield Harbert from prosecution by the Department of Justice (DOJ) for 3 years.

II. On February 4, 2002 Harbert pled guilty on behalf of his corporation's, Bilhar, violation of one count of the Sherman Antitrust Act for bid rigging. Harbert paid the United States a $54 million fine. Harbert therefore eagerly sought Elemary's intervention on his behalf. Elemary was advised By Senator Orrin Hatch that "representing anyone associated with bid rigging to the DOJ, White House or Congress is tantamount to taking great career risks". Elemary cautiously agreed to Harbert's request on strict conditions. Harbert officially named Elemary as exclusive case manager to benefit from her high powered political contacts, which included personally advising five Consecutive U.S. Presidents on Mid-East terrorism. In July 2002 Elemary retained her personal friend, former Senate Majority Leader, BOB DOLE, to assist her in dealing with the DOJ.

III. With the exception of Elemary's deposit into escrow, the parties initiated discussions on August 16-18, and agreed on October 22, 2003 that the Laguna Niguel beach house would be paid in full by Harbert, including real estate taxes at purchase time.



1

## ARTICLE FOUR
### (Personal Arrangement)

NOW, THEREFORE, in consideration of this personal arrangement as well as the business agreements and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties covenant and agree as follows:

1- Any potential lawsuit arising out of this Personal Arrangement Contract or business guarantees and agreements, as well as potential counter claims shall be governed and construed according to the laws of the state of California. Any lawsuit to enforce the terms of this Personal Arrangement and business agreements shall be commenced, and litigated (for personal disputes) in the Family Court – Superior Court in Los Angeles, California, and (for business disputes) in U.S. District Court, Central Division in Los Angeles, CA, in the County of Los Angeles. Any and all potential lawsuits, as well as compulsory counter claims will be <u>without exception</u>, litigated in California as though all the parties and witnesses to such lawsuits were California citizens and that the subject matter of the dispute upon which these lawsuits are based occurred in their entirety in the State of California, County of Los Angeles. In the event that either party to this contract-or their co-defendants or co-plaintiffs-file a motion to change this understanding on venue and jurisdiction (for any potential lawsuit) the violating party will unconditionally and unequivocally assume liability to pay the other party liquidated damages of three million dollars. Cleary, it is difficult to asses such damages. Nevertheless the parties have determined that the liquidated damages are at least $3 millon. The parties confirm their agreement herein that the violating party will pay $3 million to the other party. In the event that Harbert breaches any of the Business Agreements or Personal contract, Elemary will exclusively decide whether to pursue an expedited trial schedule, which include binding arbitration by a retired judge and/or a twenty five weeks expedited trial, whose cost will be born equally by Harbert and Elemary. Harbert's breach of this agreement for an expedited trial schedule will result in a one week demand for payment of $3 million. Otherwise, Harbert agrees to Elemary to demand double that amount from his LLC or bank accounts in Alabama and Switzerland.

2- Harbert unequivocally and unconditionally guarantees Elemary to overcome his current problems with cash flow that resulted in Harbert taking out a mortgage on the subject property. As a direct and proximate result of the drastic impact on Elemary on account of Harbert's cash flow problems, Harbert committed himself to the following:

A. To provide Elemary with a monthly payment to cover the mortgage payment and real estate taxes.

B. To divide in equal parts of fifty percent (50%) each with Elemary any and all profits arising out of his securities and stocks holdings beyond and above, i- accrued interest, ii- a seven percent (7%) annual increase of stock holdings for a two year period between the date of the execution of this document and Nov. 3rd 2005.

3- Harbert is hereby committed to compensate Elemary for his delay in paying fully for the beach house and agrees that at the earliest possible date, but no later than March 31st, 2005, <u>Harbert will pay back the mortgage in full on the Beach House in</u> compliance with his unwavering guarantee to fully pay for the beach house to satisfy his

2

part of the bargain in exchange for his acknowledgement of the receipt of 12 years of companionship and personal services and 25 years of business service.

4. Harbert confirms his unconditional commitment to fulfill written guarantees stipulated herein to provide the promised minimum security for Elemary irrespective of any third party interference (including by son Billy Harbert) or change of circumstances.

### ARTICLE FIVE

In the event the parties, convey the subject property through their own names, such transactions shall be legally titled as referenced below in article nine. The use of this legal title is necessary to insure this Personal Arrangement or (TRUST ESTATE) is consistent with other guarantees and agreements executed by the parties that refer to THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST as the instrument for transmuting real estate property. However, this Personal Arrangement Contract is legally not revocable despite the word revocable in the title. Each party hereby represents, warrants, and agrees to the other as follows:

A. Each party has received independent legal advice from his or her attorney with respect to the advisability of entering into this Personal Arrangement Contract and TRUST ESTATE.

B. Each party carefully read this Personal Arrangement Contract/ Trust created by this instrument and understands contents and legal effects of each provision hereof.

### ARTICLE SIX

Harbert is referenced in this document as the current Settlor and Trustee, Harbert will resign on November 3, 2003. Elemary will become the Settlor and Trustee two weeks after Harbert's execution of this document.

### ARTICLE SEVEN

The Settlor may not revoke the Personal Arrangement (Contract). However, Schedule B, attached, describes the necessary measures to be implemented when the parties elect to utilize the trust created in this instrument, to convey property & stocks.

### ARTICLE EIGHT

The Settlor appoints for life in the office of Settlor & Trustee, the person listed herein who shall effective the date of execution of this document, serve as the Settlor/Trustee first: Dr. Hoda Elemary. Elemary shall have power to designate one or more individuals or corporate fiduciaries to serve concurrently or serially to succeed the trustee in the event of her inability or unwillingness to act. The Trustee may revoke this instrument in whole or in part at any time. The Trustee may at any time amend any terms of this trust. Upon the trustee's death, the entire undistributed principal and income of the trust estate shall go to Elemary's designee. The Trustee shall have the full power to sell, encumber, convey, exchange, invest, reinvest, partition, divide, improve, sever and repair the property or stocks constituting the Trust Estate from time to time. The Settlor/Trustee shall have all powers conferred on the Settlor & Trustee by law and all powers contained in California Probate Code sections 16200-16249. If any provision of this instrument is unenforceable, the remaining provisions shall remain in full effect.

3

## ARTICLE NINE

The trust created in this instrument may be referred to as THE LAGUNA NIGUEL BEACH HOUSE 2003 REVOCABLE TRUST.

Executed on November _3_ , 2003.

_Bill L. Harbert_
_____
BILL L. HARBERT, Trustee

I certify that I have read the foregoing declaration of trust and that it correctly states the terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustee. I approve the declaration of trust in all particulars and request that the trustee execute it.

Date: November _3_ , 2003

_Bill L. Harbert_
_____
BILL L. HARBERT, Settlor

City of Washington
DISTRICT OF COLUMBIA          }
                             }
UNITED STATES OF AMERICA     }

On November _3rd_, 2003, before me, ~~Bill L. Harbert~~ GUILLAUME TOURNIAIRE GCT, personally appeared BILL L. HARBERT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity on behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.                    SEAL

_____
[Signature]

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

4

# SCHEDULE A

Fifty-percent (50%) undivided interest in single family residence located at 21 LE CONTE, LAGUNA NIGUEL, CALIFORNIA 92677, and more particularly described as follows:

LOT 16 OF TRACT NO. 8551, IN THE CITY OF LAGUNA NIGUEL, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A SUBDIVISION MAP, RECORDED FEBRUARY 29, 1984, IN BOOK 522, PAGES 1 TO 17, INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 658-251-07

# SCHEDULE B

1. In order to add property to this Trust, the Parties shall sign a separate document, other than this Trust, confirming the description of those properties and/or stocks to be added to this Trust, in addition to the Property described in Schedule A, attached hereto.

2. Each of the Parties hereto agrees to execute such other and further documents as are necessary and appropriate to accomplish the transfer of said additional properties and/or stocks into this Trust, i.e., assignments, deeds, etc.

Executed on November 3 , 2003.

_____
DR. HODA ELEMARY, Successor Trustee

I certify that I have read the foregoing declaration of trust and that it correctly states the terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustee. I approve the declaration of trust in all particulars and request that the trustee execute it.

Date: November 3 , 2003

_____
DR. HODA ELEMARY, Successor Settlor

7

# Bill L. Harbert

November 4, 2003

Ms. Hoda Elemary
2252 Caliente Road
Palm Springs, California 92264

> Re:    *21 Le Conte, Laguna Niguel, California 92677*
>        *APN 658-251-07*

Dear Hoda:

The purpose of this letter is to confirm the fact that I have no intention whatsoever to revoke now or in the future The Laguna Niguel Beach House 2003 Revocable Trust. However, if any of my heirs challenge this trust or should I be placed in a position to revoke or modify The Laguna Niguel Beach House 2003 revocable trust concerning the above-referenced property, either I or my estate will be irrevocably and unconditionally obligated to pay you the sum of three million dollars  This agreement to pay said amount is in consideration of your assistance on my behalf over the past few years in dealing with the DOJ in connection with the U.S. v. Bilhar, et al. case, which involves both criminal fine of fifty-four million dollars and civil fine of thirty million dollars.

You have Taken great risks in dealing with the DOJ and therefore earned the sum of money referenced above only in the event that I or any of my heirs, should challenge, revoke or modify the Laguna Niguel Beach House 2003 revocable trust.

With kind regards .

Sincerely,

*Bill L. Harbert*
Bill L. Harbert

City of Washington
District of Columbia

Bill L. Harbert appeared personally before me,
presenting an Alabama drivers license as identification

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

### Bill L. Harbert

I, Bill L. Harbert, do hereby show that I am obligated to fulfill my agreement with and promise to Hoda Elemary to assist her in purchasing a home for her; said home being the residence at 21 Le Conte, Laguna Niguel, CA 92677.  I have undertaken to sign a grant deed on November 3, 2003.

I declare unequivocally under liability to me and to my estate to Hoda Elemary, that it is my will that said grant deed not be revoked by me or by anyone else. Furthermore, I guarantee that I will unconditionally abide by my two year commitment to Hoda Elemary, referenced in my letters to her of April 26, 2002, March 1, 2003, August 17, 2003, October 1, 2003, October 17, 2003, and will not do anything in contravention of said agreements between myself and Hoda Elemary; regardless of the circumstances or the influences of others that may have an interest to see that the grant deed be revoked.

In addition to the above, any of my heirs who unsuccessfully challenge this document and my other agreements with and commitments to Hoda Elemary shall take nothing from me or my estate in the event of my incapacitation or passing.

I am signing this promise and commitment to Hoda Elemary out of my own free will and with the full knowledge that Hoda Elemary has deposited a substantial sum of her own money toward the purchase of the subject property.

Dated: _Nov 3 '03_           _Bill L. Harbert_
                                   Bill L. Harbert

City of Washington
District of Columbia

On this 3rd day of November, 2003
Bill L. Harbert personally appeared before me
and acknowledged that he executed the foregoing document.

                        11/03/03

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008



Apr-06-07 02:12am From- Case 1:07-cv-00654-RCL Document 49-6 13104742086 Filed 04/29/2008 T-264 Page 1 of 1 P.001/004 F-976

Case 2:07-cv-00457-WMA Document 8 Filed 03/22/2 Page 1 of 1

FILED
2007 Mar-22 PM 03:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

HODA ELEMARY,                      }
                                   }
        Plaintiff,                 }
                                   }        CIVIL ACTION NO.
v.                                 }        07-AR-0457-S
                                   }
BILLY HARBERT, JR., et al.,        }
                                   }
        Defendants.                }

## ORDER

Plaintiff, Hoda Elemary, having voluntarily dismissed her above-entitled action without prejudice, all pending motions are MOOT. The status and scheduling conference set on March 30, 2007, is CANCELLED.

The parties shall bear their own respective costs.

DONE this 22nd day of March, 2007.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE



**U.S. Department of Justice**

*Civil Division*
*Commercial Litigation Branch*

CGMark
46-16-2472

Tel. (202) 307-0256

601 D Street, NW, Room 9930
Washington, D.C. 20004

March 18, 2005

BY FAX – (949) 715-2060

Dr. Hoda Elemary
P.O. Box 7952
Beverly Hills, CA 90212

Re:    U.S. ex rel. Miller v. Holzmann A.G., et al.
       1:95CV01231 (D.C.D.C., filed Jun 30, 1995)

Dear Dr. Elemary:

I am writing in response to your letter of today concerning the telephone conversation on March 17th among you, Howard Teicher, AUSA Keith Morgan, and myself concerning settlement of the above-referenced matter with Bill L. Harbert Sr. Based upon our various discussions and Mr. Harbert's letter of November 11, 2004, we understand that you represent Mr. Harbert in connection with the settlement of this matter.

AUSA Morgan and I agreed to recommend a settlement whereby Mr. Harbert pays Fifteen Million ($15,000,000.00) within 10 days of the execution of a settlement agreement. The United States would thereupon release its claims against Mr. Harbert. As we discussed, any agreement would have to be authorized and approved by officials of the Department of Justice.

As we advised you, as a matter of policy, this office does not ever agree to any language that pertains to the tax treatment of a payment to be made by a defendant in a settlement. All our settlements are tax neutral -- neither side characterizes the payment.

The United States takes no position with regard to how Mr. Harbert liquidates his assets to pay the settlement amount. Our discussion of possible sources whereby Mr. Harbert could make the settlement payment was not intended to be all inclusive but merely to illustrate that Mr. Harbert is able to make the payment at the time of settlement and that payment over time is not necessary. We note that there is almost $2 million of Group 2 Wachovia shares described in Table F of the documents previously provided by Bill Sharp, Esq. which would be available

- 2 -

for the settlement, over and above the $20.7 million discussed during our telephone conversation.

We look forward to hearing from you.

Sincerely,

CAROLYN G. MARK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division

cc:    AUSA Keith Morgan

Most recently Billy and his attorneys harped on the fact that they could do a better job than I was doing as exclusive case manager for both of your cases for less money. Facts are a subborn thing- as John Harbert often said- the facts are Mr. Sam Pointer came to me and assured me that Judge Proabst will see it his way during one of their many walks during golfing together. The hard fact is Judge Proabst dismissed the declaratory relief case despite Mr. Pointer's dreams of scoring on the first hit both legal and golf balls.

Moreover, the government has consistently told Mr. Lavine and indirectly your son, Billy, that the only acceptable settlement is a settlement the United States reached in negotiating with Dr. Elemary and Senator Dole. Regrettably for you, Senator Dole and I were on our way to reducing the settlement to $10 million from $15 million when Billy and his attorneys pulled the carpet from under us and unlawfully terminated us with your signature approving such termination. More importantly, none of the motions filed by the Lavine-Sauntry team on behalf of Billy, were granted by Judge Lamberth to date, in fact the case is heading for $100 million loss. My letter to Mr. Lembke of August 1, 2006, was typed by a French secretay who could not spell, but nonetheless I am enclosing a copy for you.

You have always had the wisdom to intervene when your livelihood depended on it. In light of my preview of the evidence that I possessed on legally recorded conversations, documents, and other materials, this case is going to have more impact than you anticipate at this time.

With kind regards

Dr. Hoda Elemary

cc. Select defendants of the referenced complaint

3

# ÉVIAN
# ROYAL *Resort*

TEL : 33(0)4 50 26 85 00

RÉSERVATION/MARKETING:

33(0)4 50 75 61 00

FAX ROYAL PALACE/GOLF:

33(0)4 50 75 38 40

Mr Bill L. Harbert
820 Shades Creek Parkway
Birmingham, AL 35209

August 3, 2006

Re: Fourth attempt to settle out of court

Dear Bill,

To my regret, Billy and Matt Lembke miscalculated the impact of their pranks on my summa cum laude Harvard counsel, who is nationally renowned for fighting corporate corruption in Los Angeles where there are more attorneys per capita than anywhere else in the world.

Please find Mr. Brian Jacobs' memo to me of today enclosed for your preview of the famed Harvard training for a thorough and detailed analysis of the law.

On the other hand, your son and his counsel managed to miscalculate once again their prowess to browbeat their way through learned experts. Unable to prevail with their primal psychic hustling of my counsel, your son and his counsel were seeking to dismiss the indisputable evidence upon which my complaint is based. They have mercifully moved on to more yielding victims where their cheap trickery may find a more welcomed reception.

My incontestable evidence will show that while you had initially requested me in the past to step in and provide a defense against Sharp, Billy and other defendants' well documented blackmail and abuse of an elder person. However, to avoid confrontation you went along unwillingly with their schemes, especially under pressure from Mrs. Hoover (who had agreed to cooperate with Billy after her daughter's life was threatened by him). You have since been making statements and signing documents contrary to your interests but of interest to Billy and his attorneys.

On November 11, 2005, you again reached out to me for help as you honorably wrote on such documents as being "forgery" and signed your name adding in your own words directives contrary to the forged papers and reversing earlier directives that you had unwillingly signed under pressure from Mrs. Hoover, Billy, and his attorneys. This will be proved in a court of law providing evidence in your handwriting and under your signature.

reservation@evianroyalresort.com

www.evianroyalresort.com

S.E.A.T. SA au capital de 106 080 euros

705 780 113 RCS THONON · TB 19 705 780 113

*The Leading Hotels of the World*

8/03/06

Several of your longtime friends will also provide testimony that they have distanced themselves from doing business with Billy because they claim "to be too honest for Billy". While in Africa, I just learned that Billy regrettably does not enjoy a reputation to match his predecessors. Indeed some of what I heard is down right disturbing.

Billy and his attorneys will be placed in the United States custody should they attempt to harass my current counsel as they did when they made attempts on the life of my earlier counsel who had refused to acquiesce to Billy's dictates as well as on myself. The only written or telephonic communications that will be accepted from Billy and his counsel by myself and my attorneys will be concerning their interests to enter into settlement talks. Any other concerns regarding the litigation they may have will from now on be dealt with in court. This decision has been suggested for security purposes.

Your longtime friends are deeply concerned that you would not get caught in a web in which you are perceived to be the leader of a gang of illegitimate operators seeking to impose their will by cheating workers out of their pay through intimidation and violent means. Your continued association with Billy's reckless ways will give the federal government the opportunity to incarcerate you for being an accessory to his crimes.

John Harbert and before him Mrs. May Harbert guarded you through most of your life out of trouble. Be careful, Bill, don't let Billy's internal rebellion and self-destructiveness unknowingly use your trusting nature to assume liability for his unintelligible crimes based on his sense of entitlement to act above the law. Bill, always remember that you are not bigger than the United States.

As you recall, I arranged for you to settle the anti-trust case for approximately $35 million, which Billy turned down, even though you ended up paying the government $20 million more. As you also may remember that Bill Dillon came to me in April 2002 and suggested that I immediately get in touch with my attorney, Charles F. Rule of Fried Frank to direct him to call Dillon to renegotiate some of the terms of the $54 million that you had agreed to pay. Regrettably, Billy and his counsel, Bryan Lavine, once again interfered with your better interests when they contacted Mr. Dillon on the same day to tell him you decided to drop the appeal, you were infuriated with their actions at that time. You consequently wrote a letter dismissing Mr. Lavine. A copy of which will be presented as evidence.

2

## AFFADAVIT OF BILL L. HARBERT CONFIRMING THE TRANSFER OF
## REAL PROPERTY IN LAGUNA NIGUEL, CALIFORNIA

I, Bill L. Harbert, being of sound mind and body, do hereby declare that the facts set forth herein are based upon my personal knowledge and intentions, and if called upon to testify I could do so competently:

I, Bill L. Harbert, do hereby show in appreciation for and in exchange for Hoda Elemary's approximately 20 years of loyal and dedicated service to me, including her work for me regarding construction/legal matters in Saudi Arabia, Egypt and with the United States Government, (which have profited me and my companies tens of millions of dollars), have undertaken out of my free and informed will without any pressure from anyone, to provide Hoda Elemary with an executed quitclaim deed dated April 4, 2004 (please see attached executed quitclaim deed).

I executed said quitclaim deed as a settlement for projects completed in the past for which there were issues of dispute concerning full payment.

I am reaffirming on this date that my decision to execute the quitclaim deed on April 4, 2004 was the correct decision for me. To this end I have unconditionally and unequivocy guaranteed Hoda Elemary that I have not and will not sign another quitclaim deed to anyone else including to my son Billy Harbert. This guarantee is based on several factors, I firmly believe that it would be wrong for me to sign another quit claimdeed to anyone else concerning 21 LeConte Laguna Niguel California 92677 after I have out of my free will executed the April 4, 2004 quitclaim deed to Hoda Elemary.

*Bill Harbert*
*Aug 25. 04*

District of Columbia

On this 25th day of August, 2004 – Bill L. Harbert personally appeared before me and acknowledged that he executed the foregoing document.

1

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

I also have made this commitment on the basis that Hoda Elemary has expended a substantial sum of money improving the subject property. In understand that if I am pressured to forgo this guarantee I will do so under substantial financial penalties and liabilities to me from Hoda Elemary. I therefore will do everything in my power to live up to this guarantee. I have asked Mr. Bill Sharp to meet with Hoda Elemary to discuss several issues concerning my estate. I have assured Hoda Elemary that Mr. Sharp will in no way file suit against her or cause Hoda Elemary any damage on my behalf. My intentions remain positive towards Hoda Elemary.

I declare under penalty of perjury under the laws of the United States of America that the above and foregoing is true and correct.

This _25_ day of _Aug_, 2004.

Executed in the District of Colombia.

Bill L. Harbert

**District of Columbia )**

**SS.**

On August 25th 2004, before me, _Guillaume Tourniaire_, _Notary Public_

Personally appeared Bill L. Harbert, personally know to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

Witness my hand and official seal

Guillaume Tourniaire
Notary Public, District of Columbia
My Commission Expires 01-01-2008

2



**Bradley Arant**

BRADLEY ARANT ROSE & WHITE LLP

ONE FEDERAL PLACE
1819 FIFTH AVENUE NORTH
BIRMINGHAM, AL 35203-2119
205.521.8000   FAX 205.521.8800
WWW.BRADLEYARANT.COM

Matthew H. Lembke

Direct Dial: 205-521-8560
Direct Fax: 205-488-6560
mlembke@bradleyarant.com

March 22, 2006

<u>Via Fax and FEDEX</u>

The Honorable Bob Dole
Alston & Bird LLP
601 Pennsylvania Avenue NW
North Building, 10th Floor
Washington, D.C. 20004-2601

   Re: Mr. Bill L. Harbert, Sr.

Dear Senator Dole:

I represent Bill L. Harbert, Sr. in connection with certain disputes he has with Dr. Hoda Elemary. Last year, Mr. Harbert instructed Dr. Elemary to have no further involvement in connection with the qui tam proceeding that is pending against him in the United States District Court for the District of Columbia and to cease all communications with him.   Those instructions were contained in my letter dated June 2, 2005, a copy of which is enclosed.

Last week, contrary to the instructions contained in my letter of June 2, 2005, Dr. Elemary began a series of communications with Mr. Harbert in which she urged him to involve you in negotiations concerning his qui tam proceeding. Mr. Harbert advised her that he had a high regard for you, but that he did not wish for you or Dr. Elemary to have any further involvement in the qui tam proceeding or negotiations concerning it. Notwithstanding that instruction, Dr. Elemary has continued to communicate with Mr. Harbert on this point.

Mr. Harbert has asked me to convey to you directly his appreciation for your past involvement in his litigation, but to confirm his desire that you have no further involvement in it. He apologizes for the necessity of my contacting you directly, but Dr. Elemary's refusal to adhere to his instructions has made this necessary.

FEB-16-2005 11:20

TO:*7030000919497152060 P.2/3

# BOB DOLE

601 PENNSYLVANIA AVENUE, N.W.
NORTH BUILDING, 10TH FLOOR
WASHINGTON, D.C. 20004

February 16, 2005

Dear Mr. Hertz:

I remain grateful for your interest in Mr. Bill Harbert's matter, which is now before your Civil Division. As a follow-on to our meeting in July, and the meeting in December between Mr. Harbert's team and your staff, I am writing now to request a brief meeting, ideally during the first half of April.

I hope you will agree that we have made substantial progress and that this would be a propitious time to meet in an effort to resolve outstanding questions and reach a final settlement. Thank you for your consideration.

Sincerely,

BOB DOLE

Mr. Michael F. Hertz
Director
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
601 D Street, NW – Room 9902
Washington, DC 20530

# SENATOR BOB DOLE

601 PENNSYLVANIA AVENUE, N.W.
NORTH BUILDING, 10TH FLOOR
WASHINGTON, D.C. 20004

DRAFT

October 1, 2003

Mr. Bill L. Harbert
BilHar International Establishment
820 Shades Creek Parkway
Birmingham, AL 35209

Dear Mr. Harbert:

    This letter sets forth the terms of the engagement of Bob Dole Enterprises, Inc. ("BDE") by Mr. Bill Harbert ("Harbert") and supercedes all prior agreements. BDE commits to continue to work with you to ensure fair treatment of you and your interests by the Department of Justice and related institutions.

    As necessary and agreed, BDE will work with you to facilitate meetings with Justice, other Administration, and Congressional officials and to urge these entities and individuals to ensure fair treatment.

    BDE will maintain regular contact with Dr. Hoda Elemary and your legal counsel to ensure necessary coordination on all issues. All of BDE's activities within the framework of this agreement will be executed under the direction and supervision of Mr. Bill L. Harbert together with his Exclusive Manager Dr. Hoda Elemary.

    As compensation for these services, Harbert shall pay BDE a monthly retainer fee of US $50,000 for the period of October 1, 2003, through March 31, 2004, for a total retainer amount of $300,000. This financial arrangement may be extended by mutual consent of the signatories of this agreement.

    Senator Bob Dole will personally engage on your behalf and direct the activities of his staff as well as members of his law firm whom he may enlist at his sole discretion and as necessary to further this representation. BDE will compensate the firm for any such services at no additional cost to Harbert.

    An additional fee shall be paid to BDE depending on the outcome of efforts to conclude successfully and reduce fines proposed in your matter. The amount will be determined based on mutual agreement by both parties.

Mr. Bill Harbert
BilHar International Establishment
October 1, 2003
Page 2 of 2

*As modified by attached addendum*

If you agree to the terms of this letter,* please counter-sign and date both originals of this letter, and return one to me. The other copy is for your files. This engagement letter shall be effective once we have received your signature.

We look forward to continuing our work on your behalf. We will undertake all activities to advance your agenda with firm dedication and diligence. Thank you.

Sincerely,

ACCEPTED AND AGREED:

_____      Date: Oct 1, 03
Bill L. Harbert

_____      Date: Oct 1. 03
Hoda Elemary – Exclusive Manager

cc: Senator Bob Dole

* *Including the attached Addendum to Agreement For Services By Bob Dok Enterprises of October 1, 2003.*

Friday, C12-C18
could face Yanks
Teams' 19
Page C13.

# Business Day

### The New York Times

FRIDAY, APRIL

# Global Conspiracy on Construction Bids Defrauded U.S.

By KURT EICHENWALD

A group of international construction companies defrauded the American government out of tens of millions of dollars earmarked for Egyptian water projects undertaken as part of the Camp David peace accords, according to government officials and court documents.

One participant in the wide-ranging conspiracy, a unit of ABB Ltd., the Swiss engineering giant, pleaded guilty yesterday to its role in the scheme, agreeing to pay $63 million in fines and restitution.

The conspiracy, which lasted more than seven years, involved the rigging of contract bids submitted in the late 1980's and early 1990's to the United States Agency for International Development, which was financing Egyptian water projects that resulted from the Middle East peace accords reached during the Carter administration.

Contracts were supposed to be awarded through competitive bidding. But the construction companies subverted the bidding process through payments of bribes and kickbacks to other possible bidders, fraudulent billings to the government and the laundering of cash through Swiss bank accounts, court records in related cases show.

The conspirators included at least six international construction companies, which collectively referred to themselves as the Frankfurt Group, according to people briefed on the case. At the time of the bidding, the companies were either American or American subsidiaries of European concerns. The name of the group came from the fact that some of the largest companies were based in Frankfurt.

The investigation of the conspiracy began almost six years ago, after a top financial officer at one of the companies noticed a series of improper wire transfers, and other transactions. That executive then

brought those matters to the att the Justice Department, which h investigating ever since.

According to court records, c involved in the conspiracy were obtain profits of as much as 60 p the Egyptian water projects — that would be almost certainly in to obtain under competitive bid deed, some of the companies wen lengths to hide their profits, charg tious expenses from related com decrease the returns shown on the All told, about a dozen contra

Continued on Page 6

## A New Toy Story

Some toy manufacturers have begun marketing



Johnny Apple Bot, circa 2001

Confidence

ursuit
nts

Staff shrunk-
d to custom-
essing
its and
sh.
nillion
taxes have
ue since the
day to collect
owrote off
968,018
rs had their
re A1.]
it
yed
w as tur-
cal sys-
s first-

# Construction Conspiracy Defrauded United States

*Continued From First Business Page*

been awarded under the program, totaling more than $1 billion. To date, three contracts have been found to involve fraud, and the others remain under investigation.

The investigation has already resulted in two other guilty pleas, entered last fall by other construction companies. But until yesterday the full scope and implications of the criminal investigation were not publicly known.

In the plea entered yesterday in Federal District Court in Birmingham, Ala., ABB Middle East and Africa Participations A.G., a Milan-based subsidiary of the engineering company, admitted to taking part in a conspiracy to rig the bid for a project known as Contract 29. The original participant in the conspiracy was SAE Sadelmi USA, another ABB subsidiary, which was based in North Brunswick, N.J., and later became part of the Milan subsidiary.

Under the terms of the illegal agreement, the ABB unit met with other potential bidders on Contract 29, and agreed to pay them $3.4 million to submit inflated bids for the project. The ABB unit was then able to inflate its own bid on the project, knowing the offer would still beat other submissions. The value of the awarded contract, which was to pay for building a wastewater treatment plant in Abu Rawash, Egypt, was about $135 million.

"Although the construction work that is the subject of this case was performed on foreign shores, the U.S. government paid the bill and the U.S. taxpayers were the victims of the scheme," John M. Nannes, acting assistant attorney general in charge

## Bids were rigged for contracts awarded as a result of the Camp David accords.

of the Justice Department's Antitrust Division, said in a statement.

An ABB spokesman, William Kelly, said the company had been co-

## Companies in the plot were said to achieve profits of as much as 60 percent.

Birmingham, and the J.A. Jones Construction Company, a Charlotte, N.C., subsidiary of Philipp Holzman A.G. of Frankfurt.

Philipp Holzman pleaded guilty to a criminal complaint filed under seal last August. A spokesman for Harbert did not return a telephone call.

According to court filings by the government in related cases, the Jones-Harbert venture was at the center of other bid-rigging efforts involving the Egyptian water projects. For example, American International Contractors Inc., a construction company based in Virginia and owned by the Archirodon Group of Geneva, pleaded guilty last fall to accepting payments in exchange for a commitment not to bid on a project known as Contract 20A. That contract was awarded to the Jones-Harbert joint venture, court records show.

Indeed, irregularities in Contract 20A led to the discovery of the broader bid-rigging scheme. The irregularities were first discovered by Richard F. Miller, who worked first as a controller and then as treasurer of Jones from 1986 though 1996.

During the course of his work, Mr. Miller discovered a series of improper transactions involving the joint venture with Harbert, and pieced together that a bid-rigging scheme had been used in Contract 20A, a $107 million sewer project in Cairo.

Among the evidence eventually discovered by Mr. Miller, according to court records from a federal whistle-blower suit he filed, were wire transfers for $3.35 million from the joint venture to a related company for fictitious "preconstruction costs."

The most complex transaction, according to the court records, was a bogus "sale-leaseback" arrangement involving a Jones-related company called Sabbia. Under the terms of the deal, Sabbia was to purchase



MY 23 2003 4:25PM                                    813   4197

SHARP, SMITH & HARRISON, P.A.
4890 W. Kennedy Blvd., Suite 900
Tampa, Florida 33609-1850
Tel: +1-813-286-4199    Fax: +1-813-286-4197
E-mail: wsharp@ssh-intl-law.com

## MEMORANDUM

**Privileged &
Confidential**

To:         File (3116)

From:       William M. Sharp, Sr.

Date:       February 4, 2002

Re:         Bill Harbert International Construction, Inc. ("BHIC") and Bill L.
            Harbert ("BLH") – Summary of Meetings Held from Wednesday,
            January 30, 2002 through Friday, February 1, 2002 – Settlement of Case

### Introduction.

From Wednesday morning, January 30, 2002 through Friday afternoon,
February 1, 2002, we had a series of conference calls as well as a number of meetings
in Washington, D.C., Atlanta, Georgia and Birmingham, Alabama, all of which
culminated in the settlement of the pending Department of Justice (the "DOJ")
indictment against Bilhar International Establishment ("Bilhar") and BHIC, which
was set for trial on Monday, February 4, 2002 (BLH also was included in the
settlement). At the time of this dictation on Monday, February 4, 2002, the DOJ
indictment against Roy Anderson had not been settled [note: Roy was convicted,
sentence pending on March 29, 2002]. This memorandum summarizes the various
meetings that were convened and the matters that were discussed.

### Settlement Overview.   *(OF ANTITRUST)*



Prior to the beginning of serious settlement discussions, we understood that
the settlement would cost at least $50 million if not closer to $60 million *if the qui
tam* also were settled. We also realized that we would need to give Roy Anderson
some form of assurance, as a practical matter, to try to help settle this case.
Although Jim Neal and the Troutman team have disagreed on the various
consequences of not settling the trial, the general consensus was that the possibility
of post-trial indictments, especially in tax, money laundering, RICO, wire fraud and
related areas, would be seriously pursued by the DOJ against BLH and possibly other
persons and entities. We also had concerns for BLH's health and emotional well-
being, and the overall adverse publicity of the full-blown trial would also create

File (3116)                                          Privileged &
February 4, 2002                                     Confidential

During our background discussion of the Sabbia sale leaseback, Alan Granwell mentioned that the Coleman v. Commissioner, 87 T.C. 178 (1986) case might be helpful in analyzing the Sabbia sale leaseback transaction. This case involved a lease transaction designed to create a domestic tax shelter for purposes of obtaining a first year tax deduction for the supplier's lenders under the U.K. tax law and create other U.S. tax benefits. The court disallowed depreciation deductions in respect of a non-recourse note but did allow deductions for the recourse note portion that was genuine.

In the evening, on January 30, 2002, around 5:00 p.m. we again talked with Jim Neal. Jim said that BLH wants to settle the case and he wants to move ahead with the plea agreement. Jim said that Bryan and June Ann were screwing around with language regarding Contract 29, but it looked like Count I was the only applicable to Contracts 20A and 29 and Count II was applicable to one of the other contracts. Jim said that we were having problems getting the suspension lifted, but this should be done early in the week. He was going to get with Henry to draft the appropriate language. Jim said that Bilhar and BHIC would encourage their employees to cooperate but there would be no binding obligations in this regard.

On Wednesday evening, January 30, 2002, Alan and Alan invited Bill Harrison and me to the Washington D.C. tax bar special event that featured seven living IRS commissioners. After that function, we continued to discuss the case over dinner.

Thursday, January 31, 2002

On Thursday morning, January 31, 2002, Jim Neal tracked us down through our office at approximately 9:00 a.m. (we were getting in our cab that very cold morning to go to Alan's office). Jim said that he had met with BLH, and that the settlement proposal is likely to be completed. Various glitches regarding the cooperation of BLH apparently were being worked out. Jim said it is very important for BHIC to have a "clean bill of health" so Billy can use the company. Jim said he wants us to think about how to protect Bilhar's assets that will be held in various investment accou... pending the five year payout, and he expressed serious concern about the qui tam... tion.

Once we arr...d at Alan's office, we telephoned Jim and talked for about 45 minutes. Jim again reiterated that the cooperation agreement appeared to be worked out. He made it clear that BLH will only answer a few simple questions, and will not go into an in-depth interview. The DOJ has agreed to provide a letter confirming that cooperation has occurred and is completed once the interview

File (3116)
February 4, 2002

Privileged &
Confidential

After our conference call, we convened our meeting with Alan Granwell and Alan Swirski about 10:00 a.m. We met for another couple of hours, to wrap up our discussion. Alan expressed concern about the Section 367(d) "super royalty" and its impact on earnings and profits (on HIE assignments of contracts to Bilhar). He also expressed concern about the transfer pricing study that would need to be conducted in order to determine this royalty. Neither Alan Granwell nor Alan Swirski were aware of the six-year statute of limitations for criminal tax purposes. However, everyone agreed civil fraud could open up the company for several years of examination. Alan Granwell agreed that BLH had the protection of the PTI account.

Alan Granwell expressed concern about the engaged in trade or business issue. He also expressed concern about the assignment of the contracts, citing the Hospital Corporation of America, for Section 267 purposes.

Late Thursday afternoon after traveling to Atlanta, WTH and I discussed on the plane with June Ann Sauntry the concern that we had with the Darier account. From 1981 through 1988 the deposits in this account amounted to $1,571,232. The 1991 deposit of $1,750,000 means that Darier has received $3,321,232 of apparent unreported income.

After discussing Darier, June Ann expressed some concern about the so-called "premium" being paid by Bilhar to the DOJ. We walked back through the numbers, and the premium really varies between $5 million and $12 million. Also, late Friday afternoon, February 1, 2002, Alan Hall acknowledged that he was counting $3.0 million for the Darier account, when the real balance was probably around $1.8 million. We told Alan we would get all balance and financial information for him.

During our discussion Thursday afternoon, June Ann confirmed that the cooperation obligation will be confirmed by a short letter from Dillon to be delivered at the BLH interview in Birmingham on Friday, February 1. Again, June Ann said that the cooperation could force Bilhar to turn over the Darier account records, but there was nothing we could do about it. Upon reflection, it might have been better to leave Darier alone from the beginning, however, this would have continued to prolong the problem and never bring matters to closure.

Later on in the afternoon we discussed the possibility of contributing high basis, low value stock to Bilhar in order to offset the approximate $6 million unrealized gain in the SouthTrust shares. Unfortunately, when I discussed this matter with BLH on Friday, February 1, BLH and Van Hoover said that BLH does not have any such unrealized losses.

File (3116)                                                    Privileged &
February 4, 2002                                               Confidential

_____

Late Thursday afternoon, January 31, 2002, at approximately 5:15, we called Alan Granwell and Alan Swirski, to notify them of the imminent settlement. Alan Swirski thanked us for our call and said they would put everything on hold and stop working. We asked Alan to forward us an invoice.

After arriving in Atlanta, WTH spoke to Jim Neal, and then we had a lengthy discussion with June Ann Sauntry. Bryan Lavine did not join us until approximately 6:00 p.m. that evening. WTH departed at 6:45 p.m. and I left a little later. When I arrived at the house, I spent a couple of hours preparing for Friday's session in Birmingham. Bryan and I agreed to meet at his office at 8:00 a.m. on Friday, February 1, 2002 and drive to Birmingham together.

Jim Neal expressed concern that Jim Rein was pushing settlement too hard, but Jim Neal believes that the settlement agreement worked out well. Henry Froshin wanted to settle the qui tam matter immediately, but everyone agreed this should wait for a while. The same goes for the potential Harbert International, Inc. lawsuit (Raymond Harbert).

Apparently, Jim Rein has focused solely on the BHIC interests, Billy has been focusing on his father's and BHLI's interests and Alan has focused solely on the interest of Bill Harbert. Jim Rein similarly wanted to settle at all costs, no matter want. All of this troubled Jim Neal because his job was to get BLH out of this mess.

During our discussion with Jim Neal we talked about other aspects of the settlement, including the payment schedule and what is the true "premium" that is being paid. This varies depending on whether or not the HIE SA note of approximately $6.5 million is counted. Jim reminded us that the qui tam action does not include Bilhar, but only includes Harbert Services, U.K., Harbert International Establishment, and BHIC. Jim said that he is not very comfortable that the government would be barred from adding Bilhar.

Later on in the day Bryan Lavine told us that he and Dillon had had a "screaming match" earlier in the day, and Bryan said he is just tired of dealing with Dillon. Bryan said he may consider ethical action. Bryan also said that he made it very clear to BLH that he does not have the right to tell him what to do, but the upshot of everyone's commentary is that BLH should settle the case. Bryan went on to tell us that just between us that he would prefer to litigate the case. He feels that $14 million premium may be too much, but as we revisited the numbers, and assuming the Bilhar note is paid, Bryan agreed this "premium" is probably significantly less (probably about $8-9 million and may be as low as $4-5 million, depending on time value of money assumptions). Also, Bryan agreed that active

File (3116)                                              Privileged &
February 4, 2002                                         Confidential

foreign business income can be generated by Bilhar on a joint venture basis over the next five years, and it may be possible to structure Bilhar's passive income under the five percent/de minimis test. All of these will require further thought and consideration. Jim Neal repeatedly told us that we need to structure the tax aspects of this matter to maximize dollars.

We discussed Roy Anderson. The general drift was that he may or may not go to trial, and his lawyer, Chuck Murphy may try to plead the case. Jim said that the Plea Agreement gives BLH peace of mind, and it gives Billy's company a clean start. Everyone seems to agree that Dillon has a hands down case on bid rigging and would succeed at trial against Bilhar and BHIC, and that a post-conviction proceeding against BLH would be very possible.

Friday, February 1, 2002

On Friday morning, February 1, 2002, Bryan Lavine and I spent a couple of hours in the car going over the case. I mentioned that the discounted net present value of the $54 million payment obligation ranges from $50.8 million to $44.5 million, using a three percent to ten percent discount rate. WTH and I discussed the overall tax cost, and concluded that the overall tax savings from this matter, assuming the additional "premium" will be generated as tax deferred income to Bilhar, constitutes 38.6% times the $54 million, which amounts to $20,844,000 in permanent tax savings (i.e., a payment of the fine by Bilhar after earning tax deferred income and using the accumulated tax deferred income).

Bryan Lavine and I arrived in Birmingham at approximately 9:30 a.m., and the plea agreement documentation was already in process and being drafted by Henry Frohsin and Jim Neal. Actually, Jim and Keltie Hays were en route from Nashville. Jim was planning on spending Friday and Saturday night in preparation for the trial, but he later said he would probably go back to Nashville sometime Saturday (after the meeting with Bill Dillon on cooperation).

Subject to review of my notes, and confirming the details of various items, the remainder of this memorandum summarizes the many meetings that were held during the course of these discussions on Friday, February 1, 2002. I had the opportunity to meet with BLH by himself, and during that discussion, I walked BLH through the settlement, and also discussed with BLH the other areas of concern, especially tax law issues (that were carved out of the agreement). BLH said he fully understood the settlement proposal, and that he wanted to get the matter settled. We then had a discussion among BLH, Billy Harbert, Alan Hall and joining us later Jim Rein, and we all discussed the settlement agreement. In the presence of all

File (3116)                                                    Privileged &
February 4, 2002                                              Confidential

_____

those individuals, BLH said he wanted to have this matter fully settled. In the
course of this discussion, BLH asked me whether or not the company is in good
shape (both his entities as well as BLHI) for purposes of his making additional
investments, and how should those investments be structured. I told BLH that
there are several tax aspects of participation between Bilhar/BHIC on the one hand
and BLHI on the other, and we first needed to let the dust settle on the plea
agreement before we get too far into this. I also told BLH that our primary concern
was to review the tax aspects of the proposed settlement agreement. I explained that
we are structuring the payment obligation purely from Bilhar in order to maximize
tax efficiencies. I explained how this should reduce Bilhar's earnings and profits.
During the course of these discussions, Bryan Lavine and Jim Neal returned to
BLH's office, and said that we needed to get to work on the plea agreement drafts,
and also the draft letters regarding BLH's understanding of this matter. Jim Neal
said it is very important for BLH to sign off in writing that he understands this
agreement, and is fully accepting it. BLH said that would be fine.

From approximately noon until 2:00 p.m. we worked on the plea agreement
and underlying documentation, as well as the BLH "sign off" letter. In addition,
Henry was working on the cooperation letters that he had sent over to Bill Dillon.

The meeting with Bill Dillon regarding "cooperation," originally scheduled
for 11:00 a.m., was pushed back until the middle of the afternoon. We later went
down to Henry's offices, and while BLH and I were walking up to Henry's offices
from the parking garage we ran into Bill Dillon and his assistant. I sat in a separate
room with BLH while Jim Neal was preparing Bill Dillon with the other attorneys,
and the meeting between BLH and Bill Dillon only took a few minutes (see separate
file memorandum).

Later that afternoon we returned to Birmingham. I had arranged for a 5:00
p.m. pick-up, and told BLH, Billy and others that I needed to get back to Atlanta.
Bryan Lavine was staying over the night, as was Jim Neal. Everyone agreed to meet
in Birmingham, at BLH's offices on Saturday afternoon, about 3:00 p.m. to review
the "sign off" letter. Jim Neal said he wanted to make sure that not only BLH, but
Billy and the others would sign off on this letter.

Saturday, February 2, 2002

On Saturday, February 2, 2002, Jim Neal telephoned me to express concern
about the publication of the BLH guaranty in the public press. I told Jim that I
couldn't think of any way this could not occur. I also told Jim that the guaranty
letter was somewhat "loosey-goosey" and might not be read as a firm guaranty but

File (3116)
February 4, 2002

Privileged &
Confidential

that it is probably a legally binding agreement (note that BLH signed this as Chairman of Bilhar – not as an individual). However, upon Jim's question, I told Jim that it was my impression that BLH would be required to affirmatively disclose the guaranty to his banks. As discussed on Friday, February 1, 2002, BLH's bank is now requiring 100% collateral for all guarantees, which will tie up all of BLH's SouthTrust stock. Apparently the bank is taking the position that the qui tam suit, together with the DOJ guaranty will tap BLH out financially. Also, for some reason, the bank learned about the prospective Raymond Harbert suit, and is taking this into account. Bryan Lavine will talk to the bank to try and work this out.

WMS:mv



Civil Division
Commercial Litigation Branch

CGMark
46-16-2472

P.O.D. Street, N.W., Room 6930
Washington, D.C. 20530

202/307-0295
FAX: 202/514-7361

December 13, 2004

<u>BY FAX – (205) 326-8890</u>

Earl F. Hilliard, Esq.
Hilliard, Smith & Hunt, LLC
P. O. Box 12445
Birmingham, AL 35202

    Re:    U.S. ex rel. Miller v. Holzmann A.G., et al.
           <u>1:95CV01231 (D.C.D.C., filed Jun 30, 1995)</u>

Dear Mr. Hilliard:

    I am writing to confirm our telephone conversation today among you, AUSA Keith Morgan, and myself concerning your client, Bill Harbert Sr. As you know, we have asked that your client provide copies of Swiss bank records to us.

    We are willing to undertake not to disclose from whom we obtained the records, unless we are required to do so by the court, or through discovery or other legal process. We also are willing to agree that we will not raise the subject of the documents during our upcoming meeting on Thursday, December 16th. We otherwise cannot agree to maintain "strict confidentiality" regarding the bank records as it is not clear to us precisely what that entails.

    We appreciate your cooperation in this matter.

                        Sincerely,

                        CAROLYN G. MARK
                        Senior Trial Counsel
                        Commercial Litigation Branch
                        Civil Division

# HILLIARD, SMITH & HUNT, LLC.

### ATTORNEYS and COUNSELORS
### 228 19th Street North
### P.O. Box 12445
### Birmingham, Alabama 35202-2445
### (205) 326-8844
### (205) 326-8890 fax

Earl F. Hilliard, Jr. •
Alexia L. Hilliard-Smith

Janine Hunt-Hilliard
Earl F. Hilliard••

March 8, 2005

Judge John M. Facciola
United States District Court
For The District of Columbia
Washington, D.C. 20001

RE:  United States of America, ex rel Richard F. Miller v. Phillip Holzman AG, et al.
     Case No.:  195CV01231 WBB

Your Honor,

As attorney of record for Bill L. Harbert, I am writing to appeal to the Court to consent to mediate the difference between the government and Bill L. Harbert, Sr.  While I was physically able to negotiate with the government, significant progress had been made to date in reducing the number of issues that are still outstanding.

Regrettably, I had a near fatal accident on March 2, 2005, and am writing you from the ICU of the University of Alabama Hospital at Birmingham.  My physicians have indicated to me that it will be as least several weeks before I am able to personally participate in negotiations through electronic communications, and six months to a year before I will be able to walk again.  Accordingly, I am requesting on behalf of Bill L. Harbert, Sr, that the Court remove our appearance on April 5, 2005 from its calendar and commence immediate mediation with the parties in early May 2005.

Thank you for your serious consideration of my request.  I have enclosed the police and medical reports related to my accident for your information.

Sincerely,

Earl F. Hilliard
Of Counsel

EFH/jeh
enclosures (2)

---

•  Admitted to practice in Georgia and Washington, D.C.
••  Of Counsel

Copies To: *Laguna Niguel*

**2. Case No.** 05-072937

**2a. Citation No.**

**SHERIFF'S DEPARTMENT**
**ORANGE COUNTY**
**SANTA ANA, CALIFORNIA**
ORIGINAL

MICHAEL S. CARONA, SHERIFF-CORONER

**INITIAL CRIME REPORT**

Priority: ☐ Yes  ☒ No

**3. OFFENSE**
C.P.C. 240-242- Assault and Battery

**4. DATE-TIME COMMITTED**
04-14-05/Approximately 2030 hours

**5. WHERE COMMITTED**
#21 Le Conte  Laguna Niguel, 92677

**6. GRID**
971-D2

**7. DATE-TIME REPORTED**

**8. INFORMANT**
Same as 310

**9. ADDRESS-PHONE**
Same as #11

**10. VICTIM**
Elemary, Hoda

**DOB**
02-03-52

**11. ADDRESS-PHONE**
#21 Le Conte  laguna Niguel, 92677(949-715-2022)

**12. BUSINESS ADDRESS-PHONE**

**13. CONTACT TIME-ADDRESS**
Anytime at home

**14. FIRM NAME OF VICTIM**

**15. BUSINESS ADDRESS-PHONE**

**16. VICTIM'S OCCUPATION**
Retired

**RACE**
B

**SEX**
F

**AGE**
53

**17. TYPE OF PREMISES OR LOCATION WHERE OFFENSE WAS COMMITTED**
Driveway of residence

**COMPLETE ON ALL APPLICABLE FELONIES, MISD, SEX AND THEFTS**

**CRIMES AGAINST PROPERTY**

**18. POINT OF ENTRY**

**19. INSTRUMENT OR MEANS USED**

**20. METHOD USED**

**21. WHERE WERE OCCUPANTS AT TIME OF OFFENSE?**

**26. APPARENT MOTIVE – TYPE PROPERTY TAKEN**
Anger

**28. UNIQUE OR UNUSUAL ACTIONS BY SUSPECT(S)**
Pushed victim from behind while victim was walking towards residence

**29. VEHICLE USED BY SUSPECT(S)    YEAR, MAKE, BODY TYPE, COLOR, LIC. NO., AND ANY OTHER IDENTIFYING MARKS**
Unknown

**CRIMES AGAINST PERSONS**

**22. WEAPON OR MEANS USED**  Hands

**23. VICTIM'S ACTIVITY AT TIME OF OFFENSE**
Walking into residence

**24. EXACT WORDS USED BY SUSPECT**
None

**25. FORCE OR METHOD USED**
Pushed victim from behind

**27. TOTAL VALUE STOLEN**
$

**30. WITNESSES R/B RESIDENCE/BUSINESS ADDRESS-PHONE**

| | | |
|---|---|---|
| (1) Unknown | R | |
| | B | |
| (2) | R | |
| | B | |
| (3) | R | |
| | B | |

**31. SUSPECT(S) (IF ARRESTED, NAME, ADDRESS, AND BOOKING NUMBER)**

(1) Male, white,5-10,180fbs.,brown hair,gray pants       **BKG. NBR.**

(2)       **BKG. NBR.**

(3)       **BKG. NBR.**

|  NAME | ADDRESS | SEX | RACE | DOB | HT. | WT. | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|

**32. DETAILS OF OFFENSE: EVIDENCE COLLECTED, DESCRIPTION AND VALUE OF PROPERTY TAKEN, LIST ADDITIONAL WITNESSES AND SUSPECTS**

| QUAN. | ARTICLE | BRAND | SERIAL NO. | MODEL NO. | MISC. DESCRIPTION | VALUE |
|---|---|---|---|---|---|---|

INJURIES:

BROKEN SHOULDER

**33. INVESTIGATING OFFICERS**

**REPORT BY**
Deputy J. Danks #4017

**34. DATE OF REPORT**
4/18/05

**35. APPROVED**

PAGE 1 OF 2

1. COPIES TO:
*Laguna Niguel*

2. CASE NO. 05-072937

**SHERIFF'S DEPARTMENT**
ORANGE COUNTY
SANTA ANA, CALIFORNIA

MICHAEL S. CARONA, SHERIFF-CORONER

REPORT CONTINUATION

On Monday, April 18, 2005, at approximately 1810 hours, I arrived at #21 Le Conte in the city of Laguna Niguel and spoke to Elemary, Hoda (02-03-52) regarding an assault and battery.

Elemary told me the following: On 04-14-04 at approximately 2030 hours, she arrived at her residence. She parked her vehicle on the street and walked to her residence. As she walked onto her driveway, she saw a male subject standing near her front door.

The male subject told Elemary he was there to check for Swiss bank account records. Elemary told the subject she did not have any bank records. The male subject stated he was coming inside her residence to check. Elemary told the subject he could not come inside her residence and told him if he did not leave her premises she was going to call the police. Elemary turned away from the subject and began walking towards her front door.

As she walked to the front door, she felt something push her in the back. Elemary fell to the ground, striking her right shoulder on the front steps. Elemary told me she felt an excruciating pain in her right shoulder. She looked for the subject that pushed her but he was gone. Approximately 5 minutes later, Elemary's ex-husband, Awad, arrived at the residence and took her to the hospital.

Elemary suffered a broken shoulder. She feels this incident was related to an on-going government court battle she is involved in with a subject named Mr. Harbert. I gave Elemary a case number and told her to call the Sheriff's Department with any additional information.

| 33. INVESTIGATING OFFICERS | REPORT BY | DATE OF REPORT | APPROVED |
|---|---|---|---|
| | Deputy J. Danks #4017 | 4/18/05 | |

PAGE 2 OF 2

# ORIGINAL

**SHERIFF'S DEPARTMENT**
**ORANGE COUNTY**
**SANTA ANA, CALIFORNIA**

MICHAEL S. CARONA, SHERIFF-CORONER

Copies To: *Laguna Niguel*
F.B.I. & D.O.J.

Priority: ☐ Yes  ☒ No

2. Case No. 05-051073
2a. Citation No.

**INITIAL CRIME REPORT**

| | |
|---|---|
| 3. OFFENSE<br>CPC 653M Threatening Phone Call | 4. DATE-TIME COMMITTED<br>Fri. 3-18-05-0505 hrs. |
| 5. WHERE COMMITTED<br>21 Lu Conte, Laguna Niguel 92677 | 6. GRID<br>141/971D1 | 7. DATE-TIME REPORTED |
| 8. INFORMANT<br>#10 | 9. ADDRESS-PHONE<br>#11 |
| 10. VICTIM<br>Elemary, Hoda Hisham        DOB 2-3-52 | 11. ADDRESS-PHONE<br>21 Lu Conte, Laguna Niguel (949) 715-2022 |
| 12. BUSINESS ADDRESS-PHONE<br>Same As #11 | 13. CONTACT TIME-ADDRESS<br>M-F 8-5 #11 |
| 14. FIRM NAME OF VICTIM | 15. BUSINESS ADDRESS-PHONE |

| 16. VICTIM'S OCCUPATION | RACE | SEX | AGE | 17. TYPE OF PREMISES OR LOCATION WHERE OFFENSE WAS COMMITTED |
|---|---|---|---|---|
| Lobbyist | Can | F | 53 | Single Family Residence |

**CRIMES AGAINST PROPERTY** / **CRIMES AGAINST PERSONS**

COMPLETE ON ALL APPLICABLE FELONIES, MISD., SEX AND THEFTS

| | |
|---|---|
| 18. POINT OF ENTRY | 22. WEAPON OR MEANS USED |
| 19. INSTRUMENT OR MEANS USED | 23. VICTIM'S ACTIVITY AT TIME OF OFFENSE |
| 20. METHOD USED | 24. EXACT WORDS USED BY SUSPECT |
| 21. WHERE WERE OCCUPANTS AT TIME OF OFFENSE? | 25. FORCE OR METHOD USED |
| 26. APPARENT MOTIVE – TYPE PROPERTY TAKEN | 27. TOTAL VALUE STOLEN<br>$ |
| 28. UNIQUE OR UNUSUAL ACTIONS BY SUSPECT(S)<br>None Noted | |
| 29. VEHICLE USED BY SUSPECT(S)   YEAR, MAKE, BODY TYPE, COLOR, LIC. NO., AND ANY OTHER IDENTIFYING MARKS | |

| 30. WITNESSES R/B RESIDENCE/BUSINESS ADDRESS-PHONE | | |
|---|---|---|
| (1) Unknown | R<br>B | |
| (2) | R<br>B | |
| (3) | R<br>B | |

| 31. SUSPECT(S) (IF ARRESTED, NAME, ADDRESS, AND BOOKING NUMBER) | | |
|---|---|---|
| (1) Unknown | BKG. NBR. | |
| (2) | BKG. NBR. | |
| (3) | BKG. NBR. | |
| NAME        ADDRESS        SEX  RACE  DOB  HT.  WT.  HAIR  EYES | | |

32. DETAILS OF OFFENSE: EVIDENCE COLLECTED, DESCRIPTION AND VALUE OF PROPERTY TAKEN, LIST ADDITIONAL WITNESSES AND SUSPECTS

| QUAN. | ARTICLE | BRAND | SERIAL NO. | MODEL NO. | MISC. DESCRIPTION | VALUE |
|---|---|---|---|---|---|---|

**Narrative:**

I talked to Victim Elemary, Hoda at her residence and she told me the following: On 3-18-05, at 0505 hrs, Elemary answered her phone and the un-identified male caller in a muffled voice with a slight southern accent said, "You'll be killed." The caller then hung up the phone. Elemary's phone rang again about 5 minutes later and when she picked it up she heard no one. Elemary didn't recognize the voice on the phone, but she is afraid that the caller may carry out the threat.

| 33. INVESTIGATING OFFICERS | REPORT BY<br>Dep. E. Hutchinson #463 | 34. DATE OF REPORT<br>3/18/05 | 35. APPROVED |
|---|---|---|---|

PAGE 1 OF 2

1. COPIES TO:
*Laguna Niguel*

2. CASE NO. 05-051073

**SHERIFF'S DEPARTMENT**
ORANGE COUNTY
SANTA ANA, CALIFORNIA

MICHAEL S. CARONA, SHERIFF-CORONER

REPORT CONTINUATION

I asked Elemary to explain and she told me the following: Elemary is a Lobbyist in the U.S. Congress and she is affiliated with the World Peace Group out of Palm Springs. Billy Harbert Sr. of B.L. Harbert International LLC Group a large construction company out of Birmingham Alabama has retained Elemary as a Lobbyist. Elemary has been involved with various government committees, several U.S. Senators and the Department of Justice regarding bid rigging for federal contracts in the construction industry. Elemary and her partner Earl Hilliard assisted the DOJ committee and worked with Criminal Prosecutor Bill Dillon (404-331-7115) in a matter that ruled against B.L. Harbert International for bid rigging. Elemary is also in the process filing a civil suit against B.L. Harbert International and particularly B.L. Harbert Jr. for breach of contract.

Elemary is currently working with attorney Carolyn Mark (202-307-0256) of the Department of Justice in a civil case against B.L. Harbert International. Elemary is greatly concerned about the threatening phone call because of prior incident regarding a threat over the phone that occurred on 11-4-04 (See DR04-022613 for CPC 653M.) Also on 3-2-05, Elemary's partner Hilliard was recently involved in a suspicious car accident, with a piece of heavy construction equipment vehicle that occurred suspiciously in the middle of the night. Hilliard's injuries are so severe that he will not be able to walk for 6- 12 months. Elemary handed me numerous letters from various individuals to support what she was saying (See attached). Sgt. B. Lumm was advised of the situation.

I talked to Department of Justice Attorney Carolyn Mark on the phone later that day. Carolyn Mark confirmed what Elemary had said about working with D.O.J. and she told me that Elemary was a credible individual. Mark told me that Elemary was involved in the Criminal case against B.L Harbert International and she dealt with DOJ Prosecutor Bill Dillon. Sgt. Lumm was advised.

I asked Elemary if she had an idea who may try to harm her. Elemary felt that anyone affiliated with B.L Harbert International or his or her associates are possible but she isn't sure.

33. INVESTIGATING OFFICERS

REPORT BY
Dep. E. Hutchinson #463

DATE OF REPORT
3/18/05

APPROVED 

PAGE 2 OF 2



Newport Orthopedic Institute
PO Box 2597
Newport Beach, CA
92659
Phone:(949) 722- 7038 Ext.3604
Fax: (949) 630- 4935

Elemary, Hoda A.
132335
06/28/2006

Hoda is a young lady I saw over a year ago. She had an injury when she was accosted at home and was pushed down and had a minimally displaced scapular fracture. I have not seen her in over a year. She presently states she has a therapist coming 3 times a week to her home, and she swims. She complains of a radicular pain in her shoulder, sort of in her axilla area, and running down her arms with certain motions. It comes and goes. She says when she does a back stroke in swimming, it bothers her.

**PHYSICAL EXAMINATION:**  Her range of motion is not 100% but almost 90% of normal. She is just worried and wondering when this pain in her arm will get better.

**RADIOGRAPHIC EXAMINATION:**  No x-rays were taken today.

**TREATMENT PLAN:**  I feel probably her scapular fracture has healed, and the complaints she states are secondary to the trauma she had. At this time, no formal workup was done including neurological evaluation or MRI, which I am not sure would be beneficial at this time, but these symptoms began at the time of her injury and have not gone away.

Alexander H. Tischler, MD

AHT:pb/lm

**SOUTH COAST MEDICAL CENTER**
31872 COAST HIGHWAY, LAGUNA BEACH CA 92651
(949) 499-7193
**Discharge Instructions**

M. Taub MD

HODA ELEMARY
4862694

# SHOULDER FRACTURE

A FRACTURE is the medical term for a BROKEN BONE. This may be a small crack in the bone with nothing out of place. It may also be a major break with the broken parts pushed out of position.



If the bone fragments are in place, shoulder fractures are treated with a sling only. Casts are usually not used for this type of fracture. Healing occurs in 4-6 weeks. More serious injuries may require surgery to put the bones back into the correct position for healing.

## HOME CARE:

1) Leave the sling in place. Keep your injured arm at your side.

2) If the sling becomes loose, adjust it so that your forearm is horizontal (level with the ground) or the hand is slightly higher than the elbow. The shoulder should feel well supported.

3) During the first two days, apply ice packs over the injured area for 20 minutes every 2-4 hours. This will reduce swelling and pain.

4) You may take Tylenol (acetaminophen) or ibuprofen (Advil, Motrin) for pain, unless another pain medicine has been prescribed.

5) Do not remove the sling before your next exam unless you were instructed to do so.

**FOLLOW UP:** Shoulder joints become stiff if left in a sling for too long. Follow up with your doctor in about one week to determine when it is safe to begin range-of-motion exercises.

NOTE: A radiologist will review any X-rays that were taken. We will notify you of any new findings that may affect your care.

**RETURN PROMPTLY** if you develop any of the following:
– Fingers become swollen, cold, blue, numb or tingly
– Large amount of swelling or bruising of the shoulder or upper arm
– Increasing shoulder pain or arm swelling

Images - Copyright © 2004 The StayWell Company
Copyright © 1990-2005 Parker Hill Associates, Inc.    PATIENT COPY - Page 1 of 4

**Partial Transcript of December 7, 2006 Telephone Conversation**

**Between Congressman Earl Hilliard and Dr. Hoda Elemary**

**Dr. Elemary**: It greatly upset me to learn that Billy (Harbert) kept creating
problems with your daughter-in-law, I mean that is just uncalled
for when you are in a coma.

**Congressman Hilliard**: Yeah, he was, he was a bad apple.

**Dr. Elemary**: I fully understand your predicament not wanting to involve your
children because whatever happened to you they are not part of
the Harbert situation...I very much appreciate that you live in the
State of Alabama and that these people have, you don't have to tell
me, I know Bill Harbert... Let me put it to you that way
Congressman. the statements you stated to me during our last
conversation, and the assurances and knowledge, it is a
knowledge, it's not that we are thinking about it and scratching our
heads, it is the knowledge that the Harberts, specifically Billy
Harbert is behind this, is something that cannot be forgotten.
Whether or not it is addressed depends entirely on the fact that if
you do address it that you are entitled to a huge compensation. I
understand why you do not want to address it and I am not in any
way taking a position that you Congressman Hilliard need to join
our suit, I certainly understand the risk involved in a place like
Birmingham. I come often to Birmingham...risking innocent
grandchildren lives perhaps that should be the priority. It is your
call and I respect it, but the fact that Billy gets away again, it
doesn't help, but you can't be the social police at the expense of
your family's security. I take it that you made that decision and it
is final.

**Congressman Hillard**: Well, I think that's it. It takes so much away from you in

Page One

Partial Transcript between Congressman Earl Hilliard and Dr. Hoda Elemary

terms of your resources and we are a small family (legal) firm trying to get back on our feet. I was knocked out of service for a good year. It's been a year and a half since the accident and I'm still struggling with medical bills and I'm still creating them because I'm still have therapy. I can't protect myself the way I used to. And I definitely don't want any problems for my family.

**Dr. Elemary:** That is understandable...you have never met him (Billy Harbert)?

**Congressman Hilliard:** A looong time ago.

**Dr. Elemary:** Did you meet with him?

**Congressman Hilliard:** Yes, I did.

**Dr. Elemary:** If this happens to you then what's left of a nation that upholds the laws. If it happened to an ordinary guy you can say that's life in various parts of the world. But, a Congressman of The United States should not have to go through what you went through. Well, are you, are you then forgiving Billy, or what's your position I don't know if I am turning you into a Christian . I don't know if that was what was intended by forgiveness. Well, I don't know, <u>**are you trying to forgive him**</u> (Billy Harbert)?

**Congressman Hilliard:** <u>**Well, I'm just trying to keep it out of my mind. You know it is hard to forgive and forget**</u>. But when you are sick and still have pains and hurt every now and then,

Page Two

1   Partial Transcript Between Congressman Earl Hilliard and Dr. Hoda Elemary

2   **Congress Hilliard:**          **you forget about it and try to keep your mind**

3                                   **off of that and try not to even deal with the**

4                                   **situation,** because you know your just trying to get

5                                   well.  You always feel that once you get well you

6                                   can handle anything that comes your way.

    **Dr. Elemary:**                I am sorry for what happened and I'm sorry that I

7                                   was indirectly responsible.  You understand I had

8                                   no role in what happened to you, but I introduced

9                                   you to the (Harbert) situation.

10  **Congressman Hilliard:**       No one can blame you.

11  **Dr. Elemary:**                I appreciate that, but it weighs heavy on my

12                                  conscience when I think of the fact that this

13                                  happened to you because I guess I brought Bill

                                    Harbert one day to your office.

14

15

16

17

18

19

20

21

22

23

24

25

Page Three

# [ubiqus]

# MR. BILL L. HARBERT
# & DR. HODA ELEMARY

## Audio Transcription
## Track 2

## Telephone conversation frolabeled -
## "Bill 5-16-07"m an audiocassette tape

22 Cortlandt Street, Suite 802, New York, NY 10007
Tel : 212-227-7440 - Fax : 212-227-7524 - EIN# 13-2791733

# [ubiqus]

# Transcription
# Translation
# Interpretation



The Scribe
2620 BC



Ubiqus provides a full range of transcription, translation and interpretation services. Our core values match your needs: timeliness, accuracy and a relentless attention to detail.

Ubiqus has more than 10.000 clients around the world and has been in business for 15 years.

Our clients include corporations, meeting planners, government agencies, hospitals and law firms. We offer our services nationwide, with offices in New York and Northern and Southern California. We can also work with you on your European projects, thanks to our presence in London and Paris.

**w w w . u b i q u s . c o m**

[ST⌣ TRACK 2]

BILL L. HARBERT:  Hello.

DR. HODA ELEMARY:  Hello darling, how are you?

MR. HARBERT:  Fine.

DR. ELEMARY:  Bill, this is Hoda.  Can you hear me well?

MR. HARBERT:  Yeah, I can hear you.

DR. ELEMARY:  I mean, of course, you know, who I am but I haven't spoken to you for a couple of days.  Have you had much thought with respect to this terrible $88 million verdict that came out in Washington on the false claims case?

MR. HARBERT:  No I haven't. I know about it, but I haven't thought about it.

DR. ELEMARY:  You know about it, yes, we talked; I think we talked; actually we talked Monday after it came out.  You know, I've heard that you're not getting all your information and you really should get your letters and stuff like that.  I mean they should not, you know, just isolate you or just, monitor your letters

and stuff like that.  They should let things

come through to you.

MR. HARBERT:  As far as I know.

DR. ELEMARY:  What, I can't hear you baby.

MR. HARBERT:  I do as far as I know.

DR. ELEMARY:  Well there are some things

they kind of take their time and they kind of

edit it a little bit.  And, you know, I've

always felt that that's not a fair way to treat

anybody.  I mean if it's addressed to Bill L.

Harbert, you should really get that stuff, so.

But darling I wanted to tell you I've been

bombarded by **Roger (Goldman)** and all these

people, they're going on about how upset you are

and so on.  And I know that's not true, you

know, but you're not in any way upset because

you have, I mean, we'll find some solution to

that $88 million.  I mean as it is the companies

are bankrupt and so on.  Are you feeling okay?

MR. HARBERT:  Oh yes. [Inaudible].

DR. ELEMARY:  Well you should but you

shouldn't over worry about it, that's the key

here.  **They are pushing a lot of stuff Bill and**

**the writing on your behalf and so on and so**

2    *forth, they are making a, all kind of stuff*

3    *that you instructed them that you did not want*

4    *to hear from me, which, you know, I don't know.*

5    *Is that true?*

6       *MR. HARBERT:  No.  [Inaudible]*

7       *DR. ELEMARY:  I can't hear you.*

8       *MR. HARBERT:  That's not true.*

9       DR. ELEMARY:  Well okay, then, you know, I

10   mean what we going to do about them?  I mean

11   between Bradley Arant and Roger, and that Levine

12   is really, you know, he lost everything.  I mean

13   he just—everything he ever said never happened.

14   Brian Lavine [phonetic].

15       MR. HARBERT:  Yes, I know.

16       DR. ELEMARY:  I mean is he—are you guys

17   happy with him or are you kind of fed up with

18   his?

19       MR. HARBERT:  I just don't worry about it.

20       DR. ELEMARY:  (Laugh) Well I like your

21   attitude Bill.  I've been very concerned about

22   Homer.  Has he been in touch with you?

23       MR. HARBERT:  Homer [inaudible]?

24       DR. ELEMARY:  Yes.

25       MR. HARBERT:  No [inaudible].

DR. ELEMARY:  Because I've put a call to

him, it's a concern of mine that he needs to

kind of deal with that issue that came up and,

you know, I don't know, what his disposition is.

But he's not getting along with Billy and that

doesn't help things.

So I don't know.  I've been talking to a

couple of people in the company and they are not

too happy with the verdict but, you know, that's

to be expected.

Did you hear what happened to Tommy?

MR. HARBERT:  Tommy who?

DR. ELEMARY:  Kitchens.

MR. HARBERT:  No.

DR. ELEMARY:  He came in to testify but they

won't let him testify.  I mean, you know, during

the trial.  The trial is over, of course.  But

they won't let him testify, which is, you know,

may be to your benefit that that happened.  But

it's neither here nor there Bill.

I am a little concerned about when you feel

that it's necessary to put an end to Levine

because he cannot continue to charge you money

when he delivered, you know, such a bad result.

2    I mean, you know, we've got to be honest Bill.

3        And I did have some attempt in communicating

4    with—and I let it be known, the issue regarding

5    Raymond (Harbert). You remember when Raymond

6    went on the stand, the witness stand and he said

7    "my uncle stole the business from me and so on

8    and construction business and, you know, he and

9    Tommy Kitchens cheated me and all that stuff".

10   I talked to you about it on Monday.

11       MR. HARBERT: Yes.

12       DR. ELEMARY: Yes. And I have been, you

13   know, making it very clear that, you know, this

14   kind of nonsense has got to stop. I mean I

15   don't know what his purpose of is. We've never

16   exposed each other publicly, you know. Let's

17   hope we keep it that way. I mean, you know,

18   it's sad that he is doing this. Don't you

19   agree? I mean it's.

20       MR. HARBERT: I agree with you.

21       DR. ELEMARY: There's a lot of issues that

22   are very unsettled because of that verdict. And

23   a lot of, people are—some are writing, you know,

24   running to hide for cover. Some are, you know,

25   riding a high horse, et cetera, et cetera, you

know.   And we've got to deal with this

realistically and I just wish Bill that you kind

of monitor whatever it is that Billy is doing.

Because, you know, Billy can get a little wild

once in a while.  So, you know, is Van

[phonetic] keeping an eye on things?

    MR. HARBERT:  I think so.

    *DR. ELEMARY:  Well I don't know.  I'm also*

*wondering Bill if I should just ignore those*

*people that are saying, I should … you know,*

*that you instructed them, that you don't want to*

*hear from me and all that.  And that, you know,*

*they write me that you have a severe case of*

*dementia and, you know, you should not be*

*contacted.  I mean, you know, like they are*

*making you look like a classic, you know.*

    MR. HARBERT:  [Inaudible].

    DR. ELEMARY:  What?  I can't hear you.

    *MR. HARBERT:  Don't pay any attention.  I*

*don't know anything about that.*

    *DR. ELEMARY:  Yes, they are creepy.  I mean*

*they are getting into, you know, the issues of*

*our relationship and all of that and I just*

*don't think they should do that, do you?*

2        MR. HARBERT:  No not at all

3        *DR. ELEMARY:  I mean I just, you know, Bill*

4   *for 15 years we kept our thing very private and*

5   *sacred and, we have to just go ahead and have*

6   *attorneys, you know, just, going nuts on me over*

7   *nothing.*  I mean I think maybe Billy is

8   instructing them.  Do you think so?

9        MR. HARBERT:  [Inaudible]

10       DR. ELEMARY:  Huh?

11       MR. HARBERT:  I don't really know.

12       *DR. ELEMARY:  Yes, it is upsetting.  I am, I*

13  *mean Bill do you want me to kind of just divorce*

14  *you … and I mean is that what you want?  You*

15  *want me to just leave you alone?*

16       *MR. HARBERT:  No not at all*

17       *DR. ELEMARY:  You know, Bill, I mean we've*

18  *had quite, I mean you and I were a striking*

19  *couple when we were together.  We just took on*

20  *the House of Saud.  We've done this, we kind of—*

21  *did you get my card?  I'm back in the States now*

22  *but I was—in fact, you won't believe where I am.*

23  *I'm in Mobile, Alabama.  I'm going from Florida*

24  *to a place called Tunica, Mississippi, your*

25  *birth state.  Maybe if I run into Indianola*

AUDIO TRANSCRIPTION                                                    9

[phonetic] I'll, you know.

MR. HARBERT:   [Laughs]

DR. ELEMARY:   I'll stop and say a prayer,
you know.  Because I just think you need
strength and you'll be just fine.  I just think
a lot of people are just like, oh "Bill is this
and Bill is that".  I don't think there is
anything wrong with you.  And, you know, I've
always felt that and, you know, I mean, I just,
you know, you have been a wonderful, wonderful
person.  You by yourself, I mean.  People around
you are something else but you are just a top-
drawer person and I just won't let these people—
don't listen to them Bill.

MR. HARBERT:  No.

DR. ELEMARY:  You don't do you?

MR. HARBERT:  No.

DR. ELEMARY:  Good for you.  I mean it just—
it's such a short time that we have had since,
you know, we have—you were in control of
everything and now I guess Billy is in control
and I don't like it and you know that.  But, you
know, I don't think he's really in control.  I
just think he's doing his thing and if he can

2      *just st~ interfering with us, t~ngs will be*

3      *fine but that's becoming impossible.*

4          *I mean he's a—you know, I was asked by his*

5      *people, you know, they wanted to know about, the*

6      *marriage we had in Egypt and stuff. And, you*

7      *know, I wouldn't deal with them, you know. I*

8      *mean I'm not interested. Do you think I should*

9      *deal with Billy's people when they ask me*

10     *personal questions?*

11         *MR. HARBERT: No not at all. Don't say*

12     *anything.*

13         *DR. ELEMARY: Well it's over 15 years and I*

14     *kept this whole marriage thing secret but, you*

15     *know, and that's how long you asked me to keep*

16     *it secret. But Bill I'm not happy with the way*

17     *these attorneys are writing me, you know. Mr.*

18     *Harbert doesn't want you to contact* him and all

19     of that and he's incapable of this and that and

20     he has this.

21         And, you know, I think that's all wrong.

22     And I think you should just tell them to—well

23     I'm not going to tell you what to do but anyway

24     let me work some more on Raymond to get him

25     around and, you know. I mean that—he shouldn't

1

2    take the stand and fight you.

3        MR. HARBERT:  Okay.

4        *DR. ELEMARY:  You know, you remember the*

5    *good times we had Bill?*

6        *MR. HARBERT:  Oh yes.*

7        *DR. ELEMARY:  You remember Geneva and Paris*

8    *and...*

9        *MR. HARBERT:  Ya.*

10       *DR. ELEMARY:  You remember our union in*

11   *Egypt?*

12       *MR. HARBERT:  Yes.*

13       DR. ELEMARY:  Well you should really—you

14   want to go traveling to Europe?  I would love—

15   you want to go?

16       MR. HARBERT:  No I'm not traveling at all.

17   I quit that.

18       DR. ELEMARY:  You quit traveling?  Okay.

19   Well you take care of yourself Bill.  But I'm

20   mighty unhappy with these lawyers writing me all

21   that stuff.  But I'll try—would you like me to

22   send you what they write me or you don't want to

23   get upset with it?

24       MR. HARBERT:  [Inaudible]

25       DR. ELEMARY   Okay.  I'll handle it.

1

2       MR. HARBERT:  Okay.

3       DR. ELEMARY:  All right darling.

4       MR. HARBERT.  Okay.

5       DR. ELEMARY:  Bye.

6       MR. HARBERT:  Bye.

7        [END TRACK 2]

## C E R T I F I C A T E

I, Matt Williams, certify that the foregoing transcript of

Dr. Hoda Elemary was prepared using standard electronic

transcription equipment and is a true and accurate record.


Signature _____

Date _____ 6 -19- 07

DIANNE FEINSTEIN
CALIFORNIA



COMMITTEE ON APPROPRIATIONS
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND ADMINISTRATION

# United States Senate

WASHINGTON, DC 20510-0504

(202) 224-3841

May 27, 1999

The Honorable Amr Moussa
Minister of Foreign Affairs
Ministry of Foreign Affairs
Arab Republic of Egypt,

Dear Mr. Moussa:

 I am writing to ask you to provide me with a response concerning the Egyptian Government's position in ensuring that Ms. Hoda Elemary can travel safely in and out of Egypt at this time.

 The purpose of this request is not to question Egypt's sovereign privileges over Ms. Elemary. It is based on the vital services Ms. Elemary provides Congress, which have been determined to serve U.S. national interests. A majority of the United States Senators have overwhelmingly endorsed Ms. Elemary's work and have credited her with playing a pivotal role in lobbying the Congress to support Operation Desert Storm, as it did on January 12, 1991; forgive Egypt's $7 billion debt, as it did on October 19, 1990; and, undertake many supportive initiatives in favor of advancing the peace process and enhancing close relations between the United States and Egypt.

 I understand that she is the target of threats from political groups that oppose Egypt's cooperation with the U.S. and Israel. Because of her involvement in the Middle East peace process, I am requesting any information you may have concerning any political reasons that may prevent Ms. Elemary's safe return to the United States. I understand she will be traveling to Egypt in early June, 1999.

 I look forward to Your Excellency's response regarding Ms. Elemary's secured return to the United States from Egypt.

 With warmest personal regards.

Sincerely yours,

Dianne Feinstein
United States Senator

DF:rwh

# United States Senate
WASHINGTON, DC 20510-2803

July 21, 2000

Dona Coultice
Director, California Service Center
Immigration and Naturalization Service
Post Office Box 30014
Laguna Niguel, CA 92607

Dear Director Coultice:

I write today to request the expedition of Ms. Hoda Elemary's application for naturalization. Ms. Elemary (A# 72917452) is the founder of the Sadat Peace Foundation to Egypt, which advances the dialogue and cooperation between the United States and the people of the Middle East. She and the Foundation provide vital services of national interest to Congress, and I hope that you will give this request for expedition every serious consideration.

Ms. Elemary travels to Egypt and other countries in the Middle East on a variety of peace missions. Previous trips have required the assistance of the State Department and Members of Congress to ensure her safety and security. Expediting her naturalization application will provide her with the automatic protection of our embassies and consulates overseas, thereby promoting her peace missions and negating the need for additional assistance by the State Department and the Congress. An expedited review of her application takes on additional significance in light of the fact that Ms. Elemary is expected to travel to the Middle East again this fall.

On a more personal note, I understand that Hoda will be choosing my home State of Nevada as the first place that she will call home as an American citizen. I am proud that she has made this decision, and I look forward to calling her a fellow Nevadan in the very near future.

Should you have any questions or require additional information, please do not hesitate to call Eddie Ayoob of my staff at (202) 224-3542. Thank you for your assistance in this matter.

With all best wishes,

Sincerely,

HARRY REID
United States Senator

E-Mail: senator_reid@reid.senate.gov
Web: http://reid.senate.gov

PRINTED ON RECYCLED PAPER

ORRIN G. HATCH
UTAH

WENDY J. HIGGINBOTHAM
ADMINISTRATIVE ASSISTANT

135 Russell Senate Office Building
Telephone (202) 224-5251
TDD (202) 224-3649

# United States Senate
### WASHINGTON, DC 20510-4402

January 25, 1995

Mr. Joseph L. Thomas
Immigration and Naturalization Service
Western Service Center
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677-8111

Dear Mr. Thomas:

I am writing on behalf of Mrs. Hoda Elemary, who I understand has filed a National Interest Petition with the INS.

Mrs. Elemary is the founder and executive director of the Sadat Peace Foundation, named for the late Egyptian President Anwar Sadat, whose historic contributions to Middle East peace and stability the Foundation is committed to advancing. I first met Mrs. Elemary in 1988 and I have been a supporter of the Foundation and its efforts to promote dialogue and cooperation between the U.S. and the states of the Middle East.

Mrs. Elemary has worked with members of both parties to support bipartisan goals of strong U.S. diplomatic and economic relations with Israel and the moderate Arab nations of the Middle East. Through the Foundation, she has convened conferences in Washington as well as helped to organize a congressional delegation visit to the Middle East in 1990. Unfortunately, I am told that, because of her support for U.S. relations with the governments in the Middle East, she now has reason to fear fundamentalist forces who have demonstrated their ability to destroy those dedicated to open and moderate approaches to the Middle East's problems.

By dedicating herself to furthering Anwar Sadat's aims of a peaceful and stable Middle East, Mrs. Elemary has also served U.S. interests. For this reason, I believe her petition should be awarded favorable consideration.

Sincerely,

Orrin G. Hatch
United States Senator

OGH:pmm

**United States Senate**

WASHINGTON, DC 20510-4402

JUDICIARY
FINANCE
INDIAN AFFAIRS
JOINT TAXATION
OFFICE OF TECHNOLOGY
ASSESSMENT BOARD

October 30, 1996

Ms. Hoda Elemary
Executive Director
The Sadat Peace Foundation, Inc.
271 Madison Avenue, Suite 908
New York, New York  10016

Dear Hoda:

Congratulations on the latest initiative by the Sadat Peace Foundation, the Sadat-Rabin Peace Process Symposium Series, inaugurated last month and set to run for the next year.  Once again, your Foundation promotes the virtues of its namesake, who should always be remembered for the courage he demonstrated by rejecting conventional notions of diplomacy and instead taking great risks to advance new approaches to settling conflict in the Middle East.

Many people have lost their lives since President Sadat died in his noble pursuit.  All efforts to permanently replace violence with dialogue must be lauded, and I commend the Sadat Peace Foundation's contribution toward that worthy goal.

Sincerely,

Orrin G. Hatch
United States Senator

OGH:pmm

# United States Senate

### WASHINGTON, DC 20510

November 9, 2001

The Honorable Tom Ridge
Director of Homeland Security
The White House
Washington, DC 20500

Dear Governor Ridge:

We are writing on behalf of Hoda Elemary, the President of the Sadat Peace Foundation, to urge you or your staff to meet with Ms. Elemary to discuss the current situation in the Middle East, and a possible diplomatic and educational initiative to reach out, engage, and neutralize Muslim fundamentalists who support terrorism.

We have known Ms. Elemary for many years, during which time she has offered important services to the U.S. Congress, including building support in the Arab world for Operation Desert Storm and in bettering U.S.-Egyptian relations. The Sadat Peace Foundation seeks to build on the legacy of President Sadat's work and is dedicated to peace in the Middle East.

Given the current crisis facing the world community in combating terrorism, Ms. Elemary has asked us to intercede on her behalf and facilitate a meeting with your office to discuss these matters.

Our thanks for your consideration. Please know that you have our support in your efforts to protect U.S. national security and the lives and safety of American citizens.

Sincerely,

Dianne Feinstein

Carl Levin

ORRIN G. HATCH, UTAH, CHAIRMAN

STROM THURMOND, SOUTH CAROLINA
ALAN K. SIMPSON, WYOMING
CHARLES E. GRASSLEY, IOWA
ARLEN SPECTER, PENNSYLVANIA
HANK BROWN, COLORADO
FRED THOMPSON, TENNESSEE
JON KYL, ARIZONA
MIKE DeWINE, OHIO
SPENCER ABRAHAM, MICHIGAN

JOSEPH R. BIDEN, JR., DELAWARE
EDWARD M. KENNEDY, MASSACHUSETTS
PATRICK J. LEAHY, VERMONT
HOWELL HEFLIN, ALABAMA
PAUL SIMON, ILLINOIS
HERBERT KOHL, WISCONSIN
DIANNE FEINSTEIN, CALIFORNIA
RUSSELL D. FEINGOLD, WISCONSIN

# United States Senate

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

February 14, 1995

Mr. Joseph L. Thomas
Immigration & Naturalization Service
Western Service Center
24000 Avilo Road, 2nd Floor
Laguna Niguel, CA 92677-6111

RE:  Expeditious Determination on National Interest Petition
     filed on behalf of Ms. Hoda Elemary - Receipt # WAC-95-085-
     50781

Dear Mr. Thomas:

     I am writing on behalf of Hoda Elemary, Executive Director
of the Sadat Peace Foundation, regarding the expeditious
determination of her National Interest Petition.

     According to Ms. Elemary, the economic work of the Sadat
Peace Foundation may be adversely affected by the continued delay
in determining her National Interest Petition.  In view of the
objectives of Ms. Elemary and the Sadat Peace Foundation of peace
and stability in the Middle East, I would appreciate your
according the request for expeditious determination all due
consideration.

     Thank you for your assistance in this matter.

                                   Sincerely,

                                   Arlen Specter

AS/ccw

**SENATOR ALAN CRANSTON**

27080 Fremont
Los Altos Hills, CA 94022
Tel:  415-948-6556
FAX:  415-948-6516

December 28, 1996

His Excellency President Hosni Mubarak
His Excellency Amr Mousa
Dr. Osama Elbaz
Abdeen Palace
Cairo, Arab Republic of Egypt

Dear Mr. President, Mr. Foreign Minister and Mr. Elbaz:

As a former United States Senator, I have known Ms. Hoda Elemary and her work for over ten years.  Ms. Elemary is the foundress and Executive Director of the Sadat Peace Foundation, Inc., an American organization that has played an invaluable role in the peace process and in motivating the goodwill expressed by the U. S. Senate towards Egypt.

Ms. Elemary met with me personally and with many other Senators in the Fall of 1990. Through her professionalism and personal conviction she helped convince some undecided Senators to support the United States' forgiveness of Egypt's $7 billion debt. Ms. Elemary was present on October 19, 1990 and witnessed the close vote on the Senate floor in favor of the position she espoused.  Consequently, several Senators acknowledged Ms. Elemary's role in helping to secure enough votes towards the forgiveness of Egypt's debt in 1990.  In January 1991, the Washington Post published the enclosed article in which the Sadat Peace Foundation encouraged members of Congress to vote in favor of Operation Desert Storm.  This article accurately provided members of Congress a visionary perspective that the Middle East peace process would be greatly enhanced following Operation Desert Storm provided Congress approved it.  Clearly, Ms. Elemary's vital efforts encouraged the United States government to play a pivotal role in the Middle East Peace process over the past few years.

To this end, I write to urge your government to notify me prior to Ms. Elemary's trip to Egypt on January 7, 1997, if there are any reasons whatsoever that would prevent Ms. Elemary from traveling in and out of Egypt in January 1997 to attend to personal business following her father's death this week.

With kind regards,

Alan Cranston
Enclosure

**BARBARA BOXER**
CALIFORNIA

COMMITTEE ON ENVIRONMENT
AND PUBLIC WORKS

COMMITTEE ON BANKING,
HOUSING, AND URBAN AFFAIRS

COMMITTEE ON THE BUDGET

# United States Senate

HART SENATE OFFICE BUILDING
SUITE 112
WASHINGTON, DC 20510-0505
(202) 224-3553

1700 MONTGOMERY STREET
SUITE 240
SAN FRANCISCO, CA 94111
(415) 403-0100

2250 EAST IMPERIAL HIGHWAY
SUITE 545
EL SEGUNDO, CA 80245
(310) 414-5700

525 B STREET
SUITE 000
SAN DIEGO, CA 82101
(619) 239-3884

2300 TULARE STREET
SUITE 130
FRESNO, CA 93721
(209) 457-5109

January 8, 1997

Dear Minister Al-Alfi:

I am enclosing a copy of Senator Alan Cranston's letter to His Excellency President Hosni Mubarek regarding one of my constituents, Ms. Hoda Elemary. Ms. Elemary has to return to Egypt to attend to family business matters following the recent death of her father, former Prime Minister Abdel Galeel Elemary. There is a great deal of concern over Ms. Elemary's perceived political views in opposition to terrorist groups.

In his letter, Senator Cranston describes Ms. Elemary's contributions to the Middle East peace process. For instance, she worked to encourage members of Congress to vote in favor of the forgiveness of Egypt's debt in 1990.

I certainly appreciate the Egyptian government's position with respect to its sovereign privileges over its citizens. The purpose of this request is not to question Egypt's sovereign privileges over Ms. Elemary. It is based on the vital services Ms. Elemary provides Congress, which have been determined to serve U.S. national interests.

I am requesting any information you may have concerning any political reasons that may prevent Ms. Elemary's return to the U.S. In view of the economic and strategic relationship between our two nations, I hope you will address my request on Ms. Elemary's case as the Egyptian government has done in previous special cases.

I look forward to Your Excellency's response regarding Hoda Elemary's secured return to the United States from Egypt.

Sincerely,

Barbara Boxer
United States Senator

His Excellency Hassan M. Al-Alfi
Minister of Interior
Arab Republic of Egypt

# HOWARD R. TEICHER

## BUSINESS CONSULTING & REPRESENTATION SERVICES

August 24, 1993

TO WHOM IT MAY CONCERN:

I have known Hoda Elemary during my tenure as Senior Director for Political-Military Affairs at the National Security Council and can attest to her unique contributions to the formulation of the United States government's policies in the Middle East. I first came in contact with Ms. Elemary when I approached the Sadat Peace Foundation on behalf of former President Ronald Reagan in order to discuss the interest of the president in the Foundation. President Reagan later signed a letter to the Foundation on January 28, 1985. A copy of his letter is enclosed.

In the ensuing years I have worked closely with Ms. Elemary and can further attest to fact that many of the initiatives undertaken by the Sadat Peace Foundation, initiatives described as crucial by several former U.S. presidents and senators, were the result of Ms. Elemary's creativity, hard work and perseverance. Ms. Elemary exhibits the rare ability to deal amicably with both U.S. and Middle East leaders to promote the goals of the Sadat Peace Foundation.

When I was first introduced to the Foundation, Ms. Elemary, with the help of former Canadian Ambassador James George and Madame Jehan Sadat, former First Lady of Egypt, had assembled a formidable Board of Directors that included former Presidents Jimmy Carter and Gerald Ford, Dr. Henry Kissinger, Ambassador Philip Habib, Mr. Edgar Kaiser, Jr. and Mr. Winthrop Rockefeller. Ms. Elemary also proved over the past eight years to be a most capable fund raiser securing financing from U.S. and European donors for the Foundation's economic and social programs.

Ms. Elemary's contributions to the education of the American public about Middle East issues are as important and valuable as her efforts to promote democracy in Egypt while strengthening the ties between the United States, Israel and Egypt, a peaceful relationship which serves as the cornerstone of American policy in the Middle East.

Howard R. Teicher

THE WHITE HOUSE

WASHINGTON

April 9, 1997

Warm greetings to everyone gathered in our nation's capital as the Sadat Peace Foundation honors the life and legacy of Prime Minister Yitzhak Rabin with the 1997 Anwar Sadat Peace Achievement Award. I am proud to join you in paying tribute to this great and good man, and I thank Lea Rabin, a woman of courage and conviction, for accepting this prestigious honor on behalf of her late husband.

Since the historic day when President Anwar Sadat first visited Jerusalem, men and women of goodwill around the world have shared a vision for the future of the Middle East -- a future of comprehensive peace and regional cooperation; a future where all people of the region live free of the shadows of hatred and hostility. Under the courageous leadership of Yitzhak Rabin, that vision of peace grew in strength and purpose.

The Sadat Peace Foundation's efforts to build on the legacy of President Sadat's work -- and now on the legacy of Prime Minister Rabin -- serve as an inspiration to all of us who are dedicated to peace. I commend your organization for its pragmatic approach to conflict resolution and its role as a forum for dialogue on key Middle East issues. Your efforts are deeply appreciated by all those who seek a lasting peace in the Middle East.

Today we have an opportunity to define the future of the Middle East in terms of hope and reconciliation rather than confrontation and violence. We must not permit that opportunity to slip from our grasp. I am confident that the Sadat Peace Foundation will continue its dedicated work to help realize our shared vision of peace. The United States will continue to be a full and active partner in this noble endeavor. Our success will mean a brighter future for the region and the world.

Best wishes for a memorable tribute.

Bill Clinton

**THE WHITE HOUSE**

WASHINGTON

**October 30, 1995**

Dear Hoda:

I am honored to receive the "Sadat Peace Achievement Award." In recent years, the nations of the Middle East have made great strides toward achieving the lasting peace Anwar Sadat sought. The United States supports this historic progress toward a lasting and comprehensive peace.

In this regard I respect the efforts of the Sadat Peace Foundation. President Sadat's legacy provides an inspiration of what can be accomplished when peace is pursued with courage and determination.

With best wishes for the Foundation's continued success.

Sincerely,

Bill Clinton

Ms. Hoda Elemary
Executive Director
The Sadat Peace Foundation, Inc.
227 East 56th Street, Suite 402
New York, New York 10022

THE WHITE HOUSE

WASHINGTON

July 25, 1995

Dear Mr. Chairman:

Thank you for writing about the Harbert case.
I appreciate that this has been a long and
difficult process. Ambassador Mabus has
worked hard to reengage the Saudi
authorities, and I hope his efforts will bear
fruit. We would like to see a prompt
resolution of this case.

Thanks again for letting me know your
thoughts on this case.

Sincerely,

Bill Clinton

The Honorable Alfonse D'Amato
United States Senate
Washington, D.C.  20510

# D'Amato Gets Message Across With Hold on Envoy to Riyadh

### By Thomas W. Lippman
#### Washington Post Staff Writer

In the late hours Friday before its recess for Independence Day week, the Senate confirmed the nomination of Raymond Mabus as U.S. ambassador to Saudi Arabia after Sen. Alfonse M. D'Amato (R-N.Y.) dropped his opposition.

By putting a hold on the nomination the day before, an aide to D'Amato said, "we got the State Department's attention to something the senator is very concerned about."

That "something" is a long-simmering dispute between members of Congress and the desert kingdom over treatment of U.S. businesses.

D'Amato and dozens of other senators and House members have been pressing the Saudis for at least three years to reconsider their rejection of multimillion-dollar claims by two U.S. corporations, but the Saudis have refused.

D'Amato wielded the blunt instrument of a "hold" on a key appointment not to criticize Mabus, a former Democratic governor of Mississippi who sailed through his confirmation hearing, but to register impatience with the Saudi Arabian ambassador, Prince Bandar Bin Sultan—and with the Clinton administration for its perceived failure to put enough heat on Bandar over the issue.

Holding up confirmation of ambassadorial nominees is a traditional Senate method of delivering foreign policy messages.

Members of Congress have said in repeated letters to Bandar and to Saudi King Fahd that they believe two U.S. corporations—an Alabama construction consortium and a New York engineering firm—have been treated unfairly and that they resent Saudi Arabia's refusal to reopen their cases.

"Three years after our nation led the fight to protect the sovereign integrity of the countries of the Persian Gulf, including Saudi Arabia, it is unacceptable that a close ally should fail to honor its commercial obligations to an American citizen," wrote Sen. Daniel K. Inouye (D-Hawaii).

"Ambassador Bandar and the government he represents continue to mock our requests for justice and fair play," Rep. Earl F. Hilliard (D-Ala.) complained in an April 20 speech.



**SEN. ALFONSE M. D'AMATO**
... U.S. business claims at issue

Robert H. Pelletreau, assistant secretary of state for Near East affairs, promised the House Foreign Affairs Committee two weeks ago he would raise the issue in a meeting with Bandar.

He has since done so, a State Department official said, although no change in the Saudi position is apparent. An aide to D'Amato said the senator received no promises from Bandar or from the State Department but "will follow their progress closely."

The Saudis have told Congress repeatedly the claims are not justified. The companies pressed their claims through Saudi Arabia's legal system, disliked the results and are trying unfairly to overturn the outcome, according to Bandar and to Washington lawyer Frederick G. Dutton, who represents the Saudi Embassy.

In a March 11 letter to House members, Bandar said it "serves no purpose to continue engaging in discussions about fairness of another nation's courts after one has availed oneself of them, obtained the judgment and collected the judgment," referring to partial settlement one of the companies decided to accept.

Members of Congress, however, have told the Saudis they believe the Saudi legal process was corrupt. They cite an affidavit given to a U.S. diplomat in Saudi Arabia by a member of a Saudi claims consulting firm saying the minister of agriculture threatened to "exert his influence to destroy" the firm if it validated one of the claims in

There is "undisputed evidence" implicating the minister of agriculture in putting pressure on the consultants, 37 members of Congress complained in a January 1992 letter to King Fahd.

The United States and Saudi Arabia agreed in 1992 on a "special claims process" to resolve disputes between U.S. companies and Saudi Arabia. Such disputes proliferated in the 1980s as Americans rushed to obtain development contracts there, only to find the Saudis difficult business partners who frequently jailed foreigners over business disputes.

The only two claims not settled by the 1992 process are the ones that led to the hold on the Mabus nomination.

One involves Harbert-Howard Cos., the Alabama firm, which claims the ministry of agriculture refused to pay $13.8 million owed for work done in the late 1970s.

After the claim was processed in the Saudi legal system, Harbert-Howard was paid $6.8 million. Saudi Arabia said that settled the case, but Harbert argues—and several members of Congress say the evidence shows—that government pressure corrupted the proceedings.

The second claim involves the New York firm Gibbs & Hill Inc., which says it "sustained losses resulting in its demise after the Saudis failed to pay" in full for work on a desalination plant at the port of Yanbu in the early 1980s. Gibbs & Hill puts the "current value" of its claim at $44 million.

Clinton has praised the Saudis for their commitment to spend billions to acquire U.S.-made aircraft and communications equipment, and Democrats have appeared reluctant to exert public pressure on the administration over the claims issue.

Some members of Congress and supporters of the claimants have said they think such commercial considerations have caused the administration to be less than vigorous in trying to persuade the Saudis to reconsider.

In a June 10 letter to Bandar, D'Amato said he was "very concerned that American companies may learn of the difficulties faced by firms such as these and become reluctant to do business in Saudi Arabia, depriving

ALFONSE M. D'AMATO
NEW YORK

# United States Senate
WASHINGTON, DC 20510-3202

July 6, 1995

President Bill Clinton
The White House
Washington, D.C. 20500

Dear Mr. President

Last year, you might remember, Assistant Secretary of State
for Near East and South East Asia Affairs, Robert Pelletreau,
requested me to lift a hold I placed on the nominee for Ambassador
to Saudi Arabia, Raymond E. Mabus, Jr., to help focus attention on
the plight of U.S. claimants there. Assured there would be
progress on the issue, I agreed to lift the hold. The State
Department's commitment was later reaffirmed by Ambassador Mabus to
one such claimant, Bill L. Harbert of Harbert-Howard Co. Despite
Ambassador Mabus' commitment, no results have been provided by the
State Department to date.

It is of concern to me that the Saudi government has been
allowed to evade Congress' wishes in this regard as expressed in
various pieces of legislation since 1992 as well as repeated joint
letters to the Saudi government signed by a majority of the members
of Congress. I have specifically requested and continue to
request, the fair resolution of this claim in Saudi Arabia
concerning Harbert-Howard Cos.' case. Thank you for your help in
this important matter.

Sincerely,

Alfonse M. D'Amato
United States Senator

AMD:gjr/jrf

Newport Orthopedic Institute
PO Box 2597
Newport Beach, CA
92659
Phone:(949) 722- 7038 Ext.3604
Fax: (949) 630- 4935



**N E W  O R T**
**ORTHOPEDIC INSTITUTE**

Elemary, Hoda A.
132335
06/28/2006

Hoda is a young lady I saw over a year ago. She had an injury when she was accosted at home and was pushed down and had a minimally displaced scapular fracture. I have not seen her in over a year. She presently states she has a therapist coming 3 times a week to her home, and she swims. She complains of a radicular pain in her shoulder, sort of in her axilla area, and running down her arms with certain motions. It comes and goes. She says when she does a back stroke in swimming, it bothers her.

**PHYSICAL EXAMINATION:** Her range of motion is not 100% but almost 90% of normal. She is just worried and wondering when this pain in her arm will get better.

**RADIOGRAPHIC EXAMINATION.** No x-rays were taken today.

**TREATMENT PLAN:** I feel probably her scapular fracture has healed, and the complaints she states are secondary to the trauma she had. At this time, no formal workup was done including neurological evaluation or MRI, which I am not sure would be beneficial at this time, but these symptoms began at the time of her injury and have not gone away.

Alexander H. Tischler, MD

AHT:pb/lm



ראש הממשלה
**Prime Minister**

September 13, 2001
כ״ה אלול, תשס״א

Dear Dr. Elemary,

I admire and support the Sadat Peace Foundation's mission and refreshing perspective on key issues confronting the peace process today. Their willingness to help promote cooperation between Israel and its Arab neighbors is both commendable and necessary.

Today, as we strive to bring an end to the violence, in the hope of advancing toward peace, I recall the late Anwar Sadat's speech to the Knesset on November 20, 1977, and offer my enthusiastic support for the Foundation's endeavors to realize his vision of peaceful coexistence and enhanced economic cooperation.

Your efforts to return civility to the Arab-Israeli dialogue and your steadfast devotion to the cause of peace in the Middle East, are laudable and welcome.

Sincerely,

Ariel Sharon

Ariel Sharon

Dr. Hoda Elemary, President
Sadat Peace Foundation, Inc.
67 Wall Street, Suite 2211
New York, NY 10005
U.S.A.

Jerusalem, Israel